### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

_____
                       )
**In re: CREDIT SUISSE-AOL**  )    **Civil Action No. 02cv12146-NG**
      **SECURITIES LITIGATION**  )
_____)
**GERTNER, D.J.**

TABLE OF CONTENTS
### MEMORANDUM AND ORDER RE: CLASS CERTIFICATION
September 26, 2008

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . -1-

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

III.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . -4-
        A.   Standard . . . . . . . . . . . . . . . . . . . -4-
        B.   Rule 23(a) . . . . . . . . . . . . . . . . . . -9-
            1.   Numerosity . . . . . . . . . . . . . -9-
            2.   Commonality . . . . . . . . . . . . -10-
        C.   Rule 23(b) . . . . . . . . . . . . . . . . . -17-
            1.   Affiliated Ute . . . . . . . . . . -18-
            2.   Basic . . . . . . . . . . . . . . . -22-
                a.   Market Efficiency . . . . . . -23-
               b.   The Application of *Basic* to Analyst
                    Cases . . . . . . . . . . . . -25-
            3.   Superiority . . . . . . . . . . . . -33-

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . -34-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————— )
                                )
In re: CREDIT SUISSE-AOL        )    Civil Action No. 02cv12146-NG
       SECURITIES LITIGATION    )
———————————————————— )
GERTNER, D.J.

## MEMORANDUM AND ORDER RE: CLASS CERTIFICATION
September 26, 2008

## I.    INTRODUCTION

The court-appointed lead plaintiff, the Bricklayers and
Trowel Trades International Pension Fund ("plaintiff" or "Fund"),
brought this putative class action private securities fraud suit
on behalf of purchasers of shares of AOL Time Warner, Inc.
("AOL") between January 12, 2001, and July 24, 2002 (the "class
period").  The suit is against Credit Suisse First Boston (USA),
Inc. ("CSFB-USA"), an integrated investment bank, and Credit
Suisse First Boston, LLC, a wholly-owned subsidiary ("CSFB" or
"Credit Suisse"), as well as four individuals employed at Credit
Suisse (collectively "defendants") for allegedly issuing
misleading public analyst reports touting AOL stock.  The Second
Amended Consolidated Class Action Complaint (document # 92)
asserts two counts:  Count I alleges that Credit Suisse and
individual defendants James Kiggen and Laura Martin made material
misstatements and omissions in violation of section 10(b) of the
Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §
78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §

240.10b-5; Count II alleges that CSFB-USA, Credit Suisse, and individual defendants Frank Quattrone and Elliot Rogers acted as "control persons" in violation of section 20(a)of the Exchange Act, 15 U.S.C. § 78t(a).  Plaintiff has moved for class certification and for appointment of the Fund as class representative.  For the reasons that follow, Lead Plaintiff's Motion for Class Certification (document # 144) is **GRANTED.**

## II.  <u>FACTS</u>

The allegations in this case were already described in detail in the Court's decision of December 7, 2006, <u>In re Credit Suisse-AOL Sec. Litig.</u>, 465 F. Supp. 2d 34 (D. Mass. 2006) (hereinafter "<u>Credit Suisse I</u>").  On January 11, 2001, in one of the largest mergers in corporate history, America Online, Inc. and Time Warner, Inc. became a single corporate entity, AOL Time Warner, inc. ("AOL"), bringing under one roof "old" and "new" media.  AOL common stock began trading on the New York Stock Exchange the next day.

Credit Suisse's investment analysts covered AOL from its inception and issued its first research report on January 12, 2001, which announced the merger and contained a "buy" rating. Individual defendants James Kiggen and Laura Martin authored the report, along with two other analysts at Credit Suisse.  Between January 2001 and January 2002, Credit Suisse issued a total of thirty-five public analyst reports.

At root, plaintiff claims that defendants

> issued thirty-five research reports in which
> they promoted AOL and encouraged investors to
> purchase its stock without revealing their
> knowledge of adverse information about AOL or
> their true beliefs about the company's
> precarious financial condition, beliefs and
> information which they intentionally withheld
> from the investing public.  In fact,
> Plaintiff asserts that instead of providing
> unbiased, independent research on AOL to
> investors, as they were supposed to do, the
> Defendants were motivated to issue reports
> containing false and misleading information
> by their eagerness to win AOL's lucrative
> investment banking work.[1]
>
> As a result of the dishonest and misleading
> reports filed by [Credit Suisse], AOL's stock
> price was inflated at the beginning of the
> class period and then proceeded to lose value
> as negative financial information finally
> reached the market from other sources and
> undermined [Credit Suisse's] projections.  At
> the end of the class period, revelations in
> the Washington Post about alleged accounting
> gimmickry and the disclosure of an SEC
> investigation of these accounting practices
> resulted in a second decline in the value of
> AOL's stock.

Id. at 37.

Plaintiff filed its original complaint on November 1, 2002.

In June 2003 the Court consolidated a number of cases under a

single docket number, appointed the Fund as lead plaintiff, and

approved the Fund's choice of counsel.  Plaintiff filed a Second

_____

[1] For example, in one email, defendant Martin allegedly stated:  "What's
important that I don't say in my earnings preview is that the national ad
market is much weaker than 5 weeks ago."  Second Am. Compl. ¶ 17 (document #
92).  There is similar evidence pertaining to analysts' knowledge of layoffs
and an investigation into accounting improprieties at AOL.

Consolidated Amended Class Action Complaint in December 2005 and
defendants filed motions to dismiss shortly thereafter.  The
Court denied the motions to dismiss in December 2006.

## III. **DISCUSSION**

### A.    **Standard**

The Fund now seeks certification of the following class
pursuant to Fed. R. Civ. P. 23(a) and (b)(3):[2]

> All persons who purchased shares of AOL
> common stock from January 12, 2001, through
> July 24, 2002, inclusive, and who were
> damaged thereby.  Excluded from the class are
> defendants, including CSFB-USA, including any
> director, officer, subsidiary, or affiliate
> of CSFB or CSFB-USA; AOL and officers and
> directors of AOL; any entity in which any
> excluded person has a controlling interest;
> and their legal representative, heirs,
> successors, and assigns.

