UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
)
IN RE CREDIT SUISSE ─ AOL )
SECURITIES LITIGATION )
......................................................... ) Case No. 1:02 CV 12146
) (Judge Gertner)
)
This document relates to: )
) Oral Argument Requested
ALL ACTIONS )
)
)
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN SUPPORT OF THE MOTION OF
DEFENDANTS CREDIT SUISSE SECURITIES (USA) LLC,
CREDIT SUISSE (USA), INC., FRANK QUATTRONE,
ELLIOTT ROGERS, JAMIE KIGGEN AND LAURA MARTIN
TO PRECLUDE THE EXPERT OPINIONS OF
SCOTT D. HAKALA, M. LAURENTIUS MARAIS, BERNARD
<u>BLACK AND REINIER KRAAKMAN</u>**

| | |
|---|---|
| Lawrence Portnoy (admitted *pro hac vice*) | Robert A. Buhlman (BBO #554393) |
| Avi Gesser (admitted *pro hac vice*) | Siobhan E. Mee (BBO #640372) |
| DAVIS POLK & WARDWELL | BINGHAM MCCUTCHEN LLP |
| 450 Lexington Avenue | One Federal Street |
| New York, New York 10017 | Boston, Massachusetts 02110 |
| Tel: (212) 450-4000 | Tel: (617) 951-8000 |
| Fax: (212) 450-3800 | Fax: (617) 951-8736 |
| | |
| *Attorneys for Defendants Credit Suisse Securities (USA) LLC and Credit Suisse (USA), Inc.* | *Attorneys for Defendants Credit Suisse Securities (USA) LLC, Credit Suisse (USA), Inc., Elliott Rogers and Jamie Kiggen* |

James R. Carroll (BBO #554426)
Eben P. Colby (BBO #651456)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
Tel: (617) 573-4800
Fax: (617) 573-4822

*Attorneys for Defendant Laura Martin*


Jeff E. Butler (admitted *pro hac vice*)
CLIFFORD CHANCE LLP
31 West 52nd Street
New York, New York 10019
Tel: (212) 878-8000
Fax: (212) 878-8375


Warren L. Feldman (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-2420
Fax: (917) 777-2420

*Attorneys for Defendant Elliott Rogers*

Henry Putzel, III (admitted *pro hac vice*)
LAW OFFICE OF HENRY PUTZEL III
565 Fifth Avenue
New York, New York 10017
Tel: (212) 661-0066
Fax: (212) 661-0415

*Attorney for Defendant Jamie Kiggen*

Jeffrey B. Rudman (BBO #433380)
Jonathan A. Shapiro (BBO #567838)
Timothy J. Perla (BBO #660447)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617) 526-5000


Kenneth G. Hausman (admitted *pro hac vice*)
Barbara A. Winters (admitted *pro hac vice*)
HOWARD, RICE, NEMEROVSKI,
CANADY, FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, Seventh Floor
San Francisco, California 94111-4024
Tel: (415) 434-1600
Fax: (415) 217-5910

*Attorneys for Defendant Frank Quattrone*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................... 4

I.    Dr. Hakala's Opinions Are Entirely Unreliable and Must Be Precluded .......................... 7

    A.    Dr. Hakala's Event Study Fails to Control for Confounding Events and Contravenes Market Efficiency ............................................................... 8

        1.    Dr. Hakala's Failure to Control for Confounding Information Renders His Event Study Unreliable ........................................ 8

        2.    Dr. Hakala's Disregard of Prior Disclosures Contradicts Market Efficiency and Renders His Event Study Unreliable ................................ 11

    B.    Dr. Hakala's Event Study Methodology Is Fundamentally Flawed .................... 12

        1.    Dr. Hakala Has Failed to Use Relevant Event Dates and Has Manufactured the "Relevance" of the "Events" He Supposedly Tested ........................................................................................ 14

        2.    Dr. Hakala Continues to Improperly Use Dummy Variables, Which Renders His Methodology Impossible to Replicate ..................... 20

            (a)    Dr. Hakala's Continued Overuse of Dummy Variables Requires His Exclusion ............................................................. 20

            (b)    Dr. Hakala's Approach to Dummy Variables Cannot Be Replicated by Other Economists or Even Dr. Hakala .................. 24

    C.    Dr. Hakala's Use of a Proxy for the Effect of Defendants' Statements Is Wholly Unreliable ................................................................................ 28

II.    Dr. Marais's Opinions Are Irrelevant and Needlessly Cumulative ................................... 32

III.    Professor Black's Opinions Should Be Precluded ............................................................. 34

    A.    Professor Black's Methods Are Not Reliable and Are Not Applied Reliably to the Facts of this Case .......................................................... 34

    B.    Professor Black Is Not Qualified to Offer His Opinions .................................... 38

    C.    Professor Black's Proposed Rebuttal Testimony Impermissibly Addresses Issues Not Addressed By Defendants' Initial Experts' Reports .......................... 40

IV.   Professor Kraakman's Opinions Should Be Precluded ...................................................... 42

    A.   Professor Kraakman's Opinions on Questions of Law Are Impermissible ......... 43

    B.   Professor Kraakman Is Not Qualified to Testify on the Remaining
        Questions, He Unreliably Applies Unreliable Methods to Answer Them
        and His Opinions on These Questions Lack the Requisite Relevance ................. 44

    C.   Professor Kraakman's Proposed Rebuttal Testimony Impermissibly
        Addresses Issues Not Addressed By Defendants' Initial Experts' Reports .......... 49

CONCLUSION .................................................................................................................... 50

# TABLE OF AUTHORITIES

PAGE

**Cases**

Baldwin Graphic Sys., Inc. v. Siebert, Inc., No. 03 C 7713, 2005 WL 1300763
(N.D. Ill. Feb. 22, 2005)..................................................................................... 40

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) ............................. 6, 32, 47

DeMarco v. Lehman Bros., Inc., 222 F.R.D. 243 (S.D.N.Y. 2004) ...........................29, 30, 31-32

Dura v. Broudo, 544 U.S. 336 (2005)......................................................................... 10

Ebbert v. Nassau County, No. CV 05-5445 (FB) (AKT), 2008 WL 4443238
(E.D.N.Y. Sept. 26, 2008).................................................................................40

Elwood v. Pina, 815 F.2d 173 (1st Cir. 1987) ......................................................... 33

Fener v. Belo Corp., 560 F. Supp. 2d 502 (S.D. Tex. 2008) ................................... 7

Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997)................................................... 6, 15, 38

Greenberg v. Crossroads Sys., Inc., 364 F.3d 657 (5th Cir. 2004)................................ 7

Hartford Ins. Co. v. Gen. Elec. Co., 526 F. Supp. 2d 250 (D.R.I. 2007)....................... 5

In re Broadcom Corp. Sec. Litig., No. SACV 01275 GLTMLGX, 2005 WL 1403756
(C.D. Cal. June 3, 2005) ...................................................................................... 7

In re Credit Suisse–AOL Sec. Litig., 253 F.R.D. 17 (D. Mass. 2008) .................................... 2, 11

In re Credit Suisse–AOL Sec. Litig., 465 F. Supp. 2d 34 (D. Mass. 2006)................................. 44

In re Omnicom Group, Inc., Sec. Litig., 541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................ 7

In re PolyMedica Corp. Sec. Litig., 432 F.3d 1 (1st Cir. 2005) ....................................... 11, 25, 49

In re Williams Sec. Litig.–WCG Subclass, ___ F.3d ___, No. 07-5119,
2009 WL 388048 (10th Cir. Feb. 18, 2009) ...................................................... 5, 9, 10, 23, 25

In re Xcelera.com Sec. Litig., Civ. A. No. 00-11649 (RWZ), 2008 U.S. Dist. LEXIS
77807 (D. Mass. Apr. 25, 2008) .............................................................................. passim

Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248 (3d Cir. 2005)........................43-44

Jorgenson Forge Corp. v. Consarc Corp., No. C00-1879Z, 2002 WL 34363668
(W.D. Wash. Jan. 9, 2002)......................................................................................... 40

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) ................................................. 5

McDonough v. City of Quincy, 452 F.3d 8 (1st Cir. 2006)...................................... 33

Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92 (1st Cir. 1997)............................. 43

North v. Cummings, No. 06-CV-174-D, 2007 WL 4616282 (D. Wyo. Mar. 27, 2007) ............. 40

Peak Interests, L.L.C. v. Tara Hills Villas, Inc., No. 8:06-CV-747, 2008 WL 650301
    (D. Neb. Mar. 5, 2008)........................................................................ 40

Pelletier v. Main St. Textiles, LP, 470 F.3d 48 (1st Cir. 2006) ............................... 6, 43

Poulis-Minott v. Smith, 388 F.3d 354 (1st Cir. 2004) ................................................ 38

Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77 (1st Cir. 1998) ........ 5, 7, 32

Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162 (4th Cir. 2007)...................... 11, 26

Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68 (1st Cir. 2002) ......... 5

STS Software Sys., Ltd. v. Witness Sys., Inc., No. 1:04-CV-2111 (RWS),
    2008 WL 660325 (N.D. Ga. Mar. 6, 2008)........................................... 40

United States v. Buchanan, 964 F. Supp. 533 (D. Mass. 1997)........................... 43

United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002) ....................................... 5

United States v. Green, 405 F. Supp. 2d 104 (D. Mass. 2005).......................... 24

United States v. Mooney, 315 F.3d 54 (1st Cir. 2002). ..................................... 6

**Statutes and Rules**

Fed. R. Evid. 402 ............................................................................. 5, 32

Fed. R. Evid. 403 ......................................................................... 5, 6, 33, 49

Fed. R. Evid. 702 ............................................................................ passim

Fed. R. Civ. P. 26(a)(2)(B) ............................................................. 40

Fed. R. Civ. P. 26(a)(2)(C) ............................................................. 40

Fed. R. Civ. P. 37(c)(1)..................................................................... 40

**Other Authorities**

Nihat Aktas et al., <u>Event Studies with a Contaminated Estimation Period</u>, 13 J. Corp. Fin. 129 (2007)..................................................................................................................... 24

John Y. Campbell et al., <u>Econometrics of Financial Markets</u> (1997).............................. 13, 15, 23

Imre Karafiath, <u>Using Dummy Variables in The Event Methodology</u>, 23 Fin. Rev. 351 (1988)........................................................................................................................... 23

A. Craig MacKinley, <u>Event Studies in Economics & Finance</u>, 35 J. Econ. Literature 13 (1997)........................................................................................................................... 13

David I. Tabak & Frederick C. Dunbar, <u>Materiality & Magnitude:  Event Studies in the Courtroom</u>, <u>in</u> Litigation Services Handbook: The Role of the Financial Expert (Roman I. Weil et al. eds., 3d ed. 2001) .................................................................. 13, 15, 23

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO PRECLUDE
THE EXPERT OPINIONS OF SCOTT D. HAKALA, M. LAURENTIUS MARAIS,
BERNARD BLACK AND REINIER KRAAKMAN**

Defendants Credit Suisse Securities (USA) LLC ("CSFB"), Credit Suisse (USA), Inc.

("Credit Suisse (USA)"), Frank Quattrone, Elliott Rogers, Jamie Kiggen and Laura Martin

(collectively, "Defendants") respectfully submit this memorandum in support of their motion

pursuant to Rule 702 of the Federal Rules of Evidence to preclude the expert opinions of Dr.

Scott D. Hakala, Dr. M. Laurentius Marais, Professor Bernard Black and Professor Reinier

Kraakman, the proposed expert witnesses of Class Representative Bricklayers and Trowel Trades

International Pension Fund ("Plaintiff").

## PRELIMINARY STATEMENT

At class certification, Defendants demonstrated that the opinions of Dr. Hakala,

Plaintiff's expert on materiality, loss causation and damages, were thoroughly unreliable.  This is

because his event study – the statistical technique on which he purported to base those opinions –

did not conform to the established norms of financial economics.[1]  Defendants argued that Dr.

Hakala's opinions in support of class certification should be rejected for exactly the same reasons

that Judge Zobel of this Court precluded Dr. Hakala from testifying in In re Xcelera.com

Securities Litigation ("Xcelera"), Civ. A. No. 00-11649 (RWZ), 2008 U.S. Dist. LEXIS 77807

(D. Mass. Apr. 25, 2008), and for the same reasons that several other judges have recently

rejected Dr. Hakala as an expert.  Although this Court did not rule on the admissibility of Dr.

Hakala's testimony at that time, it nonetheless acknowledged "the seriousness of [D]efendants'

challenges to [Dr. Hakala's] conclusions . . . as to market impact [and] loss causation," based on

---

[1] (See, e.g., Defs.' Class Cert. Opp'n Br. [Dkt. # 152] 2, 27-30; Defs.' Class Cert. Sur-Reply [Dkt. # 173] 1-17; Defs.' Apr. 15, 2008 Letter Br. [Dkt. # 225] 4-6; Defs.' Notice of Supp. Auth. [Dkt. # 228] 1-2; Defs.' Daubert Mem. [Dkt. # 232] 1-12; Defs.' Daubert Sur-Reply [Dkt. # 239] 1-5.)

both the "legal framework and methodology" that Dr. Hakala had employed.  In re Credit

Suisse–AOL Sec. Litig. ("Credit Suisse–AOL II"), 253 F.R.D. 17, 30 n.16 (D. Mass. 2008).

After the close of fact discovery, Plaintiff initially served only one expert report to

support its case on the merits:  yet another report by Dr. Hakala, complete with a new event

study on AOL Time Warner, Inc. ("AOL") different from the one submitted in support of class

certification.[2]  Plaintiff now offers this report as its only evidence of market impact and loss

causation in opposition to Defendants' Memorandum in Support of Their Motion for Summary

Judgment.  (See, e.g., Pl.'s S.J. Opp. [Dkt. # 288] 31-33, 54-65.)  However, Dr. Hakala has done

nothing to remedy the numerous, glaring and fundamental defects in his opinions that

Defendants identified last year in their class certification briefing.  To the contrary, his most

recent expert and rebuttal reports compound his earlier errors – the very same ones that led to his

exclusion in Xcelera.  For example:

- Dr. Hakala continues to fail to control for confounding factors, and instead speculates, based on his event study, about the causes of AOL's stock price movements on days when there were numerous, contemporaneous disclosures, even though he admits that the established techniques of financial economics provide no basis for him to do so;

- he continues to disregard the fundamental concept of market efficiency by analyzing reiterations of previously disclosed information as new "corrective disclosures," even though in an efficient market, such as the one for AOL stock, these later disclosures should have no incremental effect on share price;

- he continues to use a poorly defined methodology, which allows him to manufacture results that cannot be replicated by other economists;

- he continues to improperly overuse "dummy variables," leading him to determine that numerous days throughout the period from January 12, 2001 through July 24, 2002

---

[2] CSFB and Credit Suisse (USA), in turn, submitted expert reports from René M. Stulz, a financial economist, and John Deighton, a professor of marketing and internet advertising.  (See Gesser Decl. Ex. 15 (Corrected Expert Report of René M. Stulz, dated July 8, 2008 ("Stulz Rpt.")); Gesser Decl. Ex. 17 (Expert Report of John Deighton, dated May 1, 2008 ("Deighton Rpt.")).)

