# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AOL TIME WARNER INC. SECURITIES LITIGATION & "E RISA" LITIGATION | MDL No. 1500 (SWK) 02 Civ. 5575 (SWK) |

## AFFIDAVIT OF SCOTT D. HAKALA, PH.D., CFA

Upon oath duly sworn, Affiant deposes and states as follows:

### INTRODUCTION

1.     "I am a Director at CBIZ Valuation Group, Inc., a national business valuation and consulting firm. I have a Ph.D. in Economics from the University of Minnesota, and I hold the designation of Chartered Financial Analyst (CFA). I have served as a consultant and expert witness in numerous cases involving economic issues similar to those in this litigation. As an economist and CFA, I have extensive education and experience in assessing the materiality to investors of information on publicly traded companies, in the trading of public securities, and in using event studies to measure inflation of share values. A summary of my qualifications, including prior testimony and articles, is provided in the resume attached hereto as Exhibit A.

2.     I was asked by counsel for the lead Plaintiff, Minnesota State Board of Investment ("MSBI"), to review the association of news events concerning America Online, Inc. ("AOL") and AOL Time Warner, Inc. ("AOLTW" or the "Company") with changes in

the share prices of AOL and AOLTW in order to identify instances, if any, of loss causation associated with the allegations in this case. This affidavit contains my findings to date in connection with this assignment and is also responsive to the opinions provided in the Affidavit of Defendants' expert Allan W. Kleidon of July 23, 2004 ("Kleidon Affidavit").

3.      My findings to date are based on my education and professional experience, as well as my review and analysis of available materials concerning the issues in this case, including:

(a)     The Second Amended Consolidated Complaint of Lead Plaintiff Minnesota State Board of Investment ("Complaint"), the Kleidon Affidavit and Defendants' Memorandum of Law in Support of the Time Warner Defendants' Motion for Summary Judgment on Loss Causation ("Memorandum");

(b)     Securities filings of AOL and AOLTW with the Securities and Exchange Commission (SEC) from January 1999 through March 31, 2003;

(c)     Published news articles, press releases, and other public news from October 1, 2000, through September 30, 2002, found on Factiva and Bloomberg, L.P.;

(d)     Various analyst reports gathered from a variety of sources, including Investext, from October 2000 through September 2002;

(e)     Publicly available financial information and public trading price information on AOL and AOLTW, market indices and similar public companies as found on Bloomberg, L.P.;

(f)     Intraday trade data from the New York Stock Exchange's TAQ (Trade and Quote) database for the month of July 2002; and

(g)    Various other texts and published articles as cited in this affidavit.

4.    Plaintiffs are being charged fees for my services in this engagement based on my hourly billing rate of $400 per hour. I received assistance from other staff employed by CBIZ Valuation Group, Inc. whose hourly rates range from $60 (for administrative staff) to $350.  I have also consulted with Dr. M. Laurentius Marais of William E. Wecker Associates, Inc.

## SUMMARY OF FINDINGS

5.    I assumed as true the allegations in the Complaint that the advertising revenues of AOL were substantially overstated by the Defendants from January 27, 1999, until at least July 24, 2002. As a result, the share prices of AOL and AOLTW, respectively, were inflated[1] throughout the Class Period (January 27, 1999, to July 24, 2002).  In order to identify instances of loss causation associated with these allegations, I analyzed the changes in the share prices of AOL and AOLTW that occurred contemporaneously with "corrective" events[2] concerning AOL and AOLTW. The significance of each corrective

---

[1] "Inflation" is the difference between the reported share price and the price the shares should have traded at that same point in time had there been full disclosure of the facts as alleged in the complaint.  Inflation can arise either because either: (i) an event occurs that causes the stock price to increase when such increase would not have occurred if the facts alleged in the complaint had been known; or (ii) the stock price would have declined had the information alleged in the complaint been disclosed in a timely manner.

[2] A "corrective event" is an event wherein information disclosed by either the company or by third parties had the effect of reducing the inflation in the stock price. Corrective events are of two types: (i) a direct revelation of the fraud through a restatement, admission or other disclosures by the defendants or by third parties; and (ii) a revelation of information regarding the "true" state of the company and its prospects that has the effect of reducing the inflation in the stock price caused by the allegations of fraud.

event was determined using the same statistical method (an "event study")[3] employed in

the Kleidon Affidavit but with certain improvements.[4]

6.    Based on my analysis to date, I find substantial evidence that the level and growth

of advertising revenues within AOL were material to investors.[5]  Furthermore, I find that

a substantial portion of the relative (or "abnormal") decline[6] in AOLTW's share price

throughout the Class Period was related to corrective events.  I found a number of

examples of statistically significant[7] corrective events throughout the period relevant to

---

[3] An "event study" is a standard statistical method for distinguishing share price changes attributable to company-specific news events ("abnormal" changes) from changes attributable to general market and industry price movements ("normal" changes). The function of my event study in this case is to isolate the abnormal share price changes attributable to corrective events pertaining to AOL and AOLTW and to assess their "statistical significance" (in other words, to distinguish "statistically insignificant" price changes, those falling within the range of routine, day-to-day price movements, from "statistically significant" price changes, those falling outside the range of ordinary, day-to-day price movements).

