# EXHIBIT 6

Page 1

1

2                UNITED STATES DISTRICT COURT

                DISTRICT OF MASSACHUSETTS

3

4    _____

5    In Re:  CREDIT SUISSE-AOL

6    SECURITIES LITIGATION

                         Master File No. 1:02 cv12146

7    _____

8    This Document Relates To:

9         ALL ACTIONS

     _____

10

11

12

13              VIDEOTAPED DEPOSITION

14                      OF

15             SCOTT D. HAKALA

16             New York, New York

17           Tuesday, July 10, 2007

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR

25   JOB NO. 11862

Page 2

```
1
2
3
4
5              July 10, 2007
6              9:38 a.m.
7
8
9       Videotaped deposition of SCOTT D.
10   HAKALA, held at the offices of DAVIS, POLK
11   & WARDWELL, 450 Lexington Avenue, New York,
12   New York, pursuant to Notice before Annette
13   Arlequin, a Certified Court Reporter, a
14   Registered Professional Reporter and Notary
15   Public of the State of New York.
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 3

```
1
2   A P P E A R A N C E S :
3
4   KAPLAN FOX & KILSHEIMER LLP
5   Attorneys for Lead Plaintiff Bricklayers and
6   Trowel Trades International Pension
7   Fund, the Proposed Class and Dr. Hakala
8       850 Third Avenue, 14th Floor
9       New York, New York 10022
10   BY:  DONALD R. HALL, ESQ.
11
12   DAVIS POLK & WARDWELL
13   Attorneys for Defendants Credit Suisse
14   First Boston LLC and Credit Suisse
15   First Boston USA
16       450 Lexington Avenue
17       New York, New York 10017
18   BY:  AVI GESSER, ESQ.
19       DANIEL J. SCHWARTZ, ESQ.
20       JONATHAN K. CHANG, ESQ.
21       DHARMA BETANCOURT FREDERICK, ESQ.
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 4

```
1
2   A P P E A R A N C E S (Cont'd.):
3
4   WILMER CUTLER PICKERING HALE and DORR, LLP
5   Attorneys for Defendant Frank Quattrone
6       60 State Street
7       Boston, Massachusetts 02109
8   BY:  JEFFREY B. RUDMAN, ESQ.
9       JARED C. MILLER, ESQ.
10
11
12   ALSO PRESENT:
13
14
15   MICHAEL PINEIRO, Legal Video Specialist
16   ANU BHARADWAJ, Cornerstone Research
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 5

```
1
2       IT IS HEREBY STIPULATED AND AGREED by
3   and between the attorneys for the
4   respective parties herein, that filing and
5   sealing be and the same are hereby waived.
6       IT IS FURTHER STIPULATED AND AGREED
7   that all objections, except as to the form
8   of the question, shall be reserved to the
9   time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17              - o0o -
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide    877-702-9580

Page 6

```
 1          * Proceedings *
 2        THE VIDEOGRAPHER:  This is the tape
 3  labeled No. 1 of the video deposition of
 4  Dr. Scott Hakala in the matter of In Re
 5  Credit Suisse AOL Securities Litigation.
 6        This deposition is being held at 450
 7  Lexington Avenue, New York, New York on
 8  July 10, 2007 at approximately 9:38.
 9        My name is Michael Pineiro from TSG
10  Reporting, Inc. and I am the legal video
11  specialist.
12        The court reporter is Annette
13  Arlequin in association with TSG Reporting.
14        Will counsel please introduce
15  yourself.
16        MR. GESSER:  Avi Gesser from Davis
17  Polk & Wardwell for the Credit Suisse
18  defendants.
19        MR. SCHWARTZ:  Daniel Schwartz,
20  Davis Polk & Wardwell, also for the Credit
21  Suisse defendants.
22        MR. RUDMAN:  Jeff Rudman, WilmerHale,
23  for Frank Quattrone.
24        MR. MILLER:  Jared Miller,
25  WilmerHale, also for Mr. Quattrone.
```
TSG Reporting - Worldwide      877-702-9580

Page 7

```
 1          * Proceedings *
 2        MS. FREDERICK:  Dharma Frederick,
 3  Davis Polk, for the Credit Suisse
 4  defendants.
 5        MR. HALL:  Donny Hall, Kaplan Fox &
 6  Kilsheimer on behalf of Bricklayers and the
 7  class and on behalf of Dr. Hakala.
 8        THE VIDEOGRAPHER:  Will the court
 9  reporter please swear in the witness.
10          *    *    *
11  S C O T T   D.   H A K A L A, called as a
12        witness, having been duly sworn by the
13        Notary Public, testified as follows:
14  EXAMINATION BY
15  MR. GESSER:
16    Q.  Dr. Hakala, you've been deposed
17  before?
18    A.  Yes.
19    Q.  How many times?
20    A.  Over 100 now.
21    Q.  Okay.  So you're familiar with the
22  ground rules?
23    A.  Yes.
24    Q.  Okay.  My job is to ask questions and
25  your job is to answer them as best you can;
```
TSG Reporting - Worldwide      877-702-9580

Page 8

```
 1          S. Hakala
 2  is that correct?
 3    A.  Yes.
 4    Q.  And have you -- is there any reason
 5  why you can't give accurate and complete
 6  testimony today; any medications you're taking
 7  or anything like that?
 8    A.  No.
 9    Q.  All right.  What did you do to
10  prepare for your deposition today?
11    A.  I reviewed my report, both my
12  original report and then my rebuttal report.
13        I reviewed the report of Professor
14  Stulzman -- Stulz.  I reviewed the deposition of
15  Professor Stulz and then I read the complaint.
16        Then I met with Donny Hall for about
17  two hours total.  Maybe a little less than.
18    Q.  When did you meet with Mr. Hall?
19    A.  Yesterday.
20    Q.  Was anyone else present?
21    A.  No.
22    Q.  And did you meet -- did you have any
23  phone conversations with Mr. Hall regarding your
24  preparation?
25    A.  Briefly, yes.
```
TSG Reporting - Worldwide      877-702-9580

Page 9

```
 1          S. Hakala
 2    Q.  About how many times?
 3    A.  Once or twice, maybe more, but mostly
 4  just scheduling kinds of things.
 5    Q.  Okay.  Where are you currently
 6  living?
 7    A.  I'm living in Highland Village,
 8  Texas.
 9    Q.  If you could take me through your
10  educational background.
11        You have a BA in economics?
12    A.  I have a BA in economics with a minor
13  in business and a pre-law emphasis in polysci,
14  and then I have a Ph.D., and I earned that in
15  1983, I earned a Ph.D. or doctorate in economics
16  in 1989.
17    Q.  From where?
18    A.  From the University of Minnesota.
19  Both of the degrees are from the University of
20  Minnesota but the undergraduate degree is from
21  the Duluth campus.
22    Q.  Okay.  And did you -- you had a
23  prelaw emphasis?
24    A.  Yes.
25    Q.  Did you intend to go to law school?
```
TSG Reporting - Worldwide      877-702-9580

Page 10

1         **S. Hakala**
2    A.   I was -- at that point I was
3 reserving my options to either go to graduate
4 school in economics or law school, and for a
5 variety of personal reasons thought law school
6 was not a good fit for me.
7    Q.   **And so you never attended law school.**
8    A.   No.
9    Q.   **And did you go straight from your**
10 **undergraduate into your Ph.D. program?**
11    A.   Yes.
12    Q.   **And your resumé says that your**
13 **advisor was Edward Prescott; is that correct?**
14    A.   Yes, that's correct.
15    Q.   **And he was awarded a Nobel Prize in**
16 **economics in 2004?**
17    A.   Yes.
18    Q.   **Did you in any way assist him or**
19 **contribute to any of the work that resulted in**
20 **the Nobel Prize?**
21    A.   No.
22    Q.   **What was the subject of your Ph.D.**
23 **dissertation?**
24    A.   It was on -- the title was "Inventory
25 Theoretic Models of Money." Essentially what I

Page 11

1         S. Hakala
2 was doing was from the ground up trying to
3 explain how and why money develops in an economy
4 and then from that, develop some mathematical
5 models for using a more sophisticated,
6 continuous time modeling technique to see if
7 modeling the theory of money from the ground up
8 of why does money exist, how does it exist and
9 then how often does one in a sense get paid,
10 what's the timing between pay intervals and sort
11 of inventory holdings of money balances, how
12 does that relate to things like hyperinflation,
13 interest rates and economic activity.
14    Q.   **Was that thesis published anywhere?**
15    A.   The paper was part of a working
16 series or was a present -- was accepted through
17 peer review for the World Econometric Society
18 meetings, but that did not count as a
19 publication.
20    Q.   **And was that -- was your thesis**
21 **related to securities analysts in any way?**
22    A.   No.
23    Q.   **As part of your academic training,**
24 **did you receive any formal instruction or do any**
25 **research on research analysts?**

Page 12

1         **S. Hakala**
2    A.   Not then, no.
3    Q.   **If you could take me briefly through**
4 **your employment history.**
5         **In 1983 you began lecturing in the**
6 **Department of Economics at the University of**
7 **Minnesota; is that correct?**
8    A.   Yes.
9    Q.   **Okay.  How long did you do that for?**
10    A.   I did that until 1987.
11    Q.   **Okay.  Did you teach any courses**
12 **during that time?**
13    A.   Yes.
14    Q.   **And what courses did you teach?**
15    A.   My primary course was the Principles
16 of Macroeconomics lecture.
17         I was, because of my training and
18 background, I was given the responsibility, the
19 first year I was really the associate so I
20 taught some of the breakout groups, but the
21 second year I was promoted to being the large
22 lecturer, which meant that I had about 450
23 students a quarter that were broken down in
24 about 10, 11 different subsections with other
25 graduate students as what I call TAs grading

Page 13

1         S. Hakala
2 papers and other things.
3         So I was the primary lecturer in
4 designing the course, designing the course
5 materials.  I would give two lectures a week and
6 Robert Heller, who very famous economist, would
7 give essentially a one lecture a week.
8    Q.   **And then you were promoted to**
9 **assistant professor; is that correct?**
10    A.   I wasn't promoted.  That was my first
11 employment after I received my Ph.D.
12    Q.   **I see.  Okay.**
13         **And that was in the economics**
14 **department at Southern Methodist University?**
15    A.   Yes.
16    Q.   **And how long did you -- were you an**
17 **assistant professor there?**
18    A.   Four years.
19    Q.   **And what courses did you teach?**
20    A.   I taught the Ph.D. level Monetary and
21 Financial Theory course.
22         I taught the Principles of
23 Macroeconomics course.
24         Occasionally Money and Banking.
25         I also taught a course on

