# EXHIBIT 7

1

2          UNITED STATES DISTRICT COURT

3            DISTRICT OF MASSACHUSETTS

4    _____

5    In Re:  CREDIT SUISSE-AOL

6    SECURITIES LITIGATION

7                    Master File No. 1:02 cv12146

8    _____

9    This Document Relates To:

10        ALL ACTIONS

11   _____

12

13              VIDEOTAPED

14      DEPOSITION OF SCOTT D. HAKALA

15        New York, New York

16      Monday, August 11, 2008

17

18

19

20

21

22

23

24   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

25   JOB NO. 18034

August 11, 2008
9:35 a.m.

Videotaped deposition of SCOTT D. HAKALA, held at the offices of DAVIS, POLK & WARDWELL, 450 Lexington Avenue, New York, New York, pursuant to Notice, before Francis X. Frederick, a Certified Shorthand Reporter, Registered Merit Reporter and Notary Public of the States of New York and New Jersey.

A P P E A R A N C E S:

KAPLAN FOX & KILSHEIMER LLP
Attorneys for Lead Plaintiff Bricklayers and Trowel Trades International Pension Fund, the Proposed Class and Dr. Hakala
    850 Third Avenue
    New York, New York  10022
BY:  DONALD R. HALL, ESQ.
    MELINDA RODON, ESQ.

DAVIS POLK & WARDWELL
Attorneys for Defendants, Credit Suisse First Boston LLC and Credit Suisse First Boston USA
    450 Lexington Avenue
    New York, New York  10017
BY:  AVI GESSER, ESQ.
    MELISSA OLIVER, ESQ.
    GUY HALFTECK, ESQ.

A P P E A R A N C E S: (Cont'd.)

WILMER CUTLER PICKERING HALE and DORR, LLP
Attorneys for Defendant, Frank Quattrone
    1117 California Avenue
    Palo Alto, California  94304
BY:  JONATHAN A. SHAPIRO, ESQ.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
Attorneys for Laura Martin
    One Beacon Street
    Boston, Massachusetts 02108
BY:  EBEN P. COLBY, ESQ.
    (via telephone)

ALSO PRESENT:
    ANU BHARADWAJ, Cornerstone Research
    MICHAEL PINEIRO, Videographer

PROCEEDINGS
THE VIDEOGRAPHER:  This is the start of the tape labeled number one of the videotaped deposition of Scott Hakala in the matter in re. Credit Suisse AOL Securities Litigation.  This deposition is being held at 450 Lexington Avenue, New York, New York, on August 11, 2008 at approximately 9:35 a.m.  My name is Michael Pineiro from TSG Reporting, Inc.  And I am the legal video specialist.  The court reporter is Francis Frederick in association with TSG Reporting.
    Would counsel please introduce yourselves.
    MR. GESSER:  Avi Gesser, Davis Polk & Wardwell, for the Credit Suisse defendants.
    MS. OLIVER:  Melissa Oliver, Davis Polk.
    MR. HALFTECK:  Guy Halfteck, Davis Polk.
    MR. SHAPIRO:  Jonathan Shapiro, Wilmer Hale, for defendant, Frank

S. HAKALA

1  Quarttrone.
2  MR. HALL: Donny Hall, Kaplan Fox
3  & Kilsheimer on behalf of the class and
4  the witness.
5  MS. RODON: Melinda Rodon, Kaplan
6  Fox & Kilsheimer.
7  * * *
8  S C O T T  D.  H A K A L A ,  called as a
9  witness, having been duly sworn by a
10  Notary Public, was examined and
11  testified as follows:
12  EXAMINATION BY
13  MR. GESSER:
14  Q.   Dr. Hakala, we've met before but
15  just on the record I'm Avi Gesser and I'm
16  going to be taking your deposition today.
17  You've been deposed many times before?
18  A.   Yes.
19  Q.   Okay.  I'm not going to go over
20  the ground rules.  I am going to just ask you
21  listen to my question, answer the question
22  that I ask.  We've got a lot of ground to
23  cover today and so if we're going to get
24  through everything I really need you to listen

S. HAKALA

1  to my question and just answer the question
2  that I've asked.
3  Do you understand?
4  A.   Yes.
5  Q.   Okay.  Did you -- in the course of
6  your work for this case, did you calculate the
7  total loss that plaintiffs have suffered as a
8  result of their trading in AOL?
9  A.   No.  Not that I know of.  I may
10  have had some calculations but I don't think I
11  ever did.
12  Q.   Okay.  And so you calculated the
13  loss -- as part of your latest expert report
14  you calculated the loss that you believe to be
15  attributable to Credit Suisse First Boston's
16  conduct; is that correct?
17  A.   Yes.
18  Q.   Okay.  Do you know what that total
19  loss is?
20  A.   Well, I know in the general class
21  case if you use a percentage method that the
22  total losses for the period that we're talking
23  about probably are in excess of $40 billion
24  and that's based on both the work I did in the

S. HAKALA

1  AOL Time-Warner Securities Litigation as well
2  as what claims and opt-outs have now
3  established.
4  Q.   And that's for which period that
5  we're talking about?
6  A.   I'm talking about from the time of
7  the merger till the end.  Now, that may be
8  high because that may include -- that may
9  include the losses suffered of Time-Warner
10  shareholders who exchanged their shares for
11  AOL Time-Warner so I'm not sure if that would
12  qualify.  But that's -- I think the losses in
13  total are probably in the order of 45 to $50
14  billion.
15  Q.   But have you done that
16  calculation?
17  A.   That's the losses attributable to
18  fraud.  The total losses of the class were
19  closer to like 80 billion or something like
20  that.
21  Q.   And how do you know that number?
22  A.   Because I did a lot of work in the
23  AOL Time-Warner Securities Litigation.
24  Q.   Okay.  And so there's a piece

S. HAKALA

1  that's attributable to regular market forces.
2  A.   Yes.
3  Q.   There's a piece attributable to
4  AOL fraud.
5  A.   Yes.
6  Q.   And there's a piece attributable
7  to, in your view, to Credit Suisse, the fraud
8  committed by Credit Suisse; is that correct?
9  A.   Yes.  And the piece committed by
10  Credit Suisse and AOL overlap to some extent.
11  But not entirely.
12  Q.   Okay.  And when you say not
13  entirely, in what area do they not overlap?
14  A.   In the class action, the layoff
15  issue was not alleged.  And the issue of
16  knowledge that AOL was not going to meet its
17  numbers was not explicitly alleged, although,
18  really, that was picked up in a different way
19  in the accounting fraud.
20  Q.   And so does that mean that with
21  respect to layoffs that Credit Suisse had
22  superior information than AOL did?
23  A.   No.
24  MR. HALL: Objection.

Page 10

S. HAKALA

1
2      A.   That -- that there are different
3  claims in different types of allegations of
4  information in the different cases. So some
5  of the losses that are being identified here
6  may not necessarily be identified in the AOL
7  class and vice versa.
8      Q.   But if Credit -- if Credit Suisse
9  First Boston has liability to plaintiffs for
10 not disclosing the layoffs at AOL, wouldn't,
11 in your view, AOL have the same liability?
12         MR. HALL: Objection.
13     A.   It depends. I never looked at
14 that issue.
15     Q.   And those -- and those -- those
16 damages were never part of the AOL case as far
17 as you know.
18     A.   As far as I know, yes.
19         They weren't explicitly.
20 Implicitly they were. I think some of the
21 layoffs to the extent that they revealed the
22 relative truth that AOL was not doing so as
23 well, they did become part of the claim but
24 not in the context of failure to disclose the
25 intent to lay off. They became part of the

Page 11

S. HAKALA

1
2  claim in the sense that the layoffs exposed
3  the fact that AOL was not doing as previously
4  represented.
5         So they didn't come in as damages
6  but under a different set of grounds.
7      Q.   And was there a piece that was
8  attributable to AOL's auditors?
9         MR. HALL: Objection.
10     Q.   Of plaintiff's total losses?
11     A.   The auditors were not separated
12 out because the auditor claim was overlapping.
13 There is no such thing as nonoverlapping
14 claims when you're dealing with auditors. The
15 auditors are really in the position of
16 essentially facilitating and making public
17 statements that affirm and maintain the fraud
18 committed by the committee -- company. So in
19 our view the auditors were on the hook for a
20 portion of the damages caused by AOL's fraud.
21 In other words, they had separate liability
22 for the same damages.
23     Q.   And to a large extent that's also
24 true for the claims here; is that right? That
25 Credit Suisse would have overlapping

Page 12

S. HAKALA

1
2  liability.
3         MR. HALL: Objection.
4      A.   To some extent that's true. And
5  to some extent that may not be true.
6      Q.   And did you determine whether or
7  not the plaintiffs in this case have already
8  been compensated for their losses in
9  connection with AOL?
10     A.   Yes, I did.
11     Q.   And what did you determine?
12     A.   I determined that the compensation
13 realized from the settlement so far, both
14 Justice Department and from the -- from the
15 settlement in the class action case represent
16 such small compensation that there's
17 effectively no offset.
18     Q.   And do you know what the total
19 amount of compensation that the plaintiffs in
20 this case have already received by virtue of
21 those settlements?
22     A.   Not exactly. But generally as a
23 rule of thumb of their eligible claims the
24 plaintiffs -- most of the plaintiffs, not
25 opt-outs, would have realized about 5 percent,

Page 13

S. HAKALA

1
2  maybe 4 percent of their total losses
3  attributable to all causes of action.
4      Q.   And do you know what the gross
5  number is?
6         MR. HALL: Objection.
7      A.   Well, the settlement in the class
8  case was 2.65 billion less legal fees and
9  expenses. I'm trying to remember what the
10 Justice Department fair funds agreement was
11 but I think it was a much smaller figure.
12        MR. GESSER: I apologize. Counsel
13 for one of co-defendants was trying to
14 dial in so I think we're trying to do
15 that. This is Laura Martin's counsel;
16 is that right? Do you have any
17 objection to them dialing in?
18        MR. HALL: No. Not at this point.
19        MR. GESSER: I'm sorry. This is
20 news to me as well.
21        MR. HALL: No, it's fine.
22        (Pause on the record.)
23     A.   Just to complete the answer it
24 should be emphasized that there are opt-out
25 cases and there have been significant

Page 14

S. HAKALA

1
2  settlements in those, so some of those
3  plaintiffs would have realized a larger
4  percentage settlement than the class case.
5  But, nevertheless, no one received, as far as
6  I know, more than 25, 30 percent of their
7  losses from all claims.
8      Q.   And some of those opt-outs would
9  be plaintiffs in this case?
10     A.   They would.
11     MR. HALL: Objection.
12     Q.   And so -- sorry.  The total number
13 that you attributed to CFSB, what number is
14 that?
15     A.   Well, if you add up all the claims
16 based on my report I think it's what? -- about
17 4 billion so I'm saying that the losses that
18 could have been avoided if CSFB had not made
19 certain statements or had disclosed what it
20 had known in a timely manner as alleged would
21 have reduced matter the total losses realized
22 by investors by about 4 billion.
23     Most of that is part of the 50
24 billion in approximate losses suffered by the
25 shareholders.  In the class case.

TSG Reporting - Worldwide    877-702-9580

Page 15

S. HAKALA

1
2      Q.   And you divide that into two
3  categories as I understand it.  You said
4  losses that would have been avoided had CSFB
5  not made certain statements and had they made
6  certain disclosures.
7      A.   Right.
8      Q.   Assuming the law is that
9  plaintiffs can't be compensated for omissions.
10 Let's just assume that to be the case.  That a
11 failure to disclose does not result in a
12 recoverable losses and that the only losses
13 that are recoverable are those that are based
14 on inflation caused by false statements.
15     A.   Commissions as opposed to
16 omissions.
17     Q.   Correct.  Assuming that's the
18 case.  How would that $4 billion number
19 change?
20     MR. HALL: Objection.
21     A.   Well, I don't know.  I'd have to
22 think about that.  I don't know how you'd
23 interpret the accounting claims which are
24 separated out as a -- if you treat those as an
25 omission those would go away.  If you treat

TSG Reporting - Worldwide    877-702-9580

Page 16

S. HAKALA

1
2  layoff claims as an omission those would go
3  away and I don't know exactly what percentage
4  of damages those represent.
5      The other claims I think clearly
6  are commission.  In other words, making
7  statements about the earnings or earnings
8  prospectuses and degree of confidence of AOL
9  meeting certain expectations.  Those appear to
10 be clearly commissions as opposed to
11 omissions.
12     Q.   Okay.  And are those commissions
13 that in your view caused inflation in AOL
14 stock price?
15     MR. HALL: Objection.
16     A.   Yes.
17     Q.   Okay.  And in terms of your damage
18 analysis did you factor in that inflation that
19 you allege is caused or was your damage
20 analysis based on the disclosure damages
21 analysis?
22     MR. HALL: Objection.
23     A.   In this particular case the
24 particular commission was actually explicitly
25 modeled based on the timing of certain AOL

TSG Reporting - Worldwide    877-702-9580

Page 17

S. HAKALA

1
2  Time-Warner analyst reports issued by CSFB or
3  Credit Suisse and what effect would have
4  happened had what I assumed to be the truthful
5  information, the alternative statement that
6  should have been made instead of the
7  commission.  In other words, when they made
8  certain statements about confidence in the
9  company meeting certain EBITDA and revenue
10 targets, price targets, et cetera, I assumed
11 that those were commissions and if they had
12 issued what I read in the e-mails, I tried to
13 make a reasonable estimate, albeit
14 conservative, of what the price effect would
15 have been had they issued those alternative
16 reports.
17     Q.   Okay.  But just to get to my
18 question which was if instead the correct
19 measure of damages were that instead of
20 issuing the reports that they issued they
21 should have said nothing, not affirmatively
22 said anything but should have said nothing,
23 did you model that damage?
24     MR. HALL: Objection.
25     A.   No. No.

