Page 114

S. HAKALA

Q. If Mr. Lorenzo said that he thought medium was insignificant would that affect your conclusions in this case?

MR. HALL: Objection.

A. It might. I don't know why you'd use a term medium if it's insignificant. Medium doesn't imply insignificant to a reader.

Q. But what Mr. Lorenzo, the author of the e-mail, said may be insignificant in terms of what -- interpreting that word?

MR. HALL: Objection.

Q. But you don't remember what he said about it.

A. I don't.

Q. All right. Sorry. So you would know that there were layoffs and what else would you know from this e-mail. Would you know where those layoffs were taking place?

A. My assumption is it was at AOL but not Time-Warner corporate.

Q. But I'm saying that from the e-mail would allow you to reach that assumption?

TSG Reporting - Worldwide    877-702-9580

Page 115

S. HAKALA

MR. HALL: Objection.

A. I don't know. I don't know. I don't remember how I drew that conclusion.

Q. Okay. But is it possible from these e-mails that one can conclude that these layoffs were negative for the company?

MR. HALL: Objection.

A. Possibly, yes.

Q. Is it possible to conclude that these layoffs were positive?

MR. HALL: Objection.

A. It's unlikely they're positive unless they were cost savings or synergy related.

Q. And what makes you think that they weren't cost saving or synergy related based on these e-mails?

A. Because of the way that they're written. Because the suggestion in this time period is that the layoffs were because of a slowing of demand.

Q. Where does that come from?

MR. HALL: Objection.

A. Other information that -- in other

TSG Reporting - Worldwide    877-702-9580

Page 116

S. HAKALA

e-mails.

Q. From who?

A. And just general market information. I mean the synergy cost savings that we're talking about from merging the two companies, those were already in the works before the merger had been completed. And most of those had already been pretty much absorbed by March.

Q. So you would assume if you saw this e-mail at this time that the layoffs would be negative?

A. Yeah. And I think the market assumed it as well.

Q. How long would it take a company like AOL to extract the synergies from a merger?

MR. HALL: Objection.

A. Well, to really extract and realize merger synergies can take up to a year. But in terms of the layoffs and the planned layoffs usually if a merger has been in the works for one year you may know exactly how much you're going to do within a month or

TSG Reporting - Worldwide    877-702-9580

Page 117

S. HAKALA

even before the merger closes.

Q. How many employees did AOL have?

MR. HALL: Objection.

A. Oh, tens of thousands.

Q. 90,000? Does that sound about right?

A. Possibly.

Q. So it may take some time to work through all the synergies with a 90,000 employees work force.

MR. HALL: Objection.

A. It might. It might. Retrospectively these were not synergistic layoffs or cost-saving layoffs.

Q. That's not what I'm asking, though. I'm asking what you would learn from the e-mails.

MR. HALL: Objection.

Q. I mean, you're telling me that Kiggens should have disclosed these and I'm trying to probe as to what it is he would have said about them.

A. No, I'm saying that that's alleged in the compliant that this was material affair

TSG Reporting - Worldwide    877-702-9580

Page 118

S. HAKALA

1
2  information.  I don't think there's any
3  question that layoffs of medium severity in a
4  company is material information.  It's listed
5  in certain -- in the Federal Register as
6  material information.  In one of the sources
7  that I site in my report.
8      Q.   Okay.  No, I'm just wondering
9  what --
10     A.   So it's something that you would
11 want to know.  Whether it's positive or
12 negative depends on what spin you put on it.
13     Q.   Okay.  So now that we've
14 decided -- we got through what you think these
15 say, so what should Mr. Kiggen have disclosed?
16         MR. HALL: Objection.
17     A.   That he is aware that there are
18 layoffs and planned layoffs at AOL.
19     Q.   That he's aware of or that his
20 source is telling him?
21         MR. HALL: Objection.
22     A.   Could be that they have sources
23 telling them.  Depends how solid the
24 information is.
25     Q.   Okay.  Well -- all right.  What

Page 119

S. HAKALA

1
2  else?
3      A.   This may be indication of weakness
4  in the operations of AOL.
5      Q.   And on what basis would they make
6  that conclusion?
7          MR. HALL: Objection.
8      A.   The fact that they're laying off
9  people.
10     Q.   But he has no idea how many
11 people, right?
12         MR. HALL: Objection.
13     A.   Well, I mean, you're assuming that
14 this is the sum and substance of what he knows
15 and that he didn't make any effort to
16 investigate from Anthony Lorenzo what the
17 meaning of his contact was.
18     Q.   Do you know who his con --
19 Lorenzo's contact was?
20     A.   No.
21     Q.   Did you read Sarah Bernard's
22 transcript?
23     A.   Oh, well, I may have but I don't
24 remember.  I didn't prepare for this
25 deposition.

Page 120

S. HAKALA

1
2      Q.   Do you know who Mr. Lorenzo -- do
3  you know the title of Mr. Lorenzo's source at
4  AOL?  Do you know whether ---
5      A.   No.
6          MR. HALL: Objection.
7      Q.   Okay.  Suppose Mr. Lorenzo's
8  source was a 25-year-old junior employee at
9  AOL.
10         MR. HALL: Objection.
11     A.   So --
12     Q.   Would that change the nature of
13 whether or not the information should be
14 disclosed?
15         MR. HALL: Objection.
16     A.   Not necessarily.
17     Q.   Okay.
18     A.   It may be the best source.
19     Q.   Because someone like that may know
20 non-public information about the company?
21         MR. HALL: Objection.
22     A.   Sure.
23     Q.   You believe that these layoffs
24 that are referred to in this e-mail are
25 layoffs that were leaked in a Wall Street

Page 121

S. HAKALA

1
2  Journal article on August 13th; is that right?
3          MR. HALL: Objection.
4      A.   That's my assumption.
5      Q.   Okay.  And did you do anything to
6  test that assumption?
7      A.   Other than speaking with counsel,
8  no.
9      Q.   And you're aware that on July 11th
10 there was a Washington Post article announcing
11 layoffs at AOL; is that right?
12     A.   Yes.
13     Q.   Okay.
14     A.   It's in my event study, in fact, I
15 think.  And it had a negative effective on the
16 stock price I believe.
17     Q.   Did it have a negative effect on
18 the stock price according to your report in
19 your class certification?
20     A.   I don't know if I picked it up
21 then.  I probably didn't pick it up until
22 later.
23     Q.   Okay.
24     A.   I remember doing -- after I did
25 class cert I remember going through LexisNexis

S. HAKALA

1  and finding additional information and news
2  and I remember that was an event I added later
3  on.
4  MR. GESSER: Let's mark this
5  Hakala 7.
6  (Hakala Exhibit 7, Washington Post
7  article dated July 11, 2001, marked for
8  identification as of this date.)
9  BY MR. GESSER:
10  **Q. If you look at Hakala 5 it says,**
11  **"I have a source at AOL and apparently the**
12  **company had some layoffs today."**
13  **Do you see that?**
14  A. Yeah.
15  **Q. And that day is what?**
16  A. July 10th.
17  **Q. Okay. And then if you look at**
18  **Hakala 7, it's the Washington Post article, it**
19  **said, "Yesterday AOL Time-Warner laid off**
20  **about 30 people in it's on-line marketing**
21  **division."**
22  A. Yes.
23  **Q. So yesterday would be July 10th,**
24  **2001; is that right?**

S. HAKALA

1  A. Yes.
2  **Q. Okay. So -- and you don't know**
3  **who Mr. Lorenzo's source was, is that right?**
4  A. That's correct.
5  **Q. Okay. So what makes you think**
6  **that these layoffs that are announced here on**
7  **this July 11th Washington Post article are not**
8  **the layoffs referred to in Mr. Lorenzo's**
9  **e-mail from July 10th?**
10  MR. HALL: Objection.
11  A. All I know is discussions from
12  counsel about other information that they had.
13  However --
14  **Q. That who had?**
15  A. That counsel had.
16  I don't know for sure one way or
17  the other whether this was. In fact, this was
18  a discussion I had with counsel of how do I
19  know that this isn't the layoffs that's talked
20  about.
21  **Q. And let me -- what's your best**
22  **guess?**
23  MR. HALL: Objection.
24  A. I don't have one.

S. HAKALA

1  **Q. You don't have a view?**
2  A. I don't have a view.
3  **Q. But your report estimates damages**
4  **and makes a series of assumptions that these**
5  **layoffs were not disclosed until August 13th.**
6  **And so I'm asking you why do you say that, why**
7  **do you think that these layoffs weren't**
8  **disclosed on July 11th?**
9  MR. HALL: Objection.
10  A. Because of conversations with
11  counsel and what's alleged in the compliant.
12  **Q. But this is your report. You**
13  **can't claim privilege. What is the basis for**
14  **your assumption that the August 13th is the**
15  **first disclosure of these layoffs?**
16  MR. HALL: Objection.
17  A. I'm not claiming privilege. I'm
18  saying -- I'm saying I'm not a finder of fact
19  and I had a discussion with counsel about what
20  counsel's basis was --
21  **Q. So tell me about that discussion.**
22  **What did counsel tell you that made you think**
23  **that the August 13th was the disclosure?**
24  MR. HALL: Objection.

S. HAKALA

1  A. We had a discussion about what
2  their understanding was of what was known and
3  when it was known and what it was.
4  **Q. Okay. And --**
5  A. And the 30 layoffs was not the
6  full extent of what was disclosed and what was
7  available. My sense is if that's the
8  assumption, here's the damages. If that's
9  not, then those damages wouldn't exist.
10  **Q. In your report do you indicate**
11  **there's any doubt or uncertainty as to when**
12  **those layoffs were disclosed?**
13  MR. HALL: Objection.
14  A. Under the assumptions of the
15  plaintiffs, no. But I don't say one way or
16  the other whether I make any conclusion on
17  this issue.
18  **Q. You don't?**
19  A. No.
20  **Q. Okay. So let me see if I**
21  **understand what you're now saying. You're now**
22  **saying that you have no view one way or the**
23  **other as to whether the layoffs were disclosed**
24  **on July 11th or August 13th; you were -- just**

Page 126

S. HAKALA

1
2   assumed that to be the case and if that was
3   the case you provided a damage analysis.
4       MR. HALL: Objection.
5       A.   That's generally correct.
6   However, I made some investigation with
7   counsel to satisfy myself that they believed
8   that they could establish that these layoffs
9   were not the sum and substance of the total
10  amount of information disclosed.
11      Q.   Okay. And what is then that
12  information that would suggest to you that
13  there is any possibility that these layoffs
14  are the layoffs that were actually disclosed
15  on August 13th?
16      MR. HALL: Objection.
17      A.   I don't know. I don't remember
18  the conversation other than --
19      Q.   You don't remember the
20  conversation?
21      A.   Other than what assumptions should
22  I assume for purposes of calculating damages.
23      Q.   Okay. And what's that assumption?
24      A.   The assumption was that layoffs
25  were going to be made in AOL of medium

Page 127

S. HAKALA

1
2   severity and that that was beyond just merely
3   30 workers. And that the extent of that was
4   partially revealed later on.
5       Q.   Okay. And so it's the fact that
6   it's a medium -- it's medium severity sounds
7   more than 30, that's it?
8       MR. HALL: Objection.
9       A.   Sounds like more than 30 and there
10  were other discussions I had with counsel and
11  I don't remember all the facts they laid out
12  for me.
13      Q.   Okay. Did they lay out the fact
14  that the source at AOL was a fairly junior
15  employee?
16      MR. HALL: Objection.
17      A.   I don't remember that.
18      Q.   Did they lay out the fact for you
19  that she was in the division in which the
20  layoffs were announced on July 11th?
21      A.   I don't.
22      MR. HALL: I don't know.
23      A.   I don't remember that.
24      Q.   Okay. So let me see if I
25  understand. So you think it's plausible that

Page 128

S. HAKALA

1
2   the August 13th layoffs are the layoffs that
3   are referred to in Mr. Lorenzo's e-mail; is
4   that right?
5       A.   No. I have no doubt that the
6   layoffs on July 11th represent part of what's
7   in the e-mail. That's not what I'm saying.
8   I'm not saying that these are not part of the
9   layoffs.
10          What I'm saying is that there was
11  more information that AOL was planning for
12  layoffs than just this 30.
13      Q.   Okay. And how --
14      A.   And that the layoffs were going to
15  be of medium severity.
16      Q.   And how was Mr. Kiggen supposed to
17  realize that?
18      MR. HALL: Objection.
19      A.   I don't know. Again, you're
20  trying to try liability and facts with a
21  damages expert who's been asked to estimate
22  damages based on the assumptions in the
23  complaint.
24      Q.   I'm trying --
25      A.   And you're trying to force me to

Page 129

S. HAKALA

1
2   do something that you know full well I'm not
3   required to do and I'm not supposed to do.
4       Q.   I am testing the assumptions on
5   which your damage analysis was based. And one
6   of your key assumptions is that information
7   that was known to Mr. Kiggen on July 11th was
8   not disclosed and was subsequently disclosed
9   on August 13th.
10      A.   Right.
11      Q.   And I'm testing that assumption
12  because I think that assumption is completely
13  without any merit.
14      MR. HALL: Objection.
15      A.   Then argue that in summary
16  judgment with counsel over here. Not with me.
17      Q.   No, but you present that
18  assumption as a factual determination that
19  you've made. If that's not the case then
20  that's fine.
21      A.   Why do I say that's a factual
22  determination I made?
23      Q.   You say that's a conservative
24  assumption in your report. But let me --
25      A.   A conservative assumption based on

