S. HAKALA

A. Yes.

**Q. And what was negative about that?**

A. Soft economy, no clear signs of advertising pick-up. The company has taken a more conservative view of AOL.

**Q. Sorry. Who's speaking here?**

A. This is Salomon Smith Barney.

**Q. This is Jill Krutick?**

A. Yeah. And in addition Argus is saying -- making some comments. And then they're saying that they don't think AOL is going to hit its cash flow targets this year.

**Q. Did you check to see whether Salomon Smith Barney had made similar claims earlier?**

A. They may have made some statements but this is an incremental statement on this day relative to prior days.

**Q. So even if they're saying basically the same thing if they're saying it later that may have an effect on the stock price even if it didn't earlier?**

MR. HALL: Objection.

A. No, your concept of saying

S. HAKALA

basically the same thing is not my concept of saying basically the same thing. If an analyst says we think that the market is weakening and we should lower guidance one day and then they say we think the economy is weakening and we should lower guidance another day, both days are relevant events in my mind. They're not saying the same thing because one's incremental to the other.

In other words, if an analyst downgrades their earnings target once and then a quarter later downgrades it again in a clean event, both days are relevant and both days will likely have a stock price impact. Even though you could argue they're saying the same thing but they're not saying the same thing. Because they're at a different time and a different reference point.

And as we noted Salomon Smith Barney was one of the most bullish on AOL at this point so that's pretty notable.

**Q. So similar things said by analysts, the same analyst, may have different effects depending on the timing of the**

S. HAKALA

**disclosure; is that right?**

A. And depending on the relative statement.

**Q. Depending on the relative statement.**

A. But, I mean, I'm not saying they're different. I mean, if you have an analyst who downgrade -- who lowers earnings 5 percent on a clean day where nothing else is happening and say I think the market's overestimating AOL's prospects, I'm going to lower earnings 5 percent, and then a quarter later on a clean day where nobody else speaks says the same thing again and lowers earnings 5 percent, all else being equal, I'd expect both days to cause a significant drop in the stock price.

So just the fact that they lowered earnings 5 percent both times they're lowering 5 percent again incremental to the prior time so both days will have an impact.

**Q. But that's not what I'm asking. I'm asking in this -- this is August 29th.**

A. Yes.

S. HAKALA

**Q. You attribute to Salomon Smith Barney a decrease in the AOL stock price because they are lowering their EBITDA numbers from 39.9 billion to 39.1 billion; is that right?**

A. That can't be EBITDA. That has to be revenue.

MR. HALL: Objection.

**Q. I'm sorry. Revenue numbers.**

A. That's part of it. There's also an Argus report, by the way, that goes the other way, that says we think the downside is limited so there's an Argus analyst that's positive that actually helps offset the effect of the Salomon report on that day.

**Q. But let's stick with the Salomon report. If Salomon had previously disclosed that they were going to lower their revenue estimate from 39.9 to 39.1, would that -- would you expect that it would have a incremental effect if that were redisclosed essentially two weeks later?**

MR. HALL: Objection.

A. Not generally. If that was

S. HAKALA

clearly the case I would -- I would take that out and then I would focus on the Argus report by itself but that's not what I understand to be the case. If it is then I would take out of that event.

(Hakala Exhibit 20, Salomon Smith Barney Equity Research Report dated August 14, 2001, marked for identification as of this date.)

BY MR. GESSER:

**Q. Hakala 20.**

A. I mean, there may be something else in that news article.

**Q. This is August 14th, 2001.**

A. Okay.

**Q. So if you look at the second bullet, trim revenues. That actually was disclosed earlier, right?**

A. This was. But the news article I'm citing isn't this.

**Q. The news article you're citing is what?**

A. She warned this week, this week being 8/29, that in the face of a soft economy

S. HAKALA

no clear signs of advertising -- the company had taken a more conservative view of AOL.

**Q. And how is that more reflective?**

A. Well, she's saying I'm going to take a more conservative view. This seems more positive.

**Q. But isn't the next statement then they're dropping their revenue from 39.9?**

A. In what?

**Q. In the news report you're just reading from. In the face of a soft economy her company had taken a more conservative view of the AOL.**

**The next line in the report is that her estimate had been to reduce --**

A. Oh. So what you're saying is that this analyst report came out on August 14th and that was just reporting on it.

**Q. Correct.**

A. If that's the case then I should have taken that out of the event study. Okay? Because that's not new.

**Q. So with that out of the event study what was the reason for the decline in**

**S. HAKALA**

**the AOL stock on that day?**

MR. HALL: Objection.

A. Then the only other possible explanation is the other major event on that day and that's the Argus report.

**Q. Okay. What --**

A. Which is a mixed report.

**Q. Why is that report mixed?**

A. It says for the long time we don't think -- we still don't think AOL is going hit is cash flow targets but now the rest of the Street seems to believe that, too. Forecasts are coming down. And we think the downside is limited probably to around 35.

