# EXHIBIT 9

Page 1

1

2          UNITED STATES DISTRICT COURT

3          DISTRICT OF MASSACHUSETTS

4    _____

5    In Re:  CREDIT SUISSE-AOL

6    SECURITIES LITIGATION

7                   Master File No. 1:02 cv12146

8    _____

9    This Document Relates To:

10         ALL ACTIONS

11   _____

12

13              VIDEOTAPED

14     DEPOSITION OF LAURENTIUS MARAIS

15         New York, New York

16      Wednesday, August 13, 2008

17

18

19

20

21

22

23

24   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

25   JOB NO. 18035

Page 2

1
2
3
4
5        August 13, 2008
6        9:39 a.m.
7
8
9        Videotaped deposition of
10   LAURENTIUS MARAIS, held at the offices
11   of DAVIS, POLK & WARDWELL, 450 Lexington
12   Avenue, New York, New York, pursuant to
13   Notice, before Francis X. Frederick, a
14   Certified Shorthand Reporter, Registered
15   Merit Reporter and Notary Public of the
16   States of New York and New Jersey.
17
18
19
20
21
22
23
24
25

Page 3

1
2   A P P E A R A N C E S :
3
4        KAPLAN FOX & KILSHEIMER LLP
5        Attorneys for Lead Plaintiff Bricklayers
6        and Trowel Trades International Pension
7        Fund, the Proposed Class and Dr. Hakala
8        850 Third Avenue
9        New York, New York  10022
10   BY:  MELINDA RODON, ESQ.
11        JOEL STRAUSS, ESQ.
12
13   DAVIS POLK & WARDWELL
14   Attorneys for Defendants, Credit Suisse
15   First Boston LLC and Credit Suisse First
16   Boston USA
17        450 Lexington Avenue
18        New York, New York  10017
19   BY:  DANIEL J. SCHWARTZ, ESQ.
20        MELISSA OLIVER, ESQ.
21        GUY HALFTECK, ESQ.
22
23
24   ALSO PRESENT:
25        SILVIO FACCHIN, Videographer

Page 4

1              PROCEEDINGS
2        THE VIDEOGRAPHER:  I'm going to
3   ask you to stand by, please.
4        This is the tape labeled number
5   one of the videotaped deposition of
6   Marthinus Laurentius Marais in the
7   matter of In Re. Credit Suisse AOL
8   Securities Litigation.  We are now going
9   on the record.  The time is 9:39 a.m.
10   Counsel would state their appearances
11   for the record.
12        MR. SCHWARTZ:  Daniel Schwartz,
13   Davis Polk & Wardwell for the Credit
14   Suisse Defendants.
15        MR. HALFTECK:  Guy Halfteck, Davis
16   Polk & Wardwell.
17        MS. OLIVER:  Melissa Oliver, Davis
18   Polk & Wardwell.
19        MS. RODON:  Melinda Rodon with
20   Kaplan Fox & Kilsheimer for the witness,
21   lead plaintiff in the class.
22        MR. STRAUSS:  Joel Strauss of
23   Kaplan Fox & Kilsheimer for lead
24   plaintiffs.
25

Page 5

1              L. MARAIS
2   L A U R E N T I U S   M A R A I S, called
3   as a witness, having been duly sworn
4   by a Notary Public, was examined and
5   testified as follows:
6   EXAMINATION BY
7   MR. SCHWARTZ:
8        Q.   Dr. Marais, my name again is
9   Daniel Schwartz.  I'm an attorney at Davis
10   Polk and we represent one of the defendants --
11   actually, two of the defendants in this case.
12        I take it you've been deposed
13   before; is that right?
14        A.   I have.
15        Q.   So are you familiar with the
16   ground rules of depositions?
17        A.   I've been given guidance
18   previously.  I'm not sure what you have in
19   mind as the ground rules.
20        Q.   Okay.  Well, I'll just cover it
21   briefly then.  I'll be asking you questions
22   today.  Your job is to answer them.  You
23   should be giving verbal and audible responses
24   so that the court reporter can pick up your
25   answers.

Page 6

L. MARAIS

1
2     Does that all make sense?
3     A.   So far.
4     Q.   Okay.  If you don't understand a
5  question that I've asked, you can ask me to
6  clarify and I'll -- or rephrase it and I'll do
7  my best.  If you need a break at any point in
8  time please let me know and I will try and
9  accommodate you.  The only caveat on that is
10  if a question is pending I would like you to
11  answer that question and then we can try and
12  take a break.
13     Does that make sense?
14     A.   That makes sense.
15     Q.   Okay.  Just for purposes of
16  understanding today, I may use various
17  abbreviations at points in time.  So, for
18  example, if I say CSFB will you understand
19  that I'm referring to Credit Suisse First
20  Boston?
21     A.   I'll keep that in mind.
22     Q.   Okay.  If I refer to AOL I will
23  intend that to mean the merged entity of
24  American Online, Time-Warner.  If I want to
25  refer to a particular division of that company

TSG Reporting - Worldwide     877-702-9580

Page 7

L. MARAIS

1
2  I will refer to either the America Online
3  division or the Time-Warner division.  Does
4  that also make sense?
5     A.   It makes sense, yes.
6     Q.   Are you represented by counsel
7  here today?
8     A.   I am not personally represented.
9  And to the extent that I understand your
10  question properly Mr. Schwartz and Ms. Rodon
11  are here but they're not my personal counsel.
12     Q.   I'm sorry.  Do you mean Mr.
13  Strauss?
14     A.   I'm sorry.  I meant Mr. Strauss
15  indeed.
16     Q.   Just to clarify because I'm Mr.
17  Schwartz.
18     A.   Yes.
19     Q.   Ms. Rodon or Mr. Strauss may
20  object from time to time to my questions.  If
21  they do as long as you understand the question
22  you can go on and answer it.
23     Does that make sense?
24     A.   Yes.
25     Q.   Are there any medical -- do you

TSG Reporting - Worldwide     877-702-9580

Page 8

L. MARAIS

1
2  have any medical or physical conditions that
3  would prevent you from testifying truthfully
4  or accurate today?
5     A.   None that I'm aware of.
6     Q.   Could you tell me what you did to
7  prepare for your deposition today?
8     A.   I reread my declaration in this
9  case as well as -- including its attachments
10  and as well I reread the Stoltz reports and
11  the Hakala report to which it makes reference.
12     Q.   Did you meet with -- I'll withdraw
13  that.
14     Have you read Dr. Hakala's
15  rebuttal report in this case?
16     A.   I've read only one Hakala report
17  in this case and I don't think it was --
18  contained the word rebuttal.  It's the one I
19  referred to in my written report.
20     Q.   Do you meet with counsel in
21  preparation for your deposition today?
22     A.   Yes.
23     Q.   And who did you meet with?
24     A.   With Mr. Strauss and Ms. Rodon.
25     Q.   Other than Mr. Strauss and --

TSG Reporting - Worldwide     877-702-9580

Page 9

L. MARAIS

1
2  well, how many times did you meet with them?
3     A.   Once.
4     Q.   Did you have any -- for how long
5  did you meet with them?
6     A.   Approximately one -- somewhere
7  between one and two hours.
8     Q.   And when was that?
9     A.   Yesterday.
10     Q.   Other than Mr. Strauss and Ms.
11  Rodon, was anyone else present?
12     A.   No.
13     Q.   Did you have any phone calls with
14  them prior to that meeting?
15     A.   I have had a number of phone calls
16  with Ms. Rodon.
17     Q.   In preparation for this
18  deposition?
19     A.   No.
20     Q.   In connection with your
21  preparation of your expert report in this
22  matter?
23     A.   Yes.
24     Q.   Other than your expert report
25  and -- or your declaration and the Stoltz

TSG Reporting - Worldwide     877-702-9580

Page 10

```
1              L. MARAIS
2     report and the Hakala -- the portions of the
3     Hakala report that you referred to, have you
4     reviewed any other documents in preparation
5     for your deposition today?
6         A.   I'm thinking about other documents
7     but in fact what comes to mind are documents
8     which are attached to my report such as my
9     curriculum vitae and the two articles attached
10    thereto.
11         So I -- nothing else comes to
12    mind.  If I think of something that seems
13    properly responsive that escapes me at this
14    moment I will find a moment to bring it up.
15         Q.   Okay.  Did you read any deposition
16    transcripts in connection with that -- sorry.
17         Let me withdraw that.
18         In this case there have been a
19    number of depositions including several
20    depositions of experts recently.  Have you
21    read any of the transcripts from those
22    depositions in preparation for your deposition
23    today?
24         A.   I have read a portion of one
25    transcript.
```
TSG Reporting - Worldwide     877-702-9580

Page 11

```
1              L. MARAIS
2         Q.   Okay.  What transcript was that?
3         A.   It was a transcript of a
4     deposition of Dr. Hakala.
5         Q.   Was that the transcript -- do you
6     recall whether that transcript was of the
7     deposition in 2007?
8         A.   I don't know the specific date.
9     It was my understanding, my impression, that
10    it was more recent.  What I saw was a rough
11    transcript so I take it it was very recent.
12         Q.   Do you know whether it was -- Dr.
13    Hakala was deposed earlier this week.  Do you
14    have an understanding of whether it was his
15    transcript from that deposition?
16         A.   I'm -- I couldn't -- I would not
17    and couldn't want to and I could not vouch for
18    that but it wouldn't surprise me.
19         Q.   It was definitely a Dr. Hakala
20    transcript from this case, though; is that
21    correct?
22         A.   That was my understanding.  It was
23    only a portion of a transcript so I have no
24    independent means of knowing that.
25         Q.   Did someone ask you to review this
```
TSG Reporting - Worldwide     877-702-9580

Page 12

```
1              L. MARAIS
2     transcript or this portion of the transcript?
3         A.   Ms. Rodon brought it to my
4     attention.
5         Q.   And did Ms. Rodon supply you with
6     the portion of the transcript?
7         A.   Yes.
8         Q.   Do you recall what --
9         MS. RODON:  Mr. Schwartz, I'm just
10    going to object.  This is -- any
11    documents I select to show in
12    preparation of deposition you know is
13    work product so I'm just going to object
14    for the record.
15    Q.   Dr. --
16         MS. RODON:  I let this go far
17    because I don't think there's any harm
18    but I just want to be on the record.
19         Q.   Dr. Marais, in the portion that
20    was -- that you reviewed of Dr. Hakala's
21    transcript, can you describe generally what --
22    what was discussed in that portion of the
23    transcript to the best of your recollection?
24         A.   To the best of my recollection, it
25    was the subject of my report in this case.
```
TSG Reporting - Worldwide     877-702-9580

Page 13

```
1              L. MARAIS
2     Dummy variables.
3         Q.   And do you recall what Dr. Hakala
4     said about dummy variables?
5         A.   I recall dis -- yes, I do.
6         Q.   And what was that?
7         A.   Dr. Hakala referred to work done
8     by Katherine Schipper.  And he also made some
9     explanatory comments in response to some
10    questions about the Atkas, et al. article that
11    is attached to my report in this case.
12         Q.   Were you familiar with the work by
13    Dr. Schipper that he made reference to?
14         A.   Generally.  I am -- as a general
15    matter, yes.  I don't have an intimate or
16    recent or fresh knowledge of it.
17         Q.   Other than the Dr. Hakala -- the
18    transcript of Dr. -- or the portion of the
19    transcript of Dr. Hakala's testimony did you
20    review any other transcripts or portions of
21    transcripts from this case in connection with
22    your deposition today?
23         A.   No.
24         Q.   How about any transcripts of
25    depositions in connection with other cases?
```
TSG Reporting - Worldwide     877-702-9580

Page 14

L. MARAIS

1
2      A.    No.
3      Q.    Other than your counsel have you
4  dis -- or other than counsel, have you
5  discussed the -- have you discussed your
6  deposition with anyone else?
7      A.    No.  In substance, no.  Obviously
8  I made travel arrangements and stretching the
9  scope of your question one could say that in
10  some sense that's the subject of my deposition
11  but not in substance.
12     Q.    I'm only -- I'm only interested in
13  the substance of it.  And I take it that your
14  answer to that is no; is that correct?
15     A.    In substance my answer is no.
16         (Marais Exhibit 1, Rebuttal
17         Declaration of M. Laurentius Marais,
18         Ph.D., marked for identification as of
19         this date.)
20  BY MR. SCHWARTZ:
21     Q.    Just before we turn to this
22  exhibit one more question about your
23  preparation.
24         Did you have any conversations
25  with Dr. Hakala in connection with -- in

Page 15

L. MARAIS

1
2  preparation for your deposition today?
3      A.    No.
4      Q.    In the course of your work on this
5  case, have you had any conversations with Dr.
6  Hakala about his work on this case?
7      A.    No.
8      Q.    Have you had any conversations
9  with Dr. Hakala in the course of your work on
10  this case about your work on this case?
11     A.    No.
12     Q.    Generally speaking, since you've
13  been retained -- which we'll get to in a
14  moment -- in connection with this case, have
15  you had any conversations with Dr. Hakala?
16     A.    Yes.
17     Q.    Did those conversations relate at
18  all to this case?
19     A.    Very broadly, yes.
20     Q.    To the extent that they related to
21  this case, can you tell me what it was that
22  you discussed with him?
23     A.    Dr. Hakala told me that the
24  criticism of his use of multiple dummy
25  variables in an event study, which I had come

