# EXHIBIT 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-----------------------------X
IN RE CREDIT SUISSE - AOL )
SECURITIES LITIGATION )
)
) Case No. 1:02 CV 12146
----------------------------- (Judge Gertner)
)
This document relates to: )
)
ALL ACTIONS )
)
-----------------------------X

VIDEOTAPED DEPOSITION
OF
BERNARD BLACK
New York, New York
Tuesday, August 19, 2008

Reported by:
ANNETTE ARLEQUIN, CCR, RPR
JOB NO. 18036

August 19, 2008
9:36 a.m.

Videotaped deposition of BERNARD BLACK, held at the offices of Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York, before Annette Arlequin, a Certified Court Reporter, a Registered Professional Reporter and a Notary Public of the State of New York.

A P P E A R A N C E S:

KAPLAN FOX & KILSHEIMER LLP
Attorneys for Plaintiff Bricklayers and Trowel Trades International Pension Fund, the Proposed Class and Dr. Hakala
850 Third Avenue, 14th Floor
New York, New York 10022
BY: FREDERIC S. FOX, ESQ.
MELINDA RODON, ESQ.

DAVIS POLK & WARDWELL
Attorneys for Defendants Credit Suisse First Boston LLC and Credit Suisse First Boston USA
450 Lexington Avenue
New York, New York 10017
BY: AVI GESSER, ESQ.
DANIEL J. SCHWARTZ, ESQ.
SANDRA WEST, ESQ.

A P P E A R A N C E S (Cont'd.):

SKADDEN ARPS SLATE, MEAGHER & FLOM LLP
Attorneys for Laura Martin
Four Times Square
New York, New York 10036
BY: MICHAEL W. MITCHELL, ESQ.

ALSO PRESENT:

SILVIO FACCHIN, Legal Video Specialist

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

THE VIDEOGRAPHER: This is the tape labeled No. 1 of the videotaped deposition of Bernard Black in the matter of In Re Credit Suisse - AOL Securities Litigation.

We are now going on the record. The time is 9:36 a.m.

Counsel will state their appearances for the record.

MR. GESSER: Avi Gesser with Davis Polk & Wardwell for the Credit Suisse defendants.

MR. SCHWARTZ: Daniel Schwartz, also Davis Polk & Wardwell, for the Credit Suisse defendants.

MS. WEST: Sandra West, Davis Polk & Wardwell, for the Credit Suisse defendants.

MR. MITCHELL: Michael Mitchell, Skadden, Arps, Slate, Meagher & Flom for defendant Laura Martin.

MR. FOX: Frederic Fox, Kaplan Fox & Kilsheimer, for the plaintiffs and the witness.

MS. RODON: Melanie Rodon, also with Kaplan Fox & Kilsheimer, for plaintiffs and

the witness.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

* * *

B E R N A R D B L A CK, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. GESSER:

**Q. Professor Black, we met earlier but just for the record, I'm Avi Gesser and I'll be asking the questions today.**

**You've been deposed before; is that right?**

A. Yes.

**Q. Many times?**

A. Some number of times.

**Q. Okay. So I'm not going to --**

A. I don't know if I want to admit to many.

**Q. Okay. I'm not going to go over all the ground rules, but we've got a lot to cover and so it would be helpful for me if you'd just**

**listen to my question and then answer the question that I ask.**

**Do you understand that?**

A. Yes.

**Q. I'm going to be using a number of abbreviations and I just want to make sure we understand each other when we use abbreviations. So I'll be using CSFB or Credit Suisse to refer to Credit Suisse First Boston at the time that's relevant here, which is the 2000 to 2002 time frame.**

**Do you understand that?**

A. Yes.

**Q. Okay. Now I'm going to be using the term "AOL" to refer to the merged Time Warner America Online entity, okay?**

A. Okay. I will try -- the way I've dealt with that is to call that AOL TW to separate AOL and TW, but I will try --

**Q. And if --**

A. I will try to understand your references.

**Q. And if ever there's some confusion as to which entity we're talking to, you'll let me**

**know.**

A. If it's okay, I will try to use my own terms, which is AOL as AOL alone, TW as the Time Warner side and AOL TW as the combined. How's that?

**Q. No. I'm going to ask you to refer to the combined entity as AOL and the America Online as America Online and Time Warner as Time Warner.**

A. Okay. I will try.

**Q. Okay. Thank you.**

**And unless I expressly say that we're talking about a different time frame, let's assume we're talking about 2001 for all my questions.**

A. Okay.

MR. FOX: And I would just note for the record that the witness used certain terms in his report and, you know, to the extent he's comfortable using those terms and the terms are in his report that way, as he indicated, he will try and use the terms you want him to use but they may be different from what he's using in his

B. Black

report.

BY MR. GESSER:

**Q. And I'm not trying to make it difficult for you, it's just that before you came along to this case, those are the terms that we have been using and so it will create I think confusion unless we try and stay consistent. I will as best I can make it clear what I'm talking about. If you can do the same, hopefully we won't have any confusion, but I'm just -- that's -- those are the terminology -- that's the terminology I'll be using. I recognize you use different terminology in your report, so I'm flagging that and I'm asking you if you could just stick with the terminology that I'm using in my questioning.**

A. I will try.

**Q. Thank you.**

**So you've been retained as an expert by plaintiffs in this matter; is that correct?**

A. Yes.

**Q. Do you know when you were retained?**

A. May, June time frame.

**Q. Okay. Do you have a retention**

**B. Black**

**letter?**

A. No.

**Q. What's the terms of your retention?**

A. Basically I bill on an hourly basis.

**Q. And what is your hourly rate?**

A. $800.

**Q. And you're not receiving any other compensation as a result of your testimony?**

A. No.

**Q. And no one else is receiving any compensation --**

A. No.

**Q. -- as a result of your testimony?**

A. Not that I know of.

**Q. Are you using anyone to do support work for you?**

A. No.

**Q. So all the calculations were all done by you?**

A. By me.

**Q. And any idea what your total hourly -- your total hours worked to date are?**

A. I would estimate 80.

**Q. And that includes preparing for**

**B. Black**

**today's deposition?**

A. Yes.

**Q. How much time do you think you spent preparing for today's deposition?**

A. Yesterday on the plane and then in the Kaplan Fox offices, so five hours.

**Q. Okay. Have you worked with Kaplan Fox before?**

A. Yes, indirectly. I worked -- I prepared an expert report in state securities litigation against AOL involving the AOL financial statements during the period from 2000 through 2002, and Kaplan Fox was one of the plaintiff firms in that case.

**Q. Have you worked with Kaplan Fox other than in that instance?**

A. I do not believe so.

**Q. Okay. Have you worked with any of the other experts in this case previously?**

MR. FOX: Objection.

A. As an expert, no.

Reinier Kraakman is my coauthor on at least a couple of papers.

**Q. Have you talked with any of the**

**B. Black**

**experts in this case about this case?**

A. No, I have not.

**Q. You indicated that you did all the calculations yourself.**

A. Back up. I have worked at least once before on a case where I believe Scott Hakala was also involved.

**Q. What case was that?**

A. I believe that was a corporate case involving Shell Oil's acquisition of Pennzoil. I had no direct contact with him --

**Q. When was that?**

A. -- other than I believe that he worked on the case.

It was a trial in 2005.

**Q. Have you recommended any of the experts in this case to lawyers who have retained you?**

MR. FOX: Objection.

A. Not in this case, no.

**Q. In any case?**

A. I have suggested from time to time that people contact Reinier Kraakman for when they've got an issue that involves market

B. Black

efficiency.

**Q. Do you know if he's ever done the same for you?**

A. I don't know.

**Q. I don't mean for market efficiency.**

**Has he ever recommended you --**

A. I do not know.

**Q. Okay. I'm sorry. So you indicated that you had done the calculations for your report yourself.**

A. Yes.

**Q. What in your background or education gives you, in your view, the expertise to conduct such calculations?**

MR. FOX: Objection.

Is there a specific calculation that you're talking about?

BY MR. GESSER:

**Q. The tables and calculations that appear in your report.**

A. I suppose I'm not following the question. I'm trying to think, okay, I know how to use Excel and that's presumably not the question that you're asking, but --

B. Black

**Q. I mean I know how to use Excel. I mean a lot of people know how to use Excel.**

**Does that mean that anyone can do the calculations that you did in your report?**

MR. FOX: Objection.

A. At some level the calculations in the report are arithmetic or at most algebra, so I think my answer to that would be yes, but a different question would be why did you do the particular calculations that you did.

**Q. Okay. Well, let me ask, to do the calculations that you did and for them to be in some way meaningful to the issues in this litigation, so not just to run the calculations but to select the appropriate numbers and reach whatever conclusions you reached, what, in your view, gives you the expertise to conduct that kind of analysis?**

MR. FOX: Objection.

A. I suppose that I consider myself to be generally knowledgeable in finance and in the valuation of companies.

I teach corporate finance.

I've been working on a textbook for

B. Black

law schools on corporate finance that I may or may not ever finish.

I have a joint position at the University of Texas Law School and in the finance department at the Macomb School of Business at the University of Texas, and I've done a lot of these calculations over the course of, you know, some number of years. I think that would be my best answer.

**Q. Okay. So you consider yourself an expertise in -- you consider yourself an expert in corporate finance?**

A. At a general level, yes. There will be of course subareas of corporate finance where I think I know something and subareas where I think that's outside my area of expertise.

**Q. And you also consider yourself an expert in securities laws and practice?**

A. Yes.

**Q. And is that part of the expertise that you're bringing to bear in your report?**

A. Certainly some knowledge about practice in the securities markets I think is relevant to my report, so call it general

B. Black

knowledge about what it is that investment banks do, that analysts do, what kinds of information investors are looking for from analysts.

I don't think there's any law in my report.

**Q. And your expertise in securities practice, does that come from an academic inquiry that you've done or from a practical, from practical experience that you have?**

MR. FOX: Objection.

A. I'd say primarily -- well, let's call it a few sources. So one is that an increasing number of years ago I was in a transactional M&A practice at Skadden, Arps. Mr. Mitchell may not remember me as a junior associate, but I remember him.

MR. MITCHELL: I remember you.

A. Since then I've written reasonably extensively about corporate acquisitions, about, you know, in a field that has come to be called law and finance which is kind of how law affects financial markets.

You know, I've been on the boards of directors of public companies.

B. Black

I've probably done a moderate amount of expert witness work in securities cases of various kinds.