Pl.'s Mem. 1 (document # 145).  Rule 23(a) requires a plaintiff
seeking class certification to show that 1) the class is so
numerous that joinder of all members is impracticable; 2) there
are questions of law or fact common to the class; 3) the claims
or defenses of the representative parties are typical of the

---

[2] Plaintiff's underlying claim arises under Rule 10(b) of the Exchange
Act, which prohibits the "use or employ[ment of] . . . any manipulative or
deceptive device or contrivance in contravention of such rules and regulations
as the Commission may prescribe as necessary or appropriate in the public
interest or for the protection of investors." 15 U.S.C. 78j(b).  Commission
Rule 10b-5, promulgated under Section 10(b), "forbids, among other things, the
making of any 'untrue statement of material fact' or the omission of any
material fact 'necessary in order to make the statements made . . . not
misleading.'" Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005) (quoting
17 C.F.R. § 240.10b-5).  "The courts have implied from these statutes and Rule
a private damages action, which resembles, but is not identical to, common-law
tort actions for deceit and misrepresentation." Id.

claims or defenses of the class; and 4) the representative
parties will fairly and adequately protect the interests of the
class.  These requirements are commonly referred to as
"numerosity," "commonality," "typicality," and "adequacy."

In addition to the requirements of Rule 23(a) the plaintiff
must also meet at least one of the requirements enumerated in
Rule 23(b).  In the instant case, the relevant subsection, Rule
23(b)(3), requires the plaintiff to show "predominance," i.e.
that "the questions of law or fact common to the members of the
class predominate over any questions affecting only individual
members," and "superiority," i.e. "that a class action is
superior to other available methods for fair and efficient
adjudication of the controversy."

Here, the requirements of numerosity, commonality, and
superiority are not seriously contested.  Thus, class
certification will largely turn on the questions of typicality,
adequacy, and predominance.  Defendants argue that because of
plaintiff's delayed correction of certain information contained
in a statutorily required certification -- which, they assert,
suggests that the Fund may have actually received a net benefit
from the alleged fraud during the class period -- the Fund is
neither typical nor adequate to serve as the class
representative.  The second and more pressing issue concerns
whether plaintiff has satisfied the predominance requirement by

establishing a class-wide presumption of reliance under either
Affiliated Ute v. United States, 406 U.S. 128 (1972), or Basic,
Inc. v. Levinson, 485 U.S. 224 (1988), in order to obviate the
need for proving reliance on a case-by-case basis.  For reasons
described below, it is clear to the Court that the "fraud-on-the-
market" doctrine enunciated in Basic, which requires the
plaintiff to show that the securities at issue traded on an
informationally efficient market, provides the proper analytical
framework for this case.  A derivative question is 1) whether, in
order to invoke the Basic presumption in a case involving
statements of stock analysts as opposed to stock issuers,
plaintiff must also make some evidentiary showing that
defendants' reports actually affected AOL's market price and, if
so, 2) whether it has met that burden here.

     In a handful of recent cases, the First Circuit has provided
district courts with guidance as to the proper level of scrutiny
to be applied to class certification, specifically in cases where
plaintiff relies on the fraud-on-the-market presumption of
reliance to overcome the necessity of proving reliance on a case-
by-case basis.  Of particular importance are the Court's
pronouncements on the extent to which a district court should
delve into facts that do not appear on the face of the
plaintiff's complaint in order to resolve class certification
issues.

As a starting point, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003) (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)). In conducting its analysis, a district court is "entitled to look beyond the pleadings in its evaluation of the applicability of the fraud-on-the-market presumption of reliance, and its resolution of the class-certification question." In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 6 (1st Cir. 2005); accord In re Xcelera.com Sec. Litig., 430 F.3d 503, 512 (1st Cir. 2005). Although this inquiry may overlap with the merits of the case, courts nonetheless must take care not to allow the defendant to turn the class-certification proceeding into an unwieldy trial on the merits." Polymedica, 432 F.3d at 17. This admonition has particular resonance in this case.

In In re New Motor Vehicles Canadian Export Antitrust Litigation, 522 F.3d 6 (1st Cir. 2008), the First Circuit reaffirmed its holdings in PolyMedica and Xcelera and held that "when a Rule 23 requirement relies on a novel or complex theory as to injury . . . the district court must engage in a searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed." New Motor Vehicles, 522 F.3d at 26. However, the court clarified that the

scope of the "searching inquiry" is limited to those questions that implicate the claim's amenability to class action treatment: "In short, 'a court has the power to test disputed premises [at the certification stage] <u>if and when the class action would be proper on one premise but not another</u>.'" New Motor Vehicles, 522 F.3d at 17 (quoting <u>Tardiff v. Knox County</u>, 365 F.3d 1,4-5 (1st Cir. 2004)) (emphasis added).  Thus, inquiry into the underlying merits of a case is only appropriate to the extent the merits overlap with the Rule 23 criteria.  <u>New Motor Vehicles</u>, 522 F.3d at 24.

The requirement that courts perform a "searching inquiry" at the class certification stage serves an important function: ensuring that class certification does not allow plaintiffs to unfairly bully defendants into settling "non-meritorious cases in an effort to avoid both risk of liability and litigation expense." <u>New Motor Vehicles</u>, 522 F.3d at 8 (citing, inter alia, <u>Tardiff</u>, 365 F.3d at 3).  That said, investors seeking damages for violations of federal securities are often considered the prototypical class action plaintiffs.  See <u>Grace v. Perception Tech. Corp.</u>, 128 F.R.D. 165, 167 (D. Mass. 1989) ("There is little question that suits on behalf of shareholders alleging violations of federal securities laws are prime candidates for class action treatment. . . ."). Additionally, "an erroneous failure to certify a class where individual claims are small may

deprive plaintiffs of the only realistic mechanism to vindicate meritorious claims." New Motor Vehicles, 522 F.3d at 8.