2

(the "Class Period")[3] are "statistically significant" event dates when, in fact, they would not be if Dr. Hakala had done his event study properly; and

- he continues to base many of his opinions on sheer speculation, even when his speculation is plainly contradicted by the facts established through the voluminous documentary and testimonial record in this case.

In addition, Dr. Hakala cannot demonstrate through the accepted techniques of financial economics that CSFB's research reports had any measurable effect on AOL's stock price. That is not a new difficulty for him. What is new, however, is that Dr. Hakala now attempts to quantify the nonexistent market impact of Defendants' reports based on a proxy that he constructs from the movements of AOL's share price in response to public statements by other analysts and by AOL itself regarding information that CSFB is never alleged to have known. There is no support in logic – much less in the academic literature – for this approach.

Apparently recognizing Dr. Hakala's inability to remedy the flaws in his own report, or to respond to the devastating criticisms of his methodology by CSFB's experts, Plaintiff tries to redeem Dr. Hakala and address the clear deficiencies in his testimony through the rebuttal reports submitted by three new experts: Dr. Marais and Professors Black and Kraakman. But each of these rebuttal reports is just as flawed as Dr. Hakala's report. Dr. Marais – whose opinions are confined to rehabilitating Dr. Hakala's use of dummy variables – cannot save Dr. Hakala from exclusion because Dr. Marais did not actually test Dr. Hakala's methodology or validate his results, nor did Dr. Marais address any of Dr. Hakala's numerous other methodological faults.

Professors Black and Kraakman not only fail to rebut any of Defendants' expert evidence

---

[3] Although the certified Class Period ends on July 24, 2002, Dr. Hakala includes July 25, 2002 in his event study to measure the effects of disclosures that he claims were made on July 24 after the close of the market. (Gesser Decl. Ex. 4 (Expert Report of Scott D. Hakala, dated Mar. 4, 2008 ("Hakala Rpt.")) ¶ 6 & n.4.) Thus, for convenience only, Defendants' references to "Class Period" in this memorandum include July 25, 2002.

(indeed, Professor Black admitted that he <u>agreed</u> with Professor Deighton), but their reports suffer from fundamental problems of their own. For example, in opining that Defendants' AOL reports were both material and unreasonable, Professor Black failed to even consider the most basic measure of reasonableness – what other analysts covering AOL were saying – even though he himself admitted that such information would have been important to his opinion. Moreover, at his deposition, Professor Black was forced to cross out line after line of his expert report and withdraw his opinion that Defendants' AOL reports were unreasonably optimistic, because, as he candidly admitted, he had improperly based that opinion on data that did not exist at the time Defendants issued their analyst reports. Finally, Professor Kraakman – who is not a financial economist – essentially disqualified himself as an expert by admitting that he is probably no more of an expert on the academic literature on which he was opining than anyone who has read the same handful of articles that he has read (which, incidentally, he read for the first time shortly before issuing his report in this case). And his principal opinion – that the fraud-on-the-market presumption of reliance can apply to research analyst statements – addresses a legal issue that this Court has already ruled on, not a fact issue for the jury.

For these reasons, the opinions of all four of Plaintiff's experts must be excluded.

## ARGUMENT

As demonstrated in the materials submitted in support of Defendants' Motion for Summary Judgment, there is no evidence in the factual record to support a finding of loss causation, reliance or materiality in this case. (<u>See generally</u> Defs.' S.J. Mem. [Dkt. # 279], as corrected; Defs.' 56.1 [Dkt. # 280], as corrected; Defs.' Reply S.J. Mem. [Dkt. # 296].) Unable to establish these elements and thus unable to satisfy its burden of proof (whether in response to Defendants' summary judgment motion or at trial), Plaintiff's only recourse for salvaging its case is to depend upon the result-driven, internally inconsistent and scientifically unsound

testimony of Dr. Hakala and the equally problematic testimony of three other experts in a bid to show how CSFB's statements supposedly <u>could</u> have caused Plaintiff's alleged losses.  Dr. Hakala's testimony and that of Dr. Marais, Professor Black and Professor Kraakman fall far short of the admissibility standards for expert evidence in myriad ways and must be rejected.

The testimony of a proposed expert may not be relied upon at summary judgment if it is inadmissible.  See, e.g., <u>In re Williams Sec. Litig.–WCG Subclass</u>, ___ F.3d ___, No. 07-5119, 2009 WL 388048, at *1 (10th Cir. Feb. 18, 2009) (affirming exclusion of expert "because his theories of loss causation could not distinguish" between the alleged fraud and confounding factors, and affirming summary judgment for defendants); <u>Hartford Ins. Co. v. Gen. Elec. Co.</u>, 526 F. Supp. 2d 250, 254 (D.R.I. 2007) (granting motion to preclude expert and for summary judgment).  To be admissible, expert testimony must be both (1) relevant and (2) reliable. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993); <u>United States v. Diaz</u>, 300 F.3d 66, 73 (1st Cir. 2002).[4]

The First Circuit has recognized that, "[t]o be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, <u>see</u> Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." <u>Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.</u>, 161 F.3d 77, 81 (1st Cir. 1998) (citing <u>Daubert</u>, 509 U.S. at 591-92); <u>see also</u> Fed. R. Evid. 702 (expert testimony is permitted only "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").

---

[4] In <u>Daubert</u>, the Supreme Court "held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147-49 (1999) (quoting <u>Daubert</u>, 509 U.S. at 589).  In <u>Kumho</u>, the Court held that a trial court's "gatekeeping obligation" under <u>Daubert</u> and Rule 702 applies to all expert testimony, not just to scientific expert testimony.  <u>Kumho</u>, 526 U.S. at 147-49; <u>see also</u> <u>Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co.</u>, 295 F.3d 68, 81 (1st Cir. 2002); <u>Diaz</u>, 300 F.3d at 73 n.4.

Importantly, however, even relevant expert testimony may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

A proposed expert's testimony must be not only relevant, but reliable as well. To be reliable, an expert witness must be "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Further, the expert testimony must be (1) "based upon sufficient facts or data" and (2) "the product of reliable principles and methods" that the expert has (3) "applied . . . reliably to the facts of the case." Id. With respect to this requirement, the Supreme Court has explained that a court need not admit an expert opinion that is inadequately linked to the facts, and may exclude "opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); see also Pelletier v. Main St. Textiles, LP, 470 F.3d 48, 55-56 (1st Cir. 2006) (affirming exclusion of expert who failed to adequately base testimony on facts of the case). Daubert enumerated four non-exclusive factors for courts to consider when determining whether expert testimony is sufficiently reliable to be admitted: (1) whether the proffered theory or technique can be and has been tested; (2) whether the proffered theory or technique has been subjected to peer review and publication; (3) a proffered technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) the level of the proffered theory or technique's acceptance within the relevant community. Daubert, 509 U.S. at 593-94; see also United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002).

The burden of showing that an expert's testimony meets the standards for admissibility is

on the party who proffers that testimony.  See Ruiz-Troche, 161 F.3d at 85.  For the reasons set

forth below, Plaintiff has not met – and cannot meet – that burden here as to any of its purported

experts.

**I.      Dr. Hakala's Opinions Are Entirely Unreliable and Must Be Precluded**

In the last five years, courts around this country have repeatedly rejected the opinions of

Plaintiff's lead expert, Dr. Hakala, because the event studies he performs are not based on a

scientifically acceptable methodology and because his opinions are not the result of a

methodology that is reliably applied to the facts.  See, e.g., Greenberg v. Crossroads Sys., Inc.,

364 F.3d 657, 666-67 (5th Cir. 2004) (declining to accept Dr. Hakala's opinions on reliance and

loss causation because he failed to control for confounding events on key corrective disclosure

day); Fener v. Belo Corp., 560 F. Supp. 2d 502, 506-07 (S.D. Tex. 2008) (rejecting Dr. Hakala's

opinions on loss causation because he failed to control for confounding factors and because he

"fail[ed] . . . to substantiate [his] claim[s]"); In re Omnicom Group, Inc., Sec. Litig., 541 F. Supp.

2d 546, 554 (S.D.N.Y. 2008) (rejecting Dr. Hakala's opinions on loss causation because his

"event study at best incorrectly identifies" corrective disclosures and fails to control for

confounding events); cf. In re Broadcom Corp. Sec. Litig., No. SACV 01275 GLTMLGX, 2005

WL 1403756, at *3 (C.D. Cal. June 3, 2005) (excluding Dr. Hakala's opinion on aggregate

damages under Daubert because his model was unreliable).  Recently, Judge Zobel precluded Dr.

Hakala from testifying under Daubert and Federal Rule of Evidence 702 in Xcelera because his

event study did not conform to the norms of financial economics in (1) its failure to control for

confounding factors, (2) its disregard of market efficiency, as demonstrated by Dr. Hakala's

ignoring the effects of prior disclosures, (3) its failure to analyze relevant event dates and (4) its

use of dummy variables.  2008 U.S. Dist. LEXIS 77807, at *2-7.

For these very same reasons, Dr. Hakala's event study – his third on AOL and his second

7

in this case – is equally faulty.[5]  Moreover, Dr. Hakala's improper use of a speculative proxy to

quantify the nonexistent market impact of CSFB's AOL reports provides an independent basis

for precluding his testimony here.[6]

   **A.    Dr. Hakala's Event Study Fails to Control for Confounding Events and
          Contravenes Market Efficiency**

      **1.    Dr. Hakala's Failure to Control for Confounding Information
             Renders His Event Study Unreliable**

   As Defendants have shown in past briefing, Dr. Hakala's event studies include allegedly

inflationary and corrective disclosure dates that are confounded by the publication of information

unrelated to the supposed disclosures on which Plaintiff has focused.  (See Defs.' S.J. Mem. 63-

65; Defs.' Daubert Mem. 11-12; see also Stulz Rpt. ¶ 5(e).)  This rendered Dr. Hakala's

conclusions at class certification thoroughly unreliable, because there was no way for him to use

his event study, consistent with accepted methods of financial economics, to determine which (if

any) of two or more pieces of confounding news actually caused AOL's stock price to change.

(See, e.g., Defs.' Daubert Mem. 11-12.)  In his latest event study, Dr. Hakala opines that over the

course of the Class Period, disclosures related to the alleged fraud occurred on 57 separate dates,

on which he claims that news released to the market either artificially inflated AOL's share price

(21 "inflationary dates") or removed artificial inflation from AOL's share price by partially

revealing the fraud and purportedly causing damages (36 "corrective disclosure dates"), which

Dr. Hakala attributes to Defendants.  Most of these dates, however, are confounded.  Dr.

Hakala's continued failure to control for confounding events thus renders Dr. Hakala's current

---

[5] What event studies are and the manner in which they are performed is discussed at Part I.B infra.

[6] In his March 2008 report, Dr. Hakala has provided, "for information purposes," his estimates of aggregate damages, although he has indicated that Plaintiff may choose not to present this information at trial. (Hakala Rpt. ¶ 16.)  Defendants reserve the right to move to exclude such testimony if and when Plaintiff chooses to introduce it.

report methodologically unreliable and requires its exclusion on <u>Daubert</u> grounds.  <u>Xcelera</u>, 2008

U.S. Dist. LEXIS 77807, at *6-7; <u>see also</u> <u>In re Williams</u>, 2009 WL 388048, at *10.

Defendants have established an ample record documenting the fact that Dr. Hakala's key

alleged corrective disclosure dates were confounded by unrelated information.  For instance:

- **February 1, 2001:**  Information released to the market included (i) a positive CSFB report, (ii) several analyst reports containing material information about AOL in addition to that allegedly concealed by Defendants, (iii) disappointing AOL earnings and (iv) media commentary on AOL.  (56.1 ¶ 204.)

- **July 18, 2001:**  AOL released disappointing earnings that contemporaneous news reports attributed to several factors, only some of which related to allegations in the Complaint.  (See Gesser Decl. Ex. 22 (<u>AOL Time Warner Reports Second Quarter EBITDA of $2.5 Billion</u>, Business Wire (July 18, 2001)).)

- **July 19, 2001 and February 5, 2002:**  Multiple analysts released reports on AOL (<u>see</u> Hakala Report Ex. B-1) and Plaintiff fails to identify any method for determining which of the several disclosures, if any, actually caused the stock price to move (<u>see</u> Gesser Decl. Ex. 6 ("Hakala 2007 Tr.") 70:25-71:3; Defs.' S.J. Mem. 64).

- **February 20, 2002:**  Lehman Brothers released a report downgrading AOL as a result of four factors, only one of which pertained to Plaintiff's allegations (i.e., AOL's exposure to the weak advertising market) (56.1 ¶ 283; <u>see also</u> Gesser Decl. Ex. 13 ("Kraakman Tr.") 172:5-173:6), and the information on which the analyst based her negative views regarding AOL's advertising prospects had been previously disclosed by the same analyst, by AOL and by the press, without any statistically significant effects on AOL's stock price.  (Defs.' S.J. Mem. 64-65; Defs.' Class Cert. Sur-Reply 17-18 n.7; Defs.' Letter Br. 4-5.)

Similarly, Dr. Hakala's key inflationary dates – such as September 19, 2001 – were clearly

confounded by reports from other analysts, for which Dr. Hakala makes no attempt to control

because no accepted method for doing so exists.  (<u>See</u> Defs.' S.J. Mem. 70; Stulz Rpt. ¶ 94.)

Indeed, although Dr. Hakala has admitted that "there is no peer reviewed way to deal

with confounding events[,] period[,] in the literature" (Hakala 2007 Tr. 70:25-71:3), that has not

stopped him from opining that Defendants are responsible for numerous increases and decreases

in AOL's share price on days that are thoroughly confounded by unrelated news from other

analysts and from AOL itself.  Dr. Hakala made no attempt at class certification to disentangle the many factors affecting AOL's stock price on such disclosure days in his event study.  (See Hakala 2007 Tr. 70:22-71:8, 211:7-18.)  In his latest event study, he similarly conducted no analysis to disaggregate the effects of confounding disclosures; instead, he simply drew inferences about which of several pieces of confounding news affected AOL's share price based on his subjective and untestable feelings about whether the news was significantly positive or negative, and the direction in which AOL's stock price moved that day.  (See, e.g., Gesser Decl. Ex. 7 ("Hakala 2008 Tr.") 84:9-85:17 (explaining his general approach); id. 394:7-12 ("Q. So you don't view [Oct. 17, 2001] as confounded?  A. It is partially confounded but I don't view it as confounded enough to ignore the effect of the analyst on that day on the stock price.").)  Dr. Hakala's instinct for when it is appropriate to ignore confounding news in assessing causation is obviously not a reproducible scientific methodology that is supported by the academic finance literature.