[4] The bases for the improvements are discussed in Appendix A to this affidavit. The primary difference is the inclusion of additional events during the period of study from January 12, 2001, to July 26, 2002, and the extension of the period of study to the date of the filing of the first complaint by MSBI. I also refined the indices in the Kleidon Affidavit event study by deleting certain companies that were not actively traded or were not sufficiently correlated with AOLTW's stock prices and adding certain companies that were identified as peer companies in analysts' reports in 2001 and 2002. Both modifications significantly enhanced the reliability and precision of the statistical analysis.

[5] Appendix B provides quotes from publications that illustrate the materiality of overstated growth in advertising revenues and lower than expected levels of advertising revenues in AOL and the materiality of allegations of improper accounting.

[6] An abnormal or relative return or decline is a movement in a share price that cannot be explained by ordinary market and industry stock price movements.

[7] Statistics and econometrics literature both recognize that the choice of a 95% confidence level for statistical significance is a widely adopted convention, rather than a fundamental principle, and is not uniformly appropriate for every situation. The decision as to what constitutes statistical significance should be adjusted based on the objectives of the study.  See, for example, Lapin, *Statistics for Modern Business Decisions*, 1978, p. 286, ("A decision rule must be chosen that will provide a lower probability of the more series error…He [the decision-marker] should therefore be wary of setting *Alpha* [the criteria for significance] and *Beta* at arbitrary or traditional levels."); Lindgren, *Statistical Theory*, Third Edition, 1976, p. 281 ("This convention [of 95% confidence for significance]-whatever it means-is quite arbitrary."); and Cassidy, *Using Econometrics: a beginner's guide,* 1981, p. 134 ("It is arbitrary whether Type I error, the level of significance, is set at 10-percent, 5-percent, 1-percent, or some other level. Researchers are supposed to specify,…, how confident they want to be…"; examples of statistical significance at a confidence level of 90%) The term "statistically meaningful" is used for events that are probable (t-statistic greater than 1.00), "weakly significant" for events at the 90% confidence level assuming a two-tailed test (t-statistic greater than 1.65), "significant" for events at the 95% confidence level assuming a two-tailed test (t-statistic greater than 1.92) and "highly significant" for events at or above the 99% confidence level. As a general rule in good statistical practice, individual events that are relevant (inflating or corrective) and statistically meaningful should not be deleted from consideration if they are included in a series of relevant events that are jointly statistically significant. (Intriligator, *Econometric Models, Techniques, and*

---

the allegations in this case, including events on the following dates: October 17 and 19, 2000; July 18 and 19, 2001; February 20, 2002; June 4, 2002; July 18, 19, 24, 25 and 31, 2002; and August 6, 22, 23 and 26, 2002. (See Exhibits B and C for the one-day and overnight event effects, respectively.) Expectations for AOL's future advertising revenue levels and rate of growth of revenues were reduced by corrective events such that the inflation in AOL's and AOLTW's respective share prices was reduced during the Class Period and in the month thereafter. Most of the relative decline in AOLTW's share price through the Class Period is not explained by industry or market forces or other explanatory events unrelated to the allegations in the Complaint. The Time Warner ("TW") component of AOLTW performed as well as or better than expected relative to its peers and relative to expectations. Thus, only the disclosure of information alleged in the Complaint regarding AOL's advertising revenues and improper accounting can explain a substantial portion of the relative decline in AOLTW's share price.[8]

7.    In summary, the stock prices of AOL and AOLTW were inflated throughout the Class Period in that they were greater than they would have been had the Defendants not acted as alleged in the Complaint.[9] The inflation in AOL's share price meant that the exchange ratio of TW shares for AOLTW shares at the time of the "Merger" was inherently unfair. The abnormal decline in AOLTW's share price was a reasonably

---

*Applications*, 1978, pp. 188-189, and Pindyck and Rubinfeld, *Econometric Models and Economic Forecasts*, 1991, p. 162-166)

[8] My review of the published news and analysts' reports at the end of the Class Period and in the month after the Class Period confirms that the primary cause of the abnormal decline in AOLTW's stock price was the decline in expectations for AOL advertising revenues and allegations of potential accounting improprieties within AOL. Between the Merger on January 12, 2001, and the end of the Class Period on July 25, 2002, the estimated value of the AOL division declined by 95% or more according to various analysts' reports. By some accounts, AOL was assigned no value or a negative value by investors by August 2002.

[9] The level of and growth of advertising revenue within AOL were key components in the valuation of AOL's and AOLTW's respective shares. Thus, overstating the level and rate of growth of AOL's advertising revenues meant that the share prices of AOL and AOLTW, respectively, were each inflated by the false and misleading representations and other acts alleged in the Complaint.

foreseeable consequence of such inflation.[10] A succession of partially corrective events during the Class Period and in the following month, including the examples of corrective events discussed in this affidavit, reduced expectations for AOL's future advertising revenue such that the inflation in the share price was reduced and shareholders suffered abnormal losses relating to the discovery of information alleged in the Complaint.

8.      The identified examples represent instances where I have concluded that loss causation exists.  These examples are not exclusive.  In my experience, the analysis of events and the application of that analysis to the facts in a particular case (in order to determine the full extent of loss causation) are dependent on information obtained in completed merits discovery.  Therefore, this affidavit does not provide or constitute a final set of analyses such as would appear in an expert report on damages in this matter.