Page 14

S. Hakala
1
2    international finance that generally was
3    targeted to senior undergraduates and students
4    in an applied master's program.
5        Q.   Did you publish any peer-reviewed
6    articles during this time?
7        A.   No.
8        Q.   Did you seek tenure as a professor at
9    Southern Methodist?
10       A.   No.
11       Q.   When did you leave Southern Methodist
12   University?
13       A.   I think formally July of 1992.
14       Q.   Why did you leave?
15       A.   I left because I was very frustrated
16   with the academic process and the level of
17   research support at SMU.
18       I also left with a year left on my
19   contract at SMU because I felt that consulting
20   would be a better fit, would give more
21   flexibility both financially and personally for
22   me.
23       Q.   So what did you do after you left
24   Southern Methodist University?
25       A.   I actually had an overlap in May of

Page 15

S. Hakala
1
2    1992. I was formally employed by a firm known
3    as Business Valuation Services, which is really
4    the predecessor of the firm I now work for.
5        Q.   And how long did you work for
6    Business Valuation Services?
7        A.   Until it was acquired in May of 1998
8    with maybe a two-month window.
9        Q.   And what did you do for them?
10       A.   I was hired as an economist, as a
11   senior consultant, and eventually I was promoted
12   to a principal.
13       I helped oversee employment issues,
14   any kind of work that was required to be done,
15   interacting with clients. Just a pretty broad
16   mix. At that time we were doing a lot of
17   valuation work so day in and day out most of the
18   work I was doing was interacting with clients
19   who needed valuations for a variety of purposes.
20       Q.   When you say "clients," these are
21   corporations you were valuing?
22       A.   Corporations or families' estates.
23   We were doing a lot of estate planning work with
24   attorneys or corporations that needed like an
25   allocation of purchase price study or a transfer

Page 16

S. Hakala
1
2    pricing study or some other valuation assignment
3    that would be used for some accounting or tax
4    purpose.
5        Q.   And why did you leave Business
6    Valuation Services in 1998?
7        A.   I only left for two months and only
8    as an interim to try and assist a company to try
9    and raise capital and to provide sort of an
10   interim position as a bridge. Other than that,
11   I never left the firm.
12       Q.   Okay. Did you work for Laser
13   Biotherapy?
14       A.   Yes, but only two months.
15       Q.   Okay. And what did you do for them?
16       Is that the company that you were
17   just referring to?
18       A.   Yes. Yeah.
19       Q.   And what did you do for Laser
20   Biotherapy?
21       A.   I was the president and CEO.
22       I was also really the controller and
23   CFO.
24       I had originally done a lot
25   consulting work in preparing business plans

Page 17

S. Hakala
1
2    projections. Essentially I completely redid the
3    financials from the ground up, reconstructed the
4    financial statements.
5        I interacted with physicians who
6    were -- we had a double blind study at the Mayo
7    Clinic in Rochester, Minnesota, so I met up and
8    met with him, reviewed his work, made sure the
9    statistics were done right.
10       I had a limited amount of oversight
11   on our seeking FDA approval for the device we
12   were manufacturing, met with perspective
13   manufacturers, vendors and other doctors where
14   we had demonstration units.
15       Q.   And why was your term at Laser
16   Biotherapy only three months?
17       A.   Well, it was really two months.
18       But once I got in, first of all, some
19   of the initial seed money that was promised we
20   would have to work with didn't show up, so it
21   was very frustrating to work without money.
22       Second, I think sometimes you get
23   into something that looks great and you get
24   along with someone really well and then when
25   you're working with them day in and day out and

Page 18

```
1              S. Hakala
2  you're making decisions, it's a different
3  matter.
4        And when you're president and CEO and
5  a fiduciary and you're trying to raise money,
6  you have to make certain assurances to investors
7  about the integrity of your systems.  And some
8  of the things that I needed to do, some of the
9  money that I had gotten commitments on I could
10 not get commitments from some of the
11 shareholders who were existing shareholders to
12 go along with what they were demanding, and so I
13 basically recognized it was time to go back home
14 so to speak.
15     Q.   And so you went back to Business
16 Value Services?
17     A.   Business Valuation Services.
18     Q.   Valuation Services.
19          And at that point it had become CBIZ;
20 is that correct?
21     A.   No.  No.  It was still Business
22 Valuation Services when I returned.
23     Q.   Okay.  And did you also serve as a
24 director of ErgoBilt, Inc.?
25     A.   Yes, I did.
```

Page 19

```
1              S. Hakala
2     Q.   And what did ErgoBilt, Inc. do?
3     A.   They were primarily a manufacturer of
4  ergonomic chairs and ergonomic products.  That
5  was their main subsidiary.
6          They also had, they owned a court
7  reporting product that they were trying to
8  develop which had some ergonomic applications,
9  and they were trying to develop it for not just
10 court reporting, but also so students that are
11 court reporting could use the device as an
12 all-in-one.  It was a, the computer, instead of
13 having a separate stenograph and a computer,
14 you'd have them all integrated, and then in
15 addition, it used a more friendly system than
16 the traditional stenographic method.
17         Some of the schools had adopted the
18 method.  It had originally been backed by EDS
19 and there was a dispute with EDS.
20         And so that was the other business
21 and I think they also acquired a court reporting
22 software company.
23     Q.   And were there accounting problems at
24 ErgoBilt when you were there?
25     A.   Well, they were -- they preceded my
```

Page 20

```
1              S. Hakala
2  existence there.  I was brought in to help clean
3  it up after the fact, but yes.
4     Q.   And in fact PwC resigned as their
5  auditor shortly after you joined; is that
6  correct?
7     A.   Yes.
8     Q.   And were they the subject of a suit
9  for securities violations?
10    A.   PwC was?
11    Q.   No, ErgoBilt.
12    A.   Oh, ErgoBilt was, yes.
13    Q.   Was that suit filed before or after
14 you came?
15    A.   Before.
16         In fact, I think the press release
17 that ended the class period was something I had
18 helped work on.  Basically I put it out there to
19 make sure we weren't continuing the problem.
20    Q.   And was ErgoBilt a public company?
21    A.   It was, yes.
22    Q.   Did it get delisted from NASDAQ?
23    A.   Yes.
24    Q.   Was that during your time there?
25    A.   Yes.
```

Page 21

```
1              S. Hakala
2     Q.   When did your affiliation with
3  ErgoBilt end?
4     A.   I believe about April of 1999, yeah.
5     Q.   And why did it end?
6     A.   I had come on board in July of '98.
7  There were a lot of bad apples.  I was in charge
8  of overseeing reconstructive audit work, getting
9  the books and records in order.
10         I was also in charge of managing or
11 on the legal committee.  That's a pretty hard
12 task, it's pretty demanding of time and the
13 principals that I was working with at Business
14 Valuation Services expressed a lot of concern
15 about the amount of time that I was spending
16 doing that.
17         I also became very increasingly
18 concerned that having made a lot of hard
19 decisions, I was not going to be effective going
20 forward and needed to eliminate my exposure.
21    Q.   And so you at this -- during this
22 time period that you were a director at
23 ErgoBilt, you were also working for Business
24 Valuation Services?
25    A.   That was the name, although the
```

Page 22

S. Hakala

1    S. Hakala
2  corporate entity had changed. In May of 1998,
3  Business Valuation Services was acquired by a
4  public company then known as Century Business
5  Services.
6      Q.   And that later became known as CBIZ;
7  is that correct?
8      A.   Yes.
9      Q.   And starting in 1998, what was your
10 day-to-day role at CBIZ?
11     A.   My formal title was still as a
12 principal. I still had some management
13 responsibilities but it had changed
14 dramatically. Rather than being a very small
15 what I would call phantom equity owner, I was
16 now working for a subsidiary of a public
17 company. So certain of the reporting,
18 decision-making process that I might have been
19 involved in the prior two or three years as a
20 principal of the firm I no longer was involved
21 in.
22         A lot of the work that I was doing in
23 that time period was what I would call working
24 with firms that were either in financial
25 distress, seeking financing or other kinds of

Page 23

1    S. Hakala
2  transaction related work. I did a lot of
3  transaction work in this time period.
4      Q.   And when did you start doing
5  litigation consulting?
6      A.   I had done litigation consulting from
7  the beginning.
8      Q.   From '92.
9      A.   From '92 onward, yeah.
10     Q.   And over the last five years, what
11 percentage of your work would you say is
12 litigation consulting?
13     A.   Well, it's about 90 percent of my
14 time, but less, substantially less than that of
15 my engagements.
16         It has increased dramatically. It
17 probably five years ago was already at 75
18 percent and then has increased steadily each
19 year since then.
20     Q.   And what's the rough percentage of
21 the income that you derive, as a percentage,
22 what amount of the income would you say comes
23 from litigation consulting?
24     A.   Well, the income of the firm?
25     Q.   The income that you -- I'm sorry.

Page 24

1    S. Hakala
2         What percentage of the income that
3  you generate for the firm would you say comes
4  from your litigation consulting?
5      A.   About 90 percent or in that -- maybe
6  85 percent, 80 percent, because a lot of the
7  non-litigation work I sell and I oversee but
8  gets leveraged or managed off to other people.
9  Litigation, I can't do that like I do my other
10 work.
11     Q.   And so for your litigation consulting
12 you have people who work for you or do you
13 actually give the work, you bring in the work
14 and give it to somebody else to run?
15     A.   No. Let's talk about non-litigation.
16 Non-litigation I have -- I might -- let's say I
17 have a client who wants me to do a transfer
18 pricing study for a pharmaceutical company,
19 okay? I'll sell that and probably 95 percent of
20 the time in the billings would be done by other
21 people in the office where I will set up the
22 meetings, initiate the work, make sure it's done
23 right, but I will do actually very little
24 substantive work.
25         In litigation, in contrast, you can't

Page 25

1    S. Hakala
2  do that. I found that's a dangerous thing to
3  do.
4         So typically there as much as, you
5  know, sometimes as little as 10 percent but as
6  much as 20, 25, 30, 40, in some cases 50 or 100
7  percent of a litigation assignment will be my
8  personal billings.
9         I don't have a separate pool of
10 staff. We have about 19, 20 professionals in
11 our office who work on anything that comes in.
12 Two-thirds of our office's billings are
13 non-litigation so... But they're general staff.
14 They do whatever comes in the door.
15     Q.   And again over the last five years,
16 what percentage of your litigation consulting
17 would you say relates to securities class
18 actions?
19     A.   It has increased substantially. I
20 would say it was probably still 50 percent or
21 less five years ago.
22         It is now substantially greater than
23 that, but probably not more than 70 percent.
24     Q.   Okay. And of those securities class
25 action consulting projects that you work on,

Page 26

1           S. Hakala
2  what would you say would be the rough breakdown
3  between doing work for plaintiffs in cases
4  versus defendants in cases?
5      A.   It's almost exclusively plaintiff
6  now.
7           Probably once every two years I
8  assist someone on the defendant side, primarily
9  as a consulting expert.  I think probably around
10  '92, '93 I issued one expert report for a
11  defendant, but so I would say probably, you
12  know, of 100 engagements, 97, 96 are going to be
13  plaintiff and the rest are defendant.
14      Q.   And when were you retained in this
15  case?
16      A.   Boy, that's a good question.
17  Probably sometime last year or earlier.
18      Q.   And who retained you?
19      A.   I think I was retained by Kaplan Fox.
20      Q.   At that time do you remember what the
21  purpose of the retention was?
22      A.   Some preliminary analyses.  You know,
23  maybe market efficiency, maybe loss causation.
24  I don't remember.
25      Q.   With respect to AOL?