TSG Reporting - Worldwide    877-702-9580

Page 18

| | |
|---|---|
| 1 | S. HAKALA |
| 2 | Q. Do you know what that damage -- |
| 3 | sitting here today, do you have a sense of |
| 4 | what that damage would be? |
| 5 | MR. HALL: Objection. |
| 6 | A. Yes. I think that they |
| 7 | contributed to some inflation in January and |
| 8 | February by making affirmative statements in |
| 9 | '01 and then again after 9/11 in September and |
| 10 | had they not issued reports reinforcing their |
| 11 | position that probably -- well, that would |
| 12 | have allowed the stock to fall more than it |
| 13 | did. I believe at least the February 1, '01 |
| 14 | report had a positive effect in and of itself |
| 15 | and that the September 19th report in |
| 16 | combination with another analyst report had a |
| 17 | positive effect in and of itself. |
| 18 | Q. So either of those two dates that |
| 19 | you mentioned where you think there was a |
| 20 | positive effect, are either of those dates |
| 21 | what you would describe as clean days? |
| 22 | A. One is clean and one is confounded |
| 23 | but I put a weight of 50 percent on the |
| 24 | confounded day. |
| 25 | Q. And the date that's clean is which |

Page 19

| | |
|---|---|
| 1 | S. HAKALA |
| 2 | date? |
| 3 | A. The February -- I need my report |
| 4 | but early February of '01 there was a report |
| 5 | one of one where there was a statement and |
| 6 | sort of a -- this is why we think the stock |
| 7 | should go up, why we think it's been |
| 8 | undervalued and why it's beaten down. |
| 9 | Q. And in your view that had a |
| 10 | statistically significant effect on AOL's |
| 11 | stock price? |
| 12 | A. Yes. |
| 13 | Q. With what confidence level? |
| 14 | A. I don't know without looking at |
| 15 | the report. |
| 16 | Q. Okay. Mark as Exhibit 1 your |
| 17 | report. |
| 18 | (Hakala Exhibit 1, Expert Report |
| 19 | of Scott D. Hakala, marked for |
| 20 | identification as of this date.) |
| 21 | BY MR. GESSER: |
| 22 | Q. So, Dr. Hakala, which day is it |
| 23 | that's -- |
| 24 | A. It's February 5th, 2001. |
| 25 | Q. And who issued that report? |

Page 20

| | |
|---|---|
| 1 | S. HAKALA |
| 2 | A. CSFB. Credit Suisse First Boston. |
| 3 | Q. Do you know who the author of that |
| 4 | report was? |
| 5 | A. Not offhand. It was a joint |
| 6 | report emphasizing the statements of Kiggens |
| 7 | and Martin. |
| 8 | Q. Was it authored by Kiggen or |
| 9 | Martin? |
| 10 | A. I don't know if it was authored by |
| 11 | them specifically so much as it was saying |
| 12 | that this is what Kiggens and Martin are |
| 13 | saying and here's our opinion. I'd have to |
| 14 | look at the report to see who authored it. |
| 15 | Q. Do you know if the report was |
| 16 | repeating information that Kiggen and Martin |
| 17 | had previously issued in a report or if there |
| 18 | was new information about their views? |
| 19 | A. It was both. It was both. |
| 20 | Q. Okay. And what was the -- in your |
| 21 | count what was the inflation that was caused |
| 22 | by that? |
| 23 | A. Cause date, 2.91 percent increase |
| 24 | in the stock price which in a one tail test |
| 25 | would be at over the 97.5 percent confidence. |

Page 21

| | |
|---|---|
| 1 | S. HAKALA |
| 2 | About a 98 percent confidence level on a one |
| 3 | tail test. |
| 4 | Q. So when you say that Credit Suisse |
| 5 | caused plaintiffs' losses could you just |
| 6 | explain to me what you mean by -- what's the |
| 7 | cause of their losses? |
| 8 | A. Well, the cause of the losses is |
| 9 | that Credit Suisse was aware of certain |
| 10 | information about declining advertising |
| 11 | revenue trends and revenue that they did not |
| 12 | disclose. And as analysts by, in a sense, |
| 13 | largely agreeing with the company's guidance |
| 14 | and reaffirming it to help to prop up the |
| 15 | stock price when they knew that that was not |
| 16 | true and as an analyst when you know that |
| 17 | that's not true you have a duty according to |
| 18 | the then AIMR and now the CFA Institute to |
| 19 | apprise your investors and the investment |
| 20 | community of that fact. |
| 21 | Additionally, later on they were |
| 22 | aware that there were layoffs in AOL of |
| 23 | moderate severity which they did not disclose |
| 24 | while issuing reports. And they were aware of |
| 25 | accounting improprieties in AOL Time-Warner |

S. HAKALA

1  which they did not disclose in their reports.
2      So the cause is really that by not
3  telling the market what they knew and not
4  being truthful about what they knew they
5  helped to prop up and, in fact, increase the
6  price of AOL Time-Warner stock over what would
7  have been the case had AOL Time-Warner spoken
8  truthfully or at least not spoken at all.
9      **Q.   But there's a -- you would agree**
10 **there's a huge difference between the damages**
11 **that would be caused by had they -- in your**
12 **view had they spoken truthfully and had they**
13 **not spoken at all.**
14         MR. HALL: Objection.
15     A.   There would be a very significant.
16 Huge is kind of -- I don't know. But
17 certainly the damages would be cut
18 substantially between acts of commission and
19 omission if you define them the way I assume
20 you're defining them.
21     **Q.   What if other analysts were also**
22 **aware of these -- what I'll describe as these**
23 **three factors that you've considered;**
24 **declining advertising trends, layoffs,**

S. HAKALA

1  accounting irregularities?
2         MR. HALL: Objection.
3     A.   Well, if the they made those
4  statements that would have -- and a few did --
5  that would have separately reduced the amount
6  of damages caused by the overall fraud
7  occurring within AOL Time-Warner.  To the
8  extent that they did not disclose those things
9  either, that does not in my mind absolve CFSB
10 of its duty as an analyst to do that.
11     **Q.   So could you have five -- assuming**
12 **there were five other analysts at other firms**
13 **who knew the exact same information that**
14 **Credit Suisse did at the time regarding the**
15 **declining advertising trends, the layoffs, the**
16 **accounting irregularities, and did not**
17 **disclose them in the same way that you believe**
18 **that Credit Suisse didn't disclose that**
19 **information, they could have overlapping**
20 **liability for the exact same damages to**
21 **plaintiffs in your view?**
22         MR. HALL: Objection.
23     A.   Not the exact same because the way
24 I did the analyst, each analyst is

S. HAKALA

1  noncumulative.  We're looking at the
2  incremental effect.  But certainly to the
3  extent if two or three of the other analysts
4  had made those statements, even if CFSB had
5  not, that would have in my mind dampened or at
6  least reduced the damages attributable to
7  CFSB.  So they are at least partially
8  overlapping.  But analysts are not -- unless
9  all the analyst uniformly make the same
10 truthful statements, incrementally each
11 individual analyst contributes to the fraud to
12 an extent that is not overlapping.  How much
13 that is is hard to say.  It's kind of a
14 hypothetical.
15     **Q.   Okay.  But if -- forget what was**
16 **said.  If there was omission, the same**
17 **omission errors or fraud committed by other**
18 **analysts, I'm just trying to get an**
19 **understanding of how these damages get**
20 **calculated, if there was the same omissions by**
21 **other analysts --**
22     A.   Or commissions.
23     **Q.   Or commissions.  Well, let's say**
24 **both.  Let's say that they were making**

S. HAKALA

1  **positive statements but they were aware of the**
2  **declining advertising trends, they were aware**
3  **of the layoffs, they were aware of the**
4  **accounting irregularities, and they didn't**
5  **disclose them.**
6         MR. HALL: Objection.
7     A.   Yes.
8     **Q.   They would be liable for the same**
9  **damages?**
10        MR. HALL: Objection.
11    A.   No.  Different damages in the case
12 of some.  To the extent that some of the
13 analysts, let's say Blodget or -- Henry
14 Blodget or some of the others made statements
15 and caused positive impact on the stock price
16 of AOL Time-Warner that would be separate and
17 apart from CSFB.  So each analyst affects the
18 mix of information and in fact the effort I
19 made in my analysis of CSFB incrementally
20 separate and apart from other analysts.  And
21 so to that extent they are to a large extent
22 nonoverlapping at least on the commission
23 component.
24        Now, on the omission component,

S. HAKALA

1  S. HAKALA
2  there may be some overlap.
3      Q.    **In fact there could be complete**
4  **overlap.**
5      MR. HALL: Objection.
6      A.    Not likely. Not likely. Because
7  each incremental analyst who raises the same
8  concerns has an incremental effect. If one
9  analyst raises a concern the market may react
10  some and ironically, in fact, we see that with
11  the layoff on August 13th and 14th. The first
12  published report actually has less effect than
13  the second. So it is not clear that there is
14  a complete overlap. There rarely is.
15      Q.    **But I guess -- and maybe we're**
16  **talking past each other but what I'm saying is**
17  **if there are five analysts who all know this**
18  **information and none of them disclose it --**
19      A.    Um-hum, yes.
20      Q.    **-- by your calculation, aren't**
21  **they also liable for the damages that you**
22  **attribute to the failure to disclose that**
23  **information? Can't they all be equally liable**
24  **for the same total amount of damages?**
25      MR. HALL: Objection.

TSG Reporting - Worldwide    877-702-9580

S. HAKALA

1  S. HAKALA
2      A.    No, no. Each one I would treat
3  differently based on when they issued reports
4  and what the impact of their reports were.
5  So, in fact, they would not necessarily be
6  overlapping. It would depend on timing,
7  amount, what discovery indicates, what the
8  pleadings say. But they would not be
9  overlapping. I can say that it is likely that
10  if there were -- if it was proven there were
11  five different analysts who were all
12  committing the same fraud it's alleged CSFB
13  committed that, taking that into account might
14  compress the damages attributable to CSFB to
15  some extent but they would not be overlapping.
16  They would be separate. Because the way I did
17  the analysts was incremental to a single
18  analyst altering the mix of information.
19      Q.    **Okay. And so what would be the**
20  **factors that you would look at to determine**
21  **which analyst caused which damage?**
22      MR. HALL: Objection.
23      A.    I would have to know what they
24  knew and should have said but didn't say.
25      Q.    **Let's assume -- let's assume it's**

TSG Reporting - Worldwide    877-702-9580

S. HAKALA

1  S. HAKALA
2  **all the same thing right here as we discussed**
3  **the three factors we've been talking about.**
4      A.    Then I'd have to look at for each
5  analyst when they issued reports what the
6  report said, what impact those reports had,
7  what incremental effect each analyst had. To
8  the extent that one analyst propped up the
9  stock price at a different time from CSFB that
10  would be a different inflation from CSFB and
11  would be nonoverlapping.
12      Now, there's a little bit of an
13  interaction in the math that goes on but
14  nevertheless you would get generally a large
15  extent of nonoverlapping damages from the mix
16  of information. I mean, another way to put
17  this is suppose five different analysts all
18  came out and said we don't think CSFB is -- we
19  don't think AOL Time-Warner can meet its
20  revenues and EBITDA targets because we're
21  seeing substantial declines in advertising.
22  The stock price reaction to that negatively
23  would have been far greater than what I'm
24  assuming or what I'm assuming for CSFB in this
25  case. The stock of AOL Time-Warner might have

TSG Reporting - Worldwide    877-702-9580

S. HAKALA

1  S. HAKALA
2  fallen as much as 10 percent or more on
3  those five different analysts all making that
4  statement at the same time.
5      Similarly, if in July or June if
6  different analysts all said we're hearing
7  rumors that AOL Time-Warner has had some
8  internal investigations and they've been
9  involved in accounting improprieties involving
10  Purchase Pro and other entities, each one
11  incrementally would have increased the total
12  magnitude of the effect much more than a
13  single report by a single analyst.
14      Q.    **Okay. I understand that. But now**
15  **assume that none of the analysts spoke at any**
16  **time until the corrective disclosure, okay?**
17      A.    Okay.
18      Q.    **So we're all on the same -- all**
19  **the analysts are in the same boat. Right? Of**
20  **the 4 billion that you talked about how would**
21  **you allocate that as between those five**
22  **analysts?**
23      MR. HALL: Objection.
24      A.    I wouldn't.
25      Q.    **They would each be liable for the**

TSG Reporting - Worldwide    877-702-9580

S. HAKALA

full amount?