Page 130

```
 1          S. HAKALA
 2  the assumption that I set forth in my report.
 3      Q.   Okay.  I'm just asking you is it
 4  reasonable to assume that a low level AOL
 5  employee would know about thousands of layoffs
 6  a month before they occurred and that she
 7  would be able -- that that information would
 8  not get leaked?
 9          MR. HALL:  Objection.  And, Avi,
10      I've been very polite here and I'm not
11      going to talk too long because I don't
12      want to do that but you keep going over
13      this point.  I think it's very clear
14      that that is an argument that you will
15      get to make to a jury.  We'll argue
16      about that.  And from the way Mr.
17      Hakala -- Dr. Hakala has done his
18      report, if you're successful in proving
19      to a jury that that's the case, then the
20      damages associated with that may be
21      affected.  But for Dr. Hakala to
22      determine that as a finding of fact is
23      inappropriate.  I think he lays out very
24      clearly what his assumptions are as do
25      all the experts in this case including
```
TSG Reporting - Worldwide    877-702-9580

Page 131

```
 1          S. HAKALA
 2  Dr. Stoltz.
 3          MR. GESSER:  Dr. Stoltz indicates
 4      when he's been instructed by counsel to
 5      make assumptions.  Dr. Hakala makes
 6      assumptions that are -- that he at least
 7      represents in his report are based on
 8      his own independent assessment of the
 9      facts.  And I'm testing to see
10      whether -- because if those assumptions
11      are not valid -- Donny, let me finish --
12      if those assumptions aren't valid then
13      his report isn't valid and then when we
14      move to strike him that'll be relevant.
15      Okay?  So --
16          MR. HALL:  But I think Dr. Hakala
17      has also testified -- and you don't need
18      to raise your voice -- I think Dr.
19      Hakala has also testified in this
20      deposition that his assumptions are
21      based on instruction of counsel and
22      based on what's in the compliant
23      assuming plaintiffs are able to prove
24      their case.
25          MR. GESSER:  Well, that's a new
```
TSG Reporting - Worldwide    877-702-9580

Page 132

```
 1          S. HAKALA
 2  revelation that I just got in the last
 3  half hour and it's very helpful to me
 4  and I will act accordingly but I need to
 5  test that for each of the assumptions
 6  that he's made.
 7      A.   With all due respect, paragraph 5
 8  at the preface makes it very clear that this
 9  is from counsel.  And it's an assumption, not
10  a conclusion.
11          MR. HALL:  Right.
12      A.   And the fact that I cite from the
13  complaint for those assumptions should also
14  have clued you in that that's where I got it
15  from.
16      Q.   Okay.  I just want to test a
17  couple of these assumptions just so I get a
18  sense of whether or not you -- because the
19  last time we went over this, if you recall at
20  class certification, you were very certain
21  that the August 13th report were related to
22  these layoffs.  The layoffs that were
23  announced on August 13th were the same layoffs
24  that Mr. Lorenzo is referring to.  That's --
25  we had this exchange about a year ago and now
```
TSG Reporting - Worldwide    877-702-9580

Page 133

```
 1          S. HAKALA
 2  I'm hearing a sort of a different story so
 3  that's why I want to get to the bottom of
 4  this.
 5          MR. HALL:  Objection.
 6      A.   That's fine.  If you want to
 7  establish whether I'm going to testify to a
 8  fact of that nature I'm perfectly happy to
 9  tell you I'm not.
10      Q.   Okay.  And I want to go beyond
11  that and I want to test whether you think that
12  assumption is reasonable or not.  That's where
13  I'm at now.  Do you understand?  And if you
14  want to tell me that assumption may not
15  reasonable, I just don't know, then you can
16  just say that and then we'll move on.
17          MR. HALL:  Objection.
18      A.   I think I've already said I don't
19  know one way or the other.
20      Q.   You don't know one way or the
21  other whether that's a reasonable assumption
22  or not.
23      A.   I don't know -- it's a reasonable
24  assumption given what counsel indicated to me
25  but I don't know one way or the other whether
```
TSG Reporting - Worldwide    877-702-9580

Page 134

S. HAKALA

1
2 assumption is true or not and I didn't make
3 that determination. And I've made that clear.
4    Q.   Okay. So let's just go through
5 it. That's a reasonable assumption based on
6 what you were told by counsel. It's a
7 reasonable assumption because you think that
8 medium severity means more than 30 and what
9 else?
10    MR. HALL: Objection.
11    A.   That it would not be announced
12 publicly by AOL.
13    Q.   Okay. Which it wasn't. Then the
14 report the next day from the Washington -- in
15 the Washington Post is an announcement by AOL.
16 It looks like a leak of some kind, right?
17    A.   Yes.
18    Q.   All right.
19    A.   Or the people being laid off
20 basically telling the Washington Post. It may
21 not even be a leak at that point.
22    Q.   Okay. What else?
23    MR. HALL: Objection.
24    A.   That's all I know.
25    Q.   That's all you know.

Page 135

S. HAKALA

1
2    Okay. Now, the August 13th
3 announcement, those are layoffs that are being
4 announced for the future, right? Not a layoff
5 that actually happened?
6    A.   Yes.
7    Q.   Correct. And those layoffs, do
8 you know where they took place?
9    MR. HALL: Objection.
10    A.   Generally in AOL.
11    Q.   But where physically?
12    A.   I don't know.
13    Q.   Okay. If I represent --
14    A.   I think some of them were in
15 Washington. Some of them were in other
16 places.
17    Q.   Do you know where Anthony
18 Lorenzo's source was physically located?
19    MR. HALL: Objection.
20    A.   No.
21    Q.   She was in New York.
22    A.   Okay.
23    Q.   Is it reasonable for a junior
24 employee at AOL in New York to know about
25 layoffs occurring in other areas and other

Page 136

S. HAKALA

1
2 divisions a month before they occurred?
3    MR. HALL: Objection.
4    Q.   Does that seem plausible to you?
5    MR. HALL: Objection.
6    A.   It's entirely possible that
7 somebody in any division would know that
8 there's going to be layoffs system-wide and
9 that they're actively looking at system-wide
10 layoffs.
11    Q.   A junior employee?
12    A.   Oh, yeah. I mean, in any
13 corporation you would.
14    Q.   That would be kept non-public for
15 more than a month?
16    MR. HALL: Objection.
17    A.   In some cases, yeah.
18    Q.   Do you know if that is consistent
19 with Mrs. -- with Ms. Bernard's testimony in
20 this case?
21    A.   I don't know.
22    Q.   All right.
23    Again, you indicated that you have
24 some experience with analysts -- analysts and
25 their duties. If Mr. --

Page 137

S. HAKALA

1
2    A.   Not just some.
3    Q.   A lot.
4    A.   Yeah.
5    Q.   Okay. So if Mr. Kiggen gets these
6 e-mails and the next day he sees this Wall
7 Street Journal article that announces the
8 layoffs, any reason for him not to assume that
9 these are the same layoffs?
10    MR. HALL: Objection.
11    A.   I don't know one way or the other.
12    Q.   You don't know whether it would be
13 reasonable for him to assume that's the same
14 layoffs?
15    MR. HALL: Objection.
16    A.   It's plausible but it wasn't my
17 basis to -- I didn't look into that. But it's
18 plausible it might be but it might not be. I
19 just don't know.
20    Q.   Okay. Well, why might it not be?
21    A.   There may be more information
22 behind these e-mails.
23    Q.   More information that who had?
24    A.   That Kiggens had, that Lorenzo had
25 that AOL was in the process of looking at and

Page 138

S. HAKALA

1 planning greater layoffs going forward.

2     **Q. But you haven't seen any evidence**

3 **of that.**

4     A. No.

5     **Q. Not in any of the deposition**

6 **transcripts, not in any of the other e-mails?**

7     A. (Witness nods.)

8     **Q. So assuming that this is all that**

9 **Mr. Kiggen saw, he saw these e-mails and the**

10 **Washington Post article, reasonable for him to**

11 **assume that the layoffs were the layoffs**

12 **announced in the Washington Post article?**

13       MR. HALL: Objection.

14     A. Might be.

15     **Q. Might be.**

16     A. Yeah, might be.

17     **Q. Okay. Let's look at the second**

18 **part of that e-mail which is Hakala 6. It**

19 **says, "In addition, I wasn't aware that AOL**

20 **was under investigation and had suspended some**

21 **employees for inappropriate accounting**

22 **activities."**

23       **In your report you assume that**

24 **this was material non-public information that**

Page 139

**S. HAKALA**

1 **Kiggen acquired through this e-mail; is that**

2 **correct?**

3     A. Yes.

4     **Q. And that this information remained**

5 **non-public until July of 2002; is that right?**

6     A. Yes.

7     **Q. And that the damages that were**

8 **attributable to Credit Suisse are the damages**

9 **that result from the disclosure of accounting**

10 **irregularities at AOL in July of 2002; is that**

11 **correct?**

12     A. Partial. Yeah.

13     **Q. Partial.**

14     A. Only partial of the damages

15 associated with that. I didn't assume all.

16     **Q. Okay. What percentage did you**

17 **assume?**

18     A. About 14.2 percent.

19     **Q. Why did you assume 14.2 percent?**

20     A. I looked at the minimum effect of

21 net disclosure of the nonaccounting issues

22 based on the net effect of the two-day report

23 in the Washington Post as a third-party

24 disclosure of this issue. And then prorated

Page 140

S. HAKALA

1 it across the three disclosures. Washington

2 Post first disclosed these unconventional

3 transactions in a series of two exposes and

4 then the company finally acknowledged that

5 they were under investigation on the evening

6 of the 2004 of July.

7     **Q. They were under investigation by**

8 **the Securities & Exchange Commission?**

9     A. I believe so, yes.

10     **Q. Do you have any idea whether the**

11 **investigation occurred -- when that**

12 **investigation started?**

13       MR. HALL: Objection.

14     A. I believe it started in --

15 sometime in the spring of 2001 at the earliest

16 in connection with the Purchase Pro and some

17 other things.

18     **Q. Okay.**

19     A. I think we know that from some of

20 the Purchase Pro issues and from I think the

21 Justice Department Fair Funds issues that have

22 come out.

23     **Q. Okay.**

24     A. I remember I did the Plan of

Page 141

S. HAKALA

1 Allocation for the Justice Department and they

2 wanted me to assume damages beginning sometime

3 in that time period. Or it was before that.

4     **Q. So we're going to go through the**

5 **same thing and if your answer is that you did**

6 **nothing to test this and you just assumed it**

7 **to be true, then maybe you should just say it**

8 **at the outset. But what was your basis for**

9 **assuming that this information was not public**

10 **at the time?**

11       MR. HALL: Objection.

12     A. I did a lot of research on whether

13 it was public both previously and otherwise.

14 And while there was knowledge of an

15 investigation of Purchase Pro and maybe AOL's

16 role with Purchase Pro there was no knowledge

17 that AOL itself was under investigation that I

18 was aware of. Certainly not of this magnitude

19 nor that AOL had actually let go employees and

20 been involved in inflating revenue. I wasn't

21 aware of any information about that until July

22 of '02 and I think in fact the defendants in

23 the AOL Time-Warner made that argument.

24     **Q. Okay. Now, so that leads you to**

Page 142

S. HAKALA

1
2  conclude that this source of Mr. Lorenzo had
3  material non-public information about an
4  investigation of AOL; is that right?
5      A.   Yes.
6      Q.   Okay.  Have you -- again, you
7  haven't read Ms. Bernard's transcript?
8      A.   If I have I don't remember doing
9  it.
10     Q.   Okay.  And anything about Ms.
11 Bernard would lead you to believe that she was
12 in a position to know material non-public
13 information about an investigation of AOL?
14         MR. HALL:  Objection.
15     A.   I don't know one way or the other.
16     Q.   Why isn't that something that you
17 looked at?
18         MR. HALL:  Objection.
19     A.   I was worried about estimating
20 damages based on what was pled in the
21 complaint.
22     Q.   So then why did you bother looking
23 at the Purchase Pro information?
24         MR. HALL:  Objection.
25     A.   I wanted to understand information

TSG Reporting - Worldwide   877-702-9580

---

Page 143

S. HAKALA

1
2  about when the market knew and what the market
3  knew about potential accounting improprieties
4  by AOL.  My knowledge of that really predates
5  this case.  It has to do with work that I was
6  doing in AOL Time-Warner Securities Litigation
7  and then subsequent work I was doing in
8  assisting in preparing the Plan of Allocation
9  as a tag-along to the distribution of the
10 funds in the AOL Time-Warner Securities
11 Litigation.
12     Q.   So when you were deposed in our --
13 in class certification you were aware of the
14 Purchase Pro investigation and that it was
15 publicly disclosed before July 11th, 2001?
16         MR. HALL:  Objection.
17     A.   Not AOL's role.  Only Purchase
18 Pro.
19     Q.   Okay.
20     A.   No one made the connection to AOL
21 that I remember in that time period.  Or if
22 they did they didn't make the connection that
23 AOL itself was engaged in anything.
24     Q.   Mr. Lorenzo says, "I wasn't aware
25 that AOL was under investigation."