So I'd have to reanalyze that report and see if that's a positive or a negative statement. It's probably mixed.

**Q. And what about September 18th, 2001? That's an inflationary day?**

A. Yes.

**Q. Why do you view that as being an inflationary day?**

A. Because AOL was up on positive analyst comments suggesting that 9/11 was not

S. HAKALA

going to have as negative an impact on AOL as expected.

**Q. Which analysts?**

A. There were a number of them but I believe the primary analysts on that day were -- we don't have the exact timing of when CSFB comes out.

**Q. You don't have the exact timing of when --**

A. The CSFB comes out. I know you've got the 9/19 but we had picked up 9/18, a comment.

**Q. By whom?**

A. But JPMorgan reiterated. And then Kaufman Brothers raised to buy from accumulate.

**Q. What made you think that there was an CSFB report on 9/19?**

A. It was late on 9/18 and we weren't sure it hit on that day or not.

**Q. What was late on -- it came out -- it came after the market closed on 9/18 or sometime --**

A. I don't remember the story on

S. HAKALA

that. I should have looked into that the other day.

**Q. Well, what does your expert report say?**

A. The expert report places it on 9/19.

**Q. Okay.**

A. Because we have a .5 weight on 9/19 and we only have a .1341 weight on 9/18. So for whatever reason when I was typing up Exhibit B I didn't move the CSFB reference.

**Q. But you think the CSFB reference should be on the 18th?**

A. No. I'm pretty sure it's on the 18th. It's either after the close of trading on the 18th or it's on the 19th, on the morning.

**Q. So why is this considered a relatively clean day in your report?**

A. For an analyst report?

**Q. For an analyst report.**

A. Because this is the only news on that day related to what analysts are saying about the stock.

S. HAKALA

**Q. What news is that?**

A. And that is the one of the analysts rated -- upgraded it from accumulate to a buy.

**Q. What analyst is that?**

A. Kaufman Brothers.

And then we have CNBC News saying AOL is up on positive analyst coverages, comments and JPMorgan reiterating which in light of 9/11 was viewed as positive apparently to CNBC.

So we have a news article that specializes on the markets saying it's up because of analysts and then the only significant news I have on that day that I've identified is an analyst upgrade.

**Q. Do you have any news reports about the analysts in your event study on this day?**

A. We probably do in our file. And we have the CNBC cites.

**Q. Do you know what the Wall Street Journal said about the analyst reports?**

A. No. Not without looking.

**Q. February 5th, 2002 is another**

**S. HAKALA**

**negative...**

**(Pause on the record.)**

**Q. Sorry. February 5th, 2002 is another negative advertising-related disclosure date; is that right?**

A. It has a negative effect and it is advertising related, yes.

**Q. And what's the negative news on that day?**

A. I'm not sure. All I have is a UBS report on that day.

**Q. But you don't know if that UBS report relates to advertising?**

A. No. It does relate to advertising.

**Q. How do you know that?**

A. It talks about the economy improving and recommends a number of stocks.

**Q. Why is that related to advertising?**

A. Because this is an advertising driven company and when the company is improving people are going to advertise more.

**Q. So you're -- the only connection**

**S. HAKALA**

**between this report and advertising is the fact that UBS is recommending someone buy AOL. That's your evidence that it's advertising?**

MR. HALL: Objection.

A. No. He's talking about the strength of the economy and how that's going to affect advertising.

**Q. Is he talking about advertising?**

MR. HALL: Objection. Dr. Hakala has already stated that before he put these into this report he reviewed them to see if they were relevant to the issues. You're asking him now --

MR. GESSER: Okay, just don't testify. Just object. Don't testify.

MR. HALL: Objection. You're asking him to look at one line and you're trying to draw examples. Pull the report out. Let's look at it.

Go ahead.

MR. GESSER: All I want to understand is what is it about this report that links it to advertising. His answer was that the economy's

S. HAKALA

improving and people were supposed to buy AOL. To me --

MR. HALL: For the record, he doesn't have the report in front of him.

A. But it's not just AOL. It's Fox, Viacom, News Corp. and Channel -- Clear Channel.

**Q. Media companies.**

A. Media companies.

So, in other words, he's saying that the media is improving. Now, it ends up being a negative event that day but because of the way I structured the event study I put it in anyway because there was a positive event the day after. In other words, once I --

**Q. I don't understand what you're saying. Stop there.**

A. Okay.

**Q. This is a negative day.**

A. This day ended up having an negative effect.

**Q. Even though this is positive news.**

A. Even though this would probably be positive news, yes.





S. HAKALA

**Q. Okay. So why is that?**

A. Don't know. It may be a carryover from what happened on 2/4/02.

**Q. 2/4/02. What happened on 2/4/02?**

A. It has to do with accounting fears sending down stocks and that AOL's offered less than detailed guidance.

**Q. Any reason to assume that of all the days in the class period that would be one of the days where the information would have to be leaked into the market over the course of two days as opposed to one day?**

MR. HALL: Objection.