Page 16

L. MARAIS

1
2  across before, was again in this case an
3  issue.
4      Q.    Did he say anything else about
5  this case?
6      A.    Not that I can recall, no.
7      Q.    How do you know Dr. Hakala?
8      A.    I have -- I was introduced to Dr.
9  Hakala in a -- in a previous engagement.  In a
10  different case.
11     Q.    Do you have a -- do you have --
12  other than periodically both being retained as
13  experts in the same case, do you have any
14  relationship with Dr. Hakala?
15     A.    No.
16     Q.    You don't socialize with Dr.
17  Hakala or -- well, let's leave it at that.
18  You don't socialize with Dr. Hakala?
19     A.    No.
20     Q.    Do you have -- other than being
21  experts together on the same case, do you have
22  any professional working relationship with Dr.
23  Hakala?
24         MR. STRAUSS:  Objection.
25     A.    None that involves any interaction

Page 17

L. MARAIS

1
2  between him and me.  In some extent we work in
3  fields that sometimes overlap.  So there is a
4  relationship in that sense but it's not a
5  personal direct relationship between him and
6  me.
7      Q.    When was it that you were
8  introduced to Dr. Hakala?
9      A.    I could not answer that with
10  precision except to say that it's several
11  years ago.  Perhaps -- somewhere in the range
12  of 2001 through 2004.
13     Q.    And when did you -- the
14  conversation you mentioned about Dr. Hakala
15  telling you that the dummy variable -- the
16  criticism of his use of dummy variables was an
17  issue in this case, when did that conversation
18  take place?
19     A.    At some point during May of 2008.
20     Q.    And how did that conversation come
21  about?  Was it a phone call?  Was it an
22  in-person -- was it a phone call?
23     A.    Yes.
24     Q.    Did Dr. Hakala call you or did you
25  call Dr. Hakala?

Page 18

L. MARAIS

1
2    A.   Dr. Hakala called me.
3    Q.   And other than this discussion
4  about -- about there being criticism of his
5  use of multiple dummy variables, was there --
6  was that part of a broader conversation or was
7  that the purpose of the conversation?
8    A.   That was the only topic of the
9  conversation that I recall.  I can't -- since
10 he called me I can't speak to what the purpose
11 was.
12   Q.   Was it a long conversation?
13   MS. RODON:  Objection.
14   A.   No.
15   Q.   Okay.  We've marked as Marais
16 Exhibit 1, a document.  Is that document your
17 expert declaration -- your rebuttal
18 declaration in this case?
19   A.   I haven't checked every individual
20 page but it certainly looks like it.
21   Q.   Are there any -- do you have any
22 reason to believe that it's not your rebuttal
23 declaration in this case?
24   A.   No.
25   Q.   Are there any portion -- now, you

Page 19

L. MARAIS

1
2  said that in preparation for your deposition
3  you reviewed your rebuttal declaration in this
4  case; is that correct?
5    A.   Reread would be more accurate.
6  But, yes, I reviewed all the sections of it.
7    Q.   In rereading it did you come
8  across any portions of it that you wish to
9  make any changes to?
10   A.   No.
11   Q.   So do you stand by all of the
12 statements and conclusions that are contained
13 in your rebuttal declaration?
14   A.   Based on the information I have
15 here sitting here this morning, yes.
16   Q.   Okay.  If you could turn, please,
17 to Exhibit A of your rebuttal declaration.
18   A.   (Witness complies.)
19   Q.   Does this -- does Exhibit A
20 accurately reflect your curriculum vitae?
21   A.   Yes.
22   Q.   Could you briefly walk me through
23 your education from -- from when you attended
24 university through any higher education that
25 you've had?

Page 20

L. MARAIS

1
2    A.   Yes.  I attended the University of
3  Stellenbash in South Africa for a bachelor's
4  degree in computer science, mathematics and
5  applied mathematics.  Those were my majors.  I
6  attended Stamford University.  From Stamford I
7  have a master's degree in statistics as well
8  as a master's degree in mathematics and a
9  Ph.D. in business administration with a minor
10 in mathematics.
11   Q.   And your Ph.D. from Stamford was
12 when?  When did you receive that degree?
13   A.   1985 is the date on my curriculum
14 vitae.  I think that's correct.
15   Q.   And from 1985 -- your curriculum
16 vitae lists your employment from I guess 1982
17 to the present; is that correct?
18   A.   That is correct.
19   Q.   And does your curriculum vitae
20 accurately reflect your employment history
21 during that period of time?
22   A.   I certainly intended it to and I
23 see no mistake as I sit here.
24   Q.   You joined William E. Wecker
25 Associates in 1992; is that correct?

Page 21

L. MARAIS

1
2    A.   As a full-time employee, yes.
3    Q.   What does William E. Wecker
4  Associates, do?
5    A.   It is a -- it provides consulting
6  services in applied mathematics and
7  statistics.
8    Q.   And consulting services to who?
9    MS. RODON:  Objection.
10   A.   Generally to clients who have
11 problems involving applied mathematics and
12 statistics.
13   Q.   Does it provide consulting
14 services in connection with litigation?
15   A.   Sometimes it does.  Often it does,
16 yes.
17   Q.   Does it -- other than litigation,
18 does it provide consulting services in
19 connection with other types of problems that
20 people might need consulting on that -- let me
21 withdraw that.
22        Other than litigation, what other
23 sorts of engagements does William E. Wecker
24 undertake to provide consulting services?
25   A.   In general problems that private

Page 22

L. MARAIS

1  
2  or government entities might have in -- that
3  involve applied mathematics or statistics. In
4  other words, what William Wecker Associates
5  does is applied mathematics and statistics and
6  sometimes the projects have some litigation
7  aspect to them but not necessarily so but they
8  always have applied mathematics and
9  statistics. That's the one thing that they
10 all have in common.
11      **Q.  I don't want you to tell me any**
12 **specifics of other types of engagements but**
13 **can you give me an understanding of what --**
14 **other than litigation matters -- what types of**
15 **engagements William E. Wecker is retained to**
16 **provide consulting services in?**
17      MR. STRAUSS: I'm just going to
18 object and caution the witness not to
19 reveal any confidential proprietary
20 information that's not in the public
21 domain.
22      THE WITNESS: Understood.
23      A.  Corporations, for example, who
24 manufacture complex mechanical equipment
25 sometimes find that their equipment fails in

TSG Reporting - Worldwide    877-702-9580

Page 23

L. MARAIS

1  
2  certain applications and are -- have data, for
3  instance, on warranty claims over a long
4  period of time for different variants of a
5  design manufactured in different ways in
6  different locations. There might then be
7  interest and value to marshalling a body of
8  warranty data and tracking down the hours of
9  exposure of each design variant and each
10 manufacturing source in order to relate such
11 hours of exposure to the number of failures
12 that have occurred or have been claimed
13 against in order to compare rates of failures
14 and in that way to get to the root cause of
15 what -- whether the problem appears to be in a
16 certain manufacturing location or in a certain
17 era of manufacturing with materials, for
18 example, coming from a certain supplier. That
19 would be an example of a statistical analysis
20 involving the marshalling of large bodies of
21 data in order to get to the root cause of
22 where a problem appears to be located in a
23 manufacturing system.
24      That's one kind of example. There
25 are other kinds of examples that I could give.

TSG Reporting - Worldwide    877-702-9580

Page 24

L. MARAIS

1  
2  But that would be an application of statistics
3  to the kind of problem a client might bring to
4  us.
5      **Q.  So would be fair to say then that**
6  **in addition to litigation William Wecker**
7  **Associates sometimes provides consulting**
8  **services to companies in connection with**
9  **aspects of their businesses that require**
10 **statistical consulting?**
11      A.  As I have testified, yes.
12      **Q.  What percentage of William Wecker**
13 **Associates' business comes from litigation**
14 **consulting?**
15      MS. RODON: Objection.
16      A.  It's not a number that I can give
17 you with any precision because it's not a
18 bright line. Sometimes a matter that
19 initially doesn't seem to have any litigation
20 angle turns into litigation.
21      That said, I would say it's
22 greater than half and probably less than
23 three-quarters but I -- it's not -- it just
24 isn't a number that I track in any systematic
25 way.

TSG Reporting - Worldwide    877-702-9580

Page 25

L. MARAIS

1  
2      **Q.  Is it a substantial portion of**
3  **William Wecker's business?**
4      A.  If you consider greater than half
5  substantial, and -- that would be a fair
6  characterization.
7      **Q.  Do you consider it substantial?**
8      A.  It seems to me greater than half
9  seems to be a substantial fraction but it's
10 not -- again, that's not a label that I use
11 customarily and I -- it depends on one's
12 definitions.
13      **Q.  When you joined William Wecker in**
14 **1992 you joined as a senior consultant; is**
15 **that correct?**
16      A.  Yes.
17      **Q.  What -- and what were your**
18 **responsibilities as a senior consultant?**
19      A.  To apply my expertise and
20 experience to problems on which Wecker
21 Associates had been retained by its clients.
22 In other words, to perform applied
23 mathematical and statistical analysis helpful
24 for solving problems brought to us.
25      **Q.  Now, where in the hierarchy of**

TSG Reporting - Worldwide    877-702-9580

Page 26

L. MARAIS

1
2    **William Wecker Associates does senior**
3    **consultant fall?  Is it a senior position or**
4    **are you reporting to somebody above you when**
5    **you're a senior consultant?**
6        A.  Yes.  Both.
7        **Q.   Okay.  Who does a senior**
8    **consultant report to?**
9        A.   To -- basically to Dr. William E.
10   Wecker who is the president and founder of the
11   company.
12       **Q.   So is a senior consultant -- how**
13   **many levels of the company are between a**
14   **senior consultant and Dr. Wecker?**
15       A.   It is -- the company is not very
16   strictly hierarchical, so for the -- I would
17   say in most cases there is zero levels in
18   between.  But in some cases there may be one
19   or two levels depending on who -- depending on
20   who had brought the problem to me in the first
21   place.
22       **Q.   Do -- are there people who report**
23   **to -- who reported to you as a senior**
24   **consultant?**
25       A.   Interpreting reporting to me as

TSG Reporting - Worldwide    877-702-9580

---

Page 27

L. MARAIS

1
2    working under my direct supervision and
3    bringing their results to me, that's how I'm
4    interpreting your question, yes.
5        **Q.   And how many -- using your**
6    **description, how many people -- when you were**
7    **a senior consultant, how many people worked**
8    **under you subject to your direction and**
9    **brought the results of their work to you?**
10       A.   The answer to that would depend on
11   the particular project and the needs of -- and
12   it would vary so I -- there's no single number
13   I can give you.  Your question perhaps assumes
14   that there is a hierarchy with certain -- with
15   certain people having a fixed reporting
16   channel to me, employed by me as it were, and
17   that's just not how the internal workings of
18   our consulting firm and maybe others are
19   organized.
20       **Q.   In terms of an informal reporting**
21   **relationship, did anyone report directly to**
22   **you when you were a senior consultant?**
23       A.   Yes.
24       **Q.   How many such people were there?**
25       A.   Understanding that this -- I'm

TSG Reporting - Worldwide    877-702-9580

---

Page 28

L. MARAIS

1
2    providing this answer subject to my previous
3    answer in which I explained that it varied
4    from project to project, on the order of five,
5    six, seven people reported to me at various
6    times.  Not all at once.  On various matters.
7        **Q.   Since -- at some point you became**
8    **principal consultant at William Wecker; is**
9    **that correct?**
10       A.   Yes.
11       **Q.   What point was that?**
12       A.   I'm consulting the -- my resume to
13   see whether I list it there.  Approximately
14   1994 would be about -- it was about two years
15   into my time at Wecker Associates.
16       **Q.   What's the difference between a**
17   **principal consultant and a senior consultant?**
18       A.   There is perhaps some small
19   difference in status inside the firm.  But as
20   a practical matter I'm not sure there is one.
21   I haven't -- I've not detected one.
22       **Q.   How many principal consultants are**
23   **there at William Wecker?**
24       A.   There are three or four.  There
25   are at least three.  And there -- actually,

TSG Reporting - Worldwide    877-702-9580

---

Page 29

L. MARAIS

1
2    there are four that I can think of and perhaps
3    five.
4        **Q.   And that number includes you.**
5        A.   Yes.
6        **Q.   In 1993 your CV says that you**
7    **became a vice president at William Wecker.**
8    **What does that signify?**
9        A.   It signifies that I became an
10   officer of Wecker Associates but that is an --
11   that is an administrative issue that stands
12   separately from the designations of principal
13   consultant or senior consultant that we were
14   discussing previously.
15       **Q.   And as a vice president in this**
16   **administrative capacity what are your**
17   **responsibilities?**
18       A.   I'm a little vague on that because
19   I'm not -- I did not detect any change in
20   responsibilities that occurred at about that
21   time.  So it is -- I have a general
22   understanding that there is a -- there is a
23   legal requirement for the corporation to have
24   certain officers designated as vice
25   presidents.  I'm not -- but -- and I am one of

TSG Reporting - Worldwide    877-702-9580

L. MARAIS

1 those. I didn't notice anything different in
2 the things that I did after that designation
3 from the things I did before that designation.
4     Q.   So the designation of vice
5 president at least in your case doesn't bring
6 with it additional duties or responsibilities
7 that you have to discharge?
8     A.   None that I was not already
9 performing before that designation was made.
10     Q.   How many vice presidents are there
11 at Wecker Associates?
12     A.   There are at least -- there are
13 two that I know of and there may be a third.
14 I'm not sure whether he -- whether the person
15 I'm thinking of has that title.
16     Q.   Is there a president of Wecker
17 Associates?
18     A.   Yes.
19     Q.   And is that Dr. Wecker?
20     A.   Yes.
21     Q.   It says that between 19 -- your CV
22 says that between 1982 and 1991 you were --
23 you were teaching at the University of Chicago
24 Graduate School of Business; is that correct?