I think that's what I would look at.

**Q. You've never been a financial analyst.**

A. Correct.

**Q. You've never been an investment banker.**

A. Correct.

**Q. Your publications that relate to analysts, securities analysts, do you off the top of your, I mean I can show you your report, off the top of your head do you know what those are?**

A. I have not written specifically about securities analysts.

**Q. Okay.**

A. There are maybe a few references in my textbook on corporate acquisitions, but I've not written specifically about securities analysts.

**Q. Are you familiar with the case law on research analysts and their impact on stock**

**B. Black**

**prices?**

MR. FOX: Objection.

A. No.

**Q. So you haven't read the decisions if I tell you a case, MetroMedia, Lantronix, DeMarco, these cases don't mean anything to you?**

A. They don't ring a bell.

**Q. Okay. How about the academic literature on the effects of analyst statements on stock prices, Womack's article, things like that.**

**Are you familiar with those?**

A. I'd say I have a general familiarity with some of that literature, but I don't claim to be closely familiar with it.

**Q. Okay. You wouldn't consider yourself an expert on them.**

A. On that body of literature that studies analysts in particular, no. I'm not a particular expert in that area because I haven't worked in that area.

**Q. Do you consider yourself an expert on advertising?**

A. No.

B. Black

**Q. Marketing?**

A. No.

**Q. Okay. I'm going to mark as Exhibit 1, your rebuttal report.**

**(Defendants' Exhibit Black 1, Rebuttal Report of Professor Bernard Black, marked for identification, as of this date.)**

**BY MR. GESSER:**

**Q. I presume you're familiar with Exhibit 1?**

A. I certainly hope so.

MR. FOX: You're calling this Black-1?

MR. GESSER: Yes.

BY MR. GESSER:

**Q. If you take a look at pages, let's say starting at page 8, Section A deals with revenue and there's a table and then continuing on there's a series of tables and calculations.**

**This is a rebuttal report and I'm curious, those tables that start at page 9, what is this being put -- strike that.**

**What are those tables rebutting?**

**B. Black**

**What proposition that is being put forward in defendants' expert report is that designed to rebut?**

MR. FOX: Objection.

A. I think that I was initially engaged as a rebuttal witness for Professor Dayton and he has some general opinions about the reasonableness of CSFB's published opinions about AOL during the relevant time period.

And in addition, Professor Stulz has some opinions about well, if you just play with terminal multiples a little bit, you can get a wide variation in predictive valuations.

So I think that this analysis is meant to be responsive to those opinions.

**Q. So you understand Professor Dayton's report to opine on the reasonableness of Credit Suisse's analyst reports on AOL.**

A. In effect, yes, though not in precisely those words I think.

**Q. I'm not sure I understand what you mean by that.**

A. I'm trying to remember. I've got in the report somewhere what his principal opinions

B. Black

are. He doesn't directly say that he thinks the CSFB opinions were reasonable.

He says instead that it would be reasonable to be more optimistic than Laura Martin was about the Time Warner segments of AOL. I think that was one of his opinions.

**Q. Do you agree with that?**

A. At that level of generality and depending on the time frame, yeah, there was, you know, there was for Time Warner or for AOL or at various times some range of reasonable opinions, and I have no doubt that one could be more optimistic than Laura Martin was at particular points in time and still be within that range of reasonableness.

**Q. Do those points in time include January through September of 2001?**

A. I think that I didn't ask myself that question.

Instead I asked were the CSFB reports both reasonable and consistent with the apparent opinions of Laura Martin and Jamie Kiggen.

I didn't ask okay, if Laura Martin is here, could you be here and be reasonable.

B. Black

I said okay, where is CSFB and what can I say about whether that was reasonable.

**Q. So before issuing your rebuttal report, you didn't even bother to determine whether or not you agreed with the conclusion of the report that you were rebutting?**

MR. FOX: Objection.

A. That isn't what I said. I think I said that I -- that it's certainly the case that sort of in general it might well be possible to be more optimistic than Laura Martin was at particular points in time.

So I read Professor Dayton's opinion and said at that level of generality, it's not clear that I would have a basis for disputing that opinion, but I also didn't treat it as the job of my rebuttal report to say it would be unreasonable for someone to be more optimistic than Laura Martin at particular points in time. I don't say that in my report.

**Q. Okay.**

MR. GESSER: Well, I'm going to mark this as Dayton-2.

MR. FOX: Black.

B. Black

MR. GESSER: I'm sorry, Black 2.

(Defendants' Exhibit Black 2, Expert report of Professor John Dayton, marked for identification, as of this date.)

BY MR. GESSER:

**Q. I'm showing you Exhibit Black-2, which is the expert report of John Dayton.**

**I presume you've read this?**

A. I have.

**Q. Have you seen the deposition transcript from the deposition of Professor Dayton?**

A. I have not. I believe the deposition was taken only yesterday.

**Q. I know. I was there.**

**Have you seen the deposition transcript?**

A. I have not.

**Q. Have you seen any of the deposition transcripts of any of the experts in this case?**

A. I have not.

**Q. All right. If you look at paragraph 6 on page 2.**

A. Okay. Yes.

B. Black

**Q. So these 6A and 6B are the two questions that Professor Dayton was asked.**

**The first one, 6A, is: "Were the kinds of concerns that Laura Martin expressed in her internal emails about the advertising market and its potential impact on AOL Time Warner..." in brackets AOL "...between January and September 2001 otherwise known to the public at the time?"**

**Did you conduct any investigation to determine the answer to that question?**

A. I think that I would answer as follows: That I do not disagree that the fact that this was not a wonderful time for the advertising market, this being 2001. I do not disagree that there was general information about troubles in the advertising market.

I think a different question is what -- you know, how deep was that concern, how bad would the advertising market be and certainly it was uncertain what the impact of a weak or bad advertising market would be on AOL.

But in terms of general knowledge about weakness in the advertising market, I

B. Black

didn't -- you know, I've done whatever reading I've done for this case but I didn't see any reason to dispute a statement made at that level of generality.

**Q. My question was did you conduct that inquiry.**

A. I did some amount of background reading in order to understand the state of the market for traditional advertising and online advertising for this case.

I also have some familiarity from work on the prior AOL securities case.

But I was not conducting a focused investigation into what was generally known about the advertising market because I didn't need to do that for the opinions that I was giving in this case.

**Q. Well, based on the limited inquiry that you did and your previous knowledge from other matters, did you form an opinion as to whether or not you had an answer to this question at 6A?**

MR. FOX: Objection. Asked and answered.

B. Black

A. At the level of generality that 6A is phrased, I did not disagree that the kinds of concerns at some level of severity that Laura Martin had at that time were out there in the public domain. It was known that there was a weak advertising market during this period of time.

I do not --

**Q. Was it also --**

A. -- think the opinions that were out there were monolithic, people had different views as to how bad the advertising would be and I do not think that how -- that that general information that was out there necessarily included how that weak overall advertising market would affect AOL in particular, nor do I think that Professor -- that the evidence that Professor Dayton recites goes to that narrower question.

So I'm trying to distinguish between general information about a general slowdown in advertising and how that general slowdown would affect AOL.

**Q. Just so I understand, your limited**

**B. Black**

**inquiry into the subject leads you to believe that there wasn't -- it wasn't known to the market that the downturn in the, that the downturn in the advertising market could potentially impact AOL?**

MR. FOX: Objection.

A. No. I think that the extent to which the general downturn in the advertising market would affect AOL was not known, nor was the severity of the downturn in the advertising market necessarily known.

**Q. Well, let's take the first of those.**

**How the advertising market would affect AOL was unknowable, wasn't it?**

MR. FOX: Objection.

A. No, it was estimatable and one might think that it was the job of an analyst covering AOL to estimate it.

**Q. And I'm so you're saying it wasn't estimated or it just wasn't estimated correctly?**

A. I didn't say either of those things.

I disagreed with your statement that it was unknowable.

**Q. Okay. But now I'm asking you, are**

**B. Black**

**you saying that people just didn't do the analysis or they didn't do the analysis correctly as to whether the downturn in the advertising market would affect AOL?**

MR. FOX: Objection.

A. I don't know who these people are and I don't think I'm saying either of those things.

**Q. Okay. So what are you saying?**

MR. FOX: Objection.

A. I don't understand the question.

I said A, you said are you saying B or C and I said no.

And you're saying well, what you saying and I'm going to come back and say I'm saying A.

**Q. So say it.**

MR. FOX: Objection.

A. I, going back about three or four questions, you said well, the impact of the advertising slowdown on AOL was unknowable and I said I don't agree with that. I think it was estimatable and it was the job of securities analysts to estimate.

**Q. Okay. So now I'm asking you, did, in**

**B. Black**

**your view, securities analysts in this time frame estimate the impact that the downturn in advertising market would have on AOL?**

A. They certainly should have and my review of information for this case suggests that at least some of them did.

And I don't know that I can form an opinion as to whether analysts in general did because I did not try to read the universe of analyst opinions about AOL at this time.

**Q. Okay. But some analysts did; is that correct?**

A. Yes.

**Q. Did any of them do it correctly in your view?**

MR. FOX: Objection.

A. I did not try to address that question in my review.

**Q. Because that was not relevant to your review?**

MR. FOX: Objection.

A. I was not in my review and my report trying to address whether the 15 or 20 analysts, however many analysts who covered AOL, were

B. Black

either doing a good job or doing a job that was consistent with their private beliefs.

I was trying to examine whether it appeared that the CSFB public statements were both internally consistent and reasonable and consistent with the private beliefs of Laura Martin and Jamie Kiggen.

I did not take myself to be forming any opinions about the opinions of other analysts or about the work that other analysts did.

**Q. And you conclude that Mr. Kiggen and Ms. Martin's public opinions about AOL in 2001 were unreasonable.**

MR. FOX: Objection.

A. What I try to do in the report is point out pieces of those opinions that to me do not appear to be reasonable or internally consistent or consistent with their prior views.

I don't want to say that everything they said was unreasonable. I want to say that there's evidence that some of the things that they said were not reasonable or were not internally consistent or were... Let me stop

B. Black

there.

**Q. Okay. Well, you're a law professor, correct?**

A. Yes.

**Q. And you understand that there's a legal dimension to the word "reasonable"; is that correct?**

A. I was not trying to use the term "reasonable" in any of the many meanings in which it has in different areas of law.

I was trying to use it in, you know, with its ordinary meaning.