**B.    Rule 23(a)**

    1.    **Numerosity**

Numerosity is not contested. Nonetheless, in light of the First Circuit's instruction to conduct a searching inquiry the Court will address each requirement of Rule 23(a) in sequence. See Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 258 n.16 (D. Mass. 2005). In order to satisfy Rule 23(a)(1)'s numerosity requirement, plaintiff must demonstrate that the class is "so numerous that joinder of all members is impracticable." While plaintiff must do more than speculate as to the number of potential class members, however, it is not required to generate an exact number. See Swack, 230 F.R.D. at 258 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1762 (2004)). Plaintiff easily satisfies the requirement.

"[D]istrict courts may draw reasonable inferences from the facts presented to find the requisite numerosity." McCuin v. Sec'y of Health and Human Servs., 817 F.2d 161, 167 (1st Cir. 1987). Courts routinely find the numerosity requirement satisfied based on the number of shares outstanding and the average trading volume during the class period. See, e.g., Swack, 230 F.R.D. at 258; Grace, 128 F.R.D. at 167. Here, AOL's

total number of outstanding shares during the class period was
greater than 4.2 billion. Hakala Dec. ¶ 6 (document # 146). The
average daily trading volume during the class period was over 20
million shares, which represents a daily turnover rate of 0.5%
and a weekly turnover rate of 2.36%. Id. at ¶ 7. The volume of
shares traded and the rate of turnover during the class period
make joinder impracticable.

    **2.**   **Commonality**

Plaintiff also easily meets the commonality requirement. A
single common legal or factual issue can suffice to satisfy the
Rule 23(a)(2) requirement. Payne v. Goodyear Tire & Rubber Co.,
216 F.R.D. 21, 25 (D. Mass. 2003). The requirement of
commonality is "largely irrelevant" in cases such as this, where
the central question is not whether there are common questions of
law or fact -- which there clearly are -- but whether those
questions "predominate" within the meaning of Rule 23(b)(3).
See Swack, 230 F.R.D. at 259 (quoting Grace, 128 F.R.D. at 167).

In the instant case, plaintiff points to at least five
common questions of law and fact: 1) whether defendants' acts
and/or omissions violated federal securities law; 2) whether
defendants participated in and pursued the course of conduct
alleged in the complaint; 3) whether defendants' public
statements contained misrepresentations or material omissions; 4)
whether the market price of AOL common stock was artificially

-10-

inflated during the class period; and 5) what damages resulted.
Pl.'s Mem. 6-7 (document # 145).  Defendants do not contest
commonality; the requirement is clearly satisfied.

### 3.    Typicality and Adequacy

The requirements of typicality and adequacy tend to merge
and, therefore, are addressed jointly here.  See In re Monster
Worldwide Inc. Sec. Litig., 251 F.R.D. 132, 134 (S.D.N.Y. 2008).
The representative plaintiff satisfies the typicality requirement
when its injuries arise from the same events or course of conduct
as do the injuries of the class and when plaintiff's claims and
those of the class are based on the same legal theory.  See
Guckenberger v. Boston Univ., 957 F. Supp. 306, 325 (D. Mass.
1997).  Rule 23(a)(3), however, does not require that the
representative plaintiff's claims be identical to those of absent
class members.  Swack, 230 F.R.D. at 260.  The primary focus of
the typicality analysis is the functional "question of whether
the putative class representative can fairly and adequately
pursue the interests of the absent class members without being
sidetracked by her own particular concerns."  Id. at 264.

Adequacy demands a similar inquiry into whether the putative
representative plaintiff's interests are aligned with other class
members and whether the plaintiff is in a position to vigorously
protect the class' interests.  Rule 23(a)(4) requires a showing
that "the representative parties will fairly and adequately

-11-

protect the interests of the class."  The analysis has two steps:
The Court must determine, "'first, whether any potential
conflicts exist between the named plaintiffs and the prospective
class members, and, second, whether the named plaintiffs and
their counsel will prosecute their case vigorously.'"[3]
Guckenberger v. Boston Univ., 957 F. Supp. 306, 326 (D. Mass.
1997) (quoting In re Bank of Boston, 762 F. Supp. 1525, 1534 (D.
Mass. 1991)).  Both typicality and adequacy may be defeated where
the class representatives are subject to unique defenses which
threaten to become the focus of the litigation.  In re Salomon
Analyst Metromedia Litig., 236 F.R.D. 208, 213 (S.D.N.Y. 2006).
"Adequate representation is particularly important because of the
res judicata implications of a class judgment." Andrews v.
Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).

     Defendants argue that the Fund fails to satisfy both the
adequacy and typicality requirements.  At the center of
defendants' challenge are certain corrections made to the Fund's
2002 certification of its transactions in AOL stock during the
class period.  The Fund's original certification, filed pursuant
to the Private Securities Litigation Reform Act ("PSLRA"), 15
U.S.C. § 78u-4(a)(2)(A)(iv), stated that the Fund had made a
total of thirty purchases and eight sales of AOL stock during the
class period.  See Exh. 9 to Gesser Dec. (document # 154-10).

--------

[3] The first step largely overlaps with the typicality inquiry.

However, after filing a proof of claim in another action in 2006, the Fund corrected its certification in this action in March 2007. The corrected certification shows that the Fund made a total of thirty-two purchases and nineteen sales of AOL during the class period. Exh. 13 to Gesser Dec. (document # 154-14). Thus, according to the corrected certification, during the class period 1) the Fund sold more shares of AOL than it purchased, and 2) the value of the shares sold during the class period exceeded the value of the shares purchased. As such, defendants argue that the Fund is atypical of the class.

Plaintiff's status as a "net seller" does not automatically render its claims atypical. See Frank v. Dana Corp., 237 F.R.D. 171, 172-73 (N.D. Ohio 2006) ("[T]hough [plaintiff] may have been a net seller, it should have no trouble proving damages and, therefore, is qualified to serve as lead plaintiff."); In re NLT, Inc. Sec. Litig., 2006 WL 330113, at *10-11 (S.D.N.Y. Feb. 14, 2006). Moreover, the Fund has submitted evidence that it suffered significant losses during the class period[4] under either a first in, first out ("FIFO") accounting method or a last in, first out ("LIFO") method.[5] See Exhs. J & K to Rodon Dec.