Therefore, Dr. Hakala's conclusion that AOL's price movements on numerous days throughout the Class Period were caused by Defendants – and not caused by any number of other speakers' unrelated statements about AOL – is pure speculation that must be excluded.  See Xcelera, 2008 U.S. Dist. LEXIS 77807, at *6-7; In re Williams, 2009 WL 388048, at *10 (stating that expert's "failure to show why the February 4 losses should be attributed to the revelation of the fraud and not other non-fraud related news renders his methodology unreliable"); cf. Dura v. Broudo, 544 U.S. 336, 343 (2005) (describing the "tangle of factors" affecting market price and emphasizing that, while an inflated purchase price may suggest that a misrepresentation "'touches upon'" a subsequent economic loss, "[t]o 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires" (citation omitted)).

### 2.    Dr. Hakala's Disregard of Prior Disclosures Contradicts Market Efficiency and Renders His Event Study Unreliable

Dr. Hakala's current report is further flawed because it includes inflationary and corrective event days on which the information disclosed to the market was not new.  Dr. Hakala's report thus contravenes this Court's finding – and his own opinion – that AOL stock traded in an efficient market.  See Credit Suisse–AOL II, 253 F.R.D. at 32; (Hakala Rpt. ¶ 19). In an open and efficient market, a company's stock reacts immediately to new information that is important to reasonable investors.  In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 14 (1st Cir. 2005).  Conversely, an efficient market should not react at all to reiterations of previously released information.  Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 187 (4th Cir. 2007). As Defendants have shown, Dr. Hakala's event studies in this case disregard market efficiency for exactly the same reasons that led to the exclusion of his testimony by Judge Zobel in Xcelera, and his opinions here should similarly be excluded.  (See, e.g., Defs.' Daubert Mem. 9-10; Defs.' Class Cert. Sur-Reply 8-9, 16 n.6, 17-18 n.7; Defs.' Letter Br. 4-5; Defs.' S.J. Mem. 61-62, 69-71.)

Judge Zobel found that Dr. Hakala's event study in Xcelera could not "be squared with the theory of market efficiency" because (1) his study found that it took multiple days for Xcelera's stock price to incorporate allegedly material information and (2) the same information had to be disclosed several times before Dr. Hakala's event study showed that it was incorporated into the stock price.  Xcelera, 2008 U.S. Dist. LEXIS 77807, at *4-6.  One or both of these flaws can be found with respect to four out of the five "key" event days that Dr. Hakala claimed at class certification both were curative disclosures and had a statistically significant price effect on AOL's stock (two of which – August 14, 2001 and July 24, 2002 – are no longer

even <u>relevant</u> to his analysis).[7]  The same flaws apply to numerous other purported inflationary and corrective disclosure dates throughout the Class Period that Dr. Hakala includes in his present report.  (<u>See</u> Defs.' <u>Daubert</u> Mem. 10; Defs.' S.J. Mem. 61-62, 64-65.)

For instance, as noted above (<u>supra</u> Part I.A.1), the February 20, 2002 Lehman Brothers report that Dr. Hakala views as a corrective disclosure repeated information about AOL's fourth quarter 2001 intracompany advertising that the same analyst had disclosed, without any statistically significant price effects, in a report on January 31, 2002.  (<u>Compare</u> Gesser Decl. Ex. 24 (Lehman Bros. Report dated Feb. 20, 2002) <u>with</u> Gesser Decl. Ex. 23 (Lehman Bros. Report dated Jan. 31, 2002); <u>see also</u> Stulz Rpt. ¶¶ 45, 62; Defs.' <u>Daubert</u> Mem. 10; Defs.' S.J. Mem. 64.)  Similarly, Dr. Hakala maintains that February 5, 2001 was a very important inflationary date due to a CSFB report issued that day, yet he admitted at his deposition that the report did not contain any new information.  (Hakala 2008 Tr. 206:3-24, 210:13-214:18 ("[S]ometimes a report that might not change anything . . . can sometimes have a positive effect. And that's an example of what's happening here.").)  Such inconsistencies in approach and methodology require exclusion of Dr. Hakala's testimony.

## B.    Dr. Hakala's Event Study Methodology Is Fundamentally Flawed

Beyond Dr. Hakala's failure to control for confounding events and his disregard of market efficiency, his latest event study suffers from even more fundamental flaws because of the idiosyncratic and unreliable methodology he used to design and perform the study.

To understand Dr. Hakala's numerous and significant deviations from the accepted methodology of financial economics, it is first necessary to review how a standard event study is

---

[7] The "key" event days that Dr. Hakala identified at class certification were 7/18/01, 8/14/01, 2/20/02, 7/24/02 and 7/25/02.  (<u>See</u> Pl. 5/09/08 <u>Daubert</u> Mem. [Dkt. # 229] 4.)  As noted above, August 14, 2001 and July 24, 2002 are no longer relevant to Dr. Hakala's analysis.  (<u>See</u> Hakala Rpt. Ex. C-1a, at 5 & Ex. C-2a, at 2 (showing zero "relevant events" for each day).)

performed.  An event study "measures the impact of a specific event on the value of a firm."
(Gesser Decl. Ex. 14 (Declaration of René M. Stulz, dated Apr. 26, 2007 ("Stulz Decl.")) ¶ 10
(quoting A. Craig MacKinley, Event Studies in Economics & Finance, 35 J. Econ. Literature 13,
13 (1997)).)

Most event studies have two basic steps.[8]  First, an economist performs a regression to
estimate the relationship between a stock's actual return (e.g., the difference between closing
prices on two consecutive days) and the movement of one or more indices representing an
average of the stock prices for several companies that make up the market and/or industries in
which the firm operates.  This step allows the economist to predict how the stock should move
on any given day based on the movement of the indices (an "expected return"), and thereby
controls for factors that affect all companies within a particular market or industry.[9]  Second, the
expected return estimated through the regression is used as the baseline against which the stock's
actual return on preselected event days is measured.  The expected return is thus a measured
expectation of what the normal stock price movement would be if the event had not occurred.  If
the difference between the expected return and actual return (known as the "abnormal return") on

---

[8] The description of event study methodology that follows is drawn from Stulz Decl. ¶¶ 9-13; Gesser Decl. Ex. 18 (John Y. Campbell et al., Econometrics of Financial Markets, 150-52 (1997)); and Gesser Decl. Ex. 19 (David I. Tabak & Frederick C. Dunbar, Materiality & Magnitude:  Event Studies in the Courtroom, in Litigation Services Handbook:  The Role of the Financial Expert 19.5-19.6 (Roman I. Weil et al. eds., 3d ed. 2001)).  (See generally Defs.' Daubert Mem. 3-5.)

[9] An economist must exclude from the regression the possible effects of the preselected events for which he or she is testing.  Otherwise, the predicted return will already include such effects, if any, which may cause the predicted return to be higher or lower than it would otherwise be if the event had been excluded.  Such contamination could affect the findings in the second step of the event study.  To avoid this problem, economists typically perform the regression "for a period that precedes the event subject to analysis."  (Stulz Decl. ¶ 12); see also Campbell et al. supra note 8, at 152.  In this case, such an approach was not feasible because the first day of the Class Period was also the first day that AOL traded as a combined company.  (Stulz Decl. ¶ 12.)  In these circumstances, the economist may perform the regression over a period that covers the events that were preselected for testing, but will exclude the event dates themselves from the regression (either by using dummy variables or otherwise), as Professor Stulz did.  (See id.; see generally Defs.' Daubert Mem. 4-5.)  It is not, however, permissible to use dummy variables for all manner of non-event days, as Dr. Hakala does.  (See infra Part I.B.2(a).)

an event day is sufficiently large, then it may be attributed to the event occurring on that day, provided that there are no confounding events that same day. The magnitude of the abnormal return is assessed through statistical significance, which is determined by comparing the abnormal return on the event day to the standard deviation of all abnormal returns during the period over which the regression was estimated (the "estimation window").[10]

Dr. Hakala's event study diverges in important respects from this procedure. Among other things, Dr. Hakala fails to properly preselect relevant events to test, and adds an entirely new step to his regression, through which he excludes numerous, <u>nonevent</u> days (which he confusingly calls "material events") from his estimation period by using dummy variables.

### 1.    Dr. Hakala Has Failed to Use Relevant Event Dates and Has Manufactured the "Relevance" of the "Events" He Supposedly Tested

The event dates that Dr. Hakala analyzed in the event study attached to his expert report are largely irrelevant to the facts of this case, just as they were in his class certification declaration and in his <u>Xcelera</u> report.[11] In <u>Xcelera</u>, Judge Zobel rejected Dr. Hakala's testimony because, "[q]uite simply, his theory does not match the facts." <u>Xcelera</u>, 2008 U.S. Dist. LEXIS 77807, at *4. In that case, Dr. Hakala had mischaracterized a <u>single</u> key date as "relevant" despite the lack of any evidence that the disclosures on that date actually corrected the

---

[10] For example, if an event is statistically significant at the 95% confidence level (t-statistic=1.96), it means that an event of the same or greater magnitude should randomly occur on only 5% of days. (Stulz Decl. ¶ 8 n.5.) Dr. Hakala uses the 90% confidence level in his event study, which is less accepted in the academic literature. (Hakala Rpt. ¶ 34; <u>see also</u> Stulz Decl. ¶ 13; Gesser Decl. Ex. 16 ("Stulz 2007 Tr.") 170:6-14.) Dr. Hakala's lower threshold for significance is another factor predisposing his analysis to error.

[11] As Defendants demonstrated in their summary judgment brief, all of Dr. Hakala's event days are irrelevant because there is no evidence in the record linking the alleged corrective disclosures regarding advertising market risk, layoffs or accounting investigations to anything Defendants allegedly knew but did not disclose in their AOL analyst reports. (Defs.' S.J. Mem. 65-68.) Defendants will not repeat those arguments here, and instead focus on other incurable problems in Dr. Hakala's relevance determinations.

defendants' alleged fraud. Id. at *3-*4. Here, Dr. Hakala lists 57 "relevant" days in Exhibits C-1a and C-2a of his expert report, and 118 "relevant" days in Exhibit B-1, most of whose relevance he either cannot explain at all, or can explain only through pure ipse dixit, which cannot be credited. See, e.g., Hakala 2008 Tr. 304:24-305:4 (explaining that February 8, 2001 Merrill Lynch report was relevant because "Blodget would have had a different impact had Credit Suisse made a different statement"); cf. Joiner, 522 U.S. at 146 (courts may exclude "opinion evidence which is connected to existing data only by the ipse dixit of the expert"). Dr. Hakala's unscientific and arbitrary relevance determinations, which have little to do with the allegations or facts in this case and make no sense even under his own definition of "relevance," are merely after-the-fact rationalizations for Plaintiff's recovery that do not follow any accepted "methodology" of financial economics.

In his latest expert report, Dr. Hakala never really defines the events he is testing. At the beginning of an event study, an economist must identify the events whose stock-price impact he intends to test. Campbell et al., supra note 8, at 151; Tabak & Dunbar, supra note 8, at 19.4. Failure to rigorously identify the events to be tested creates a risk that the relevant events will be determined in an arbitrary fashion after the event study has been performed, making it impossible for a different economist to replicate the analysis. "In securities fraud cases, the events of interest usually include all the alleged disclosures of fraud, the dates of the fraudulent statements, or both." Tabak & Dunbar, supra note 8, at 19.4. In this case, one would thus expect Dr. Hakala to select as his relevant events the dates of Defendants' AOL analyst reports and the dates alleged as corrective disclosures in the Complaint. That, however, is not what Dr. Hakala does. Rather, he engages in after-the-fact speculation – exactly what the proper event study methodology is designed to prevent.

Instead of preselecting "events" (as that term is normally used in the financial literature) before performing his event study, Dr. Hakala identifies what he calls "material event" days – essentially, all AOL-specific news days, whether or not the news is in any way related to the Complaint's allegations. (Hakala Rpt. ¶¶ 30, 33 n.17.)  As discussed below, Dr. Hakala then uses dummy variables to exclude all of these "material event" days when he performs his regression. These "material events," however, are not the "events" that Dr. Hakala tests for significance in the next step of his event study.  Indeed, Dr. Hakala made <u>no</u> advance determination about which events he needed to test to assess the effects of Defendants' analyst reports and alleged omissions on AOL's stock price.

Although Dr. Hakala purports to assess, after the fact, whether certain of his "material events" were "relevant" to this case (<u>see, e.g.</u>, Hakala Rpt. ¶ 44; <u>id.</u> at Exs. B-1, C-1a, C-2a), he offers only vague and conflicting definitions of what it means for an event to be relevant.[12]  For example, Dr. Hakala's full "event study summary" (Ex. B-1) inexplicably includes more than twice as many "relevant events" (118) as are included in his event study summaries for advertising-related claims and layoff/accounting-related claims (Exs. C-1a and C-2a, respectively).  With respect to the set of "relevant events" listed in Exhibits C-1a and C-2a, Dr. Hakala states that "[r]elevant events are those that either would not have occurred but for the sustained allegations in the Complaint or would have occurred (or equivalent disclosure events would have occurred) at or before the beginning of the Class Period but for the sustained allegations in the Complaint."  (<u>Id.</u> ¶ 44 (footnote omitted).)  This definition, however, is utterly meaningless, and cannot explain Dr. Hakala's event selection for at least two reasons.

---

[12] Dr. Hakala's corrective disclosure dates can be identified in Exhibit C-1a if a date has both a "Relevant Events" value other than zero and a negative "1 Day Effect" value.  Similarly, Dr. Hakala's inflationary dates are dates with both a "Relevant Events" value other than zero and a positive "1 Day Effect" value.

First, as Defendants have repeatedly shown, many of Dr. Hakala's "relevant" events concern matters (e.g., AOL's quarterly earnings releases) that had not happened at the start of the Class Period and thus – contrary to Dr. Hakala's definition of relevance – could not, at that time, have been known to or disclosed by CSFB or anyone else.[13]  This flaw is apparent in Dr. Hakala's analysis of July 25, 2002 as a "relevant" disclosure date.  (Hakala Rpt. Ex. C-2a, at 2.) The new information that Dr. Hakala believes was disclosed that day – that the SEC was investigating AOL in response to articles the Washington Post had published the prior week regarding AOL's accounting for certain advertising transactions – simply did not exist at any point in time when Defendants were issuing research on AOL.  (See Defs.' S.J. Mem. 11-15; Defs.' Daubert Mem. 8; Hakala 2007 Tr. 180:7-22; Defs.' Class Cert. Sur-Reply 13-14.)  Such a disclosure obviously could not have been made "at or before the beginning of the Class Period" eighteen months earlier, in January 2001.

Second, the "relevance" of many of Dr. Hakala's "relevant" event dates is directly contradicted by "the sustained allegations in the Complaint," and thus cannot be relevant according to the definition that Dr. Hakala provides in his report.  For example, on February 1, 2001, CSFB issued its first complete analyst report on AOL – including the first issuance of the $75 price target and 2001 revenue and EBITDA projections that Plaintiff claims were misleading.  (Second Consolidated Amended Complaint (the "Complaint" or "SCAC") [Dkt. # 92] ¶ 22.)  On March 7, 2001, CSFB issued a report on the new AOL Networks division.  The Complaint alleges that this report was misleading because it did not include Laura Martin's purported belief that Networks was "'increasingly unlikely . . . [to] hit our P&L estimates.'"