## EXAMPLES OF CORRECTIVE EVENTS AND LOSS CAUSATION

### The Period Before January 12, 2001, Prior to the AOLTW Merger

9.      Prior to the Merger, concerns regarding advertising revenues in AOL led to statistically significant declines in AOL's stock price.  AOL's stock price fell 12.10% on October 17, 2000, and 8.94% on October 19, 2000, relative to an appropriate Composite

---

[10] Economic theory suggests that a stock price which is inflated because of inflated revenues or earnings will likely suffer an abnormal decline over time because the inflation of revenues and earnings becomes increasingly more difficult to sustain. An apparently innocent revenue or earnings shortfall relative to expectations can result from the reversal of previously inflated revenues and earnings. The company may never acknowledge and the market may never know of the misrepresentation but a real economic loss will result in such circumstances. Indeed, corrective events are often indirect in that they do not reveal improprieties but effectively reduce (correct) the inflation in the share price by shedding light on the true financial prospects of the company. Moreover, corrective events are often distributed over time in a series of partially corrective events, often related to public statements and discoveries by third parties, rather than disclosed through a one-time restatement and admission by the affected company.  The information associated with such a partial disclosure may also be countered and its effect attenuated, for example, by a denial from the company or dismissive commentary from analysts.

Index.[11]    These declines were a direct result of investor concerns regarding the ability of AOL to grow online advertising revenues at the rates previously experienced and forecast. (See Appendix B, No. 1) AOL partially countered those concerns by reassuring investors on October 18, 2000. (See Appendix B, Nos. 2-8) The assurances provided by the Defendants led to a statistically significant increase in the price of AOL's shares of 5.93% on October 18, 2000.  As alleged in the Complaint, the Defendants continued to falsely reassure investors and inflate AOL's share prices prior to the Merger and AOLTW's share price after the Merger.

**The Period from the Merger to July 17, 2002**

10.    After the Merger, AOLTW's share price fell relative to the Composite Index primarily as a result of slowing and then declining AOL advertising revenues relative to expectations. The partially corrective events after the Merger and prior to July 18, 2002, generally related to third-party concerns, a series of disappointments in reported revenues and earnings and lowered guidance with respect to AOL. (See Appendix B, Nos. 9-13) By reducing future earnings expectations for AOL, these events dissipated the inflation in AOLTW's share price over time.  As AOL advertising revenues fell increasingly short of expectations, AOLTW's management began to lose credibility. If the facts alleged in the Complaint are true, then these disclosures of disappointing revenues and earnings and

---

[11] The Composite Index constructed in this case is discussed in more detail in Appendix A.  The Composite Index is an index that reflects the changes in broad US stock market indices and the returns (stock price movements and dividends) of publicly traded competitor companies in manner consistent with changes in AOL and AOLTW's share prices over time.  Thus, changes in the Composite Index represent the predicted changes in AOL and AOLTW's share prices as a result of industry and market forces.

*Affidavit of Scott D. Hakala, Ph.D., CFA*                                                                  7

lowered guidance would have been foreseeable and are partially corrective, even without disclosures of accounting improprieties.[12]

11.    Between the Merger on January 12, 2001, and July 17, 2002, AOLTW's share price fell from $46.47 to $13.11, a total decline of 71.8%.  The event study analysis indicates that the abnormal decline in AOLTW's stock price was 50.9%, or 50.9% more than predicted by the movement in the Composite Index between January 12, 2001, and July 17, 2002.  By July 17, 2001, the inflation in the stock price of AOLTW was partially dissipated.   This dissipation in the inflation of the share price of AOLTW related primarily to a series of corrective events (including, for example, statistically significant corrective events on July 18 and 19, 2001; February 20, 2002; and June 4, 2002).  Had the advertising revenues of AOL been reported at the lower levels suggested in the

---

[12] Partially corrective events often relate to the discovery of information by investors in advance of company announcements. Princeton economics professor Burton G. Malkiel, *A Random Walk Down Wall Street*, (Rev. ed. 1999), pp. 186-87, reports, "Research indicates that, on average, stock prices react well in advance of unexpectedly good or unexpectedly bad earnings reports." Similarly, Ragothaman and Bublitz in "An Empirical Analysis of the Impact of Asset Writedown Disclosures on Stockholder Wealth," *Quarterly Journal of Business and Economics*, June 1996, pp. 32+, state, "Early writedown studies focus on whether writedown announcements convey information about future cash flows. But the event methodology used in these studies ignores the fact that market agents learn about valuation-relevant events from many sources over a long period of time. Specifying a date when information reaches the market is not always feasible; information can reach the market gradually through many sources....Thus, in all prior studies the precise identification of the event date is a problem; the market seems to have alternative sources of information." Eakins, Stansell, Teer and Wertheim, "Earnings Forecasts and Institutional Demand for Common Stock*," Journal of Applied Business Research*, January 1997, p. 57+, make clear that the ability of the market to learn about and react in advance of earnings announcements through earnings whispers is consistent with efficient markets (suggestive of the semi-strong form of efficiency). Later in their paper they conclude, "While initially surprising, the results presented in this paper may be simply affirming that institutional investors are rational believers in efficient markets." (p. 364) In general terms, anticipation of events can cause the market to react prior to the actual date of disclosure or the identified event date. Other similar findings on the market's anticipation of earnings events can be found in Acharya, "Value of Latent Information: Alternative Event Study Methods," *Journal of Finance*, March 1993, pp. 363-385 (The author in this text notes that learning and anticipation of events can cause the event study analysis to inadequately account for the "latent information underlying an event."); Malesta and Thompson, "Partially Anticipated Events: A Model of Stock Price Reactions with an Application to Corporate Acquisitions," *Journal of Financial Economics*, 14, 1985, pp. 237-250; and, Campbell, Lo and Mackinlay, *The Econometrics of Financial Markets*, 1997, p. 166 ("The CAR plots show that to some extent the market gradually learns about the forthcoming [earnings] announcement. The average CAR of the good-news firms gradually drifts up in days −20 to −1, and the average CAR of the bad-news firms gradually drifts down over this period.").