Page 27

1           S. Hakala
2      A.   Yes.
3      Q.   And had you worked with Kaplan Fox &
4  Kilsheimer before?
5      A.   Yes.
6      Q.   How many times?
7      A.   At most a handful.  Maybe three or
8  four that I can think of.
9      Q.   And what type of cases were those?
10      A.   Well, one was not a class action
11  securities case but, I think, but I think all
12  but one was a class action securities.
13      Q.   Did any of them involve analyst
14  statements?
15      A.   One did.
16      Q.   Do you remember which case that was?
17      A.   Yeah.  It's Salomon Smith
18  Barney/Citicorp is being sued for their -- for
19  certain statements in analyst reports involving
20  Metromedia Fiber Network or MFN.
21      Q.   And what is your billing rate for the
22  work that you do in this case?
23      A.   $525 an hour.
24      Q.   And do you expect to receive any
25  other compensation as a result of your work in

Page 28

1           S. Hakala
2  this case?
3      A.   No.
4           Well, first of all, that's
5  compensation to the firm, that's not
6  compensation to me.
7      Q.   Okay.  And have you actually been
8  paid for any of your work in this case so far?
9      A.   We've been paid on all work through
10  our invoice issued in June.
11          We haven't issued an invoice for time
12  in June yet.
13      Q.   Any idea roughly about how much that
14  is yet?
15      A.   I don't think it's a large amount
16  because we had -- I had done a draft report on
17  this rebuttal to Stulz before that, so it's...
18  I don't know, it might be a few thousand
19  dollars.
20      Q.   I mean total.
21      A.   The newest invoice?
22      Q.   I mean the total amount that you
23  received in this case so far.
24      A.   35, 40,000 maybe.  It's a rough
25  guess.  I don't know for sure.

Page 29

1           S. Hakala
2      Q.   About how much time do you think
3  you've spent preparing the two reports that you
4  did in this case?
5      A.   Over 100 hours probably.
6           No, it can't be that much.  Probably
7  about 50 hours for me.
8      Q.   And how many other people worked in
9  preparing the reports?
10      A.   I don't know.  Probably two or three
11  primarily and mostly in assistance and review.
12      Q.   And those were people who worked in
13  your office?
14      A.   Yes.
15      Q.   Any idea how much time they spent on
16  preparing the reports?
17      A.   Probably the same amount --
18          MR. HALL:  Objection.
19      A.   -- or greater in terms of time.
20      Q.   And how does that time compare with,
21  for example, the amount of time that was
22  prepared -- that was spent preparing reports
23  that you had done in Metromedia?
24      A.   I spent more time on Metromedia
25  because I issued a direct report in a damages

8

Page 30

```
 1              S. Hakala
 2  report, so there was a lot more time reviewing
 3  depositions and other things.  I wouldn't be
 4  surprised if my time in that case is over 100
 5  hours, whereas this is probably at most maybe 40
 6  to 60 hours of work at most on my part.
 7          (Defendants' Exhibit Hakala 1,
 8          Declaration of Scott D. Hakala Regarding
 9          Market Efficiency, is marked for
10          identification, as of this date.)
11  BY MR. GESSER:
12      Q.  Dr. Hakala, I'm showing you a
13  document marked Hakala Exhibit 1.
14          Do you recognize this document?
15      A.  Yes.
16      Q.  Can you tell me what this document
17  is?
18      A.  This appears to be a copy of the
19  declaration and report on market efficiency that
20  I've prepared in this case.
21      Q.  Do you stand by the analysis and
22  conclusions that were reached in this report?
23      A.  Yes.
24      Q.  Is there anything that you'd like to
25  change in this report?
```

Page 31

```
 1              S. Hakala
 2      A.  Not that I can think of.
 3      Q.  Did you draft the first draft of this
 4  report?
 5      A.  I think so.  Yeah, everything in here
 6  is my wording but some of the footnotes you'll
 7  probably recognize from other reports, but it's
 8  all mine.
 9      Q.  And when you say the footnotes I
10  might recognize from other reports, those are
11  other reports that you filed in other cases?
12      A.  Yes.  Yeah.
13      Q.  So if the same issue arises in
14  different cases that you're consulting with, you
15  will take pieces from one report and drop it
16  into the other report to the extent that it's
17  applicable?
18      A.  Yes.
19      Q.  Okay.  I'm showing you now —
20      MR. GESSER:  We'll have to mark that
21  Exhibit 2.
22          (Defendants' Exhibit Hakala 2,
23          Rebuttal report of Dr. Hakala, is marked
24          for identification, as of this date.)
25  BY MR. GESSER:
```

Page 32

```
 1              S. Hakala
 2      Q.  Do you recognize the document that's
 3  marked Exhibit 2?
 4      A.  Yes.
 5      Q.  Can you tell me what that is?
 6      A.  It's a copy of a rebuttal report that
 7  I prepared in this case.
 8      Q.  And is there anything you'd like to
 9  change or modify or correct in this report?
10      A.  Not that I can think of, no.
11      Q.  So you stand by the analysis and
12  conclusions in the report?
13      A.  Yes.
14      Q.  And do you know if you drafted the
15  first draft of this report?
16      A.  Yes.  This was entirely written by
17  me.
18      Q.  All right.  If you turn to the last,
19  I guess it's the second to last page of Exhibit
20  2 --
21      A.  Yes.
22      Q.  -- it says that you declare under the
23  laws of the State of Texas, declare under
24  penalty of perjury under the laws of the State
25  of Texas.
```

Page 33

```
 1              S. Hakala
 2          Do you know why Texas was chosen?  Is
 3  that because that's where you live?
 4      A.  That's where I live.
 5      Q.  Okay.  But the actual document was
 6  executed in Philadelphia?
 7      A.  Yes.
 8      Q.  Is that because you were there at the
 9  time?
10      A.  Yes.
11      Q.  Paragraph 7 of the report, this is on
12  page 5, if you look at the second sentence it
13  says, "Most of the reports issued by the
14  defendants were merely repeating or commenting
15  on AOL Time Warner news without significant
16  changes in opinion, such that stock price
17  effects would be viewed as unlikely."
18      A.  Yes.
19      Q.  Can you tell me what you mean by
20  that?
21      A.  What I mean by that is that if an
22  analyst issues a report that does not
23  significantly alter their recommendation or
24  alters their forecasts or other comments that
25  are not different from what one would expect
```

Page 34

S. Hakala
1
2  from an analyst in that time period, they are
3  unlikely to cause a significant movement in the
4  stock price.
5      Q.  So for the analyst reports that are
6  at issue in this case, the CSFB reports on AOL,
7  do you know about how many of those reports you
8  would put into this category?
9      A.  Well, the vast majority of the
10 reports have material statements, meaning that
11 if the reports had said what is alleged in the
12 complaint and identified in emails, those
13 reports certainly would have caused a
14 significant effect on the stock price.
15     However, because they did not make
16 those statements, they omitted to make those
17 statements, most of the reports are merely
18 reiterating existing guidance or commenting on
19 events where they are merely reiterating the
20 same forecasts they might have made in another
21 report.
22     So many of the reports are like AOL
23 announces they have achieved 28 million
24 subscribers and then they re-insert in the
25 report that they expect AOL to make EBITDA
TSG Reporting - Worldwide    877-702-9580

Page 35

S. Hakala
1
2  targets of 10.9 billion and, you know, continue
3  to see, you know, whatever, but they're
4  repeating the same thing that's in a prior
5  report is what I mean.
6      Q.  Okay.  And so my question to you was,
7  how many of the reports fall into this category?
8      MR. HALL:  Objection.
9      A.  I didn't do an add up.
10     We could do that if you had a list of
11 all the reports and we could segregate them.
12     I would say the majority of the
13 reports would probably fall into the category of
14 merely commenting on the news without making an
15 affirmative statement on the part of AOL -- of
16 CSFB about AOL.
17     Q.  But so there are some reports in your
18 view that do not fall into this category where
19 new news was being disclosed to the market from
20 CSFB; is that correct?
21     A.  No.  I don't think that it was new
22 news, although the July 19th and the September
23 18 or 19, the reports around those two time
24 periods, that was clearly new news by CSFB.
25     Q.  July 19th of --
TSG Reporting - Worldwide    877-702-9580

Page 36

S. Hakala
1
2      A.  '01 and September 18 or 19 of '01.
3      Q.  Okay.  We'll get to those in a
4  moment.
5      But can you think of any other
6  reports that in your view were more than merely
7  a reiteration of either a previous report by
8  CSFB or a statement to the market by AOL?
9      A.  I think there were probably about 8
10 or 10 reports that were beyond a reiteration
11 where they made some affirmative comment about
12 whether the guidance of AOL was achievable or
13 some other statement which would be material to
14 investors in the sense that it's telling them
15 something about the risk and prospects for AOL
16 Time Warner.
17     A number of the statements that were
18 what I would call new were issued in like the
19 first six months of 2001, and I remember there
20 being about a handful of reports that were not
21 just a comment on what AOL is saying and then
22 just a repeat of what's in a prior report in
23 both sum and substance, but making some
24 additional affirmative or negative comment.
25     Q.  Okay.  And can you tell me which days
TSG Reporting - Worldwide    877-702-9580

Page 37

S. Hakala
1
2  those -- on which days those reports were issued
3  that in your view had an impact on AOL's stock
4  price?
5      MR. HALL:  Objection.
6      A.  Well, I would tell you that all of
7  the reports had an impact on AOL's stock price,
8  and what I mean by impact is a report that does
9  not change earnings expectations impacts the
10 stock price because when you're doing the
11 consensus estimates and you're looking at
12 trends, the fact that an analyst is retaining or
13 maintaining their current earnings targets,
14 their current price target and other metrics and
15 revenue forecasts shows up on the boards so to
16 speak.
17     So if I'm looking at momentum, let's
18 say there's 20 analysts covering a stock, I want
19 to see what analysts let's say in the last week,
20 the last four weeks, the last two months have
21 reduced earnings guidance, reduced revenues
22 guidance, reduced EBITDA guidance, have lowered
23 their recommendation or raised their
24 recommendation.  I want to see trends.
25     So all of these are having an impact
TSG Reporting - Worldwide    877-702-9580