A.   Well, no.  Because as I pointed out, each of them is liable for a different amount unique to its circumstances and the total amount of damages that would have been avoided had all five spoken truthfully would be much larger than the 4 billion we're talking about in this case.

So I don't think you can do it that way.  The other thing is that when we're looking at a single defendant, we're assuming that somebody else out there who's not been specifically identified is also liable for the fraud and that somehow you can claim an offset for that.  I don't know that to be true.  I have to take what all the other analysts have done as given and say what's the incremental effect of CSFB by itself issuing its reports.  I think that's the proper way for us to look at the issue.

Q.   So let's take these one at a time.  Let's start with the advertising.

A.   Sure.

Q.   At the beginning of the class

S. HAKALA

period -- you believe that the beginning of the class period CSFB had knowledge of a weakening ad market; is that correct?

A.   Yes.

Q.   Was this knowledge that CSFB had, was this non-public information?

MR. HALL:  Objection.

A.   Some probably was unique to what CSFB through its own methods had in turn obtained.  Others -- component of it was a knowledge generally.  The real issue is not weakening ad market but whether the weakening of the ad market that was known was substantially less than what CSFB was the actual fact.

In other words, the market knew that the advertising industry and advertising was weakening.  That was known.

Q.   Okay.

A.   The question here was what impact would have then on AOL Time-Warner's ability to meet its earnings and revenue guidance in the coming year.

Q.   Okay.  And what part of that

S. HAKALA

knowledge of Credit Suisse was non-public?

MR. HALL:  Objection.

A.   I think most of it.  I don't think the public knew that Credit Suisse had determined internally that given the weakening ad market and given the guidance that AOL Time-Warner was not capable of meeting its numbers.  There were some other analysts who expressed those concerns but they were - as the opposing expert Professor Stoltz has noted - in the minority, not the majority.

In other words, I can't say that the information was unique to CSFB but I can say that CSFB had some incremental information and knowledge that was distinguishable from what the market believed.

Q.   Let's try and break this down.  There is data and then there are opinions about that data, okay?  In terms of the raw data about the advertising market, was there anything that Credit Suisse knew that was not public?

MR. HALL:  Objection.

A.   Based on my e-mails, yes.

S. HAKALA

Q.   What is it that they knew that was not public?

A.   My understanding is that Laura Martin knew that the advertising market in the media industry was deteriorating more rapidly than expected and had continued to deteriorate.

Q.   And how did she know that?

A.   Because of her own contacts within the industry.  Because of her own investigations in the industry.

Q.   And that was non-public information about AOL?

MR. HALL:  Objection.

A.   Non-public information or information not generally known about the industry.  And then the connection to AOL was also non-public.

Q.   On what basis do you make that conclusion?

A.   Based on reading the e-mails and based on reading the comments that she made internally.

Q.   Okay.  Let's get that e-mail out.

Page 34

1       S. HAKALA
2           (Hakala Exhibit 2, document
3       bearing production numbers
4       CS-AOL_0004761 through CS-AOL_0004762,
5       marked for identification as of this
6       date.)
7   BY MR. GESSER:
8       Q.   Have you seen this e-mail before?
9       A.   Yes.
10      Q.   Is this the e-mail that you're
11  referring to when we were speaking a moment
12  ago about the decline in the advertising
13  market?
14      A.   This is one of them.
15      Q.   Okay. Have you read Laura
16  Martin's deposition transcript?
17      A.   At some point I may have. I don't
18  remember. No, I'm sure I did.
19      Q.   Okay.
20      A.   I did at some point.
21      Q.   What about this e-mail suggests to
22  you that Laura Martin had access to non-public
23  information about the advertising market?
24      A.   She was talking about scattered
25  pricing at ABC and CBS. I don't know that the

TSG Reporting - Worldwide    877-702-9580

Page 35

1       S. HAKALA
2   market knew that generally.
3       Q.   Do you know that the market didn't
4   know that?
5       A.   I don't know.
6       Q.   You're making an assumption about
7   that, aren't you?
8           MR. HALL: Objection.
9       A.   What I'm really assuming is that
10  the position that CSFB's making as an analyst
11  about what the market is and their bullish ad
12  stance, as she describes it, is contrafactual
13  with what she knows internally. Whether
14  she --
15      Q.   Let's stick with the question I
16  asked. What about this e-mail tells you that
17  Laura Martin has access to non-public
18  information about the ad market? You said to
19  me that it's because she's talking about ABC.
20  And my question to you is what makes you think
21  that that information was not public?
22      A.   Because I didn't see information
23  that suggested that that was public.
24      Q.   Okay. But --
25      A.   Or that the public had the ability

TSG Reporting - Worldwide    877-702-9580

Page 36

1       S. HAKALA
2   to understand that information, absorb it
3   and, relate it to AOL Time-Warner.
4       Q.   But that's just an assumption that
5   you're making, right? I mean, on what basis
6   do you make --
7       A.   But I'm a damages expert. I'm not
8   a liability expert. I'm entitled to make that
9   assumption, aren't I?
10      Q.   Okay. But what's the basis for
11  your assumption?
12          MR. HALL: Objection.
13      A.   Just what I talked about. The
14  fact that she's talking about specific pricing
15  trends for advertising in specific media
16  entities that she's apparently gathering as a
17  media analyst. That's not something that
18  public would generally know.
19      Q.   Did you do anything to test to see
20  whether that information was available to the
21  public at that time?
22          MR. HALL: Objection.
23      A.   Yes.
24      Q.   What did you do?
25      A.   I did research on what other

TSG Reporting - Worldwide    877-702-9580

Page 37

1       S. HAKALA
2   analysts were saying. What news articles were
3   saying about AOL Time-Warner, et cetera.
4       Q.   Okay. And you could not find any
5   information about this in the public at that
6   time, about ABC's -- about the scattered price
7   market for ABC?
8           MR. HALL: Objection.
9       A.   No. What I told you earlier is
10  that the market was aware that there was
11  weakening of the national marketing.
12      Q.   That's not what I'm asking you.
13  I'm asking you --
14          MR. HALL: Objection. Let him
15  answer the question.
16          MR. GESSER: He's not answering
17  the question.
18      Q.   My question was did you determine
19  whether or not the specific information about
20  the scatter market was or was not public?
21          MR. HALL: Objection.
22      A.   No. I didn't -- I didn't find any
23  evidence to tell me one way or the other. All
24  I knew was that there was some evidence that
25  the ad market was weakening but that the

TSG Reporting - Worldwide    877-702-9580

Page 38

S. HAKALA

1
2  evidence was mixed and some people suggested
3  it was not weakening. And as Laura Martin
4  suggests her, they were putting out a bullish
5  ad stance at the same time they internally
6  were aware that the market was weakening.
7          So in the mix of information CSFB
8  was presenting information to the market,
9  information contrary to what they knew to be
10 true. Which is really what I was concerned
11 with.
12    **Q.    Would other media analysts have**
13 **access to this information?**
14          MR. HALL: Objection.
15    A.    Some would. Some would not.
16 Depends on the quality of their investigation
17 and experience. Laura Martin, as I understood
18 it, was particularly diligent and
19 knowledgeable in this area but there were
20 probably a handful of other analysts that
21 maybe could have obtained this information or
22 might have known this information.
23    **Q.    In fact, wouldn't this be**
24 **something that all advertising and media**
25 **analysts would be looking for?**

Page 39

**S. HAKALA**

1
2          MR. HALL: Objection.
3    A.    They might. They might not. It
4  depends on how diligent and capable they are.
5    **Q.    Okay. So Laura -- so Laura Martin**
6  **is aware of this information and yet it**
7  **doesn't get disclosed, correct? Is that**
8  **your --**
9    A.    It not only doesn't get disclosed.
10 It doesn't get disclosed in the context of
11 what the implications of that are for AOL
12 Time-Warner which is I think the issue in this
13 case.
14    **Q.    If you read down in the third**
15 **paragraph of that e-mail it says, "Personally**
16 **I'm okay with our bullish stance until our**
17 **earnings estimates go negative."**
18          **Do you see that?**
19    A.    Yes.
20    **Q.    What is it that suggests to you**
21 **about this e-mail that Ms. Martin did not**
22 **agree with the research reports that were**
23 **coming out from Credit Suisse?**
24          MR. HALL: Objection.
25    A.    I don't know. I think there's

Page 40

S. HAKALA

1
2  other e-mails that may show that.
3    **Q.    But there's nothing about this**
4  **e-mail.**
5    A.    Well, later on she says she is
6  lowering her EBITDA forecasts for Viacom,
7  Disney, and Time-Warner's 2 percent but she I
8  think -- I'm not sure this is the one where
9  she makes it clear that she didn't think the
10 company can make its EBITDA targets. I think
11 that's a different one.
12    **Q.    In this e-mail is Ms. Martin**
13 **talking about traditional advertising or**
14 **on-line advertising?**
15          MR. HALL: Objection.
16    A.    My assumption is both but more
17 likely traditional.
18    **Q.    Have you read her deposition**
19 **transcript discussing this e-mail?**
20    A.    At some point, yes.
21    **Q.    Do you remember what her view was**
22 **about this e-mail?**
23    A.    Not without reviewing it, no.
24    **Q.    When she refers to the scatter**
25 **market does that refer to on-line or does that**

Page 41

**S. HAKALA**

1
2  **refer to traditional?**
3    A.    That's traditional.
4    **Q.    Okay.**
5    A.    Or I shouldn't say traditional.
6  But traditional media outlets.
7    **Q.    Not on-line.**
8    A.    Right.
9    **Q.    So what is it that you believe**
10 **with respect to this e-mail was the**
11 **nondisclosure or omission that Credit Suisse**
12 **committed?**
13          MR. HALL: Objection.
14    A.    Just that the national ad market
15 had been weakening over the last five weeks,
16 much more than previously; that that would
17 have ordinarily, if I was reading that, caused
18 me to further discount the revenue and EBITDA
19 guidance of AOL; and that, therefore, as a
20 result CSFB should have lowered its revenue
21 and EBITDA guidance and price target for AOL.
22          But really I think the assumptions
23 I made about what are the facts I assumed
24 based on the pleadings and complaint are
25 really set forth in my report in paragraph 5.

Page 42

S. HAKALA

Q.   Okay.  So let's turn to that.

A.   So I didn't make a specific assumption about a specific e-mail.  I mean if you want to argue liability, that's fine.  I'm just not the right expert.

Q.   The assumptions that you made are in paragraph --

A.   5.

Q.   All right.

A.   Specifically at the beginning of the class period is 5A.

Q.   Okay.  The Kiggen and Martin were aware that there was a substantial weakening in the advertising marketing that would affect AOL negatively?

A.   Yes.

Q.   And that AOL would be unable to achieve the earnings and revenue guidance published by CSFB.

A.   Yes.

Q.   In particular Martin knew that the national ad market is much weaker than five weeks ago.

A.   Yes.

---

Page 43

S. HAKALA

Q.   Additionally, defendants knew that the price target of AOL should be materially lower than the $80 price target published in their January 12th and 16 reports.

A.   Yes.

Q.   Okay.

A.   And there's more.

Q.   And the more is?

A.   They continued to issue on February 1st a reaffirmation of their earnings and price target or set a price target of 75 despite knowledge that AOL could not achieve those revenue and earnings targets.  The resulting price target was set too high.

Q.   And when you say that they knew AOL couldn't achieve their price targets, you don't mean they literally knew that, right?  You mean that that was their opinion, right?

MR. HALL:  Objection.

A.   You know, yeah.  I think you could say that that was their opinion or based on the information about the market that they did not feel that AOL's guidance was well founded or was achievable.  That's probably a fair

---

Page 44

S. HAKALA

statement.

Q.   And so based on that information, did you believe that $80 price target was unreasonable?

MR. HALL:  Objection.

A.   Yeah.

Q.   Unsupportable?

MR. HALL:  Objection.