TSG Reporting - Worldwide   877-702-9580

---

Page 144

S. HAKALA

1
2      A.   Yes.
3      Q.   Does that suggest that Mr. Kiggen
4  was aware of that?
5          MR. HALL:  Objection.
6      A.   I don't know.
7          MR. GESSER:  We're marking Hakala
8  Exhibit 8.
9          (Hakala Exhibit 8, Washington Post
10 article dated June 19, 2001, marked for
11 identification as of this date.)
12 BY MR. GESSER:
13     Q.   So let's go through this one at a
14 time.  Suspended some employees.  Okay?
15     A.   Yes.
16     Q.   It says, "An America Online
17 executive has been placed on administrative
18 leave."
19         Is that the same as being
20 suspended?
21         MR. HALL:  Objection.
22     A.   I guess.
23     Q.   It says, "At least one other
24 low-level employee was put on administrative
25 leave."

TSG Reporting - Worldwide   877-702-9580

---

Page 145

S. HAKALA

1
2          MR. HALL:  Objection.
3      A.   Okay.
4      Q.   Is that right?
5      A.   Okay.
6      Q.   So for that part of the e-mail
7  that AOL -- that employees had been suspended
8  is that consistent with information that was
9  already in the market?
10         MR. HALL:  Objection.
11     A.   With regard to the Purchase Pro
12 they're assisting or aiding and abetting in
13 Purchase Pro, yes.  But I believe that any
14 knowledge that there had been any impropriety
15 in AOL, that was not known.
16     Q.   I'm sorry.  These were AOL
17 employees, correct?
18     A.   Right.
19     Q.   And these are AOL employees who
20 were placed on administrative leave, right?
21     A.   Right.
22     Q.   Okay.
23     A.   But not for their actions in AOL.
24     Q.   Are they Purchase Pro employees?
25     A.   No.

TSG Reporting - Worldwide   877-702-9580

Page 146

S. HAKALA

1
2      Q.    Okay.  So it's in their capacity
3  as AOL employees that they're being put on
4  suspension, right?
5          MR. HALL: Objection.
6      A.    Right.
7      Q.    And it talks about an
8  investigation; is that right?
9      A.    Yes.
10     Q.    And is the investigation relating
11 to accounting activities?
12         MR. HALL: Objection.
13     A.    At Purchase Pro. I don't believe
14 it is at AOL at all.  It says probe is focused
15 on accounting issues related to Purchase Pro
16 and then it says all rev --
17     Q.    Related to Purchase Pro.
18     A.    It says all revenues related to
19 Purchase Pro have been accounted for
20 appropriately and accurately by AOL.
21     Q.    Okay.  So you view these as being
22 different.  Is that what you're saying?
23         MR. HALL: Objection.
24     A.    My understanding is that this
25 relates to two employees being implicated in

Page 147

S. HAKALA

1
2  possibly aiding and abetting in some
3  accounting issues at Purchase Pro where
4  Purchase Pro was under investigation.
5          But at this point AOL and others
6  had specifically said AOL was not under
7  investigation and AOL -- there was no
8  indication that AOL had done anything
9  improper.  That was my understanding.  Not
10 just from this but from other documents.
11     Q.    But you're telling me that this --
12 you view this June 19th e-mail as being that
13 AOL was not under investigation, that Purchase
14 Pro was under investigation; it's just that
15 AOL employees were under investigation?
16         MR. HALL: Objection.
17     A.    AOL employees were implicated in
18 the investigation of Purchase Pro but my
19 understanding was that there was no public
20 knowledge that AOL itself was under
21 investigation.  That only came out a year
22 later.  As far as I remember.
23     Q.    Here it says, "As a policy we
24 don't comment on employee matters."
25         That's the AOL statement, right?

Page 148

S. HAKALA

1
2      A.    Yes.
3      Q.    So what do you think that a
4  disclosure would look like if Mr. Kiggen
5  decided -- you believe that Mr. Kiggen should
6  have disclosed this information; is that
7  right?
8          MR. HALL: Objection.
9      A.    Yeah.  In some form.
10     Q.    Okay.  And what if Mr. Kiggen had
11 looked at this June 19th Washington Post
12 article and had said, Well, that looks like
13 this is already public?  Would that be a
14 reasonable conclusion for him to make?
15         MR. HALL: Objection.
16     A.    I don't know.  Not if it implies
17 only Purchase Pro was under investigation and
18 there was no impropriety at AOL and that AOL
19 was not under investigation, no.  But
20 otherwise, it might be.
21     Q.    But that's an interpretive issue
22 is what you're telling me; is that right?
23     A.    That's an issue for the jury and
24 the judge.  That's not my issue.
25     Q.    Okay.  So assuming that Mr. Kiggen

Page 149

S. HAKALA

1
2  came to the view that, oh, this sounds pretty
3  similar, it may not be the exact same thing
4  that I'm getting from this e-mail and assuming
5  Mr. Kiggen made inquiries at AOL, couldn't get
6  anymore information, what should he have
7  disclosed in this report?
8          MR. HALL: Objection.
9      A.    I haven't thought about that.
10 Other than, you know, what I assumed based on
11 the complaint.  I don't know.  I'd have to
12 think about that some more.  Probably at a
13 minimum that AOL was involved in -- apparently
14 was involved in some activities with Purchase
15 Pro and that this may have some implications
16 for AOL.
17     Q.    How would he reach that
18 conclusion?
19         MR. HALL: Objection.
20     A.    Two employees were placed on
21 administrative leave.
22     Q.    But there's no indication that
23 it's related to Purchase Pro, is there?
24         MR. HALL: Objection.
25     A.    Yeah.

Page 150

S. HAKALA

1
2    Q.   Where's that?
3        A.   It's in this Washington Post
4    article.
5        Q.   Oh.  But now you're saying that it
6    would be reasonable for Kiggen to link these
7    two things together?
8            MR. HALL:  Objection.
9        A.   No.  That was your hypothetical.
10   That was your hypothetical that linked those
11   two together.  If I'm on June 11th --
12       Q.   Right.
13       A.   -- I don't -- unless there's more
14   behind this that this is Purchase Pro, I don't
15   think he has that.  I think what he has
16   knowledge of is that AOL is under
17   investigation.  Because it doesn't say
18   Purchase Pro was under investigation.  AOL was
19   under investigation.  And suspended some
20   employees for inappropriate accounting
21   activities.  Some deals book inappropriate
22   inflated revenue.
23       Q.   So he should just put that in the
24   report.
25           MR. HALL:  Objection.

TSG Reporting - Worldwide   877-702-9580

Page 151

S. HAKALA

1
2        A.   That he aware of or there are
3    rumors that AOL is under investigation or he
4    has a credible source or a source that
5    indicates such, sure.
6        Q.   And assuming his source is a
7    25-year-old woman who's a junior employee at
8    AOL, should he have disclosed that as well?
9            MR. HALL:  Objection.
10       A.   I don't know if I would have
11   disclosed that.  I would just disclose that he
12   has a source.  He might determine the voracity
13   of the source.  He might do some additional
14   verification.  But he certainly is in
15   knowledge now that AOL is under investigation
16   and suspended some employees.  That's not
17   public information.
18       Q.   Well, the suspension -- well,
19   let's say that he has read -- again, he's read
20   the June 19th article and he assumes that
21   they're the same.  The suspending employees
22   seems to be public; is that right?
23           MR. HALL:  Objection.
24       A.   Well, it becomes public or at
25   least it leaks out with the Washington Post

TSG Reporting - Worldwide   877-702-9580

Page 152

S. HAKALA

1
2    article at least with regard to two employees.
3    We don't know that that's the full extent of
4    it.
5        Q.   Right.  Before -- okay.  So what
6    would the market do with that information?
7            MR. HALL:  Objection.
8        A.   Well, if it only implicates
9    Purchase Pro and it doesn't implicate AOL
10   probably nothing.
11       Q.   Suppose he were to write I have a
12   source at AOL who tells me that AOL is under
13   investigation, has suspended some employees
14   for inappropriate accounting activity, some
15   deals booked inappropriately inflated revenue,
16   also some employees have been accused of
17   trading irregularities, namely shorting
18   partner stocks.  Essentially cuts and pastes
19   the e-mail into his report and says he has a
20   source at AOL who says that.
21       A.   Okay.
22       Q.   Under your analysis would that be
23   a complete disclosure?
24           MR. HALL:  Objection.
25       A.   It might be.  And that certainly

TSG Reporting - Worldwide   877-702-9580

Page 153

S. HAKALA

1
2    would have impacted the stock price.
3        Q.   That would have impacted the stock
4    price?
5        A.   Oh, sure.
6        Q.   Without there being any indication
7    of the magnitude of the investigation, how
8    many employees were involved, just that?  That
9    would have impacted the stock price?
10           MR. HALL:  Objection.
11       A.   Sure.
12       Q.   What makes you say that?
13       A.   Because in similar kinds of
14   discussions later times impacted the stock
15   price.
16       Q.   For example, July 18th, 2002?
17       A.   The 18th Purchase Pro -- yeah.
18   The Washington Post article was actually very
19   narrow in terms of its implications.
20       Q.   And close to close, did that have
21   an impact on the stock price?
22           MR. HALL:  Objection.
23       A.   Close to close it had an impact
24   but the impact was muted by the company's
25   denials.  But close to open had a huge impact

TSG Reporting - Worldwide   877-702-9580

Page 154

S. HAKALA

1  and the company in a sense committed fraud in
2  denying it. But if you isolate the event
3  itself it has a very significant impact.
4          (Hakala Exhibit 9, Washington Post
5          website article entitled Unconventional
6          Transactions Boosted Sales, marked for
7          identification as of this date.)
8  BY MR. GESSER:
9      Q.   You view this e-mail here, the --
10 **Hakala 6 and the information that is Mr.**
11 **Lorenzo's conveying to Mr. Kiggen there as**
12 **being equivalent to the information that was**
13 **disclosed a year later by the Washington Post;**
14 **is that correct?**
15         MR. HALL: Objection.
16     A.   Not quite.
17     Q.   Not quite?
18     A.   No. The impact of this was much
19 greater than the impact I assumed would have
20 occurred if this had been disclosed.
21     Q.   The impact of what?
22     A.   This first article.
23     Q.   And what is that?
24     A.   There's a lot of possible reasons.

TSG Reporting - Worldwide   877-702-9580

Page 155

S. HAKALA

1      Q.   Why don't you give me some.
2      A.   It was fairly detailed. There was
3  a lot to it. However, on the other hand, the
4  magnitude of what's being discussed here
5  really was very small as I think the company
6  pointed out. So my view is this is a
7  third-party disclosure that AOL's got some
8  accounting concerns. I thought it was the
9  most equivalent disclosure of what would occur
10 but I gave it a lower weight. In fact, I gave
11 it the net weight rather than the gross effect
12 that the article had before the company
13 denial.
14     Q.   And how did you do that?
15     A.   Took the net effect of the drop on
16 July 18th and July 19th of 2002 and applied it
17 backwards. And assumed that would have been
18 the effect had there been some disclosure that
19 AOL was under investigation.
20         The other thing is that this
21 doesn't reveal that AOL's under investigation.
22 AOL doesn't actually acknowledge it's under
23 investigation for its accounting until the
24 evening of the 24th of July.

TSG Reporting - Worldwide   877-702-9580

Page 156

S. HAKALA

1      Q.   And in doing so it indicates that
2  the SEC began its investigation following the
3  July 18th report; is that correct?
4          MR. HALL: Objection.
5      A.   That's what's suggested in the
6  July 24th statement. Now we now know
7  subsequently that's not really true.
8      Q.   Who's we now?
9      A.   I know from the SEC that they were
10 actually looking at AOL with regard to
11 Purchase Pro and some of the other trading.
12     Q.   Is that public anywhere?
13     A.   It's part of the Fair Funds
14 disclosure. So when they finally settled with
15 AOL, yeah.
16     Q.   But you haven't looked at Ms.
17 **Bernard's deposition testimony to know whether**
18 **she knew that or not.**
19         MR. HALL: Objection.
20     A.   No, I didn't.
21     Q.   Are there factual disclosures that
22 **are made in this July 18th report that are in**
23 **addition to the July 11th e-mail from a year**
24 **earlier?**

TSG Reporting - Worldwide   877-702-9580

Page 157

S. HAKALA

1      A.   Yes.
2          MR. HALL: Objection.
3      Q.   Can you think of some of those?
4      A.   Well, I mean, we can look at the
5  article and compare them but certainly the
6  article is a long expose along with certain
7  denials by the company as well.
8      Q.   And does it make a difference
9  **whether, referring to the market, what the**
10 **source of the information is?**
11         MR. HALL: Objection.
12     A.   It could.
13     Q.   Does it make a difference of what
14 **the timing of the information is? I mean,**
15 **whether the information was disclosed in July**
16 **of 2001 or in July of 2002, would that --**
17 **could that have any effect on what impact it**
18 **would have on the stock price?**
19     A.   It might. It might not. It
20 actually might go the other way because by
21 July 18th of 2002 there had already been
22 concerns about accounting issues at AOL in
23 early -- in late June and early July. So to
24 some extent the Washington Post article was