A. Sometimes if it's rumors and fear, yeah, it would be.

**Q. Did you do anything to test that?**

A. No. I mean, essentially, what I did was I stuck to a basic theory that if I marked something as relevant on an a priori ground I stuck with it as relevant after regardless --

**Q. Even if it looked counterfactual after the fact?**

A. Yeah, yeah.





S. HAKALA

**Q. Okay.**

A. Now, I could -- you know, I could take that out and show what the effect is and I don't think it's going to be that much but...

**Q. What about February 6th, 2002?**

A. That's pretty clear.

**Q. What is that?**

A. That they're inexpensive after a recent drop. Assets are undervalued. And two -- three analysts all say that.

**Q. Three analysts say -- so these are analysts reports that are relating -- it's advertising relating?**

A. Ad related and analyst related.

**Q. And, again, Credit Suisse didn't issue a report this day. In fact, Credit Suisse wasn't even covering AOL at this point.**

A. That's right.

MR. HALL: Objection.

**Q. February 20th, 2002.**

A. Yes.

**Q. That's another negative ad day?**

A. Yes.





S. HAKALA

**Q. What was the negative information in that day?**

A. I think that's pretty clear. That's a downgrade by Lehman from buy to market perform.

**Q. Right. We already --**

A. Substantial lowering of earnings.

**Q. We already discussed that, right?**

A. Um-hum.

**Q. And February 21st?**

A. That's really a follow-on to that. I was actually -- Janis in light of the report was trimming its stake in AOL on concerns. Raymond James on the other hand recommends buy and exaggerate concerns and then it says negative sentiment from many analysts. So it's sort of a mixed day but overall negative.

**Q. And what was the Janis report?**

A. Janis didn't issue a report. Janis was an investor. In fact, they were the largest single investor in AOL at this time. That's unaffiliated or not affiliated with the company.

**Q. And what was it that was**

S. HAKALA

**disclosed?**

A. They were cutting their stake in AOL.

**Q. Was that news?**

A. Yep.

**Q. Had they been cutting their stake --**

A. Earlier.

**Q. Earlier?**

A. But the fact that they were abandoning AOL came out on this date.

**Q. When did Janis makes its regulatory filing that revealed it's cutting its shares in AOL?**

A. The one on the fourth quarter was on 2/15/02.

**Q. So the regulatory disclosure was public before this date, right?**

A. Yeah. But this is a second one saying that there's rumor in the market that Janis is further trimming it following Lehman.

**Q. And --**

A. This is a second piece of news.

**Q. And why is this advertising**

S. HAKALA

**related?**

A. That was one of their concerns, that AOL was not going to be able to sustain its business.

**Q. Where does that come from?**

A. I'd have to go back and look at C-basemarketwatchstreet.com. But that's the concern. The concern is that that's the relationship of the business. I mean, the business is either driven by subscribers or advertising.

**Q. What business?**

A. Versus subscriptions.

AOL Time-Warner.

**Q. It's not driven by anything on the Time-Warner side?**

MR. HALL: Objection.

A. Time-Warner is heavy media including their cable.

**Q. They have a movie industry. They have TV networks. They have all sorts of other things that aren't necessarily driven by advertising, right?**

A. Not really. I mean, movie to some

S. HAKALA

extent is driven by entertainment. And they have some entertainment lines. But the same fundamentals that drive advertising drive their entertainment business. And a lot of their entertainment is advertising dependent.

**Q. Let's take a look at the Janis report.**

**(Hakala Exhibit 21, Janis research report dated February 21, 2002, marked for identification as of this date.)**

**BY MR. GESSER:**

**Q. What in this report leads you to believe that Janis was concerned about advertising?**

A. It doesn't say they're concerned about advertising in general.

**Q. It doesn't say anything about advertising?**

A. No. Just that they think that the stock isn't going to grow so they're beginning to repair their position.

**Q. So why is this an advertising negative disclosure date?**

MR. HALL: Objection.

S. HAKALA

A. Because if you're paring the position because of advertising it's because you're concerned that the business is no longer going to grow and the growth is driven by advertising.

**Q. I'm sorry. So let's see if I understand this right. So just because Janis is cutting its position on AOL makes this news relating to advertising?**

MR. HALL: Objection.

A. It makes it relating to that. And also relating to an analyst issue. It's basically institutional investors saying I don't think this is a good buy and cutting its position in the wake of Holly Becker the prior day cutting her forecast.