L. MARAIS

1     A.   Yes.
2     Q.   Why did you leave teaching at the
3 University of Chicago?
4     A.   I received an attractive offer
5 from Wecker Associates to join that firm.
6     Q.   Are there any other reasons?
7     A.   That's the reason that comes to
8 mind. The primary reason. The west coast --
9 a secondary reason is that I like living in
10 northern California better than I like living
11 in the midwest?
12     Q.   I can't imagine why that would be?
13     MS. RODON:  Objection.
14     Q.   1994 to 1998 it says that you were
15 a consulting professor at Stamford Law School;
16 is that correct?
17     A.   Yes.
18     Q.   What were you teaching as a
19 consulting professor at Stamford?
20     A.   Quantitative methods I think was
21 the designation of the course that I taught
22 there. In substance it was applied
23 mathematics and statistics.
24     Q.   Did it cover event studies?

L. MARAIS

1     A.   I don't recall. I may have.
2 Under the heading of regression analysis.
3     Q.   Did it cover dummy variables?
4     A.   I just don't recall.
5     Q.   Was there a specific -- was it --
6 was the teaching of quantitative methods
7 geared to a particular purpose or was it just
8 an introductory type course on quantitative
9 methods?
10     A.   It was an introductory type course
11 aimed at a law school student audience.
12     Q.   Why was a course on quantitative
13 methods being taught at the law school?
14     MS. RODON:  Objection.
15     Q.   If you know.
16     A.   As described to me, the reason was
17 that it was expected that the future lawyers
18 then in training at the Stamford law school
19 might well in their later careers encounter
20 the need for or have to endure somehow the
21 reading of or consultation with experts or
22 technicians in that field and that it would,
23 therefore, be useful to them to have some at
24 least introductory level background in the --

L. MARAIS

1 what were the -- what was the array of
2 techniques and methods and how could they be
3 applied to practical problems. That is, as I
4 say, as explained to me. But whether that was
5 the real purpose or the sole purpose is
6 something that I could not answer. That would
7 be a question for the dean's office at
8 Stamford Law School.
9     Q.   Did you -- were you co-teaching
10 with anybody?
11     A.   Yes.
12     Q.   And who was that?
13     A.   Dr. Wecker.
14     Q.   Do you have any legal training?
15     A.   No. I've met lawyers but I've not
16 taken classes in law or anything that I would
17 consider any formal training.
18     Q.   Does Dr. Wecker have any legal
19 training?
20     A.   None that I am aware of. I know
21 that he also has met lawyers but I don't
22 believe he's attended a law school.
23     Q.   You testified earlier that
24 litigation probably accounts for somewhere

L. MARAIS

1               **L. MARAIS**
2  **between 50 percent and less than two-thirds of**
3  **Wecker Associates' business.**
4           MS. RODON:  Objection.
5     **Q.  Do you recall that?**
6     A.  I recall giving an answer along
7  those lines.  I don't think those were the
8  numbers that I used.
9     **Q.  Okay.  Could you tell me, then,**
10 **what -- roughly again what percentage --**
11 **not -- let me withdraw that.**
12         **Could you tell me again what**
13 **numbers you used to quantify the amount of**
14 **litigation work that Wecker Associates does?**
15     A.  I attached the preamble that I
16 really don't have an exact number in mind but
17 that it would probably be more than 50 percent
18 and probably less than 75 percent.
19     **Q.  In your personal work at Wecker**
20 **Associates what proportion of your work is**
21 **litigation related?  Is it roughly the same as**
22 **the numbers you gave me for Wecker Associates**
23 **as a whole?**
24         MS. RODON:  Objection.
25     A.  The numbers that I gave -- the

TSG Reporting - Worldwide    877-702-9580

L. MARAIS

1               **L. MARAIS**
2  numbers that I gave you are based on my own
3 experience at Wecker Associates so yes.  And
4 it -- it's a useful caveat to my -- appendix
5 to my previous answer that the answer I gave
6 you is based on my experience at Wecker
7 Associates.  But I've made no attempt and I
8 haven't had any reason to try to compile some
9 systematic tabulation for Wecker Associates as
10 a whole.
11     **Q.  Have you ever been charged or**
12 **convicted of any crime?**
13     A.  None that -- nothing that rises to
14 the level of crime that I -- in my mind what
15 I'm thinking of is I've had a parking ticket
16 or two.
17     **Q.  That doesn't rise to that level in**
18 **my mind either.**
19         **When were you retained -- or let**
20 **me withdraw that.**
21         **When were you asked to begin**
22 **working in this case on your rebuttal**
23 **declaration?**
24     A.  I believe it was in June.
25     **Q.  June of 2008?**

TSG Reporting - Worldwide    877-702-9580

L. MARAIS

1               **L. MARAIS**
2     A.  Yes.
3     **Q.  And that's when you were first**
4 **contacted?**
5     A.  No.
6     **Q.  When were you first contacted?**
7     A.  In May of 2008.
8     **Q.  And at that time who contacted**
9 **you?**
10     A.  It was Ms. Rodon.
11     **Q.  And did you have an understanding**
12 **of why you were being contacted?**
13         MS. RODON:  I'm just going to
14     advise the witness not to reveal the
15     substance of any confidential -- or
16     privileged communications that don't
17     relate to your role here as a testifying
18     expert.
19     A.  Would you repeat the question,
20 please?
21     **Q.  Yes.  Do you have an under -- did**
22 **you have an understanding at that time of why**
23 **you were being contacted?**
24     A.  Yes.
25     **Q.  And what was that?**

TSG Reporting - Worldwide    877-702-9580

L. MARAIS

1               **L. MARAIS**
2     A.  It was -- I formed the
3 understanding of that conversation that Dr.
4 Hakala was serving as an expert in a case
5 which turns out to be this case.  I'm not sure
6 I knew the name of the case at that time; that
7 he had -- that he had performed an event study
8 with multiple -- using multiple dummy
9 variables; that there was some form of
10 criticism or rebuttal of the dummy variables
11 issue; and that I was being asked what I
12 thought of it.
13     **Q.  Were you shown anything specific**
14 **with respect to what criticism of Dr. Hakala's**
15 **use of dummy variables was at that time?**
16     A.  I don't think I had any -- at that
17 time any materials that put -- that showed in
18 writing either what Dr. Hakala had done or
19 what was being said about it in this case.  I
20 got those later.  Not then.
21     **Q.  And the conversation you had with**
22 **Ms. Rodon, was that before or after the**
23 **conversation you described before with Dr.**
24 **Hakala?**
25     A.  It was before.

TSG Reporting - Worldwide    877-702-9580

Page 38

L. MARAIS

1
2    Q.   Do you have a sense of how much
3    before?
4    A.   My recollection is that it was all
5    on the same day, the -- I
6    don't recall the precise interval.  It was
7    not -- it was not two conversations
8    immediately following one another.  There may
9    have been an hour or two in between them.  My
10   best recollection as I sit here today is that
11   it all happened on one day.
12   Q.   Have you worked with the firm of
13   Kaplan Fox before?
14   A.   No.  I -- not to my -- not that I
15   can recall.  I don't think so.
16        Let me add that occasionally I am
17   retained in matters where there are parties
18   involved that I don't even know the names of
19   or there are multiple parties involved and I
20   can't be certain that on every such occasion
21   over the years I've been at Wecker Associates
22   that never was Kaplan Fox involved in any way.
23   I don't know that.  But what I am testifying
24   is that I'm not aware of any previous
25   involvement with Kaplan Fox.

TSG Reporting - Worldwide     877-702-9580

Page 39

L. MARAIS

1
2    Q.   You've never previously been asked
3    by Kaplan Fox to prepare a report or a
4    declaration for a litigation matter.
5    A.   I am virtually certain that that
6    is true.  Again, to explain that answer,
7    occasionally I get a call about something --
8    somebody explains to me some problem that they
9    have and I might say I don't think that's
10   something that I can help with or -- for some
11   reason and such a call may pass without me
12   even ever having clearly understood the name
13   of the firm from which the person was calling.
14        But, again, my testimony is I have
15   no specific -- I have no recollection of ever
16   being in touch with Kaplan Fox before.
17   Q.   Do you have an understanding of
18   whether Dr. Hakala recommended you to Kaplan
19   Fox in connection with this case?
20   A.   I don't.  It wouldn't surprise me.
21   But I just don't have as I sit here -- I don't
22   know how they found me.
23   Q.   Have you ever recommended Dr.
24   Hakala as an expert in a case?
25   A.   I can't think of any occasion on

TSG Reporting - Worldwide     877-702-9580

Page 40

L. MARAIS

1
2    which I did that.
3    Q.   Are you being compensated for your
4    time in this case?
5    A.   Indirectly, yes.  I am -- I'm a
6    salaried employee of Wecker Associates and
7    Wecker Associates as a professional services
8    firm bills for my time.
9    Q.   What does -- strike that.
10        Do you know how much Wecker
11   Associates is being compensated for your work
12   in this case?
13   A.   Yes.
14   Q.   And how much is that?
15   A.   $625 an hour.
16   Q.   Do you know whether Wecker
17   Associates has received any payments to date
18   based on your work in this case?
19   A.   Yes.
20   Q.   Yes, you know, or, yes, Wecker
21   Associates has received payment?
22   A.   Yes, I know.
23   Q.   Has Wecker Associates received
24   payment thus far in connection with your work
25   in this case?

TSG Reporting - Worldwide     877-702-9580

Page 41

L. MARAIS

1
2    A.   They have.
3    Q.   And do you know how much in
4    payment Wecker Associates has received in
5    connection with your work in this case?
6    A.   Not precisely.  But I know an
7    approximate number.
8    Q.   And what is that approximate
9    number?
10   A.   It's at or below $20,000.
11   Q.   Other than the hourly rate that
12   Wecker Associates bills for your time, do you
13   know whether Wecker Associates stands to
14   receive any other compensation in connection
15   with your work in this case?
16   A.   I don't know of any other form of
17   compensation that Wecker Associates stands to
18   receive.
19   Q.   So, to your knowledge, there's no
20   provision for any sort of contingency payment
21   or anything like that.
22   A.   That's correct.
23   Q.   Now, do you know whether Dr.
24   Hakala has ever recommended you as an expert
25   in a case?

TSG Reporting - Worldwide     877-702-9580

Page 42

1              L. MARAIS
2     A.   Yes.
3     Q.   And has he?
4     A.   Yes.
5     Q.   And what cases -- what case or
6   cases was that?
7     A.   There were two.
8         MR. STRAUSS: I'm just going to
9   object and make sure that -- remind the
10  witness that he shouldn't reveal
11  nondisclosed consulting arrangements
12  which he may -- that he should not
13  reveal any privileged or work product in
14  connection with matters that -- where he
15  was not a disclosed expert.
16        THE WITNESS: Understood. Thank
17  you.
18    A.   There were two cases in which I
19  was retained. The case -- they were the
20  Broadcom case that I believe was listed in my
21  testimony list. And an AOL-related case in
22  which I was retained by the Minnesota Board of
23  Investment. Minnesota State Board, MSBI. And
24  it was my understanding that they approached
25  me on the recommendation at that time of Dr.