**Q. And what do you take its ordinary meaning to be?**

A. That in the area of forecasting the performance of a firm, as in many other areas, there's not an exact known right answer.

One is forecasting, one is estimating, one is trying to form reasonable judgments based on everything one knows and there will be some range of reasonable outcomes that a particular analyst could reach.

**Q. And in doing that analysis, you didn't think it was helpful or useful to look at**

**B. Black**

**what other analysts were saying at the same time about the same metrics?**

MR. FOX: Objection.

A. I was generally aware of the views, the consensus views, let me call them that, of other analysts and of the specific views of a few analysts, but I didn't view my job as being to try to assess whether they did a reasonable job and I did not have access to what their private unpublished views might be in order to assess whether what they were saying in public was consistent with what they believed in private.

**Q. But whether or not Ms. Martin's views and Mr. Kiggen's views as expressed in the research reports were reasonable, in your view was that in any way informed by what other analysts were saying at the time?**

MR. FOX: Objection.

A. Yes.

**Q. How? How did what other analysts say at the time inform your view as to whether the CSFB research reports were reasonable?**

A. I am generally aware that the -- that

B. Black

AOL had publicly announced its own guidance, as they called it, that they would have revenue of $40 billion and EBITDA of $11 billion for the year 2001 as a whole, and that many analysts were not disagreeing with that guidance and were preparing forecasts that were consistent with that guidance, especially in the first half of 2001.

**Q. Is that your answer to my question?**

A. Yes.

**Q. Okay. Then I'm going to ask it again.**

**How did what other analysts say inform your opinion as to whether or not Laura Martin and Jamie Kiggen's views about AOL were reasonable?**

MR. FOX: Objection.

A. I was looking at a situation where the published views of Jamie Kiggen and Laura Martin were within a range, for the most part, where other analysts were also publishing views, and that informed my judgment as to the reasonableness or plausibility of their views against some generic set of background beliefs

B. Black

about the market, the advertising market, the online advertising market, the non-online advertising market and how developments in those markets would affect AOL.

**Q. Okay. And nonetheless are there instances where you found that a particular metric that was put forward in the CSFB analyst reports was unreasonable even though it was below the consensus of other analysts who were covering AOL at that time?**

A. I phrase that narrowly. I did not ask that question. I was generally aware that the numbers they were putting out in public were within the range of what other analysts were doing and also that they were trying to keep them within that range.

For particular numbers at particular times, I did not try to evaluate is this number above or below the range of what other analysts had in their reports at that time.

What I was trying to do in the tables in my report was assess internal consistency and consistency with the already known results for AOL for prior periods and consistency with the

B. Black

private views of Laura Martin and Jamie Kiggen.

**Q. Okay. Can I -- let me try to break that into piece because I think we're muddling two different ideas here.**

**You have a view that certain metrics that are in CSFB's analyst reports between January 2001 and January 2002 were unreasonable.**

MR. FOX: Objection.

BY MR. GESSER:

**Q. Is that correct?**

A. Yes.

**Q. And assuming for a second, if you can, that all of the internal emails and so forth that you've reviewed about Jamie Kiggen and Laura Martin's beliefs, assuming they did not exist and now you're only looking at the reports themselves, do you nonetheless believe that some of the metrics that they put forward were unreasonable or are all the basis, bases for your belief that those were unreasonable dependent on the existence of internal emails that you've viewed between Laura Martin and Jamie Kiggen and other analysts on that team?**

MR. FOX: Objection.

B. Black

A. I believe that some of the numbers that they had in the public domain were unreasonable by reference to AOL's prior numbers.

And I also believe that they did not update or adjust their numbers in the way I would think an analyst should as additional AOL information came out.

And for purposes of my answer I am, as you requested, putting aside the emails or internal conversations.

**Q. Okay. So I'm going to refer to just shorthand so I don't have to repeat that whole thing, I'm going to refer to the instances in which their numbers are unreasonable irrespective of the internal back and forth, as numbers that are objectively unreasonable and numbers that are unreasonable by virtue of the fact that they are, in your view, inconsistent with the internal views as expressed in emails among the analysts as subjectively unreasonable.**

**Is that a fair -- can I use those terms?**

MR. FOX: Objection.

B. Black

Mischaracterizes.

A. Let me suggest a slightly finer division I would be happy with; that I think there are going to be some numbers that are unreasonable against the background of what we know about AOL's prior performance or what we -- what people believed about the state of the markets.

There are going to be a second set that are unreasonable in the sense that if you believed A at time 1 and then the following new information came out, you couldn't still believe A at time 2 because the information on which you were basing your opinion had changed. So maybe if you believed something different than A at time 1, a star, you could still believe A at time 2.

**Q. I understand that distinction. That distinction is meaningless for what I'm trying to accomplish so let me give the distinction that I care about.**

**The distinction I care about is numbers that are unreasonable based on information that was public and numbers that are**

**B. Black**

**unreasonable based on information that only Jamie Kiggen, Laura Martin and whoever else was on those emails knew.**

**Do you understand that distinction?**

MR. FOX: Objection.

A. I do, but let's see where we go with specific questions because what I'm calling the intermediate category of failure to update or if you believe A at time 1, you can't still believe A at time 2, may still turn out to be important.

**Q. Well, to the extent that what you believe at the time A or time 2 is dependent on information that is only known among the analysts at Credit Suisse, I would view that as being subjective, and anything that no one could believe because it's only based on public information would be objective.**

MR. FOX: Objection.

A. Again, I want to suggest that --

**Q. I think this disagreement that we're having is going to be the crux of some questions, so why don't we stick with how I'm defining it, and then once we get to the issue, I think this will become clearer as to why we**

**B. Black**

**have this disagreement.**

**Is that fair?**

A. Let's go forward and I may want to come back with my middle category of failure to update. Let's call it that.

**Q. All right. For numbers that are objectively unreasonable, which I think you agree there are some --**

A. Yes.

**Q. -- did you then go on and take a look at what other analysts were saying at the time for those numbers to test whether or not those numbers were consistent with what other analysts in the market were saying?**

A. I did not specifically undertake that work, no.

**Q. Okay. Don't you think that work would be important in determining whether or not those numbers were unreasonable?**

**So if, for example, you viewed the October -- well, take the April 10th CSFB EBITDA numbers for AOL as objectively unreasonable but then you went on and found that every other analyst in the market had higher EBITDA numbers**

**B. Black**

**for AOL, shouldn't that have informed your opinion as to whether or not the CSFB EBITDA numbers in the April 10th report were in fact unreasonable?**

A. That feels like an incomplete hypothetical and I think my answer would be let's look at particular numbers at particular times and then first of all, it may or may not be factually the case that other analysts had similar numbers --

**Q. But you don't know that.**

A. -- at similar times.

At that level of detail number, number by number, I do the not know that. That's correct.

**Q. So it's possible that you've identified a number, a metric by Credit Suisse that you view as being objectively unreasonable that nonetheless is lower than a number that many other analysts at the time had for AOL.**

MR. FOX: Objection.

A. That is certainly theoretically possible since I didn't review all of the other analyst opinions.

B. Black

And whether it's true in fact, I do not know.

**Q. Based on your review of the analyst reports in this case, do you have a view as to whether you are a better analyst for media companies than Jamie Kiggen?**

MR. FOX: Objection.

A. I did not view Jamie Kiggen as being a media analyst. I viewed him as being an Internet analyst.

**Q. Okay. Do you view yourself as a better Internet analyst than Jamie Kiggen?**

A. I don't have an opinion on that question.

**Q. Do you view yourself as a better media/Internet analyst than Mary Meeker?**

A. I am generally aware that Mary Meeker is a, or was at the time, a highly respected Internet analyst and beyond that I have no opinion on that question.

**Q. So you may be a better analyst than she is.**

MR. FOX: Objection.

A. First of all, I am not --

B. Black

MR. FOX: He said he has no opinion.

MR. GESSER: So I am now asking him is it possible that he is a better analyst than Mary Meeker.

MR. FOX: I don't understand. Objection.

A. Here's a more complicated answer, okay?

With respect to -- at one level I am not a securities analyst and there is certainly much about the business of securities analysis that I do not know. I know corporate finance in general, but I am not a securities analyst in particular.

On the other hand, I would suspect that if I were to sit down and undertake the job of analyzing a company, I would not develop numbers that I thought were internally unreasonable and there are at least some instances in which I believe that the CSFB reports were so.

I have no basis for having a view as to whether there were similar unreasonablenesses in the opinions of other analysts so I don't

B. Black

want to offer any opinion on how good an analyst Mary Meeker was other than to say that she was highly regarded by investors at that time.

**Q. Okay. I mean I can go through a whole long list of analysts who covered AOL at the time. I assume your answer is going to be the same for everyone, but I'm just going to go through them; Richard Bilotti, Mary Meeker, Jessica Reef Cone, Holly Becker, Lanny Baker, all analysts who covered AOL at the time.**

**You have no view one way or the other as to whether you are a better analyst of AOL than they are?**

A. Well, again, I am generally knowledgeable in corporate finance but I'm not a securities analyst so it feels like a weird question to say I'm better than they are at their business. I would not claim to be better than they are at their business.

I would claim to be capable of doing financial analysis and recognizing, you know, whether numbers add up consistently, whether trends make sense and so on, and there are instances in at least the CSFB reports where I

B. Black

believe it was not the case that the trends made sense to me. It is possible that I would find similar issues in the reports of other analysts and I have not done that work.

**Q. Okay. And the work that you did with respect to the Credit Suisse analysts, you did that, analyst reports on AOL, you did that in the last two months; is that correct, three months?**

A. Yes.

**Q. So you did it after the fact.**

MR. FOX: Objection.

A. That is correct.

**Q. So you're analyzing trends knowing how those trends turned out; is that correct?**

A. I believe that I tried to be careful --

**Q. That's not my question.**

**My question is --**

MR. FOX: Let him finish his answer. He was in the middle of an answer.

MR. GESSER: A nonresponsive answer, but yes.

MR. FOX: Let the witness please

B. Black

finish his answer.

A. In offering a view as to, for example, the reasonableness of the implicit fourth quarter revenue of America Online that is implicit in the Fidelity presentation which is one of the pieces of my report, I did not use information about what the fourth quarter revenue turned out to be. I used information that was available at the time, which was information through the third quarter.