_____

[4] Plaintiff also notes that its losses resulting from the transactions at issue were recognized in the settlement in In re AOL Time Warner Sec. & "ERISA" Litig., MDL Docket No. 1500, 02 Civ. 5575 SWK (S.D.N.Y.) ("In re AOL").

[5] "Courts have recognized two potential accounting methods when assessing gains/losses that result from the purchase and sale of securities. Under the First-in-First-Out ("FIFO") method, a party matches its first share sold with its first share purchased to determine the gain/loss. Each

(document # 162-7).  See In re eSpeed, Inc. Sec. Litig., 232
F.R.D. 95, 100-101 (S.D.N.Y. 2005) (identifying LIFO and FIFO as
the "two distinct accounting methods" for calculating losses;
finding LIFO to be the better method); Hill v. Tribune Co., 2005
WL 3299144, at *2 (N.D. Ill. Oct. 13, 2005) ("The current
majority view . . . is that securities fraud losses should be
calculated using LIFO."); SEC v. Bear, Stearns & Co., 2005 WL
217018, at *7 (S.D.N.Y. Jan. 31, 2005) (using LIFO rather than
FIFO to determine compensation amounts for stockholders suffering
losses during class period).  Indeed, according to plaintiff, the
additional transactions contained in the 2007 certification yield
"a modest increase" in plaintiff's estimated losses under either
calculation.  Pl.'s Reply 35 (document # 164).  Both the FIFO and
LIFO methods have been employed to calculate losses stemming from
securities fraud (though LIFO seems to be emerging as the
preferred method).  See Arenson v. Broadcom Corp., 2004 WL
3253646, at *2 (C.D. Cal. Dec. 6, 2004) (applying LIFO to loss
calculation at summary judgment; noting trend away from FIFO); In
re Chipcom Corp., 1997 WL 1102329, at *24 (D. Mass. June 26,
1997) (approving settlement using FIFO).

While defendants have cited cases stating that courts
generally prefer "net purchasers" to "net sellers" as

---

subsequent sale proceeds accordingly.  Under the Last-in-First-Out ("LIFO")
method, a party matches its first share sold with its most recent share
purchased to determine the gain/loss."  In re Comverse Tech., Inc. Sec.
Litig., 2007 WL 680779, at *7 n.10 (E.D.N.Y. Mar. 2, 2007).

representative plaintiffs, <u>see, e.g.</u>, <u>In re Goodyear Tire &</u>
<u>Rubber Co. Sec. Litig.</u>, 2004 WL 3314943, at *4 (N.D. Ohio May 12,
2004), there is scant support for the "netting" methodology they
propose; LIFO and FIFO are clearly the dominant methods for loss
calculation.[6] <u>See</u> John C. Coffee, Jr., <u>Reforming the Securities</u>
<u>Class Action: An Essay on Deterrence and Its Implementation</u>, 106
Colum. L. Rev. 1534, 1540 n.15 (2006).  Given the formulaic
nature of damages calculations in securities fraud cases, it is
unlikely that the issues raised by defendants will either cause
the Fund's interests to diverge from those of other class members
or be a major focus at trial.  Thus, defendants' argument does
not defeat typicality.

Likewise, the Court finds that the Fund satisfies the
adequacy requirement of Rule 23(a)(4).  Pointing to the Fund's
2007 correction of its original certification, defendants argue
that the Fund has failed to "perform the crucial responsibility
required of a class representative, directing and controlling the
litigation rather than unduly deferring to lead counsel."  <u>In re</u>
<u>Sonus Networks, Inc. Sec. Litig.</u>, 229 F.R.D. 339, 342 (D. Mass.
2005).  While plaintiff's late correction of its original
certification is less than ideal, it does not, as defendants
argue, wholly undermine the adequacy of the Fund to represent the

---

[6] In addition, determining the proper method of calculating losses is a
"pure question of law."  <u>Arenson v. Broadcom Corp.</u>, 2004 WL 3253646, at *1
(C.D. Cal. Dec. 6, 2004).

class.  It is clear to the Court that the Fund has taken an
active part in this litigation and has exercised adequate
supervision over counsel.  See Exh. H to Rodon Dec. 64, 82-86,
148-49, 179-80 (document # 164) (Rule 30(b)(6) witness stating
that he reviewed various documents, including certification).
There is also no evidence that the mistakes in the original
certification were made in bad faith.  See In re Sepracor, Inc.
Sec. Litig., 233 F.R.D. 52, 56-57 (D. Mass. 2005) (plaintiff not
inadequate where errors in previous filings were later
corrected).  But see Sonus Networks, 229 F.R.D. at 343 (plaintiff
inadequate representative where proposed class representative
signed certification even though he had never reviewed underlying
documents).  And the lack of supervision alleged by defendants
certainly does not rise to the level of the "sham" found by the
court in Monster Worldwide.[7]  251 F.R.D. 132, 136 (S.D.N.Y. 2008)
(finding plaintiff inadequate where Co-Chairman of plaintiff fund
knew nothing of the underlying case).  Put simply, "[t]he
arguments raised by defendants on adequacy are distractions."
DeMarco v. Robertson Stephens Inc., 228 F.R.D. 468, 471 (S.D.N.Y.
2005).  The Court is satisfied that the Fund's claims are typical

---

[7] Moreover, plaintiff has satisfied the Court that it took sufficient
care in choosing counsel and discussing a fee arrangement and that counsel is
sufficiently qualified and experienced to conduct the litigation.  See Exh. H
to Rodon Dec. 68, 72, 77 (document # 164) (Rule 30(b)(6) witness discussing
choice of counsel and fee issues).

of the class and that it will adequately represent the interests
of the class members.

C.    **Rule 23(b)**

Plaintiff must also meet at least one of the requirements of
Rule 23(b).  Here, plaintiff contends that it has sufficiently
shown that the "questions of law or fact common to the members of
the class predominate over any questions affecting only
individual members, and that a class action is superior to other
available methods for fair and efficient adjudication of the
controversy."  Fed. R. Civ. P. 23(b)(3).  "Under the predominance
inquiry, 'a district court must formulate some prediction as to
how specific issues will play out <u>in order to determine whether
common or individual issues predominate in a given case</u>.'"  <u>New
Motor Vehicles</u>, 522 F.3d at 20 (quoting <u>Waste Mgmt. Holdings,
Inc. v. Mowbray</u>, 208 F.3d 288, 298 (1st Cir. 2000)).