---

[13] To talk of "equivalent disclosures" being made for such events "at or before the beginning of the Class Period" is equally nonsensical, especially in light of the fact that January 12, 2001, the first day of the Class Period, is the day that the America Online–Time Warner merger closed.

(SCAC ¶ 26.)  Both of these days are "relevant" for Dr. Hakala, but rather than treating them as inflationary as the Complaint alleges, Dr. Hakala instead deems them to be <u>corrective disclosures</u> – i.e., revelations of the "truth" as to CSFB, which <u>removed artificial inflation</u> from AOL's stock price, causing it to <u>decline</u>.  (Hakala Rpt. Ex. C-1a, at 1, 2.)  Dr. Hakala's definition of relevance provides no explanation for this decision, which appears to be based on little more than the decline in AOL's share price on those days and contemporaneous news reports unrelated to CSFB.  (<u>See</u> <u>id.</u>)  Dr. Hakala's disregard of the Complaint's allegations with respect to the relevance of Defendants' AOL reports is not isolated to just a few event dates.  In fact, of the 35 CSFB reports on AOL that the Complaint alleges are misleading, Dr. Hakala deems 22 to be <u>not</u> relevant to this case at all.  (<u>Compare</u> Stulz Decl. Ex. 1 <u>with</u> Hakala Rpt. Ex. C-1a.)[14]

With respect to numerous other dates, Dr. Hakala makes no attempt to link specific "relevant events" to specific alleged misstatements by CSFB or specific information that CSFB allegedly knew and failed to disclose.  It is thus impossible to discern how many of the "relevant events" listed in Dr. Hakala's exhibits have anything to do with this case.  For example:

- **February 8, 2001:**  According to Dr. Hakala, Henry Blodgett of Merrill Lynch initiated research coverage of Microsoft with a downgrade but reiterated a positive rating for AOL.  CSFB did not issue any report on AOL.  (Hakala Rpt. Ex. C-1a, at 2.)  Rather than treat this day as unrelated to the case as he should have, Dr. Hakala deems it a "relevant" inflationary event and increases the amount of damages he attributes to Defendants based on this event.  (<u>Id.</u>)

- **April 4-5, 2001:**  According to Dr. Hakala, on April 4, 2001, Reuters reported on a possible deal between AOL and Dreamworks SKG, while Thomas Weisel Partners made positive comments about AOL.  (<u>Id.</u> Ex. C-1a, at 3.)  The following day, UBS issued a positive report on AOL, Lehman Brothers issued a positive report on Yahoo! and Prudential cut its price target for AOL.  (<u>Id.</u>)  On neither day did CSFB issue a report on AOL.  But instead of treating these events as entirely unrelated to this case, Dr. Hakala again deems them to be "relevant" inflationary events, and increases the

---

[14]  The CSFB reports that are not relevant according to Dr. Hakala are dated 1/16/01, 3/5/01, 3/8/01, 3/21/01, 3/23/01, 4/10/01, 4/16/01, 5/15/01, 5/16/01, 5/22/01, 5/29/01, 6/4/01, 6/12/01, 6/25/01 (2 reports), 8/2/01, 8/22/01, 9/25/01, 10/18/01, 11/26/01, 12/5/01 and 1/30/02.

damages he attributes to Defendants based on these events.  (Id.)

- **June 7, 2001:**  According to Dr. Hakala, Deutsche Bank issued a positive report stating that AOL CEO Gerald Levin "is confident about meeting 2001 guidance" and Merrill Lynch issued a report rating AOL a "buy."  (Id. Ex. C-1a, at 4.)  Once again, this date should be irrelevant.  But even though CSFB made no statements about AOL and the disclosures appear to be positive, Dr. Hakala deems the event to be a "relevant" corrective disclosure, and assesses damages to Defendants as a result.  (Id.)[15]

At his deposition, Dr. Hakala could not plausibly explain why most of CSFB's reports are

irrelevant to his analysis, while the seemingly unrelated reports of analysts at other firms are

"relevant" inflationary or deflationary events attributable to CSFB.  Indeed, Dr. Hakala admitted

that "if [he] marked something as relevant on an a priori ground [he] stuck with it as relevant

[there]after, regardless" of what he found after studying the actual disclosures on the event day.

(Hakala 2008 Tr. 367:18-22.)  Incredibly, when asked if he continued to do so "[e]ven if [a

relevance determination] looked counterfactual after the fact," Dr. Hakala responded, "Yeah,

yeah."  (Id. 367:23-25.)

Dr. Hakala's relevance determinations in this case are thus even more problematic than

they were in Xcelera.  See Xcelera, 2008 U.S. Dist. LEXIS 77807, at *3-*4 (excluding Dr.

Hakala's opinions because his event study focused on the wrong dates).  As Defendants

demonstrated in prior briefing, Dr. Hakala's class certification declaration suffered from exactly

this same flaw (see Defs.' Daubert Mem. 7-9; Defs.' Class Cert. Sur-Reply 11-16), and it is now

obvious that Dr. Hakala is either unwilling or unable to limit his analysis to events that actually

---

[15] Other event dates that Dr. Hakala finds relevant despite their obvious lack of connection to this case include August 29, 2001, February 5, 2002, March 12, 2002 and April 18, 2002.  Dr. Hakala treats all of these dates as corrective disclosures apparently due to statements by other analysts regarding advertising and AOL's financial prospects (id. Ex. C-1a, at 5, 8, 9), even though (1) CSFB's own estimates for AOL's financial prospects at the time of these "corrective" disclosures were lower or less optimistic than those contained in the purported corrective disclosures, (2) CSFB was no longer covering AOL at the time of the disclosures, (3) the disclosures contain positive news about AOL or (4) the disclosures concern issues CSFB is never alleged to have misstated (e.g., subscriber growth and broadband issues).  (See Defs.' S.J. Mem. 60-61.)

are relevant to the allegations of this case and the facts established in discovery.  Accordingly, just as in <u>Xcelera</u>, his opinions must be excluded here as unreliable.

 2.  **Dr. Hakala Continues to Improperly Use Dummy Variables, Which Renders His Methodology Impossible to Replicate**

 (a)  **Dr. Hakala's Continued Overuse of Dummy Variables Requires His Exclusion**

Dr. Hakala's persistent, incorrect use of dummy variables to manufacture statistical significance where there is none similarly requires his opinions to be excluded here, just as they were in <u>Xcelera</u>.[16]  <u>See</u> 2008 U.S. Dist. LEXIS 77807, at *2-3.  At class certification, Defendants demonstrated that Dr. Hakala's use of dummy variables in his first event study in this case "deviate[d] significantly" from the "well-documented event study method" in finance literature, and seriously biased his results in favor of finding statistical significance, contrary to what a standard event study would find.[17]  In his latest event study, Dr. Hakala abuses dummy variables even more egregiously, using 79 (60%) <u>more</u> dummy variables during the Class Period than in his earlier event study, and consequently finding 44 (68%) <u>more</u> days during the Class Period to be statistically significant at the 90% confidence level.  (<u>Compare</u> Hakala Rpt. Exs. C-1a & C-2a <u>with</u> Hakala Decl. Ex. B; <u>see also</u> Stulz Rpt. ¶ 104 & Ex. 3.)[18]  Indeed, as Professor Stulz, CSFB's financial economics expert, has found, "the most remarkable aspect of Dr. Hakala's approach is that it unfailingly inflates the statistical significance of abnormal stock returns of the subject company."  (Stulz Rpt. ¶ 100.)

---

[16] "A dummy variable is a variable that takes the values of 1 or 0 to indicate the presence or absence of some effect."  (Stulz Decl. ¶ 26 n.27.)  Dr. Hakala uses them to effectively exclude days on which there were disclosures of "material events" – i.e., AOL-specific news – from his regression analysis.  <u>See</u> <u>supra</u> Part I.B.1.

[17] (Stulz Decl. ¶¶ 25-27; <u>see also</u> Defs.' Class Cert. Sur-Reply 16 n.6; Defs.' <u>Daubert</u> Mem. 3-7; Defs.' <u>Daubert</u> Sur-Reply 3-5.)

[18] In total, Dr. Hakala now finds 109 statistically significant events at the 90% confidence level (all within the Class Period), as compared to 81 (65 within the Class Period) at class certification.

Just as he did in <u>Xcelera</u> and at class certification, Dr. Hakala uses dummy variables in his latest event study to control for what he calls "material events" – effectively, "for every date on which he claims there was any news at all about [AOL] that might have affected the stock price," <u>Xcelera</u>, 2008 U.S. Dist. LEXIS 77807, at *3. In the <u>very same</u> words he used to explain what he did in <u>Xcelera</u> and at class certification, Dr. Hakala's latest expert report states that he used these dummy variables "to control for <u>all</u> days when potentially material information [about AOL] came into the market." (Hakala Rpt. ¶ 30 (emphasis added); Gesser Decl. Ex. 3 (Declaration of Scott D. Hakala, dated Feb. 28, 2007 ("Hakala Decl.")) ¶ 12 (verbatim); Gesser Decl. Ex. 2 (Expert Report of Scott D. Hakala filed in <u>In re Xcelera.com Sec. Litig.</u>, No. 00-CV-11649 (RWZ), dated Apr. 26, 2007 ("<u>Xcelera</u> Rpt.")) ¶ 31 (verbatim).)

Indeed, the <u>only</u> difference in Dr. Hakala's use of dummy variables in his current report from his use of dummy variables in <u>Xcelera</u> and at class certification is the prodigious increase in their number here. In <u>Xcelera</u>, "the dummy variables exclude[d] over 130 of the 343 trading days in the Class Period," or 38%. 2008 U.S. Dist. LEXIS at *3. At class certification, Dr. Hakala used dummy variables to exclude 161 of 421 trading days (Hakala Decl. ¶¶ 15, 17), again amounting to roughly 38% of his sample (Stulz Decl. ¶ 26). Now, however, Dr. Hakala uses dummy variables to exclude 211 of 388 trading days – "<u>more than half</u> of the total trade days considered in the analysis." (Hakala Rpt. ¶ 35 (referencing 216 events) (emphasis added); <u>see also</u> Hakala Rpt. Ex. B-1 (identifying 217 events, of which 6 occur before the Class Period).) "In other words, in the extreme approach to dummying days out that Dr. Hakala takes in [his] Report" supposedly to control for aberrant observations created by AOL-specific news days, the result is that "a stock return is more likely to be aberrant than not." (Stulz Rpt. ¶ 100.)

Dr. Hakala's flawed approach essentially depresses his baseline measurement of the

volatility in AOL's stock price and "invariably results in a greater number of days with larger statistical significance." (Stulz Rpt. ¶ 100.) By using dummy variables to exclude "material events" – i.e., all days on which he identified "a potentially material company-specific news event" (Hakala Rpt. ¶ 35) – Dr. Hakala systematically removes from his regression those days that "tend to have larger stock-price reactions" (Stulz Rpt. ¶ 100; see Stulz Decl. ¶ 26 (explaining that "any company's returns, including in this case AOL's, are likely to be more volatile on days with news than on other days")). Thus, Dr. Hakala estimates AOL's expected returns based only on the least volatile days – the days when AOL's actual returns are likely to most nearly track market/industry returns – which "leads to an understatement of what is [a] normal" price movement for AOL. (Stulz Rpt. ¶ 100; Stulz Decl. ¶ 26 (explaining that Dr. Hakala's use of dummy variables "has the effect of creating a downward bias in his estimate of the volatility of abnormal returns").) Consequently, when Dr. Hakala calculates AOL's abnormal returns on the "relevant" event days (when AOL-specific news does enter the market and returns are more volatile) in the next step of his event study, those abnormal returns are far more likely to be large and statistically significant than they would be if Dr. Hakala had used the accepted methodology for event studies. (See Stulz Decl. ¶ 26; Defs.' Daubert Mem. 5-6.)

This is not merely a theoretical problem with Dr. Hakala's report. At class certification, Dr. Hakala had already found a number of supposedly relevant event dates to be significant based on his improper use of dummy variables, including August 13, 2001, the date on which Dr. Hakala asserts that the relevant truth about layoffs was disclosed to the market. (See Defs.' Daubert Mem. 6.) This event would not have been significant for Dr. Hakala had he performed his event study in accordance with accepted methodology, as Professor Stulz did. (See Gesser Decl. Ex. 25 (Stulz 2007 Tr. Ex. 2), at 3 (showing t-statistic of -1.13 for Aug. 13, 2001).) In Dr.

Hakala's latest event study, the 44 newly significant event dates – which Dr. Hakala did not consider statistically significant in 2007 but now does as a result of his using additional dummy variables – include still more "relevant events" that are critical for his analysis and Plaintiff's case, such as February 5, 2001, the date CSFB issued a Media Week report on AOL, which is the single largest inflationary event in Dr. Hakala's study.  (Compare Hakala Decl. Ex. B, at 1 (t-stat = 1.33 for 2/5/01) with Hakala Rpt. Ex. C-1a, at 1 (t-stat = 2.01 for 2/5/01).)

As Judge Zobel found in Xcelera, "no peer-reviewed journal supports the view that dummy variables may be used on all dates on which any company news appears," as Dr. Hakala has done here.  2008 U.S. Dist. LEXIS 77807, at *3.  Professor Stulz likewise "know[s] of no event study published in a peer-reviewed academic journal that uses [Dr. Hakala's] approach." (Stulz Rpt. ¶ 99.)  Indeed, Defendants have shown that academic texts that discuss the use of dummy variables do not do so in the context of explaining how to perform event studies, and caution that dummy variables should be used sparingly.  (See Defs.' Daubert Sur-Reply 4-5 & n.6.)  Articles that do explain how to perform event studies do not recommend the use of dummy variables, at least not in the way Dr. Hakala has used them.  See, e.g., Campbell et al., supra note 8, at 151-52 (no discussion of dummy variables); Tabak & Dunbar, supra note 8, at 19.4-19.6 (same); (Gesser Decl. Ex. 20 (Imre Karafiath, Using Dummy Variables in The Event Methodology, 23 Fin. Rev. 351 (1988)) at 352 (no discussion of using dummy variables to control for company-specific news days, but explaining that "the same results" as "the traditional [2-step] method" for performing event studies "may be obtained in one step" by using dummy variables for the events being tested (emphasis added)), cited in Hakala Rpt. ¶ 33 n.17).  Even Dr. Marais, whom Plaintiff has put forward as an expert in support of Dr. Hakala's methodology, admits "that there is no article in the academic literature that does exactly what Dr. Hakala did

[with dummy variables] in this case." (Gesser Decl. Ex. 9 ("Marais Tr.") 105:2-4.)[19]

Accordingly, Dr. Hakala's dummy variable methodology, which is fundamental to his analysis and has clearly biased his results in favor of finding statistical significance, cannot be considered a generally accepted method of financial economics and his opinions must be excluded here as a result.