Complaint, the share prices of AOL and AOLTW, respectively, would have been significantly reduced throughout the Class Period and the losses realized by shareholders as a result of the abnormal decline in AOLTW's share price prior to July 18, 2002, would have been at least partially avoided.

*July 18 and 19, 2001*

12.     An example of a partially corrective event occurred in connection with the second quarter 2001 earnings announcement by AOLTW on July 18, 2001. In the second quarter earnings announcement, it was acknowledged the advertising and commerce revenues in AOL fell well short of expectations. A Merrill Lynch analyst had forecast quarterly revenue of $774 million as compared with announced revenue of $706 million.[13] (See Appendix B, No. 6) The lower than expected amount of advertising revenue in AOL meant that AOL's overall revenues grew less than expected by analysts. Furthermore, this 10% shortfall in advertising revenue indicated a substantial slowing of the revenue growth rate in AOL and led to a reevaluation of AOLTW's share price by investors on July 18 and 19, 2001. The event study found that AOLTW's share price fell 7.92% relative to the Composite Index on July 18 as a result of AOLTW's earnings announcement and fell another 4.49% relative to the Composite Index on July 19, 2001, as a result of analysts' comments on these disclosures. Both declines were statistically significant, related to the allegations in the Complaint, and related, at least in part, to AOL falling short of expectations for the growth and level of advertising revenues.

---

[13] The AOL portion of AOLTW was valued at a substantial multiple of revenue at this time. Advertising revenues in AOL were considered low cost, high margin revenues and had a disproportionate effect on earnings. Additionally, lower growth would reduce the valuation multiple.

*January to April 2002*

13.     A series of third party disclosures and concerns, as well as lowered guidance by AOLTW, further reduced the inflation in AOLTW's share price between January and April 2002. The corrective events continued to emphasize problems within the AOL division and substantially reduced the implicit guidance and growth expectations for advertising revenue in that division. A number of analysts and AOL TW management lowered guidance for AOL's advertising revenues in January 2002. Corrective events between January and April 2002 included, for example, a February 20, 2002, event relating to a reduction in expectations for AOL by Lehman Brothers (7.49% relative price decline). The February 20 event included an analysis by Ms. Becker of Lehman of the decline in advertising revenues in AOLTW. (See Appendix B, No. 9) She calculated that, absent intracompany advertising, the actual advertising revenues of AOL fell 27% in the fourth quarter of 2001. Collectively, the corrective events were statistically significant and caused a greater than a 20% relative decline in AOLTW's share price between February 19 and April 23, 2002.

*June and early July 2002*

14.     An example of a statistically significant partially corrective event occurred on June 4. On June 4, a Lehman analyst predicted a substantial decline in online advertising. (Appendix B, Nos. 10-13) This led to a 4.24% relative decline in AOLTW's share price. Statements by AOLTW's CFO on June 5 did not prevent a small additional loss in the relative value of AOLTW shares on June 5, 2002.

**The Period from July 18, 2002, to July 25, 2002 (the End of the Designated Class Period)**

15.    Between July 18 and 25, 2002, the event study demonstrates that there was a statistically significant abnormal decline in AOLTW's share price for corrective events on both July 24 and 25, 2002, and there was a statistically significant abnormal decline in AOLTW's share price between July 18 and July 25, 2002, both before and after controlling for events unrelated to the allegations in the Complaint. The cumulative abnormal decline associated with corrective events on July 18, 19, 24 and 25 was 22.2% and was statistically significant. (Exhibit B) Similarly, the July 18, 19 and 25 events were jointly statistically significant and led to a 15.7% abnormal decline. The overnight event analysis (based on the change in the stock price from the close one day to the open the next) found that the declines in AOLTW's share price from the closing prices of the prior days to the opening prices on July 18, 19 and 25, respectively, were statistically significant. (Exhibit C)  Various published articles and comments in analysts' reports between July 18 and July 25, 2002, indicated that the allegations in the Complaint were material to investors and that the public disclosure of certain adverse information related to the allegations in the Complaint had a significant effect on AOLTW's share price. Exhibit D demonstrates that the information disclosed on July 18 and 19 and July 24 and 25, 2002, substantially reduced analysts' valuation of AOL within AOLTW.