10

Page 38

S. Hakala

1     in the sense that they are not signaling a
2     change in expectations for AOL Time Warner when
3     my understanding is the pleadings are that they
4     would have done so had the truth been disclosed.
5
6       Q.   All right.  Let's leave aside --
7     let's leave aside what wasn't said in the
8     reports for in a moment and dealing with the
9     effect of what was said in the reports on AOL
10    stock price.
11      A.   Yes.
12      Q.   Now you had said that if I'm --
13    correct me if I'm wrong.  You said that because
14    these CSFB reports were part of the consensus of
15    analysts --
16      A.   Yes.
17      Q.   -- that they would have an effect on
18    the stock price.
19      A.   Right.
20      Q.   Okay.  Did you analyze the CSFB
21    reports against the consensus to see how the
22    CSFB reports compared to the analyst consensus?
23      A.   Not formally, but I did look at all
24    the analyst reports that we had at various time
25    periods, especially in the first and second half

TSG Reporting - Worldwide      877-702-9580

Page 39

S. Hakala

1     of '01, and lined up where CSFB was in terms of
2     price target, in terms of downgrades and so on
3     against them, but I did not do a formal study of
4     that.
5
6       Q.   So you wouldn't know, for example,
7     what would happen to the consensus if the CSFB
8     reports had been removed from the consensus
9     forecasts.
10      A.   No.
11      Q.   So you wouldn't know whether the
12    consensus forecasts would have been affected at
13    all.
14           MR. HALL:  Objection.
15      A.   Up or down -- well, they would have
16    been affected but I don't know how much.
17           If you're talking about the consensus
18    earnings or revenue or EBITDA or growth
19    forecasts, I don't know.  I think it would have
20    gone down slightly because there were some more
21    pessimistic reports out there, but probably not
22    a lot.
23      Q.   And were there times during the class
24    period where the CSFB forecasts were below the
25    consensus?

TSG Reporting - Worldwide      877-702-9580

Page 40

S. Hakala

1
2       A.   I don't remember that.
3           I think Stulz mentioned in his report
4     that there may have been, but that may not have
5     been my understanding of the consensus.
6           I mean there's multiple consensuses
7     depending on if you include buy-side analysts,
8     if you include other analysts.
9       Q.   Any idea how many analysts were
10    covering AOL at this time that would have been
11    part of those various consensus?
12      A.   Various consensus reports I saw were
13    in the high teens to the mid 20s, maybe even as
14    high as 30 in some.
15      Q.   And --
16      A.   Now that's the broad consensus.
17           There was what I would call a core
18    consensus of sell-side analysts who are viewed
19    as top tier and I think it was, CSFB was
20    probably one of five or six of what I would call
21    the core top tier, meaning they were most
22    frequent and most active in covering and viewed
23    as having a closer relationship and more direct
24    knowledge of AOL Time Warner than most analysts.
25      Q.   And where do you get that from?

TSG Reporting - Worldwide      877-702-9580

Page 41

S. Hakala

1
2       A.   I get that from just reviewing the
3     frequency of the CSFB analyst reports relative
4     to the other analyst reports, some of the
5     perceptions out there in terms of just looking
6     at who's publishing when, how many.
7       Q.   But was there an actual core
8     consensus number that was released to the market
9     or --
10      A.   No.  I'm talking about if you read
11    the reports, which reports appear to be analysts
12    issuing more than just a bare bones report,
13    making very strong qualitative comments about
14    quality of earnings, achievability of forecasts,
15    analysts who might be perceived by investors as
16    having some access to AOL or having superior
17    knowledge rather than just somebody like an
18    investment survey who just listens to conference
19    calls and, you know, once every three months
20    says I think it's a buy or a sell or whatever.
21      Q.   But there's also something called an
22    analyst consensus, an actual number that gets,
23    you know, reported in the press as being the
24    consensus forecast for a company.
25      A.   There are actually multiple ones.

TSG Reporting - Worldwide      877-702-9580

11

Page 42

S. Hakala
2  Q.  Okay.
3  A.  The most common one I think you're
4 probably referring to is the First Call
5 consensus.
6  Q.  And just to be clear, you haven't
7 done an analysis to determine what would have
8 happened to that First Call consensus had CSFB's
9 reports been removed from the consensus
10 forecasts.
11  A.  No.
12  Q.  All right.  So --
13  A.  Not that issue.
14  Q.  And the second -- turning back to
15 whether the CSFB reports had an effect on AOL
16 stock price, let's leave aside the issue of what
17 would have happened had the reports disclosed
18 something that they didn't disclose, just the
19 statements that are contained in the reports,
20 how would you determine whether they had an
21 impact on the stock price?
22  MR. HALL:  Objection.
23  A.  It's very difficult to do.  You might
24 look at trading and price movement directly
25 around the time of issuance of a report, but I

Page 43

S. Hakala
2 mean it's difficult because all the tests for
3 impact are really what is the effect of the
4 report relative to what the effect would have
5 been in some alternative scenario and without
6 seeing the alternative scenario, you can't do
7 that properly.
8  Q.  But didn't you conduct an event study
9 for exactly that purpose?
10  A.  I did a daily event study and I did
11 not do an intraday event study and yes, I did it
12 not for that purpose so much as to show that the
13 information that was omitted was material and
14 that when analysts of similar weight in the
15 market did issue lowering guidance, did make
16 questioning statements --
17  Q.  But --
18  A.  -- they had the effect.
19  MR. HALL:  Let him finish first.
20  MR. GESSER:  He's not answer --
21  Q.  I said leaving aside the disclosure,
22 the issue of what wasn't disclosed, just talking
23 about what was disclosed --
24  A.  Yes.
25  Q.  -- there are --

Page 44

S. Hakala
2  MR. HALL:  Objection.
3  Q.  -- there are days in which CSFB spoke
4 where there was no impact by your event study at
5 the 95 or 90 percent confidence level; is that
6 correct?
7  MR. HALL:  Objection.
8  A.  No.  You're confusing impact and
9 materiality with statistical significance in a
10 movement of the stock price.
11  The fact that the stock price did not
12 move significantly does not mean that that
13 report had no impact.
14  It may have had a small impact that
15 we can't distinguish from noise.
16  In some cases we have some pretty
17 strong indications that it had an impact at
18 least on two dates that are identified in my
19 report, but that impact was in conjunction with
20 at least a couple of analysts on July 19th and
21 with at least one other analyst in September of
22 '01.
23  We cannot say that the reports had no
24 impact.  We cannot say that.
25  Q.  But can you say that the reports did

Page 45

S. Hakala
2 have an impact?
3  A.  Yes.
4  Q.  And how are you able to distinguish
5 what was noise from what was the effect of other
6 analysts from what was the effect of CSFB?
7  MR. HALL:  Objection.
8  A.  Again, you're confusing impact with
9 moving the stock price.  That's not necessarily
10 impact in a true econometric or in a statistical
11 sense.
12  Statistics would say and materiality
13 would say the fact that, for example, CSFB in
14 the spring of '01 indicated that they thought
15 that the forecasts were achievable and that they
16 tended to discount or try to discount some of
17 the rumors that AOL Time Warner was going to
18 struggle, they had some impact.
19  Whether we can isolate it
20 statistically or not is another matter.  They
21 had an impact.
22  Q.  How do you know that?
23  A.  Because they were qualitative
24 statements.  Because if the statements had been
25 made alternatively that are the truthful

TSG Reporting - Worldwide    877-702-9580

Page 46

S. Hakala

1
2   statements, we know from other results that it
3   would have had an impact. I mean --
4       Q.   You say you know that. I mean you,
5   you, you suspect that.
6           Your -- this is I mean -- you can't
7   know what would happen had a statement that
8   wasn't made been made.
9           MR. HALL: Objection.
10      A.   No, you can by looking at what
11  happens when somebody else or when the company
12  makes that statement or when that truth leaks
13  out.
14      Q.   And so if CSFB were to make a
15  statement about AOL, you're saying that you
16  can -- well, if CSFB -- withdrawn.
17          If CSFB knew information, some
18  information about AOL but didn't disclose it,
19  and then AOL actually disclosed it and that
20  affected the stock price, you're saying that you
21  could then determine that CSFB, had it disclosed
22  it, wouldn't have the same -- that statement by
23  CSFB would have the same effect as if AOL
24  disclosed it.
25      A.   You can look at the effect when AOL

TSG Reporting - Worldwide     877-702-9580

Page 47

S. Hakala

1
2   discloses news versus when an analyst discloses
3   news. I think you can or a jury can reasonably
4   draw an inference that it would have had an
5   effect.
6           It may not have had the same effect
7   as if AOL had disclosed it, but it would
8   certainly have had an effect.
9           There's no question it would have had
10  an effect because lesser analysts when they
11  issued questions similarly later in the class
12  period had an effect.
13          We also know that CSFB when it issued
14  a report in September had some effect and we
15  have an idea that CSFB as part of a small
16  handful of analysts on July 19th, 2001 had an
17  effect.
18      Q.   All right. Let's start with, because
19  I think we're talking at cross purposes, let's
20  start with what it is that affects stock prices,
21  okay?
22      A.   Yes.
23      Q.   Because I think it would be helpful.
24          AOL, you were involved in the In Re
25  AOL class action; is that correct?