A.   Yeah.  Based on their internal opinions, sure.  But that's more -- they believed internally that it was so.

Q.   And when you say --

A.   I mean, some of the e-mails suggest they knew that was not a supportable price target.

Q.   And when you say "they" who is they.

A.   At least Laura Martin and probably to some extent Mr. Kiggens.

Q.   Well, let's take that separately.  Laura Martin, what was her status on the AOL coverage team for Credit Suisse?

A.   She was considered a foremost -- one of the primary or premier media analysts

---

Page 45

S. HAKALA

and Kiggen was known as the Internet analyst.  So when AOL Time-Warner merged they in a sense were viewed as merging the two analysts.  Although I believe Kiggen's name appeared before her on the reports.

Q.   He was the lead analyst?

MR. HALL:  Objection.

A.   He was probably the lead analyst but I think it was viewed in the market as co-analyst reports.

Q.   What in your view made that -- how do you know what the market view their reports as being?

A.   Based on what I saw on the news when I did searches on Kiggen and Martin.

Q.   And what did you find?

A.   That Martin was viewed as an analyst covering the stocks I think in May of 2001.  In fact, she chaired some kind of meeting among media CEOs; that she had had contact with Pittman.  So the fact that her name was on the report was viewed as significant because she was viewed as a senior analyst.

Page 46

S. HAKALA

1
2    Q.   But what made you think that she
3    was viewed as a co-lead analyst?
4        MR. HALL: Objection.
5    A.   I don't remember. It was just my
6    sense that when two analysts are covering two
7    companies that are a marriage of equals and
8    they continue to sign the report, that's
9    generally viewed as a co-analyst report.
10   Q.   You had read their depositions on
11   that issue?
12   A.   Yes.
13   Q.   And what do both Kiggen and Martin
14   say about that in their depositions?
15   A.   They might have suggested that at
16   some point Kiggen was the lead but with Martin
17   still signing the report, most investors would
18   have naturally assumed that her input on the
19   media side would have played a very important
20   role.
21   Q.   Do you know how many times Laura
22   Martin was mentioned in connection with the
23   AOL coverage by the press during the class
24   period?
25   A.   No.

TSG Reporting - Worldwide    877-702-9580

Page 47

S. HAKALA

1
2    Q.   Do you know how many times Mr.
3    Kiggen was mentioned in connection with AOL
4    coverage in the press during the class period?
5    A.   Only in a couple.
6    Q.   You know that he was only
7    mentioned a couple times?
8    A.   I did a word search on his name
9    and AOL and I only found a few hits.
10   Q.   And Laura Martin?
11   A.   Same. I think later on there was
12   a lot more when Laura Martin was -- depending
13   on when she was terminated there was a lot
14   more press on this issue.
15   Q.   On her coverage of AOL.
16   A.   Yeah. Yeah, there was quite a bit
17   of a discussion about her former coverage of
18   AOL in October/November of 2001.
19   Q.   How many press stories do you
20   think there were about that?
21   A.   I don't know without looking at my
22   file.
23   Q.   More than one?
24   A.   More than one.
25   Q.   What would have happened if Credit

TSG Reporting - Worldwide    877-702-9580

Page 48

S. HAKALA

1
2    Suisse had issued a $60 price target instead
3    of an $80 price target which I think was what
4    your view was the correct -- withdraw that.
5        What was -- in your view what was
6    the correct price target for -- Credit Suisse
7    could have provided for AOL in light of the
8    information that they had?
9        MR. HALL: Objection.
10   A.   I didn't form that view
11   explicitly. I had that view from my prior
12   work that it was below 60. If one knew that
13   the ad market was weakening it should have
14   been below 60. But I did not form that nor
15   was that necessarily what was important. What
16   was important to me was that the view that
17   CSFB internally acknowledges it should have.
18   Q.   And what was that?
19   A.   $60 or less.
20   Q.   And what would had happened if AOL
21   had -- if CSFB had issued a 60 price target
22   for AOL?
23   A.   Dropped it from 75 or 80 I think
24   that would have been a least a 2 to 3 percent
25   on the stock by itself just from looking at

TSG Reporting - Worldwide    877-702-9580

Page 49

S. HAKALA

1
2    the other -- what happens when in a clean
3    event another analyst lowers the price target
4    that significantly generally the stock
5    reaction was at least 2 and a half to
6    3 percent or more.
7        (Hakala Exhibit 3, document
8        bearing production numbers
9        CS-AOL_0003086 through CS-AOL_0003096,
10       marked for identification as of this
11       date.)
12   BY MR. GESSER:
13   Q.   Dr. Hakala, have you seen this
14   document before?
15   A.   No.
16   Q.   Okay. It's a media daily. Do you
17   know what that is?
18   A.   No.
19   Q.   It's a Credit Suisse analyst
20   report. Do you see the date on it? It's
21   Tuesday, January 16th, 2001?
22   A.   Okay.
23   Q.   Do you see in the bottom
24   right-hand -- left-hand corner there is what I
25   would describe as a mini report on AOL?

TSG Reporting - Worldwide    877-702-9580

**S. HAKALA**

1
2  A.  Yes.
3  Q.  Do you see that Laura Martin is on
4  top and Kiggen is beneath her name?
5  A.  Yes.
6  Q.  Do you see that this has a price
7  target of AOL of $60?
8  A.  Yes.
9  Q.  If you look at your report, what
10 was the return for AOL on January 16th, 2001?
11 A.  Negative.
12 Q.  Negative what?
13 A.  Negative .54 percent.
14 Q.  Is that statistically significant?
15 A.  No.
16 Q.  At the 90 percent level is that
17 statistically significant?
18 A.  No.  The primary news on that day
19 was AOL subscriber increase looking at my
20 report.
21 Q.  What was the range of price
22 targets for AOL during this time period?
23 A.  It was fairly wide.  I'd have to
24 go back and look but it was generally anywhere
25 from the 40s or 50s all the way up to maybe a

**S. HAKALA**

1
2  hundred, 90 or a hundred.
3  Q.  Who was the top-ranked analyst in
4  entertainment at that time?
5  MR. HALL:  Objection.
6  A.  I don't remember.
7  Q.  Was it Jessica Reed Cohen?
8  A.  It might have been Cohen.
9  Q.  Where was she?
10 A.  Cohen was Merrill Lynch.
11 Q.  And do you know what Merrill
12 Lynch's price target was at that time?
13 A.  No.
14 Q.  If I told you it was 60 would that
15 surprise you?
16 MR. HALL:  Objection.
17 A.  No.
18 Q.  In a co-coverage -- sorry.
19 Returning to that last question,
20 so the market was aware of a large range of
21 price targets for AOL.
22 A.  Yes, they were.
23 Q.  And so what makes you think that
24 if Credit Suisse had lowered its price target
25 from 80 to 60 that would have had a dramatic

**S. HAKALA**

1
2  effect on AOL's stock price?
3  A.  I didn't say dramatic.
4  Q.  Statistically significant?
5  A.  Enough to be statistically
6  significant.  It would have been modest.  Two
7  to 3 percent is a modest effect.  It would
8  have been a suggestion that another analyst,
9  especially an analyst who was viewed as pro
10 company, a sell side analyst was substantially
11 lowering their estimate of the prospects for
12 the company's price in the future and that
13 would have been important material
14 information.
15 Q.  What was AOL trading at at that
16 point?
17 A.  Which day?
18 Q.  Let's take January 16th, 2001.
19 A.  $46.70.
20 Q.  So $60 was still 33 percent above
21 what it was trading at?
22 A.  Yes.
23 Q.  Why don't you think the stock --
24 AOL stock reacted in a statistically
25 significant negative way on January 16th,

**S. HAKALA**

1
2  2001?
3  A.  Because I didn't find evidence
4  that this report was widely disseminated and
5  because the primary news on that day was that
6  they had increased the amount of subscribers
7  in AOL which was positive.
8  Q.  How many times during the class
9  period did AOL announce that it increased its
10 number of subscribers?
11 A.  A number.
12 Q.  A large number?  Five times?
13 A.  At least five.
14 Q.  Maybe ten?
15 A.  I don't know about ten.
16 Q.  Maybe 20?
17 A.  I don't know about 20.  Couldn't
18 have been 20.
19 Q.  Could not have been 20?
20 A.  I don't think so.
21 Q.  And so you're saying that -- well,
22 let me see if I understand.
23 Are you saying that this media
24 daily you don't think was disseminated widely
25 enough to affect AOL's stock price?

**S. HAKALA**

1  
2    A.   I didn't see it.  In the formal --
3  the formal published, what I'd call first call
4  price target of CSFB was not $60.  It was $80.
5  And $75 in this time period.  That's what the
6  e-mails are showing.
7    Q.   **That's not what I'm asking.**
8    A.   So I don't know how -- whether
9  this got disseminated or not.
10   Q.   **Okay.  Let's assume for the**
11  **purposes of today's discussion that it was**
12  **disseminated in the same way that the research**
13  **reports were disseminated.  Institutional**
14  **investors, widely distributed received this**
15  **information.  CSFB customers received it.**
16       MR. HALL:  Objection.
17   Q.   **Why would this not have had a**
18  **negative effect?**
19   A.   Because CSFB's formal price target
20  remained in the 80 to $75 range.  So people
21  would have been confused by this.
22   Q.   **And so if people were confused by**
23  **this you think it may not have had an effect**
24  **on the stock price?**
25   A.   It would have had a more muted

S. HAKALA

1  
2  effect, especially if the company had
3  reiterated its price target.
4    Q.   **What company?**
5    A.   CSFB.
6    Q.   **Does the fact that Laura Martin's**
7  **name is on top and Jamie Kiggen's name was**
8  **below do you think the market would interpret**
9  **anything by that?**
10   A.   I don't know.
11   Q.   **Is it possible that people reading**
12  **that would realize that Laura Martin had a $60**
13  **price target and Jamie Kiggen had an $80 price**
14  **target?**
15       MR. HALL:  Objection.
16   A.   Not necessarily.
17   Q.   **That's not what I asked.  I asked**
18  **isn't it possible that people would be**
19  **confused?**
20       MR. HALL:  Objection.
21   A.   I mean, we can speculate about it
22  but essentially this is a report by two
23  analysts who are trying to cover the stock.
24  I'm not sure they would attribute it to one or
25  the other.  Under CSF -- under -- under CFA

S. HAKALA

1  
2  guidelines it wouldn't matter whose name is up
3  front.  Both of them should subscribe to the
4  opinion or their names should not be on the
5  report.
6    Q.   **Where does the CFA guidelines say**
7  **that?**
8    A.   Standards of Professional
9  Practice.
10   Q.   **Say what?**
11   A.   That an individual can't sign a
12  report or can't have their name associated
13  with a report to which they do not subscribe
14  with the opinions.
15   Q.   **Is Jamie Kiggen a CSA analyst?**
16   A.   CFA.  But Laura Martin is and it
17  doesn't matter.  It's the Standards of
18  Practice in the industry.  You don't issue a
19  report where one of the persons listed with
20  the report doesn't hold the view of the
21  report.  That's considered unethical.
22   Q.   **Really?  Is that your practice as**
23  **well with your expert reports?**
24   A.   Absolutely.
25       MR. HALL:  Objection.

S. HAKALA

1  
2    Q.   **So ever single thing in your**
3  **expert report is something that you believe**
4  **and that your counsel believes as well?**
5       MR. HALL:  Objection.
6    A.   No, no, no.  Counsel didn't issue
7  my report.  My report is issued by me.  But if
8  I have a valuation report, for example, and
9  three people sign it, or work on it, if anyone
10  dissents from some aspect of the report I'm
11  required under USPAP to report that.
12   Q.   **Okay.  And so in every co-coverage**
13  **situation you believe that every -- you**
14  **believe that all the analysts believe**
15  **absolutely everything that's in the reports.**
16       MR. HALL:  Objection.
17   A.   I can't say in that extreme way
18  but every material difference of opinion
19  should be diclosed or one of the analysts
20  should not put their name on the report.
21   Q.   **Have you ever seen that?  Have you**
22  **ever seen a dissenting opinion in an analyst**
23  **report?**
24       MR. HALL:  Objection.
25   A.   Yeah, I have but it's very rare

S. HAKALA

1  because it's --
2      Q.   What's the name of that company?
3      A.   I can't think of it.  I saw it in
4  one case where there was a split in analysts
5  in the company.  They were both covering the
6  same stock.
7      Q.   Do you remember what stock that
8  was?
9      A.   No.
10     Q.   How many instances can you think
11 of that happening?
12     A.   One that I know of and maybe two
13 or three others.
14     Q.   How many co-coverage instances can
15 you remember that happening?
16         MR. HALL:  Objection.
17     A.   Surprisingly frequent especially
18 when you have large conglomerates with
19 multiple stocks so that they cover the
20 universe of two different analysts in the same
21 company.
22     Q.   Okay.  Maybe 50 instances of
23 co-coverage?
24     A.   More than that.