TSG Reporting - Worldwide   877-702-9580

Page 158

S. HAKALA

1      S. HAKALA
2  fairly -- the response was muted by that fact.
3       If there was knowledge that AOL
4  was more intimately implicated in the Purchase
5  Pro issues and that itself -- it, itself, was
6  under investigation as a result of that, that
7  I may have had even a greater impact at that
8  time.
9      Q.  Did you test for that?
10     A.  How do you test for something that
11  didn't happen?  You can only draw inferences
12  from equivalent disclosures.  So obviously
13  not.  I mean, sometimes you have to apply
14  deductive reasoning and use equivalent
15  disclosures to draw inferences.
16     Q.  And did you do that?  Did you look
17  for equivalent disclosures here?
18     A.  Yes.
19     Q.  And is this the only equivalent
20  disclosure you looked at for this e-mail?
21     A.  No.
22     Q.  What was the other equivalent
23  disclosure you looked at?
24     A.  July 19th, July 24th.  I also
25  looked after the class period at the

TSG Reporting - Worldwide    877-702-9580

Page 159

S. HAKALA

1  disclosure, the Justice Department
2  investigation in I think July 30th or 31st of
3  2002.  But those were the only times I found
4  anything that resembled the content of what's
5  in this e-mail.  So that was the best evidence
6  I had.
7      Q.  Have you ever seen a disclosure in
8  an analyst report like this -- like what's in
9  the e-mail from Lorenzo to Kiggen that there's
10  an investigation, doesn't say which division,
11  doesn't say who's investigating, doesn't say
12  anything like that;  some employee suspended,
13  no number, doesn't say what group, accounting
14  activity, no specifics about that.  I mean,
15  anything like this kind of unspecific rumor.
16     MR. HALL:  Objection.
17     Q.  Have you ever seen an analyst
18  report with anything like that?
19     A.  Yes, I have --
20     Q.  Can you think of an example?
21     A.  -- but beyond that that assumes
22  that what's in this e-mail was the sum and
23  substance of what was known.  I'm sure if
24  Kiggen had asked more questions or if Lorenzo
25

TSG Reporting - Worldwide    877-702-9580

Page 160

S. HAKALA

1      S. HAKALA
2  had elaborated on the phone I'm sure they
3  would have known a lot more.
4      Q.  Why do you say that?
5      A.  Because of the specificity of
6  this, that it related to Purchase Pro, you
7  know, what division were they -- I mean, if
8  you know the employees were laid off, you'd
9  obviously know then which division they were
10  laid off in.
11     Q.  And does looking at the Lorenzo
12  transcript or the Bernard transcript, does
13  that suggest to you that there was more
14  information to be known?
15     MR. HALL:  Objection.
16     A.  I don't know.
17     Q.  Okay.
18     A.  I don't know what they did and I
19  don't know how a jury will interpret what the
20  testimony is about that.
21     Q.  Do you know Mr. Lorenzo and Mr.
22  Bernard both indicated they don't remember
23  anything about that?
24     MR. HALL:  Objection.
25     A.  That doesn't surprise me.

TSG Reporting - Worldwide    877-702-9580

Page 161

S. HAKALA

1      S. HAKALA
2      Q.  Why not?
3      A.  There seems to be a loss of memory
4  in securities litigation depositions of fact
5  witnesses that -- I always am surprised when
6  you watch on like the NFL channel how players
7  can remember exact plays 20 years ago that
8  happened when they were playing football games
9  but when things like this come up and people
10  are in depositions suddenly they can't
11  remember anything.
12     Q.  So Mr. Lorenzo and Ms. Bernard are
13  committing perjury in your view?
14     MR. HALL:  Objection.
15     A.  I didn't say that.  They may not
16  remember or they might have been coached not
17  to remember or they just made no effort to
18  recollect what they thought.  That doesn't
19  mean that when they wrote this e-mail they
20  didn't know.
21     Q.  Well --
22     A.  All that says is that they didn't
23  know at the time of their deposition if
24  assuming what you're representing is true.
25       And all I'm telling you is it's

TSG Reporting - Worldwide    877-702-9580

Page 162

S. HAKALA

1
2  very frustrating for me to read depositions
3  where people don't seem to remember things
4  that ordinary people should and ought to
5  remember. And whether that's perjury or what
6  that means legally, I don't know. It doesn't
7  seem to be very enforceable.
8      **Q. So just so I understand you think**
9  **that Ms. Bernard knew about non-public**
10 **investigations going on at AOL even though she**
11 **was a 25-year-old low-level employee and that**
12 **that managed to stay secret for more than a**
13 **year; is that what you're saying?**
14     MR. HALL: Objection.
15     A. It's entirely plausible. And in
16 fact I've been in that type situation.
17     **Q. What situation --**
18     A. In corporations.
19     **Q. What situation is that?**
20     A. Where corporations were under
21 investigation or where employees were
22 suspended for accounting improprieties and it
23 never got out. It was never disclosed
24 publicly.
25     **Q. And that junior, very low-level**

Page 163

S. HAKALA

1
2  **employees knew about it?**
3      MR. HALL: Objection.
4      A. Oh, sure. Everybody knew.
5      **Q. In a company like AOL.**
6      MR. HALL: Objection.
7      A. Sure. If it's in their division.
8  If it's people they report to. People they
9  know. Sure.
10     **Q. When you did the testing for the**
11 **overnight return, did you use the last price**
12 **for AOL?**
13     A. Should be the closing price.
14     **Q. But that's not what I asked. Did**
15 **you use the last price or did you --**
16     A. I used the last price but it is
17 the closing price.
18     **Q. I'm not sure what you mean by**
19 **that.**
20     A. The last price is a closing price
21 except under certain exceptional
22 circumstances.
23     **Q. And in this circumstance you used**
24 **the --**
25     A. Closing.

Page 164

S. HAKALA

1
2      **Q. You used the closing price.**
3      A. Yeah.
4      **Q. Is that what your report**
5  **indicates?**
6      A. I'm not sure. I would use
7  whatever price was the last price reported on
8  a formal exchange. But I'm pretty sure in
9  this particular case the last price was the
10 closing price. I'm not sure it makes any
11 difference anyway.
12     **Q. You're not sure whether it makes**
13 **any difference whether it's the last price or**
14 **the closing price?**
15     A. No.
16     **Q. Was this an issue with Xcelera?**
17     A. It was but for a different reason.
18     **Q. What was the different reason?**
19     A. Because Xcelera was traded on an
20 odd exchange and actually we were surprised by
21 that. That was an issue that could have been
22 addressed fairly easily in Xcelera frankly.
23 We did it both ways, closing price and last
24 price.
25     **Q. But that was one of the reasons**

Page 165

S. HAKALA

1
2  **why your testimony was struck in Xcelera; is**
3  **that right?**
4      MR. HALL: Objection.
5      A. That was a flaw or a concern of
6  the court. I'm not sure by itself that would
7  have been. But there -- I mean, that's kind
8  of a complex ruling. But the use of last
9  price versus closing price, people do both and
10 it just -- the key there is making sure you've
11 accounted for what information comes in when.
12     **Q. Did you take a look at what the**
13 **effect of the disclosure on June 19th was? Of**
14 **2001.**
15     A. I don't know. I didn't -- did I
16 specifically include it in my event study or
17 not?
18     I have an event on that day.
19     Yeah, I did.
20     **Q. And what was the return of AOL on**
21 **that day?**
22     A. Small negative.
23     **Q. Is that statistically significant?**
24     A. No.
25     **Q. At the 90 percent level?**

Page 166

S. HAKALA

1
2      A.   No.  And that's because AOL
3   indicated that it was probing its relationship
4   with the Purchase Pro but indicated that it
5   had no implications for AOL.
6      Q.   So -- sorry.  Because of AOL's
7   denial you think that it didn't have an effect
8   on the stock price?
9      A.   The probe was the relationship
10  with Purchase Pro.  Not that AOL itself was
11  under investigation or done anything wrong.
12     Q.   Does it say that?
13     A.   Not in this news service but that
14  was in other information and that's actually
15  in the Hakala Exhibit 9.
16     Q.   What title does Eric Keller have?
17         MR. HALL: Objection.
18     A.   I don't know.
19     Q.   It says here he was the senior
20  vice president of business affairs.
21     A.   Okay.
22     Q.   So he was suspended.
23     A.   Okay.
24     Q.   So in what sense does AOL act
25  other than through its employees?

Page 167

S. HAKALA

1
2         MR. HALL: Objection.
3      Q.   I mean, an investigation of Eric
4   Keller, isn't that an investigation of AOL?
5         MR. HALL: Objection.
6      A.   For his role in accounting in AOL
7   or for his role in assisting Purchase Pro?
8      Q.   I'm not sure I understand the
9   difference.
10     A.   The difference is AOL subject
11  to itself an accounting action or is it merely
12  AOL had an employee who was assisting Purchase
13  Pro in order to gain business from Purchase
14  Pro.  That's a big difference from an investor
15  standpoint.
16     Q.   Can Eric Keller bind the company?
17         MR. HALL: Objection.
18     A.   Possibly.
19     Q.   Can liability for Eric Keller be
20  liability for the company?
21         MR. HALL: Objection.
22     A.   I don't know.
23     Q.   So you place a lot of weight on
24  the e-mail that it's AOL that's under
25  investigation.  That's the crux of the

Page 168

S. HAKALA

1
2   difference between this and the Purchase Pro
3   report; is that correct?
4         MR. HALL: Objection.
5      A.   That deals were being
6   inappropriately booked, that inflated revenue
7   in AOL, and AOL is under investigation, yes.
8   Those are the two components of that.
9      Q.   Where does it say that?
10     A.   Some deals booked inappropriately
11  inflated revenue.
12     Q.   So does that say that it's at AOL?
13         MR. HALL: Objection.
14     A.   Not specifically but that's the
15  inference I would draw if AOL is under
16  investigation.  I mean, ultimately we know
17  that is what the SEC went after them for.
18     Q.   In connection with Purchase Pro.
19         MR. HALL: Objection.
20     A.   Yes.
21     Q.   So this is --
22     A.   No, in connection with AOL.  The
23  AOL side of the transaction.  Cooked AOL's
24  books.
25     Q.   But this investigation that is

Page 169

S. HAKALA

1
2   disclosed on the June 19th e-mail, that is the
3   investigation that eventually disclosed --
4   that was eventually disclosed on June 18th --
5   in July of 2002; is that right?
6         MR. HALL: Objection.
7      A.   No.
8      Q.   This is separate?
9      A.   You're talking about the July 11th
10  or --
11     Q.   The June 19th.
12     A.   June 19th is not what's in the
13  Wall Street Journal -- Washington Post.
14     Q.   But it leads to the -- this
15  investigation leads to what is disclosed in
16  the Washington Post article; is that correct?
17         MR. HALL: Objection.
18     A.   Not directly.
19     Q.   These are totally separate
20  Purchase Pro investigations?
21     A.   No, they --
22         MR. HALL: Objection.
23     A.   They are related and they're a
24  logical chain but at the time you're talking
25  about on June 19th, in the June 19th article

S. HAKALA

1  there is no indication that AOL is involved in
2  accounting improprieties in AOL.  It is true
3  that the investigation of Purchase Pro led to
4  an investigation of AOL and ultimately
5  identified that fraud.
6       What was not known by the public
7  was that the SEC was already looking at the
8  AOL's side of the transaction in 2001.  That
9  was not known until July of 2002.
10  **Q.   But you think Credit Suisse knew**
11  **that.**
12       MR. HALL:  Objection.
13  A.   That's what the e-mail suggests.
14  **Q.   The e-mail suggests?**
15  A.   AOL's under investigation.
16  **Q.   And that doesn't mean an internal**
17  **investigation in your view.**
18       MR. HALL:  Objection.
19  A.   If AOL is under investigation that
20  wouldn't be an internal investigation.  It
21  would be AOL investigating some employees for
22  their activities involved in Purchase Pro.  I
23  wouldn't read it that way.
24  **Q.   So you think -- you think Ms.**

S. HAKALA

1  **Bernard knew that AOL was under investigation**
2  **from some regulatory body; is that right?**
3       MR. HALL:  Objection.  Objection.
4  A.   I don't know what I think.  All
5  I'm --
6  **Q.   Clearly.**
7       MR. HALL:  Objection.
8  A.   Again, you want to argue liability
9  with a damages expert who's making a certain
10  assumption and I think that's just
11  inappropriate and I think you know it's
12  inappropriate but --
13  **Q.   I think your assumptions are**
14  **inappropriate and I just want to test them.**
15       MR. HALL:  Well, Avi, then you can
16  argue that to a jury and --
17       THE WITNESS:  Argue that with
18  counsel, not with me.
19       MR. HALL:  -- unfortunately for
20  all of us no one in this room is the
21  final finder of fact and you get to put
22  forward your arguments.  I mean, you're
23  going around and around about this.
24  It's very clear from his report and his

S. HAKALA

1  testimony that he assumes -- what his
2  assumptions are and how they would
3  impact his damage analysis.
4  A.   That being said, in terms of
5  making sure the answer's clear, my reading of
6  this e-mail suggests AOL was under
7  investigation.  AOL being under investigation
8  is not by itself I would assume.
9  **Q.   Okay.  The July 18th report, did**
10  **you look to see whether that -- the Washington**
11  **Post article, did you look to see whether that**
12  **was a confounded?**
13  A.   It was confounded.
14  **Q.   Okay.**
15  A.   But it wasn't confounded
16  overnight.  It was confounded during the day.
17       In other words, it was a clean
18  event overnight, but it was then confounded
19  later in the day.
20  **Q.   Why was it a clean event**
21  **overnight?**
22  A.   It was the only piece of news
23  overnight.  From close to open it was the only
24  piece of news.  The confounding information

S. HAKALA

1  occurred later in the day during trading.
2  **Q.   Okay.  And so what was the volume**
3  **close to open?  Do you know?**
4  A.   There is no volume close to open.
5  **Q.   So --**
6  A.   I mean, unless you got the
7  intraday trading and I think I had that
8  somewhere.  And you had the overnight.  But it
9  wasn't long.  It was that the market opened
10  significantly down from the close for reasons
11  of this article.  I don't think there's any
12  doubt of that.
13  **Q.   You don't think there's any doubt**
14  **of that.**
15  A.   No.  I don't think there's any
16  doubt from reading the news articles that the
17  drop overnight was due to this article.
18  **Q.   Did you look at the intraday**
19  **trading to look at whether the trading volume**
20  **reflected that?  Whether there was a drop in**
21  **the morning when this Washington Post article**
22  **came out as opposed to after trading the night**
23  **before?**
24  A.   This article didn't appear until

S. HAKALA

1 like after midnight. So you wouldn't pick it
2 up in the after-hours trading anyway. But,
3 yes, I did.
4    Q.    You looked for that.
5    A.    I had previously. Not in this
6 case but previously.
7    Q.    And what did you find?
8    A.    The reaction was from close to
9 open. It wasn't --
10    Q.    I'm talking about intraday. Did
11 you track to see whether --
12    A.    You're talking after hours, not
13 intraday.
14    Q.    Yeah, after hours.
15    A.    I don't remember. But I do know
16 that after-hours trading does not reflect a
17 drop. I don't see an after-hours drop in the
18 price.
19    Q.    You checked for that?
20    A.    At some point before this case,
21 yes.
22    Q.    And what did you find?
23    A.    There was none.
24    Q.    There was none what?