**Q. But Holly Becker is cutting her forecast for a number of reasons. Advertising is one them and I guess my question is why do you assume that Janis is focused on that issue as opposed to the other three issues that are identified in Holly Becker's report?**

MR. HALL: Objection.

A. That's my assumption. Because

S. HAKALA

that issue is the predominant issue. That's the one that's going to drive growth and valuation.

**Q. All right. Let's take a look at Hakala 22.**

**(Hakala Exhibit 22, Janis research report dated February 21, 2002, marked for identification as of this date.)**

**BY MR. GESSER:**

**Q. This is also on February 21st, 2002. Have you seen the CNNfn: Street Sweep before?**

A. Probably.

**Q. Is it in your report?**

A. Yes.

**Q. If you look at the one, two, three, four...fifth paragraph down it says, "So what's ailing AOL? Well, talking to analysts today and, of course, that downgrade coming out of Lehman's yesterday it's the maturing AOL unit. Nobody really mentioned what's going on with entertainment. They're satisfied with that. But it's what's going on with the AOL, the subscribers, the dial-up**

**S. HAKALA**

**base there, that that is maturing, the growth rates are beginning to slow there."**

A. Okay.

**Q. Does that sound like advertising to you?**

A. If the advertising is in AOL on-line, yes. But not explicitly, no.

**Q. I'm not sure I understand what you're saying. Doesn't this sound like what's ailing AOL is the decline in the subscribers?**

A. The slowing of subscriber growth is an issue.

**Q. It's the issue. Isn't that what they're saying?**

A. It's an issue.

**Q. Talking to analysts today, this is what's ailing AOL. Isn't that what this paragraph is saying?**

MR. HALL: Objection.

A. That's not independent of advertising.

**Q. Subscriber growth is not independent of advertising?**

A. No. Not if you look at the Becker

S. HAKALA

report. Look at the EBITDA on the advertising part in her report.

**Q. So -- I'm sorry. Fewer subscribers effects advertising how?**

A. If you have fewer subscribers you're not going to get as much advertising revenue. The other side of it is if you look at Becker's report it's not just the growth in subscribers, it's the growth in advertising, on-line advertising revenue.

**Q. But that's not what this is saying.**

A. I know. But that's part of the story. It's talking about the Becker report. And that's what they're talking about. He also goes up and talks about the media versus Internet people.

**Q. But you remember reading this?**

A. Yeah.

**Q. And you remember discounting this as being the reason for -- is it that you discounted this as the reason for the stock decline on that day or is it because you view a decline in subscribers as being synonymous**

**S. HAKALA**

**with advertising?**

A. I viewed the whole issue as being advertising related because of the analysis of Holly Becker.

**Q. Can you think of anything that would be negative about AOL that isn't advertising related?**

MR. HALL: Objection.

A. If you were talking about something like cable subscriptions and growth in cable or if you were talking about in --

**Q. Why wouldn't that be advertising related? Isn't --**

MR. HALL: Objection.

A. Some of it would. Some of it would not.

**Q. All right. Let's turn to your use of dummy variables in this case.**

A. Sure.

**Q. In your damages report about how many days did you for lack of a better term dummy out of the class period?**

A. 216.

**Q. How many days were there in the**

S. HAKALA

**class period?**

A. 388.

**Q. It's more than 50 percent?**

A. Yes.

**Q. And your regression period, is it shorter than the regression period that you used in your class certification declaration?**

A. Yes.

**Q. It goes from 461 days to 382?**

A. Something like that, yeah.

**Q. Okay. Why did you use the shorter period?**

A. Because I felt that the company was a different company prior to the merger or prior to the confirmation that the merger was going to occur and after July 25th the stock began to trade very differently. It began to trade as though AOL was a net negative. So I wanted to narrow the study period to make it more reflective of what I thought was the appropriate dynamics of the stock both in terms of volatility and in terms of relationship to the market indices during the class period, itself, as opposed to outside of

S. HAKALA

the class period.

**Q. Before you said that Cox was a comparable stock to AOL. Is that part of your indices that you used?**

A. I thought it was.

No, it wasn't. I misspoke. It was a comparable in one analysis but for some reason something specific to Cox happened that kicked it out of my analysis.

**Q. Do you know what that was?**

A. No. There was probably something company-specific to Cox in this period that caused it to move different from AOL on some key days.

**Q. How did your analysis here with respect to the use of dummy variables differ from your analysis in Xcelera?**

A. There are three basic differences. In Xcelera I had to rely heavily on bulletin board postings because the company had very limited news and analyst coverage.

Two, because of the nature of postings and because of the information I generally put a -- as I pointed out, a -- I

S. HAKALA

marked most of the days when there was any news as an event. Here I did not. I was much more selective. As you're probably well aware AOL Time-Warner has news on every single day so I didn't identify every single day.