Page 43

1              L. MARAIS
2   Hakala.
3     Q.   In both the Broadcom and the
4   AOL-related case.
5     A.   Yes.
6     Q.   And did you issue a report in the
7   Broadcom case?
8     A.   Yes.
9     Q.   And how about in the AOL-related
10  cases?
11    A.   I believe I did. As I -- I know I
12  issued a report in at least one of those. And
13  I think both.
14    Q.   And what were the topics of your
15  report or reports in those cases?
16    A.   They included the dummy variables
17  issue or one very similar to the dummy
18  variables issue in this case as I understand
19  it in this case. And -- but they ranged more
20  broadly. There were some other also technical
21  topics. I say also technical in that I was
22  commenting and providing opinions on
23  statistical -- on issues concerning the
24  statistical proprietary of certain methods of
25  analysis. I don't recall in detail as I sit

Page 44

1              L. MARAIS
2   here what the range of other topics might have
3   been.
4     Q.   You're familiar -- are you
5   familiar with a case called in re. OmniCom
6   Securities Group Litigation?
7     A.   The name seems familiar.
8     Q.   Do you know if you issued a report
9   in the OmniCom case?
10    A.   It doesn't -- I can't rule it out.
11  It was not -- I would have remembered it if it
12  was a major analytical report of a hundred
13  pages. It's possible that I -- I would not be
14  amazed if you showed me a declaration or some
15  relatively short report that I'd issued but I
16  don't remember it clearly as I sit here.
17    Q.   Is it possible that you issued a
18  declaration in OmniCom that discusses Dr.
19  Hakala's methodology?
20        MS. RODON: Objection.
21    A.   It's possible that -- I can't rule
22  out that there was another matter in which
23  something like the dummy variables came up.
24  But I, again, as I've testified already, the
25  name OmniCom is familiar but I'm just not -- I

Page 45

1              L. MARAIS
2   can't bring to mind what involvement I had if
3   any.
4     Q.   Other than Broadcom, the
5   AOL-related case, are there other cases where
6   you have issued declarations or reports
7   discussing Dr. Hakala's methodology?
8         MR. STRAUSS: Objection.
9     A.   I can't think of any -- any others
10  that would fit that description, assuming you
11  mean by that the same kind of just level of
12  discussion of Dr. Hakala's methodology that I
13  have in this case. Some -- in terms of any
14  broader discussion of Dr. Hakala's methodology
15  I can't recall that I've ever done that.
16    Q.   Are you often retained to opine on
17  the methodology of another expert in a case?
18        MS. RODON: Objection.
19    A.   It's not unusual.
20    Q.   Are there experts for whom you
21  have issued declarations opining on their
22  methodology more than you have done so with
23  respect to Dr. Hakala?
24    A.   I can't think of any example. I
25  don't think so.

L. MARAIS

1
2     Q.   Dr. Hakala stated in his -- I'll
3  withdraw that.
4          Do you have any sort of formal
5  agreement with Dr. Hakala?
6     A.   In my mind I have no agreement
7  with Dr. Hakala, whether formal or informal.
8     Q.   Does Wecker Associates have any
9  sort of agreement with a company called CBIZ,
10  C-B-I-Z, Incorporated?
11     A.   Not to my knowledge.
12     Q.   Are you familiar with a company
13  called CBIZ?
14     A.   Yes.  In the sense that I have
15  read references to it in Dr. Hakala's reports.
16  But not in -- not in any greater depth than
17  that.
18     Q.   Do you own any shares of CBIZ?
19     A.   Certainly not directly
20  whether -- I don't know who owns CBIZ or of
21  what CBIZ might be a part that may be held by
22  some mutual fund that I do own.  But I've no
23  direct ownership in CBIZ.
24     Q.   Do you know if Wecker owns any
25  sort of financial stake in CBIZ?

L. MARAIS

1
2     A.   None that I am aware of.  By
3  Wecker, you mean Dr. Wecker?  That's what
4  I'm -- that's how I interpreted that.
5     Q.   I was actually referring either
6  to -- let's take that first question as
7  referring to Dr. Wecker.  So the answer is not
8  that you're aware of.
9     A.   Not that I'm aware of.
10     Q.   How about the company Wecker
11  Associates?  Does Wecker Associates own any
12  financial stake in CBIZ?
13     A.   Again, none that I'm aware of.
14     Q.   And to your knowledge does CBIZ
15  own any stake in Wecker Associates?
16     A.   There I am -- I know that they
17  own -- that they do not own any stake in
18  Wecker Associates.
19     Q.   Do you know whether Wecker
20  Associates has ever paid Dr. Hakala any
21  referral fee for referring you as an expert in
22  any case?
23     A.   I have no knowledge of any such
24  fee and I would be surprised to learn that
25  there'd been anything like that.  Certainly

L. MARAIS

1
2  none that was negotiated or mentioned to -- by
3  me or mentioned to me or of which I have any
4  knowledge at all.
5     Q.   Do you own any AOL securities?
6     A.   None directly.  Again, I can't
7  rule out that some mutual fund of which I own
8  a tiny piece may be invested in AOL
9  securities.  I just don't know that.  But I've
10  no direct stake.
11     Q.   Between 2001 and 2002, did you own
12  any -- any direct stake either by way of
13  security ownership or otherwise in AOL?
14     A.   No.
15     Q.   How long did you spend working on
16  this report?
17     A.   On the order of 15 hours.  Maybe
18  15 to 20 hours.
19     Q.   How does that compare to the
20  declaration you did in the Broadcom case?
21     A.   I really can't answer that.  As I
22  sit here the Broadcom case was years ago and I
23  don't even remember the scope of what I wrote
24  there.
25     Q.   How many litigation cases

L. MARAIS

1
2  approximately do you do in a year?
3          MR. STRAUSS:  Objection.
4     A.   Interpreting that as how many
5  times have I testified in a year on average,
6  in recent years I would say three or four
7  times a year.  Probably on that order.  Maybe
8  five.  It varies from year to year.
9     Q.   And is the number the same if the
10  question is how many times you've issued --
11  let me withdraw that.
12          When you say testified or given
13  testimony, did you include in that issuing a
14  declaration or report even if you are not been
15  called to give live testimony at a hearing or
16  in a deposition?
17     A.   No.  By testified I meant live
18  testimony of some kind.
19     Q.   On average in the course of a year
20  how many litigation matters do you submit an
21  expert declaration or report in connection
22  with?
23     A.   Again, it is not a number that I
24  have any reason to tabulate and I don't.  I
25  don't carry around in my head.  It's certainly

L. MARAIS

1
2    more than the number of times that I actually
3    provide live testimony and is probably twice,
4    maybe three times as many occasions.  So ten
5    would not be a -- ten times per year would not
6    be a grossly wrong number.  But it varies from
7    year to year.  And so ten would not be the
8    right number for -- necessarily for any
9    particular year.
10       Q.   Did anyone assist you in the
11   preparation of your declaration in this case?
12       A.   In substance, no.
13       Q.   What do you mean by in substance?
14       A.   I mean that in terms of any
15   substantive content I wrote -- I decided on
16   and wrote the content.  But I did have help in
17   editing, for instance, in and production and
18   proofreading.
19       Q.   Did you do all of the drafts of
20   your report?
21       A.   Yes.
22       Q.   That includes the first draft; you
23   wrote that?
24       A.   Yes.  With the under -- with the
25   caveat or the clarification that your question

L. MARAIS

1
2    seems to imply that there was a first draft
3    and a second draft and so on.  And it's a
4    document that evolved from the first sentence
5    I wrote down.  But it was in my custody and I
6    wrote it from that first sentence to the final
7    version.
8        Q.   Dr. Marais, what do you understand
9    to be your -- or how would you characterize
10   your areas of expertise?
11       A.   I am an expert in applied
12   mathematics and statistics with a strong
13   background in securities market research which
14   is the field in which I was trained at
15   Stamford University and in which I conducted
16   scholarly research while I was at the
17   University of Chicago.  So I know -- I am an
18   expert in certain kinds of accounting, not
19   public accounting, but managerial accounting,
20   and in the application of statistical and
21   econometric methods to security markets
22   analysis, in particular event studies.
23       Q.   Have you ever been retained as an
24   expert to perform an event study in connection
25   with a securities litigation that you then

L. MARAIS

1
2    issued in the form of a report?
3        A.   I don't recall clearly any such
4    occasion.  Although there may have been one or
5    even a handful of occasions.  But as I --
6    certainly none recently.  And I -- so -- and
7    in order to be clear about what I am referring
8    to now, I understand your question as being
9    have I ever been the primary sponsor of an
10   event study that I myself crafted in a
11   securities litigation context and presented in
12   the form of testimony or of an expert report
13   in a litigation context.  I -- and that's --
14   that's the understanding in which I gave the
15   answer that I gave.
16       Q.   Have you ever otherwise been
17   retained as an expert in a securities related
18   litigation to opine on the effects of a
19   particular statement or set of statements on
20   the price of a security?
21       MS. RODON:  Objection.
22       A.   I have.  Yes, I believe I have.
23       Q.   And what case or cases was that?
24       A.   There were some cases really quite
25   a long time ago in the '90s involving I think

L. MARAIS

1
2    ThreeCom -- I think that's the name of a
3    company that was producing modems and computer
4    communications equipment.  There were -- and
5    at the time there were two or three other
6    similar matters I believe in which I was asked
7    to give an opinion of the kind that you've
8    just referred to.
9            None recently.  But some time ago,
10   yes.
11       Q.   Have you ever been asked as an
12   expert to opine on the effects of research
13   analysts' statements on the price of a
14   particular firm's securities?
15       MR. STRAUSS:  I'm just going to
16   object and just caution the witness --
17   the way I understood your question is
18   where he gave a public opinion.
19       MR. SCHWARTZ:  That's correct.
20       MR. STRAUSS:  As opposed to a
21   nondisclosed consulting.
22       MR. SCHWARTZ:  That's right.
23       Q.   I'm only asking about an instance
24   in which you've issued an expert report or
25   given live testimony or a declaration or

L. MARAIS

1       **L. MARAIS**
2   **something to that effect.**
3           A.   That is how I understand the
4   question.  And that's how I understood your
5   previous questions.  And I assume unless you
6   tell me otherwise in follow-up questions
7   that's the understanding under which I will
8   answer.
9           I don't recall a case as I sit
10  here in which that was the -- the primary
11  matter on which I was being asked to opine.
12          I am fairly sure given the nature
13  of the subject matter that it has come up but
14  in ways that seem to me to be peripheral to
15  the main thrust of what I was doing.  But I
16  don't -- I don't recall a case in -- that I --
17  that seems to me to fit the characterization
18  in your question.
19          Q.   **Are you familiar with the academic**
20  **finance literature on the effects of research**
21  **analysts' statements on the prices of**
22  **securities?**
23          A.   I'm familiar with some of it, yes.
24          Q.   **And --**
25          A.   And as a footnote it's sometimes

L. MARAIS

1   unclear whether one should call it academic
2   finance literature or accounting literature.
3   But I am -- I'm generally familiar with
4   so-called information content research.
5           Q.   **And how did you become familiar**
6   **with that research?**
7           A.   It is research that was
8   conducted -- some of which was conducted by
9   faculty colleagues of mine in the years I was
10  a full-time academic.  It was certainly all
11  around me in my office and in the offices of
12  my colleagues at the University of Chicago and
13  as Stamford University.  It's a standard kind
14  of topic in empirical finance and accounting
15  research.
16          Q.   **And other than since you've left**
17  **Chicago have you kept up to date on that**
18  **research?**
19          A.   As a general matter, yes.  By
20  which I mean that I don't follow that line of
21  research as a -- in order to maintain a
22  specialist level of knowledge in it but I'm
23  generally aware of -- I'm still a member of
24  relevant professional societies and I see

L. MARAIS

1   their journals and so -- and colleagues and
2   friends of mine still do it.  So, yes, I'm
3   generally familiar with it.
4           Q.   **Have you read any case -- legal**
5   **case opinion relating to the effects of**
6   **analysts' statements on the price of a**
7   **particular firm's security?**
8           A.   As in opinions issued by courts.
9           Q.   **Yes.**
10          A.   Most surely, yes.  Although I
11  can't think of -- I can't identify specific
12  example.  I've read many opinions and I'm sure
13  some of them had to do with this topic.
14          Q.   **Have you read any such opinions in**
15  **connection with your work in this case?**
16          A.   No.
17          Q.   **Have you read the district court's**
18  **opinion in this case on the motion to dismiss?**
19          A.   No.
20          Q.   **Have you read any of the**
21  **complaints in this case?**
22          A.   No.
23          Q.   **Do you have an understanding of**
24  **what the allegations in this case are?**

L. MARAIS

1           A.   Not at the level that I would wish
2   to try to explain.  I do not have a clear
3   understanding of the allegations in this case
4   beyond the sort of understanding that I --
5   beyond the level of familiarity that I got
6   from a very quick perusal of the portions of
7   the Stoltz and Hakala reports, outside the
8   scope of what I was actually looking at for my
9   opinion in this case.
10          Q.   **In preparing your rebuttal**
11  **declaration in this case did you make any**
12  **assumptions about various facts in forming**
13  **your opinions?**
14          MS. RODON:  Objection.
15          A.   That seems awfully broad and so
16  broad that it almost seems as if the answer
17  has to be yes although I can't point to any.
18  Perhaps you could make that a little narrower
19  and I can give you a clean yes or no answer.
20          I assume that we -- that standard
21  principles of statistics and mathematics would
22  continue to apply in this case as they do in
23  other cases; that there wasn't some special
24  suspension of the rules of logic.  Those are

1            L. MARAIS
2    assumptions but they did not occur to me as
3    special assumptions that I was making for the
4    purpose of my report in this case.
5        Q.   Other than assumptions about the
6    laws of statistics remaining what they
7    normally are and the like, does your rebuttal
8    declaration depend on any particular factual
9    assumptions in order for you to be issuing the
10   opinions that it contains?
11       A.   None that I can think of as I sit
12   here in response to your question.  I can't
13   think of any particular fact concerning
14   allegations in this case, for example, that I
15   am assuming true.  It may be that as we go
16   through my opinions, if we go through my
17   opinions, that something will occur to me that
18   does seem to fit your question.  Although it
19   does not occur to me now.  And if it does, I
20   will find a way to raise it then.
21       Q.   Could you turn to paragraph 3 of
22   your report, please.
23       A.   Yes.  I'm there.
24       Q.   Does paragraph 3 accurately
25   represent the questions that you were asked to