Similarly, in reviewing, analyzing, if you like, the public April 10th forecast and model for AOL that was published by CSFB, I took into account information through the fourth quarter of 2000 but I did not take into account information about the first quarter of 2001 which was at that time not yet available.

So I tried to be careful in not using knowledge about what the future would turn out to be in assessing whether particular numbers at particular times were reasonable when made.

**Q. We're going to have a long day and your answers, you have a sort of a slow way of answering questions and so if we're going to get**

**B. Black**

**through all the questions, it will be helpful if you just listen to my question and give me the answer, okay? So let me just ask this again, okay?**

**The trends that you were looking at, so the growth in AOL, AOL stock price, how the advertising market was going, all those things, those are now known to you what actually happened; is that correct?**

MR. FOX: Objection.

A. In some cases yes, although not in all because I wasn't trying to say systematically what happened to A, B or C in the future because my opinion was about what was reasonable at the time. So they are knowable but they are not necessarily known to me.

**Q. But you did work for AOL previous to this case, work related to AOL previous to this case; is that right?**

A. Yes.

**Q. And through that work you know generally how AOL performed in 2003, 2004, 2005, its stock price performed?**

MR. FOX: Objection.

B. Black

A. Yes, but certainly not at the level of particular numbers and particular quarters in nature of my report here.

It's also the case that my prior report was really focused on America Online rather than on AOL as a whole.

**Q. I understand that, but getting to my, back to the original question, which was you're conducting this analysis that you're doing of AOL with the benefit of some hindsight; is that correct?**

MR. FOX: Objection.

A. I want to return to my prior answer which is I was trying not to review or analyze the public statements by CSFB with the benefit of hindsight even though that hindsight was potentially available.

**Q. That's sort of a difficult task, though, isn't it, to keep what you know about what happened --**

**(Witness' cell phone ringing.)**

**Q. Do you want to take that?**

A. No. I'm turning my phone off.

**Q. To keep what you know about what**

**B. Black**

**happened to AOL separate in your mind when you're doing this analysis.**

**Is that a difficult task to do?**

A. I think it's a plausible task.

There is certainly some risk of allowing what can be called hindsight bias to influence your opinions, and I was attentive to that risk and tried not to introduce, directly or indirectly, knowledge of the future into opinions to speak as of a particular point in time.

It's certainly possible that I was not completely successful in that effort, but that's what I was trying to do.

**Q. As you sit here today, is there anything that you'd like to change in your report?**

A. I think that we did a fair amount of editing and mostly trimming over the last few days before the deadline and as a result, I read the report and say God, you know, this needs another draft.

I think there are two tables that are virtually identical, for example, and so I might

B. Black

want to go back and just sort of reread for flow and clarity.

I don't think there are opinions that I state in the report that I today consider to be inaccurate.

**Q. How about any of the numbers? Do you consider the numbers to be inaccurate?**

A. No.

**Q. But you may after today go back and read it and make some stylistic changes? Is that what you're saying?**

MR. FOX: Objection.

A. No. That if I had the opportunity to have had some extra time, I would have reread it, marked it up, edited it at the level of style and flow.

**Q. This report is dated the 17th of July; is that right?**

A. I don't recall.

**Q. I'm representing to you that it's dated the 17th of July.**

**So you haven't had time in the last month to go over this and just see if there are any changes you want to make?**

**B. Black**

A. I read it yesterday and I am comfortable with the opinions in the report.

I am not happy with flow and smoothness and with the fact that there are two duplicative tables.

**Q. Leaving that aside, there's nothing as you sit here today that you think needs to be changed in order for it to be accurate and accurately reflect your views; is that right?**

A. Yes.

**Q. We've gone on a fairly long, tangent but where we were at before we got off was we were in Exhibit 2, which is Professor's Dayton's report, and we were looking at the assignment that Professor Dayton was asked, and we were on 6A and I never got to 6B so I wanted to get back to that.**

**The question -- the second question that Professor Dayton was asked was, was it reasonable for someone knowledgeable about the advertising market and AOL between January and September of 2001 to have understood the kinds of concerns raised by Ms. Martin but have reached more optimistic conclusion regarding**

**B. Black**

**AOL's prospect than Ms. Martin appears to have reached.**

**Did you conduct that inquiry?**

A. Once again, at that level of generality, was it reasonable for someone knowledgeable about the advertising market and AOL to have generally understood Ms. Martin's concerns but reached a more optimistic conclusion, I had no basis, no reason to disagree with that opinion.

I thought that that wasn't a terribly sensible question to ask and I instead wanted to ask the more specific questions for particular statements at particular times; were they reasonable in light of known information about AOL, which you've asked me to call objective reasonableness, were they subjectively reasonable and were they appropriately updated.

And those were the questions that I thought it was appropriate to ask and the questions that I attempted to address in my opinion.

**Q. Okay. But you don't -- as they are phrased here, leaving aside what questions you**

**B. Black**

**thought were the appropriate questions, but as they are phrased here, you don't have any issue with either 6A or 6B as answered by Professor Dayton in his report at this level of generality; is that correct?**

MR. FOX: Objection.

A. No.

**Q. Okay. So you're not rebutting his answer to these questions in your report, you are formulating what you think is the more appropriate question to be asking to get at what you think is the heart of the issue and then going ahead and answering it; is that accurate?**

MR. FOX: Objection.

A. I am attempting in my report to explain why the questions that he poses for himself or that you posed for him are framed too broadly and too generally, and describing what I think more appropriate questions might be and attempting to answer those questions.

**Q. Did you form any opinions about Credit Suisse's analyst reports on AOL that are not reflected in your report?**

MR. FOX: Objection.

Page 54

B. Black

A. Yes.

**Q. What are those?**

A. First, I think a judgment was made as to what level of numerical detail to include in the report and, you know, a draft report had additional numbers and additional details.

And so I have opinions about additional numbers and additional details that are consistent with the opinions that are in the report but are not specifically in the report.

**Q. And why didn't you include those in the report?**

MR. FOX: Objection.

I think that you're -- just so it's clear, as you know, we have a stipulation about drafts in this case and I think you're starting to get very close to why things are and aren't in --

MR. GESSER: Fair enough. I understand.

BY MR. GESSER:

**Q. So the additional opinions that aren't reflected in your report, if you were to testify at trial, you would -- would you be**

Page 55

**B. Black**

**opining on those additional opinions or would you be sticking to what is in your report?**

A. I don't know and let me explain why I don't know.

So I have in the report an opinion that, for example, Table 1 on page 9 and the related text where I say in effect, gee, the bubble burst in March of 2000. AOL's America Online's growth after the bubble burst was in the three to four percent per quarter range revenue growth here and given that, it was not reasonable and not plausible to project that they suddenly bounced up to 19 percent growth in the fourth quarter of 2000.

Behind that I have a further analysis of AOL's revenue basically comes from two sources; subscriptions and advertising. There's a little bit left over, but not much. So I looked specifically at the, let me call it the sub-projections for subscriptions, subscription revenue and for advertising and e-commerce revenue to assess the reasonableness of those individual sub-numbers.

And I would think it appropriate as

Page 56

B. Black

part of the basis for my overall opinion that the 19 percent growth projection, implicit projection, is unreasonable to also discuss the sub-numbers that are components of that overall number.

**Q. And so sticking on this 19 percent growth rate, you characterized that growth rate as absurd; is that right?**

A. I don't recall the exact term that I used.

**Q. Take a look at on page 9, first full paragraph, last sentence.**

A. I see the word "absurd."

**Q. Okay. So --**

A. I characterized an estimate of 19 percent quarter-over-quarter growth against the background of 3.9 percent and 3.2 percent in the preceding two quarters and a weak overall economy as, quote, absurd, close quote.

**Q. Did you take a look at what other analysts' quarter-over-quarter growth rate were?**

A. I did not.

**Q. So it's possible that other analysts' growth rates were absurd as well.**

Page 57

**B. Black**

A. It's possible.

**Q. Okay. What would be a reasonable quarter-over-quarter growth rate?**

MR. FOX: Objection.

A. I didn't try to precisely define a range of reasonableness. I suppose that I could attempt to do that.

I just said hey, 19 percent ain't it and it isn't close to being it, and I didn't try to decide well, okay, 3 percent is clearly reasonable given what they've done in the past 2 quarters, 4 percent is clearly reasonable. If we start to go 5 percent, 6 percent, 7 percent, at what point do I say that's unreasonable, at what point do I say that's absurd. I didn't try to form an opinion to that level of precision.

**Q. Because you didn't need to because in your view, 19 percent is clearly absurd.**

A. I think that 19 percent was well outside a range of reasonable fourth quarter 2000 revenue estimates for America Online.

**Q. Was your view of the reasonableness of other metrics informed in any way by the absurdity of this metric?**

B. Black

**So, for example, did you look at them, each one individually and objectively, or did the fact that this number was so absurd, did that in any way influence your thinking that well, if he's got this, in your view, crazy number here, you know, that makes this number more crazy or that -- I mean or that makes me think that he's willing to use crazy numbers, I'm going to look here?**

**Do you understand my point?**

**Was this sort of a holistic analysis or did you actually just go metric by metric and evaluate them individually without having any regard to how other metrics played through your analysis?**

MR. FOX: Objection.

A. I mostly tried to go metric by metric but I also I think tried to have in the background, look, I think it's nuts to think that fourth quarter revenue is going to jump by 19 percent relative to the third quarter, but if it does, they're going to do real well on EBITDA too.

**Q. So to some extent there is an**

B. Black

**overlap. This number does in some way impact on other analyses that you were doing.**

A. Yes. You'd have to sort of look at particular numbers and particular analyses to have a more, a more fine grained answer, but I think it's inevitable in trying to understand the financial prospects of a company that the numbers relate to each other.

**Q. And let me understand, if I can, what goes into your analysis of why 19 percent quarter-over-quarter growth rate was absurd.**

**First of all, do you have any sense of when the Internet bubble burst in terms of the sharp downturn in Internet-based stocks?**

A. I think most people would date that to March of 2000.

**Q. Okay. So sometime in the first quarter of 2000; is that right?**

A. Late in the first quarter of 2000. So in terms of impact on financial outcomes, one would not -- the first quarter was sort of, I would date as being basically within the bubble period and, you know, by the second quarter we're probably coming out of it and certainly by

B. Black

the third quarter we're out of it.