The basic elements of a securities fraud action under §
10(b) of the Exchange Act and Rule 10b-5 are: 1) a material
misrepresentation (or omission); 2) scienter, i.e., a wrongful
state of mind; 3) a connection with the purchase or sale of a
security; 4) reliance, often referred to in cases involving
public securities markets as "transaction causation"; 5) economic
loss; and 6) loss causation, i.e., a causal connection between
the material misrepresentation and the loss.  <u>PolyMedica</u>, 432
F.3d at 7 (citing, inter alia, <u>Dura</u>, 544 U.S. at 341).  As in

-17-

most securities fraud cases, the question of predominance here boils down to the element of reliance.

Whereas the remaining elements are easily amenable to common proof, reliance is typically proven on an individual basis. See id. In order to overcome the obstacle of having to prove individual reliance for all members of the putative class, the Supreme Court has identified two circumstances in which a class-wide presumption of reliance is appropriate. Under the doctrine enunciated in Affiliated Ute, plaintiffs are absolved from proving individual reliance where the defendant failed to disclose material facts which it had a duty to disclose. 406 U.S. at 153. The second circumstance occurs when there has been a material misrepresentation that results in a fraud on the market. See Basic, 485 U.S. at 248. The Basic presumption, however, only applies where there is an efficient informational market for the stock in question. Id.

Thus, the first question the Court must address is whether to apply the Affiliated Ute/omission framework or the Basic/misrepresentation framework.

### 1.   Affiliated Ute

The Court need not spend too much time dispensing with plaintiff's argument that it is entitled to the presumption of reliance under Affiliated Ute; for the reasons that follow, the Affiliated Ute presumption is not applicable here.

-18-

In Affiliated Ute, a Native American tribe formed a
corporation to manage the tribe's assets, which then issued stock
to Native American shareholders and designated a local bank as
its transfer agent.  406 U.S. at 135-40.  In their role as
transfer agents, the bank's assistant managers induced tribal
members to sell their shares at below-market rates.  Id.  Bank
officers purchased the shares themselves and then arranged sales
to non-Native American investors, for which they received
gratuities and commissions.  Id.  The bank failed to provide
shareholders with information regarding the true value of the
shares and the importance of retaining their shares, despite the
corporation's explicit request that the bank "discourage the sale
of stock of the Ute Distribution Corporation by any of its
stockholders and to emphasize and stress to the said stockholders
the importance of retaining said stock."  Id. at 145-46.

The Supreme Court found that the bank in Affiliated Ute had
an affirmative duty to disclose the higher resale value of the
stock to Native American shareholders and held that in such
circumstances the shareholders were not required to prove
individual reliance in order to prevail.  Id. at 153-54.  Where
the allegations involve "primarily a failure to disclose," the
Court held, "[a]ll that is necessary [to show reliance] is that
the facts withheld be material in the sense that a reasonable
investor might have considered them important in the making of

-19-

this decision." Id.  Thus, in order for the Affiliated Ute
doctrine to apply, the plaintiff must show that the defendant 1)
had a duty to disclose 2) a material fact but 3) failed to do so.
Id. at 152-53.

Plaintiff goes to great lengths to characterize its claims
as primarily involving defendants' omissions rather than
affirmative misrepresentations so as to fall within the ambit of
Affiliated Ute.[8]  Plaintiff's reasons for seeking application of
Affiliated Ute are plain:  The Affiliated Ute presumption
obviates the need to show that the market in which AOL stock
traded was efficient (as with the Basic presumption).  Here, the
Fund argues that defendants' duty to disclose the negative
information derived from its choice to speak in the first place:
where a defendant has chosen to speak, it must "speak honestly."
In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 427-28
(S.D.N.Y. 2003).

There is some support for plaintiff's argument.  See,
e.g., Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 186-87
(S.D.N.Y. 2005) (applying Affiliated Ute in analyst securities
fraud case).  Indeed, courts have generally characterized
Affiliated Ute as applying to cases primarily involving omissions

---

[8] The allegations include defendants failure to disclose 1) negative
trends in the national advertising market affecting defendants' revenue and
earnings estimates for AOL; 2) certain layoffs at AOL which were not publicly
announced; 3) the fact that AOL was under investigation; and 4) that AOL
engaged in inappropriate accounting activities which inflated revenues.

-- whereas <u>Basic</u> applies in cases involving affirmative misrepresentations -- and attempted to draw fine lines between omissions and misrepresentations. <u>See, e.g.</u>, <u>In re Salomon Analyst Metromedia Litig.</u>, 236 F.R.D. 208, 218-19 (S.D.N.Y. 2006); <u>Joseph v. Wiles</u>, 223 F.3d 1155, 1162 (10th Cir. 2000).

But the simple distinction between omissions and misrepresentations in fact provides an incomplete account of the Supreme Court's reasoning in <u>Affiliated Ute</u>. Certainly, the <u>Affiliated Ute</u> doctrine is necessary to overcome the evidentiary problem of proving reliance on a non-disclosure. <u>Metromedia</u>, 236 F.R.D. at 219. A reading of the case, however, suggests that the Court's application of the presumption of reliance turned as much, if not more, on the special relationship that existed between the Native American tribe and the bank in question. Indeed, the Court cited <u>Chasins v. Smith, Barney & Co.</u>, 438 F.2d 1167 (2d Cir. 1970), a case involving a stock brokerage's duty to a client whose account it handled, in support of its finding that bank had affirmative duty to disclose material information to the plaintiffs. <u>Affiliated Ute</u>, 406 U.S. at 153. Thus, it seems clear that <u>Affiliated Ute</u> applies to "omissions cases" only where there is a special affirmative "obligation to disclose" material information rather than merely a duty to speak truthfully.[9] <u>See</u>

---

[9] This, of course, is not to say that the omitted information is irrelevant: Rule 10b-5 forbids, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order <u>to make the statements made . . . not misleading</u>." 17 C.F.R. § 240.10b-

<u>DeMarco v. Lehman Bros., Inc.</u>, 222 F.R.D. 243, 248 n.2 (S.D.N.Y. 2004) (<u>Affiliated Ute</u> does not apply where the duty to disclose only arises from the duty to speak truthfully).  It is the reasonable ex ante expectation that material information will be forthcoming -- derived from a fiduciary relationship or some statutory or regulatory obligation -- that gives silence (which indicates maintenance of the status quo) its substance and makes it actionable.