### (b) Dr. Hakala's Approach to Dummy Variables Cannot Be Replicated by Other Economists or Even Dr. Hakala

Dr. Hakala's dummy variables methodology is so arbitrary and mutable that his findings cannot be replicated. Dr. Hakala has performed three event studies on AOL, each of which purports to use a similar methodology and covers a similar time period, yet each of which produces different results. A hallmark of a reliable expert methodology is that its results can be replicated by a different analyst who uses the same methodology. See, e.g., United States v. Green, 405 F. Supp. 2d 104, 120 (D. Mass. 2005) (Gertner, J.) ("Reproducibility is an essential component of scientific reliability."). Here, Dr. Hakala's methodology is so unreliable that he cannot even reproduce his own results.

Professor Stulz has demonstrated that Dr. Hakala repeatedly and inexplicably changed three key aspects of his AOL event study each time he has performed it. (Stulz Rpt. ¶¶ 102-109.) First, as noted above (supra Part I.B.1), Dr. Hakala's identification of "material events" (i.e., AOL-specific news days), and his corresponding use of dummy variables for such days, has

---

[19] Dr. Hakala has repeatedly insisted that an article by Aktas, de Bodt and Cousin in the Journal of Corporate Finance ("Aktas") supports his use of dummy variables. (Gesser Decl. Ex. 21 (Nihat Aktas et al., Event Studies with a Contaminated Estimation Period, 13 J. Corp. Fin. 129 (2007)), cited in Hakala Rpt. ¶ 33 n.17; Gesser Decl. Ex. 5 (Rebuttal Report of Scott. D. Hakala, dated July 17, 2008 ("Hakala Rebuttal Rpt.")) ¶ 38 nn.19-20.) However, Defendants have already shown that Aktas neither follows nor recommends Dr. Hakala's approach. Unlike Dr. Hakala, Aktas (1) uses a statistical technique – the two-state market model – and not dummy variables to control for contaminating events and (2) simulates a "typical" situation, in which a 225-day estimation period is contaminated by three events (1.3%) – nowhere near the 55% of days that Dr. Hakala dummies out in his current report. (See, e.g., Stulz Rpt. ¶ 99 n.67; Defs.' Daubert Sur-Reply 4-5 (citing Aktas, supra, at 130, 137-38).) Moreover, Professor Stulz has shown that the point of the Aktas article is to control for event-induced variance increases, which Dr. Hakala's use of dummy variables fails to control for. (Stulz Rpt. ¶ 99 n.67.)

markedly increased over the course of his three AOL event studies, from 142 "material events" (114 of which correspond to the Class Period here) in his first event study in <u>In re AOL Securities & ERISA Litigation</u> ("<u>In re AOL</u>"), to 161 "material events"/dummy variables (132 within the Class Period) in his class certification declaration, to 211 days in his current report. (<u>See</u> Stulz Rpt. ¶ 104 & n.73; Hakala Decl. Ex. B; Gesser Decl. Ex. 1 (Affidavit of Scott D. Hakala filed in <u>In re AOL</u>, MDL No. 1500 (S.D.N.Y. filed Nov. 2, 2004) ("Hakala Aff.")) App. A ¶ 31.)  Thus, the number of "material events" in the Class Period has jumped by 85% since Dr. Hakala's Affidavit, and by nearly 60% since class certification in this case.  (<u>See</u> Stulz Rpt. ¶ 104.)

Dr. Hakala has essentially <u>admitted</u> that no other economist could exactly duplicate his selection of "material events."  As he has stated, it would not surprise him if two different economists disagreed over the selection of 20-30 out of the 161 "material" days (12%-18%) he identified at class certification.  (Hakala 2007 Tr. 203:5-9.)  At other times, Dr. Hakala has suggested a lower error rate:  "you probably have a plus or minus error rate on event selection about 5 to 10 percent."  (<u>Id.</u> 203:23-25; Hakala 2008 Tr. 191:21-192:3 (suggesting, "at most," a 5% rate).)  But regardless of whether Dr. Hakala believes the error rate is 18%, 10% or 5%, his estimates are <u>dwarfed</u> by the actual 85% change across his three AOL reports.[20]  (<u>See</u> Stulz Rpt.

---

[20] Dr. Hakala claims that he made the changes because his opinions in <u>In re AOL</u> "did not focus specifically on the impact of analyst reports on AOL's share price," which "is more specific to the issues in this case."  (Hakala Rebuttal Rpt. ¶ 35.)  But this justification is inconsistent with what he says in his reports.  In all three event studies, Dr. Hakala's purpose in identifying "material events" is the same:  "to control for all days when potentially material information [about AOL] came into the market."  (Hakala Aff. App. A ¶ 31; <u>see also</u> Hakala Rpt. ¶ 30 (verbatim); Hakala Decl. ¶ 12 (verbatim).)  In all three event studies, Dr. Hakala specified the <u>same</u> protocol for identifying the potentially "material events," which included analyst reports:  "I relied upon the NASDAQ guidelines for material news as set forth and accepted by the SEC.  The information considered included information <u>in analysts' reports</u>, press releases, securities filings and published news articles (newspapers and daily publications, as well as more general publications)."  (Hakala Aff. Ex. A ¶ 31 (emphasis added); <u>see also</u> Hakala Rpt. ¶ 30 & n. 14 (same); Hakala Decl. ¶ 12 & n.6 (same).)  Moreover, Dr. Hakala has repeatedly stated that his identification of potentially "material events" and his use of dummy variables is supposed to control even for "<u>news unrelated to the subject of interest</u>."  (Hakala Rpt. ¶ 33 n.17 (emphasis added); <u>id.</u> (dummy variables used to control for AOL-specific news "both related and unrelated to the allegations in this case"); Hakala Decl. ¶ 15 n.9 (same).)  Thus, "[i]f [Dr. Hakala's] purpose of

25

¶ 104 n.74.)

Second, Dr. Hakala has inexplicably altered the estimation window he uses for his regression.  (Stulz Rpt. ¶¶ 108-109.)  In In re AOL, Dr. Hakala used a period from January 12, 2001 through September 16, 2002, and specifically "extended the study period beyond . . . July 26, 2002," which, he claimed, had "increased the reliability and precision of the resulting estimates."  (Hakala Aff. Ex. A ¶¶ 30, 32.)  At class certification, Dr. Hakala used a very similar estimation window (January 9, 2001-September 16, 2002).  (Hakala Decl. Ex. B.)  However, in his current report, Dr. Hakala uses the period from January 12, 2001-July 25, 2002 – exactly the one he rejected as too short in In re AOL.  (See Stulz Rpt. ¶ 108-09.)

Third, Dr. Hakala has changed the market index and the components of the industry indices he uses for his regression – again, without providing any rationale for the change.[21] (Stulz Rpt. ¶¶ 105-107.)

Like Dr. Hakala's improper, post-hoc relevance determinations, his inadequately explained and seemingly arbitrary changes to his event study have the effect of increasing the statistical significance on days Dr. Hakala believes may be important to Plaintiff's claims.  For example, as a result of the changes that Dr. Hakala introduced since class certification, an additional five days on which CSFB issued analyst reports (or the following days when the reports were issued after the market closed), and an additional thirteen "relevant" "curative

---

dummying out days is, as he claims, to obtain a set of days that are not contaminated by news, that set of dummy variables should not change based on whether the defendants in the case are analysts or not."  (Stulz Rpt. ¶ 104 n.74.)

[21] In his rebuttal, Dr. Hakala claims that his latest selection of companies was not arbitrary, because they "were reported by analysts and in news reports as moving in concert with or otherwise related to AOL Time Warner's two business segments."  (Hakala Rebuttal Rpt. ¶ 47.)  But that is just the point:  Professor Stulz shows that some of the changes Dr. Hakala made were not supported by analyst reports or AOL's identification of its own competitors in its securities filings.  (Stulz Rpt. ¶ 106.)  Dr. Hakala's other justification, that his changes were necessitated by the shorter estimation period (Hakala Rebuttal Rpt. ¶ 48), just begs the question of why he changed the estimation period back to one that he considered inadequate at the time he did his first event study in In re AOL.

disclosure" or inflationary event days have become, according to Dr. Hakala, statistically

significant at the 95% confidence level.  (Stulz Rpt. ¶ 102; id. at Ex. 3.)  Dr. Hakala undertook a

similar, results-oriented exercise in between his first AOL event study in In re AOL and his class

certification event study in this case by adding material event dates/dummy variables for days on

which Defendants issued their AOL reports, including, for example, September 19, 2001 (Hakala

2007 Tr. 86:17-24 (admitting that September 19, 2001 was not a materal event day in his In re

AOL event study), one of only two or three dates on which Dr. Hakala believes that a CSFB

report measurably increased AOL's stock price (id. 227:8-228:5; Hakala Rebuttal Rpt. ¶¶ 7, 32).

The arbitrary changes that Dr. Hakala made to his selection of material events and his

event study in order to increase statistical significance render his report unreliable.  They do not

qualify as a "methodology" that could be used by another analyst to duplicate Dr. Hakala's

results.  As a result, these changes – standing alone – would provide more than sufficient

grounds for excluding Dr. Hakala's opinions.

But these are not Dr. Hakala's only departures from standard event study methods that

make his results impossible to replicate.  Indeed, Dr. Hakala's unique and arbitrary take on

statistical significance flies in the face of basic scientific methodology.  Dr. Hakala at times

eschews statistical significance entirely.  Thus, as Professor Stulz has pointed out:

> [i]t is contrary to established scientific methodology to assume that
> a day associated with insignificant abnormal returns can be
> considered to be 'curative' . . . .  However, almost half of the days
> Dr. Hakala claims are relevant corrective disclosures of
> advertising-related information are insignificant even in his model,
> which systematically overstates the significance of abnormal
> returns.

(Stulz Rpt. ¶ 58; id. ¶ 58 n.47 (noting that 23 of 49 days cited as "relevant" in Dr. Hakala's Ex.

C-1a are statistically insignificant).)  The insignificant dates on which Dr. Hakala attributes

inflation or loss causation to Defendants include January 12, 2001, the first day of the Class

Period, when Defendants allegedly issued their first AOL report, which contained an allegedly false $80 price target, and July 18-19, 2002, the days the <u>Washington Post</u> published articles raising questions about AOL's accounting for certain advertising transactions and, according to Dr. Hakala, the first corrective disclosures of the alleged fraud relating to advertising investigations.  (<u>See</u> Hakala Rpt. Ex. B-1, at 1, 11.)  Nothing in Dr. Hakala's report explains why he believes it is appropriate to jettison statistical significance at some times but not others, nor is there any basis from which another economist could duplicate his unscientific significance determinations.  As a result, Dr. Hakala's opinions lack any indicia of reliability, and must be rejected.

### C. Dr. Hakala's Use of a Proxy for the Effect of Defendants' Statements Is Wholly Unreliable

Besides Dr. Hakala's repetition of the flaws that led Judge Zobel to exclude his opinions in <u>Xcelera</u>, his latest event study contains an equally fatal problem.  Dr. Hakala does not measure the price inflation attributable to CSFB's alleged misstatements by analyzing the movement in AOL's share price when Defendants actually issued their AOL reports – as he should have under established law and economic principles.  Rather, he attempts to do so based on AOL's average price movement on 23 days when CSFB <u>did not speak</u> but when other analysts issued negative reports regarding information that CSFB is not alleged to have known.  (Hakala Rpt. ¶¶ 14, 27-28.)  Dr. Hakala then takes the average AOL price movement on such days – which he computes to be approximately -2.7% – and introduces that amount (or a percentage of that amount) of artificial inflation into AOL's stock price on certain days on which CSFB <u>did</u> issue an AOL report, regardless of AOL's <u>actual</u> stock price movement on those days.  Dr. Hakala thus relies on the market impact of other analysts' statements on AOL's share price as a proxy for the purported impact of CSFB's statements, in an effort to establish that, had Defendants made

disclosures that were different from what Defendants actually published in their reports, these statements would have affected AOL's stock price. (Id.; see also Stulz Rpt. ¶ 35.) Dr. Hakala's approach is inherently and profoundly speculative and it is inconsistent with generally accepted methodologies in the field of financial economics. (See Defs.' S.J. Mem. 71-72; Stulz Rpt. ¶¶ 5(d), 32-48.)

There are at least three serious methodological flaws in Dr. Hakala's use of an analyst proxy that render his opinion inadmissible. First, Dr. Hakala's proxy has absolutely nothing to do with AOL's actual stock price movements. Although Dr. Hakala performed what he considers to be a detailed event study, he often disregards the results of that study and instead replaces them with the unrelated computations he derived from his proxy analysis. Thus, on January 12, 2001, the day CSFB issued its first AOL report during the Class Period, Dr. Hakala's event study calculated a negative abnormal return for AOL of -2.23%. (Hakala Report Ex. B-1, at 1.) Dr. Hakala, however, applies his proxy to introduce positive 2.7% artificial inflation into AOL's stock price that day. (Id. Ex. C-1, at 1.) In other words, Dr. Hakala seems to think that on a day when AOL's stock price declined, its price would have been exactly 2.7% lower but for Defendants' report. Yet Dr. Hakala has never identified any academic support for this approach of substituting his hypothetical proxy for his actual event study results, and none exists.

Indeed, Dr. Hakala's use of his analyst proxy, rather than his event study's results, to demonstrate inflation and market impact is virtually identical to the approach that the Southern District of New York excluded as "so transparently unreliable as to be inadmissible as a matter of law" in DeMarco v. Lehman Brothers, Inc., 222 F.R.D. 243, 248 (S.D.N.Y. 2004). There, the plaintiff's expert relied on an analyst proxy that was based on an academic study, which had found that significant ratings downgrades by research analysts result, on average, in abnormal

29

returns of -5%.  Id. at 248-49.  Yet the court rejected the study as a basis for the expert's opinion,

finding, among other things, that the proxy "has virtually nothing to do with [the defendant

analyst], [the analyst's] alleged influence on the market (which [the expert] largely just

assumes), or [the analyst's] actual statements, and appears irrelevant on its face."  Id. at 248.  In

fact, Dr. Hakala's approach is even less reliable than the approach that the DeMarco court

rejected, because Dr. Hakala's average analyst effect is computed using far fewer data points

over a much shorter period of time.  See id. (noting that study looked at ratings changes for 200

companies over three-year period).

     Second, Dr. Hakala's approach is intellectually unsound because it essentially assumes

that any time one analyst issues a negative report about a company, it will have an effect that is

very similar to a different analyst's negative report concerning different information about that

company.  Dr. Hakala's approach thus "contradicts the literature in financial economics that

shows that the impact of analyst statements on stock price, when there is one, depends on a wide

variety of factors for which Dr. Hakala does not control."[22]  (Stulz Rpt. ¶¶ 5(d)(i); see id. ¶ 37;

cf. Stulz Decl. ¶¶ 32-33, 36.)