16.    The July 18 and 19, 2002, articles by the *Washington Post* disclosed advertising accounting improprieties by AOL.  (See Appendix B, No. 14-15) Both articles were countered by public denials by the Defendants (the Company and Ernst & Young) within the articles and later in analysts' reports and in denials published in articles on July 18

and 19, 2002. (See Appendix B, Nos. 16-19) At the market's opening on July 18, 2002, the relative share price of AOLTW declined 7.21% (t-statistic 8.80) based on an overnight event study (Exhibit C). The overnight event study provides a more accurate analysis of the significance of the *Washington Post* article in isolation from other events. However, the stock price recovered later during trading in the day, related in part to announced and anticipated management changes within AOL (in the afternoon) and as a result of denials by AOLTW (including reports by certain analysts that repeated AOLTW's denials and indicated that the amount of revenue indicated in the *Washington Post* reports was relatively small). Thus, two "events" occurred on July 18, 2002. The first event was the *Washington Post* article and the overnight response to that article. The second event was an inflating event that included a series of analysts' reports and news articles that repeated the allegedly false and misleading denials of AOLTW and that looked positively toward anticipated changes in AOL's management announced later on July 18, 2002. Absent the Defendants' denials the abnormal decline in AOLTW's share price would have be significantly greater. The extent of analyst commentary and the substantial increase in AOLTW's trading volume to 43 million shares from a 50-day average of 24 million shares indicates that the July 18 events were material to investors.

17.     Similarly, the relative overnight decline in AOLTW's share price to its opening price on July 19, 2002, was 2.87% and was statistically significant (t-statistic of 3.39). The trading volume on July 19, 2002, increased to 55 million shares. The overnight change in AOLTW's share price was primarily attributable to additional information about AOL's accounting improprieties revealed in the *Washington Post* early on July 19, 2002.

18.    On July 24, 2002, AOLTW's share price fell 7.71% relative to the Composite Index in anticipation of disappointing news regarding AOL.[14]    This was statistically significant (t-statistic of 4.09).    A news report in the morning regarding earnings had indicated that AOL was likely to fall short of expectations.[15]    (See Appendix B, Nos. 19-20)  Because this event preceded the earnings announcement and anticipated that announcement, an analysis of the effects of the subsequent earnings announcement on AOLTW's share price would be incomplete absent inclusion of this statistically significant event.

19.    After the close of trading on July 24, 2002, AOLTW announced earnings for the second quarter of 2002.    The earnings announcement had three significant material elements:  (i) the AOL division continued to fall well short of expectations; (ii) the TW portions of the Company performed better than expected and partially offset the AOL division shortfall; and, (iii) the Company confirmed an "informal" inquiry by the SEC. (See Appendix B, Nos. 21-27) The relative decline in AOLTW's share price on July 25, 2002, was highly statistically significant (t-statistic of 7.35) at 12.91%.    A number of analysts downgraded AOLTW's shares out of concern over the news of an SEC inquiry

---

[14] Thomas S. Mulligan, "Anxiety Builds Over AOL Earnings Release Media: Investors will focus on advertising revenue and subscriber growth at the troubled America Online unit," *Los Angeles Times*, 24 July 2002, p. C-3.  Also, Susan Lisovicz and Jen Rogers, "AOL Earnings, Conference Call After The Bell Today," CNNfn: The Biz, 24 July 2002, 11:00am. (This report mentions AOLTW selling off before the bell and before earnings are announced.)

[15] See the prior footnote. Princeton economics professor Burton G. Malkiel, *A Random Walk Down Wall Street*, (Rev. ed. 1999), pp. 186-87, reports, "Research indicates that, on average, stock prices react well in advance of unexpectedly good or unexpectedly bad earnings reports." Eakins, Stansell, Teer and Wertheim, "Earnings Forecasts and Institutional Demand for Common Stock," *Journal of Applied Business Research*, January 1997, p. 57+, make clear that the ability of the market to learn about and react in advance of earnings announcements through earnings "whispers" is consistent with efficient markets (suggestive of the semi-strong form of efficiency). Later in their paper they conclude, "While initially surprising, the results presented in this paper may be simply affirming that institutional investors are rational believers in efficient markets." (p. 364) Also, Campbell, Lo and Mackinlay, *The Econometrics of Financial Markets*, 1997, p. 166 ("The CAR plots show that to some extent the market gradually learns about the forthcoming [earnings] announcement. The average CAR of the good-news firms gradually drifts up in days −20 to −1, and the average CAR of the bad-news firms gradually drifts down over this period.").

and out of concern over declining advertising revenues (and lower earnings) in AOL, despite relatively positive earnings news from the TW portions of AOLTW. (See Appendix B, Nos. 25, 28-31)

20.     Dr. Kleidon's assertion that the Company disclosures after closing on July 24 did not represent new information related to the Complaint is contradicted by a number of the citations attached as exhibits to his expert report and a number of articles quoted in Appendix B (Nos. 22-31) to this affidavit. Clearly, the continuing decline in AOL division advertising revenues relates to the allegations in the Complaint, and the confirmation of SEC inquiries was identified by a number of analysts and publications as the major cause of investors' concerns on July 25, 2002. (See Appendix B, Nos. 22-31) There were losses suffered by shareholders that sold shares on July 25, 2002. The share price of AOLTW closed at a low of $9.64 per share on July 25, 2002.

**The Period From July 26, 2002, to September 16, 2002**

21.     It is appropriate to consider corrective events for a period of time following the end of the Class Period, particularly when partially corrective events occur interspersed with denials of wrong-doing by the Defendants. Between July 26 and September 16, 2002, statistically significant corrective events included: July 31, 2002, and August 6, 22, 23 and 26, 2002.