TSG Reporting - Worldwide     877-702-9580

Page 48

S. Hakala

1
2       A.   Yes.
3       Q.   Okay. And you were retained by
4   plaintiffs In Re AOL?
5       A.   Yes.
6       Q.   And what did you conclude about AOL's
7   effect on its own stock price with respect to
8   its alleged misstatements about its
9   accounting --
10          MR. HALL: Objection.
11      Q.   -- practices?
12          MR. HALL: Objection.
13      A.   That they were material, that they
14  caused a substantial inflation in the value of
15  AOL and then later AOL Time Warner stock price,
16  and that as the truth leaked out, and part of
17  the leakage in my study was from analysts and
18  for the earnings disappointments in 2001,
19  actually the first one was in October of 2000,
20  and then finally some partial admissions and
21  then other disclosures in let's say July and
22  August of 2001 the truth finally really came out
23  to a large extent.
24      Q.   And so AOL, you concluded that AOL's
25  alleged misstatements had caused a loss to AOL

TSG Reporting - Worldwide     877-702-9580

Page 49

S. Hakala

1
2   shareholders?
3       A.   Yes.
4       Q.   And did you conclude that any other
5   defendants in that case had caused a loss to AOL
6   shareholders?
7       A.   Not specifically. I didn't isolate
8   one defendant versus another. I never even got
9   to that point.
10      Q.   But were you looking at other
11  statements, statements by anyone other than AOL
12  or AOL employees?
13      A.   Yes.
14      Q.   And did you conclude whether any of
15  those defendants other than the AOL defendants
16  caused a loss to AOL shareholders?
17          MR. HALL: Objection.
18      A.   Well, in a contingent sense, yes.
19  And some of them were not defendants.
20          In other words, I found that certain
21  analyst reports caused a loss, both in
22  re-inflating the stock price based on
23  reaffirming statements AOL was making and/or
24  caused a loss in the sense that they revealed
25  part of the relevant truth, and so some of the

TSG Reporting - Worldwide     877-702-9580

Page 50

S. Hakala

1    S. Hakala
2 key loss causation events were attributable to
3 analysts.
4    **Q.   But if an analyst -- if AOL had made**
5 **a false statement to the market that**
6 **artificially inflated AOL's share price and an**
7 **analyst learned that information and revealed it**
8 **to the market as soon as it found out, that**
9 **analyst wouldn't be the cause of losses to AOL**
10 **shareholders, would it?**
11    MR. HALL: Objection.
12    A.   I mean we can get into semantics, but
13 if I reveal truth to the market, I'm causing a
14 loss.
15        Now liability wise, they're not the
16 cause of that loss, AOL is ultimately the cause
17 of that loss, but there might be multiple causes
18 to that loss.
19        In other words, different defendants
20 may have acted and because one defendant didn't
21 disclose the truth doesn't absolve another
22 defendant from disclosing the truth as well.
23    **Q.   And when --**
24    A.   So there could be multiple people who
25 contributed to the inflation in the stock price

TSG Reporting - Worldwide    877-702-9580

Page 51

S. Hakala

1    S. Hakala
2 that ultimately caused the loss when the truth
3 was revealed.
4    **Q.   But in the example that I gave you**
5 **where an analyst learns of AOL's false statement**
6 **and as soon as the analyst learns of the false**
7 **statement, that analyst discloses it to the**
8 **market, the cause as you describe from a**
9 **liability point of view is not the analyst**
10 **because the inflation that is being removed from**
11 **the stock price is inflation caused by AOL in**
12 **that circumstance, not by the analyst; is that**
13 **correct?**
14    MR. HALL: Objection.
15    A.   In a liability sense and in the legal
16 sense, yes, but in a practical sense the analyst
17 is still causing the loss because he's leaking
18 the relevant truth.
19        Now he's not liable for it because he
20 has -- he's in effect doing a service. He's
21 just merely revealing the truth, he's not
22 previously hiding the truth which is what
23 ultimately causes the inflation.
24        So there's -- you're sort of using
25 words that have both a meaning in a legal

TSG Reporting - Worldwide    877-702-9580

Page 52

S. Hakala

1    S. Hakala
2 context and a meaning in an ordinary context.
3    **Q.   Well, let me pick up on that, that I**
4 **think you just said the concealing causes**
5 **inflation, okay?**
6    A.   Yes.
7    **Q.   So I'm at a cocktail party and I**
8 **overhear two AOL executives saying that AOL**
9 **isn't going to meet its targets on an analyst,**
10 **okay?**
11    A.   Yes.
12    **Q.   I learn that and I don't disclose**
13 **that to anybody.**
14        **Am I inflating AOL stock price at**
15 **that point as an analyst?**
16    MR. HALL: Objection.
17    A.   Implicitly yes. If you have a duty
18 to speak, if you've got a ratings out there and
19 you don't downgrade, yes.
20    **Q.   Where does my duty to speak come from**
21 **in that circumstance?**
22    MR. HALL: Objection.
23        This is a legal -- I mean you're
24    talking about in a legal sense?
25    MR. GESSER: He just said there's a

TSG Reporting - Worldwide    877-702-9580

Page 53

S. Hakala

1    S. Hakala
2 duty to speak so I'm asking him what that
3 duty to speak is.
4    A.   Well, let's put it in a non-legal
5 that we're getting into the standards of
6 professional practice of the AIMR at that point,
7 now the CFA institute.
8        If you as an analyst come upon that
9 kind of information, you have an affirmative
10 duty to pull your reports and withdraw your
11 recommendations at that point.
12        Now you cannot disclose the news but
13 you do have an affirmative duty to pull. You
14 can't continue to cover the company and you
15 certainly can't issue any reports until that
16 news is disclosed by the company.
17        And in fact if the company does not
18 come forthwith, you actually have an affirmative
19 duty, ethical duty at a minimum to disclose that
20 to the public, to your clients as well as to the
21 public in general.
22    **Q.   Okay. Let's start from a simpler**
23 **hypothetical because I think my question to you**
24 **is from an economic point of view, at what point**
25 **does somebody who has knowledge start inflating**

TSG Reporting - Worldwide    877-702-9580

Page 54

```
 1          S. Hakala
 2  a stock price.
 3          So I don't cover -- I'm an analyst.
 4  I don't cover AOL, okay? I'm an analyst. I'm
 5  at a cocktail party. I don't cover AOL. I
 6  overhear two AOL executives saying that AOL
 7  isn't going to meet its financial targets in a
 8  month from now.
 9     A.   Okay.
10     Q.   At that point, am I as the analyst
11  causing an inflation in AOL stock price?
12          MR. HALL: Objection.
13     A.   In the abstract of to the extent that
14  you're aware of news that if revealed would have
15  caused the stock to fall, yes.
16          In a liability sense, probably no in
17  that scenario as I understand it.
18     Q.   So you're saying from an economic
19  point of view, anybody who knows information
20  about a company that if disclosed would cause
21  its stock to fall is, by not disclosing that
22  information, inflating the stock price.
23     A.   Yes. If information is inside,
24  non-public and material information and it is
25  adverse to the company, then that is inflating
```
TSG Reporting - Worldwide     877-702-9580

Page 55

```
 1          S. Hakala
 2  the stock price, and anyone who is party to that
 3  information is party to the inflation.
 4          Now --
 5     Q.   Even --
 6     A.   -- that's a different issue from what
 7  your legal obligations might be and where
 8  liabilities lines may be drawn, which is a legal
 9  issue I don't draw on.
10          But even in that scenario, if my firm
11  is covering that company, let's say I'm an
12  analyst and I don't have coverage responsibility
13  but my firm does, there's still an ethical
14  question of whether or not my firm can continue
15  to cover.
16     Q.   Suppose I'm not even an analyst.
17  Suppose I'm me. I'm a lawyer, I work at a law
18  firm and I overhear two AOL executives talking
19  at a cocktail party saying that they won't meet
20  their numbers in a month.
21     A.   So now you know that the stock is
22  inflated.
23     Q.   I know -- all I know -- I don't --
24  all I know is what I've heard. I've heard that
25  two AOL executives think they're not going to
```
TSG Reporting - Worldwide     877-702-9580

Page 56

```
 1          S. Hakala
 2  make their numbers.
 3     A.   And you think that's credible, then
 4  you're aware that there's inflation in the stock
 5  price.
 6     Q.   And I'm part of the cause of the
 7  inflation.
 8          MR. HALL: Objection.
 9     A.   Yeah, if -- but you may not be liable
10  for it and you may not be required to act to
11  remove it but you're part of the cause.
12          Once you're party to or knowledgeable
13  about something that's material and inside to a
14  corporation, you're part of it.
15          And in fact there's a whole
16  discussion about when you, when you come upon
17  these settings as a CFA, what duties and
18  responsibilities you have to the party that has
19  that knowledge of encouraging them to come forth
20  and be forthright and what your duties and
21  responsibilities are.
22          And I don't purport to be a legal or
23  an ethical expert beyond a CFA, but it's not as
24  simple as you would make it out to be.
25          Now as I would say that if I'm just
```
TSG Reporting - Worldwide     877-702-9580

Page 57

```
 1          S. Hakala
 2  some regular guy or an attorney and I come upon
 3  this information, if I'm an attorney for the
 4  company, I may not have a duty to disclose
 5  because I'm not known as a speaker about the
 6  company, I don't have a duty to go post it on
 7  the Internet but so I may not be legally liable,
 8  but nevertheless I might even then have an
 9  obligation to go to the proper people and say
10  look, you know, you're in possession of this
11  information, you should be aware of it.
12     Q.   But I'm asking --
13     A.   You need to disclose it.
14     Q.   I'm asking you from an economics
15  point of view, you're asked to determine whether
16  statements had an impact on AOL's stock price
17  and I think what you told me is some of these
18  statements or all of the statements had an
19  impact because they failed to disclose
20  something.
21          So I'm asking you from an economic
22  point of view, I'm the lawyer who overhears at a
23  cocktail party that two AOL executives are
24  saying they're not going -- AOL is not going to
25  make their numbers and I'm asking you from an
```
TSG Reporting - Worldwide     877-702-9580

Page 58

```
1              S. Hakala
2  economic point of view, having heard that, am I
3  now having an impact on the stock price by
4  failing to disclose it?
5       MR. HALL: Objection.
6     A.   Well, first let me correct something
7  because you mischaracterized my prior testimony.
8       You have an impact on the stock price
9  even if you reiterate or reaffirm something,
10 okay? Because relative to the alternative of
11 what you could have said, that's an impact.
12      Now it may not have moved the stock
13 but it's still an impact.  It still enters the
14 mix of information.  It may not alter it, but it
15 does enter the mix.  And if you measure it
16 against what the alternative would have been, it
17 certainly has an impact against the alternative,
18 which is the way we always think about in
19 economics.
20      Second of all, in answer to your
21 question, yes, you have an impact.  You are now
22 in possession of material inside information
23 which is different from what the market knows.
24 At that moment you are part of the cause of the
25 inflation but you may not be liable for it and
```
TSG Reporting - Worldwide    877-702-9580

Page 59

```
1              S. Hakala
2  you may not have an obligation, but you do have
3  and you are part of it.
4       You know, in the broader sense if you
5  knew that there was insider trading or fraud
6  going on, you might have an affirmative duty to
7  disclose it to the SEC.  So even if you were
8  just Joe Schmoe on the street and you heard two
9  guys talking about this on the street, if it was
10 credible and you knew about responsibility, you
11 might still have a duty to go and call a
12 regulatory authority and say hey, I just heard
13 this.
14    Q.   And from an economic point, Joe
15 Schmoe on the street hears two AOL executives
16 talking, you view that as being sufficient to
17 create an impact on the stock price for that
18 person who overheard it.
19      MR. HALL: Objection.
20    A.   Yes, because the individual at that
21 moment has the ability within their action by
22 making a statement or by taking an action that
23 is within their purview of influencing that
24 stock price.
25    Q.   Okay.
```
TSG Reporting - Worldwide    877-702-9580