S. HAKALA

1      Q.   Okay.  A hundred instances of
2  co-coverage?
3      A.   I don't know.
4      Q.   So in a hundred instances of
5  co-coverage over the last ten years you know
6  of maybe one instance where there was a
7  dissenting opinion.
8          MR. HALL:  Objection.
9      A.   It's not even co-coverage.  When
10 you issue an analyst report sometimes you list
11 four different analysts who are on that group
12 on that report.
13     Q.   Okay.
14     A.   If any one of those analysts
15 doesn't agree with the report they should drop
16 their name or note the dissent.
17     Q.   So you think that --
18     A.   That's ethically required.
19     Q.   That's not what I'm asking.  You
20 think that if -- in all those situations all
21 the analysts agreed with everything in each of
22 those reports.
23         MR. HALL:  Objection.
24     A.   I can't say absolutely but in

S. HAKALA

1  material aspects if they thought any part of
2  the report was materially false or misleading
3  they are not supposed to agree to the report
4  and the report should go out noting that.
5  Ethically they're supposed to.  And if they
6  don't it's one of -- it's frankly one of the
7  sore spots within now the CFA Institute that
8  that policy has not been enforced.  But it has
9  also been known in the investment management
10 industry that you cannot put out a report on
11 that report with a person on that report not
12 subscribing to material opinions in that
13 report.
14     Q.   And so you believe that the market
15 thinks that every analyst on every report
16 agrees with everything material in that
17 report.
18         MR. HALL:  Objection.
19     A.   Not in that extreme level but
20 materially in terms of the general gist of the
21 price target, the general views of target,
22 yes.
23     Q.   Is that a realistic expectation
24 for the market?

S. HAKALA

1          MR. HALL:  Objection.
2      A.   Depends on who you are.  I think
3  some institutional investors are a little
4  jaded about that, especially given what we now
5  know.  But the simple fact of the matter is a
6  report is not supposed to go out unless it
7  represents the collective opinion of the
8  authors and of the firm.
9      Q.   Okay.  And if I were to tell you
10 that it's very common for analysts working in
11 co-coverage situations to have different views
12 of price target, different views of EBITDA
13 numbers, different views of earnings per
14 share, and yet they reach a consensus in doing
15 so, would that surprise you?
16         MR. HALL:  Objection.
17     A.   That would not surprise me that
18 they might reach a consensus but then it would
19 have to be a consensus that they both can
20 subscribe to and is within the range of price
21 targets that they both are comfortable with,
22 not an issue like this where one is saying I
23 believe the price target should be much lower.
24     Q.   Okay.  But do you -- have you

Page 62

S. HAKALA

1
2  reviewed Laura Martin's deposition transcript
3  on that issue?
4      A.  I have in the past.  Not recently.
5      Q.   Anything in her deposition
6  transcript suggest that she didn't believe the
7  numbers that went out under her name in the
8  report?
9      A.  I'm not going to read minds.  I
10 think that's an issue for the judge and the
11 jury.  Not for me.  I have my own view of
12 that.
13     Q.   And what is your view of that?
14     MR. HALL:  Objection.
15     A.  My view is that I think internally
16 she knew that the numbers for AOL Time-Warner
17 were inflated and she was trying to get CSFB
18 to knock them down.
19     Q.   But that's not what she said.
20     A.  In her e-mails.
21     Q.   Okay.  So your assumption is that
22 she committed perjury during her deposition?
23     MR. HALL:  Objection.
24     A.  I'm not going to draw that
25 conclusion one way or the other other than to

Page 63

S. HAKALA

1
2  suggest that sometimes years after the fact we
3  give answers that are self-serving.  Fact
4  witnesses do especially when they're
5  defendants.  But beyond that it's neither here
6  nor there.  Her e-mails speak for themselves.
7      Q.   Okay.  Let's go back to the e-mail
8  I showed you before.  Her e-mail says,
9  "Personally I'm okay with our bullish stance
10 until my earnings estimates go negative."
11     A.  Okay.
12     Q.   Does that suggest to you that she
13 didn't believe the earnings for Credit
14 Suisse -- didn't believe the estimates?
15     MR. HALL:  Objection.
16     A.  I don't know.  From this e-mail
17 alone I don't know but from other e-mails I do
18 know.  I think there's other e-mails where
19 she's clearly concerned that AOL cannot meet
20 its targets even with the price increase.  AOL
21 Time-Warner cannot meet its target for EBITDA
22 even if it raises its ad -- it's AOL
23 subscription rates.
24     Q.   What was AOL's target for EBITDA
25 for the first quarter of 2001?

Page 64

S. HAKALA

1
2      A.  I don't think it was the first
3  quarter we focused on.  It was for the full
4  year.
5      Q.   And what was that?
6      A.  40 billion.
7          No, no.  That was revenue.  What
8  was the EBITDA?
9          EBITDA was 11 billion.
10         (Pause on the record.)
11         (Hakala Exhibit 4, document
12 bearing production numbers
13 CS-AOL_0004840 through CS-AOL_0004865,
14 marked for identification as of this
15 date.)
16 BY MR. GESSER:
17     Q.   We're at Hakala 4?
18         Dr. Hakala, have you seen this
19 before?
20     A.  I think so.
21     Q.   What do you think this is?
22     A.  This is an e-mail about a draft
23 report that she's writing which appears to
24 have some extensive detail on AOL Time-Warner.
25 And she's here saying a price target of $60.

Page 65

S. HAKALA

1
2      Q.   So this is her internal -- this is
3  her internal view?
4      A.  This is my understanding, yeah.
5      Q.   Turn to page 14.
6      A.  (Witness complies.)
7      Q.   What's her EBITDA number for the
8  year?
9      A.  The EBITDA number here is 11
10 billion.
11     Q.   It's above AOL's guidance number,
12 isn't it?
13     A.  In this draft, yes.
14     Q.   All right.  What should Laura
15 Martin -- what should Jamie Kiggen have done
16 if he disagreed with Ms. Martin on her views
17 about the price target?
18     MR. HALL:  Objection.
19     A.  Ethically?  Realistically?
20     Q.   Insure view.
21     A.  Disclosed that there was a
22 difference of opinion.
23     Q.   And, again, we've discussed that
24 that very rarely happens; isn't that right?
25     MR. HALL:  Objection.

Page 66

S. HAKALA

1  
2    A.   Yeah, it very rarely happens for
3  ethical reasons.
4    Q.   **What do you think the market would**
5  **have done with that kind of disclosure?**
6    A.   They would have started
7  discounting the stock price and it would have
8  taken that into account.
9    Q.   **You don't think the market would**
10 **have been confused?**
11   A.   Oh, sure it would have represented
12 uncertainty.  But it certainly would have
13 indicated that even CSFB was conflicted as to
14 whether AOL could meet its targets.  Given
15 Martin's reputation she would have put a lot
16 of weight on the fact that she was concerned
17 that they couldn't meet the targets.
18   Q.   **You said they couldn't meet their**
19 **targets.**
20   A.   For earnings and for EBITDA and
21 for revenue.
22   Q.   **Okay.  About I just showed you**
23 **that her internal EBITDA number was 11**
24 **billion.**
25       MR. HALL: Objection.

Page 67

S. HAKALA

1  
2    A.   But I'm assuming that that's
3  inconsistent with other e-mails where she knew
4  that.
5    Q.   **I just asked you did this show --**
6  **this is an internal e-mail in which she**
7  **provides in her draft report that they have an**
8  **$11 billion EBITDA and you're just ignoring**
9  **that?**
10       MR. HALL: Objection.
11   A.   No.  I'm saying that just because
12 she put that there doesn't necessarily mean
13 she believes that it was an achievable number.
14 Or that that number didn't have some
15 substantial risk.
16   Q.   **Well, what makes you think that?**
17   A.   Other e-mails.
18       MR. HALL: Objection.
19   A.   Other information pled by counsel.
20 Again, you know, you're trying to argue
21 liability and facts with a damages expert.
22 It's kind of silly.
23   Q.   **Well, you've made a whole bunch of**
24 **assumptions and I'm just trying to test to see**
25 **how well your assumptions hold up and whether**

Page 68

S. HAKALA

1  
2  **they're driven by a result oriented analysis**
3  **or whether you've actually done any objective**
4  **analysis to determine whether your assumptions**
5  **make sense.**
6       MR. HALL: Objection.
7    A.   I've done an internal analysis to
8  determine whether my assumptions make sense
9  but I also as all damages experts have taken
10 as given the allegations in the complaint.
11   Q.   **I mean, this is an e-mail that**
12 **you're just simply discounting.**
13       MR. HALL: Objection.
14   A.   No, I'm not discounting it.  I'm
15 saying that Laura Martin knowingly -- look,
16 Laura Martin is a defendant in this case
17 because she knowingly let reports go out that
18 counsel alleges in certain e-mails she knew
19 had earnings targets and price targets in it
20 that couldn't be met.
21   Q.   **Although I just showed you an**
22 **e-mail that says she's fine with the bullish**
23 **stance.**
24       MR. HALL: Objection.
25   A.   Well, again, you point to one

Page 69

S. HAKALA

1  
2  piece of paper and ignore another.  That's not
3  my issue.  And -- I mean, you're trying to try
4  your case on fact and liability with a damages
5  expert and I'm just not going to let you go
6  there.
7    Q.   **Okay.  What if Mr. Kiggen had just**
8  **taken Laura Martin's name off the report?**
9       MR. HALL: Objection.
10   A.   Probably would have been a
11 negative signal.  I don't know how negative.
12   Q.   **Could you test for that?**
13       MR. HALL: Objection.
14   A.   No.
15   Q.   **Did you test it?**
16   A.   No.
17   Q.   **So there's no way to know what the**
18 **market would have done in that situation.**
19   A.   It would have raised some concerns
20 but I don't know for certain, that's true.
21   Q.   **And had Laura Martin's name come**
22 **off the report would the report still be**
23 **factually misleading?**
24       MR. HALL: Objection.
25   Q.   **In your view?**

**S. HAKALA**

1
2   A.   Potentially, yeah.
3   Q.   Why?
4   A.   Other persons in the analyst group
5   were of the opinion that there was no way AOL
6   Time-Warner could meet the $11 billion target
7   given the weakening ad market.
8   Q.   Who?
9   A.   Laura Martin. Other analysts.
10  Q.   Her name is not on the report.
11  A.   It doesn't matter. It's going out
12  on CSFB.
13  Q.   Wait. So Jamie Kiggen has to make
14  sure that everybody at CSFB agrees with a
15  report even if their name isn't on it?
16       MR. HALL: Objection.
17  A.   He has to acknowledge that there
18  is a significant concern about these
19  particular issues and that the concern is that
20  these targets are not achievable, that there's
21  weakening of the national ad market that make
22  it unlikely or difficult for AOL to meet these
23  numbers.
24  Q.   Even if he disagrees with that?
25       MR. HALL: Objection.

S. HAKALA

1
2   A.   Well, I don't know. I mean, you
3   know, I'm not an -- I'm not going to testify
4   to liability or facts. I have to assume what
5   I have to assume as an expert.
6   Q.   Okay. So I'm asking you -- I'm
7   asking you would you assume that in that
8   situation there would be a failure to disclose
9   because -- even if Laura Martin's name was not
10  on the report that Kiggen had an objection to
11  disclose her views?
12       MR. HALL: Objection.
13  A.   Assuming Kiggen didn't also hold
14  those views privately and admit to them but
15  took a different position for reasons of
16  investment banking and politics which is
17  another issue here as I understand it.
18  Q.   Okay. I'm not --
19  A.   I mean, you're assuming that
20  Kiggens held to these beliefs and believed
21  them and I'm not necessarily granting that
22  assumption.
23  Q.   Okay. So you believe that there's
24  evidence that Jamie Kiggen didn't believe his
25  reports?