S. HAKALA

1    A.    No after-hour drop. This was an
2 issue in summary judgement. There was a
3 motion for summary judgement in AOL
4 Time-Warner Securities Litigation. And in
5 response to that we looked very carefully at
6 the intraday trading and the after-hours
7 trading of that stock. The stock dropped due
8 to this article overnight. It dropped from
9 close to open --
10    Q.    Yeah, but when did it drop? In
11 that time frame, when did it drop? Did you
12 test to see whether it dropped at 8 in the
13 morning, 6 in the morning, 4 in the morning?
14 Did you do any analysis to determine whether,
15 in fact, in the time between close and open
16 the stock dropped?
17    A.    It was in the morning. Other
18 than --
19    Q.    Did you test for that?
20    A.    How can you test for something
21 when there's no trading? If there's no
22 trading you can't test for it. All you can
23 know is that this is the only piece of news
24 between close and open and there's at least

S. HAKALA

1 five or six articles that say this caused the
2 stock to drop and open lower. And then later
3 in the day the stock rebounds when the company
4 makes a statement and a bunch of analysts make
5 statements.
6    Q.    Did you look at overnight trading
7 for any other days in the class period?
8    A.    In July of 2002 I believe I did.
9    Q.    For any other time frame?
10    A.    Not that I know of. Other than in
11 response to I think there was one day that
12 Professor Stoltz made a comment on. I looked
13 at that but that's the only other day I can
14 remember.
15    Q.    So the fact that Pittman was going
16 to resign, that wasn't known until after the
17 market opened?
18    MR. HALL: Objection.
19    A.    Yes.
20    Q.    You're sure about that?
21    MR. HALL: Objection.
22    A.    I think Pittman's resignation came
23 in sometime during the day.
24    Q.    And because --

S. HAKALA

1    A.    I mean, I have to go back and
2 verify that but I'm almost certain that that's
3 the case. If that's the day. Was that the
4 day Pittman's resignation leaked out? Was
5 there a board meeting at some point?
6    Let me check.
7    (Document review.)
8    A.    The news Pittman may resign came
9 out during the day on the 18th after the open.
10 His actual resignation doesn't occur until the
11 19th.
12    Q.    And was the 19th a statistically
13 significant day?
14    A.    Overnight, yes. Over the day as a
15 whole, no.
16    Q.    Why did you use overnight?
17    A.    Because that would be the impact
18 of the Washington Post article unconfounded.
19    Q.    So, again, you looked to see
20 whether the article -- you looked to see
21 whether the article on its own had an effect
22 close to opening.
23    A.    Yes.
24    Q.    And so did you look at trading

Page 178

S. HAKALA

1
2  volume at the opening on both those days?
3      A.   I might have.
4      Q.   You don't remember if you did or
5  you didn't?  You might have?
6      A.   There's no such thing as trading
7  volume at the open.  There's just trading
8  volume during the day.  The opening price is
9  an indication price.  And then trading begins.
10  Now, there can be some premarket trading and
11  indications depending on how the market works.
12      Q.   Did you look at those?
13      A.   I don't remember.  I probably did
14  but I don't remember.
15      Q.   But you might not have.
16      A.   Yeah.  I -- I don't know.  Most of
17  that is only quoted by the specialists and
18  usually that's difficult to obtain even in the
19  TAQ data or what's called trade and quote
20  data.
21      Q.   Did you test -- in your efficiency
22  testing did you test so see whether the AOL
23  stock would have traded efficiently from close
24  to opening?
25      A.   Yeah.

TSG Reporting - Worldwide   877-702-9580

Page 179

S. HAKALA

1
2      Q.   You did?
3      A.   Yeah.
4      Q.   And?
5      A.   It did.
6      Q.   Where is that analysis?
7      A.   I ran an overnight trading volume
8  analysis.
9      Q.   Is that part of your report?
10      A.   It was part of the overnight
11  regression, yeah.
12      Q.   Overnight regression, where?  In
13  this --
14      A.   Yeah, in this case.
15      Q.   Okay.  So when you say the AOL
16  stock traded efficiently you include in that
17  overnight trading for the class period as
18  being efficient trading?
19      A.   When you're talking about from
20  close to open, yes.  I'm not sure I made any
21  conclusions about trading in the after hours
22  necessarily.  Although, that's generally
23  not -- it means generally most of the
24  after-hours trades are really trades that were
25  agreed to during the day and are just being

TSG Reporting - Worldwide   877-702-9580

Page 180

S. HAKALA

1
2  late reported.  But the fact of the matter is
3  that if the market's efficient the overnight
4  trading should be fairly efficient as well.
5      Q.   Should be.
6      A.   Should be.  And it was in this
7  case.
8      Q.   And you tested for that?
9      A.   Yeah.
10      MR. GESSER:  All right.  Let's
11  take a lunch break.
12      THE VIDEOGRAPHER:  The time is
13  12:46.  This is the end of tape number
14  two.  We're going off the record.
15      (Luncheon recess taken at 12:46
16  p.m.)

TSG Reporting - Worldwide   877-702-9580

Page 181

S. HAKALA

1
2  A F T E R N O O N   S E S S I O N
3  (Time noted:      1:29 p.m.)
4      THE VIDEOGRAPHER:  This is the
5  start of the tape labeled number three.
6  The time is 1:29 and we're back on the
7  record.
8          * * *
9  S C O T T  D. H A K A L A,   resumed and
10  testified as follows:
11  BY MR. GESSER:
12      Q.   Dr. Hakala, before we took a break
13  for lunch we were talking about overnight
14  returns and looking at close to opening price
15  changes.
16      And I'd asked you if you had
17  looked at any other overnight returns for any
18  day in the class period other than July 18th
19  and July 19th of 2002.
20      Do you remember that?
21      A.   Yes.
22      Q.   Okay.  And what was your answer to
23  that?
24      A.   I had looked at overnight returns
25  in general but if -- I think your question was

TSG Reporting - Worldwide   877-702-9580

S. HAKALA

1  with regard to after-hours trading. And I had
2  not looked at after-hours trading on any other
3  days.
4      Q.   Okay. For overnight returns, did
5  you look at any of the days in which you found
6  a statistically significant increase in AOL
7  share price that you attributed to a newspaper
8  article?
9      A.   I don't know.
10     Q.   Okay. So let's take August 13th,
11  for example. August 13th, 2001.
12     A.   Okay.
13     Q.   You, in your report, indicate that
14  there's a statistically significant increase
15  in AOL stock price for August 13th and 14th
16  combined; is that right? Is that how you --
17  due to the disclosure of the layoffs?
18     A.   Combined -- well, I think it's
19  both individually and together on a close to
20  close basis.
21     Q.   Okay. And what was the news that
22  reached the market that day on August 13th?
23     A.   That layoffs are expected at AOL.
24     Q.   What was the source of that?

S. HAKALA

1      A.   And AOL struggling to meet its
2  financial targets.
3      Q.   What was the source of that?
4      A.   That was a Wall Street Journal
5  article.
6      Q.   Okay. That would have been
7  released before the market was opened?
8      A.   Yes.
9      Q.   Okay. But you didn't look -- did
10  you look to see the close to opening change
11  to --
12     A.   Yes.
13     Q.   You did.
14     A.   Yes.
15     Q.   And was that statistically
16  significant?
17     A.   No, it was not.
18     Q.   Okay. So why in this case for
19  August 13th did you decide to look at close to
20  close whereas for July 18th, 2002 you went
21  close to open?
22     A.   I thought that this was a rumor.
23  And because it was a rumor and because it was
24  discussion on the 13th --

S. HAKALA

1      Q.   What was the rumor?
2      A.   The layoffs. That there was a
3  considerable amount of debate and reaction
4  during the day of trading as opposed to close
5  to open.
6          Also, there had been some rumor
7  that there was layoff speculation on August
8  10th. So --
9      Q.   I'm not sure I understand. You're
10  saying that there may not have been -- the
11  information in the report may not have been
12  fully digested by the market?
13     A.   Because it was a rumor and because
14  people were investigating the rumor on the
15  13th. So it's not until the 13th and then
16  when the Washington Post confirms it on the
17  14th that you really see the impacts.
18     Q.   I see. So in this particular case
19  you needed two disclosures for it to be
20  incorporated into the stock price? Two
21  separate disclosures?
22     A.   Because it was a rumor there were
23  reports throughout the day, not just the
24  Washington Post and Wall Street Journal, but

S. HAKALA

1  other news sources. I think there was a
2  Standard & Poor's downgrade during the day on
3  the 13th. And then there was a CNN show.
4      Q.   And so you think the significant
5  information on the August 13th report was that
6  there was a rumor about layoffs?
7      A.   And also AOL struggling to meet
8  its financial targets.
9      Q.   Was there any factual information
10  in that report?
11     A.   Not that I know of. Beyond that.
12  The more detailed report came out on the 14th.
13     Q.   And what information was in the
14  14th that wasn't in the report on the 13th?
15     A.   A thousand employees.
16     Q.   And what did it say on the 13th?
17  What did it say about that?
18     A.   Just that it's expected to have
19  layoffs.
20     Q.   Did it say that it was hundreds of
21  employees?
22     A.   It might have.
23     Q.   But you don't think that's
24  specific enough?

Page 186

S. HAKALA

 1    MR. HALL: Objection.
 2    A.    It's specific.
 3    Q.    But --
 4    A.    I'm not sure why from close to
 5  open the stock didn't react more.  All I know
 6  is that I've got news reports from various
 7  press articles saying that during the day on
 8  trading as these rumors gained verification or
 9  further validity, the market began to react to
10  them.
11    Q.    And you view the quality of this
12  information differently than the quality of
13  the information in the July 2002 report from
14  the Washington Post?
15    MR. HALL: Objection.
16    A.    Yes.
17    Q.    Why is that?
18    A.    Much larger.  More of an
19  indication of a broad set of layoffs in the
20  AOL unit due to weeks in on-line advertising
21  as opposed to laying off 30 or 40 employees.
22    Q.    No, I'm sorry.  I'm comparing the
23  August 13th disclosure in the Wall Street
24  Journal to the July 2002 disclosure in the

TSG Reporting - Worldwide    877-702-9580

Page 187

S. HAKALA

 1  Washington Post in terms of how long it would
 2  take for the market to react.  You described
 3  the August 13th report as being rumors which
 4  would have taken a while to react.
 5    A.    Right.
 6    Q.    And I'm saying that's different in
 7  quality than the --
 8    A.    At least that's the way the market
 9  interpreted it.
10    Q.    That's how you -- that's how you
11  account for the difference?
12    A.    That's how I understood the
13  difference, yes.
14    Q.    In determining how plaintiffs --
15  how much of plaintiffs' losses are
16  attributable to Credit Suisse, can you explain
17  to me how you constructed the methodology that
18  you used to come up with the number?
19    A.    Basically what I wanted to do was
20  come up with an idea of what an equivalent
21  disclosure impact was by using relatively
22  clean analyst reports both positive and
23  negative that met certain criteria and to look
24  at what their average impact was.  What I