Third, as I showed in my rebuttal report, if you limit the results to just the days that prove to be marginally significant the results actually get stronger, they don't get weakened. So all three of those are reasons why it's different from Xcelera.

**Q. Okay. So you used only -- you used potentially material days in Xcelera and you used -- I mean, what's the different criteria that you used?**

A. Well, the difference in Xcelera was any time there was any evidence of any news I tended to pick it up.

**Q. But here you didn't do that because that would have been every day.**

A. That would have been every day and also in Xcelera we had the problem that we had a company with very limited analyst report news coverage so I assumed if there was any

S. HAKALA

news at all it was potentially material.

Additionally, I had to use bulletin boards to find the news because a lot of the news on Xcelera was not immediately accessible so you had to go on bulletin boards to find when something hit the wire.

**Q. And you rely on -- partially rely on Atkas, the article by Atkas to support your use of dummy variables in this case.**

A. Yes.

**Q. All right. Do you know about how many days in the estimation period Atkas controls for?**

A. In his assimilation just a few. But Atkas basically says in his report that the natural solution would be to control for all days when there is company-specific news. In other words, don't confuse his Monte Carlo simulation with what he says in his report.

So in his report he says that if you fail to control for any days where there are significant movements caused by company-specific news then your estimates will be biased and your standard errors will be

S. HAKALA

overstated. And that can be proven by the way, statistically.

**Q. Where does he say that?**

A. He says that on page 130 and again on 135.

(Hakala Exhibit 23, Journal of Corporate Finance Article entitled Event Studies With A Contaminated Estimation Period, marked for identification as of this date.)

A. It's the second paragraph.

**Q. Yep.**

A. He goes on and he says, "In particular, unrelated events may be present during the chosen estimation window which bias the estimation of the return generating process parameters. A natural solution seems to be to choose on a case-by-case basis an estimation window free of such contaminating events."

So he's saying that in the natural solution or in the ideal during your clean period or your clean observations, there should be no extraneous company-specific

S. HAKALA

events. If there's any they will bias your estimates.

**Q. Okay. So but in the case of AOL where could you have every single day what is -- what is the -- how do you determine when you cut out those events?**

A. They can't meet the criteria for being potentially material which basically means they're not an analyst report that makes a significant change in rating, guidance, et cetera. Remember, part of our study is focusing on the impact of analysts.

**Q. Right.**

A. Well, there's analysts writing reports on AOL almost every day.

**Q. Right.**

A. So now --

**Q. But most of those are reiterations, are they not?**

A. So most of those are reiterations. So we're just going to take out all the days when there's reiterations and we're going to focus just on the days when the analysts say something that we think is material and

S. HAKALA

changes it -- changes that analyst's opinion or represents a change in opinion with the exception of CSFB and/or there's a news article attributing something to that analyst that's important on that day.

**Q. What does Atkas say are the kinds of news items that you need to dummy out?**

A. He doesn't. To do that you would have -- he says any company-specific news. He doesn't say which ones or what type.

**Q. Okay. Let's take a look at page 137. If you look at the last paragraph before at the bottom, 4.3, he says, "They merely represent disruptions in the normal return-generating process, of the size and amplitude we might expect from various corporate event announcements (e.g., M&A operations, share buy-backs, earning announcements."**

A. Okay.

**Q. So those are the kinds of examples that he's using to describe the events that you'd be dummying out?**

A. These are examples of the types of

S. HAKALA

various corporate event announcements that you should dummy out. He doesn't say you should not also dummy out analysts' reports.

**Q. But he doesn't say you should dummy out analysts' reports.**

A. Oh, no, no. He's saying any company-specific events. And, in fact, there's a paper by Shipper where she specifically points that out.

**Q. I'm talking about Atkas.**

MR. HALL: Let him finish, please.

**Q. Does Atkas anywhere indicate that analysts' reports are company-specific events?**

MR. HALL: Objection.

A. He doesn't say that in those words but anybody who knows what extraneous events are would know that you dummy out analysts' reports that represent significant changes.

And besides, I mean, you could prove this statistically. And if your expert would have taken the time to actually do some actual testing statistically he would have known better than to say what he's saying about this stuff. As would Cornerstone. I

S. HAKALA

mean, some of this criticism is silly.

**Q. So you're saying that it is a -- that these analyst reports are equivalent for the purposes of dummying them out to M&A, share buybacks and earnings announcements; is that correct?**

A. Sure. And that's what Ryan and Taffler say in their paper. And that's what others say in their papers.

**Q. Okay. So you say there is significant market news -- company-specific market news relating to AOL in your view on more than half of the days during the class period.**

A. Material. Or potentially material, yes.

**Q. And so those all have to be dummied out for your analysis.**

A. To avoid contaminating your market model estimates, yes. And that's what Atkas says.

**Q. Atkas says that -- Atkas says nothing about analyst reports.**

MR. HALL: Objection.