1            L. MARAIS
2    opine on in this case?
3        A.   It is certainly what I intended
4    with paragraph 3.  Having reread paragraph 3
5    yesterday I don't notice anything that I would
6    want to say differently.  Paragraph 3,
7    however, to be clear, those are my words.
8    That's my characterization of what I
9    understood that I was being asked.  It's not a
10   verbatim question or a restatement of words
11   that I -- in which a question to me were
12   formulated -- was formulated.
13       Q.   Other than the questions that you
14   formulated as they appear in paragraph 3, were
15   you asked to reach an opinion on any other issues in this
16   case?
17       MS. RODON:  Objection.
18       A.   Nothing that I can think of.  I
19   think this captures it.
20       Q.   So all of the questions on which
21   you were asked to reach an opinion in this
22   case are reflected in paragraph 3 of your
23   rebuttal declaration.
24       A.   Yes.  I cannot think of
25   anything -- of anything that I was asked to do

1            L. MARAIS
2    that doesn't fall within the scope of what I
3    have formulated as this three-part question
4    request.
5        Q.   And do paragraphs 5, 6 and 7 of
6    your declaration accurately reflect the
7    opinions you've reached in this case?
8        A.   They accurately summarize the
9    opinions that I've reached.  I have -- there
10   are reasons for the opinions.  And, of course,
11   the reasons that appear in this summary
12   section.  But, yes, these are a fair summary
13   of my opinions.
14       Q.   And is the first opinion that you
15   express that -- well, let me withdraw that.
16            You've read Dr. Hakala's expert
17   report in this case, correct?
18       A.   Yes.  With the qualification that
19   I have -- I have paged through the entire
20   report but glossed over pages that did not
21   appear to me to deal with the specific issue
22   on which I was asked to point.  So, yes, I
23   have -- I have at least looked at every page
24   in order to determine whether it involved a
25   discussion of Dr. Hakala's event study

1            L. MARAIS
2    formulation and the way in which he used dummy
3    variables in that formulation.  If the page
4    appeared to have content about that I read it
5    with close attention.  Otherwise, I noted the
6    subject matter and moved on.
7        Q.   Now, in your review of Dr.
8    Hakala's expert report in this case subject to
9    the type of review you just testified to, did
10   you encounter any portions where Dr. Hakala
11   opines on whether his dummy -- his use of
12   dummy variables is proper or appropriate?
13       MS. RODON:  Objection.
14       A.   I would -- yeah, I would say the
15   answer is yes.  I don't recall that he uses
16   those words or exactly that formulation but in
17   substance there are such portions of his
18   report.
19       Q.   And, again, in your review of Dr.
20   Hakala's expert report does he discuss an
21   article by Atkas, et al. and state that his
22   use of dummy variables is consistent with the
23   methodology of Atkas?
24       MS. RODON:  Objection.
25       A.   I recall that Dr. Hakala makes

Page 62

L. MARAIS

1
2  reference to Atkas.  I do not recall anything
3  that rise -- in my view rises to a level of a
4  discussion as you put it of Atkas, et al.  Dr.
5  Hakala makes reference to Atkas as I recall it
6  as being supportive of what he's doing but
7  whether he uses the word, the exact word
8  "consistent with" I just don't recall.
9           Obviously, I'm assuming you're
10 not -- you don't intend this to be a memory
11 test and his report is his report and it says
12 what it says.  I don't -- whether I remember
13 his using that word or not.
14       Q.  I'm not asking you to -- whether
15 you remember him using a specific word or not.
16 I'm asking generally with respect to the
17 substance of his report.
18           And with that clarification, does
19 he indicate in his report that his use of
20 dummy variables is consistent with his
21 understanding of the academic literature on
22 event studies or generally?
23       MS. RODON:  Objection.
24       A.  I would -- it -- that appears to
25 me to be consistent with what I understand Dr.

Page 63

L. MARAIS

1
2  Hakala's position to be, but I really can't
3  testify about -- that really seems to be a
4  question to Dr. Hakala, not to me.  That's the
5  impression that I get.  The understanding that
6  I get from reading his report.
7       Q.  And from reading his report do you
8  also understand that Dr. Hakala discusses that
9  his methodology with respect to dummy
10 variables is not arbitrary and that it's
11 reproducible?
12       MS. RODON:  Objection.
13       A.  I certainly don't recall him
14 describing it as arbitrary.  And I -- I don't
15 recall that word coming up one way or the
16 other.
17           And as to reproducible, I don't
18 recall what he says about reproducible.  He
19 describes a protocol or a procedure for how he
20 conducted his method.  And I don't recall the
21 subject of reproducibility or degrees of
22 reproducibility from Dr. Hakala's report.
23 Perhaps it's there.  I don't recall as I sit
24 here at this moment.
25       Q.  But, again, you haven't read his

Page 64

L. MARAIS

1
2  rebuttal declaration in this case; is that
3  correct?
4       A.  I have read one -- as I testified
5  earlier, I've read one document authored
6  apparently by Dr. Hakala and that's the one
7  I'm referring to.  It's the one that I cite
8  and identify by date in an appendix to my
9  report.
10      Q.  So it's possible that in his
11 rebuttal declaration Dr. Hakala may in fact
12 discuss whether his methodology is
13 reproducible but you just don't know one way
14 or the other?
15      MS. RODON:  Objection.
16      A.  I don't even -- since I have not
17 read such a document and have no independent
18 basis for knowing that it exists, I would have
19 to say anything is possible.
20      Q.  With respect to the points that
21 you express in paragraphs 5 and 6, how do
22 those add to anything Dr. Hakala says in this
23 case?
24      A.  I'm just rereading it.
25      Q.  Sure.

Page 65

L. MARAIS

1
2  (Document review.)
3       MS. RODON:  Objection.
4       A.  Dr. Hakala used multiple dummy
5  variables in a certain way in his analysis in
6  the report that I read.  He describes having
7  used them in a certain way.  I've also read a
8  report by Dr. Stoltz in this case in which he
9  says Dr. Hakala's use of dummy variables in
10 the particular way in which he used them is
11 inappropriate, that it is inconsistent with,
12 not supported by academic literature, and that
13 it -- Dr. Hakala's report is flawed and his
14 results biased as a result of a way that he
15 implemented and used the dummy variable
16 apparatus.
17           Clearly, if Dr. Stoltz is correct
18 in his criticisms, that undercuts and tends to
19 undue to validity of Dr. Hakala's analysis in
20 this case.  I have reviewed in detail what Dr.
21 Stoltz said and I find that it is in fact
22 incorrect on these points.
23           That makes a difference.  It makes
24 the difference between Dr. -- whether this
25 criticism by Dr. Stoltz is effective in



Page 66

L. MARAIS

1     removing the validity of a certain portion of
2     Dr. Hakala's analysis or not. So I'm weighing
3     in on a question that goes to the correctness
4     of a certain methodological point in Dr.
5     Hakala's work. That's the difference it
6     makes. And that's what it adds.
7          Q.   If I told you that Dr. Hakala did
8     submit a rebuttal declaration in this case and
9     he addresses Professor Stoltz' criticism of
10    his methodology would you believe that your
11    rebuttal declaration adds to Dr. Hakala's --
12    the validity of Dr. Hakala's methodology?
13         MS. RODON: Objection.
14         A.   I could not possibly know that
15    just from your -- the premise of your
16    hypothetical that Dr. Hakala has submitted a
17    rebuttal report. For one thing I am not Dr.
18    Hakala and so there would be some weight to
19    the fact that an additional third-party has
20    looked at this and weighed in in a certain
21    way. If by some miracle you told me that
22    every sentence I had written here and every
23    citation that I had given to the particular
24    articles that I cite here had been included
25

Page 67

L. MARAIS

1     verbatim in somebody else's rebuttal report
2     then I would have to say the two reports --
3     each is redundant with respect to the other.
4     But you haven't told me that so -- and you
5     haven't -- you haven't put enough in the
6     question for me to give you an informative
7     answer one way or the other.
8          Q.   Is it your view that your -- that
9     the only way your -- let me withdraw that.
10         Other than the additional weight
11    that comes from having an additional person
12    opine on the validity of Dr. Hakala's
13    methodology, is it your view that the only --
14    I'll withdraw that.
15         Is it your view that the only way
16    Dr. Hakala's report, rebuttal report that
17    we're talking about, and your rebuttal report
18    would cover identical material is if your
19    report sentences appeared verbatim in Dr.
20    Hakala's report?
21         MS. RODON: Objection.
22         A.   That would be the starkest way.
23    It's possible I suppose that one could have a
24    paraphrase of exactly the same points but with
25

Page 68

L. MARAIS

1     slightly different words but we seem to be in
2     awfully abstruse hypothetical territory.
3          I would also add that in terms of
4     the weight, that the weight comes not merely
5     from -- it is the sentences that matter. The
6     weight does not come from any -- from sheer
7     authority. That's not what I'm claiming or
8     suggesting.
9          The weight comes from the
10    considerations that I have set forth and
11    citations and the quotes that I have given.
12    And that's where it comes from.
13         Q.   It's possible Dr. Hakala could
14    have opined on -- I'll strike that.
15         How do you -- we've talked about
16    dummy variables a little bit today. How do
17    you -- what's a dummy variable?
18         A.   Dummy variable, sometimes called
19    an indicator variable in statistics, is a
20    numeric coding usually in the form of zeros
21    and ones alone usually meant to represent in a
22    mathematical or statistical model the presence
23    or absence of a certain condition.
24         For example, a dummy variable can
25

Page 69

L. MARAIS

1     represent, as it does in this analysis, the
2     occurrence of a news release or an information
3     event of a certain kind.
4          Q.   And do you have an understanding
5     of how Dr. Hakala uses dummy variables in his
6     expert report in this case, the one that
7     you've read?
8          A.   Yes, I do.
9          Q.   And can you describe your
10    understanding, please?
11         A.   Certainly. Dr. Hakala uses for
12    his event study a statistical apparatus called
13    a market model which is a form of regression
14    model that explains the returns to AOL
15    securities, that's the daily -- the trading
16    daily rate of return on the security, as a
17    function of several variables that -- since
18    this is a regression model I'll call it the
19    right-hand side variables. The explanatory
20    variables. Those include, like most market
21    models, a market index variable as well as an
22    intercept. There are also, too, other
23    industry type intercepts in the model. And
24    then there are information event dates defined
25

L. MARAIS

1  L. MARAIS
2  by -- and identified by Dr. Hakala in a
3  certain way.
4         There is -- for each of those
5  information event dates there is an additional
6  variable in the model.  And that is a variable
7  that takes the value zero for every day in the
8  sample period except the one day of the
9  information release itself.  The one trading
10  day.  And on that day that dummy variable
11  takes the value -- is given the value of one.
12         Dr. Hakala uses -- then performs
13  regression calculation that produces
14  coefficients of all of these variables.  That
15  is numbers that multiple those variables in a
16  formula.  For certain of those information
17  event days, those coefficients are important
18  to his analysis in that they measure effects
19  that he is concerned about or that he views as
20  relevant to -- as measuring things that are
21  relevant in this case.  For the majority of
22  event days, the coefficient does not enter
23  further into this analysis.  The function of
24  the dummy variable is exactly the same as
25  simply dropping that day from the estimation

L. MARAIS

1  L. MARAIS
2  data.  It is just a way of ensuring that the
3  day does not affect the measurement of
4  anything in the regression model.
5     Q.   And so does Dr. Hakala's use of
6  dummy variables effectively reduce the period,
7  the estimation period over which he is
8  performing his regression?
9         MS. RODON:  Objection.
10     A.   It effectively removes certain
11  days from the estimation period, the days of
12  information releases.
13     Q.   And those days of information
14  releases, are those -- do you have an
15  understanding of whether those are the days
16  that Dr. Hakala refers to as containing
17  potentially material events?
18     A.   I think I recall him using that
19  formulation.  There's no -- when I say I think
20  I recall him using that formulation I'm not
21  sure I've got exactly the right -- exactly the
22  same words that he used.  Those sound familiar
23  to me.  I don't think there's any ambiguity
24  about which days we're talking about.
25  those -- we are talking -- I am talking about

L. MARAIS

1  L. MARAIS
2  the days for which Dr. Hakala added dummy
3  variables, indicator variables to his market
4  model.
5     Q.   If I refer to those days as
6  potentially material days will you understand
7  that those are the days I'm talking about?
8     A.   I will try to keep in mind that
9  you are referring to days identified by Dr.
10  Hakala in the way that I've just testified to.
11     Q.   Do you know how many potentially
12  material days Dr. Hakala accounts for using
13  dummy variables in his regression?
14     A.   It's something over 200.
15     Q.   Would you be surprised if I told
16  you it was about 214?
17     A.   I would not be surprised if you
18  told me it was about 214.  Approximately.
19     Q.   And do you know how long -- how
20  many trading days were in Dr. Hakala's
21  estimation period prior to his removal of
22  those approximately 214 days with dummy
23  variables?
24     A.   I'm not sure that Dr. Hakala
25  identifies what have ever anywhere what would