**Q. So you've got, if you're looking at Table 1 on page 9, you've got two quarters of post bubble revenue numbers for AOL; is that right?**

A. That's correct.

**Q. If you go back to the first quarter of 2000, the numbers are significantly higher. You've got 12.1 percent quarter-over-quarter growth and 10.6 quarter-over-quarter growth.**

**Does the fact that you're only looking at two quarters right after the Internet bubble burst, does that in any way suggest to you that maybe those numbers are unusually low and that there may be a rebound in the fourth quarter of 2000?**

A. Here's what I think I would say. I'm sort of trying to say okay, imagine I'm sitting in January of 2001. At this point it's reasonably clear that a whole lot of Internet stocks are going down, companies are failing, running out of money, we all know that.

It is likely that AOL will also be affected by those trends and that would be part

B. Black

of why I would think it would be appropriate to ask whether the pre-bubble quarter-over-quarter growth rates were still an appropriate basis for projecting future growth.

Now you've only got two post bubble quarters. They're substantially lower than the pre-bubble period and therefore your degree of -- because you've only got two of them, your degree of confidence that there's something dramatically different about the post-bubble period would be lower than it would otherwise be if you had a longer time period.

On the other hand, it's not the case that one was seeing 19 percent quarter-over-quarter growth in the middle of the bubble. One was seeing at the most, you know, 10.6 percent and 12 percent.

So I think your line of analysis is sensible and would go to what the range of reasonableness was for a projection for the fourth quarter and, you know, if you had four or five quarters of post-bubble period, you have more confidence in what's a reasonable range than if you had only two.

B. Black

**Q. But your view is 19 percent is unreasonable in part because it's even more than the biggest quarter-over-quarter growth that you had before the tech bubble burst.**

A. Yes.

MR. FOX: Objection.

A. And indeed, although I didn't include that data in this table, I went further back into 1999 in my, in my own work to try to see if there were similar growth rates earlier in 1999.

Before that I basically started my analysis at the beginning of 1999.

**Q. Did you, in going back and looking at those numbers, did you notice any trends in terms of where the biggest quarter-over-quarter growth occurs as among the four quarters for any particular year?**

A. It was my judgment that America Online was not strongly seasonal so that the quarter-over-quarter growth analysis was appropriate.

Time Warner on the other hand is strongly seasonal so the fourth quarter is a large quarter for Time Warner. So I think a

B. Black

quarter-over-quarter growth analysis for Time Warner would be less appropriate and you might have to be looking at this quarter versus the same quarter a year earlier to get a better sense of what likely growth would be.

**Q. But for the combined entity, did you see any trends that would suggest to you that the fourth quarter, quarter-over-quarter growth was typically higher than the other quarter-over-quarter growths for any particular year?**

A. For the combined entity, given that Time Warner was seasonal and had a strong fourth quarter and to a lesser extent a strong second quarter, then -- and if AOL was not strongly seasonal, then necessarily the combined company would be seasonal, though on a fractional basis less so than Time Warner by itself.

**Q. And when you say "seasonal," you're acknowledging that that would result in a higher expected fourth quarter, quarter-over-quarter growth than you would see in the other three quarters for any particular year?**

A. That's correct. Table 1 is about

B. Black

AOL, America Online, excuse me, using your terminology, it's not about the combined company.

**Q. Okay. And you saw no trend for the fourth quarter for the America Online division.**

A. I did not see significant seasonality if I recall. Maybe the fourth quarter tended to be a little bit better I think because people bought AOL subscriptions as Christmas presents, but not -- but this was not a strong trend and not enough so that I thought the quarter-over-quarter analysis was inappropriate.

**Q. Okay. Let me just looking at this chart, first quarter '99 was almost twice as much as third quarter '99. Fourth quarter 2000 turned out to be almost twice as much as third quarter.**

**You don't see that as being a trend in any way?**

A. At the time, the question one would have asked was was there evidence of strong seasonality in past AOL results, and I don't recall seeing that but I'm not carrying my spreadsheet in my head.

B. Black

**Q. Okay. But just the table that you've got in front of you, just the two data points that you've got, would suggest that fourth quarter was on average, I don't know it's not quite twice as much, but let's say it's 90 percent higher than third quarter?**

MR. FOX: Objection.

A. One would want to break that down. Again, one would want to have more information such as the first quarter of 1998 versus the third quarter of 1998. One would want to break that down into advertising revenue versus subscription revenue.

And I tried, as I suggested in an earlier answer, to do the analysis at that finer level and found some fourth quarter seasonality, but again, not enough so that I thought the quarter-over-quarter analysis was inappropriate.

In contrast for the time Time Warner side, I would think that a pure quarter-over-quarter analysis would not be appropriate because of much more significant fourth quarter seasonality and to a lesser extent, second quarter seasonality.

B. Black

**Q. But you don't have the '98 numbers in front of you, right?**

A. I don't have them --

**Q. Do you know what they are?**

A. I have them in a spreadsheet. I don't know what they are.

**Q. Okay. Let's just look at the numbers we've got in front of us. I've given you a calculator if you need a calculator to be able to do this.**

**But what is the percent increase in quarter-over-quarter growth between the third quarter of 1999 and the fourth quarter of 1999 for AOL according to your chart?**

A. I'm sorry. I'm not sure what question you're asking, but the chart clearly speaks for itself.

**Q. Well, I'm asking you what's the difference between a 5.7 third quarter '99 quarter-over-quarter growth and a 10.6 percent fourth quarter '99 quarter-over-quarter growth?**

MR. FOX: Objection.

A. Algebraically, the quarter-over-quarter percentage growth was 5.7

B. Black

percent for the third quarter of '99 versus the second quarter, 10.6 percent for the fourth quarter versus the third quarter, and then 12.1 percent for the first quarter of 2000 versus the fourth quarter of 1999.

**Q. All right. I understand that.**

**And I'm asking you what is the increase percentage quarter-over-quarter growth between the third quarter '99 and the fourth quarter '99?**

A. From the third -- the change in the quarter-over-quarter, quarter-over-quarter growth rate is plus 4.9 percent for the fourth quarter versus the third quarter, and plus 1.5 percent for the first quarter of 2000 versus the fourth quarter of 1999.

**Q. That's not what I'm asking.**

**I'm asking what is the percent increase of the quarter-over-quarter growth from fourth quarter '99 over third quarter '99?**

**So I mean I can just tell you what the math is. If you divide 10.6 divided by 5.7, right, you're going to get 1.8 6?**

A. If you tell me that, I'll believe

B. Black

you.

**Q. Okay. Which means that the quarter-over-quarter growth between the third quarter of '99 and the fourth quarter '99 represents an 86 percent increase in the quarter-over-quarter growth; is that right?**

A. I don't think about it that way. I think about it as a 4.9 percent difference and I would also observe that as I look at these numbers, the first quarter of 2000 is, quarter-over-quarter growth rate is higher than the fourth quarter of 1999. That's not the pattern that you would expect if there was strong fourth quarter seasonality and is part of why I did not see strong overall seasonality in the America Online numbers that I reviewed.

**Q. Well, that doesn't necessarily not indicate strong seasonality, it may indicate both strong seasonality and strong overall growth; is that right?**

MR. FOX: Objection.

A. I'm trying -- so what you expect if you have strong seasonality would typically be let's say the fourth quarter is going to be a

B. Black

strong quarter. Almost necessarily then the first quarter is going to be weak relative to the fourth quarter against the background of whatever underlying long-term growth trend there might be.

So if I had a, you know, longer series of data, I could try to estimate sort of what's the year-over-year growth trend at a particular point in time and does it look as if the fourth quarter is significantly above trend over a period of years.

Based on this data, again, looking at -- the fourth quarter you black out because don't know, it hasn't happened yet. You're projecting it.

Looking at the other five quarters and based on my best recollection of the further past history of AOL, I did not see strong seasonality in their quarterly results and I think that the five existing quarters that are here are consistent with the absence of strong seasonality.

**Q. But you have the fourth quarter of 2000. You know what that number is.**

B. Black

A. I didn't -- no. For purposes of doing this analysis, right, you don't have that number. It hasn't -- doesn't exist yet.

This analysis is in effect asking whether in January of 2001 before the fourth quarter of 2000 is out, is 19 percent quarter-over-quarter growth reasonable.

I don't know the fourth quarter of 2000 for purposes of that analysis. I know the fourth quarter of '99, I know the fourth 98, but I don't know the fourth quarter of 2000 yet.

**Q. I'm asking a different question though.**

**I'm asking you, is it reasonable to assume that the fourth quarter for AOL would be higher than the other quarters. For that analysis, we have the number, we know what the number is, and I'm saying that the only data points we have for this chart that you give us has in both instances a fourth quarter, quarter-over-quarter growth rate that is in the sort of 85 percent range higher than the previous quarter, the third quarter, quarter-over-quarter growth range.**

B. Black

**And I'm asking you it seems odd to me that that is what I see on this data and yet you conclude there's no seasonality, there's no ex -- there would be no expectation that the fourth quarter growth rate would be significantly higher than the previous quarter.**

MR. FOX: Objection.

A. I do not recall from my review of earlier numbers finding strong evidence of seasonality, and therefore I concluded that the quarter-over-quarter growth rates were reasonable to present in this analysis.

**Q. Okay.**

MR. FOX: Is it time for a break?

MR. GESSER: If you want to take a break, we can take a break.

MR. FOX: We've been going on for an hour-and-a-half.

MR. GESSER: Okay. That's fine.

THE WITNESS: Let me ask in terms of our overall structure --

MR. GESSER: Sure.

MR. FOX: Are we on the record or off the record?

B. Black

MR. GESSER: Off the record.

THE VIDEOGRAPHER: We're now going off the record. The time is 11:03 a.m.

(Recess is taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:21 a.m.

This is the beginning of the tape labeled No. 2.

BY MR. GESSER:

**Q. Professor Black, I'm going to ask you to turn to page 19 of your report.**

A. Okay.

**Q. If you look at the last full sentence on that page it says, "The largest driver of value with the AOL division and within AOL, ads were the principal driver of growth accounted for most of its profit and for the lion's share of its market share."**

**Do you agree with that sentence?**

A. Let me restate it since you misread it slightly. So it says, "The largest driver of value with the AOL division..." by which we mean the America Online division "...and within AOL..." by which we mean the America Online

B. Black

division "...ads were the principal driver of growth, accounted for most of its profit, and for the lion's share of its market value."