In the instant case, defendants dealt with investors at arms' length, releasing their research reports to the public. They did not take on any special obligations as the defendants in <u>Affiliated Ute</u> did.  No special relationship existed between defendants and the public that would give rise to a reasonable expectation that material information would be disclosed; had they simply remained silent there would be no cause of action.[10] Thus, the <u>Affiliated Ute</u> framework is inapplicable here.

### 2.  **Basic**

More convincing is plaintiff's contention that it is entitled to a class-wide presumption of reliance pursuant to the fraud-on-the-market doctrine.  <u>See</u> <u>Basic</u>, 485 U.S. at 241-42.  In

---

5 (emphasis added).  Affirmative statements may only be called misleading to the extent that they omit or distort relevant truthful information.

[10] Indeed, all of the cases plaintiff cites in support of applying <u>Affiliated Ute</u> in this case, save <u>Fogarazzo</u>, involve close corporations, broker-client relationships, and other circumstances in which some sort of heightened fiduciary obligation exists.  <u>See, e.g.</u>, <u>Ansin v. River Oaks Furniture, Inc.</u>, 105 F.3d 745, 754 (1st Cir. 1997).

order to take advantage of the <u>Basic</u> presumption, plaintiff must demonstrate that the market for AOL common stock was an efficient one and that the market price of AOL stock fully reflected all publicly available information.  See <u>PolyMedica</u>, 432 F.3d at 14. "The fraud-on-the-market presumption of reliance and its relationship to market efficiency can . . . be reduced to the following syllogism: a) an investor buys or sells stock in reliance on the integrity of the market price; b) publicly available information, including material misrepresentations, is reflected in the market price; and therefore, c) the investor buys or sells stock in reliance on material misrepresentations." <u>PolyMedica</u>, 432 F.3d at 8; <u>see also</u> <u>Basic</u> 485 U.S. at 241-42 (quoting <u>Peil v. Speiser</u>, 806 F.2d 1154, 1160-61 (3d Cir. 1986)). Since the fraud-on-the-market presumption is rebuttable at trial, a party seeking to assert it "need only establish 'basic facts' in order to invoke the presumption of reliance." <u>PolyMedica</u>, 432 F.3d at 17, 19.

### a.   <u>Market Efficiency</u>

The determination of whether a market is efficient involves a mixed question of law and fact. <u>PolyMedica</u>, 432 F.3d at 4.  An efficient market is one "in which the market price of the stock fully reflects all publicly available information" and where the "market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of

such information." <u>Id.</u> at 19.  In determining whether the market

for a specific security is efficient, the First Circuit uses the

factors laid out by the court in <u>Cammer v. Bloom</u>, 711 F. Supp.

1264 (D.N.J. 1989): 1) the stock's average trading volume; 2) the

number of securities analysts that follow and report on the

stock; 3) the presence of market makers and arbitrageurs; 4) the

company's eligibility to file a Form S-3 Registration Statement;

and 5) a cause-and-effect relationship over time between

unexpected corporate events or financial releases and an

immediate response in stock price.  <u>Id.</u> at 1286-87; <u>see</u>

<u>also</u> <u>Xcelera</u>, 430 F.3d at 511.

Here, there is no dispute that the market for AOL stock was

efficient.  Plaintiff has provided sufficient evidence to satisfy

all of the <u>Cammer</u> requirements.[11]  The market for AOL stock

during the class period was the quintessential efficient market.

AOL was actively traded on the New York Stock Exchange and the

total number of outstanding AOL shares during the class period

was greater than 4.2 billion and the average daily trading volume

was over 20 million shares, representing a daily turnover rate of

0.5% and a weekly turnover rate of 2.36%.  Hakala Dec. ¶¶ 6, 7

(document # 146); <u>see</u> <u>Xcelera</u>, 430 F.3d at 514.  AOL was actively

covered by at least 20 analysts and had numerous market makers.

---

[11] While the First Circuit has noted that the <u>Cammer</u> factors are not
exhaustive, <u>see</u> <u>PolyMedica</u>, 432 F.3d at 18, there is no need to look beyond
them in the instant case as the efficiency of the market for AOL stock is
uncontested.

Hakala Dec. ¶¶ 5, 9 (document # 146).  AOL was also eligible to file Form S-3.  Id. at ¶ 10.  Most importantly, during the class period, AOL's stock price adapted quickly to new information. Stulz Dec. ¶ 23 (document # 153).  Indeed, defendants' own expert concedes that the market for AOL was efficient.  Id.  Thus, plaintiff has made a sufficient showing of market efficiency for purposes of invoking the fraud-on-the-market presumption.

### b.    The Application of *Basic* to Analyst Cases

In their challenge to class certification, defendants have retooled their argument, made first at the motion to dismiss stage, that the fraud-on-the-market presumption should not apply at all in securities fraud cases involving statements by research analysts as opposed to issuers of stock.  Here, they argue that because analyst statements are qualitatively different than issuer statements, class certification and the application of the Basic framework should be conditioned on an additional showing that the analyst reports at issue impacted the market price of AOL.  They further argue that plaintiff has failed to make such a showing.  The district courts that have addressed the question are split, and no circuit court has yet weighed in on the subject.  See, e.g., Swack, 230 F.R.D. at 268 (whether plaintiffs in analyst cases must make showing of market impact at class certification is an "open question"); Hevesi v. Citigroup, Inc.,

366 F.3d 70, 79-80 (2d Cir. 2004) (declining to decide the issue).

The courts that have required plaintiffs to make an additional showing of market impact have drawn on the distinction between issuer statements and analyst statements:

> [T]here is a qualitative difference between a statement of fact emanating from an issuer and a statement of opinion emanating from a research analyst.  A well-developed efficient market can reasonably be presumed to translate the former into an effect on the price, whereas no such presumption attaches to the latter. . . . As a result, no automatic impact on the price of a security can be presumed and instead must be proven and measured before the statement can be said to have 'defrauded the market' in any material way that is not simply speculative.