     Notably, Dr. Hakala never bothers to compare the information disclosed on his 23 proxy

days and the negative information that CSFB allegedly should have disclosed but did not.  (Stulz

Rpt. ¶¶ 35-36; Hakala 2008 Tr. 95:14-96:15 (acknowledging that his opinion does not make any

effort to account for the varying content and importance of the news released on various days, or

different ratings, estimates and price targets that other analysts had on AOL).)  As a result, 11 of

Dr. Hakala's 23 analyst proxy days contain commentary and estimates for AOL's 2003

---

[22] Such factors include, but are not limited to, the content of the report, the ranking of the analyst, statements by other analysts and the subject company – here, AOL – and the timing of the recommendation or earnings forecast.  (See Stulz Rpt. ¶ 36.)

performance, even though CSFB did not issue 2003 estimates for AOL <u>at any point</u> in the Class

Period, nor is CSFB alleged to have made any misstatements or omissions about AOL's 2003

performance.  (Stulz Rpt. ¶ 44; <u>id.</u> at Ex. 2.)  Dr. Hakala's proxy also includes similarly

irrelevant dates, such as March 12, 2002, when multiple analysts issued negative commentary

regarding AOL's subscriber growth (Hakala Rpt. Ex. C-1a, at 8), even though CSFB is not

alleged to have made misstatements or omissions about AOL's subscriber growth.

 <u>Third</u>, as Professor Stulz has explained, "[e]ven if one were to assume that the average

reaction of AOL's stock price to analyst reports can be used to approximate AOL's stock-price

reaction to a hypothetical disclosure by CSFB, Dr. Hakala's estimate of such a reaction is flawed

because his sample of 'negative analyst days' is beset with errors."  (Stulz Rpt. ¶¶ 5(d)(iii), 41;

<u>id.</u> at Ex. 2.)  Dr. Hakala's proxy date selection is "arbitrary and unscientific," and does not even

conform to his own selection criteria.  (Stulz Rpt. ¶¶ 41-48; <u>id.</u> at Ex. 2.)  For example, although

Dr. Hakala purports to base his proxy on "relatively clean" days (Hakala Rpt. ¶ 27) – a self-

defined term by which Dr. Hakala means that there was limited confounding information – he

nonetheless includes dates such as October 17, 2001, which coincides with AOL's <u>own</u> earnings

release for the third quarter of 2001 (<u>id.</u> Ex. C-1a, at 6; Hakala 2008 Tr. at 393:3-394:12

(admitting that 10/17/01 was "partially confounded")).  Other dates in Dr. Hakala's proxy are

confounded by public press reports regarding AOL, by information in the analyst reports

themselves that is unrelated to the allegations in this case and/or by the release of multiple

analyst reports on the same day, which the academic literature indicates will typically have a

greater impact than a single report by a firm such as CSFB.  (Stulz Rpt. ¶¶ 42-46.)  Just as the

<u>DeMarco</u> court held, there is absolutely "no objective basis" for a purported methodology that

depends on an expert's "subjective impression that [the days he selected for computing a proxy]

31

were dates when 'confounding news' from the issuer was 'minimal.'"  222 F.R.D. at 249.  Such

an approach – which Dr. Hakala also followed here – simply is not admissible under <u>Daubert</u> or

Federal Rule of Evidence 702.  <u>See</u> <u>id.</u>

Dr. Hakala's proxy approach is nonsensical when evaluated from the perspective of logic,

the academic literature or even the allegations (much less the facts) in this case, and must

accordingly be excluded as fundamentally unreliable.

**II.**    **<u>Dr. Marais's Opinions Are Irrelevant and Needlessly Cumulative</u>**

Plaintiff submitted the "rebuttal" report of Dr. Marais in a belated effort to salvage Dr.

Hakala's testimony regarding his unconventional use of dummy variables.  (<u>See</u> Pl.'s S.J. Opp'n

53 n.37; <u>see also</u> Gesser Decl. Ex. 8 (Rebuttal Declaration of M. Laurentius Marais, dated July

16, 2008 ("Marais Rpt.")) ¶¶ 3, 5-7; Marais Tr. 66:3-6, 111:8-14.)  Since Dr. Hakala's testimony

is inadmissible for the reasons set forth above, the "rebuttal" testimony of Dr. Marais must

likewise be precluded for the simple reason that, without Dr. Hakala's testimony in the record,

Dr. Marais's testimony is irrelevant.

However, even if Dr. Hakala's testimony were not inadmissible, Dr. Marais's testimony

would still have to be precluded.  To be admissible, expert testimony must be relevant "not only

in the sense that all evidence must be relevant, <u>see</u> Fed. R. Evid. 402, but also in the incremental

sense that the expert's proposed opinion, if admitted, <u>likely would assist the trier of fact to

understand or determine a fact in issue</u>."  <u>Ruiz-Troche</u>, 161 F.3d at 81 (citing <u>Daubert</u>, 509 U.S.

at 591-92) (emphasis added).  Because Dr. Marais's testimony is only offered as a partial – and

inadequate – defense of Dr. Hakala's methodology concerning dummy variables and does not

bear on any fact placed at issue by Plaintiff's claims, Dr. Marais's testimony will not "assist the

trier of fact to understand or determine a fact in issue" and thus does not satisfy <u>Daubert</u>.

Moreover, Dr. Marais repeatedly insisted at his deposition that he has not taken any steps

to evaluate or form an opinion about how Dr. Hakala has applied his methodology to the facts of this case or whether Dr. Hakala has properly applied the abstract principles about which Dr. Marais has opined.  For example, Dr. Marais explicitly acknowledged:

- "It is fair to say that I have no expert opinion one way or the other about the degree of replicability of Dr. Hakala's protocol.  It's simply not anything that I have looked into.  It's outside the scope of what I have looked into in this case."  (Marais Tr. 91:24-92:5.)

- "I've focused as I've explained previously on a specific and narrow issue; namely, how did [Dr. Hakala] use dummy variables to represent certain dates.  Not exactly how did he arrive at those certain dates."  (Id. 103:3-7.)

- "Dr. Hakala quotes some academic literature but the connection between his decisions on [whether to use a dummy variable for] certain days and the academic literature that he quotes is outside the scope of what I have looked at and been asked to consider in this case."  (Id. 112:2-112:8.)

Consequently, even if the validity of Dr. Hakala's findings was deemed a "fact in issue" for the jury, Dr. Marais has made abundantly clear that he has no view concerning the specific results of Dr. Hakala's event study or even on whether Dr. Hakala's methodology was applied properly in his analysis for this case, casting doubt on both the relevance and reliability of Dr. Marais's opinions here.

Finally, since Dr. Marais's "rebuttal" testimony is specifically intended to address Professor Stulz's criticisms of Dr. Hakala's use of dummy variables, it is essentially redundant, because Dr. Hakala himself has already responded to Professor Stulz's criticisms at length.  (See Hakala Rebuttal Rpt. ¶¶ 41-46 & nn.21-33; Hakala 2008 Tr. 384:7-388:5.)  Federal Rule of Evidence 403 makes clear that even relevant expert testimony may be excluded if it represents a "needless presentation of cumulative evidence," as is the case here.  Fed. R. Evid. 403; McDonough v. City of Quincy, 452 F.3d 8, 20 (1st Cir. 2006); see also Elwood v. Pina, 815 F.2d 173, 178 (1st Cir. 1987) ("Evidence is cumulative if repetitive, and if the small increment of probability it adds may not warrant the time spent in introducing it.") (quotation marks omitted).

### III.    Professor Black's Opinions Should Be Precluded

Plaintiff's third proposed expert, Professor Black, offered two main opinions in his report:  (1) that if CSFB had publicly disclosed AOL projections by Kiggen and Martin that were consistent with their alleged private views and information, these hypothetical disclosures would likely have been important to investors and would likely have affected AOL's share price; and (2) that, assuming Kiggen and Martin had the private views and information alleged, CSFB's published AOL projections were unreasonable.  (Gesser Decl. Ex. 10 (Expert Rebuttal Report of Bernard S. Black, dated July 17, 2008 and marked as Exhibit 1 at the deposition of Professor Black ("Black Rpt.")) at 5-6.)  At his deposition just one month later, however, Professor Black was forced to acknowledge not only that many of the financial figures central to his report's conclusions were fundamentally wrong, but that, as a consequence, he was no longer comfortable with certain of his earlier opinions concerning the unreasonableness of Defendants' projections, and that, by reaching his conclusions in something of a vacuum, he had failed to take into account information concerning other analysts' own projections that could well cause him to alter his opinions still further.  Because Professor Black's own testimony demonstrates that his methods – such as they are – are neither reliable nor applied reliably to the facts of this case, and because it further shows that he is not qualified to offer the analyst-related opinions proposed and, instead, has offered "rebuttal" testimony on issues not addressed by Defendants' initial experts' reports, Professor Black's testimony must be precluded.

### A.    Professor Black's Methods Are Not Reliable and Are Not Applied Reliably to the Facts of this Case

As he was compelled to acknowledge at his deposition, Professor Black's report – which was served upon Defendants in its purportedly final and complete form – required drastic revisions during his deposition due to his reliance on incorrect data, severely undermining the

reliability of his conclusions.  His deposition revealed that his opinions are based on little more than speculative guesswork, baseless interpretations of the limited facts available to him, and what he deems his own "informed judgment."  (Gesser Decl. Ex. 11 ("Black Tr.") 159:5.)  This sort of haphazard "methodology" from a purported expert witness is inadmissible, and Professor Black's testimony should be precluded as a result.

In order to address the second of the two questions posed in his report, Professor Black embarks on an extended narration of selected events between January and September 2001, detailing why he believes that one CSFB report (April 10, 2001) and a January 24, 2001 CSFB presentation to Fidelity (which was never published and is not even at issue in this case) demonstrate that CSFB's public projections were not plausible when contrasted with Kiggen's and Martin's privately held views and information and AOL's actual performance.  (Black Rpt. at 7-16.)  Putting aside the tautological nature of Black's exercise – which expressly assumes that Kiggen and Martin did not believe in CSFB's public estimates (id. at 3-4) in order to reach the conclusion that there is evidence "that Kiggen was not reporting an honest, combined Kiggen-Martin view of AOL's or AOLTW's prospects of value" (id. at 8) – there are at least two fundamental problems with his impressionistic efforts to second-guess Kiggen's and Martin's work and malign their motives based on a less-than-complete understanding of the factual record.[23]

First, Professor Black simply gets the underlying numbers wrong.  In support of his conclusion that "CSFB's revenue projections are not plausible" (id. at 10), Professor Black's report undertakes an analysis of AOL's revenues, including Kiggen's projected quarter-over-quarter growth rate for America Online for the fourth quarter of 2000, which Professor Black

---

[23] Professor Black reviewed "selected portions" of certain specified documents, including "[o]ther discovery documents provided to me by counsel."  (Black Rpt. at 3.)  It is not apparent what those documents were.

calculated at 19% and deemed "absurd" (id. at 7-9).  However, as Professor Black was forced to admit at his deposition, the figures and calculations contained in his revenues discussion were erroneously based on financial results that were restated in March 2001 – i.e., on numbers that did not exist when Kiggen projected America Online's fourth quarter 2000 revenue in January 2001.  (Black Tr. 87:7-103:12.)  As a result of this fundamental mistake, Professor Black spent considerable time at his deposition manually correcting his report to address all the errors he found by examining the relevant numbers (see Black Rpt. at 9), including by amending his original assertion that Kiggen had projected a 19% quarter-over-quarter growth rate for the fourth quarter of 2000 with the actual figure of 11.8%, which Professor Black now agreed was not "absurd" but simply "highly optimistic" (Black Tr. 103:7-107:15; 123:20-124:23, 228:4-229:20).  Professor Black likewise revised his written testimony to delete colorful adjectives such as "unrealistic" and "shocking" (Black Rpt. at 9) and indicated that he would have to conduct further analysis before he could even express a view as to whether the new 11.8% figure was unreasonable (Black Tr. 103:13-24).  Importantly, Professor Black acknowledged that his erroneous 19% metric affected to some extent his judgment as to whether CSFB's other metrics were reasonable (id. 57:23-59:9), calling into question the reliability of his overarching opinion as to the supposed unreasonableness of all of CSFB's projections – and whether Professor Black even still believes his own initial conclusions on this point.

Second, although Professor Black acknowledged at his deposition that looking at the report and projections of Morgan Stanley's Mary Meeker on AOL "would potentially be relevant" in reaching his opinion as to whether or not the market growth figures attributed to Kiggen in Table 2 of Professor Black's report were reasonable (id. 114:19-115:18), Professor Black did not undertake such a review of other analysts' projections (id. 107:24-109:3).  Nor did

36

he undertake any sort of systematic review of analyst opinions on AOL more generally in order to assess the reasonableness of CSFB's published estimates as compared with those of other peer analysts (id. 30:10-11, 40:7-17, 56:21-57:2, 169:22-170:3, 247:6-249:5), though he acknowledges in his report that "[o]ne cannot assess an analyst's work or honesty in the abstract" (Black Rpt. at 17) and testified at his deposition that, despite not having done any systematic review, other analysts' published views somehow "informed my judgment as to the reasonableness or plausibility of [Kiggen and Martin's] views" (Black Tr. 34:14-35:5).  Rather, and despite the fact that he himself is "not a securities analyst" and recognizes that "there is certainly much about the business of securities analysis that I do not know" (id. 43:10-13), Professor Black's methodological approach appears to boil down to whether he can discern or comprehend what he would consider a reasonable basis for Defendants' views and projections (see id. 31:13-32:23; see also id. at 44:21-45:3 ("I would claim to be capable of doing financial analysis and recognizing, you know, whether numbers add up consistently, whether trends make sense and so on, and there are instances in at least the CSFB reports where I believe it was not the case that the trends made sense to me.")).  This sort of subjective, after-the-fact smell-test by a law professor hardly qualifies as reproducible scientific methodology, much less a reliable one for the financial analysis of a complex company.

Professor Black's approach to the first question posed in his report – concerning the "likely" hypothetical stock-price impact and importance to investors of hypothetical disclosures by Kiggen and Martin – is equally problematic.  When asked what he did to reach his conclusions, Professor Black responded:  "I tried to become informed about what AOL was saying publicly.  I tried to become generally informed about news stories about AOL during the time period and I tried to become generally informed about the views of other analysts."  (Id.

157:5-11.)  Professor Black – who acknowledged that he has only a "general familiarity" with the academic literature on analyst statements and market impact (id. 19:9-16) – did not try to "pin [his overall view about the events of this case] down to a particular impact of a particular statement on a particular day" (id. 154:4-7), nor did he conduct any empirical tests to see what happened if other similarly ranked analysts released negative news about AOL (id. 157:12-18, 159:17-160:12).  In his words, his opinions "concern not the effect of the statements that CSFB's analysts made, but the potential effect of the statements it could have made" (Black. Rpt. 21 (emphasis added)), although, as he testified, he does not even know how to prove his views about the likely impact of negative analyst statements (Black Tr. 158:11-159:6).  Rather, he termed the basis for his conclusion "an informed judgment about financial markets" based upon his "being generally knowledgeable about market efficiency and what kinds of information are likely to matter" (id. 158:2-159:6) and what seems "plausible" to him (id. 162:3-10).