22.     The Defendants and Dr. Kleidon assert incorrectly that the corrective information disclosed after the close of trading on July 24, 2002, was not material. They then focus on the abnormal increase in AOLTW's stock price on July 26, 2002, to assert that the abnormal movement in AOLTW's stock price in response to that information was not statistically significant. However, their July 26 bounce-back argument is not supported

for a number of reasons (as will be discussed in more detail in paragraph 27) and neither the Defendants nor Dr. Kleidon take into account the corrective events identified after July 26, 2002, which more than offset the July 26, 2002, bounce-back.

23.    On July 31, 2002, disclosure and confirmation by AOLTW that the US Department of Justice was involved in the investigation into AOLTW's accounting led to a statistically significant 7.40% decline in AOLTW's relative share price. (See Appendix B, No. 32) Including the July 31, 2002, event with the prior events on July 18, 19, 24 and 25, 2002, the cumulative abnormal decline was 27.9%.    Offsetting that cumulative decline with the abnormal increase on July 26, 2002, the total cumulative decline between July 18, 19, 24, 25, 26 and 31, 2002, was 20.4%.

24.    Mixed news (including information on the possible narrowing of the SEC inquiry into AOLTW's accounting) related to the Complaint on August 5, 2002, led to a 5.15% relative increase in AOLTW's share price.    This news was then offset by a statistically significant decline in AOLTW's relative share price by 5.81% on August 6, 2002, as a result of news regarding the SEC's inquiry into transaction between AOLTW and Purchase Pro. (See Appendix B, Nos. 33-35) By the close of August 6, 2002, the share price of AOLTW was again under $10, at $9.90.

25.    A series of corrective events on August 22, 23 and 26, 2002, were each statistically significant in reducing AOLTW's share price. (See Appendix B, Nos. 36-39) On August 22, 2002, further news regarding the possible impropriety of AOL advertising transactions with WorldCom led to a 4.21% relative decline in AOLTW's share price. On August 23, 2002, information regarding the SEC investigation of AOL's and AOLTW's prior statements of online advertising outlook and regarding AOLTW

potentially having to restate additional financial information led to a relative decline in AOLTW's share price of 5.12%. On August 26, 2002, AOLTW's shares lost another 4.61% in relative value as a result of disclosures regarding the alleged impropriety of AOL's investments in Internet companies in return for inflating advertising revenue. These three statistically significant events resulted in a relative loss in AOLTW's share value of 13.4%.

26.     Additional information related to problems with the AOL division continued to drag down AOLTW's share price in the month following the Class Period (after adjusting for the effects of positive news events regarding the TW portion of AOLTW's business and other news). This was noted repeatedly by analysts and in news articles during the period between July 25 and August 26, 2002. (See Appendix B, Nos. 23-28) Thus, adjusting for the corrective and inflating events identified after July 25, 2002, the share price of AOLTW was substantially depressed as a result of the relevant events between July 26 and August 26, 2002. Given the statistical significance of these relevant corrective events (both individually and collectively), the corrective information disclosed in the month after the end of the Class Period was demonstrably material to investors.

27.     The Kleidon Affidavit and the Defendants' Memorandum both assert incorrectly that the statistically significant abnormal increase in AOLTW's share price on July 26, 2002, offset and somehow neutralized the significance of the July 25, 2002, abnormal decline in AOLTW's share price. This assertion is incorrect for a number of reasons. First, by itself, the July 25, 2002, abnormal decline in AOLTW's share price was a foreseeable result of the false and misleading statements alleged in the Complaint and

resulted in significant losses to AOLTW's shareholders, including those shareholders that sold their shares on that date.[16]  Second, there is no basis to assume that the abnormal increase in AOLTW's share price on July 26, 2002, was a mere reversal of the abnormal decline in the stock price on July 25, 2002. Most of the increase in AOLTW's stock price on July 26, 2002, did not occur prior to the opening on July 26, 2002, but occurred instead during the trading day.   Some of the information that caused the abnormal increase in AOLTW's stock price on July 26, 2002, was unrelated to allegations in the Complaint and related more to expectations regarding the TW side of the business, which performed at or above investors' expectations in the second quarter of 2002.[17]  Third, the shareholders of AOLTW suffered a significant net loss over July 24, 25 and 26, 2002. Fourth, even if the July 26, 2002, event were a "bounce back," it was offset and reversed again as a result of a series of subsequent corrective events, including statistically significant abnormal declines in AOLTW's share price on July 31 (7.4%) and August 6 (5.8%), 22 (4.2%), 23 (5.1%) and 26 (4.6%), 2002.  On an overall basis, the cumulative decline was 31.6% and statistically significant for the event dates of July 18, 19, 24, 25, 26 and 31 and August 5, 6, 22, 23, and 26, 2002.  Fifth, the Kleidon Affidavit and Defendants' Memorandum provide no economic basis or justification for only considering the July 26, 2002, stock price increase (as an offset to the decline in AOLTW's share price on July 25, 2002) without similarly considering the statistically significant abnormal declines in AOLTW's stock price on July 24, July 31 and in August 2002.  Jointly, the corrective events at the end of the Class Period and continuing through

---

[16] A total of 150 million shares were traded on July 25, 2002.
[17] Ken Brown and Julia Angwin, "Is There Deja Vu Value in AOL's Suffering Stock Price?" *The Wall Street Journal,* 26 July 2002, p. C1.  (Article emphasizes value of Time Warner as justifying a greater stock price.)