Page 60

```
1              S. Hakala
2     A.   They have the ability to influence
3  the stock price.
4     Q.   Okay.  So let's call that disclosure
5  impact, okay?  What we just discussed.
6     A.   Okay.
7     Q.   Leaving aside disclosure impact, all
8  right, does your event study establish that any
9  of the CSFB reports caused a statistically
10 significant increase in AOL stock price?
11      MR. HALL: Objection.
12    A.   It is a reasonable hypothesis but it
13 is not provable that by itself AOL Time Warner
14 caused the increase in the stock price around
15 September 18th and 19th by itself, but it would
16 certainly --
17    Q.   You mean CSFB?
18    A.   Yes.  When CSFB issued a report or
19 commentary around September 18 and 19, that it
20 was not the only speaker on that day but it was
21 one of only two credible speakers on that day in
22 that time period.
23    Q.   But that was a negative impact,
24 right?
25    A.   No.  No.  No, no, no, no.
```
TSG Reporting - Worldwide    877-702-9580

Page 61

```
1              S. Hakala
2     Q.   A positive?
3     A.   July 19th was negative.  September
4  18, 19 was positive.
5     Q.   Okay.  And is that the only day that
6  you can think of that your event study would
7  show a statistically significant increase in AOL
8  stock price as a result of a CSFB report?
9       MR. HALL: Objection.
10    A.   Where one could draw that inference,
11 albeit that there is at least one other analyst
12 that could explain at least part of that
13 movement as well, yes.
14    Q.   So that's the only day.
15    A.   That's the only day where there's a
16 positive impact based on a statement about AOL
17 Time Warner by a CSFB analyst where it's
18 identifiable.
19    Q.   You say September 18th or September
20 19th.
21      Do you know which day that report was
22 released on?
23    A.   I think that's the report we were
24 having trouble locating so I don't know that I
25 had the time stamp.
```
TSG Reporting - Worldwide    877-702-9580

16

Page 62

S. Hakala

1      I do know it got picked up.
2      (Witness reviewing exhibit.)
3      A.    We have it on 9/18/01, but I'm not
4    absolutely convinced it came out that day as
5    opposed to it may have continued, because it was
6    not a formal report, it may have continued to
7    sort of filter into the market on the 19th and
8    had an impact on the 19th.  But at least for our
9    event purposes, we have it on 9/18.
10      (Defendants' Exhibit Hakala 3, Credit
11      Suisse analyst report on AOL dated 9/19/01,
12      is marked for identification, as of this
13      date.)
14  BY MR. GESSER:
15      Q.   I'm showing you a document marked
16  Exhibit 3.
17      Do you recognize this document?
18      A.    Yes.
19      Q.   Can you describe what it is?
20      A.    It is a morning meeting call on
21  September 19.
22      Q.   Is a Credit Suisse analyst report on
23  AOL?
24      A.    Yes.

Page 63

S. Hakala

1      Q.   And it's dated September 19th.
2      A.    Yes.
3      Q.   Is this the report that you referred
4    to as being the one that in your event study may
5    have an impact on --
6      A.    Yes.
7      MR. HALL: Objection.
8      A.    Yes, although I don't know that this
9    is the exact report or content.  We picked it up
10  on another source and I can't remember where,
11  and I think we first saw it on the 18th, not the
12  19th but I'm trying to remember where.  It was a
13  long time ago we picked it up actually.
14      Which reminds me actually when I give
15  an earlier answer when we were engaged, we
16  actually did some very early work for the
17  drafting of the complaint.
18      MR. HALL:  I'll stop you right there.
19  I would like to caution you not to talk
20  about any consulting work you may have done
21  before you were retained for class
22  certification purposes.
23      A.    I wasn't retained -- I was retained
24  earlier by the counsel for other purposes.

Page 64

S. Hakala

1      So yeah, we were struggling to find
2    out when exactly this hit.  We knew for sure it
3    came in on the morning call on the 19th.
4      We were not sure that this hadn't
5    gone out in some fax or some pre-release to
6    clients sometime on the 18th.
7      Q.   Okay.  And reminding you of what you
8    had said earlier about the AOL analyst
9    statements, that "Most of the reports issued by
10  the defendants were merely repeating or
11  commenting on AOL Time Warner news without
12  significant changes in the opinion, such that
13  stock price effects would be viewed as
14  unlikely," does this report fall into that
15  category?
16      MR. HALL: Objection.
17      A.    No.
18      Q.   Why not?
19      A.    Because this is saying that the
20  concerns that the market has been raising
21  recently that had been deflecting downward the
22  price of AOL are already priced in the stock and
23  therefore the stock is a buy, so this would
24  either stop the price from declining.

Page 65

S. Hakala

1      So let's say on September 18th,
2    September 19th, the analyst either puts out the
3    word to institutions before this call goes out
4    or on the morning of this call puts out the word
5    that they think that the stock is now
6    undervalued or that these concerns are fully
7    priced and they recommend a buy.  That would
8    stop the price from continuing to fall and may
9    bring buyers back into the stock and move the
10  stock back up.  That's not uncommon.
11      Q.   And where do you see that?
12      A.    "Concerns about Entertainment Group
13  Priced into AOL; Buy at Current Levels."
14      Q.   Where is that?
15      A.    Tag line, right here on the first
16  page.
17      And then they go on furthermore, "The
18  rev mix is more favorable.  For investors who
19  need to be long something in this group, AOL has
20  meaningfully outperformed the rest of the
21  entertainment group on the downside.  As an
22  early turn play, it is worth owning at current
23  levels, in our view."
24      So they're saying if you want to get

Page 66

1        S. Hakala
2  in ahead of the turnaround in the stocks,
3  stock's been falling, we think it's going to
4  turn around and start going back up, you want to
5  get in early, get in now.
6     Q.  And you think this is materially
7  different than what CSFB had been saying in
8  other reports?
9     A.  It is not so much materially
10 different as materially different than what the
11 market understood in this time period and was
12 reflecting a change in sentiment relative to the
13 market that an analyst was making that had not
14 been made by other analysts, certainly not this
15 forcefully with the exception of a Bear Stearns
16 analyst sometime on the 19th.
17        (Defendants' Exhibit Hakala 4, Bear
18    Stearns report entitled "Top Fundamental
19    Pick in Our Universe", is marked for
20    identification, as of this date.)
21        (Witness reviewing exhibit.)
22 BY MR. GESSER:
23    Q.  I'm showing you Exhibit 4.
24        Do you recognize this?
25    A.  Yes.

Page 67

1        S. Hakala
2     Q.  Is this the Bear Stearns report that
3  you were referring to?
4     A.  Yes.
5     Q.  Can you read the title of the report?
6     A.  "Top Fundamental Pick in Our
7  Universe."
8     Q.  Okay.  And if you read the first
9  sentence under "Key Points," "AOL Time Warner is
10 our top fundamental pick in this environment.
11 Out of all the entertainment companies we
12 follow, AOL Time Warner has the lowest exposure
13 to advertising."
14    A.  Yes.
15    Q.  Is that correct?
16    A.  Yes.
17    Q.  Would you view this as being equally
18 or more favorable than the report that was
19 issued on the same day by CSFB?
20        MR. HALL:  Objection.
21    A.  It's really hard to say.  I think
22 Bear Stearns had already had AOL Time Warner as
23 their top pick previously, so if you go down
24 below, they're reiterating previously.
25        But I would -- I mean if we sort of

Page 68

1        S. Hakala
2  break this down and do content analysis, I would
3  not necessarily put any less weight on the
4  Credit Suisse report than the Bear Stearns
5  report.
6        In other words, we have two reports
7  coming out by two different analysts around the
8  18th and 19th, both saying we think AOL is going
9  to turn around, AOL has less exposure to its --
10 than its peers to these advertising concerns, so
11 we think it's a top pick, you know, or we think
12 it's a good buy for a turnaround play.  Which
13 one would have a greater impact I think we could
14 debate all day.
15        I'm just saying we've got two analyst
16 reports and the combination of those two is
17 clearly having a significant impact on the stock
18 price in this time period, and there's no other
19 news in this time period that I think is doing
20 it.
21    Q.  But as an economist, how could you
22 possibly conclude one way or the other whether
23 the impact that you measure on that day is
24 caused by the Bear Stearns report or the CSFB
25 report?

Page 69

1        S. Hakala
2        MR. HALL:  Objection.
3        Can you define what you mean by
4     impact?
5     Q.  Whatever the statistical significant
6  movement that you've discovered through your
7  event study.
8     A.  Well, you can't say which one is --
9        MR. HALL:  Objection.
10    A.  -- completely the cause and that's
11 with any event where there's two pieces of news
12 simultaneously and they both would tend to move
13 the stock in the same direction, you have to do
14 some kind of analytics outside of the event
15 study itself to determine which one was the
16 cause or both were the cause.
17        In this case it ultimately is an
18 opinion and a judgment and a judgment of fact
19 that could go to a jury, for example, of looking
20 at it and saying we do know there's two analysts
21 that spoke and when these two analysts spoke
22 over this two-day period, the stock went up a
23 lot.
24        So we can draw an inference that when
25 two analysts speak and speak contrary to market

TSG Reporting - Worldwide    877-702-9580

18

Page 70

```
1              S. Hakala
2  beliefs and expectations and give more than just
3  a reiteration, that it does move the stock price
4  and CSFB was one of the two.
5        And to me that's enough. That's what
6  I'm supposed to do.
7     Q.  But there's no economic, recognized
8  economic analysis that would let you determine,
9  peer-reviewed economic analysis that would let
10 you determine whether either of these reports
11 individually caused an impact on the stock
12 price.
13        MR. HALL: Objection.
14        Just one question. When you talk
15    about impact, are you talking about a
16    positive movement in the stock price?
17        MR. GESSER: I'm talking about a
18    statistically significant positive impact
19    on the stock price.
20 A.  Well, economic --
21        MR. HALL: Objection.
22 A.  Economically you can say that using
23 rational analysis of these two, they both with a
24 high degree of confidence contributed to the
25 movement, but you're right that there is no peer
```

Page 71

```
1              S. Hakala
2  reviewed way to deal with confounding events
3  period in the literature.
4        And that's always been a problem of
5  literature and that's why that's an issue of
6  fact and analysis that ultimately experts can
7  disagree on and juries can disagree on, but it's
8  still an issue.
9        It still establishes at this point
10 the two analysts issuing reports in this time
11 period significantly influenced the stock price
12 and that certainly shows impact to me.
13    Q.  Do you know how Raymond Lee Katz was
14 ranked as an analyst?
15    A.  I saw some ratings on him. I don't
16 think he was rated that highly but I don't want
17 to speak until I look.
18        And also I tend to take those ratings
19 with a grain of salt. Just because somebody
20 gets a higher rating in one poll versus another
21 doesn't necessarily mean he has more pull or
22 more weight.
23    Q.  Does the academic literature agree
24 with your analysis?
25    A.  Yeah. I think the academic
```