**S. HAKALA**

1
2   A.   That's -- I believe -- that's my
3   understanding is that CSFB as a group and even
4   Kiggen and people working with Kiggen were
5   aware of the fact that these revenue and
6   earnings targets were not achievable.
7   Q.   Okay. And what's your basis for
8   that view?
9        MR. HALL: Objection.
10  A.   What's pled in the complaint.
11  Q.   Did you do anything to test that?
12  A.   Well, I have read depositions.
13  I've read e-mails. But that's not my role.
14  Q.   But any -- I understand that.
15  A.   I mean that's not my role and
16  you're trying to make it my role. It's not.
17  Q.   But you are saying that there are
18  damages as a result of failing to disclose
19  things so I'm asking you what was it that was
20  failed -- that was not disclosed. And you're
21  telling me that Kiggen's true views weren't
22  disclosed and I'm asking you where do those
23  true views come from.
24       MR. HALL: Objection.
25  A.   I didn't say that. I said that

S. HAKALA

1
2   the allegations in the compliant are that
3   CSFB, either Martin or Kiggens, were fully
4   aware of the fact that the price target should
5   be lower, that the revenue target that was put
6   up by AOL Time-Warner was not achievable and
7   the EBITDA target was not achievable and
8   should be lowered.
9   Q.   Okay. And I'm asking did you --
10  A.   And that the national ad market
11  was weakening and was continuing to weaken
12  such that there was a need to lower their
13  targets and nevertheless they did not do so.
14  Q.   And I'm asking you on what basis
15  do you believe that that was Jamie Kiggen's
16  view?
17       MR. HALL: Objection.
18  A.   I said I didn't form that one way
19  or the other. It was irrelevant whether it
20  was or was not.
21  Q.   Why is that irrelevant?
22       MR. HALL: Objection.
23  A.   Because whether it was Martin's
24  view or Kiggen's view they're both on the
25  report.

Page 74

S. HAKALA

1  S. HAKALA
2  **Q.   Okay.  But we were now in this**
3  **hypothetical where Laura Martin's name does**
4  **not appear on the report.**
5  A.   Okay.
6  **Q.   And then I'm asking -- now I'm**
7  **asking you is there still something in the**
8  **report that was not disclosed that you feel**
9  **should have been disclosed?**
10          MR. HALL: Objection.
11  A.   Sure.
12  **Q.   And what's that?**
13  A.   That the price target was too high
14  and couldn't be supported by a reasonable
15  valuation.
16  **Q.   Okay.  And my question is what**
17  **makes you think that Jamie Kiggen did not**
18  **believe that the price target was supportable?**
19          MR. HALL: Objection.
20  A.   Just from the e-mails that I saw.
21  **Q.   Can you -- do you remember any**
22  **particular e-mail?**
23  A.   No.  And that wasn't the focus of
24  my analysis.  I'm a damage expert.  I'm not a
25  fact expert and a liability expert.  And

TSG Reporting - Worldwide   877-702-9580

Page 75

S. HAKALA

1  that's not a proper role for me as an expert.
2  **Q.   But your damages and your analysis**
3  **is based on assumptions that you're making so**
4  **I'm just testing those assumptions.  If you're**
5  **telling me that those are assumptions that**
6  **aren't necessary for your report, then we can**
7  **move on.**
8
9          MR. HALL: Objection.
10  A.   Well, you're now posing a
11  contrafactual hypothetical which is that Laura
12  Martin was not on the report.  That's the
13  first problem.  The second problem is you're
14  assuming that plaintiffs have not alleged that
15  CSFB and Kiggens and at least some of the
16  people besides Kiggens and Martin associated
17  with that report did not know that there were
18  problems with AOL and that they weren't
19  putting up reports that were -- how can I say
20  it? -- intended to please AOL for investment
21  banking reasons.  That's the allegation.  I
22  think there's plenty of evidence of that and
23  that's not a surprising thing to see analysts
24  do.
25  **Q.   What was the Salomon Brothers's**

TSG Reporting - Worldwide   877-702-9580

Page 76

S. HAKALA

1  **S. HAKALA**
2  price target for AOL at this time?
3          MR. HALL: Objection.
4  A.   I don't know.
5  **Q.   Would it surprise you if I told**
6  **you it was 115?**
7          MR. HALL: Objection.
8  A.   No, it wouldn't at all.
9  **Q.   So that's 35 -- 45? -- $35 higher**
10  **than Credit Suisse's price target at this**
11  **time?**
12  A.   Apparently, yes.
13  **Q.   Okay.  Does that necessarily mean**
14  **that someone at Salomon Brothers was**
15  **committing fraud?**
16          MR. HALL: Objection.
17  A.   I don't know.  It's possible.  But
18  I don't know.
19  **Q.   That's not my question.  Does it**
20  **necessarily mean that someone at Salomon Smith**
21  **Barney was committing fraud?**
22          MR. HALL: Objection.
23  A.   I don't know.  No.
24  **Q.   No, it doesn't necessarily mean**
25  **that?**

TSG Reporting - Worldwide   877-702-9580

Page 77

S. HAKALA

1  **S. HAKALA**
2  A.   You know, it could.  It could not.
3  **Q.   That's not -- does it necessarily**
4  **mean that someone at Salomon Brothers was**
5  **committing fraud?**
6          MR. HALL: Objection.
7  A.   It's incomplete.  There's more to
8  it than that.  Given what you know about the
9  market and given what a competent analyst
10  should know, a $115 price target in this time
11  period would raise a lot of eyebrows.
12  **Q.   Okay.  How many analysts had**
13  **higher price targets than Credit Suisse at**
14  **this time?**
15  A.   A number.
16  **Q.   Goldman Sachs?**
17          MR. HALL: Objection.
18  A.   I don't know.
19  **Q.   Morgan Stanley?**
20          MR. HALL: Objection.
21  A.   I don't know.
22  **Q.   How about Bernstein Research?**
23          MR. HALL: Objection.
24  A.   I don't know.
25  **Q.   Did they have an investment**

TSG Reporting - Worldwide   877-702-9580

Page 78

**S. HAKALA**

1
2  banking business?
3      MR. HALL: Objection.
4      A.   I don't now. I don't think so.
5      Q.   Okay. So if a research analyst
6  firm that did not have investment banking
7  business had a higher price target than Credit
8  Suisse at this time, what would that tell you?
9      MR. HALL: Objection.
10     A.   That that analyst was overly
11 optimistic or not as well informed as Laura
12 Martin.
13     Q.   Okay. So --
14     A.   I mean, given what Laura -- we're
15 talking about what Bernstein thought and I
16 don't think that's relevant. The issue that's
17 relevant here is Laura Martin is very, very
18 thorough in her knowledge of the media
19 industry and media segment and ad trends and
20 she's saying that based on what she's seeing
21 in the market which we have to give weight to,
22 this company can't meet its numbers.
23     Q.   But She knows more than
24 Salomon Smith Barney, she knows more than
25 Goldman Sachs, she knows more than all these

TSG Reporting - Worldwide    877-702-9580

Page 79

**S. HAKALA**

1
2  other analysts with higher price targets.
3      MR. HALL: Objection.
4      A.   She may or may not. I don't know.
5  I didn't make that determination.
6      Q.   But it's possible all those
7  analysts were -- is it possible that all those
8  analysts reached those price targets having
9  done a reasonable analysis?
10     MR. HALL: Objection.
11     A.   I don't know. I don't think so.
12     Q.   But you're not an analyst, are
13 you?
14     A.   Yeah, I am. I'm a CFA. I've done
15 analyst work.
16     Q.   Okay.
17     A.   I don't publish it like a
18 securities analyst in an investment banking
19 firm but I do analyst work all the time.
20     Q.   Do you have any special expertise
21 in media companies or on-line companies?
22     A.   Yeah. I've valued hundreds of
23 them over the last 16 years.
24     Q.   Okay. And so you feel you're
25 capable of making an investment as to whether

TSG Reporting - Worldwide    877-702-9580

Page 80

**S. HAKALA**

1
2  or not an $80 price target was reasonable at
3  this time?
4      MR. HALL: Objection.
5      A.   That wasn't the focus of what I
6  did in this case.
7      Q.   That's not my question.
8      A.   But if I did and was in that
9  position and looking at all the same
10 information, yeah.
11     Q.   And you would say that an $80
12 price target at this time was unreasonable?
13     MR. HALL: Objection.
14     A.   Based on what I know from some
15 other information, yeah.
16     Q.   Okay. And therefore anybody --
17 anybody with a higher than $80 price target at
18 that time would have been behaving
19 unreasonably in your opinion?
20     MR. HALL: Objection.
21     A.   They would have been taking
22 positions that I don't think were sustainable.
23 Given what I know. Both on the on-line
24 subscriber side as well as in the traditional
25 media side.

TSG Reporting - Worldwide    877-702-9580

Page 81

S. HAKALA

1
2      Q.   And so if Credit Suisse had gone
3  with Laura Martin's numbers do you know how --
4  where she would be as against consensus?
5      MR. HALL: Objection.
6      A.   She would be lower than average.
7  On price target. On EBITDA she would be lower
8  than average on consensus.
9      Q.   Significantly lower?
10     MR. HALL: Objection.
11     A.   Yeah. But the consensus was like
12 10.6, 10.7, with some up at 11, some down as
13 low as 10. She would have pulled the
14 consensus down by herself. And both -- she
15 would have pulled the consensus price target
16 and the consensus EBITDA target down
17 especially if you do what we call the narrower
18 survey of the major investment banks that
19 provided regular consistent coverage of which
20 there are about five.
21     Q.   And if she would have published a
22 dissent what would that have looked like?
23     MR. HALL: Objection.
24     A.   It's not an issue of dissent.
25 It's an issue of in the report it would have

TSG Reporting - Worldwide    877-702-9580

Page 82

S. HAKALA

1 been noted that there was a difference of
2 opinion within CSFB and a number of members of
3 CSFB were of serious doubt that the company
4 was --
5     Q.    When you say a number of members,
6 other than Laura Martin who else was that?
7         MR. HALL: Objection.
8     A.    I don't know without looking at
9 the discovery. My understanding it wasn't
10 just exclusively Laura Martin opinion. It may
11 have even been Mr. Kiggen's.
12    Q.    But don't know that.
13        MR. HALL: Objection.
14    A.    Other than what I've read, no.
15 But I'm not going to form that opinion.
16    Q.    Okay. So based on you -- just
17 sitting here today, can you think of anyone
18 else other than Credit Suisse -- at Credit
19 Suisse other than Laura Martin who would have
20 had to have put a dissent or a different
21 opinion than what was in the research report?
22        MR. HALL: Objection.
23    Q.    In order for it to be accurate in
24 your view.

TSG Reporting - Worldwide    877-702-9580

Page 83

S. HAKALA

1     A.    Not offhand, no. And I didn't
2 make that determination.
3     Q.    So in order for the reports not to
4 have been misleading in your view what would
5 they have had to say?
6         MR. HALL: Objection.
7     A.    They would have said that among
8 the analysts who are assigned coverage of this
9 particular stock of which there are two, that
10 there was a significant difference of opinion
11 as to price target and as to the likelihood of
12 the company meeting its expectations.
13    Q.    And is there any way to test how
14 the market would react to that?
15    A.    You can look at what happens when
16 two different analysts issue a report, one
17 positive, one negative, and see what impact
18 that is. And I've done that in this case.
19 Generally they'll give weight to the negative
20 and not the positive.
21    Q.    Generally they. Who's they?
22    A.    Investors.
23    Q.    Is there any scientific way to
24 actually measure that, though?

TSG Reporting - Worldwide    877-702-9580

Page 84

S. HAKALA

1     A.    Yeah. If you look at days when
2 they're multiple analyst reports and one is a
3 reiterating or a an upgrade and one is
4 negative, downgrade, generally would carry
5 weight. Statistically I think it's pretty
6 well known. In fact, in the survey that I've
7 done here a number of cases we have that.
8     Q.    But wouldn't that just be the
9 definition of confounded? If one analyst on
10 the report is saying something positive and
11 another analyst is saying something negative
12 isn't that exactly what confounding is?
13    A.    Well, confounding mean that
14 there's multiple pieces of information. That
15 doesn't mean that you can't isolate from the
16 confounding information which one has the
17 influence.
18        If one says something positive and
19 one says something negative and the stock
20 reacts negatively we certainly know from the
21 confounding information that the negative had
22 a greater impact than the positive. If you
23 have two pieces of information and they go in
24 the opposite direction and the stock moves in

TSG Reporting - Worldwide    877-702-9580

Page 85

S. HAKALA

1 one direction and not the other, then we have
2 a pretty good idea which one was the primary
3 impact. Confounding information doesn't
4 prevent you from drawing inferences.
5     Q.    Have you ever seen anybody do that
6 analysis?
7     A.    Yeah.
8     Q.    For dissenting opinions in
9 analysts' reports?
10    A.    Not for dissenting opinions but
11 for multiple opinions that dissent from each
12 other, yes.
13    Q.    Okay. Who's done that?
14    A.    I've done that a number of times.
15    Q.    Who else has done that?
16    A.    I don't know. I've seen other
17 studies of analyst reports that have looked at
18 negative versus positive reports and noted
19 that negative reports tend to carry more
20 weight than positive reports.
21    Q.    Have you seen any academic
22 literature that supports that you could
23 actually isolate a negative report from
24 positive reports that are released on the same