TSG Reporting - Worldwide    877-702-9580

Page 188

S. HAKALA

 1  found I think was that the average impact I
 2  think in actual log terms of an analyst report
 3  whether a positive or negative that met
 4  certain qualitative criteria and was either
 5  unconfounded or issued in connection with
 6  another analyst report which was neutral was
 7  about 2.7 percent in general on both the
 8  positive and negative and I think about
 9  2.71 percent if it was just a negative report.
10    And so I tried to look at it in
11  general of what effect on average would a
12  report have that either reduced price target
13  or substantially reduced EBITDA targets and
14  commented on the reduction in the prospects
15  for the company.  And so the way that we often
16  do it -- in the event study literature we
17  often talk about this in the context of
18  earnings response models or equivalent
19  disclosure models.  But to use various analyst
20  reports to draw that inference.
21    I also looked at the impact of the
22  February 5th announcement.  Why that one out
23  of one article caused the stock to go up as
24  much as it did is not clear but clearly the

TSG Reporting - Worldwide    877-702-9580

Page 189

S. HAKALA

 1  impact I came up with is not inconsistent with
 2  the impact we see around September 19th with
 3  the significant analyst report that's
 4  positive.  And what we see on February 5th of
 5  2001.
 6    So, in other words, it was
 7  confirmed both by things specific to CSFB in
 8  terms of its coverage of other media stocks
 9  when it downgraded -- in September Laura
10  Martin downgraded some other media stocks as
11  well as least two instances specific to CSFB
12  related to AOL.  And then a more general study
13  as to how does the market react to both
14  positive and negative analyst reports that
15  meet a certain criteria.
16    Q.    When you use the term "clean" and
17  "relatively clean" you mean that the analyst
18  report is the only news about AOL on that day?
19    A.    The only news that we would have
20  identified as potentially material.  There's
21  always news about AOL every single day.  But
22  it's the only news that our criteria would say
23  would be potentially material.
24    Q.    And what were the criteria you

TSG Reporting - Worldwide    877-702-9580

1          S. HAKALA
2    used?
3         A.    Potentially material was based on
4    Federal Register and a list of the types of
5    events that are potentially material in Ryan
6    and Taffler.  It's a published paper in 2004.
7    We're looking at, you know, significant news
8    of merger and acquisition activity which there
9    was very little.  Changes or rumors of changes
10   in earnings.  Earnings expectations.  Company
11   announcements relating to that.  Certain
12   corporate developments that would be
13   considered significant because they were
14   commented on by analysts.  And then we would
15   not include analysts' reports if they were
16   merely reiterations unless they're CSFB
17   reports which we put in as a matter of course.
18        If they were significant upgrades
19   or downgrades in either price targets,
20   earnings, or some other qualitative nature, a
21   recommendation of buy versus sell, then it
22   would come into play.
23        Q.    How reproducible do you think that
24   analysis is?  If someone else were to try to
25   do the same analysis what do you think the

1          S. HAKALA
2    variability would be?
3         A.    Typically the variability changes
4    depending on what point you look at
5    reproducibility.  If you're looking at
6    reproducibility based on the entire database
7    and source of information reviewed.  What we
8    typically find is if two different people are
9    looking at the same information they're going
10   to agree about 95 percent of the time on
11   average.
12        Q.    You've tested this?
13        A.    Yeah.  Yeah.  We do what we call
14   double blinds where we have two different
15   people go through the same information and see
16   what they come up.
17        Q.    Who's we?
18        A.    My firm.
19        Q.    Okay.
20        A.    My office.
21        Additionally, if both people are
22   looking at all of the same information that
23   had been previously identified and then we're
24   looking at is this an event or is this not an
25   event, typically the rate of error is fairly

1          S. HAKALA
2    small.  It's usually a couple percent to
3    5 percent at most.
4         As a backup in this case as in
5    most cases I went and did my own thorough very
6    detailed review of LexisNexis after my guys
7    had already done all their work and I ended up
8    changing only about 2 to 3 percent of the
9    events.
10        Q.    Okay.  But there were events that
11   changed between your class certification
12   report and your summary judgment report; is
13   that right?
14        A.    You mean my expert report for
15   damages?
16        Q.    Yeah.
17        A.    Yes.  That's because I did a much
18   more extensive event search at this stage
19   because at this stage I wanted to find all the
20   analyst reports, not just some.  So, yeah, we
21   went to a greater number of databases so we
22   added more events.  And I think we may have
23   altered a few events but most of the changes
24   should be adding an event where we found out
25   that there was an analyst on a given day who

1          S. HAKALA
2    made a statement that fit within our criteria
3    that we had not known about at the class cert
4    stage.
5         So typically what I would say is
6    it's kind of like layers.  It's more likely
7    that you will omit an event that you'd like to
8    consider at some point than that you'll make a
9    mistake as including an event that you
10   shouldn't have included.  And as you go
11   through greater and greater databases and as
12   you have more hands working the study, the
13   number of events will go up and your risk of
14   an omission or significant omission will go
15   down.
16        Q.    Okay.  So you're saying that at
17   least in selecting events to consider the
18   error rate is about 5 percent, is that what
19   you said?
20        A.    Five to 10 percent depending on
21   the type of company and the circumstance,
22   yeah.  And given a certain database.  The
23   error rate can be higher on omissions but
24   omissions do not tend to affect the
25   reliability of the result very much.

Page 194

S. HAKALA

**Q.   And --**

A.   In fact, the omission rate -- in other words, you could miss half of the events and the event study will still be superior to the alternatives of a simple cumulative abnormal no return study or what I call an incomplete intervention analysis which is what Professor Stoltz did.

**Q.   Were the differences between the events in your study for In Re. AOL versus your events in this case were?**

A.   It was larger because in In Re. AOL we were not focused on analyst reports and the issue of influence of analysts. So we tended not to put in events associated with the analyst reports as much.

**Q.   But isn't an event an event? I mean, why should that matter?**

A.   It's more of an issue of how thorough we searched the sources. It's more an issue of omission than commission. So what happens is the original AOL report was done for summary judgment and was preliminary in nature. We say that. We had certain data.

TSG Reporting - Worldwide    877-702-9580

Page 195

S. HAKALA

Then when we went to the class cert in this case we did a little bit more additional searching and so we added some additional events we might have missed. And then in the final report we found some additional analysts reports because we went to additional data sources that I did not have in 2004.

Some of the information, some of the sources of data that I have now I did not have access to in 2004.

So I had some omissions in terms of I was missing some events in the original summary judgment response event study in AOL Time-Warner Securities Litigation. I filled in many of those in the class cert in this case.

**Q.   So a clean day is a day in which there is no other information that you view as being material other than the analyst report.**

A.   Potentially material.

**Q.   Potentially.**

A.   Or if there is other information the information was deemed to be not significant. To be most likely neutral.

TSG Reporting - Worldwide    877-702-9580

Page 196

S. HAKALA

**Q.   Okay. But that's also a judgment call.**

A.   That's always a judgment call, yeah.

**Q.   And that adds another layer of error; is that right?**

A.   It can. Although if you look at the event study literature that deals with confounding events, generally when they're doing multiple company event studies they include any instance where in the judgment of the researcher the event of interest is at least half or more than half of effect on that day.

In other words, if there's two pieces of information on that day but the researcher concludes the other piece is insignificant or not likely to be important they'll still include that as an event.

**Q.   Where is that?**

A.   I'd have to go back and look but I did a research on what the event study literature says on confounding events and I was surprised how little there is in the

TSG Reporting - Worldwide    877-702-9580

Page 197

S. HAKALA

academic literature. Most of the academic literature does not really deal with the problem of confounding events other than figuring out -- believing that by looking across a large sample of companies the confounding issue can sort of average out.

And here the way we're averaging out is by having a large number of analyst reports and analyst related events and trying to isolate days when analyst reports are the dominant piece of information. Very similar to way the academic literature is doing it.

**Q.   So how many days did you determine were either clean or relatively clean analyst days?**

A.   I think about 40-something. Forty-seven.

**Q.   And how do those relate to the inflationary or deflationary days?**

A.   They give us a measure of the equivalent effect or the equivalent disclosure effect of certain type of analyst changes. Significant upgrades, downgrades, changes in price targets, changes in earnings targets,

TSG Reporting - Worldwide    877-702-9580

Page 198

S. HAKALA

1
2 and what effect on average those would have.
3     Q.    Okay.  So you have inflationary
4 and deflationary days.
5     A.    Yes.
6     Q.    Those are different than the
7 analyst days, right?
8     A.    Yes.  Because some of the
9 inflationary and deflationary days relate to
10 the company as opposed to analysts.
11     Q.    Okay.  So tell me what are -- how
12 did you determine what are inflationary or
13 deflationary days?
14     A.    Is the statement a positive
15 statement that I would have expected a priori
16 to cause the stock price to go up and does it
17 in fact go up.  That's inflationary.  If it's
18 a positive statement that relates to the --
19 we're talking about the advertising issue here
20 by the way.
21     Q.    Okay.
22     A.    Because the layoff issue is
23 different.
24     Is it a negative statement about
25 advertising, advertising trends, and earnings

TSG Reporting - Worldwide    877-702-9580

Page 199

S. HAKALA

1
2 that causes the price to go down or we expect
3 the price to go down and in fact it goes down.
4     I think there's a total of 45 days
5 I considered of which 23 were considered
6 negatives.  Of the analyst days.
7     Q.    Okay.
8     A.    And then there's a broader set of
9 days that relate to advertising in general.
10 Because that includes company earnings
11 announcements.
12     Q.    And this notion of relatively
13 clean days, is that something that you found
14 in the finance literature or is that just a
15 term of art you used?
16     A.    No, no.  That is in the finance
17 literature.  When they talked about the
18 confounding, generally it's a knowledge that
19 there can be confounding events on all days if
20 you really look for it.  But the real issue is
21 is the confounding information so significant
22 that it affects your estimate enough to be
23 worried about.
24     So when I say relatively clean,
25 for example, a day when there's a negative

TSG Reporting - Worldwide    877-702-9580

Page 200

S. HAKALA

1
2 analyst reply but there's also a neutral
3 analyst report that's a mere reiteration I
4 would view that as a relatively clean day
5 because I would view the reiteration as not
6 having an impact or much of an impact and I
7 would view the negative report as being the
8 dominant impact on that day.
9     Q.    And is there any support in the
10 academic literature for that; for being able
11 to take analyst reports and determine that one
12 of them is neutral and, therefore, it's not
13 confounding for the purposes of assessing
14 impact?
15     A.    Yes.  I've seen that in some
16 studies.
17     Q.    Can you tell me which studies?
18     A.    No.  I think some of the work that
19 Shipper did, Laurentius Marais has done some
20 work with Catherine.  I have to go back and
21 look at the other analysts' reports.  A number
22 of the that studies we cite actually here do
23 something like that.
24     Q.    They do?
25     A.    They look at buy/sells and

TSG Reporting - Worldwide    877-702-9580

Page 201

S. HAKALA

1
2 negative versus positive reports.
3     Q.    And say that it's okay to ignore
4 confounding analyst reports if they're
5 neutral?
6     A.    Some of them don't say it but if
7 you actually look at the underlying data they
8 do it.  In other words, they only include days
9 when there are positive or negative reports
10 but if you actually look you'll see there's
11 more analyst reports on some of those days.
12 But they're neutral.
13     And in fact some of the studies
14 don't even control for confounding information
15 unless it's like a company's earnings
16 announcement.
17     Q.    But those studies have been
18 criticized for that?
19     A.    No, no.  A lot of them have not.
20 In fact, there's a surprising amount of
21 literature they don't even make an effort to
22 control for confounding information.
23     Q.    Even when they're looking at a
24 particular date as opposed to an aggregate?
25     A.    There's very little of that.  In

TSG Reporting - Worldwide    877-702-9580

1          S. HAKALA
2    fact, single company event studies where a
3    single day of interest is considered, is an
4    applied exercise which does not appear
5    generally in the academic literature.  So
6    there's very little in the academic literature
7    on that.
8          In fact, I think there's a
9    discussion in -- of text by Gilson and Black
10   that talk about that and say that in those
11   circumstances one must simply use some kind of
12   analytical approach or deductive reasoning to
13   draw inferences.
14         So there is literature on it.
15   There's not a lot of literature on it and the
16   academic literature has tended to sweep the
17   issue under the rug and ignore it.
18      **Q.   And is there some objective way to**
19   **determine whether an analyst report is**
20   **neutral?**
21      A.   Well, if the report says it's a
22   reiteration or if there's no either price
23   target or buy or sell.  That would be pretty
24   obvious.  Pretty objective.
25      **Q.   So that would be a neutral report.**

1          **S. HAKALA**
2      A.   Yeah.  Yeah.  So our criteria is
3    is there a material change in an earnings
4    expectation.  Is there a material statement
5    buy/sell kind of change in rating.  Or is
6    there a significant material change in price
7    target.
8          Now, there's one exception.  If
9    it's an analyst report that's written like a
10   day after five other analysts have taken the
11   same action we would probably not include it
12   because we'd consider it old news.  In other
13   words, the analyst is just following what
14   other analysts have said.
15      **Q.   Even if that analyst in particular**
16   **hasn't said it before.**
17      A.   Yeah.  Now, in general, we
18   would -- we didn't do that here as you'll
19   notice.  But in general in most event studies
20   I would generally not include those analyst
21   reports if they're what I call follow-on or
22   me-too reports.
23         But in general here we were pretty
24   careful -- or I tried to be as careful as I
25   could in including any analyst report where

1          S. HAKALA
2    there was any material change in price target,
3    buy or sell rating, or earnings forecast.
4      **Q.   Okay.  So if all that stayed the**
5    **same you wouldn't expect it to have any impact**
6    **on the stock price?**
7      A.   No.  There may still be impact
8    because sometimes the nuances of what's said
9    in the narrative, the qualitative statements.
10     **Q.   And you looked through all the**
11   **reports and looked at all the qualitative**
12   **analysis.**
13     A.   No.
14     **Q.   You didn't do that.**
15     A.   No.  I couldn't.  So to the extent
16   that there may have been some reports that
17   made some qualitative statements but didn't
18   change targets, unless there was a news
19   article about it I didn't include it.
20     **Q.   Because you wouldn't expect that**
21   **to have an impact on the stock price?**
22     A.   I wouldn't know for sure.  There
23   was no way for me to do that.
24     **Q.   Why wasn't there any way for you**
25   **to do it?**

1          **S. HAKALA**
2      A.   That's not as objective.
3          Now, on the other hand you'll see
4    there's some news articles where, like,
5    Blodget or somebody says AOL's a really good
6    stock, you should buy it.  I put that in.
7          If Becker of Lehman says -- makes
8    a comment, and she says something good or bad,
9    then I put that again.
10         But generally if it's just a
11   qualitative type of statement without price
12   target or earnings, generally I did not put
13   that in unless there was an associated news
14   article that highlighted that qualitative
15   statement.
16         So it had to be something more to
17   it.
18         MR. GESSER:  We're up to Hakala
19   10.
20         (Hakala Exhibit 10, MediaWeek
21   article entitled AOL/Time-Warner - One
22   of One?...Plus Commentary on the Past
23   Week's Market News and Performance,
24   marked for identification as of this
25   date.)