S. HAKALA

A. Well, you know, can you go around in circles but any company-specific event or any event that is company specific is a contaminating event.

**Q. Have you ever seen anybody cite Atkas for the proposition that you could dummy out analyst reports?**

MR. HALL: Objection.

A. Well, first of all, this is published in 2007. But, second of all, there's a prior paper by Catherine Shipper that says the exact same thing. In fact, when she's studying the effect of analyst reports in her working papers she says you should dummy them all out. And Ryan and Taffler in 2004 also do it. Using the same criteria that I did. Any analyst that doesn't reiterate but makes a significant change, he dummies out.

Furthermore, if analyst reports are part of the focus of the study you'd have to dummy them out.

**Q. Well, the Credit Suisse reports you say you'd have to dummy out.**

A. No, all of them.

S. HAKALA

**Q. All analysts reports.**

A. All would. Otherwise they're contaminated. Otherwise your events are contaminated by the analyst reports.

MR. GESSER: How much time do we have on the record?

THE VIDEOGRAPHER: Twelve minutes left before seven hours. Thirty-five minutes left on the tape.

MR. GESSER: Let's take a five-minute break.

THE VIDEOGRAPHER: The time is 5:31. We're going off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 5:35. We're back on the record.

BY MR. GESSER:

**Q. Just before we took a break, Dr. Hakala, we were talking about academic support for the use of dummy variables and I think you mentioned Brown and Warner; is that right?**

A. No.

**Q. Oh, you did not. Okay. Are you familiar with the Brown and Warner article on**

**S. HAKALA**

**conducting event studies?**

A. Yeah.

**Q. Is that considered to be an authority on how to conduct event studies?**

A. It is. But it's very primitive. It was written at a time before the modern development of computers. And it was done in the context of multi-company event studies where the issues that Atkas raises and some of the other authors I cite raise were not at the forefront. Unfortunately, the finance field has not caught up with the field of statistics in this area. But -- so it's still cited. But a lot of us who have more what I would call Ph.D. level statistics training would not use Brown and Warner.

**Q. But Atkas cites Brown and Warner as being the classic in the field of event study methodology; is that right?**

A. It is an old classic but that doesn't mean it's correct still. There are some problems with Brown and -- it doesn't mean you can't do it. It doesn't mean it's not generally accepted. It does mean, though,

S. HAKALA

that there are issues in using Brown and Warner especially in the context of single-company event studies which is the point Atkas is making as well as some others have made.

**Q. In the last year can you think of how many times your expert report has either been rejected by a court or that you've been stricken as an expert?**

A. I've only been formally stricken once.

**Q. In what case was that?**

A. That was Xcelera.

**Q. Okay.**

A. Rejected, it depends how you read Omnicom and Bi-Lo. Omnicom I don't think he rejected my report. He just -- he imposed a higher burden on some of the interpretation of the events than is appropriate.

And in Bi-Lo you have to be careful in reading that because the Bi-Lo in my opinion was a reply report, it wasn't in the opening brief so it's hard to know what the judge was thinking there.

S. HAKALA

Those are the only ones I can think of where it went that way. Let's see. Berrick, court accepted. Flag, accepted.

Those are the only ones I can think of in the last year. Coates versus Coates went to trial and that was accepted but it's a bench ruling with a jury trial.

**Q. Okay. And --**

A. And that one the jury agreed with me entirely so...

**Q. And with respect to the analysis that you conducted in Xcelera I think we talked about the use of dummy variables. Have you modified your report here in any way in light of the ruling in Xcelera?**

MR. HALL: Objection.

A. In the rebuttal report I demonstrated that addressing the issue as I understood the concern of the court in Xcelera by limiting the events to those that are minimally significant not only does not have the effect that the opposing expert said in Xcelera it had, it had the opposite effect. It actually strengthens the results. So in

S. HAKALA

fact the testimony of the opposing expert in Xcelera was wrong. And so that's the only approach I've done now post Xcelera. In Stone Energy and in this case I'm running the regression one way with all the events in and then another way where I only leave in the events that are at least significant by some minimal standard according to academic literature.

**Q. And you did that here?**

A. And I did that here in the rebuttal report.

**Q. And how many days did you dummy out when you did that?**

A. I think only about half as many.

**Q. So you still dummied out 25 percent of the days?**

A. Probably.

**Q. Did you --**

A. And what I demonstrated was that the issue in Xcelera has no practical implications is essentially the way I address it. Has no effect on the reliability results.