L. MARAIS

1  L. MARAIS
2  ordinarily be referred to as an estimation
3  period.  I think what you're -- I'm going to
4  interpret your question as meaning how many
5  days there were in the data in the sample of
6  trading days, the initial sample of trading
7  days be -- used in the Hakala calculation and,
8  yes, I do.
9     Q.   And how many days was that?
10     A.   As reported by Dr. Hakala it was
11  388.
12     Q.   And do you know what percentage
13  214 is of 388?
14     A.   Actually not offhand.  I know how
15  to work that out but I don't know the answer
16  as I sit here.
17     Q.   It wouldn't surprise you to learn
18  that it's approximately 56 percent?
19     A.   That's not obviously wrong on its
20  face but I can't vouch for it.
21     Q.   In paragraph 11 of your report, if
22  you could turn to that for a second and just
23  take a look.
24     A.   (Witness complies.)
25     Q.   You write, "Dr. Hakala chose to

1           L. MARAIS
2    exclude from the estimation period data used
3    for his event study any date containing a
4    material event concerning AOL."
5           Do you see that?
6       A.  Yes.
7       Q.  When you refer to an estimation
8    period in paragraph 11 are we talking -- are
9    you talking about the same period of 388 days
10   that we were just talking about?
11      A.  More or less.  There are some --
12   there are some complications concerning what
13   exactly one means by an estimation period as
14   opposed to a target period or a test period.
15   It's not vital to the point that I'm
16   discussing here.  And so I -- I wouldn't want
17   to give you a simple plain yes because that
18   would seem to gloss over some things that
19   indeed I did gloss over in what I am saying
20   here.  There is -- I'll leave it at that
21   unless you want to --
22      Q.  Well, I just want to understand,
23   you're using the term estimation period in
24   paragraph 11, correct?
25      A.  Yes.

1           L. MARAIS
2       Q.  What do you mean by estimation
3    period when you use it in paragraph 11, if
4    it's not the 388 day period we were just
5    talking about?
6       A.  I mean estimation period as that
7    term is ordinarily used in the context of an
8    event study.  And I -- if you want me to I
9    could explain that and how it fits in.
10      Q.  Well, were you referring to an
11   estimation period used by Dr. Hakala in
12   paragraph 11?
13      A.  Yes.
14      Q.  And is that estimation period
15   different from the 388 day trading period --
16   trading day period that you and I were just
17   talking about?
18      A.  In the -- yes, in the ordinary --
19   if one interprets that as the ordinary -- in
20   the sense in which that term is ordinarily
21   used in event studies.
22      Q.  What are the differences between
23   the estimation period used by Dr. Hakala that
24   you are referring to there and the 388 day
25   trading period -- trading day period that you

1           L. MARAIS
2    and I were talking about a few moments ago?
3       A.  I can -- I think to close the
4    issue, it's best if I explain the answer to
5    your question as follows:  Ordinarily in an
6    event study there is an estimation period
7    during which -- that is used for the sole
8    purpose of calculating or estimating
9    statistically the parameters of the market
10   model.  That means that the coefficients of
11   the right-hand side variables as well as the
12   standard error of the regression, the
13   remaining -- the unexplained portion of the
14   regression model.
15          Ordinarily, that is defined as one
16   section of the data of the event study and a
17   separate non-overlapping portion in the
18   ordinary usage of event study language is the
19   test period or the -- the event period when
20   the actual event effect is being measured.
21          That distinction certainly appears
22   in Dr. Hakala's analysis in this case but it's
23   implicit because he didn't use the language
24   that way.  Dr. Hakala refers to a single
25   sample of 388 observations.  Those 388

1           L. MARAIS
2    observations contain both the estimation
3    period as I've defined it for you and the
4    event period.
5          The effective event period or
6    the -- yes, the effective event period and the
7    implicit estimation period in Dr. Hakala's
8    analysis together don't add up to the 388 days
9    because there are also the days associated
10   with dummy variables that are not associated
11   with events that are relevant to this case and
12   are effectively -- I think the term that is --
13   has been used -- that Dr. Hakala may have used
14   is dummied out using dummy variables.  So
15   there is -- amongst the 388 days there are
16   event days relevant to this case, there are --
17   there is an implicit estimation period and
18   there are days that are simply dummied out for
19   the reasons that I have testified to.
20          I hope that explains the answer to
21   your question.
22          MR. SCHWARTZ:  Okay.  Let's take a
23   five-minute break so that the
24   videographer can change the tape.
25          THE VIDEOGRAPHER:  We're now going



L. MARAIS

1
2      off the record.  The time is 11:20 a.m.
3          (Recess taken.)
4          THE VIDEOGRAPHER:  I'm going to
5      ask you to stand by, please.
6          We are back on the record.  The
7      time is 11:36 a.m.  This is the
8      beginning of the tape labeled number
9      two.
10  BY MR. SCHWARTZ:
11      Q.   Dr. Marais, before the break we
12  were discussing your definition of estimation
13  period in paragraph 11 of your declaration.
14  And I just have a few more questions about
15  that.
16          What I understood you to be saying
17  in your last answer is that Dr. Hakala -- your
18  understanding is Dr. Hakala starts with this
19  388 day -- trading day period.  Out of that
20  388 days he dummies out 214 or approximately
21  214 days and on what's left, that is the
22  period that you're using when you refer to the
23  estimation period in paragraph 11.  Is that
24  about right?
25      A.   That's about right, yes.

L. MARAIS

1
2      Q.   Now, do you have an understanding
3  of how Dr. Hakala selected the approximately
4  214 days he uses dummy variables for?
5      A.   I have the understanding that
6  comes from reading his report.
7      Q.   And what is that understanding?
8      A.   That he set about identifying
9  certain categories of news days that he lists
10  not in exhaustive detail but at least
11  generically by category in his report.
12          Again, I assume this is not a
13  memory test.  His report says what it says.  I
14  don't recall verbatim what the categories are.
15  The most important words are a priori.
16          (Marais Exhibit 2, Expert Report
17      of Scott D. Hakala, Ph.D., CFA, marked
18      for identification as of this date.)
19          (Document review.)
20  BY MR. SCHWARTZ:
21      Q.   Dr. Marais, have you seen this
22  document before?
23      A.   Yes.
24      Q.   Is this the expert report of Dr.
25  Hakala that you reviewed in connection with

L. MARAIS

1
2  your work in this case?
3      A.   It certainly looks like it.  The
4  pages that I just reviewed briefly look quite
5  familiar to me.  So I have no reason to think
6  this is not the report and it certainly looks
7  like the report I reviewed.
8      Q.   Can you direct your attention to
9  page 27, paragraph 30 of the report.
10  Twenty-seven.  I am referring to the number in
11  the lower right-hand corner of the page.
12      A.   I'm there.
13      Q.   And is this the paragraph that you
14  recall in which Dr. Hakala explains how he
15  selects the days for which he's going to use
16  dummy variables?
17          MS. RODON:  Objection.
18      A.   It is certainly a key paragraph
19  that I recalled in that connection.  I'm not
20  sure it's the only one.  But it is -- it's an
21  important one.  Along, of course, with the
22  footnotes that are cited in that paragraph.
23  That are identified in that paragraph.
24      Q.   In your view in testing the
25  validity of particular methodologies is it

L. MARAIS

1
2  important for the methodology to be
3  reproducible?
4          MS. RODON:  Objection.
5      A.   Very generally that is a -- one of
6  the hallmarks of a scientific procedure, its
7  replicability.  What one means by reproducible
8  and the degree of reproducibility that is
9  necessary to pass that threshold is -- it
10  depends on the context.  So it's important to
11  have that understanding.
12          But subject to that qualification,
13  yes, reproducibility is an important feature
14  of a valid, albeit defensible procedure.
15      Q.   And what degree of replicability
16  or reproducibility do you believe that a
17  procedure requires in order for it to satisfy
18  that hallmark?
19          MS. RODON:  Objection.
20      A.   I do not have in mind a single one
21  recipe fits all circumstances with a single
22  bright line kind of statement that I can give
23  you in response to that.  It rather depends on
24  the -- on the specific context.  As I
25  testified to in my previous answer.

Page 82

```
 1            L. MARAIS
 2      Q.   In the context -- have you ever
 3   served as a referee for academic journals?
 4      A.   Yes.
 5      Q.   Do you ever evaluate any papers
 6   involving event studies in that capacity?
 7      A.   I have done so.
 8      Q.   In serving as a referee on an
 9   academic journal when you were evaluating
10   papers involving event studies, what degree of
11   replicability would you have required or did
12   you require in order to ensure the validity of
13   the procedures discussed in those articles?
14          MS. RODON:  Objection.
15      A.   Your question has two parts.  One
16   is what degree did I require and what degree
17   otherwise you say would I require.  On the did
18   I -- what degree did I require, I don't have a
19   clear recollection as I sit here of how that
20   issue may have come up in my -- in any
21   specific refereeing assignment that I have
22   had.  I haven't done refereeing for some
23   years.  Although I refereed many journal
24   articles when I was closer to my academic
25   years or actually a full-time academic.
```
TSG Reporting - Worldwide    877-702-9580

Page 83

```
 1            L. MARAIS
 2          But I -- so I can't as I sit here
 3   today explain the -- how -- how exactly that
 4   issue played out in any specific actual
 5   refereeing assignment.
 6          How it would play out, the other
 7   half of your question is that it would --
 8   exactly as I have already testified; it would
 9   depend on the context of the event study, what
10   it was being used for.  There is no -- there
11   is no -- I've testified already there is no
12   single recipe that I can give you that -- a
13   one size fits all kind of recipe.
14      Q.   Well, let's say two researchers --
15   I mean, let's say two -- I'm giving you a
16   hypothetical here.  Let's say two researchers
17   purported to use the same methodology in
18   performing an event study and their results
19   were 75 percent -- that there was a difference
20   between their results of 75 percent.
21          Knowing nothing else would you be
22   able to say that that satisfies -- that that
23   procedure is replicable?
24          MS. RODON:  Objection.
25      A.   Knowing nothing else I don't think
```
TSG Reporting - Worldwide    877-702-9580

Page 84

```
 1            L. MARAIS
 2   I could -- I can't give you any answer to the
 3   hypothetical because the hypothetical isn't
 4   meaningful yet.  You have not -- you've said
 5   their results are 75 percent different but
 6   you've not -- 75 percent means that there must
 7   mean that something in the story when divided
 8   by something else in the story gives you the
 9   answer 75 percent.  But since I have not the
10   slightest notion from your hypothetical of
11   what those two somethings are, there is -- the
12   hypothetical with respect is meaningless and I
13   can't give you a meaningful answer.
14      Q.   So then is it possible -- still
15   sticking with this hypothetical, is it
16   possible that you could have a procedure which
17   varies 75 percent between how it's applied by
18   two different researchers and you would
19   consider it replicable?
20          MS. RODON:  Objection.
21      A.   It would, as I have testified
22   repeatedly, depend on the circumstances.
23   There are -- to clarify that, there would be
24   many circumstances in which a range of
25   variation in some thing which you have not
```
TSG Reporting - Worldwide    877-702-9580