**Q. And you agree with that sentiment?**

A. Yes.

**Q. And what time period are you talking about there?**

A. This would have been during the time period that was relevant to my report, which is I would say here the period of 2000 and 2001.

**Q. And for the period of '97, '98, '99 before the merger, leaving aside obviously the first part of that sentence wouldn't make sense, but would the second part of that sentence make sense during that time period, that ads were the principal driver of growth for America Online and accounted for most of America Online's profits and the lion's share of its market value?**

MR. FOX: Objection.

I guess here you're talking about pre-merger AOL.

MR. GESSER: Yes, just the America Online company.

B. Black

A. Here's what I recall: So America Online had extremely rapid growth in advertising and commerce revenue from a quite low base during the period of '97, '98, '99 and 2000.

So by '99 and 2000 I think it's fair to say that ads were the principal driver of growth and accounted for most of the profit.

I don't know that I would want to make that statement earlier because ads were a smaller part, a substantially smaller part of the overall AOL business.

So let me limit that statement to, you know, the period of 2000 and 2001 when I think it's accurate.

**Q. So for 1990 -- let's take 1998, this statement as it relates only to the America Online division that ads were the principal driver of growth, is that --**

A. I would view as it becoming more and more important during the period of '97, '98 and '99, and at some point I'd be willing to say they were the principal driver of growth but I'd actually have to look at the numbers to have a firm view on when that would be.

B. Black

**Q. Okay.**

**All right. I'm going to show you what we'll mark as Dayton-3. I'm sorry, Black-3.**

**(Defendants' Exhibit Black 3, PricewaterhouseCoopers IAB Internet Advertising Revenue Report, marked for identification, as of this date.)**

MR. GESSER: This is what happens when you have depositions back to back.

BY MR. GESSER:

**Q. Professor Black, have you seen this document before?**

A. I have not.

**Q. Okay. I'm going to represent to you this is the PricewaterhouseCoopers IAB Internet Advertising Revenue Report and it shows revenue that is generated from Internet advertising across this whole spectrum of the Internet advertising market, okay?**

A. Okay.

MR. FOX: Objection.

**Q. If you look at page 7, it shows historical revenue statistics, both annually and**

**B. Black**

**quarterly revenue growth comparisons for the Internet advertising market.**

**Have you seen these numbers before?**

MR. FOX: Objection.

BY MR. GESSER:

**Q. Have you seen --**

A. No, I have not.

**Q. Okay. If you look at '97 and -- 1997 and 1998 for the growth of the Internet advertising market, do you see that there appears to be an increase in the quarter-over-quarter growth in the fourth quarter of both 1997 -- 1998 and 1999. I'm sorry. Focus on 1998 and 1999.**

MR. FOX: Objection.

Are you representing that this document is accurate?

MR. GESSER: I'm just asking him what the document says.

A. If I look over the whole period of this chart, I'm not seeing significant evidence that the fourth quarter year over year figure is higher than the third quarter.

I'm seeing some evidence that the

B. Black

quarter-over-quarter growth in the fourth quarter is high relative to the third quarter, so I'm seeing some evidence of seasonality in online advertising.

**Q. Okay. And assuming that that seasonality in online advertising translates into seasonality in revenue for AOL during the same time period --**

A. Okay.

**Q. -- then let's make that assumption, then there would be seasonality in AOL's revenue quarter-over-quarter such that one would expect that the fourth quarter would be higher in quarter-over-quarter growth than other quarters and especially the third quarter.**

MR. FOX: Objection.

A. For this data, you know, aggregate Internet online, there is evidence of a seasonally higher fourth quarter compared to the preceding and subsequent quarters.

**Q. And is it reasonable to assume that that would translate into seasonal fourth quarter higher revenue for AOL in the 1998, 1999, 2000 time frame?**

**B. Black**

MR. FOX: Objection.

Are you asking him whether looking at this chart indicates something for AOL or are you just asking the question independent of this chart?

MR. GESSER: Independent of the chart. I'm asking him whether the data, assuming the data in this chart is accurate, is it reasonable to assume because of the revenue makeup of AOL in the 1998, 1999, 2000 time frame, that to the extent that there's a trend in seasonality in online advertising, would that translate into a trend in seasonality in AOL's revenue for that time period.

MR. FOX: Objection. Then you're not, then you're not asking him a question independent of the chart because you said, you started off by saying I'm asking something independent of the chart but then you said assuming the data in this chart is accurate, is it reasonable, et cetera so...

MR. GESSER: You and I maybe have a different view of what independent means,

B. Black

but the question is the question.

MR. FOX: Okay. Objection.

You can answer.

A. I would expect that if online advertising as a whole shows seasonality, that it would be likely that some portion of AOL's advertising would also show seasonality.

The reason I qualify that was because one of the things that AOL was doing and publicly saying during this period was we're not as dependent as everybody else on short-term spot advertising contracts. We have these large multiyear, multiperiod deals. We have this $3 billion backlog.

It might well be that the components of those larger deals and that backlog would be less seasonal than advertising revenue as a whole so I want to qualify my opinion in that regard; that the seasonality of the market as a whole might impact only some of AOL's own advertising and commerce revenue.

**Q. And you didn't do that analysis.**

A. I did not. I observed, as I said, some seasonality in AOL's results in the numbers

B. Black

that they had, but not enough so that I thought the quarter-over-quarter analysis was inappropriate or misleading.

**Q. I'm sorry. I thought you had said earlier that you saw no seasonality for AOL and some seasonality for Time Warner, but now you're saying that you saw some seasonality for AOL as well?**

MR. FOX: Objection.

A. I believe that my prior testimony was that there was some seasonality for AOL and strong seasonality for Time Warner.

**Q. Okay.**

**All right. So now going back to a question I asked you earlier, we've now been through I think the issue as to the fact that we only have two quarters of post bubble data that are much lower than the pre-tech bubble bursting data.**

**We also went over the seasonality issue and I think at the beginning of all of this I was asking you, you know, if the 19 percent number is absurd, what would be reasonable and you said you didn't do that**

**B. Black**

**analysis; is that right?**

A. That's correct.

**Q. Okay. Nor did you look at what other analysts had as a quarter-over-quarter growth rate.**

A. That's correct.

**Q. Okay. So if I were to tell you that another analyst looking at all this data, considering whatever seasonality existed and considering the issue relating to the post bubble bursting number, so forth, came up with a number of ten percent as the quarter-over-quarter growth rate for AOL for the fourth quarter of 2000, would that number to you be absurd?**

MR. FOX: Objection.

A. No.

**Q. Would it be unreasonable?**

A. I would -- given the post bubble experience and the likelihood that we are now in a different framework, I would think that ten percent quarter-over-quarter growth would be highly optimistic but I'm not sure, you know, is it unreasonable, is it not unreasonable? It's

B. Black

highly optimistic.

I'd want to know more about vari -- quarter to quarter variability to form a judgment on whether ten percent would have been outside a range of reasonableness or, you know, kind of within but toward the highly optimistic end of that range.

**Q. Okay. Eleven percent?**

A. Again, I don't want to cut it that finely. You know, once you're up in ten percent, you're really stretching what seems to me one could reasonably have expected at the time based on what one knew about AOL in particular, the market in general, the bursting of the bubble, but I haven't done an analysis at that level of detail where I want to say well, 10 percent is within the range of reasonableness and 11 percent isn't.

**Q. Okay. And I'm not trying to pin you down, I just want to understand where your confidence is.**

**You seem to be very confident at 19 percent is unreasonable, absurd.**

A. Yes.

B. Black

**Q. Are you very confident at 13 percent, unreasonable and absurd?**

A. It would be hard for me based on what I know about AOL and the advertising market and what was known about its subscription revenue, which was a lot of that was known intraquarter because they were basically reporting sort of every time they got an extra million subscribers, they would tell the world and people would count how many days since the last million and so on. So one could have estimated quite precisely, and it hadn't changed their rates during this period, one could estimated their subscription revenue quite precisely, probably within a couple of percent margin of error for the fourth quarter as of mid-January of 2001 when you already knew their subscriber counts.

I haven't done that analysis but it wouldn't be hard to do and I think I say in my report that at this point subscription revenue was 60 plus percent of total revenue, so that would really limit the range of reasonable numbers that one could, that one could come to.

B. Black

One would have a broader range of potential numbers for advertising and commerce revenue and you would have to put the two together to form an overall sense of reasonableness. And again, I tried to do that subanalysis in the work that underlies this report but didn't present it in the report.

And my guess is that if I say that here's what I think I know about subscription revenue, you probably could have pinned it down to two percent, three percent growth at that point pretty precisely. It was going to be two percent or three percent, and it wasn't going to be four and it sure wasn't going to be five and say well, how much could advertising commerce be? I don't see how you can get to 13. You might be able to get to 10, but I don't see how you could get to 13.

But I don't think you do it at the aggregate level, I think you do at first what do I know about subscriptions and that what kind of bump would it take in advertising commerce to get you do that overall analysis.

**Q. But you didn't do that analysis.**

**B. Black**

MR. FOX: Objection.

A. I did. I did look at the separate analysis for subscriptions and advertising commerce revenue.

**Q. And can you confidently say that based on that analysis, that 13 percent would be unreasonable and absurd?**

A. I want to say that as best I recall the subscription numbers, so let me try to recall this in my head a little bit. So suppose you had 4 percent growth, which is at the high range of what they might plausibly have gotten for subscriptions for 60 percent of your business, that would be 2.4 percent overall growth and then you wanted to get to 13 percent, that means you would need another 10.6 percent growth coming out of 40 percent of your business, which means you would need quarter-over-quarter advertising growth approaching 30 percent. I think that was the analysis that I went through.

It would be really hard to see how you would get quarter-over-quarter advertising growth rate of 30 percent. That's an

B. Black

astonishing annual growth rate in the face of a troubled online advertising market.

I don't know that at that time I'd want to make a stronger statement than that, but certainly an online market that was no longer growing at the kind of rate that you see in this chart during 1996, '97, '98, '99.

**Q. I've asked this now twice and I've gotten very, very long answers so just I'm going to ask it a third time.**

**As you sit here today, do you have confidence that you could say that a 13 percent as opposed to a 19 percent quarter-over-quarter growth rate for the fourth quarter of 2000 would be absurd and unreasonable?**

A. I think I would want to call it unreasonable and I'm not sure I'd get to the level of absurd.

**Q. What about 12 percent?**

MR. FOX: Objection.