DeMarco v. Lehman Bros., Inc., 222 F.R.D. 243, 246-47 (S.D.N.Y. 2004).  In Lehman Bros., the court went on to hold that because of this "qualitative difference," plaintiffs in analysts cases seeking to invoke the Basic presumption at class certification must produce evidence that the analyst's statements "materially and measurably impacted the market price of the security to which the statements relate."  Id. at 247.

More recently, another court in the Southern District of New York came to the same conclusion in the wake of the Second Circuit's decision in Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.), 471 F.3d 24 (2d Cir. N.Y. 2006), which cast doubt generally on the applicability of the

Basic presumption in analyst cases.  In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig., 250 F.R.D. 137, 139 (S.D.N.Y. 2008).  Lantronix involved a claim similar to the one at bar: an analyst issued three allegedly misleading "buy" recommendations in exchange for Lantronix's IPO underwriting business.  Id at 137.  There, the Court conducted an in-depth analysis of the parties' competing expert reports and found that there were no statistically significant abnormal market returns following the issuance of defendants' reports.[12] Id. at 143.  Concluding that extension of the Basic presumption to analyst cases requires an additional showing of market impact, the court ultimately decertified the class.  Id. at 149.

Other courts, however, have declined to require any additional showing of market impact.  In DeMarco v. Robertson Stephens, for example, the court declined to adopt a higher class certification standard for analyst cases, holding that the scope of the class certification analysis is limited to the text of Rule 23.  228 F.R.D. 468, 475 (S.D.N.Y. 2005).  The court reasoned that "[n]othing in the holding of Basic or the text of Rule 23 requires [a showing of market impact]," and noted that while the defendants hotly contested the underlying evidence, any rebuttal would apply equally to the entire class.  Id. at 474.

---

[12] Even if plaintiff is required to make a showing of market impact at class certification, it is unclear whether this represents the proper standard.

The same judge reached the identical conclusion even after the
Second Circuit's decision in Miles.  See In re Salomon Analyst
Metromedia Litig., 236 F.R.D. 208, 223 (S.D.N.Y. 2006) ("An
actual causal effect on market share price, however, is not an
element that plaintiffs must prove in order to justify
application of the Basic presumption.").  Similarly, in Swack v.
Credit Suisse First Boston, 230 F.R.D. 250 (D. Mass. 2005), the
court surveyed the various cases addressing this question and
ultimately adopted the reasoning in Robertson Stephens.  Swack,
230 F.R.D. at 270.[13]

This Court also agrees with the conclusions in Robertson
Stephens.  To some extent, the Court already addressed
defendants' arguments in its decision on the motion to dismiss.
See Credit Suisse I, 465 F. Supp. 2d at 44 ("I am not persuaded
that the impact of analyst reports on stock prices is so distinct
from the impact of a company's statements as to justify a
different approach").  Indeed, as the Court noted previously,
while proving that a particular statement was material and had an
impact on a stock's market price may be more difficult for
analysts statements than for issuer statements, the identity of

_____

[13] While Swack adopted the reasoning in Robertson Stephens, the Court
nonetheless "engage[d] with the merits" in order to resolve "the predominance
question," analyzing the plaintiff's proof of market impact to some degree and
than certifying the class.  Swack, 230 F.R.D. at 270, 273.  However, it is
unclear to what extent the Court's conclusion in Swack turned on that proof.

the speaker should not alter the legal or analytical framework.
Id. at 44-45.

Having already found that Basic applies in analyst cases,
the Court sees no reason to cram an additional requirement into
the predominance inquiry that is unrelated to whether "questions
of law or fact common to members of the class predominate over
any questions affecting only individual members."  Rule 23(b)(3).
It is undoubtedly true that statements made by analysts are
qualitatively different than those made by issuers of stock.
See Lehman Bros., 222 F.R.D. at 246-47.  It does not follow,
however, that analyst cases are less amenable to class action
treatment.  That loss causation may be more difficult to prove in
analyst cases simply has no bearing whatsoever on the
appropriateness of class action treatment.

The commonality of the ultimate reliance inquiry turns on
whether the market for the security is efficient, not on the
materiality or market impact of defendants' particular
statements.[14]  See PolyMedica, 432 F.3d at 8 ("This [fraud-on-

---

[14] To the extent that the Basic presumption turns on the materiality or
market impact of the allegedly misleading statements, in cases where the
statements at issue were made publicly, the requirements are wholly
duplicative of the materiality and loss causation elements of securities fraud
actions more generally, both of which are amenable to common proof.
See Metromedia, 236 F.R.D. at 223 n.11.  Cf. Dura, 544 U.S. at 346 (plaintiff
must prove that defendant's misrepresentation proximately caused plaintiff's
economic loss).  Moreover, this Court has already held that plaintiff
adequately pleaded materiality.  Credit Suisse I, 465 F. Supp. 2d at 57.  The
Court reaffirms that conclusion here: Plaintiff has made a sufficient showing
that defendants' reports "would have been viewed by the reasonable investor as
having significantly altered the total mix of information made available."
Metromedia, 236 F.R.D. at 222 (citation omitted).

the-market] syllogism breaks down, of course, when a market lacks
efficiency and the market does not necessarily reflect the
alleged material misrepresentation.").  Once the presumption
attaches, all other questions of loss causation are common to the
class.  Given that AOL traded on an efficient market, the class'
entire claim will rise and fall on the same questions.
See Robertson Stephens, 228 F.R.D. at 475 ("the existence of this
dispute, however heated, does not demonstrate that individual
issues will predominate over common ones").