The mere fact that a conclusion about hypothetical events makes "plausible" sense to someone – even a law professor "generally knowledgeable about market efficiency" – hardly renders that conclusion reliable for purposes of admission as expert testimony.  Indeed, the sort of untested, untestable and patently speculative opinion testimony offered by Professor Black about which hypothetical statements by Defendants would have been relevant to investors and would have impacted the market price of AOL – opinion testimony which is "connected to existing data only by the ipse dixit of the expert," Joiner, 522 U.S. at 146 – must be excluded.

### B.    Professor Black Is Not Qualified to Offer His Opinions

It is well established that witnesses may not give expert testimony regarding matters on which they are not qualified as an expert.  See Poulis-Minott v. Smith, 388 F.3d 354, 359 (1st Cir. 2004).  Although Professor Black considers himself an expert on "corporate finance [and] corporate and securities law and practice; including the potential impact of analyst estimates on

share prices" (Black Rpt. at 2), Professor Black's own testimony demonstrates that he is not qualified to testify as an expert on either of the two analyst-related issues identified in his report: (1) the likely importance to investors of particular hypothetical analyst statements and (2) the reasonableness of particular statements by analysts, assuming they had certain information and beliefs.  (See id. at 5.)

In particular, Professor Black acknowledged that he has never been a securities analyst, has never published any work on securities analysts, has not read any of the case law on analyst statements and market impact, and has only "general familiarity" with "some of" the academic literature on analyst statements and market impact and does not "claim to be closely familiar" with or otherwise consider himself an expert on that literature.  (Black Tr. 18:6-19:22, 159:11-21.)  As he himself admitted:  "On that body of literature that studies analysts in particular, no. I'm not a particular expert in that area because I haven't worked in that area" (id. 19:19-22) and "there is certainly much about the business of securities analysis that I do not know" (id. 43:10-13).  Although he claims to have "general knowledge" about "what kinds of information investors are looking for from analysts" (id. 16:23-17:4), it is not apparent whether he has any more expertise in making such assessments than a finder of fact.  Professor Black thus plainly lacks sufficient "knowledge, skill, experience, training or education" regarding either of the analyst-related issues on which he seeks to opine as an expert witness and should be excluded as unqualified.  Fed. R. Evid. 702.[24]

---

[24] Professor Black also acknowledged that he is not an advertising or marketing expert.  (Black Tr. 19:23-20:3.)  He further admitted that he brings no expertise to reviewing e-mails and reading deposition transcripts and drawing factual conclusions from them (id. 132:8-18), an approach that he employed in reaching conclusions about what Kiggen and Martin believed about the advertising market (see id. 128:13-132:18; see also Black Rpt. at 3-16).

### C.   Professor Black's Proposed Rebuttal Testimony Impermissibly Addresses Issues Not Addressed By Defendants' Initial Experts' Reports

A rebuttal expert, by definition, must attempt to actually rebut or otherwise contradict the testimony of another party's expert witness.  See, e.g., Fed. R. Civ. P. 26(a)(2)(C).  Because Professor Black seeks to offer "rebuttal" testimony that neither rebuts nor contradicts that of Professors Deighton and Stulz but instead addresses issues outside the scope of their proffered opinions, his testimony must be excluded.  See, e.g., Peak Interests, L.L.C. v. Tara Hills Villas, Inc., No. 8:06-CV-747, 2008 WL 650301, at *3 (D. Neb. Mar. 5, 2008) (excluding plaintiff's proposed rebuttal expert witness where he did "not rebut any of the opinions offered by the Defendant's experts"); North v. Cummings, No. 06-CV-174-D, 2007 WL 4616282, at *2 (D. Wyo. Mar. 27, 2007) (explaining that rebuttal experts "must restrict their testimony to attacking the theories offered by the adversary's experts"); Jorgenson Forge Corp. v. Consarc Corp., No. C00-1879Z, 2002 WL 34363668, at *1 (W.D. Wash. Jan. 9, 2002) (excluding rebuttal expert testimony that went "well beyond the scope of the Plaintiff's expert reports and introduce[d] new opinions").[25]

Far from offering testimony to rebut the opinions expressed by Professor Deighton, Professor Black admitted at his deposition that he actually agrees with Professor Deighton as to both of the questions addressed in Professor Deighton's own report.[26]  In other words, Professor

---

[25] Insofar as the July 2008 reports of Professors Black and Kraakman (see infra Part IV) may, in the alternative, be viewed as initial expert reports, they are untimely.  See, e.g., Baldwin Graphic Sys., Inc. v. Siebert, Inc., No. 03 C 7713, 2005 WL 1300763, at *1-3 (N.D. Ill. Feb. 22, 2005) (excluding rebuttal report sections containing new opinions as untimely under Rules 26(a)(2)(B) and 37(c)(1)); (see also Stipulation and [Proposed] Order Regarding Fourth Scheduling Modification [Dkt. # 212] (approved by electronic order on February 19, 2008).  This untimeliness is neither "substantially justified" nor "harmless," Fed. R. Civ. P. 37(c)(1), as Professors Black's and Kraakman's discussion of new issues in their reports prejudices Defendants by making it difficult, if not impossible, for them to respond.  See Ebbert v. Nassau County, No. CV 05-5445 (FB) (AKT), 2008 WL 4443238, at *14 (E.D.N.Y. Sept. 26, 2008); STS Software Sys., Ltd. v. Witness Sys., Inc., No. 1:04-CV-2111 (RWS), 2008 WL 660325, at *2 (N.D. Ga. Mar. 6, 2008).

[26] In particular, both Professors Deighton and Black opine that during the period when Martin was privately voicing concerns about the advertising market downturn, the market was already aware that the traditional

40

Black does not take issue with Professor Deighton's opinions on the two questions Professor Deighton was asked to answer (id. 21:17-23:21, 25:2-26:5, 52:24-53:8); rather, he views his task as coming up with different and, in his view, "more appropriate" questions to answer (id. 53:9-21).  This is simply not the purpose of a rebuttal expert report.

Professor Black's two opinions likewise appear to be, at best, tangential riffs on – rather than rebuttals to – Professor Stulz's own expert report.  As Professor Black himself explains, "[m]ost of Prof. Stulz's report addresses damages, stock price reactions on particular days, and whether CSFB's actual reports had a significant effect on market prices.  These subjects are beyond the scope of my report."  (Black Rpt. at 21.)  And where Professor Black does mention Professor Stulz's specific views, he either does not disagree with them (see, e.g., id. at 22) or expressly voices his concurrence (see, e.g., id. at 22 ("Prof. Stulz argues that investors knew in general of potential risks in both traditional and online advertising.  I agree.") (internal footnote omitted), 23 ("Prof. Stulz observes that 'several of [CSFB's] reports' indicated risks to whether AOLTW would achieve its guidance, and some expressly mentioned the slowing ad market.  Indeed they did.")).  That Professor Black may wish to use Professor Stulz's views as a launch-pad for his own exploration of a topic in no way renders Professor Black's opinions proper rebuttal testimony, and his testimony should therefore be excluded.

---

advertising market was declining and that this decline could have negative effects on AOL.  (Compare Deighton Rpt. ¶ 9 with Black Tr. 27:2-7 (acknowledging that he "did not disagree that the kinds of concerns at some level of severity that Laura Martin had at that time were out there in the public domain"), 29:19-30:7 (explaining that his review of information suggests that "at least some" analysts estimated the impact that the downturn in the advertising market would have on AOL); see also id. 25:4-26:5).  Professor Black likewise agrees with Professor Deighton on the second issue, namely whether it was reasonable for someone knowledgeable about advertising and AOL between January and September 2001 to have reached a more optimistic view than Martin appears to have reached.  (Compare Deighton Rpt. ¶ 10 with Black Tr. 22:9-16 (explaining that Black has "no doubt that one could be more optimistic than Laura Martin was at particular points in time and still be within the range of reasonableness"), 23:10-13 ("[I]t's certainly the case that sort of in general it might well be possible to be more optimistic than Laura Martin was at particular points in time."); see also Black Tr. 23:14-17 ("I read Professor D[eigh]ton's opinion and said at that level of generality, it's not clear that I would have a basis for disputing that opinion . . . ."), 52:5-11.)

**IV.** <u>**Professor Kraakman's Opinions Should Be Precluded**</u>

In his "rebuttal" report, Professor Kraakman – Plaintiff's final proposed expert and another law professor – has sought to address several questions concerning how efficient markets function and whether, assuming prominent securities analysts can have a material effect on share prices in an efficient market, there is "justification" for treating analyst statements differently from issuer statements for purposes of fraud-on-the-market theory. (Gesser Decl. Ex. 12 (Expert Rebuttal Report of Reinier Kraakman, dated July 16, 2008 ("Kraakman Rpt.")) ¶ 3.) [27] Insofar as Professor Kraakman is opining on questions of law, such testimony improperly invades the judge's function and should be precluded. And, insofar as he is opining on empirical or definitional issues, his testimony must likewise be precluded as neither relevant nor the result of reliable methods applied reliably to the facts of this case.

Professor Kraakman has conducted no empirical studies to support the opinions reflected in his report (Kraakman Tr. 60:9-12, 63:19-21) and, by his own admission, his opinions add nothing to the existing literature on market efficiency (<u>id.</u> 65:23-66:4). Indeed, as Professor Kraakman acknowledged, his opinions on several of the questions serve largely to confirm the existing definition of what it means for there to be an efficient market (<u>id.</u> 62:9-63:4, 65:17-22) and he is "[p]robably not" any more of an expert on the financial literature concerning the effect of securities analyst statements on stock prices than the lawyer questioning him at the deposition (<u>id.</u> 51:25-52:7). Because he is demonstrably unqualified to render expert opinions on questions concerning the effect of analyst statements on market prices and because the vast majority of his

---

[27] In particular, Professor Kraakman was asked by Plaintiff's counsel to opine on four issues: (a) "whether the reports of prominent securities analysts can have a material effect on share prices in an efficient market"; (b) "whether, assuming such an effect, there is justification for treating analyst statements differently than issuer statements for purposes of fraud-on-the-market theory"; (c) "whether prices in an efficient market react only to new information bearing on share value"; and, if so, (d) "whether prices in an efficient market *necessarily* react to statements by analysts who, although capable of moving market prices, merely repeat information (or misinformation) that is already fully disclosed to the market." (Kraakman Rpt. ¶ 3.)

report does not even attempt to rebut Defendants' own experts' opinions (much less to address actual issues of fact in this case rather than normative judgments and speculative guesses about what should or could have taken place), his testimony should be precluded.

### A. Professor Kraakman's Opinions on Questions of Law Are Impermissible

Federal Rule of Evidence 702 allows expert testimony only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Thus, Rule 702 does not permit expert opinions on legal questions because such opinions do not help the trier of fact – the jury – "to understand the evidence or to determine a fact in issue." Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997). Accordingly, experts are generally not permitted to opine on questions of law. Id. at 99 ("[P]urely legal questions and instructions to the jury on the law to be applied to the resolution of the dispute before them is exclusively the domain of the judge. Accordingly, expert testimony on such purely legal issues is rarely admissible."); id. at 100 ("[T]he judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial."); Pelletier, 470 F.3d at 54 ("the general rule is that it is the judge's role, not a witness's, to instruct the jury on the law"); United States v. Buchanan, 964 F. Supp. 533, 537 (D. Mass. 1997) (Gertner, J.) ("To the extent that [the Government's proposed expert witness's] testimony recounts issues of law . . . it invades the judge's function.").

Professor Kraakman seeks to opine on the question of whether analyst statements should be treated differently from issuer statements for purposes of the fraud-on-the-market theory.[28] (Kraakman Rpt. ¶ 3.b.) This is a question of law, as it can be answered solely by determining what relevant law means, without any need to determine the facts of the case. See Interfaith

---

[28] Professor Kraakman also acknowledged that another of the questions on which he seeks to opine – "whether the reports of prominent securities analysts can have a material effect on share prices in an efficient market" (Kraakman Rpt. ¶ 3) – was partially a question of law (Kraakman Tr. 59:9-16). He used "common sense" to answer the legal aspect of that question (Kraakman Tr. 59:17-22), however, and, tellingly, admitted that he had no more expertise on the issue than the ultimate fact-finder in this case (id. 59:23-60:5).

Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 269 (3d Cir. 2005) (Ambro, J., concurring).

Indeed, Professor Kraakman acknowledges that the presumption of reliance at the heart of the

fraud-on-the-market theory is "a legal presumption."  (Kraakman Tr. 52:20-53:8.)  Moreover,

Professor Kraakman admits that this Court has already considered this question as well as every

argument that Professor Kraakman offers in support of his conclusion.  (Kraakman Rpt. ¶ 8 &

n.13 (citing In re Credit Suisse–AOL Sec. Litig., 465 F. Supp. 2d 34, 44 & n.9 (D. Mass. 2006));

Kraakman Tr. 136:25-137:9.)  And even if the legal nature of the question were not grounds

enough for his opinion on this issue to be excluded, Professor Kraakman's own testimony

confirms that – as someone who has not even read more than one case addressing the application

of the fraud-on-the-market theory to research analysts – his methodology in reaching his

conclusion is more impressionistic and instinctive than researched and reliable.[29]

**B.      Professor Kraakman Is Not Qualified to Testify on the Remaining Questions, He Unreliably Applies Unreliable Methods to Answer Them and His Opinions on These Questions Lack the Requisite Relevance**

As Professor Kraakman explained at his deposition, his methodology in reaching the

opinions reflected in his report consisted of relying on

> what I take to be generally accepted in the literature, in finance
> literature, views about market efficiency.  I'm simply extrapolating
> from a theory I think that I share with Professor Stulz.

---

[29] Professor Kraakman's opinion on this question is not the "product of reliable principles and methods," Fed. R. Evid. 702, as it appears to be based on his reading of a single case (Kraakman Rpt. ¶ 4 (noting that Professor Kraakman has reviewed this Court's 2006 opinion in this case); see also Kraakman Tr. 54:13-55:8 (conceding that other than this Court's 2006 opinion he had not read any of the cases that discuss the application of the fraud-on-the-market theory to research analyst statements)).  Asked whether he had "more expertise on the presumption of reliance [under the fraud-on-the-market theory] than someone who reads the Basic case," Professor Kraakman responded: "I didn't do a comprehensive review of the case law, of the fraud-on-the-market theory since Basic.  I have read some other cases on and off, but I would have to . . . bone up on more recent case law."  (Kraakman Tr. 53:9-17; see also id. 122:2-8 (testifying that "I haven't reviewed the case law in this area recently, but I do know that . . . the Basic opinion that is the origin of the fraud-on-the-market theory . . . doesn't cabin itself to issuers and that is essentially what I meant when I said no doctrinal reason" for distinguishing between issuer and influential analyst statements under the fraud-on-the-market theory).)  He added: "What I'm essentially saying here is that just looking at the [B]asic opinion, . . . which doesn't distinguish between issuers and other speakers, and considering issues of policy, I see no reason to distinguish analysts or at least very prominent analysts from issu[ers] for fraud-on-the-market theory purposes."  (Id. 54:5-12.)