August 26, 2002, led to a substantial and statistically significant cumulative abnormal decline in AOLTW's share price.

## CONCLUDING COMMENTS

28.     I expect to perform further work in this matter, and expect to revise or refine the findings reported in this affidavit as appropriate in light of additional information and analysis. In particular, my analysis of loss causation issues to date was performed without the benefit of any information that may be obtained in merits discovery in this case. Discovery (including review of internal Company documents and third party, such as analysts and customers, documents produced and testimony from fact witnesses)[18] and associated analyses by other experts (particularly accounting experts)[19] are typically relied upon and essential to completing a definitive event study analysis and applying the findings in a definitive event study analysis to the allegations in the Complaint in order to estimate damages.

---

[18] For example, some analysts' reports are often not available from public sources. Information from a customer might indicate that the reason for the cancellation of a contract or loss of revenues relates to the complaint in a given case. Sometimes third party discovery will further reveal information, including rumors, but that information will not be found in a retrospective review of published information. In one case, discovery revealed that an analyst's downgrade related directly to that analyst's discovery of information related to the allegations in that case. Thus, the analyst's downgrade was identified as a corrective event.

[19] The accounting experts cannot complete their analysis until merits discovery is largely complete and they have had a chance to review underlying accounting information and related documents. The accounting expert reports will further indicate when the revenue shortfalls should have been realized and, thus, allow for a more consistent analysis of the inflating and corrective events.

Further Affiant saith not.

_____
Scott D. Hakala, Ph.D, CFA

*November 2, 2004*
Date

STATE OF TEXAS          )
                         )
COUNTY OF DALLAS         )

Subscribed and sworn to before me this 2nd day of November, 2004.

KELLI A. MANN
MY COMMISSION EXPIRES
May 13, 2006

Notary _____

# Appendix A

## DISCUSSION OF THE EVENT STUDY ANALYSIS

29.    An event study is based on a market model. A market model is a model of how the price of a security (in this case, the price of AOLTW's publicly traded common shares) moves in relation to a market index and/or an index of peer group companies and responds to news and information.

30.    The event study provided with this affidavit was based on refining and extending the analyses performed in the Kleidon Affidavit.    The event study period ("Study Period") was from January 12, 2001 (the date of the Merger) to September 16, 2002 (the date of the filing of the first complaint by MSBI). I extended the study period beyond the July 26, 2002, date in the Kleidon Affidavit in order to analyze the events that occurred between July 26 and September 16, 2002.

31.    The first stage of the event study was the a priori identification of material events. The intent of this step of the event study analysis was to control for all days when potentially material information came into the market.[20]  The available public information was reviewed to determine information that investors would find to be material to AOLTW shareholders based on qualitative criteria. I relied upon the NASDAQ guidelines for material news as set forth and accepted by the SEC.[21] The information considered included information in analysts' reports, press releases, securities filings and

---

[20] As long as there are sufficient degrees of freedom, the addition of more events will ensure a set of "clean" observations and avoid contaminating the market model estimates. See, for example, Intriligator, *Econometric Models, Techniques, and Applications*, 1978, pp. 188-189, and Pindyck and Rubinfeld, *Econometric Models and Economic Forecasts*, 1991, p. 162-166.

[21] *Federal Register,* Vol. 67, No. 157, August 7, 2002, pp. 51306-51310.

published news articles (newspapers and daily publications, as well as more general publications). The Study Period included periods when news regarding AOLTW was particularly common. As a result, I added approximately one hundred events beyond those identified in the Kleidon Affidavit and removed seven of the event dates in the Kleidon Affidavit due to the lack of identified material news. The dates included as possible event dates were: 01/09/2001, 01/10/2001, 01/11/2001, 01/12/2001, 01/16/2001, 01/17/2001, 01/19/2001, 1/24/2001, 01/26/2001, 01/31/2001, 02/01/2001, 02/13/2001, 02/26/2001, 02/28/2001, 03/05/2001, 03/06/2001, 03/08/2001, 03/12/2001, 03/14/2001, 03/23/2001, 03/27/2001, 03/28/2001, 04/02/2001, 04/03/2001, 04/04/2001, 04/12/2001, 04/16/2001, 04/18/2001, 04/19/2001, 05/10/2001, 05/15/2001, 05/17/2001, 05/22/2001, 06/07/2001, 06/19/2001, 06/20/2001, 06/25/2001, 06/27/2001, 07/06/2001, 07/18/2001, 07/19/2001, 07/25/2001, 08/13/2001, 08/14/2001, 08/15/2001, 08/22/2001, 09/04/2001, 09/06/2001, 09/10/2001, 09/21/2001, 09/24/2001, 09/25/2001, 10/08/2001, 10/17/2001, 10/19/2001, 11/05/2001, 11/14/2001, 11/15/2001, 11/19/2001, 11/26/2001, 11/29/2001, 12/05/2001, 12/07/2001, 12/10/2001, 12/13/2001, 12/20/2001, 12/28/2001, 01/02/2002, 01/03/2002, 01/04/2002, 01/07/2002, 01/08/2002, 01/30/2002, 02/07/2002, 02/08/2002, 02/20/2002, 02/25/2002, 02/26/2002, 02/28/2002, 03/11/2002, 03/12/2002, 03/14/2002, 03/21/2002, 03/25/2002, 03/26/2002, 03/27/2002, 04/02/2002, 04/03/2002, 04/05/2002, 04/08/2002, 04/10/2002, 04/15/2002, 04/16/2002, 04/22/2002, 04/23/2002, 04/24/2002, 04/25/2002, 05/06/2002, 05/15/2002, 05/16/2002, 06/04/2002, 06/05/2002, 06/18/2002, 06/25/2002, 06/26/2002, 06/28/2002, 07/01/2002, 07/02/2002, 07/03/2002, 07/08/2002, 07/10/2002, 07/12/2002, 07/18/2002, 07/19/2002, 07/22/2002, 07/24/2002, 07/25/2002, 07/26/2002, 07/29/2002, 07/30/2002, 07/31/2002, 08/01/2002, 08/02/2002, 08/05/2002,