Page 72

```
1              S. Hakala
2  literature suggests that it's very difficult to
3  tell which analyst is more or less important
4  from a statistical standpoint.
5        I think it is acknowledged that
6  certain types of analysts in certain cases using
7  event studies when they speak differently from
8  the market positively or negatively will seem to
9  move the stock more than others, but just saying
10 as an abstract matter because one analyst is
11 ranked third in a tier of their peer group in a
12 subindustry and another is ranked fourth that
13 one will have more influence than the other I
14 don't think follows.
15        In fact they're probably viewed
16 equally by the market.
17    Q.  And sitting here today, you can't
18 determine whether this report came out on the
19 18th or the 19th; is that correct?
20    A.  Well, I know this particular report
21 came out on the 19th.
22        What I'm saying is that we saw some
23 indicia or evidence that either the Bear Stearns
24 report or the Credit Suisse report, one or the
25 other or both, even though they are published on
```

Page 73

```
1              S. Hakala
2  the 19th began to come out in some form or
3  fashion sometime on the 18th. That's not
4  uncommon.
5     Q.  And did you find a statistically
6  significant movement of the stock price on the
7  18th?
8     A.  Yes.
9     Q.  At what confidence level?
10    A.  If we hypothesize a positive
11 direction, then it would be at the 95 percent
12 confidence interval.
13        If we use a two-tail test, it would
14 be at the 90 percent level.
15    Q.  So can you explain to me the
16 difference between those two tests?
17    A.  Yes. One test says this is good
18 news, a priori this should move the stock up. I
19 want to see if in fact it moved the stock up.
20 That's a one-tail test.
21        If I look at this and say this is
22 news, this is an analyst report I want to see if
23 it had any effect at all positive or negative,
24 that's a two-tail test.
25    Q.  And so the two-tail test had
```

Page 74

```
1           S. Hakala
2  confidence at what level?
3      A.   90 percent and the one tail at 95
4  percent, which for this purposes would be
5  considered statistically significant, although
6  standard nomenclature we would say that a
7  matisse statistic of 1.65 is weakly
8  significantly. Weakly means it's statistically
9  significant but it's just barely so.
10     Q.   And if the CSFB report did come out
11 on the 18th, would you still expect it to have
12 an impact on the stock price the next day?
13     A.   Yes because it would have come out
14 late on the 18th as I understood it and the
15 morning call would have reiterated and that
16 would have been the primary impact.
17         In other words, we saw the 18th as a
18 leakage event. We didn't see the 18th as the
19 primary event.
20         This report originally we said put it
21 on the 18th because that's when we thought it
22 first hit the market.
23         When I saw this report, actually I
24 saw it more recently, we were pretty convinced
25 it was sort of a two-day window for CSFB.
```
TSG Reporting - Worldwide     877-702-9580

Page 75

```
1           S. Hakala
2      Q.   And when you say "late on the 18th,"
3  do you mean after the close of the market or
4  before the close of the market?
5      A.   Before the trading stopped but at or
6  near the close or sometime in the afternoon.
7         I mean in my mind if it came out on
8  the 19th, that's not even a question that's
9  statistically significant so...
10     Q.   But the report, just to be clear, the
11 report on the 19th had a buy rating; is that
12 correct?
13     A.   Yeah.
14     Q.   That was consistent with previous
15 CSFB reports; is that right?
16     A.   As was Bear Stearns.
17     Q.   Okay.
18     A.   They both had buy ratings. They both
19 maintained a buy rating. They both reiterated a
20 buy rating.
21     Q.   I'm just asking you what was -- in
22 terms of the CSFB report, the buy rating was
23 same as previous reports and the price target
24 was the same; is that correct?
25     A.   I believe that's right.
```
TSG Reporting - Worldwide     877-702-9580

Page 76

```
1           S. Hakala
2      Q.   Do you know if any of the estimates
3  that appear in the September 19th, 2001 report
4  for CSFB were changed from previous reports?
5      MR. HALL:  Objection.
6      A.   I don't remember. If they were
7  changed, they had really been signaled in a
8  change in July 19th.
9         I viewed this as a report speaking to
10 a market that was concerned and had been, quote,
11 unquote, hitting the stock price and saying we
12 don't think it's that bad, buy at these levels
13 because we think the stock's going to recover.
14         So I didn't look so much at the
15 rating as the content of what was being said and
16 how investors interpreted it.
17     Q.   You viewed as what is being said as
18 being different from what other analysts were
19 saying other than Bear Stearns.
20     MR. HALL:  Objection.
21     A.   Other analysts in this time period
22 and/or the market in general.
23         In other words, they're speaking in a
24 time where the market, there's not as much
25 analyst commentary because they're sort of in an
```
TSG Reporting - Worldwide     877-702-9580

Page 77

```
1           S. Hakala
2  interim period and they are now speaking against
3  concerns that had been leaking into the market,
4  and they are in the sense countering or
5  moderating those concerns. They're saying those
6  concerns are overdone or already priced in the
7  stock. We don't think the stock is going to go
8  down anymore, buy at current levels.
9         And that's different than just it's a
10 buy, it's -- this is a good time to buy because
11 you're getting in on the floor on a turnaround.
12     Q.   Did you do an intraday analysis on
13 either the 18th or 19th?
14     A.   No.
15     Q.   Why not?
16     A.   Well, I looked at overnight, but
17 other than overnight, no.
18     Q.   Why not?
19     A.   I don't generally have intraday trade
20 data and I did not have an exact timing for
21 these events.
22     MR. GESSER:  I understand we're
23 almost done with the tape; is that correct?
24     THE VIDEOGRAPHER:  You have five
25 minutes.
```
TSG Reporting - Worldwide     877-702-9580

20

Page 78

```
 1              S. Hakala
 2  BY MR. GESSER:
 3      Q.  Let's turn to the days in which there
 4  were what you describe in your rebuttal report
 5  as disclosures of the relevant truth.
 6      A.  Okay.
 7      Q.  All right?
 8          MR. HALL:  Do you have a specific
 9  section in the rebuttal report?
10          MR. GESSER:  Paragraph 4 of the
11  rebuttal report.
12  BY MR. GESSER:
13      Q.  If I understand you correctly, you
14  conclude that the CSFB reports, all of them, had
15  an impact on AOL share price because they failed
16  to disclose certain facts that were known to the
17  AOL analysts at CSFB and you know that that had
18  an impact because when those facts were actually
19  disclosed, AOL stock price reacted negatively;
20  is that correct?
21          MR. HALL:  Objection.
22      A.  Not entirely.
23      Q.  Okay.  Why don't you characterize
24  that for me.
25      A.  We also know that the CSFB reports
```
TSG Reporting - Worldwide    877-702-9580

Page 79

```
 1              S. Hakala
 2  made certain statements about the quality of
 3  earnings expectations that I believe had an
 4  impact but it was small, not enough to be
 5  measurable in terms of changing the mix of
 6  information but clearly that is in my mind an
 7  impact.
 8          In other words, it's not just the
 9  non-disclosure, it's the affirmative statement
10  in contrast with the non-disclosure that is the
11  impact.
12          If CSFB had said we're neutral or
13  we're uncertain, that would have had a big
14  impact in the other direction.
15      Q.  For those statements you described
16  them as being not measurable, how do you know
17  that they had an impact?
18          MR. HALL:  Objection.
19      A.  Because we know that other analysts
20  when they made statements in times when no one
21  else was making statements had an impact.
22          We know that the nature of the
23  statement made, the type of statement made had
24  an impact significantly, albeit it was an impact
25  earlier in the day that the company made.
```
TSG Reporting - Worldwide    877-702-9580

Page 80

```
 1              S. Hakala
 2          I think April 18th of '01 is a good
 3  example where the company makes a statement and
 4  then CSFB makes a statement, and the increase in
 5  the CSFB statement is modest at best, but the
 6  content of what's being said has an impact.
 7          If CSFB had said instead we think the
 8  company is wrong, rather than the stock going up
 9  a little bit more and reinforcing what the
10  company's already said, it would have gone down
11  a lot because it would have disputed what the
12  company is saying, so in my mind that's impact.
13      Q.  But in your mind that's impact for
14  what was not disclosed.
15          MR. HALL:  Objection.
16      A.  It means it's beyond what was not
17  disclosed.  You know, if I come out and I issue
18  an analyst report today and I give a buy rating
19  and say the price target is $80 and then two
20  weeks later I come out and give a buy rating
21  again and say the price target is $80, I'm
22  reiterating the same thing.  And I wouldn't
23  expect it to cause the stock to go up a lot but
24  the fact that I'm reiterating and maintaining my
25  targets in the face may be of market evidence of
```
TSG Reporting - Worldwide    877-702-9580

Page 81

```
 1              S. Hakala
 2  increasing concerns and a declining stock price
 3  is impacting.
 4          Whether the impact is a half of a
 5  percent or one percent in the positive
 6  direction, whether the impact is felt right away
 7  or whether people read the report and think
 8  about it for two or three days and the stock --
 9  or whether the impact prevents the stock from
10  falling as much, it's still an impact.
11          It's not necessarily measurable
12  because it's not a statement where you're making
13  a significant change in isolation of any other
14  thing going on, but it's still having an impact.
15  You can't say it doesn't have an impact.
16      Q.  Well --
17      A.  In other words, the failure to find
18  it doesn't prove that it didn't have an impact.
19      Q.  But had CSFB not issued an analyst
20  report on April 18th, 2001, would AOL stock
21  price, in your view, be different?
22          MR. HALL:  Objection.
23      Q.  Had been different.  Would AOL stock
24  price have been different?
25      A.  Yes, but not a lot different.  Maybe
```
TSG Reporting - Worldwide    877-702-9580

Page 82

```
1              S. Hakala
2    half a percent, maybe a percent different by the
3    end of the day.
4        Q.  How would you know that?  How would
5    you measure that?  Is that your opinion or is
6    there any --
7        A.  It's my opinion --
8        Q.  Is there any economic accepted way to
9    measure that?
10       A.  No.  No.  Other than to show what
11   happens when they later withdraw coverage or
12   when they correct their statements or when
13   another analyst does it, then we can see what
14   the impact is.
15       Q.  Then you're looking at what would
16   have happened if an analyst would have withdrawn
17   coverage.
18           I'm asking you if they simply did not
19   --
20           THE VIDEOGRAPHER:  We have to change
21   the tape.
22           The time is 11:05.  We are going off
23   the record.
24           (Recess is taken.)
25           MR. GESSER:  Marking as Exhibit 5.
     TSG Reporting - Worldwide    877-702-9580
```