TSG Reporting - Worldwide    877-702-9580

1    **S. HAKALA**
2    day?
3    A.   No.  What it generally says is
4    that if you look at a day when there's a
5    positive and a negative report the negative
6    report tends to dominate the positive report
7    and cause a negative impact.
8    Q.   But is there any academic support
9    for measuring what that impact would be?
10   A.   For the negative report by itself
11   or for the effect of the two together?
12   Q.   Either.
13   A.   For the two together it's easy.
14   Q.   For the effect of the negative
15   report itself.
16   A.   Yeah.  For the negative report
17   itself all you can say is that the effect must
18   have been at least as great or greater than
19   the negative reaction.
20   Q.   Okay.  But you --
21   A.   But you're applying deductive
22   reasoning and natural logic to that.
23   Q.   But you haven't done that here.
24   You haven't tried to determine what would have
25   happened had Laura Martin's report -- instead

1    **S. HAKALA**
2    of Credit Suisse issuing Laura Martin's report
3    if Credit Suisse issued the report it had with
4    Laura Martin.
5    A.   No, no.  We have examples here
6    where there are positive or neutral or
7    reiterations against a negative report and the
8    negative report is statistically significant.
9    Some of the examples in my report are --
10   Q.   No, no.  That's --
11   A.   Well, that is what you're asking.
12   Q.   No, it's not.
13        What I'm asking is did you test to
14   see what would have happened in this case had
15   CSFB issued the report it did along with
16   information about Laura Martin's views in that
17   report?
18   A.   The only way to do that is to do
19   something equivalent and that is what happens
20   when there is a negative report and a positive
21   report issued on the same day --
22   Q.   But did you do that here?
23   A.   Yeah.
24   Q.   For what day?
25   A.   I can't remember but there's a

1    **S. HAKALA**
2    number of days.
3    Q.   No, no.  It's not that you
4    believe --
5    A.   Even February 20th, 2002 when the
6    Lehman downgrade occurs, there's positive
7    reports on that day and the following days and
8    the stock still goes negative.
9    Q.   My question is your analysis as I
10   understand it is you take a look at what would
11   have happened if CSFB had issued Laura
12   Martin's report; is that correct?
13   A.   No.  I look at what the impact
14   would have been if the allegations of the
15   plaintiffs are true.  And given what my
16   understanding is that there's a factual
17   foundation for the allegations of the
18   plaintiff.  In assessing the damages you
19   assume a disclosure by Credit Suisse of a
20   report that instead of the report that was
21   issued it was Laura Martin's views that were
22   disclosed; is that right?
23   MR. HALL:  Objection.
24   A.   Not necessarily.
25   Q.   Okay.  What is it that you

1    **S. HAKALA**
2    examine?
3    A.   That a report was issued with a
4    substantially lower price target and with a
5    substantially -- substantial amount of caution
6    saying we don't think given the current ad
7    environment that AOL is going to be able to
8    meet its revenue or EBITDA targets.  And,
9    therefore, the EBITDA target should be 6
10   billion.
11   Q.   And my question --
12   A.   And then as you go through the
13   year it should be lower and lower and lower.
14   Q.   So my question is you didn't test
15   to see what would have happened if Credit
16   Suisse had its $80 price target but also
17   indicated that there was a $60 price target
18   had Laura Martin's views been the one to
19   prevail and Laura Martin had a lower EBITDA
20   number.  That is not the test that you did; is
21   that correct?
22   A.   I didn't look at a test of a joint
23   report nor do I think you can do that.
24   Q.   Okay.
25   A.   The issue is really -- if you're

Page 90

S. HAKALA

1 going to talk about that then I think the
2 marketing would generally probably given
3 Martin more weight than Kiggens. A dissenting
4 report like that would have been a pretty
5 interesting event.
6     Q.   Except it wasn't on January 6th,
7 2001.
8         MR. HALL: Objection.
9     A.   Or January 12th. I don't know.
10 You know, all I can say is if there had been
11 two reports, one by a media analyst and one by
12 an Internet analyst, and the media analyst
13 said I don't think this company's going to
14 make it and its price target needs to be much
15 lower, I have a very good indication from what
16 I've read in the academic literature and in
17 this case the market would have given more
18 weight to the -- Laura -- what you're calling
19 the Laura Martin opinion than the Kiggens
20 opinion.
21     Q.   Wouldn't the market view her
22 opinion being more related to Time-Warner and
23 his opinion being more related to the American
24 On-Line division?

TSG Reporting - Worldwide    877-702-9580

---

Page 91

S. HAKALA

1     MR. HALL: Objection.
2     A.   Possibly but possibly not.
3     Q.   What's her expertise?
4     A.   She was a media analyst. But in
5 media analyst she would be understanding the
6 advertising on-line segment or new media
7 segment as well.
8     Q.   Is that what she said in her
9 deposition?
10     A.   I don't know.
11         MR. GESSER: Let's take a break.
12         THE VIDEOGRAPHER: The time is
13 11:04. This is the end of the tape
14 labeled number one. We are going off
15 the record.
16         (Recess taken.)
17         THE VIDEOGRAPHER: The time is
18 11:16. This is the start of the tape
19 labeled number two. We're back on the
20 record.
21 BY MR. GESSER:
22     Q.   Dr. Hakala, how many advertising
23 related corrective disclosures did you
24 determine there were during the class period?

TSG Reporting - Worldwide    877-702-9580

---

Page 92

S. HAKALA

1     A.   From the company or from other
2 individuals?
3     Q.   In total.
4     A.   In total I don't remember without
5 adding them up but there were probably at
6 least 20.
7     Q.   Okay. Could there have been at
8 least 49?
9     A.   It's possible. Some of them were
10 small though. There's about 20 that were
11 significant.
12     Q.   And how many days do you believe
13 that CSFB inflated AOL's stock price?
14         MR. HALL: Objection.
15     A.   Well, to the extent that it made
16 certain statements and then continued to
17 reiterate certain statements that are alleged
18 to be false and misleading it would be all the
19 days from the beginning of the class period
20 around January 12th all the way to some time
21 in March and April of 2002 on the advertising
22 claims.
23         On the -- on the claims relating
24 to failure to disclose internal accounting

TSG Reporting - Worldwide    877-702-9580

---

Page 93

S. HAKALA

1 improprieties, that would be out till July
2 25th of 2002.
3     Q.   Okay. And -- but with respect to
4 the advertising, the omission as you see it,
5 is this knowledge that Ms. Martin had about
6 the declining advertising market and what its
7 likely effect would be on AOL; is that
8 correct?
9         MR. HALL: Objection.
10     A.   No.
11     Q.   Okay. What is the omission?
12     A.   The omission is that CSFB knew
13 that there was declining advertising trends,
14 that the ad market was weakening, and that in
15 light of the weakening of the ad market that
16 AOL was unlikely to meet its earnings target,
17 revenue targets, but particularly unlikely to
18 meet its EBITDA targets for 2001 and then
19 later for 2002.
20     Q.   And when was the last of the
21 curative disclosures that took place?
22     A.   In terms of inability to meet
23 EBITDA targets and declining ad revenue I took
24 the analysis out to March and April of 2002.

TSG Reporting - Worldwide    877-702-9580

Page 94

S. HAKALA

1
2  **Q.   Okay.  So it took 14 months for**
3  **that information to be cured in the market; is**
4  **that right?**
5      A.   To be fully --
6          MR. HALL:  Objection.
7      A.   -- fully cured.  But the first
8  really significant curative disclosures really
9  begin around July 18th of 2001.
10     **Q.   But in total it took dozens of**
11 **disclosures to cure that; is that right?**
12         MR. HALL:  Objection.
13     A.   Incrementally, yes.
14     **Q.   And during this time period, other**
15 **analysts, they were becoming aware of this**
16 **issue or how is it that -- what was the role**
17 **of other analysts in exposing this alleged**
18 **omission?**
19     A.   Well, the role of certain analysts
20 was that certain analysts were raising these
21 issues and making similar statements and as
22 such they were partially corrective because
23 they were revealing a portion of the relative
24 truth at various points in time.
25         But what I did to handle that was

Page 95

S. HAKALA

1
2  I put a weight on each time an analyst or the
3  company made affirmative statements that I
4  believed were inflationary in nature.
5      **Q.   And what was that weight?**
6      A.   About .134.
7      **Q.   That was the same weight for each**
8  **one?**
9      A.   For each one, yes.  Except for
10 when CSFB spoke.
11     **Q.   So you treated those all as**
12 **equivalent?**
13     A.   Yes.
14     **Q.   Okay.  Do you believe that they**
15 **all would be equivalent or is that just some**
16 **kind of shorthand that was helpful for your**
17 **analysis?**
18     A.   I think they were helpful.  I'm
19 not sure that they're all entirely equivalent.
20 There are some alternatives that a jury or a
21 judge may consider.  But I think in light of
22 the facts of the case and the circumstances it
23 was the best assumption of the alternatives I
24 considered.
25     **Q.   Many of these analysts who were**

Page 96

**S. HAKALA**

1
2  **curing the omission from Credit Suisse, these**
3  **were the same analysts who had higher price**
4  **targets than Credit Suisse at the beginning of**
5  **the class period?**
6          MR. HALL:  Objection.
7      A.   Some did.  Many did not.
8      **Q.   Okay.  And some maintained price**
9  **targets that were higher than Credit Suisse**
10 **even as they were making these curative**
11 **disclosures; is that right?**
12     A.   At least on the advertising on the
13 EBITDA side, that's correct.  Frankly, I was
14 more concerned with revenue and EBITDA than
15 with price targets, but, yes.
16     **Q.   How many corrective disclosures**
17 **did you find in the In Re. AOL case; do you**
18 **remember?**
19         MR. HALL:  Objection.
20     A.   No.
21     **Q.   Do you remember how many of those**
22 **corrective disclosures related to advertising**
23 **revenue?**
24         MR. HALL:  Objection.
25     A.   I didn't focus on that issue in

Page 97

S. HAKALA

1
2  that context.  I focused on disclosures which
3  revealed the revenue truth regarding
4  advertising that was concealed by the fraud
5  which was accounting.  So the answer is no.  I
6  think the earliest corrective disclosures were
7  October of 2000.  And some of the primary
8  corrective disclosures may have been in the
9  spring and I think the July 18, 19, 2001 were
10 viewed as partially corrective.
11     **Q.   So did you view -- with respect to**
12 **advertising you view this as a fraud that CSFB**
13 **committed that AOL may not necessarily have**
14 **committed, is that right?**
15         MR. HALL:  Objection.
16     A.   They may have committed.  But it's
17 a different claim and it's a different case.
18 AOL committed it by in a sense manufacturing
19 revenue and misstating earnings and revenue in
20 its AOL division specifically with regard to
21 advertising.  Whereas here, we're talking
22 about CSFB putting out analyst reports at a
23 time where they knew, had reason to know that
24 the guidance given by AOL was not true.
25     **Q.   Okay.  And I guess my question is**

S. HAKALA

1  but does that mean that AOL knew that its
2  guidance wasn't true for the same reason or
3  not necessarily?
4      A.   I didn't investigate that.  AOL,
5  as you're aware, at least the part I worked
6  on, settled while discovery was ongoing.  So I
7  never really got that far.
8      Q.   But if Laura -- I guess my
9  question is if Laura Martin figured out that
10 AOL couldn't meet its numbers, is it possible
11 that AOL did not figure that out?
12     MR. HALL: Objection.
13     A.   No.  I don't really think so.  I
14 think AOL knew their numbers were cooked.
15     Q.   For the same reason.
16     A.   For the same reason and other
17 reasons.  I think they knew their numbers were
18 cooked for the same reasons Laura Martin knew
19 and then beyond what Laura Martin could know.
20 Or CSFB could know.  In other words, the
21 magnitude of the fraud in AOL was much greater
22 than what CSFB was aware of.  I have no doubt
23 of that.
24     Q.   Analysts -- you said that you have

S. HAKALA

1  some familiarity with analyst coverage; is
2  that correct?
3      A.   Yes.
4      Q.   Do analysts often hear rumors
5  about the companies they cover?
6      A.   Yes.
7      Q.   Especially with a large company
8  like AOL; is that right?
9      A.   Yes.
10     Q.   Did you read Mr. Kiggen's
11 deposition transcript with respect to what his
12 experience was with rumors?
13     A.   I don't remember it but I'm sure I
14 read it.
15     Q.   Okay.  And what is an analyst in
16 your view supposed to do with rumors they
17 receive?
18     MR. HALL: Objection.
19     A.   They should investigate them or
20 validate them.  If they're coming from
21 credible insiders they should be given weight
22 as though they're inside information.
23     Q.   Should they go ahead and publish
24 the rumors they receive?