S. HAKALA

BY MR. GESSER:

Q.    Earlier you said that there was
an analyst report from Credit Suisse on
February 5th that you thought had a
significant impact on AOL stock price; is that
right.

A.    Yes.

Q.    Is that the report?

A.    Yes.

Q.    Does this report change AOL --
Credit Suisse's rating or price target or any
of the factors we were just discussing that
would lead you to believe that it was likely
to have an effect on stock price?

A.    No.  No, and, in fact, when I
first put it in I actually expected it to have
only a small positive effect at most.

Q.    So in your analysis that we're
talking about for the disclosures you would
have treated this -- but for the fact that it
happened to be from Credit Suisse you would
have treated this as a neutral report?

A.    Generally, yes.

Q.    Okay.

S. HAKALA

A.    Generally, yes.  I wouldn't have
put it in the event study because I wouldn't
have known how to interpret it.  Once you read
the report - and I was focused on the Credit
Suisse - that would alter the interpretation.

Q.    So this demonstrates that your
methodology may have some problems in the
sense that there are reports in your view that
would be neutral and yet could have a fairly
significant impact on stock price?

MR. HALL:  Objection.

A.    That's true.  There's no such
thing as a perfect event study.  And I think
the allusion that there is is an allusion.

But this is a little different.
When we're talking about the reports of
interest in this case we're going to be far
more liberal in including them in the event
study than we would if they were third-party
analyst reports.

Q.    But I mean whether the reports
have an impact on the stock price, that's --
whether they're from Credit Suisse or someone,
else an effect is an effect; is that right?

S. HAKALA

A.    That's correct.

Q.    And what about this report makes
you think it would have -- other than looking
simply at the stock return what about this
report made you think it had a positive impact
on the stock price?

A.    Well, there's a number of things.
They're really commenting on the news of the
prior week and they're saying that they think
that the market has become overly skeptical
about AOL and it's overly concerned and their
analysts say Jamie and Lauren believe that
it's underowned and that there's going to be
this upside to the stock.

And I think in -- I think in
context of that, that is what the market sort
of refocusing on.  It's kind of a report out
of the blue after there'd been some negative
reaction to news in January.

And it seemed to me that the
market was now saying, Okay, where is this
going to go and this is now a report from CSFB
which is a concept report which suggests that
we think that this is a stock that's going to

S. HAKALA

do better than its peers.

Q.    Okay.  This report is authored by
Dennis Leibowitz; is that right?

A.    Yes.  And Regan and Pappas.

Q.    Okay.  Is there any allegation of
which you're aware that Mr. Leibowitz or Mr.
Regan or Mr. Pappas didn't believe anything
they were saying in these reports?

MR. HALL:  Objection.

A.    No.

Q.    Okay.

A.    Not that I know of.

Q.    Do you know of any news stories
that picked up on this report and commented on
it as being significant?

MR. HALL:  Objection.

A.    I don't remember.  I thought there
was something I found but I don't know for
sure.

Q.    And if you look at page 2 of this
report, if you look at the fourth paragraph,
it talks about doubts about the credibility of
AOL's targets being raised.  And it says,
"There were also some suspicions of accounting

Page 210

**S. HAKALA**

1  **S. HAKALA**
2  **maneuvers and concerns over the lack of**
3  **information on topics like AOL's submission of**
4  **advertising."**
5      A.   Yes.
6      Q.   **And then it says, "The first**
7  **quarter reflects what is expected to be the**
8  **slowest in one of the advertising -- the**
9  **slowest one in the advertising industry**
10 **particularly for the Turner networks and some**
11 **of the merger savings are not yet in full**
12 **force."**
13          **And you would characterize that as**
14 **being somewhat negative; is that correct?**
15     A.   No.
16     Q.   **No?**
17     A.   Not for this report.  I would
18 suggest that this is reflecting why the stock
19 was reacting negative the prior week.  So this
20 is more of a retrospective analysis of why AOL
21 Time-Warner stock has lagged at the end of
22 January.  So if you look at my event study,
23 it's not the report itself that's negative.
24 What the report is saying is here are the
25 concerns in the market that have led the stock

Page 211

S. HAKALA

1          S. HAKALA
2  price to languish recently and the languishing
3  of the stock price really occurred on January
4  31st and February 1st.  So this is a report in
5  response to that.
6      Q.   **Okay.**
7      A.   Not -- the report's not saying
8  we're concerned about these things.  We're
9  saying this is the market's concern already.
10     Q.   **Well, it says the first quarter**
11 **reflects what is expected to be the slowest**
12 **one in the advertising industry, particularly**
13 **for the Turner networks.**
14     A.   Yes.
15     Q.   **The Turner networks is part of**
16 **AOL?**
17     A.   Yes.
18     Q.   **So that's not -- that's an**
19 **objective statement, is it not?**
20     A.   Yes.  But not new in this report.
21 That's a statement of concern relating to the
22 drop in the stock price on July 31st and
23 February 1st.
24     Q.   **January 31st.**
25     A.   January 31st and February 1st,

Page 212

S. HAKALA

1  right.
2      Q.   **And -- but this discloses a**
3  **concern about advertising revenue for the**
4  **Time-Warner division; is that right?**
5      A.   That was in the market, yes.
6      Q.   **But you nonetheless view this as a**
7  **positive report because you think that these**
8  **concerns are swept aside by the report; is**
9  **that right?**
10     A.   This report says that we think
11 that the market is overdiscounted those
12 factors and Jamie Kiggen and Laura Martin are
13 saying we think that you should, you know --
14 you should buy this because the institutions
15 aren't in this stock as much as they should be
16 and we think the company's going to do better
17 than people think.
18     Q.   **It says that these issues are**
19 **going to cause the stock to tread water for a**
20 **while; is that right?**
21     A.   Right.
22     Q.   **Okay.  And did you think that**
23 **the -- is it your assumption that the**
24 **concentration of institutional ownership was**

Page 213

**S. HAKALA**

1          **S. HAKALA**
2  something that was new in this report?
3      A.   No.
4      Q.   **That was already out in the**
5  **market.**
6      A.   Yeah.
7      Q.   **Okay.  So then why would that have**
8  **an effect on the stock price?**
9      A.   Because that's not really what's
10 going on here.  What's going on here is
11 they're saying the market's reacting to these
12 concerns.  We think the market is giving too
13 much weight to these concerns.  We think AOL's
14 going to do better.
15     Q.   **But how is that different from**
16 **what all the -- I mean, there are other**
17 **analysts who have much higher priced targets,**
18 **much higher estimates, and -- at this time why**
19 **is the market reacting to what Credit Suisse**
20 **is saying?**
21     A.   Because Credit Suisse is speaking
22 now after the stock has had a shakeout of two
23 days of negative reports and saying we think
24 the market's -- my take of this report is
25 they're saying the market's overreacting and

Page 214

S. HAKALA

1
2   that AOL has a track record of credibility so
3   that the market is overdiscounting this stock
4   and we expect this stock to return in the
5   future. And that's what investors of taking
6   out of this and that's why they're reacting to
7   it.
8           Now, I was actually surprised at
9   the reaction but clearly it's a significant
10  reaction and there's clearly nothing else I
11  found that would explain it other than this.
12          So sometimes a report that might
13  not change anything but is reacting after a
14  negative event such as occurred on February
15  1st, even reiterating a report that's
16  following a negative development can sometimes
17  have a positive effect. And that's an example
18  of what's happening here.
19      Q.   So what happened on February 1st?
20      A.   It's in our events study.
21          (Document review.)
22      A.   February 1st was -- the tag line
23  from Reuters is investors are skeptical about
24  growth prospects and are now thinking that
25  numbers released the day before were worse

TSG Reporting - Worldwide    877-702-9580

Page 215

S. HAKALA

1
2   than what they originally thought.
3           And then there's another article
4   the following day saying that AOL is
5   hard-pressed to meet its fiscal year targets.
6       Q.   And so that's -- February 1st. So
7   what -- is that an advertising day in your --
8       A.   Yes.
9       Q.   So -- and what does that mean?
10  That means that this was a partial correction
11  of Credit Suisse's omission earlier in the
12  month; is that right?
13      A.   Yes.
14      Q.   And then you take the position
15  that on February 5th then there was a
16  reinflation; is that correct?
17      A.   Yes. Yes.
18      Q.   Okay. Does it -- does your -- and
19  do you view February 1st as a relatively clean
20  day?
21      A.   It's relatively clean for the news
22  on that day. However, there is a positive
23  CSFB report on that day but it doesn't seem to
24  stem the tide. The day is dominated by
25  investor and other analyst reaction. So in

TSG Reporting - Worldwide    877-702-9580

Page 216

S. HAKALA

1
2   effect February 1st is relatively clean in
3   terms of what's causing the market to move on
4   that day. But it is confounded in the sense
5   that Credit Suisse report probably kept that
6   drop from being greater as well as some other
7   reports.
8       Q.   As well as some other reports.
9       A.   Yeah.
10      Q.   Do you remember who else released
11  reports that day?
12      A.   No, I don't.
13      Q.   Okay. Is it possible that Bear
14  Stearns, Bernstein, Deutsche Bank, Goldman
15  Sachs, Salomon Smith Barney, UBS Warburg all
16  released reports on that day?
17      A.   I'm not surprised at all. It was
18  an analyst day so I would expect all the major
19  analysts that were regularly covering the
20  stock to have issued reports in that time
21  period.
22      Q.   So how do you separate out Credit
23  Suisse's report from all those other reports?
24      A.   I don't. On that day I don't give
25  weight to Credit Suisse any more than any of

TSG Reporting - Worldwide    877-702-9580

Page 217

S. HAKALA

1
2   the other reports.
3       Q.   But you just divide them up among
4   the analysts? Or how do you do it?
5       A.   No, no, no, no. That day is an
6   advertising day. That day is a day that's
7   corrective. It reduces damages going forward.
8       Q.   And so the stock price drops on
9   that day?
10      A.   Drops on that day because the
11  market is partially realizing the relevant
12  truth before we can have loss causation
13  because I don't start loss causation. So by
14  having that day in I'm actually neutralizing
15  some of the inflation in the stock price.
16      Q.   And have you read the Bear
17  Stearns, the Bernstein, the Goldman Sachs, the
18  Salomon Smith Barney, and the UBS reports to
19  see if they had other concerns about AOL that
20  may have been contributing to the drop in the
21  stock price?
22      A.   Yes. Not all of them but most of
23  the ones that you mentioned I'm pretty sure
24  I've read. And I think most of them all have
25  concerns that relate to this issue if they

TSG Reporting - Worldwide    877-702-9580

Page 218

S. HAKALA

1
2  have concerns at all.  The reports are really
3  mixed.  Some reports are the market's
4  overreacting to concerns which is sort of the
5  CSFB tone and other reports are these are
6  legitimate concerns so we're lowering our
7  EBITDA targets or our EBITDA targets are going
8  to be below management guidance.  So there's
9  sort of two sets of reports in my mind with
10  some gradation in between.
11      **Q.   And you feel that you can sift**
12  **through all this and determine the effect of**
13  **the disclosure?**
14      A.   Well, all we're doing is we're not
15  trying to determine the effect of a single
16  disclosure.  We're saying there's a whole
17  series of relevant statements on that day but
18  since they're all relevant we're taking the
19  net effect of the stock price movement on that
20  day and we're considering it to be related to
21  the advertising related claims in this case so
22  I don't have to parse it out because all of
23  the events, all of the statements relate
24  primarily to the issue in the case.
25      **Q.   But you didn't read all those**

TSG Reporting - Worldwide    877-702-9580

Page 219

**S. HAKALA**

1
2  **reports to determine that?**
3      A.   I can't say for certain I read all
4  of them but I certainly read a lot of them.
5  And I certainly read summaries of most of
6  them.
7      **Q.   So is that amount that is**
8  **attributable to the disclosure, is that**
9  **quantifiable or are you just take whatever the**
10  **stock drop was that day and you attribute all**
11  **of that to the disclosure of -- of what?**
12      A.   Once I'm convinced that the
13  statement on that day and the movement in the
14  stock price on that day relate to the issue in
15  the case and not something else then I take
16  the net movement on that day.
17      **Q.   And the net --**
18      A.   The fact that there are multiple
19  statements on that day doesn't change that
20  result.
21      **Q.   So how can you determine as**
22  **between all that information what's relevant?**
23      A.   Well, all of it's relevant.
24  That's the problem is all of it's relevant
25  so --

TSG Reporting - Worldwide    877-702-9580

Page 220

S. HAKALA

1
2      **Q.   Well, cumulatively it's relevant**
3  **but any particular piece of it, you can't**
4  **determine whether any particular piece of it**
5  **is relevant.**
6      A.   Well, why not?  If you're talking
7  about what is -- what is the punch line of
8  what investors are react to go on that day
9  it's relevant information.
10      **Q.   And what is that?**
11      A.   The relevant information is
12  whether or not advertising demand is going to
13  be -- and pricing is going to be sufficient to
14  allow AOL to meet its revenue and earnings
15  targets.
16      **Q.   And when they talk about**
17  **advertising is that on-line or is that --**
18      A.   Both.
19      **Q.   It's both?**
20      A.   It's both.
21      **Q.   And where do you get that from?**
22      A.   From the news articles and the
23  analysts' reports.
24      **Q.   Which news articles?**
25      A.   I cite one in specific.