**Q. Is that in your report?**

**S. HAKALA**

A. It's in my rebuttal report, yeah.

**Q. Take a look at October 17th, 2001.**

A. Okay.

**Q. Is that a negative analyst day?**

A. Yes.

**Q. Why was it a negative analyst day?**

A. It's the Merrill Lynch report.

**Q. Merrill Lynch downgraded AOL from a buy to a neutral?**

A. Yes.

**Q. Did AOL also release its third quarter earnings on that date?**

A. Yes.

**Q. And those third quarter earnings were negative?**

A. They were actually in line with expectations. In fact, you'll see that CSFB issued a report the second day saying that.

**Q. Saying that what?**

A. That the actual earnings announced by AOL were in line with expectations. There was no change in outlook. And, in fact, the stock dropped later that day on the Merrill downgrade.

S. HAKALA

**Q. You looked at the intraday?**

A. I looked at some intraday on that one, yeah.

**Q. Is that in your report?**

A. I don't know if it's in my report.

**Q. So you don't view that day as confounded?**

A. It is partially confounded but I don't view it as confounded enough to ignore the effect of the analyst on that day on the stock price. It -- because the earnings announcement, the issue that would affect earnings positively or negative relates to advertising, it wouldn't be a confounding event from a loss causation standpoint anyway because both the Merrill report and the earnings announcement relate to the issues in the case.

**Q. But whether or not the stock dropped as a result of the AOL report or the Merrill report would matter in terms of whether or not the analysts had the ability to affect stock price, wouldn't it?**

A. Well, what it would do is if that

S. HAKALA

was a confounding event then I would take the Merrill Lynch report out of my analysis.

**Q. But you didn't --**

A. I didn't in one but in my rebuttal report I did. I did look at what the effect would be if I took it out. I think I addressed that in my rebuttal report because I think Professor Stoltz raised that issue.

(Pause on the record.)

MR. GESSER: I'm letting the anticipation grow for my final question.

(Pause on the record.)

MR. GESSER: Well, I think that's going to be it.

I'm just going to mark one last exhibit.

(Hakala Exhibit 24, Broadcasting and Cable article entitled The Digital Age's Downside, marked for identification as of this date.)

BY MR. GESSER:

**Q. I'm marking Hakala Exhibit 24. Earlier we talked about whether or not --**

MR. HALL: Avi -- Avi, it's going

S. HAKALA

to be a quick question, right?

MR. GESSER: Yeah.

MR. HALL: Okay. I'm just --

MR. GESSER: That's it. Believe me.

**Q. Earlier we talked about whether or not the information that Laura Martin had was about the advertising market was available or not to the market. If you take a look at -- this is a Broadcast Cable report from January 22nd, 2001. If you look at one, two, three, four, five, six paragraphs down it talks about Wall Street to revise its number downward. Now projecting a 5 percent drop. I'm sorry. It says, "That said, the downturn in the economy certainly isn't helping the matter. It caused the bottom to fall out of the fourth quarter network-scatter and local TV markets. The first quarter doesn't seem much better."**

**Okay. Do you see that?**

A. Yes.

**Q. Okay. So does that inform your view as to whether or not this information was publicly available or not?**

**S. HAKALA**

MR. HALL: Objection.

A. I think earlier I said that the market knew that the ad markets were weakening and that they were weak. That's not the issue. The issue is what impact that would have on AOL's ability to meet its guidance.

MR. GESSER: Okay. That's it. Thank you.

(Continued on the next page to include jurat.)

S. HAKALA

THE WITNESS: Thank you.

MR. HALL: Thanks.

THE VIDEOGRAPHER: The time is 5:49. This is the end of today's deposition. We're going off the record.

(Time Noted: 5:49 p.m.)

____________________

SCOTT D. HAKALA

Subscribed and sworn to before me this ___ day of __________, 2008.

________________________________

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, FRANCIS X. FREDERICK, a Notary Public within and for the State of New York, do hereby certify:

That SCOTT D. HAKALA, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of August, 2008.

____________________

FRANCIS X. FREDERICK

----------------- I N D E X -----------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| SCOTT D. HAKALA | MR. GESSER | 6 |

----------- INFORMATION REQUESTS -------------

DIRECTIONS: NONE

RULINGS: NONE

TO BE FURNISHED: NONE

REQUESTS: NONE

MOTIONS: NONE

------------------ EXHIBITS ------------------

HAKALA FOR ID.

Exhibit 1
Expert Report of Scott D. Hakala......... 19

Exhibit 2
document bearing production numbers
CS-AOL_0004761 through CS-AOL_0004762.... 34

Exhibit 3
document bearing production numbers
CS-AOL_0003086 through CS-AOL_0003096.... 49

------------------ EXHIBITS ------------------

HAKALA FOR ID.