Page 85

```
 1            L. MARAIS
 2   defined yet as great as 75 percent might be an
 3   unacceptably large variation.  And to provide
 4   some of the specificity that your -- in my
 5   answer that your hypothetical lacks, if there
 6   were two procedures, for example, two
 7   statistical procedures for determining the
 8   population of the United States and one of
 9   them came up with an answer of 400 million
10   people in the United States and the other
11   procedure came up with -- or someone else's
12   attempt to implement the same procedure
13   produced an estimate of 100 million people
14   living in the United States, for most purposes
15   that would be an unacceptably wide range of
16   variation that would call into question why --
17   why such a large range.
18          On the other hand, if the -- if
19   the object of the exercise were to determine a
20   census of bacteria on some surface and the
21   only question of interest was whether there
22   were many bacteria on that surface or it was
23   sterile and free of life and the range of
24   variation between two procedures for detecting
25   this microscopic life form were between 100
```
TSG Reporting - Worldwide    877-702-9580

```
1              L. MARAIS
2    million and 400 million bacteria living on the
3    surface there would be broad agreement between
4    the two implementations that this is a highly
5    contaminated surface with a very large
6    population of bacteria living on it.
7         So for one purpose that range
8    might be unacceptable.  For another purpose it
9    might be acceptable for the purpose for which
10   the exercise is being conducted.  There is not
11   enough in your hypothetical for me to know
12   which of those cases we're in.
13        Q.   With respect to Dr. Hakala's
14   selection of material event days, those days
15   that he used dummy variables for, did you
16   consider what an acceptable level of
17   replicability would be or is for the procedure
18   he used to identify those days?
19        MS. RODON:  Objection.
20        A.   In the most general terms, yes.
21   The terms that are similar in generality to my
22   answers here.  In concrete detail coming down
23   to a number like 75 percent of some
24   unspecified quantity or 22 percent or some
25   other percentage, no.
```

```
1              L. MARAIS
2         Q.   Did you reach an opinion on
3    whether Dr. Hakala's -- well, let me ask this.
4         If Dr. Hakala's -- if a different
5    researcher purporting to employ the criteria
6    set forth by Dr. Hakala in paragraph 30 in
7    note 14 of his expert report in this case --
8    so if a different researcher were using those
9    criteria and came up with a different set of
10   material event dates that was 75 percent
11   different from what Dr. Hakala came up with,
12   would you consider Dr. Hakala's criteria to be
13   replicable?
14        MS. RODON:  Objection.
15        A.   Interpreting the question as to
16   whether reasonable implementations of the
17   procedure by qualified researchers produced
18   exactly the same result, in that -- if that's
19   what you mean by replicable, of course not.
20   In your -- as you have stated the
21   hypothetical.
22        In terms of what final and
23   relevant conclusion Dr. Hakala draws from all
24   of this, I have no way of knowing.  Dr. Hakala
25   draws conclusions I understand.  I've not --
```

```
1              L. MARAIS
2    those are not within the scope of my work, but
3    he does draw conclusions from this event
4    study.  The set of days of potentially
5    material events doesn't stand on its own as an
6    end point of the work that Dr. Hakala does in
7    this case.  If it were the case, and I treat
8    this as a hypothetical, I have no reason to
9    think that it is so, but if it were the case
10   that reasonable implementations of the fully
11   specified protocol which I don't think we have
12   in this one footnote, led to widely different
13   sets of dates, it would still not tell me
14   whether that range of variation that I've
15   described as widely different was different
16   enough to make any material difference to the
17   end result, the conclusion that is drawn from
18   the event study that is relevant to this case.
19        That is a calculation that I've
20   never performed and it's not anything that I
21   can -- I can know the outcome of in this
22   hypothetical.
23        The way to know it would be to do
24   it and to trace through to the very end
25   every -- every way in which an opinion depends
```

```
1              L. MARAIS
2    -- or a conclusion that's relevant to the
3    issues in this case depends on the whole event
4    study analysis.
5         You could not get there by
6    calculating percentages of dates that match
7    between two implementations.  It just...
8         Q.   So is it your view that without
9    knowing what effects Dr. Hakala's selection of
10   material event date has on the final result of
11   his event study, you can not determine whether
12   his protocol for selecting those material
13   events is replicable or not?
14        MS. RODON:  Objection.
15        A.   You cannot -- it is my view that
16   you cannot tell without tracing whatever range
17   of variation happens to occur in the
18   implementation of the event selection protocol
19   without tracing that through to its
20   consequences for final opinions or for
21   final -- for ultimate conclusions, you cannot
22   know whether the range of variation is
23   unreasonable or is too great.  Or is --
24        Q.   And by un -- I'm sorry.
25        A.   Or is great enough to have any
```

L. MARAIS

1    L. MARAIS
2  material effect on ultimate conclusions.
3     Q.   Is it -- when you say material
4  effect on ultimate conclusions, is that what
5  you mean by replicable?
6     A.   That -- no, no, that's not a
7  definition of replicable.  But it is -- I
8  suppose fleshing out your question, it is how
9  I am interpreting what I under -- what I have
10 understood to be the intent of what you're
11 asking me.  I think you're asking me to be
12 clear about scientific replicability and
13 recognizing that there are many procedures in
14 the hard sciences and in statistical analysis
15 that don't yield exactly identical results
16 from one implementation to the next, I am --
17 I've been trying to give you an informative
18 answer to the question of what is a reasonable
19 degree of replicability in the circumstances.
20    Q.   I believe you testified that you
21 didn't -- it was outside the scope of your
22 expert opinion in this case whether Dr.
23 Hakala's selection of material event dates,
24 how that affected his final conclusions that
25 he draws from his event study; is that

L. MARAIS

1    L. MARAIS
2  correct?
3     A.   As I interpret that statement,
4  yes.
5     Q.   And I also believe you
6  testified -- it's my understanding of what you
7  testified that without doing that analysis you
8  cannot say whether his protocol for selecting
9  material event dates is scientifically
10 replicable or not.
11       MS. RODON:  Objection.
12    Q.   Is that correct?
13    A.   More or less.  I would not --
14 those are not words that I would choose.  I
15 would say whether his protocol, fully fleshed
16 out protocol, for selecting potentially
17 material events is sufficiently replicable for
18 the purpose for which he uses it in this case.
19    Q.   So is it correct, then, that you
20 have formed no view as to whether Dr. Hakala's
21 selection of material event dates is
22 sufficiently replicable for the purpose for
23 which he has used it in this case?
24    A.   It is fair to say that I have no
25 expert opinion one way or the other about the

L. MARAIS

1    L. MARAIS
2  degree of replicability of Dr. Hakala's
3  protocol.  It's simply not anything that I
4  have looked into.  It's outside the scope of
5  what I have looked into in this case.
6     Q.   So could you take a look at
7  paragraph 7 of your expert report, please.
8     A.   (Witness complies.)
9        Yes.
10    Q.   So is it fair to say that the
11 opinion that you express in this paragraph is
12 simply that you believe that Dr. Stoltz has
13 not established his criticism of Dr. Hakala
14 but not that Dr. Hakala's procedure for
15 identifying material event dates is in fact
16 replicable?
17       MS. RODON:  Objection.
18    A.   Consistent with my previous
19 answer, yes.  I have -- I have not looked into
20 replicability of the procedure.  I have looked
21 into Dr. Stoltz' report and noted that he
22 tosses off a speculation about the
23 replicability without providing any -- any
24 basis for the opinion that he states.
25    Q.   Is it possible that Professor

L. MARAIS

1    L. MARAIS
2  Stoltz and you are using different definitions
3  of replicability?
4        MS. RODON:  Objection.
5     A.   I'm not sure -- or you might be
6  able to point me to an exception but I don't
7  recall as I sit here that I used the term
8  replicability in my report in this case.
9        And I don't recollect as I sit
10 here that Dr. Stoltz uses the term
11 replicability in his report.  So your question
12 with respect is somewhat baffling in that I
13 don't know from my exposure to materials in
14 this case that either one of us has stated a
15 definition or has -- necessarily has a
16 definition of that term in mind.
17    Q.   Okay.  Using the terminology you
18 have in paragraph 7, is it possible that you
19 and Dr. Stoltz or using different definitions
20 for the term nonidentical results in your
21 respective expert reports?
22       MS. RODON:  Objection.
23    A.   I can only testify about what I
24 meant by nonidentical.  I meant nonidentical
25 in the plain English sense of nonidentical

L. MARAIS

1            L. MARAIS
2  means two sets of dates are identical if
3  they're exactly the same.  If they are not
4  exactly the same then they are nonidentical
5  and my opinion here is that Dr. Stoltz has in
6  his report in this case provided no basis for
7  the claim that different researchers -- for
8  assessing any extent to which different
9  researchers would arrive at different
10  outcomes.  In fact, as his own language that
11  I've quoted here "quite likely" will produce
12  nonidentical results.
13        There's simply no basis in Dr.
14  Stoltz's report.  It's not that it would be
15  impossible to produce -- to do the work and
16  produce some basis and only then would the
17  considerations that I have testified about
18  previously about a sufficient degree of
19  replicability come into play.
20        But Dr. Stoltz's criticism on this
21  point doesn't even reach that point.
22  **Q.   Is it your view that his criticism**
23  **on this point doesn't reach that point however**
24  **because it's your view that Dr. Stoltz doesn't**
25  **trace differences -- or how the differences**

L. MARAIS

1            L. MARAIS
2  **he's talking about in the selection of**
3  **material dates, how those differences would**
4  **impact the final results that Dr. Hakala has**
5  **used his event study in this case for?**
6      MS. RODON:  Objection.
7     A.   No.  My testimony in my previous
8  answer was -- in my testimony in my previous
9  answer what I meant to convey is this:  We
10  don't even have from Dr. Stoltz's report
11  examples of different outcomes from applying
12  the Hakala recipe, the Hakala protocol.
13        We don't -- I don't understand
14  from Dr. Stoltz's report that he has any
15  specific basis for pointing to a degree of
16  variation amongst different implementations.
17  He simply states blandly that it is quite
18  likely that there will be differences but he
19  doesn't talk about degrees of difference and
20  much less does he talk about degrees of
21  difference in terms of what I consider the
22  relevant metric which is the ultimate
23  conclusion that is drawn from the exercise.
24  **Q.   I'm trying to understand -- is it**
25  **your view that Professor Stoltz doesn't give**

L. MARAIS

1            L. MARAIS
2  **any examples of differences between different**
3  **implementations of Dr. Hakala's selection of**
4  **material event dates?**
5      MS. RODON:  Objection.
6     A.   That is my understanding from my
7  review of Dr. Stoltz's report that he -- he
8  mentions in his report the -- what he -- what
9  I will characterize, and I'm not quoting
10  verbatim, as his view of the peculiarity of
11  the treatment of a certain event by Dr.
12  Hakala's -- I think he says perhaps it's
13  difficult to understand.
14        But he doesn't get close to a
15  statement along the lines of I, myself, Dr.
16  Stoltz, performed this procedure attempting as
17  best I could to follow the guidance given by
18  Dr. Hakala or I directed someone working for
19  me to do it and we arrived at the result which
20  in your hypothetical number is 75 percent
21  different.  I don't recall finding anything
22  along those lines in Dr. Stoltz's report.  If
23  it's there I missed it.
24  **Q.   You did some work, you testified**
25  **earlier, in connection with Dr. Hakala's work**

L. MARAIS

1            L. MARAIS
2  in an AOL-related case.  Do you recall
3  testifying to that?
4     A.   Previous to this case, yes.
5  **Q.   Previous to this one, yes.**
6     A.   Yes.
7  **Q.   Okay.  Did Dr. Hakala perform an**
8  **event study in that case, do you recall?**
9     A.   My somewhat vague recollection as
10  I sit here today, since I haven't looked at
11  that in a really long time, is yes.
12  **Q.   Do you know whether Dr. Hakala**
13  **employed the same criteria for selecting**
14  **material event dates in that case?**
15      MS. RODON:  Objection.
16     A.   I don't know that with precision.
17  I do recall that one of the citations that Dr.
18  Hakala gives here, namely in Ryan -- the
19  citation to Ryan and Taffler -- is familiar to
20  me I think from that case.  So I believe he
21  used that citation and -- but I have no basis
22  as I sit here for either testifying that it's
23  exactly the same or for pointing to
24  differences.
25      (Marais Exhibit 3, Affidavit of

1           L. MARAIS
2       Scott D. Hakala, Ph.D., CFA, marked for
3       identification as of this date.)
4    BY MR. SCHWARTZ:
5       Q.  Dr. Marais, have you seen the
6    document that's been marked Marais Exhibit 3?
7    Have you seen that document before?
8       A.  Frankly I don't know.  I see that
9    it's in Time-Warner Securities Litigation.
10   But looking at the cover page of this document
11   I don't know if I've seen it before and I'm
12   not sure if I read the whole thing whether I
13   could be sure one way or the other whether I
14   had seen this specific document before.  I
15   don't know.
16      Q.  Could I direct your attention to
17   paragraph 4 on page 3 of the document.
18      A.  Okay.  I see that.
19      Q.  Do you recall consulting with Dr.
20   Hakala on his -- on the -- on the document
21   that has been marked Marais Exhibit 3?
22      A.  I recall working with Dr. Hakala
23   in this case as I have indeed testified more
24   than once today already.  I don't recall
25   working with Dr. -- I don't know whether I did

1           L. MARAIS
2    work with Dr. Hakala on this document in any
3    way that I would characterize it that way.
4    And I don't -- I'm not sure how to read the
5    sentence, "I have also consulted with Dr. M.
6    Laurentius Marais of William E. Wecker
7    Associates Incorporated."
8       It is -- that is a true statement
9    in the context of this case.  Whether it is a
10   true statement in the context of Dr. Hakala's
11   preparation of this affidavit, I don't know
12   one way or the other.  And, indeed, he doesn't
13   say specifically that it was so for this
14   document.
15      Q.  Let me direct your attention to
16   Appendix A of this document which I believe
17   begins on paragraph 29 on page 20.
18      A.  I see that.
19      Q.  Okay.  And I'd like specifically
20   to refer you to paragraph 31 of Appendix A.
21      A.  I'm there.
22      Q.  Now, does Dr. Hakala describe
23   the -- does Dr. Hakala describe the protocol
24   he uses to select material event dates in
25   paragraph 31 of Appendix A to his affidavit in

1           L. MARAIS
2    the AOL case?
3           MS. RODON:  Objection.
4       A.  To begin to answer that I would
5    have to read paragraph 31.
6       Q.  Okay.  Well, why don't you take a
7    moment to do so.
8           (Document review.)
9       A.  Paragraph 31 does characterize his
10   selection of potentially material event days.
11   The paragraph along with its footnotes does
12   not -- is not completely explicit.  It does
13   not in this form state a protocol that I would
14   expect somebody else to be able to implement
15   in just the way that Dr. Hakala did.  That
16   might well take some more input from Dr.
17   Hakala to know exactly what he meant by the
18   summary characterization that he gives here.
19          But with that qualification my
20   answer is yes, this paragraph does describe
21   his procedure.
22      Q.  And is his description of his
23   procedure here similar to his description of
24   his procedure in paragraph 30 of his expert
25   report in this case?