A. At a rough sense, again, this is off the top of my head not having run the numbers, not having looked at path variability, I'm not prepared to say 10 percent was unreasonable and

B. Black

I think I probably would say 12 percent was unreasonable and 11 is kind of on the bubble, but this is off the top of my head. These aren't -- this isn't in my opinion and these aren't, these aren't hard numbers.

**Q. Okay.**

**Okay. All right. So let's take a look at this table now on page -- Table 1 on page 9.**

A. Of my report.

**Q. Of your report.**

**How do you get to the 19 percent? How do you calculate that that's what Kiggen was predicting?**

A. This, as I recall, was based on estimates that were provided to Fidelity in January of 2001. It was the basis for public statements, although I don't know that these precise numbers were publicly distributed.

**Q. Okay. Would it be helpful if I gave the Fidelity report so you can show me how you got this number?**

A. If you want, that would be fine.

**Q. Well, it's up to you.**

**B. Black**

**If you can show me the number without it, I'm happy to do it that way.**

**If you need it to do the calculation, I'm happy to give it to you.**

**Whatever you think you need?**

A. What my report says is that the Fidelity number for America Online revenue has a full year 2000 number. It doesn't have quarter by quarter numbers, okay?

**Q. Okay.**

A. But we know what the quarter by quarter numbers are for the first three quarters because they're already public.

**Q. Okay.**

A. So I can take the full year number, I can subtract the nine months number and back into an estimate of what fourth quarter revenue would have to be in order to get the year total of 7959 in millions of dollars. That was the calculation that --

**Q. Can you just --**

A. -- I went through.

**Q. At the risk of spending a little math time, but can you just actually just do that for**

**B. Black**

**me just so I understand what you did; I mean literally just take me through the calculation?**

A. What I would have done is take the 7959 revenue estimate for the America Online division --

**Q. Yup.**

A. -- and subtracted the known publicly reported revenue for America Online for the first three quarters of 2000, and that number should be in Table 1 and we can see if that works.

**Q. So I'm just actually going to do that right now if that's okay with you. I'm going to do 7959 minus 1814; is that right? Minus 1885, minus 1945 equals and I get 2315; is that correct?**

A. That's correct. We agree on how I did that calculation.

**Q. Right.**

**And then I take 2315 and I divide it by 1945 and I get 1.190, which translates into a 19 percent quarter-over-quarter growth.**

A. That's correct and I believe that that is the calculation that I did, and it's

B. Black

good that the numbers match. You can't say I got my numbers wrong.

**Q. I am saying that you got your numbers wrong but not yet.**

**So where do you get these numbers, the first quarter, second quarter, third quarter revenue from AOL?**

A. We certainly want to look over AOL's public financial statements.

**Q. Okay. Let's take a look.**

**I'm going to represent to you these are excerpts. The entire 10-K is enormous but I'm going to represent to you these are excerpts. If you want the entire 10-K, I can give it to you, but here is marked as Exhibit -- marked as Exhibit Black-4 are AOL's 10-K issued on March 27.**

A. It's not where these numbers would have come from.

They would have come from the 10-Q. It's possible that as part of a year-end audit that intraquarter numbers moved around a little.

**Q. I'll just show you the exhibits, you'll answer my questions and then we'll move**

**B. Black**

**around it. Is that okay?**

A. Okay.

(Defendants' Exhibit Black 4, Excerpts from AOL's 10-K dated 3/21/00, marked for identification, as of this date.)

BY MR. GESSER:

**Q. This is Black Exhibit 4.**

**So if you see -- oh, great. I'm going to show you -- I apologize the pages aren't numbered, but if you look at the, what is the third page, the signature page, it's dated March 21st, 2000 --**

A. Let me look at the last page.

**Q. Okay.**

A. These numbers look like my numbers, so what's the problem?

**Q. Okay. So these numbers match your numbers, right?**

A. I'm looking at the last page of Black Exhibit 4 and the row labeled "Total Revenues for America Online Inc." and the numbers there are 1814, 1885, 1945 and then for the full year 2059.

B. Black

**Q. Okay. So these numbers match your numbers?**

A. These numbers match my numbers. That's good.

**Q. Well, the problem, as you asked, is that these are restated numbers, okay? So this is a restatement of AOL's numbers as of March 27, 2001.**

**If you look at the third page, in the second paragraph under "Business Combinations" --**

A. Okay.

**Q. -- it says, the last sentence says, "Prior period financial statements have been restated to give effect to the merger unless the effect of the business combination is not material."**

**Okay?**

**(Document review.)**

**Q. AOL had engaged in several business combinations during the time period of 2000 prior to the merger with Time Warner and as a result, AOL restated its revenue numbers on March 27th, 2001 for the 2000 time period.**

**B. Black**

**Were you aware of that?**

A. I hadn't focused on this. I think I'd go back to my earlier response and say this is an effort to project what was knowable at January 2001 and for that purpose, what would be knowable would be something that was published. The most recent 10-Q would be probably be a good source of information.

**Q. Okay. Let's take a look at the most recent 10-Q that was available would have been what? It would have been November, the third quarter 2000 10-Q; is that right?**

A. Correct.

**Q. Okay. Let's look at that third quarter 2000 10-Q.**

MR. GESSER: This is Black 5.

(Defendants' Exhibit Black 5, Excerpts from AOL's 10-K dated 11/30/00, marked for identification, as of this date.)

BY MR. GESSER:

**Q. Okay. So if you turn to I think it's probably flagged for you as well, but it's the one, two, three, fourth page in. It has revenue**

B. Black

**numbers.**

**(Document review.)**

A. Okay.

**Q. It's got a third quarter revenue number for AOL for 2000.**

**Do you see that number?**

A. Yes.

**Q. What is that number?**

A. Total third quarter revenue is 1975.

**Q. Okay. So that's different than what you have as the total third quarter revenue.**

A. Oh, for third quarter 2000?

**Q. Yes.**

A. I have 1945 and this is 1975.

**Q. Do you understand why you may have that discrepancy?**

A. I could speculate, but since I thought I was using the correct numbers that were knowable at the time and it now looks like I may have been using numbers from a different source that were slightly different, I would have to speculate as to what the causes of the discrepancy are.

**Q. Okay. So why don't you speculate what the cause of the discrepancy is?**

B. Black

MR. FOX: I don't think you want him to speculate. What's the point of his speculation?

If you have some -- first of all, I didn't understand the question.

Are you asking him to say what the difference is between the restated number and the number that's in Black Exhibit 5?

MR. GESSER: I'll ask the question.

BY MR. GESSER:

**Q. Here's the question: I think you just have indicated the right place to look for the numbers for this calculation would be the third quarter 10-Q for 2000 for AOL, which I now have shown you which has a number of 19 -- 1975 for the third quarter AOL revenue and that's a different number than you have for your third quarter AOL revenue, and I'm asking you why it is that you have a different number than the number that I think you had just indicated was the correct number to use for this calculation?**

MR. FOX: Objection.

You may answer if you understand the question.

B. Black

A. I would be speculating and I'm willing to speculate if you want me to speculate.

**Q. Okay. I am looking for you to speculate.**

A. It might be that the numbers that I used, and they might well have come out of the 10-K because I don't recall exactly where they came from, in part because I developed them from my earlier AOL report which would have been a couple of years back so my memory is not that precise as to exactly where the numbers came from, it might be that the, let me call them the 10-K numbers which appear consistent with the numbers that I used exclude intracompany transactions between America Online and Time Warner, while the quarterly numbers that were reported by America Online prior to the merger would not exclude intracompany transactions. So that feels to me like a plausible speculation as to a possible basis for the difference.

**Q. Okay. Now having seen that discrepancy, what do you think is the appropriate number to use for your calculation for the third quarter 2000 AOL revenue?**

B. Black

A. I would want to use the 1975 number that is in the 10-Q unless there was some reason at the time to think that that number was not accurate. But based on the information I have now, I would be inclined to think that 1975 would be the right number to use.

**Q. Okay. So I'm going to ask you then above in your report, do you have a pen?**

**I'll provide you with one.**

**I'm going to ask you to now write 1975 above 3Q 2000 in your report so you've got that number there.**

A. I don't want to write it on the official copy, if you will, but if you give me a piece of paper --

**Q. No, I'm actually going to ask you to write it on the copy because this is going to get -- because I want this to be part of the exhibit.**

A. Okay. As instructed, I'm going to write 1975 for the third quarter of 2000.

I will observe that at this point it

B. Black

is possible that the numbers for first quarter and second quarter of 2000 are also different than the numbers in my report, and we have not yet confirmed whether the fourth quarter of 2000 number which is in my report is before or after restatement, so I don't know yet whether the 2059 should be compared to 1945 or to 1975.

**Q. Okay. We're actually going to go right through that right now, so the anticipation will not have to be in place for too much longer.**

A. Okay.

**Q. So let's take a look. If you were to try and find out what the number is, the right number is to plug in for 1Q 2000 and 2Q 2000, where would you look for that?**

A. The first place that I would look would be to the 10-Qs for those periods.

**Q. Okay.**

A. One would also, it would be common to find that the third quarter financial statements include a nine month number as well, which would give you a basis for verifying that nothing changed by the end of the third quarter. I'm

B. Black

actually not seeing those here.

**Q. Do you know what AOL's fiscal year was during this time period?**

A. Oh, yeah. That's right. It was a June 30th fiscal year. That's why we're only seeing the three month numbers.

**Q. So if we were to look at the 10-K for previous year, that would also give you the numbers, right?**

A. So what you would want to look at is their fiscal 2000 10-K, which would have come out in the fall of 2000 if it has the quarterly numbers in it and it might.

**Q. So let's take a look at Black-6.**

**(Defendants' Exhibit Black 6, Excerpts from AOL's 10-K, dated 6/30/00, marked for identification, as of this date.)**

**BY MR. GESSER:**

**Q. So there's a flagged page here and it's buried deep close to the end of the report, gives you revenue numbers for --**

A. I've got it.

**Q. You've got it?**

**B. Black**

A. Yes.

**Q. I just wanted for the record to indicate what we're talking about here.**

A. Note 17, which is quarterly information unaudited to the fiscal 2000 10-K.

**Q. Okay. So now we've got the quarter ending March 31st and June 30th which correspond to a first quarter 2000 and second quarter 2000 revenue number?**

A. With your permission, I'll just put the numbers in for the four periods that are reported here.

**Q. Well, can you just say what the number you have recorded and then what the number you're putting in as what you now view to be the correct number for your calculation.**

A. Okay.

MR. FOX: Objection.