     The First Circuit's recent opinion in New Motor Vehicles
does not alter the Court's conclusion.  The plaintiffs in New
Motor Vehicles alleged that car manufacturers had conspired to
illegally block lower-priced imports from Canada from entering
the country in violation of various state and federal antitrust
laws.  522 F.3d at 8.  The potential class consisted of roughly
thirteen million car purchasers whose purchases covered numerous
makes and models of cars, each sale individually negotiated.  Id.
at 20.  Addressing the issue of class certification, the court
held that when "a Rule 23 requirement relies on a novel or
complex theory as to injury . . . the district court must engage
in a searching inquiry into the viability of that theory and the
existence of the facts necessary for the theory to succeed."  Id.
at 26.  Class certification ultimately foundered on the question
of whether damages could be proven by common facts.  Plaintiffs'

expert proposed two possible approaches to establishing common evidence of damages, one involving the use of so-called "Nash equilibriums" to predict market outcomes for individual negotiations, the other employing a comparative "benchmark" method.  Id. at 20.  The analysis was further complicated by the fact that plaintiffs asserted state law claims, resulting in a patchwork of applicable legal standards.  Id. at 22.  Ultimately, the First Circuit found that plaintiffs had failed to provide a viable model of proving that the class qua class had been damaged -- that is, "whether the proposed model will be able to establish, without need for individualized determinations for the many millions of potential class members, which consumers were impacted by the alleged antitrust violation and which were not." Id. at 28.

There is no such problem here: the efficient market, as conceived in Basic, provides the appropriate aggregating mechanism.  Indeed, plaintiff's claims in this case do not present a novel legal theory, but rather a novel application of an already established theory.  And as the First Circuit made clear in New Motor Vehicles, the scope of the Court's "searching inquiry" at the class certification stage is limited to the requirements of Rule 23.  Id. at 24; see also Robertson Stephens, 228 F.R.D. at 474 (court may consider expert reports, but only to determine whether requirements of Rule 23 have been met).  To

require plaintiff to show more than market efficiency at this

stage "would conflate the issue of whether common issues will

dominate the merits decision with the merits decision itself."

Robertson Stephens, 228 F.R.D. at 475.

The Court's sole concern at class certification is whether

plaintiff's claims are properly amenable to class action

treatment, and, in particular, whether common legal and factual

questions predominate over individual ones.  The question of

whether Basic should apply in analyst cases was resolved at the

motion to dismiss stage.  Whether plaintiff's evidence has raised

triable issues of fact is a question for summary judgment.[15]

Defendants' arguments regarding market impact, while certainly

not insubstantial,[16] do not address the purposes of Rule 23.  To

_____

[15] At summary judgment or trial, "[d]efendants may rebut the presumption
of reliance by disputing any of the elements giving rise to the presumption
(e.g., that the company's shares traded in an efficient market), or by showing
'that the misrepresentation in fact did not lead to a distortion of price or
that an individual plaintiff traded or would have traded despite his knowing
the statement was false.'"  Robertson Stephens, 228 F.R.D. at 472 (quoting
Basic, 485 U.S. at 248).

[16] As defendants note in their brief, academic studies "support the view
that some analysts' statements do affect some stock prices some of the time."
Defs.' Opp. 21 (document # 152) (emphasis in original).  Whether
these analysts' statements affected this stock price this time is a question
for summary judgment or trial.  Again, the Court reaffirms its conclusion that
plaintiff has made a sufficient showing of materiality at this stage.

Nonetheless, the Court harbors no illusions about the seriousness of
defendants' challenges to the conclusions of plaintiff's expert, Dr. Hakala,
as to market impact/loss causation.  Defendants challenge both the legal
framework and methodology used by Dr. Hakala in reaching his conclusions.
These challenges take on added weight in light of Judge Zobel's recent order
in Xcelera, Civ. A. No. 00-11649-RWZ (D. Mass. Apr. 25, 2008), excluding Dr.
Hakala's expert testimony in the face of methodological challenges similar to
those lodged in this case.

While the Court recognizes defendants' justifiable desire to jump
straight to the core of the case -- which they believe to be wholly lacking in

engage with them here would drag the Court into "an
unwieldy trial on the merits." <u>PolyMedica</u>, 432 F.3d at 17
(emphasis omitted).

As such, the Court holds that plaintiff need not show market
impact at the class certification stage, as such a requirement
does not address the underlying purposes of Rule 23.  Thus,
because plaintiff has shown that the market for AOL stock was
efficient during the class period, Rule 23(b)(3)'s predominance
requirement has been met.

### 3.  <u>Superiority</u>

Investors seeking damages for violations of federal
securities are often considered the prototypical class action
plaintiffs.  <u>See</u> <u>Grace</u>, 128 F.R.D. at 167 ("There is little
question that suits on behalf of shareholders alleging violations
of federal securities laws are prime candidates for class action
treatment. . . .").  Given the analysis above, a class action is

---

merit -- and avoid the settlement pressure inherent in class certification,
deciding the issue of market impact/loss causation at this point in the
proceedings would require the Court to stretch the strictures of Rule 23 to
their breaking point.  Class certification is simply not the correct venue for
addressing these issues.

This is especially true here since neither party presented live expert
witnesses at the hearing on class certification.  Following Judge Zobel's
order in <u>Xcelera</u>, and in response to the concerns raised by defendants, the
Court invited further briefing on whether the Court should conduct a <u>Daubert</u>
hearing (or some modified version thereof) to determine whether and to what
extent the Court should consider Dr. Hakala's conclusions.  Both parties
rejected the suggestion.

In light of these concerns, the Court is amenable to structuring the
summary judgment briefing and hearing schedule in such a way as to deal
systematically with some of the discrete issues that remain to be resolved.

clearly "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

## IV.  <u>CONCLUSION</u>

For the forgoing reasons, I find that the Fund has satisfied the requirements of Rule 23.  Therefore, Lead Plaintiff's Motion for Class Certification (document # 144) is **GRANTED**.


**SO ORDERED.**

**Date:  September 26, 2008**          /s/Nancy Gertner
                                       **NANCY GERTNER, U.S.D.C.**

-34-