> The methodology is reviewing the finance, reviewing some aspects
> of the finance literature dealing with analyst reports and bringing
> that together with my understanding of the larger finance theory
> and empirical research dealing with market efficiency.

(Kraakman Tr. 49:25-50:12.)  This methodology – and Professor Kraakman's own qualifications

to opine on the non-legal questions at issue – are problematic in several key respects.  Because

he clearly lacks sufficient "knowledge, skill, experience, training or education" regarding the

influence of analyst reports and other information on stock prices, because his methods are

neither "reliable" nor "applied . . . reliably to the facts of th[is] case," and his opinions simply

lack the required relevance to this case, Fed. R. Evid. 702, Professor Kraakman must be

precluded from testifying on these remaining questions as well.

First, Professor Kraakman's opinions on the non-legal questions relate to the influence of

analyst reports and other information on stock prices and are, by his own estimation, empirical or

(insofar as they relate to the efficient market hypothesis) definitional in nature.  (Kraakman Rpt.

¶ 3; Kraakman Tr. 59:9-16, 60:6-12, 60:13-61:17, 63:10-21.)  Professor Kraakman, however, is

not a financial economist; he is principally an expert in corporate law and, as he conceded, he did

no empirical research to opine on the questions addressed in his report.  (Kraakman Rpt. ¶ 1;

Kraakman Tr. 33:22-34:5, 59:9-16, 60:6-12, 60:13-61:17, 63:10-21.)  He has never performed an

event study in connection with his published articles, much less conducted an empirical analysis

in those articles on the effects of analysts' statements on stock price.  (Id. 18:21-19:7; see also id.

36:22-37:4.)  Rather, as he explains:

> I'm a consumer.  I think I can understand the articles produced by
> financial economists, but I wouldn't consider myself qualified to,
> for example, discuss alternative event study methodologies or
> something like that.

(Kraakman Tr. 36:16-21.)  His main professional experience in the area of the influence of

information on stock prices consists of two articles that he wrote over a 20-year period.  (See

45

e.g., id. 56:19-57:8; Kraakman Rpt. ¶ 8 n.14.)  Just how this background qualifies him to serve as

an expert witness on empirical issues concerning questions of market impact – such as whether

an "elite" analyst "would in fact distort [AOL's] market price in precisely the same way that

[AOL] would fraudulently distort its share price" if the analyst were to reiterate a prior

assessment in which she no longer believed (Kraakman Rpt. ¶ 15) or whether Plaintiff's

allegations, if credited, "may form a sufficient basis for finding that [Defendants'] misstatements

and omissions distorted [AOL's] share price even if [AOL's] share price did not respond to the

reiterations" (id. ¶ 16)[30] – is not clear.

Moreover, while Professor Kraakman has described his methodology as involving a

combination of his general background with a review of "some aspects of the finance literature

dealing with analyst reports" (Kraakman Tr. 50:7-12), by his own admission he is only "broadly

familiar" with the relevant literature on market efficiency and with econometric techniques

(Kraakman Rpt. ¶ 1; Kraakman Tr. 36:10-14; see also id. 33:18-21).  As for the finance literature

specifically dealing with the effect of analyst statements on stock prices, Professor Kraakman

does not purport to be an expert and has only "reviewed a portion of that literature."  (Kraakman

Tr. 50:13-17; see also id. 51:2-6 (acknowledging that he had not really kept up to date with

relevant literature from 1984 until he began work on his report).)  Indeed, Professor Kraakman

conceded that he is "[p]robably not" more of an expert on this literature than Defendants'

attorney taking the deposition, assuming that the attorney had read the same handful of articles

that Professor Kraakman had.  (Id. 51:25-52:5; see also id. 64:17-65:16 (admitting to have read

only "seven or eight articles").)  Given Professor Kraakman's limited familiarity with the

academic research on analyst statements, disavowal of expertise concerning the relevant

---

[30] Insofar as this latter conclusion could be deemed a legal rather than empirical conclusion, it constitutes
impermissible expert testimony.  See supra Part IV.A.

literature and impressionistic methodological approach, his testimony simply does not meet the requirements of Federal Rule of Evidence 702 for a reliable methodology.

Nor does he apply his methodology to the facts of this case in a reliable manner.  To take one example:  Based on his review of selected articles, Professor Kraakman reaches the uncontroversial conclusion that "the reports of prominent securities analysts can have a material effect on share prices in an efficient market." (Kraakman Rpt. ¶ 17.)  However, he then proceeds to opine that "one can infer whether a given analyst belongs to the influential professional elite by examining the indicia of elite status listed in the empirical literature, such as press coverage, professional prominence, and affiliation with a prominent investment bank" (id. ¶ 6) and that "on the basis of the characteristics singled out by the literature" Kiggen and Martin qualify as "influential analysts" (id. ¶ 7).[31]  As was made plain at his deposition, however, Professor Kraakman's novel theory of classifying analysts as "elite" or "influential" based simply on a subjective assessment about the existence of a handful of vague factors like "press coverage" and "professional prominence" (without any thought to the precise measures or degrees relevant for each factor, the weights to be given to the various factors or the caveats and nuances contained in the very articles on which Professor Kraakman relies) has no actual precedent in the academic literature (see, e.g., Kraakman Tr. 75:5-80:9, 82:11-14; 82:25-83:7, 84:17-85:2, 91:4-15, 102:9-13, 102:20-104:18) and fails all of Daubert's four tests for reliability, see Daubert, 509 U.S. at 593-94.  Professor Kraakman's belief – based not on any application of expertise but on "just common sense" – that a September 2000 e-mail from Quattrone describing Kiggen as a "rock

---

[31] Professor Black similarly opined that Kiggen and Martin "were both highly respected analysts" whose statements "would likely have affected [AOL's] share price" (Black Rpt. at 6), but offered no basis for his bald conclusion beyond his own "judgment," which is simply not sufficient to satisfy the requirements of Daubert or Federal Rule of Evidence 702.  See supra Part III.A.  Dr. Hakala's opinion that Defendants' reports "carried stronger weight than most other analysts" because "[b]oth Kiggen and Martin were noted in news reports and recognized as prominent analysts within their sectors" (Hakala Rpt. ¶ 8) is likewise devoid of any empirical methodology or support.

star internet analyst" qualifies as another relevant indicia of "eliteness" (Kraakman Tr. 104:19-108:10) only serves to underscore the unscientific and unreliable nature in which he applies his "methodology" to the facts of this case.[32]

Finally, as Professor Kraakman himself admits, his opinions on the empirical/definitional questions add <u>nothing</u> to the existing literature on market efficiency.  (<u>Id.</u> 65:23-66:4.)  Indeed, his answers to two of the four questions posed in his report are, he acknowledges, essentially restatements of the definition of what it means for there to be an efficient market:

> Q.  So is it fair to say that your opinion to the third question, the opinion you reached as to this third question, you're essentially confirming that a definition that is well understood is in fact correct?  Is that fair to say?
>
> MR. FOX: Objection.
>
> A.  It's a little more than a definition but yes.  It's – I mean you can't make arbitrage profits on public information.  It's reflected very rapidly in share price.  That's based on just a mountain of research out there.
>
> Q.  And that's all part of the definition of what it means for there to be an efficient market, correct?
>
> A.  That's part of the definition.
>
> Q.  And your opinion in this third question is that the definition is correct?
>
> A.  That definition is essentially correct, yes.

---

[32] Even putting aside the amorphous and untested nature of Professor Kraakman's classification scheme, his classification of Kiggen and Martin as "elite" analysts is meaningless, rendering his testimony on this point entirely lacking relevance for purposes of Federal Rule of Evidence 702.  Professor Kraakman opines that "elite status and the indicia of elite status" should be understood as "proxies for the ability to influence stock prices" (Kraakman Tr. 116:2-14) but when asked if "most statements by influential analysts affect stock price," he responded:  "I don't know.  I would offer Credit Suisse reports as an example of statements by influential analysts that by and large didn't influence stock prices" (<u>id.</u> 110:3-9).  Thus, even assuming Professor Kraakman's "eliteness" classification scheme was in any way vetted empirically or reflected in the academic literature (which it is not), it is not at all clear on what basis "eliteness" could or should serve as a reliable proxy for stock price influence in this case since Professor Kraakman himself has no idea if most statements by "elite" analysts even impact stock prices in the first place.

(Kraakman Tr. 62:9-63:4; see also id. 65:17-22 ("Q.  Do you view your opinion to question D as also part of the definition of what it means for there to be an efficient market?  A.  I don't think it's purely, purely definitional.  You know, it may be, but it largely is, yes.").)  Because the definition of an efficient market is a matter of substantial jurisprudence in this Circuit alone, see, e.g., PolyMedica, 432 F.3d at 13-14, and because the definition of an efficient market is not an issue in this case – much less a factual issue – Professor Kraakman's opinions in this regard simply do not constitute the kind of "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.[33]

### C. Professor Kraakman's Proposed Rebuttal Testimony Impermissibly Addresses Issues Not Addressed By Defendants' Initial Experts' Reports

Professor Kraakman's report improperly opines on questions not at issue in Defendants' initial experts' reports or, to the extent Defendants' experts may have touched broadly on similar themes concerning definitional implications of the efficient market hypothesis, reaches the same conclusions as do Defendants' experts.  (Compare, e.g., Stulz Rpt. ¶13 with Kraakman Rpt. ¶ 10.)  Indeed, though styled broadly as a response to Professor Stulz's report (Kraakman Tr. 42:5-9, 174:13-16; Kraakman Rpt. ¶ 4), Professor Kraakman's report only directly addresses Professor Stulz's report with respect to one issue:  "his assertion in connection with the Lehman Brothers [February 20, 2002] opinion report that there was no new information, at least about – there was no new information in that report, at least with respect to the advertising problems of AOL" (Kraakman Tr. 174:17-24; see also id. 175:4-13).  And far from rebutting Professor Stulz

---

[33] Moreover, since Plaintiff can simply introduce the relevant sections of the literature concerning market efficiency into evidence and Professor Kraakman's testimony adds nothing to that literature, Professor Kraakman's testimony should, in the alternative, be excluded as needlessly cumulative, duplicative and not assisting the trier of fact to understand the evidence or determine a fact in issue.  Fed. R. Evid. 403, 702.

on this point, Professor Kraakman actually appears to <u>agree</u> with him that the negative

information about online advertising at AOL in the February 20, 2002 report had already been

disclosed in Lehman Brothers' January 31, 2002 report.  (<u>Compare</u> Stulz Rpt. ¶¶ 45, 62 <u>with</u>

Kraakman Tr. 175:14-25.)  That Professor Kraakman may wish to discuss the implications of the

Lehman Brothers February 20, 2002 report more broadly or his own stance on "the role of

analysts as interpreters of information" in general (Kraakman Tr. 175:10-11) simply does not

render his opinions on these issues actual rebuttal testimony and Professor Kraakman's report is

therefore not a proper rebuttal report and should be excluded.  <u>See</u> <u>supra</u> Part III.C.[34]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court preclude

admission of the expert opinions of Dr. Hakala, Dr. Marais, Professor Black and Professor

Kraakman.

---

[34] Professor Kraakman opines that the share price "reaction to" the Lehman Brothers report is "telling evidence in support" of his conclusion that elite analysts can influence the stock price of AOL when they publish new information.  (Kraakman Rpt. ¶ 17.)  Since Professor Kraakman is basing his conclusion on an "assumption" that there were no confounding events on February 20, 2002, an "assumption" about what was and was not new in the February 20 report as compared to the January 31 report, and an "assumption" about what constitutes a "fair reading" of the February 20 report (<u>id.</u> ¶ 17 n.23), it is not at all clear how "telling" or reliable his "evidence" of a share price "reaction" is, much less why he is more qualified to opine on how two documents differ than the ultimate finder of fact in this case.

CREDIT SUISSE SECURITIES (USA) LLC,
CREDIT SUISSE (USA), INC., AND
ELLIOTT ROGERS AND JAMIE KIGGEN,

By their attorneys,

/s/ Siobhan E. Mee
Robert A. Buhlman (BBO #554393)
Siobhan E. Mee (BBO #640372)
siobhan.mee@bingham.com
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA 02110
Tel: (617) 951-8265
Fax: (617) 428-6327

-and-

Lawrence Portnoy (admitted *pro hac vice*)
Avi Gesser (admitted *pro hac vice*)
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
Fax: (212) 450-3800

*Attorneys for Defendants*
*Credit Suisse Securities (USA) LLC and*
*Credit Suisse (USA), Inc.*

-and-

Jeff E. Butler (admitted *pro hac vice*)
CLIFFORD CHANCE LLP
31 West 52nd Street
New York, NY 10019
Tel: (212) 878-8000
Fax: (212) 878-8375

LAURA MARTIN,

By her attorneys,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
james.carroll@skadden.com
Eben P. Colby (BBO #651456)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
Tel: (617) 573-4800
Fax: (617) 573-4822

FRANK QUATTRONE,

By his attorneys,

/s/ Jeffrey B. Rudman
Jeffrey B. Rudman (BBO #433380)
Jonathan A. Shapiro (BBO #567838)
jonathan.shapiro@wilmerhale.com
Timothy J. Perla (BBO #660447)
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

-and-

-and-

Warren L. Feldman (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-2420
Fax: (917) 777-2420

*Attorneys for Defendant Elliott Rogers*

-and-

Henry Putzel, III (admitted *pro hac vice*)
LAW OFFICE OF HENRY PUTZEL III
565 Fifth Avenue
New York, NY 10017
Tel: (212) 661-0066
Fax: (212) 661-0415

*Attorney for Defendant Jamie Kiggen*

Kenneth G. Hausman (admitted *pro hac vice*)
Barbara A. Winters (admitted *pro hac vice*)
HOWARD, RICE, NEMEROVSKI,
CANADY, FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, Seventh Floor
San Francisco, CA 94111-4024
Tel: (415) 434-1600
Fax: (415) 217-5910

*Attorneys for Defendant Frank Quattrone*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)</u>

I hereby certify that counsel for Credit Suisse Securities (USA) LLC and Credit Suisse

(USA), Inc. conferred with counsel for Plaintiff, and attempted in good faith to resolve or narrow

the issues raised in this Motion, but we were not able to do so.

<u>/s/ Siobhan E. Mee</u>
Siobhan E. Mee

Bingham McCutchen LLP
One Federal Street
Boston, MA 02110

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF System will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and,

except to the extent registered participants at the same firm(s) received copies electronically as

identified on the Notice of Electronic Filing, paper copies will be sent to those indicated as non-

registered participants by U.S. Mail on April 21, 2009.

<u>/s/ Siobhan E. Mee</u>
Siobhan E. Mee

Bingham McCutchen LLP
One Federal Street
Boston, MA 02110