08/06/2002, 08/07/2002, 08/09/2002, 08/14/2002, 08/15/2002, 08/16/2002, 08/20/2002, 08/21/2002, 08/22/2002, 08/23/2002, 08/26/2002, 8/27/2002, 09/04/2002, 09/09/2002, 09/10/2002, 09/12/2002, 09/13/2002, and 09/16/2002.

32.    The additional event dates identified during the Study Period substantially increased the "goodness of fit"[22] of the overall event study analysis and, thus, increased the reliability and precision of the resulting estimates.

33.    The second stage of the event study involved modification of the two industry indices in the Kleidon Affidavit.  Possible market indices and guideline or peer group companies were identified by reviewing analysts' reports in 2001 and 2002.

34.    A number of the companies in Dr. Kleidon's AOL Competitor Index were rejected for either theoretical or practical reasons.  Excite@Home was acquired by At Home and then lost most of its value and traded as a "penny stock" during much of the Study Period. Infoseek ceased trading before the Study Period.  Juno Online lost most of its market value and then ceased trading in September 2001.  Terra Lycos was thinly traded in the US such that published closing prices were not available for many days during the Study Period.  FreeServe was acquired and ceased public trading after May 4, 2001.  AT&T Corp. was only competing with AOL in a peripheral manner and more appropriately included only in the Time Warner Competitor Index.  Amazon.com and Earthlink were not sufficiently correlated with AOLTW's share price to be considered appropriate peers.  This left only Yahoo!, Microsoft and eBay for the AOL Competitor Index, renamed TECH in the analysis presented herein.

---

[22] Goodness of fit (R-squared) is a term of art equivalent to a measure of the ability of the analysis to explain the movements (variance) in the stock price on a daily basis.

35.     With respect to the Time Warner Competitor Index (Media), Excite@Home was not deemed appropriate for the reasons previously stated and because it .was not sufficiently in the same markets as TW.  Charter and Vivendi had significant company-specific events such that they were not sufficiently correlated with AOLTW's returns to justify inclusion in the index.  Liberty Media (LBTY or L) and Comcast (CMCSK) were added to the index based on their being identified in analysts' reports as peer companies in 2001 and 2002.

36.     The modifications to Dr. Kleidon's two industry indices significantly improved the overall fit of the indices in explaining AOLTW's returns during the Study Period.  Thus, these modifications improved the quality and precision of the overall event study analysis relative to Dr. Kleidon's analysis.

37.     The third stage of the analysis involved analyzing the candidate events (identified in stage one of the analysis) in the context of the industry and market indices developed (in stage in of the analysis).  The regression methodology is essentially the same as was employed in the Kleidon Affidavit.

38.     The event study summarized in Exhibit B is based on regression analyses of the returns generated by AOLTW during the Study Period.[23] The market model portion of the analysis is based on the NADAQ Composite Index (CCMP), the Standard & Poors 500 Index (SPX), an industry based on AOL competitors (TECH) and an industry index based on TW competitors (Media).  The two industry indices were based on equally-weighted geometric returns from the index members.  Collectively, the two market and two industry indices could explain 51.73% of the daily variance in AOLTW's stock price

---

[23] For consistency purposes, I use the natural log transformation consistent with the customary assumption that stock returns are log-normally distributed after controlling for events.

returns. Incorporating the identified company-specific event days, the percentage of the variance increased to 84.44%, although the adjusted percentage was 62.25% for those days when no events were identified. Based on these percentages of the variance explained, the reliability of the event study analysis was significantly improved by the modifications made to Dr. Kleidon's event study.

39.      A Composite Index was constructed to isolate and distinguish the share price movements caused by company-specific news from movements caused by market and industry news. The Composite Index has two components, one based on broad US stock indices (the market component) and another based on the stock prices and returns provided by companies in the same or similar industries as AOL and TW (the industry component). The estimated coefficients for the four indices were combined with the indices to form a single Composite Index for analytical purposes. The change in the Composite Index on a given day represents the prediction of the movement in the share price of AOLTW on that day assuming no company-specific news. Thus, on any given day, the change in the Composite Index predicts the expected ("normal") change in AOLTW's share price. The "abnormal return" is the difference between the return realized by AOLTW shareholders during a period of time (a day or an extended number of days) and the return predicted by the Composite Index over the same period of time.

40.      An alternative event analysis was prepared for the overnight returns from the closing price of one day to the opening price of the next day. This analysis is presented in Exhibit C. This analysis was employed to test the statistical significance of certain events where distinct news was announced after closing but before opening the next day.

This analysis demonstrated that the overnight returns had relatively low volatility after adjusting for industry and market indices and for company-specific news.