Page 83

```
1              S. Hakala
2           (Defendants' Exhibit Hakala 5,
3    Affidavit, is marked for identification, as
4    of this date.)
5           THE VIDEOGRAPHER:  This is the start
6    of the tape labeled No. 2.
7           The time is 11:20.  We are back on
8    the record.
9    BY MR. GESSER:
10       Q.  Dr. Hakala.  I'm showing you a
11   document marked Exhibit 5.
12           Do you recognize this document?
13       A.  Yes.
14       Q.  Can you tell me what it is?
15       A.  It is the affidavit with all the
16   exhibits that was prepared in response to a
17   Motion for Summary Judgment on loss causation in
18   AOL Time Warner, the main securities litigation.
19       Q.  The case against AOL.
20       A.  Yes.
21       Q.  And you prepared an expert report in
22   that case?
23       A.  Well, this is an affidavit, not
24   technically an expert report but it's pretty
25   close to the same thing.
     TSG Reporting - Worldwide    877-702-9580
```

Page 84

```
1              S. Hakala
2        Q.  Okay.  And what was the issue that
3    resulted in that -- what was the issue in that
4    case that resulted in you filing this affidavit?
5        A.  Dr. Allan Kleidon of Cornerstone
6    issued a declaration or affidavit claiming that
7    there was no loss causation associated with the
8    allegations in AOL Time Warner, so I and another
9    expert, Dr. Laranches Meray, prepared affidavits
10   in support of or that were relied on by
11   plaintiffs in their response to that Motion for
12   Summary Judgment.
13       Q.  And in part of this submission did
14   you prepare an event study?
15       A.  Yes.
16       Q.  And for that event study did you
17   determine what were the material days during the
18   class period?
19       A.  Yes.
20       Q.  And do you remember what the class
21   period was in that case?
22       A.  It was fairly long.  It went from I
23   think early 1999 through July 24th of 2002.
24       Q.  And so the first stage of that event
25   study you would identify material events; is
     TSG Reporting - Worldwide    877-702-9580
```

Page 85

```
1              S. Hakala
2    that correct?
3        A.  Yes.
4           MR. HALL:  Objection.
5        Q.  And when you were looking for
6    material events, what would those include?
7        A.  They would include in this study, any
8    significant upgrades, downgrades, changes in
9    price targets or earnings forecasts of analysts,
10   any news about AOL or Time Warner that would be
11   considered more than ordinary about any new
12   contracts, relationships, other things, any
13   earnings announcement that was given by AOL Time
14   Warner, any comments on earnings generally that
15   we could identify by AOL Time Warner or its
16   executives.  Those were the primary news events
17   that we would have looked into.
18           Any news about any regulatory or
19   actions by government agencies was another area.
20       Q.  What was the purpose of identifying
21   those days?
22       A.  We wanted to isolate those dates as
23   what I would call the relevant event dates
24   specific to the allegations in the complaint
25   and/or to control for days when potentially the
     TSG Reporting - Worldwide    877-702-9580
```

S. Hakala

1  news that came out could have impacted or
2  altered the stock price in a significant manner
3  and therefore needed to be controlled for.
4      **Q.   And when you say "the stock price,"**
5  **you mean the stock price of AOL?**
6      A.   AOL Time Warner, yeah.  AOL first and
7  then AOL Time Warner later.
8      **Q.   Okay.  And if you look on page 20 of**
9  **that report.**
10     A.   Okay.
11     **Q.   Appendix A.**
12     A.   Yes.
13     **Q.   It's a discussion of the event study**
14 **analysis.**
15     A.   Yes.
16     **Q.   And in paragraph 31 you discuss the**
17 **days that were selected --**
18     A.   Yes.
19     **Q.   -- as material event days?**
20     A.   Yes.
21     **Q.   Do you see September 18th or**
22 **September 19th, 2001 in your list of days?**
23     A.   No.
24     **Q.   Returning to April 18th, 2001, before**

S. Hakala

1  **the videotape changed I had asked you what would**
2  **happen if the CSFB report on that day had not**
3  **been issued, and I think you had said that you**
4  **could conclude that it would be that the absence**
5  **of the report would have had some small effect**
6  **on AOL stock price?**
7      A.   Yes.
8          MR. HALL:  Objection.
9  BY MR. GESSER:
10     **Q.   My question to you is how would you**
11 **know that?**
12     A.   There's no way to test it but I
13 always view analyst reports following a major
14 statement by the company.  Remember the company
15 is reaffirming earnings guidance in the face of
16 a slipping stock price where questions are made
17 about earnings.
18         When an analyst comes in in the sense
19 after the conference call says we agree with
20 management, that reiteration acts sort of like a
21 booster shot.
22         Now typically what happens or what
23 can happen in some of these cases, management
24 comes with a real bullish conference call and

S. Hakala

1  initially the reaction may be positive, then
2  people may sit down at the end of the trading
3  day or next morning and say you know, they may
4  have been blowing a lot of smoke at us, maybe
5  they're not all that cracked up and the stock
6  might have fallen or slipped one or two percent
7  at the end of day or the next day.
8          But if a couple of analysts come out
9  and credibly say, and especially with Martin, I
10 think there's some evidence she had some
11 credibility, we're reiterating and we think this
12 is good news and we're reconfirming what
13 management just said, we agree with it, they are
14 in sense acting like a booster shot.
15         It's kind of like if I have a flu
16 shot and the first shot only protects me 50
17 percent from the flu, and then I go out and I
18 get another flu shot and that gives me 25
19 percent protection and then another flu shot
20 gives me another incremental 10 percent
21 protection, each incremental flu shot short of
22 protects me from the flu so the chances I'm
23 going to get the flu are less and less and less.
24         Analyst reports following a major

S. Hakala

1  statement by the company can in a sense maintain
2  the stock price and prevent it from falling, can
3  increase it further or can cause it to fall
4  further or it could cause it to fall depending
5  on the content and nature.
6      **Q.   Okay.**
7      A.   But in this particular case my sense
8  was looking at it, and especially after the
9  Stulz report, was that the report acted like a
10 booster shot in the sense that it did have a
11 small positive effect, but more likely prevented
12 the stock from falling late in the day and
13 overnight.
14     **Q.   How do you determine that it had a**
15 **small positive effect?**
16     A.   Looking at the intraday.
17     **Q.   Looking at the intraday, you**
18 **determined that following CSFB's analyst report**
19 **that there was an increase in the AOL stock**
20 **price?  Is that what you're saying?**
21     A.   I don't remember, but what I do
22 remember was that it may have either broken a
23 trend or that my sense was that the stock might
24 have fallen the following day or, I don't

Page 90

S. Hakala

1
2  remember exactly how or what I was looking at
3  there, but I had a specific reason why I felt
4  that that statement in that particular report,
5  while it didn't change the stock price by much,
6  certainly not by a significant amount, it did
7  act as a booster shot that may have prevented
8  the stock from falling further, and the silence
9  by CSFB following that announcement would have
10  in my opinion probably allowed a greater
11  decline.
12       In fact this is it. I'm looking at
13  my event study, Exhibit B, "4/19 Credit Lyonnais
14  lowers price target." And the price only falls
15  a little bit on the 19th of April, and I believe
16  one of the reasons why it failed was because the
17  CSFB report, which was kind of a unique report,
18  helped to neutralize the impact of the credit
19  report.
20       In other words --
21       Q.  Did you say the CSFB report was a
22  unique report?
23       A.  Yeah, that was my understanding.
24       Q.  What do you mean by "a unique
25  report"?

TSG Reporting - Worldwide    877-702-9580

Page 91

S. Hakala

1
2       A.  It made some specific comments and
3  commentary that I thought -- and the timing was
4  I thought somewhat unique for that report.
5       Q.  As opposed to the other reports that
6  were issued on that day?
7       A.  As opposed to some of the other
8  reports, although it certainly wasn't alone.
9       Q.  Do you know how many reports were
10  issued on that day?
11       A.  No, not now. I did then.
12       Q.  Okay. Can you tell me what it was
13  about the CSFB report on April 18th that you
14  remember to be unique?
15       MR. HALL:  Objection.
16       A.  Not without looking at it.
17       Q.  Let's look at it.
18       (Defendants' Exhibit Hakala 6, CSFB
19  analyst report for AOL Time Warner for
20  4/18/01, is marked for identification, as
21  of this date.)
22       (Witness reviewing exhibit.)
23  BY MR. GESSER:
24       Q.  You recognize this document marked
25  Exhibit 6?

TSG Reporting - Worldwide    877-702-9580

Page 92

S. Hakala

1
2       A.  Yeah.
3       Q.  Is this the CSFB analyst report for
4  AOL Time Warner for April 18th, 2001?
5       A.  Yes.
6       Q.  The title is "AOL reports positive
7  surprise for March quarter results. No change
8  to guidance, but visibility remains low."
9       A.  Yes.
10       Q.  What do you take "visibility remains
11  low" to mean?
12       A.  Meaning that there are risks to the
13  forecast because there are uncertainties in
14  coming periods.
15       Q.  Okay. And what do you view as being
16  unique about this report as opposed to what
17  either AOL was saying or what other analysts
18  were saying on this day?
19       A.  The stock is underowned as it is.
20  The risk/reward on any pullback looks
21  compelling, meaning that this report would in a
22  sense help staunch further declines in the stock
23  price and add sort of a support underneath the
24  stock.
25       Q.  And you think that's more positive

TSG Reporting - Worldwide    877-702-9580

Page 93

S. Hakala

1
2  than what any of the other analysts were saying?
3       A.  Than some of the analysts. I don't
4  say all of the analysts. I certainly don't.
5       But I thought that the timing of this
6  report also came out at a little different time
7  than some of the others. Certainly this report
8  and a number of reports acted sort of to
9  reinforce and keep the Credit Lyonnais report
10  and some other negative reports on the 19th from
11  having a negative effect, from having a strong
12  negative effect.
13       Q.  Is there any way to measure that?
14       A.  No. No.
15       Q.  There's no economically recognized
16  methodology that would allow you to reach that
17  conclusion.
18       A.  Well, it's kind of like saying this:
19  Suppose somebody comes out and says something
20  that's positive and reinforcing and the stock
21  doesn't move, but suppose that if they had not
22  made that statement, the stock would have fallen
23  four percent. There's no way to test that until
24  you can look at what happens when they don't
25  make the statement later on or you can draw an

TSG Reporting - Worldwide    877-702-9580

24