S. HAKALA

1      MR. HALL: Objection.
2      A.   I haven't formed an opinion on
3  that.  I think generally if there are such
4  rumors they should at least acknowledge that
5  there are such rumors.  And that if they are
6  at all potentially material that they can't
7  issue a report without acknowledging these
8  risks.  Now, usually what they might say is
9  there is a rumor of this.  We haven't been
10 able to confirm it or we have obtained from a
11 reliable source.  But they should at least put
12 it out there.
13     And I have to say it's surprising
14 how often analysts do that.
15     Q.   Really?  Have you seen a lot of
16 instances of that?
17     A.   Oh, yeah.
18     Q.   Can you think of an instance in
19 the last year an analyst has done that?
20     MR. HALL: Objection.
21     A.   Not without going back.  I see it
22 all the time.
23     Q.   You see it all the time?
24     A.   Yeah.

S. HAKALA

1      Q.   Are you aware that the SEC has
2  stepped up enforcement against people --
3  analysts who are publishing rumors?
4      MR. HALL: Objection.
5      A.   Not if they're valid sources of
6  information, no.  What the SEC is enforcing is
7  fair disclosure violations.  Reg FD.  That's
8  different.  And I'm aware in a couple of cases
9  I'm working on that kind of circumstance.
10     Q.   And how is that different?
11     A.   That's different where a company
12 insider is leaking to an analyst that they're
13 going to miss earnings or have a particularly
14 good quarter ahead of time and the analyst
15 puts that out privately to his brokerage
16 group.
17     Q.   That's not what I'm talking about.
18 I'm talking about.  I'm talking about analysts
19 who are publishing rumors that they've heard
20 who are being -- who are facing regulatory
21 action from the SEC for publishing
22 unsubstantiated rumors.
23     MR. HALL: Objection.
24     A.   I've never heard of that.  And

Page 102

S. HAKALA

1    I've never heard of it saying as long as they
2    properly couch it as the support they have
3    I've also understood they have the same rights
4    as any other person reporting on a stock to
5    comment on what's moving the stock and what's
6    out there.
7        I'd be shocked if the SEC's
8    prosecuting that. Given that I'm now
9    occasionally interacting with the SEC I've
10   never heard of that. Most of the SEC stuff
11   I'm seeing them enforcing is like insider
12   trading. Violations of Reg FD. It's a very
13   different concept.
14      Q.   And what if the analyst isn't able
15   to confirm the rumor one way or the other?
16      MR. HALL: Objection.
17      A.   Well, if you're not able to
18   confirm -- I don't know. I mean, if there's a
19   resume and it has some validity and it's
20   weighing on a stock price I think it's
21   perfectly acceptable to say that there is a
22   rumor out there saying this and it appears to
23   have been affecting the stock price. We
24   haven't been able to confirm it. That's a

TSG Reporting - Worldwide    877-702-9580

Page 103

S. HAKALA

1    truthful statement. It's a material statement
2    to investors. I have seen that in numerous
3    reports. Lots of reports I've seen where
4    analysts do that.
5      Q.   Okay. But you can't think of any
6   off the top of your head?
7      A.   No. I haven't done a survey of
8   that but I know it happens done all the time.
9    In fact, it's a basis I have in my event
10   studies for identifying what was driving a
11   stock in a given time period and whether there
12   was leakage.
13      Q.   Leakage of what?
14      A.   Relevant truth. Because a lot of
15   times the rumors are really persons within the
16   company leaking out information concerning
17   potential improprieties, frauds, the company's
18   not doing well, et cetera. It's surprising
19   how often that happens.
20      Q.   Let's focus on the layoffs. In
21   your report you conclude that Credit Suisse
22   was aware of layoffs that were going to happen
23   at AOL; is that right? On July 10th, 2001?
24      A.   I assume that based on what the

TSG Reporting - Worldwide    877-702-9580

Page 104

S. HAKALA

1    information is that counsel has and based upon
2    my review of the information that CSFB knew of
3    layoffs that were planned of moderate severity
4    or grade in AOL.
5      Q.   Were you asked to assume that or
6   did you reach that assumption on your own?
7      MR. HALL: Objection.
8      A.   Well, I reached the assumption on
9   my own but it was part of the allegations in
10   the complaint. So it was not so much asked as
11   if I'm doing damages and that's an allegation
12   in the complaint then I would perform that
13   analysis based on those assumptions.
14      Q.   Okay. So let's take a look at I
15   think the e-mail that is the basis for your
16   assumption.
17      MR. GESSER: Okay. We're marking
18   this Hakala 5. And then -- and Hakala
19   6.
20      (Hakala Exhibit 5, document
21   bearing production number
22   CS-AOL_0020112, marked for
23   identification as of this date.)
24      (Hakala Exhibit 6, document

TSG Reporting - Worldwide    877-702-9580

Page 105

S. HAKALA

1    bearing production number
2    CS-AOL_0020110, marked for
3    identification as of this date.)
4    BY MR. GESSER:
5      Q.   Have you seen these e-mails
6   before?
7      A.   Yes.
8      Q.   And so Mr. Kiggen receives these
9   two e-mails regarding layoffs at AOL on July
10   10th and then July 11th, 2001. And based on
11   these e-mails you believe that Mr. Kiggen
12   should have disclosed this information?
13      MR. HALL: Objection.
14      A.   At some point. The next time the
15   report was issued.
16      Q.   And what should he have said?
17      MR. HALL: Objection.
18      A.   My understanding from the
19   complaint is he should have said he is aware
20   of layoffs of medium severity at AOL.
21      Q.   I'm sorry. Your understanding of
22   the complaint?
23      A.   What the complaint alleges. I'm
24   not an expert on the law. So I'm saying that

TSG Reporting - Worldwide    877-702-9580

Page 106

1    S. HAKALA
2  the next time the report was issued or at some
3  point they have a duty to disclose to the
4  public that they're aware that there are
5  layoffs of medium severity that the company is
6  not disclosing.
7      Q.   I'm sorry.  Let me see if I
8  understand what you're saying now.
9           You're saying that the damages
10 that you calculated are based on a failure to
11 disclose certain information but you're taking
12 no position on what that information was that
13 should have been disclosed?
14      MR. HALL: Objection.
15      A.   Other than what's set forth in the
16 complaint.
17      Q.   So you're assuming whatever is
18 alleged in the complaint as -- should have
19 been disclosed to be true.
20      A.   Yes.
21      MR. HALL: Objection.
22      Q.   And you're not making any
23 independent assessment of that.
24      A.   No.
25      MR. HALL: Objection.

TSG Reporting - Worldwide    877-702-9580

Page 107

1    S. HAKALA
2      A.   How can I?  I would be stepping in
3  the role of the judge and the jury.  That's
4  not the role of an expert on damages.
5      Q.   Okay.  So the assumptions that you
6  make in your report are assumptions that you
7  have been asked to make or you on your own
8  have decided to make in order to issue your
9  report?
10      MR. HALL: Objection.
11      A.   It's a combination of both.  It's
12 a conversation with counsel as to what should
13 I assume that they will prove.  What are the
14 facts they believe they will prove at trial.
15 And then based on that I do an analysis.
16      Q.   Okay.  And so were you asked to
17 assume that these layoffs were the layoffs
18 that actually were announced by AOL on August
19 13th?
20      MR. HALL: Objection.
21      A.   They weren't announced by AOL on
22 August 13th.
23      Q.   That were disclosed to the market
24 on August 13th?
25      A.   They were leaked to the market on

TSG Reporting - Worldwide    877-702-9580

Page 108

1    S. HAKALA
2  August 13th.  They weren't disclosed to the
3  market.
4      Q.   Okay.  And is that an assumption
5  that you have made or you were asked to make
6  or is that a conclusion you have reached?
7      A.   Both of the two former and not the
8  later.
9      Q.   I'm sorry.  Just for the sake of
10 clarity?
11      A.   It's an assumption I made.  It was
12 an assumption I was asked to make.  It is not
13 a conclusion I formed because I didn't believe
14 that it was my role to step into the role of
15 the finder of fact.
16      Q.   Did you do anything to test
17 whether that assumption was reasonable?
18      MR. HALL: Objection.
19      A.   I talked to counsel at length.  I
20 looked at the e-mails.  I looked at the other
21 information.  But beyond that, no.
22      Q.   So you're assuming based on the
23 complaint that Mr. Kiggen should have
24 disclosed -- I'm sorry.  And I cut you off.
25 What?

TSG Reporting - Worldwide    877-702-9580

Page 109

1    S. HAKALA
2      A.   That AOL was planning layoffs of
3  moderate severity and that this was an
4  indication that there was weakness in AOL.
5      Q.   Would that have been responsible
6  for him to disclose that?
7      MR. HALL: Objection.
8      A.   If he had a credible source, yeah.
9      Q.   Well, does he have a credible
10 source?
11      MR. HALL: Objection.
12      A.   Apparently.
13      Q.   Why do you say that?
14      MR. HALL: Objection.
15      A.   Just based on the e-mail from
16 Antonio Lorenzo it appears he has a good
17 source within AOL who's telling him what's
18 going on.
19      Q.   And so would he in his report have
20 to say I have -- I've heard from a source or
21 would he just say AOL its planning layoffs?
22      MR. HALL: Objection.
23      A.   I would probably assume that he
24 would be as specific as possible.
25      Q.   Okay.

TSG Reporting - Worldwide    877-702-9580

S. HAKALA

1
2    A.    Based on a source of information
3    it is our understanding that AOL's planning
4    layoffs of medium severity and that they will
5    not be announced publicly.  This could be
6    interpreted as a sign that AOL is struggling
7    or is not performing as well as expected and
8    might adversely affect the results or
9    projections of AOL.
10    Q.    After the merger were layoffs
11    anticipated?
12        MR. HALL:  Objection.
13    A.    Yes.  Some were.
14    Q.    Okay.
15    A.    But not in this area.
16    Q.    What area?
17    A.    AOL advertising.
18    Q.    How do you know the layoffs were
19    in AOL advertising?
20    A.    They were in AOL and AOL was
21    supposed to be growing.  The layoffs that were
22    anticipated were supposed to be more of cost
23    savings at a corporate overhead overlapping
24    roles and not within divisions.
25    Q.    Sorry.  What about his e-mails

TSG Reporting - Worldwide    877-702-9580

S. HAKALA

1
2    let's you know anything about where these
3    layoffs are taking place?
4        MR. HALL:  Objection.
5    A.    My assumption is that these are at
6    AOL, not AOL Time-Warner or the parent.
7    Q.    What makes you -- what's the basis
8    of your assumption?
9    A.    What actually happened.
10    Q.    What actually happened when?
11    A.    In terms of what layoffs AOL was
12    planning in this time period.
13    Q.    That's not my question.  I'm
14    asking you from Kiggen's point of view reading
15    these e-mails what would he know about the
16    layoffs?
17        MR. HALL:  Objection.
18    A.    I don't know.  I'm not going to
19    get into his mind.  I would assume that he
20    would know that the layoffs are in AOL.
21    Q.    Why?
22    A.    Because I would assume that he
23    would gather further information.
24    Q.    From who?
25    A.    From the person sending the

TSG Reporting - Worldwide    877-702-9580

S. HAKALA

1
2    e-mail.  And that in addition AOL was under
3    investigation from some employees for
4    inappropriate accounting activities.
5    Q.    Okay.  Let's leave that for a
6    second.  Let's stick with the layoffs.  So
7    let's start just from the e-mails themselves,
8    okay?  Forget follow-up.  Just from the
9    e-mails themselves what would Mr. Kiggen know?
10    Or what would you know from reading these
11    e-mails?
12    A.    Some, but not a lot.  Not without
13    following up and getting something on the
14    phone from this individual.
15    Q.    Let's probe that.  What is the
16    some that you would learn from these?
17        MR. HALL:  Objection.
18    A.    The layoffs were medium term in
19    severity.
20    Q.    What does that mean to you?
21    A.    That means that they were material
22    to the operations of AOL.
23    Q.    Why does medium mean that they
24    were material to the operations of AOL?
25        MR. HALL:  Objection.

TSG Reporting - Worldwide    877-702-9580

S. HAKALA

1
2    A.    If they were minor or a few people
3    it would be significant but medium term in
4    severity means you're laying off people
5    because you don't have enough business or
6    volume.
7    Q.    Where do you get that from?
8        MR. HALL:  Objection.
9    A.    Just my inference from the tone of
10    that.
11    Q.    Have you read Mr. Lorenzo's
12    transcript?
13    A.    No.
14    Q.    Do you know what Mr. Lorenzo
15    said --
16    A.    I'm sorry.  I may have read it but
17    I didn't -- I don't know.  It's been a long
18    time since I reviewed it.
19    Q.    Do you remember thinking that --
20    you've reached a conclusion what medium yet.
21    Would it matter what Mr. Lorenzo meant when he
22    wrote medium?
23        MR. HALL:  Objection.
24    A.    I don't know.  I don't know.  I
25    don't remember.

TSG Reporting - Worldwide    877-702-9580