TSG Reporting - Worldwide    877-702-9580

Page 221

S. HAKALA

1
2      **Q.   Okay.  Which one is that?**
3      A.   Reuters.
4      **Q.   What does it say?**
5      A.   Growth prospects are now thinking
6  the numbers released the day before were worse
7  than when they originally thought.
8          But the issue was advertising and
9  advertising rates and growth.
10      **Q.   So just so I understand, is there**
11  **any peer review method that would allow you to**
12  **determine that the stock was responding to the**
13  **Reuters article as opposed to something else?**
14      A.   No.  The Reuters article was not
15  what the market was responding to.  The
16  Reuters article is a summary of what the
17  market was responding to.  It's the other way
18  around.
19      **Q.   Okay.  So what was the market**
20  **responding to?**
21      A.   It was responding to these
22  concerns and these concerns were expressed by
23  a number of different analysts and a number of
24  different investors.  And the Reuters article
25  is just a convenient way of summarizing what

TSG Reporting - Worldwide    877-702-9580

Page 222

S. HAKALA

1  the market was responding to. And the peer
2  reviewed way of doing that is to look at the
3  news and ask what are the analyst reports
4  saying about why the stock reacted negatively.
5        And, in fact, if we look at Hakala
6  Exhibit 10 we see exactly it says, "This is
7  what the market is skeptical about. Here's
8  the concerns in the market."
9        And my point is that the February
10 5th report by Credit Suisse First Boston says
11 that the concerns that the market's reacting
12 to at the end of January and early February
13 relate to the allegations in this complaint.
14     **Q.   And earlier you said that the**
15 **effect of a number of analysts speaking would**
16 **be different than the effect of one analyst**
17 **speaking; is that right?**
18     A.   Sometimes. Sometimes not.
19     **Q.   Okay.  In this particular case**
20 **you're tagging CSFB with all the liability for**
21 **a decline in AOL stock price that occurs on a**
22 **day when there are a number of analyst**
23 **reports; is that right?**
24     A.   No.  No, I'm not.

Page 223

S. HAKALA

1     **Q.   No?  What are you doing?**
2     A.   I'm only tagging them with a
3  fraction of that and I'm considering that to
4  be an event which releases inflation from the
5  share price so it reduces damages in this
6  case. It doesn't increase them.
7     **Q.   This isn't a relative disclosure**
8  **day?**
9     A.   It is relative disclosure but
10 because it represents the materiality of the
11 concerns, it reduces some of the inflation in
12 the stock price before you could have damages.
13 So it doesn't increase damages. It decreases
14 damages by including that day in the event
15 study. Including that day in the event study
16 and putting a partial weight on that date
17 which is determined mathematically in Exhibit
18 C-1A and C-1 causes that event to reduce
19 damages. Not increase damages.
20     **Q.   But that's not an equivalent**
21 **disclosure date for you?**
22     A.   It is an equivalent disclosure
23 date. It does give us information that the
24 issues in this complaint are material but

Page 224

S. HAKALA

1  because it's causing the stock to go down for
2  reasons related to the fraud before I argued
3  the first major corrective disclosure, I don't
4  assume there's any loss causation associated
5  with the drop on that date so I don't have any
6  damages on that day.
7     **Q.   When's the first major disclosure**
8  **date?**
9     A.   The first major disclosure that
10 really sort of reveals the relevant truth in
11 my mind is really the July 18th date.
12     **Q.   Okay.  We'll get to that in a**
13 **second.**
14     A.   So there's positive and negative
15 events as the mix of information's changing
16 and going back and forth in this time period.
17 And I want to pick up both positive and
18 negative days and give some weight to them.
19 But it's a fractional weight that reflects
20 CSFB's role, not a full weight. I'm not
21 putting a hundred percent weight on that.
22     **Q.   So what weight are you putting on**
23 **that?**
24     A.   It's about .1341.

Page 225

S. HAKALA

1     **Q.   Of what?**
2     A.   Of the full effect. So about 13.4
3  percent of the full --
4     **Q.   And how do you arrive at that**
5  **number?**
6     A.   It's calculated based on the event
7  effect of CSFB's analyst reports throughout
8  the period.
9     **Q.   Cumulatively?**
10     A.   Cumulatively.
11     **Q.   So it's a rough --**
12     A.   It's solved. It's solved for.
13 It's called a calibration. Which is something
14 in the peer review literature, by the way.
15        So that's an exact calculation of
16 what portion of all those relative events
17 should be attributable to CSFB by itself.
18     **Q.   When you take -- well, let's go to**
19 **July 18th.**
20     A.   Okay.
21     **Q.   And that's a negative ad related**
22 **disclosure date for you?**
23     A.   Yes.
24     **Q.   And that's the first date for**

Page 226

S. HAKALA

1
2    which you start assessing damages; is that
3    right?
4        A.   Yes.
5        Q.   And what was the cause of the
6    corrective disclosure?
7        A.   Missed analyst estimates because
8    of declines in ad revenues both in AOL and in
9    Time-Warner.  And a lowering of guidance
10   accordingly.
11       Q.   And why wouldn't that be a full
12   corrective disclosure of the alleged fraud?
13       A.   Because I'm assuming that CSFB's
14   only on the hook for part of it.  And, by the
15   way, it was almost a full corrective
16   disclosure.  If you look at the inflation
17   percentage, the inflation in the share price
18   is very close to zero after those two days.
19   And then there's reinflation in August and
20   September.
21            So in fact it is -- one could
22   argue -- I mean, there is an argument to be
23   made in an alternative that you would take the
24   analyst reports at the beginning of the class
25   period and carry them out to that date.  And

Page 227

S. HAKALA

1
2    you could do that.  That would be something
3    one could do and that would be an alternative
4    to present to the jury.  But what I'm looking
5    at is, you know, how much of the drop is
6    occurring prior to and then subsequent to that
7    date.
8        Q.   And you attribute all of the drop
9    in AOL stock price to decline in advertising
10   revenue?
11       A.   Yes.  I believe that is the
12   primary if not exclusive cause of the effect
13   on those two days.
14       Q.   Does your event study indicate
15   that there's any other negative news about AOL
16   that occurs on those two days?
17       A.   There is some other news but I
18   don't think it's net negative.
19       Q.   What is that news?
20       A.   Well, there's other news about
21   subscriber revenue, subscriber rates in AOL.
22   Not much more.
23       Q.   Anything about Warner Music's
24   revenues?
25       A.   There certainly is information

Page 228

S. HAKALA

1
2    about each division but Warner Music is one of
3    the issues that Laura Martin expresses a
4    concern about.
5        Q.   About advertising.
6        A.   In general.
7        Q.   Well, does she express a view
8    about the music sale business and how it might
9    be affected by on-line pirate downloads?
10       A.   I don't know but I don't remember
11   that being a particularly noticeable component
12   of the drop on that day.  If you know it was
13   that would be interesting.
14       Q.   Well, I don't know what it was.  I
15   mean, I don't know how -- how do we determine
16   that?  If there's negative news about Warner
17   Music Group's revenues, how do we decide what
18   was attributable to what?
19       A.   You'd have to look at the
20   disclosure about Warner and whether or not
21   that was part of what she foresaw.  She did
22   foresee problems in the Warner division.
23       Q.   No, I'm not talking about what she
24   foresaw.  I'm talking about if you look on any
25   particular day how do you determine if there's

Page 229

S. HAKALA

1
2    negative news in a whole bunch of areas, how
3    do you determine what is a cause in a drop in
4    the stock?
5        A.   Reading all the analyst reports
6    and news reports and drawing inferences from
7    those information and deductive reasons.
8        Q.   Okay.  So let's take a look at
9    Hakala 11.
10       A.   Okay.
11            (Hakala Exhibit 11, Business Wire
12            press release dated July 18, 2001,
13            marked for identification as of this
14            date.)
15   BY MR. GESSER:
16       Q.   So this is -- have you seen this
17   article before?
18       A.   Yes.
19       Q.   What is this?
20       A.   This is the press release where
21   the company is disclosing its second quarter
22   earnings.
23       Q.   Okay.  So if you look at page 6.
24       A.   Yes.
25       Q.   In the music section it says that

Page 230

1    **S. HAKALA**
2    **Warner Music Group's quarterly revenues**
3    **totaled 895 million, down 11 percent from the**
4    **previous year due primarily to lower industry**
5    **wide music scales and unfavorable currency**
6    **exchange.**
7        A.   Yes.
8        Q.   **EBITDA declined 33 percent.  Okay?**
9    **Would you agree that's negative news?**
10       A.   All else being equal, yes.  But
11   relative to what was previously expected, no.
12       Q.   **That decline is expected?**
13       A.   In other words, if you already
14   knew that the Music Group was struggling and
15   the music was being pirated and that you were
16   having problems with the marketing costs and
17   artists that would already be baked into your
18   forecasts.
19       Q.   **Do you know what the expectations**
20   **were for the Music Group at this time?**
21       A.   It was struggling and it was known
22   to be declining.
23       Q.   **Do you know what the expectations**
24   **were for revenue?**
25       A.   I don't know if it was this much

Page 231

1    S. HAKALA
2    but I do know that it was having troubles.
3    And I know that it was having troubles in the
4    first quarter as well.  See, this is down from
5    the previous year's quarter.  So they'd
6    already been down in the first quarter that
7    year.
8        Q.   **You know that?**
9        A.   Yeah.
10       Q.   **How much?**
11       A.   Don't know.  We'd have to look at
12   that first quarter.  We'd have to look at the
13   guidance.  But I know that the Warner Music
14   Group was struggling all throughout this
15   period and I think Laura Martin somewhere made
16   a comment of that.  She may even have
17   commented on that before the merger.
18       Q.   **So --**
19       A.   The other thing is, you know --
20       Q.   **So you're able to read these**
21   **reports, take a look at the negative news, and**
22   **determine which piece of this information is**
23   **likely to be the cause of a stock drop and**
24   **which is not.**
25            MR. HALL:  Objection.

Page 232

1    S. HAKALA
2        A.   It's not just me.  It's what are
3    the analysts saying and it's also, okay,
4    subscriptions are up in AOL.  So if we have a
5    little bit of poor performance in one division
6    but good performance in another the question
7    is that net of the issue that we're concerned
8    about was the net effect of all the other
9    issues positive or negative or relatively
10   neutral.  And my determination was that it was
11   relatively neutral.  To slight negative.  But
12   certainly not -- nothing even remotely
13   necessary to cause the kind of price declines
14   we're talking about.
15       Q.   **And what are the price declines**
16   **we're talking about?**
17       A.   We're talking about a relative
18   stock price effect on two days.  The first day
19   8.18 percent and then on the second day when
20   the analysts say that this is really bad for
21   ad revenue and CSFB, by the way, lowers second
22   half revenue and visibility another
23   4.88 percent.
24       Q.   **So that's July 18th and July --**
25       A.   July 19th, yes.  So you're looking

Page 233

1    S. HAKALA
2    at more than a 12 percent drop over two days.
3        Q.   **And then what did you do -- how do**
4    **you attribute that drop to the damages in this**
5    **case caused by CSFB?**
6        A.   I only attribute a fraction of it
7    to CSFB because CSFB is only issuing a partial
8    report on one day and the disclosures made by
9    the company so I assume that company
10   disclosures carry far more weight than CSFB so
11   I only assigned 13.4 percent of the effect of
12   those drops to CSFB.
13       Q.   **And how do you come up with the**
14   **13.4 percent?**
15       A.   Again, calibration.  I did an
16   EBITDA target at the beginning of the class
17   period and not issued the February 5th report,
18   and then working forward --
19       Q.   **How do you come up with that**
20   **number?**
21       A.   Based on the equivalent disclosure
22   analyst impact analysis we previously
23   discussed.
24       Q.   **And what is that?**
25       A.   We've already discussed that.  I