Exhibit 4
document bearing production numbers
CS-AOL_0004840 through CS-AOL_0004865.... 64

Exhibit 5
document bearing production number
CS-AOL_0020112.......................... 104

Exhibit 6
document bearing production number
CS-AOL_0020110.......................... 105

Exhibit 7
Washington Post article dated
July 11, 2001........................... 122

Exhibit 8
Washington Post article dated
June 19, 2001........................... 144

Exhibit 9
Washington Post website article
entitled Unconventional Transactions
Boosted Sales........................... 155

------------------ EXHIBITS ------------------

HAKALA FOR ID.

Exhibit 10
MediaWeek article entitled
AOL/Time-Warner - One of One?...Plus
Commentary on the Past Week's
Market News and Performance.............. 205
Exhibit 11
Business Wire press release dated
July 18, 2001............................ 211
Exhibit 12
Lehman Brothers Equity Research Report... 252
Exhibit 13
First Edition Morning Highlights,
Wednesday, September 19, 2001............ 288
Exhibit 14
Bear Stearns Equity Research Report
dated September 19, 2001................. 295
Exhibit 15
Credit Suisse Equity Research Report
dated September 15, 2001................. 296
Exhibit 16
Salomon Smith Barney report
dated April 4, 2001...................... 323

------------------ EXHIBITS ------------------

HAKALA FOR ID.

Exhibit 17
Bernstein Research Call report
dated April 4, 2001...................... 327
Exhibit 18
USB Warburg Research Note dated
April 4, 2001............................ 330
Exhibit 19
USB Warburg Research Note dated
August 15, 2001.......................... 347
Exhibit 20
Salomon Smith Barney Equity Research
Report dated August 14, 2001............. 358
Exhibit 21
Janis research report dated
February 21, 2002........................ 372
Exhibit 22
Janis research report dated
February 21, 2002........................ 374

------------------ EXHIBITS ------------------

HAKALA FOR ID.

Exhibit 23
Journal of Corporate Finance Article
entitled Event Studies With A
Contaminated Estimation Period........... 382
Exhibit 24
Broadcasting and Cable article
entitled The Digital Age's Downside...... 395

NAME OF CASE: IN RE. AOL TIME-WARNER
DATE OF DEPOSITION: AUGUST 11, 2008
NAME OF WITNESS: SCOTT D. HAKALA
Reason codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______
From ________________ to ____________

Page ______ Line ______ Reason ______
From ________________ to ____________
Page ______ Line ______ Reason ______
From ________________ to ____________

Page ______ Line ______ Reason ______
From ________________ to ____________
Page ______ Line ______ Reason ______
From ________________ to ____________

Page ______ Line ______ Reason ______
From ________________ to ____________
Page ______ Line ______ Reason ______
From ________________ to ____________

Page ______ Line ______ Reason ______
From ________________ to ____________
Page ______ Line ______ Reason ______
From ________________ to ____________

Page ______ Line ______ Reason ______
From ________________ to ____________
Page ______ Line ______ Reason ______
From ________________ to ____________

______________________________

SCOTT D. HAKALA

Errata Sheet
ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
(212)750-6434

Name of Case: In re Credit Suisse – AOL
Date of Deposition: August 11, 2008
Name of Witness: Scott D. Hakala

| Page | Line | From | To | Reason |
|---|---|---|---|---|
| passim | passim | Stoltz | Stulz | Error in transcription |
| passim | passim | Janis | Janus | Error in transcription |
| 20 | 23 | Cause date | Caused a | Error in transcription |
| 34 | 24 | scattered | scatter | Error in transcription |
| 37 | 6 | scattered | scatter | Error in transcription |
| 51 | 7 | Reed | Reif | Error in transcription |
| 65 | 20 | Insure view | In your view | Error in transcription |
| 102 | 20 | resume | rumor | Error in transcription |
| 109 | 16 | Antonio | Anthony | Misstatement |
| 129 | 21 | I | you | Error in transcription |
| 151 | 12 | voracity | veracity | Error in transcription |
| 207 | 15 | allusion that there is is an allusion | illusion that there is is an illusion | Error in transcription |
| 249 | 23 | don't have | you have | Error in transcription |
| 259 | 3 | Beck's | Becker's | Misstatement |
| 259 | 9 | Laura Martin | Holly Becker | Error in transcription / Misstatement |
| 279 | 21 | wait | weight | Error in transcription |
| 286 | 24 | piqued | peaked | Error in transcription |
| 291 | 20 | portend to have a few | pretend to have a view | Error in transcription |
| 306 | 2 | add-related | ad-related | Error in transcription |
| 318 | 23 | nuisance | noise | Error in transcription |

By: ______________________________
Scott D. Hakala

Sworn to before me this
__ day of _________, 20__.

______________________________
Notary Public