1           L. MARAIS
2           MS. RODON:  Objection.
3       A.  To answer that I will have to find
4    paragraph 30 and read the two side by side.
5       Q.  As well as -- and let me add to
6    that as well as the footnotes to paragraph 30.
7           (Document review.)
8       A.  The two are not identical but
9    there are at least portions in which the
10   language is very similar and at least some of
11   the references and the comments in footnotes
12   are quite similar.  So I see some
13   similarities.  I see that there are
14   differences in detail in the language.  To go
15   beyond that I would need to know what degree
16   of similarity you were asking me about.
17      Q.  From reading these two paragraphs
18   side by side do you understand that there
19   are -- that Dr. Hakala used a different
20   protocol for selecting material event days in
21   the earlier AOL case from the protocol he used
22   for selecting such dates in this case?
23          MS. RODON:  Objection.
24      A.  From my reading thus far I've not
25   arrived at a judgment one way or the other as

Page 102

L. MARAIS

1
2  to whether these are identical or not.  And
3  I'm not sure that even if I -- if I took more
4  minutes to really compare the language very
5  closely I could know that.  In light of my
6  previous answer about this being a summary
7  characterization.
8        It is possible -- if you would
9  like me to I will take the time now to read
10  these and see if I can identify any clear-cut
11  material difference between the two.  But even
12  if I can't -- if I don't find such a
13  difference I still could not know that
14  therefore the procedure -- the two protocols
15  were identical because these are just
16  summaries of a -- of how a procedure was
17  conducted.
18  **Q.   Does Dr. Hakala provide -- in his**
19  **report in this case, does he provide anywhere**
20  **in his expert report the necessary detail to**
21  **determine the true protocol that he used to**
22  **select material event dates?**
23      MS. RODON:  Objection.
24     A.   I'm not sure of the answer one way
25  or the other.  I don't recall coming across a

TSG Reporting - Worldwide     877-702-9580

Page 103

L. MARAIS

1
2  highly-detailed level of protocol in this
3  report.  But then I've focused as I've
4  explained previously on a specific and narrow
5  issue; namely, how did he use dummy variables
6  to represent certain dates.  Not exactly how
7  did he arrive at those certain dates.  Except
8  in a general sense that there was an a priori
9  selection.  That he implemented an a priori
10  selection procedure.  So I don't know.  I
11  would have to go through the whole report.  I
12  don't know of such a description as I sit
13  here, though.
14      MR. SCHWARTZ:  Can we take a
15  two-minute break?
16      MR. STRAUSS:  Sure.
17      THE VIDEOGRAPHER:  Going off the
18  record.  The time is 12:19 p.m.
19      (Recess taken.)
20      THE VIDEOGRAPHER:  We're back on
21  the record.  The time is 12:26 p.m.
22  BY MR. SCHWARTZ:
23  **Q.   Dr. Marais, if you turn to**
24  **paragraph -- you can put away the Hakala**
25  **affidavit from In Re. -- from the AOL case.**

TSG Reporting - Worldwide     877-702-9580

Page 104

L. MARAIS

1
2  **You can...**
3     A.   (Witness complies.)
4  **Q.   Now, is it your opinion that Dr.**
5  **Hakala's use of dummy variables is supported**
6  **by the academic, finance, and accounting**
7  **literature?**
8     A.   It is certainly consistent with
9  and -- with considerations that are expressed
10  in that literature and is not in conflict with
11  that literature.  To give you a simple yes
12  would seem to imply that one could find
13  somewhere where somebody writes Dr. Hakala's
14  use of dummy variables in the way that he did
15  is just right.  Of course, you can't.  The
16  academic literature isn't about that topic or
17  about the specific thing that Dr. Hakala's
18  trying to do here.  But the idea -- the
19  underlying principle is certainly in that
20  literature.
21  **Q.   Is there any article that you are**
22  **aware of that uses dummy variables in exactly**
23  **the way Dr. Hakala uses them in this case?**
24      MS. RODON:  Objection.
25     A.   I've just one moment ago testified

TSG Reporting - Worldwide     877-702-9580

Page 105

L. MARAIS

1
2  that there is no article in the academic
3  literature that does exactly what Dr. Hakala
4  did in this case so I'll stand on that answer.
5  **Q.   Okay.  Now, we talked about before**
6  **Dr. Hakala uses dummy variables for**
7  **approximately 56 percent of the days in that**
8  **388 day trading day period we were talking**
9  **about.  Now, let's assume for the moment that**
10  **Dr. Hakala had -- instead of 56 percent he had**
11  **used dummy variables for 80 percent of the**
12  **days in that trading day period that we were**
13  **talking about.  Would that still be consistent**
14  **with the discussion of dummy variables in the**
15  **academic, finance, and accounting literature?**
16      MS. RODON:  Objection.
17     A.   It would depend -- as a whole in
18  the context of his event study it would depend
19  on how many observations were left, what were
20  the reasons for effectively excluding those
21  80 percent of potential observations.  So it
22  would depend on the -- on the context.
23  There's not enough in your hypothetical for me
24  to give you an answer at the same level of
25  thoughtful consideration that I did to the

TSG Reporting - Worldwide     877-702-9580

Page 106

1          L. MARAIS
2    actual analysis that he performed in this
3    case.
4          In any case, it would not be the
5    dis -- the criterion that I would be using
6    would not be the mechanistic and superficial
7    percent of some universe of observations that
8    he might have been able to use that he chose
9    or decided for whatever reason not to use.
10         It would go to valid technical
11   principles concerning the validity of the
12   exercise; not -- and it would not depend on a
13   number like 56 or 80.
14       **Q.   Assuming for the moment that there**
15   **were enough days remaining -- enough**
16   **observations remaining that you could have**
17   **confidence that Dr. Hakala could perform a**
18   **regression on the remaining days. Let's say**
19   **he implemented in this case the same protocol**
20   **that he did to get the 216 or so days that he**
21   **dummied out but instead he dummied out even**
22   **more days and got to 80 percent of that 388**
23   **day trading period. So for the same purpose**
24   **that he does so in this case just instead of**
25   **being 56 percent it was 80 percent.**

TSG Reporting - Worldwide    877-702-9580

Page 107

1          L. MARAIS
2    **That would not in your view be**
3    **inconsistent with the academic finance and**
4    **accounting literature?**
5         MS. RODON:  Objection.
6       A.   You're asking me to assume that he
7    implemented the same protocol that he actually
8    used in this case but arrived at a result that
9    you're asking me to assume is hugely different
10   on this metric that you've put in your
11   question or very different, the 56 to
12   80 percent.
13         The hypothetical -- it appears to
14   me to contradict itself in the way that I've
15   just identified and I -- and since it does not
16   make sense to me I don't know how to give you
17   a sensible answer to it. If you can clarify
18   how this comes about, how it is that Dr.
19   Hakala in your hypothetical applies the same
20   procedure and gets a different result. This
21   is not a different analyst, a different
22   researcher.
23       **Q.   Sure. Are you aware that Dr.**
24   **Hakala filed a declaration in this case in**
25   **connection with plaintiff's motion for class**

TSG Reporting - Worldwide    877-702-9580

Page 108

1          L. MARAIS
2    **certification?**
3       A.   I have -- it wouldn't surprise me
4    if such a thing had happened but I don't have
5    any direct knowledge of it. I'm not aware of
6    it.
7       **Q.   Well, I will represent to you that**
8    **he did so. And I will represent to you that**
9    **he also performed an event study in connection**
10   **with his class certification declaration in**
11   **this case and I will represent that his**
12   **description of the protocol that he used to**
13   **identify material event days in that**
14   **declaration was similar to the protocol that**
15   **he uses -- his description of the protocol**
16   **that he uses here except that he ended up with**
17   **132 material event days in that declaration**
18   **and he has 216 material event days here.**
19         **So with that information I'd like**
20   **to now turn you back to my hypothetical.**
21   **Let's assume that Dr. Hakala employing the**
22   **same protocol that he uses to identify**
23   **material event days, instead of coming up with**
24   **56 percent he comes up with 80 percent and**
25   **those were the days he dummies out.**

TSG Reporting - Worldwide    877-702-9580

Page 109

1          L. MARAIS
2    **Under those circumstances, would**
3    **you view it as consistent with the academic,**
4    **finance and accounting literature?**
5         MS. RODON:  Objection.
6       **Q.   His use of dummy variables.**
7       A.   Okay. So the preamble to your
8    question was meant to clean up the problem I
9    had as I understand it with your previous
10   question, but it unfortunately does not do
11   that. So to try to be helpful on this let me
12   interpret your question as follows and then
13   I'll answer the question that does -- that I
14   can understand at least.
15         I think you're asking me to assume
16   counterfactually that Dr. Hakala employed
17   exactly the protocol that he did employ in
18   the -- for the report that I have read, but
19   counterfactually had -- that that resulted in
20   80 percent of the days being associated with
21   dummy variables. Leaving, in other words,
22   20 percent or approximately 78 observations
23   total not dummied out in his data set.
24         I would notice that 78 is getting
25   towards the low end of what would be

TSG Reporting - Worldwide    877-702-9580

```
1              L. MARAIS
2   conventionally used in a -- an event study or
3   market model regression using daily data.
4   It's a small number for that purpose.
5   Probably not unprecedentedly small.  But it
6   looks to me unusual.  I would notice that one
7   thing.
8              But I would not disqualify the
9   exercise based on the 80 percent alone.  I
10  would consider in the same way that I
11  considered his actual report -- about the
12  event study the way he actually did it, that
13  circumstance, and removing for cause from the
14  estimation period, from the estimation data,
15  certain observations is not in itself a
16  disqualification and is not in itself -- is
17  not per se inconsistent with the accounting
18  and finance literature.
19             Indeed, the reason in the actual
20  case for Dr. Hakala's removal of certain dates
21  is affirmatively and positively consistent
22  with ideas that are in the peer reviewed
23  literature.
24      Q.   Did you analyze any of the
25  specific days Dr. Hakala dummied out to
```

```
1              L. MARAIS
2   determine whether it was consistent with the
3   criteria in the literature for employing a
4   dummy variable on?
5         MS. RODON:  Objection.
6      A.   Your question conflates two
7   issues; one of which I have considered and one
8   of which I have not considered.  To be clear,
9   the question that I have considered is whether
10  it is appropriate and consistent -- whether it
11  is, per se, appropriate and consistent with
12  the academic literature to use multiple dummy
13  variables in the way that Dr. Hakala has.
14  That is an issue that I have considered.  It's
15  not -- I have not performed any detailed
16  numerical analysis of that issue.  It's not
17  that kind of question.  But it's an issue that
18  I have considered and on which I have
19  expressed an opinion in my report in this
20  case.
21             The other part of your question
22  seems to go to whether a particular day for
23  which Dr. Hakala used a dummy variable in his
24  report, whether the reason Dr. Hakala's stated
25  reason for using a dummy variable for that day
```

```
1              L. MARAIS
2   is supported by academic literature.
3             Well, Dr. Hakala quotes some
4   academic literature but the connection between
5   his decisions on certain days and the academic
6   literature that he quotes is outside the scope
7   of what I have looked at and been asked to
8   consider in this case.
9             So the answer -- the only fair
10  answer to your question is yes and no as
11  explained in this rather lengthy preamble.
12      Q.   You used the term "per se" a few
13  times.  Is it fair to say that your opinion
14  with respect to Dr. Hakala's use of dummy
15  variables is that based on the literature it
16  is not per se inappropriate to use multiple
17  dummy variables to account for -- well, let's
18  leave it at that.  That it's not per se
19  inconsistent with the literature to use
20  multiple dummy variables for days in the
21  estimation in the course of performing the
22  regression analysis?
23         MS. RODON:  Objection.
24      A.   That seems like a fair statement.
25  But my opinions are the opinions that I have
```

```
1              L. MARAIS
2   stated in my report for the reasons that I
3   have stated in my report and to the extent
4   that you meant by that to summarize what I
5   have in my report, yes, I would agree with it.
6             If you meant to change in any way
7   what I have stated in my report, then I would
8   disagree.
9      Q.   I meant -- I'm trying to make sure
10  I understand the opinion that you've expressed
11  in your report.  So my attempt there was to
12  summarize your opinion.
13             Now, does your -- does your
14  opinion go beyond that?
15         MR. STRAUSS:  Objection.
16      A.   The -- to help us get to closure
17  on this perhaps you could point to a specific
18  opinion of the three opinions that I have in
19  the report and tell me what the "that" is that
20  you are asking me whether it goes beyond.
21      Q.   The opinion expressed in paragraph
22  6.  Does that opinion go beyond what we just
23  talked about?
24         MS. RODON:  Objection.
25      A.   What we just talked about is
```