A. So what I'm going to do, and I'll do it on the exhibit if you want --

**Q. Yeah.**

A. -- is take the four quarters included in fiscal 2000 and report that for the third calendar quarter of '99, which is the first

B. Black

fiscal quarter of 2000, the reported number there in the 10-K is 1477 versus the 1463 in my report.

**Q. Okay.**

A. In the fourth quarter of calendar '99, which is the second fiscal quarter of 2000, the number is 1633 versus the 1618 in my report.

In the first quarter of calendar 2000, which is the third quarter of fiscal 2000, the number is 1847 versus the 1814 in my report.

And in the second quarter of calendar 2000, which is the fourth quarter of fiscal 2000, the number is 1929 versus the 1885 in my report.

And if you'd like me to, I can then compute the quarter-over-quarter growth rates as well.

**Q. Well, what I'd like you to do is also now tell me, you had Kiggen's projection for fourth quarter 2000, based on your calculation, as 2315; is that right?**

A. Yes.

**Q. Okay. So I'd like you to tell me what, based on what I think we agree now are the**

Page 102

B. Black

**correct numbers to be using, what would be your projection for Kiggen's -- for what you think Kiggen's projection was --**

A. Got it.

**Q. -- and then what Kiggen's growth projected was.**

A. Okay.

MR. FOX: Objection.

A. So he was projecting 7959? 7959. And then I'm going to subtract from that 1975, I'm going to subtract 1929, I'm going to subtract 1847 and I'm going to get 2208, okay?

**Q. So that should go in place of 2315?**

A. Correct.

**Q. Now you're dividing that number by 1975; is that right?**

A. That's right.

**Q. And what does that give you?**

A. That's going to give me a fourth quarter revenue estimate of 2208 and a quarter-over-quarter projected growth of 11.8 percent.

**Q. Now having been through that exercise, if you were to issue your report**

Page 103

B. Black

**today, would you be issuing your report with these numbers?**

MR. FOX: Objection.

A. To the best of my knowledge as I sit here today, yes.

**Q. So then what that would also do is require you in the first full paragraph of the report on page 9 to change the number in the last sentence from 19 percent to 11.8 percent; is that correct?**

A. Yes.

**Q. Okay. Would you keep the sentence the same "Against this backdrop, Kiggen was projecting an absurd..." now 11.8 percent "...quarter-over-quarter growth"?**

A. No.

**Q. Okay. So as you sit here today, what would you do with that sentence?**

A. I think I would describe it as highly optimistic and I would want to go back and do the subanalysis of subscription and ad com revenue to form a judgment on whether it is so highly optimistic as to be unreasonable.

**Q. Okay. So to be accurate for now**

Page 104

B. Black

**sitting here today, you want to cross out the word "absurd" and write "highly optimistic"? Would that be --**

A. I think that's a fair statement --

**Q. Okay.**

A. -- based on not yet having done the further work.

**Q. Okay.**

A. I'm happy to do that.

**Q. Would you --**

A. I would also of course have to change the quarter-over-quarter growth rates for the second and third quarters of 2000, which I'm now computing as being 4.4 percent in the second quarter and 2.4 percent in the third quarter.

**Q. And going back, you'd have to also change the third quarter '99, fourth quarter '99 and first quarter 2000 quarter-over-quarter growth rates as well; is that right?**

A. Yes.

And I have marked, at least subject to having punched the wrong buttons, what those growths rates are on the exhibit.

**Q. So what is the fourth quarter '99**

Page 105

B. Black

**quarter-over-quarter growth rate, was 10.6, now what is it?**

A. 10.6.

**Q. It stays 10.6?**

A. Yes.

**Q. And first quarter 2000?**

A. It becomes 13.1.

**Q. Okay. On page 10 of your report you say that, "Kiggen instead projected that AOL's market share would jump from 27 percent in 2000 to 41 percent in 2001 and then keep climbing to 60 percent in 2005."**

A. Yes.

**Q. And then you write, "This was highly unlikely. It required AOL to grow rapidly in 2001 while all other online advertising was shrinking and then follow up this performance by capturing over 70 percent of all growth in the online advertising for the next four years."**

**So do you agree with that statement?**

A. Yes.

**Q. You get those numbers, the 27 percent, the 41 percent and the 60 percent, you get those numbers again from the Fidelity**

Page 106

B. Black

**presentation; is that right?**

A. Yes.

**Q. Did you compare Kiggen's projections for the -- well, strike that.**

**Did you, in forming your opinion that this was highly unlikely, did you look to see what the actual growth of online advertising was in the 2000 to 2005 time frame?**

MR. FOX: Objection.

A. I was situating myself in January of 2001, at which time the future growth rate in the total online advertising market was not known.

I did not form a view that the projections for roughly 25 percent annual growth over 2002 through 2005 were unreasonable, so I was, if you will, accepting those as the base for further analysis.

**Q. So Kiggen's projections for the total online advertising market growth from 2000 to 2005 were reasonable. What he was unreasonable about was how much of that AOL would capture?**

A. My strong suspicion is that the numbers for the total online ad market were

Page 107

B. Black

numbers that he took from somewhere else rather than being his own numbers.

And I guess I'm perfectly happy to say that at that time I have no reason to think that those overall numbers were unreasonable or if you prefer to say that they were reasonable, I'm happy to say that...

**Q. You're happy to say --**

A. Somehow I'm happier saying I have no reason to think they were unreasonable.

**Q. Okay.**

A. It feels like saying affirmatively that they're reasonable requires a bit more information than I have.

**Q. And did you check to see whether in fact those numbers, and when I say "those numbers" I mean the growth in the online advertising market, actually turned out to be accurate for this time period?**

MR. FOX: Objection. Asked and answered.

A. I did not.

**Q. And did you check to see whether other analysts had similar growth projections**

Page 108

B. Black

**for AOL's share of the total online advertising market in this time period?**

A. I did not.

**Q. And if other analysts, prestigious analysts such as Mary Meeker at Morgan Stanley, had growth rates for AOL's share of the total online advertising market that were consistent with Mr. Kiggen's view as expressed in the Fidelity presentation that you looked at, would that in any way change your view as to whether this growth that is exhibited in your Table 2 was highly unlikely at the time?**

MR. FOX: Objection.

A. I think that I'd want to know more about what other analysts thought and the basis for those beliefs.

It would certainly have been possible at the cost of a much larger effort than I undertook to systematically review the views of other analysts and see whether they contain that information, and I didn't do that work.

And if other analysts were also developing numbers that I have called here, quote, highly unlikely, close quote, then I'd be

Page 109

B. Black

puzzled and want to understand the basis for those numbers.

MR. GESSER: I'm going to mark as Black-7, this is an analyst report from Morgan Stanley Dean Witter on January 19th, 2001.

(Defendants' Exhibit Black 7, Morgan Stanley Dean Witter Analyst Report dated 1/19/01, marked for identification, as of this date.)

BY MR. GESSER:

**Q. By the way, do you know what the date of the Fidelity presentation that you looked at was?**

A. It was around January 20th.

**Q. Around the same time?**

A. This is around the same time frame, yes.

**Q. Is yours flagged? If you look at page 111.**

MR. FOX: I mean I would -- objection. I would just say if the witness appears to be reviewing the document, that if you take time to review it --

B. Black

A. I don't have a page 111. I have a 32-page report.

**Q. You're probably looking at the top. If you're looking at top, it's page 19.**

**If you're looking at the bottom right, it's page 111.**

A. So at least I want to see what is --

MR. FOX: I don't see any numbers on the bottom right.

BY MR. GESSER:

**Q. Okay. I'm sorry then. It may have be that they got cut off in the copying.**

**The bottom -- the top right, page 19, is that --**

MR. FOX: I think the witness is looking at other parts of the document.

MR. GESSER: Okay. The witness can look at whatever part --

A. Yeah. I just want to see what's in here before I respond on a particular...

(Document review.)

A. Okay.

**Q. I'm not sure it's going to be fruitful for us to spend the time crunching**

**B. Black**

**these numbers, but if you look at page 19, this has results for the total Internet advertising market.**

**It's also got results for what Ms. Meeker and others at Morgan Stanley view as being their projections going through 2005 of the Time Warner advertising revenue, the AOL advertising revenue and so forth.**

A. Yup.

**Q. And I think we can crunch these numbers to get projections that are similar, at least in kind, to the projections that you're attributing to Mr. Kiggen in Table 2.**

**And I'm wondering if we were to do that and we were to find that her projections about the growth of AOL's share in the market and so forth were similar to Mr. Kiggen's, would that affect in any way your report or any of the conclusions that you reached in your report regarding the likelihood or the reasonableness, the likelihood of these numbers coming to bear or the reasonableness of Mr. Kiggen's position as reflected in these numbers on the chart in Table 2?**

**B. Black**

MR. FOX: Objection.

A. Well, the numbers are substantially different.

It is the case that the Morgan Stanley Dean Witter report by Mary Meeker and others is projecting strong growth in AOL Internet advertising both in absolute dollars and as a, and as a share of the market, but is not projecting the same percentage capture of growth in the market and is not projecting the same 2005 terminal market share.

**Q. It's not the same but it's actually higher, isn't it?**

A. I don't believe so. So I'm looking at Meeker projecting that AOL in 2005 will have 42 percent of a $16 billion market versus Kiggen estimating 60 percent of a $21 billion market. I'm not entirely sure why they seem to be using different, different starting numbers.

So Meeker may be backing out commerce revenue and looking only at Internet advertising. She seemed to have different starting numbers than Kiggen and, you know, I'd have to go back and understand that. She's

B. Black

projecting strong growth in market share but she's not projecting a 62 percent terminal market share and she's not projecting that they're going to capture 70 plus percent of the incremental growth.

**Q. It depends on --**

A. But look, she's -- these are optimistic numbers as well.

**Q. Okay. And if you take -- if you look at the third line in the AOL Time Warner advertising and direct marketing revenue, take the third line under that heading, which is "AOL Internet Advertising and e-Commerce" and in brackets "100 percent" --**

A. Yes.

**Q. -- and you take a look at that number which is 13.9 --**

A. Right.

**Q. -- that's obviously a much larger percentage of the total Internet advertising market than 42.5 percent, right?**

A. Well, that -- okay. So that is consistent with my speculation that she was comparing AOL Internet advertising to the