B. Black

1     B. Black
2  Internet advertising market and was backing out
3  e-commerce revenue in some way.
4        She may have been estimating the
5  relative contributions of the two because as I
6  recall, AOL did not itself provide that
7  breakout. They lumped the two together, so she
8  may be estimating that each of them is 50
9  percent of the total of Internet advertising and
10 e-commerce revenue.
11    **Q.   But that's her guess as to the split,**
12 **right?**
13       MR. FOX:  Objection.
14    A.   I am speculating that this is her
15 guess as to the split because I believe that
16 AOL, that America Online at that time did not
17 provide the split. It bundled the numbers
18 together.
19    **Q.   But you haven't seen this before and**
20 **I know we're trying to move on and not waste too**
21 **much time on this and so I guess my question is,**
22 **these numbers, we can spend a lot of time on**
23 **them and I have, and we can break it out also by**
24 **looking at the report and getting a better,**
25 **through the report, getting a better**

**B. Black**

1     **B. Black**
2  **understanding of what these numbers mean and I**
3  **don't think it's fruitful for us to spend the**
4  **time here today because you haven't looked at**
5  **this report before, and but my question is,**
6  **would looking at this report and the numbers**
7  **that are here in any way be helpful in informing**
8  **your opinion as to whether or not the numbers**
9  **that you have attributed to Kiggen in Table 2**
10 **are reasonable?**
11       MR. FOX:  Objection. Asked and
12 answered.
13    A.   I think my answer was yes, it would
14 potentially be relevant and I'd want to
15 understand the basis for Mary Meeker projecting
16 that, off the top of my head, that AOL would
17 capture looks like about 55 percent of the
18 growth over this time period.
19       Now 55 percent isn't 70, but it's
20 still a very large number and I'd, you know, in
21 effect want to understand the basis for that
22 because that would be highly unusual in any
23 maturing market.
24       It would be a more normal expectation
25 that the market share of the market leader might

B. Black

1     B. Black
2  well shrink rather than, rather than grow and
3  I'd want to understand the basis for why another
4  analyst was projecting that it was, was going to
5  grow and then I might have an opinion on whether
6  that was reasonable.
7     **Q.   You viewed the online advertising**
8  **market in January of 2001 as being a maturing**
9  **market?**
10    A.   Certainly compared to the late 1990s,
11 right? So in the late 1990s we had annual
12 growth rates on the order of 100 percent as
13 we've seen in the prior exhibit that you showed
14 me and that was, you know, clearly slowing down
15 and people were projecting 25 percent annual
16 growth going forward. That's maturing relative
17 to the late 1990s, yes.
18    **Q.   But I mean my daughter's**
19 **two-and-a-half and she's maturing every day. I**
20 **mean as a -- I'm not sure that -- is there any**
21 **meaning to -- I mean everything is maturing,**
22 **right, as time goes forward.**
23       **So is there anything other than the**
24 **obvious and tautological application of the word**
25 **"maturing" that you're trying to use?**

**B. Black**

1     **B. Black**
2       MR. FOX:  Objection.
3       Well, I think he told you -- his
4  answer stands. I mean I think he gave you
5  his answer.
6       Objection.
7       MR. GESSER:  I think he sees the
8  problem with his answer, so I just want
9  to...
10    A.   I think I may now be in the realm of
11 aging rather than maturing, but let's leave that
12 aside.
13       (Laughter.)
14    A.   AOL clearly was a leader in figuring
15 out how to sell online advertising. No question
16 about that. They sold a lot of it for real,
17 even if you put aside the stuff that they faked.
18       But that kind of ability was likely
19 to be, at least in part, copyable so I would
20 think at the time sort of a base expectation
21 would be that it would be hard for AOL to
22 maintain its first mover or early mover
23 advantage and that they would be doing quite
24 well to hold their share of this still rapidly
25 growing market and doing extraordinarily well to

B. Black

1
2  substantially expand their share of this rapidly
3  growing market.
4       And I'd in effect want to understand
5  the basis for why people would expect a rapid
6  expansion of their share rather than expect them
7  to fight to hold it against new competition.
8  Most markets don't work that way.
9      Q.   And do you know how the online
10  advertising market has in fact evolved in terms
11  of the concentration of revenue by company?
12     A.   I have not examined that question.
13          We know that Google's market share is
14  far higher than it was and AOL's is far lower
15  than it was.
16     Q.   But as between Google and everybody
17  else, do you have a sense of how concentrated
18  Google's share is?
19          MR. FOX:  Objection.
20     A.   I do not.
21     Q.   Do you have a sense as to whether
22  Google's concentration of the market share in
23  online advertising is in any way -- whether
24  Google's share of the total online advertising
25  market is consistent with the range of

B. Black

1
2  expectations that AOL would have for the
3  concentration of the market as expressed by
4  analysts about AOL in the 2001 time frame?
5          MR. FOX:  Objection.
6      A.   I do not have enough information to
7  form an opinion.
8      Q.   Okay.  So is it possible that
9  analysts were right that there would be a high
10  concentration in one company of the market share
11  of online advertising but they were just wrong
12  as to which company that would be?
13          MR. FOX:  Objection.
14     A.   I think I would be speculating
15  because I just don't have the numbers available
16  to me.
17     Q.   But by asking isn't it possible, I'm
18  sort of -- I'm asking you to speculate.
19          I mean is it -- as you sit here
20  today, can you think of any -- well, as you sit
21  here today, is it possible that Google has
22  accumulated a significant enough market share of
23  the online advertising market such that analysts
24  in 2001 who were predicting a concentration of
25  online advertising revenue in one company were

B. Black

1
2  right about the range of concentration that
3  would exist in one company but were simply wrong
4  about who would have that concentration when
5  they said it was AOL and it turned out to be
6  Google?
7          MR. FOX:  Are you asking him whether
8  these analysts considered an analysis of
9  market share of AOL and Google and picked
10  AOL over Google and they did that
11  correctly?
12          Is that -- I don't understand the
13  question.
14          MR. GESSER:  Okay.  Well, Google had
15  no market share at that time so that's not
16  what I'm asking.
17          MR. FOX:  So how could that
18  comparison be made then?
19  BY MR. GESSER:
20     Q.   Do you understand my question?
21          MR. FOX:  I don't understand.
22          MR. GESSER:  I'm not asking you.
23          MR. FOX:  Okay.  That's a good thing.
24     A.   I think I do not have enough
25  information to rule out that possibility.

B. Black

1
2      Q.   Fine.  All right.
3          This report is by Mary Meeker and
4  Richard Bilotti.
5          Do you know how they ranked in terms
6  of their analyst status as compared with Jamie
7  Kiggen and Laura Martin?
8      A.   My understanding is that Mary Meeker,
9  like Jamie Kiggen, was an Internet analyst who
10  was a highly regarded one.  Probably more highly
11  regarded than Jamie Kiggen.
12          I don't believe that she was a media
13  analyst so I wouldn't put her head to head, in
14  what I know about analyst rankings, with Laura
15  Martin.
16          I have no information about Richard
17  Bilotti.
18     Q.   But Mary Meeker, do you know what --
19  she wasn't a media analyst.  Do you know what
20  she was I mean in terms what her area of
21  expertise was?
22     A.   My understanding is that she was an
23  Internet analyst at least in substantial part.
24     Q.   Okay.  So when talking about AOL
25  revenue as -- America Online revenue as opposed

**B. Black**

1
2  to the Time Warner revenue, that would be within
3  her area of expertise as you understand it?
4      A.   Yes.
5      Q.   Okay.  If you take a look at page 17
6  of this report --
7      A.   Of her report.
8      Q.   Yeah, the report you have in front of
9  you, which is Dayton -- I'm sorry, Black-7.
10         MR. FOX:  You have Dayton on the
11  brain.
12         MR. GESSER:  Yes, unfortunately.
13     A.   Okay.
14     Q.   If you go down, last set of numbers
15  on the page has AOL revenue broken out.  It's
16  got a fourth quarter estimate of 2152.9.
17     A.   Yup.  Okay.
18     Q.   You've just done a calculation.
19         Are you doing quarter-over-quarter
20  growth?  Is that what you just did?
21     A.   Yes.
22     Q.   And what did you get?
23     A.   9.0 percent for fourth quarter of
24  calendar 2000 over third quarter of calendar
25  2000.

**B. Black**

1
2      Q.   Okay.  Then you don't have a view as
3  to -- I think that was well within the range of
4  numbers that you don't have a view as to whether
5  that's absurd or unreasonable; is that right?
6         MR. FOX:  Objection.  The testimony
7  is what it is.
8      A.   I think that would be in the range
9  that I described 10 percent as highly optimistic
10  so let me call 9 percent highly optimistic as
11  well.
12     Q.   And the absolute number, the 2152.9,
13  you would describe that as also highly
14  optimistic?
15     A.   At that time I would describe that as
16  a highly optimistic number.
17     Q.   Going back to page 9 of your
18  report --
19     A.   Okay.
20     Q.   -- while we were fixing numbers, I
21  forgot to fix the last number in the text before
22  the table.
23         So "A week later AOL reported fourth
24  quarter 2000 revenue of 2059 million, a shocking
25  11 percent short of Kiggen's estimate."

**B. Black**

1
2      A.   Yes.
3      Q.   Okay.  So that 11 percent number is
4  wrong; is that right?
5      A.   Correct.
6      Q.   What's the right number?
7      A.   To the nearest percentage point,
8  seven percent and I think I would agree to
9  delete the adjective "shocking."
10     Q.   Okay.  So now looking at Footnote 6.
11     A.   Yes.  We've now resolved the puzzle
12  that I had, which is I couldn't find a basis for
13  the 2.2 billion number.
14         We now have a basis for the 2.2
15  billion number.
16     Q.   Okay.  So that would need to be, and
17  we don't need to wordsmith it now, you can just
18  delete the --
19     A.   I think I would say remove the
20  footnote.
21     Q.   Okay.  So let's cross that out.
22     A.   I'm happy to cross that footnote out.
23  It was a puzzle which we have now resolved.
24     Q.   We've been talking a bit about this
25  Fidelity report which is the basis for a number

**B. Black**

1
2  of the conclusions that you reach about the
3  reasonableness of Jamie Kiggen and Laura
4  Martin's public views about certain metrics for
5  AOL; is that correct?
6      A.   Certainly part of the basis, yes.
7      Q.   Okay.  But the Fidelity report I
8  think you know was not public; is that right?
9      A.   That's my understanding.
10     Q.   So why did you use the Fidelity
11  report as opposed to one of the actually
12  published research reports that Credit Suisse
13  made in doing your analysis?
14     A.   The published reports from Credit
15  Suisse during this time frame are quite thin on
16  numbers.  We don't see the type of full
17  numerical analysis that you just showed me in
18  the Morgan Stanley Dean Witter report or that we
19  saw in, from CSFB in April of 2001 or that we
20  saw in draft form prepared by Laura Martin I
21  believe on January, the date of January 12th of
22  2001.  So I worked with the Fidelity report as
23  the best full statement of the beliefs that
24  underlay the public statements by CSFB.
25     Q.   But you're aware that the Fidelity

B. Black

1  report itself is not a basis of a fraud claim
2  against Credit Suisse in the sense that the
3  statements in there, in the Fidelity report, are
4  alleged to have been fraudulent and caused harm
5  to AOL shareholders?  Is that --
6      MR. FOX:  Objection.
7  BY MR. GESSER:
8      Q.  Do you understand that?
9      A.  If I was to put my legal hat on as
10  opposed to my expert hat on, I would agree with
11  that.
12      Q.  So your using -- your use of the
13  Fidelity report is illustrative of what you
14  think the problems in the published CSFB reports
15  which you could not use to do the same analysis
16  because they didn't have the underlying data
17  that the Fidelity report had.
18      Is that a fair characterization of
19  your -- the reason you used the Fidelity report?
20      A.  I think that the published numbers
21  had to have a basis in an underlying analysis of
22  the type that you see in Laura Martin's January
23  12th draft or the Fidelity report, or the April
24  report or the Mary Meeker January report, and I

B. Black

1  took the Fidelity presentation to be the best
2  contemporaneous expression of what that
3  underlying analysis was.
4      Q.  So turning to page 4 --
5      MR. GESSER:  Fred, you're looking at
6  your watch.  What time is it?
7      MR. FOX:  It's twenty to one.
8      MR. GESSER:  All right.  You want to
9  take a break for lunch?
10      MR. FOX:  I was just looking at my
11  watch.  I mean I --
12      THE WITNESS:  Yeah, I think that I
13  was about to say okay --
14      MR. GESSER:  Okay.  We're moving on
15  to a new topic, so now is a perfect time if
16  you want to take a break.
17      All right.  Let's take --
18      THE WITNESS:  Let me put this away or else...
19      MR. GESSER:  Okay.  Sorry.
20      Let's go off the record.
21      THE VIDEOGRAPHER:  Going off the
22  record.  The time is 12:37 p.m.
23      (Lunch recess taken from 12:37 p.m.
24  until 1:30 p.m.)

B. Black

1      A F T E R N O O N   S E S S I O N
2      (Time noted:  1:30 p.m.)
3      THE VIDEOGRAPHER:  We're back on the
4  record.  The time is 1:30 p.m.
5      This is the beginning of the tape
6  labeled No. 3.
7          *    *    *
8  B E R N A R D   B L A C K,   resumed and
9      testified as follows:
10  EXAMINATION BY (Cont'd.)
11  MR. GESSER:
12      Q.  Professor Black, I'm going to ask you
13  to turn back to your report, Exhibit 1.
14      If you look at page 3 of your report
15  under the heading marked "Assumptions."
16      A.  Okay.
17      Q.  It says, "I've been instructed by
18  plaintiffs' counsel to make the following
19  factual assumptions which are consistent with
20  the factual record available to me" and then it
21  lists three assumptions.
22      The first assumption is that, "During
23  the class period, Laura Martin did not believe
24  that AOL Time Warner would meet either its

B. Black

1  guidance or CSFB's public estimates for revenue
2  and EBITDA due to the declining market for both
3  traditional non-online and online advertising."
4      Is that an assumption that you
5  independently sought to test in any way or is
6  that something you simply assumed and in the
7  course of the work that you did, did not find
8  any evidence to the contrary or some other -- or
9  is there something else that is a correct
10  characterization of that assumption?
11      MR. FOX:  Objection.
12      A.  I'm not sure what you mean by test,
13  so there are, you know, internal emails at
14  various points that indicate that -- that are
15  consistent with assumption No. 1 and there are
16  reasonably clear statements that she doesn't
17  think that AOL will meet its guidance, and
18  therefore CSFB's public estimates which were
19  consistent with the guidance for several of the
20  Time Warner divisions.
21      Q.  Well, let me put it this way:  If I
22  were to ask you to test this theory, this is the
23  proposition.  A proposition is that Laura Martin
24  did not believe, and we can continue with the

B. Black

1 **B. Black**
2 **rest of that assumption that is laid for in your**
3 **expert report, if I asked you to test that**
4 **assumption, is there anything that you would do**
5 **to test that assumption that you didn't do in**
6 **preparing your report?**
7    A.   I'm not sure what you mean by test in
8 a sense that we have the statements we have by
9 Laura Martin at the time.
10    **Q.   I don't know what you have so that's**
11 **part of my question.**
12    A.   I reviewed a bunch of emails,
13 presumably all the emails that counsel thought
14 was relevant to provide to me about --
15 containing her views as to how AOL and
16 particular divisions were doing.
17       I'm not sure how you test --
18    **Q.   And you also --**
19    A.   -- her beliefs in some other way
20 other than by seeing whether what she wrote
21 mapped against what CSFB stated publicly.
22       One could of course also read her
23 deposition and I've done that.
24    **Q.   So this is an assumption that you**
25 **were asked to make by counsel that you believed**

1 **B. Black**
2 **to be true based on what you've reviewed.**
3       MR. FOX:  Objection.
4    A.   I think I prefer the framing in the
5 report, which is this assumption is consistent
6 with the factual record available to me.
7    **Q.   What I'm getting at is, is there any**
8 **point in me putting documents in front of you to**
9 **try and show you that this assumption is not a**
10 **valid assumption or is your response going to be**
11 **well, it's the assumption I made, I didn't reach**
12 **any independent conclusion as to whether that**
13 **assumption is valid?**
14    A.   I think I reached the conclusion that
15 this assumption was consistent with the factual
16 record available to me taken as a whole.
17    **Q.   Okay.  And is that conclusion that**
18 **you've reached that this assumption is**
19 **consistent with the factual record as presented**
20 **to you as a whole, is that something that you**
21 **are putting forward in your expert report as**
22 **being one of your findings?**
23       MR. FOX:  Objection.
24    A.   I believe I would say no, that I
25 viewed this as being a factual question and so

1       B. Black
2 as an expert, I'm entitled to rely on the facts
3 as they might be developed at trial, but, you
4 know, I don't get to decide what the facts are.
5       I would not be comfortable making an
6 assumption that I thought was inconsistent with
7 the factual record available to me.
8    **Q.   Okay.  But you're not bringing to**
9 **bear any expertise in reviewing emails and**
10 **reviewing deposition transcripts and drawing**
11 **factual conclusions based on those materials; is**
12 **that correct?**
13    A.   I agree with that.
14    **Q.   And that holds true for both the**
15 **first assumption which I read to you, as well as**
16 **the second and the third assumption listed on**
17 **the top of page 4 of your report?**
18    A.   Yes.
19    **Q.   Do you have a view as to whether**
20 **Laura Martin had access to non-public**
21 **information about the advertising market in**
22 **January, February, March of 2001?**
23       MR. FOX:  Objection.
24    A.   Can you specify a little bit more
25 what you mean about the -- by the, quote, the

1       B. Black
2 advertising market?
3    **Q.   Well, you say, your assumption in one**
4 **is that Laura Martin did not believe that AOL**
5 **would meet its numbers due to the declining**
6 **market for both traditional and online**
7 **advertising.**
8       **So however you mean the traditional**
9 **and online advertising market in point one, my**
10 **question to you is, do you believe that**
11 **Ms. Martin had any non-public information about**
12 **that market?**
13    A.   I have no reason to think that Laura
14 Martin had available non-public information
15 about the state of the advertising market in
16 general.
17       Her internal emails in January
18 suggest that based on her review of what was
19 happening with other companies, she may have had
20 a view as to how that general downturn had
21 affected them and therefore was likely to affect
22 AOL, and I view that as being kind of a central
23 part of what analysts do, which is take
24 different pieces of information and put them
25 together in an interesting and informative way

1            B. Black
2    where it might have been that no single piece
3    was unavailable to the public, but she still
4    might have had an interesting and informative
5    analysis of how the pieces fit together.
6        Q.   Okay.  So just so I'm clear, leaving
7    aside what her own views of the advertising
8    market were, which clearly you take the view was
9    not public because those views were not
10   disclosed, leaving that aside, she didn't have
11   any metrics, numbers, information about the
12   advertising market, as far as you know, that was
13   not public; is that correct?
14       MR. FOX:  Objection.
15       Time period?
16       MR. GESSER:  In the January,
17   February, March 2001 time period.
18       A.   I am not aware of her having
19   non-public information, but I don't want to rule
20   out the possibility that some of the information
21   which came to her as a media analyst might
22   otherwise have been, you know, relatively
23   obscure and not fully impounded into share
24   prices.
25       Q.   But you don't know whether that was

1            B. Black
2    true one way or the other.
3        A.   I guess I want to say I have no
4    affirmative knowledge that she had non-public
5    information.  I just don't want to affirmatively
6    state that she had none.
7        Q.   But your conclusions in your report
8    aren't necessarily dependent on the fact that
9    she had non-public information.
10       A.   The opinions in my report do not
11   presume that she had access to non-public
12   information.
13       Q.   But they do depend on her concerns
14   relating to both the traditional and the online
15   advertising market; is that correct?
16       A.   I believe that she had concerns about
17   the advertising market in general and from the
18   record available to me, it's not clear that she
19   was drawing a hard line between traditional,
20   quote, unquote, traditional versus online
21   advertising.
22       Q.   I'm showing you Black Exhibit 8.
23       (Defendants' Exhibit Black 8,
24       Transcript of deposition of Laura Martin,
25       marked for identification, as of this

1            B. Black
2    date.)
3    BY MR. GESSER:
4        Q.   If you turn to -- this is, I'm
5    showing you is a, Laura Martin's deposition
6    transcript.
7            You indicated I believe that you had
8    read this?
9        A.   I did.
10       Q.   If you look at page, it's a
11   miniscript so there are actually four pages per
12   page, but if you look at page 322.
13       (Witness complies.)
14       A.   Okay.
15       Q.   Starting with the question that's at
16   the bottom of page 322, these are questions that
17   occurred at the end of Ms. Martin's deposition
18   testimony.
19       Question is:
20       "Question:  And when you said earlier
21   that in reviewing emails that the national ad
22   market was weak or was in free fall, do you
23   recall giving testimony about statements like
24   that in emails?"
25       Answer is:

1            B. Black
2        "Answer:  Yes."
3        The question is then:
4        "Question:  When you were referring
5    to the ad market, what were you referring to?
6    Is that print or online?"
7        Ms. Martin answers:
8        "Answer:  It was not online.  It was
9    the general ad market that affected most of my
10   stocks so that would have been potentially some
11   television, mostly television, I think actually
12   TV, broadcast television or cable television.  I
13   don't know.  I can't remember if I was looking
14   at radio or newspaper at the time.
15       "Question:  But not online
16   advertising?
17       "Answer:  No, I didn't look on online
18   advertising.  Jamie did that."
19       Do you remember reading that?
20       A.   I read the deposition.
21       Q.   That's not my question.
22       Do you remember reading that
23   exchange?
24       A.   Do I specifically recall this precise
25   question and answer?  No, I don't.

Page 138

B. Black

1   Q.   Okay.  Now having read this specific
2   precise question and answer, are you still of
3   the view that Laura Martin's concerns related to
4   online advertising as expressed in her emails?
5        MR. FOX:  Objection.
6        Can you identify who the questioner
7   was?
8        You may answer.
9   A.   I think it is fair to say that as I
10  understand what is clear and disputed in this
11  case, that there's no doubt that Laura Martin
12  had concerns about the impact of what I've
13  called here the traditional advertising market
14  on the Time Warner segments that depended in
15  part on traditional advertising, and I
16  understand there to be a factual dispute with
17  some evidence on both sides as to the extent to
18  which her skepticism also related to the America
19  Online segment which depended on online
20  advertising, but not significantly on
21  traditional advertising.
22  Q.   And did you conduct your own
23  examination or have you formed a view as to
24  whether that factual dispute is more likely to

Page 139

B. Black

1   be resolved in favor of whether she was
2   referring to traditional advertising or both
3   traditional and online advertising?
4        MR. FOX:  Objection.
5   A.   I have not.
6        MR. GESSER:  We're up to Black 9.
7        (Defendants' Exhibit Black 9, Email
8        dated 1/11/02 from Martin to several
9        individuals and attached research report,
10       marked for identification, as of this
11       date.)
12  BY MR. GESSER:
13  Q.   I'm showing you an exhibit marked
14  Black-9, which is an email from Laura Martin to
15  a group of people dated January 11, 2001.  It
16  attaches a research report dated January 11,
17  2000, which is incorrectly dated 2000.  It
18  should be dated 2001.
19       Have you seen this email before?
20  A.   Yes, I have.
21  Q.   Okay.  And do you understand that
22  this email is one of the emails which plaintiffs
23  have purported demonstrates Ms. Martin's true
24  belief about AOL's prospects at this time in

Page 140

B. Black

1   light of developments in the advertising market?
2        MR. FOX:  Objection.
3   A.   I am generally aware of that, yes.
4   Q.   In reviewing this email, is there
5   anything that indicates to you that Ms. Martin
6   is talking about anything other than traditional
7   advertising -- strike that.
8        Is there anything in this email that
9   suggests to you that Ms. Martin was talking
10  about online advertising?
11       MR. FOX:  Objection.
12  A.   There is nothing in this email that
13  is specifically about online advertising, but
14  neither is there anything in the email that
15  specifically excludes online advertising.  It's
16  a more general email.
17  Q.   If you look at five lines from the
18  bottom it says, "In January the scatter market
19  is still up year over year."
20       MR. FOX:  I'm sorry.  Where you are
21       you looking?
22       MR. GESSER:  Five lines from the top
23       of the email.
24  Q.   It says, "In Jan, the scatter market

Page 141

B. Black

1   is still up year over year"?
2   A.   Yes.
3   Q.   Do you know what the scatter market
4   is?
5   A.   No.  I could speculate but I don't
6   have a precise knowledge.
7   Q.   Well, either --
8   A.   Other than it's related to
9   advertising and I can guess about, something
10  about what it might be, but I don't actually
11  know.
12  Q.   If you had to guess, would you guess
13  that it is related to online advertising,
14  traditional advertising or both?
15       MR. FOX:  I don't know that it's
16       helpful, having the witness guess about
17       things in emails written by Laura Martin is
18       going to be helpful to anything here.
19       MR. GESSER:  We can decide whether
20       it's helpful after he's already given his
21       guess but...
22       MR. FOX:  Well, if you want him to
23       sit here -- look, it's your time.  If you
24       want to sit here and have him guess at

Page 142

```
1              B. Black
2       things, I guess if the witness is willing
3       to do that, go ahead.
4            MR. GESSER:  What I'd like is for you
5       to just make whatever objection you're
6       going to make and then let me ask my
7       questions.
8            MR. FOX:  That's what I'm trying to
9       do.
10       A.    Based on the next sentence, it
11      appears that the scatter market is related to
12      television advertising and quite possibly to
13      spot advertising.
14           Having said that, it's at least
15      plausible and perhaps likely that rates in
16      different segments of an overall advertising
17      market would be related and that if there was
18      pricing weakness in one segment, it might well
19      carry over to others since advertisers are
20      looking for more cost effective ways of reaching
21      audience rather than less.
22       Q.    Okay.  But that's not my question.
23           My question is, does the scatter
24      market, in your view, relate to online
25      advertising or traditional advertising?
```

Page 143

```
1              B. Black
2            MR. FOX:  Objection.
3       A.    I think I said that my speculation is
4       the scatter market relates to television
5       advertising.
6       Q.    Which is what?
7       A.    In particular, television advertising
8       would be a component of traditional advertising.
9            MR. FOX:  Before you ask another
10      question, could I just ask is the
11      attachment, this January 11, 2000 report
12      which you said the date is incorrect, is
13      this -- are you representing this as a
14      draft or is this something that was
15      published or --
16           MR. GESSER:  I'm representing it as
17      being what was attached to the email.
18           MR. FOX:  Okay.  But is it a draft or
19      is it something that was published?  You
20      don't know?
21           MR. GESSER:  I'm asking the question.
22           MR. FOX:  I know, but I'm asking you
23      a question.
24           MR. GESSER:  Okay.
25           MR. FOX:  I know you're asking him a
```

Page 144

```
1              B. Black
2       question, but I'm asking you a question.
3           Can you answer my question?
4           MR. GESSER:  No.
5           MR. FOX:  You cannot?
6           MR. GESSER:  No, I will not.
7           MR. FOX:  You will not.
8           MR. GESSER:  Yes.
9           MR. FOX:  Okay.  Well, okay.
10      BY MR. GESSER:
11       Q.    Would you agree that the growth
12      trends for traditional and online advertising in
13      2001 would be different?
14           MR. FOX:  Objection.
15       A.    They certainly could be and I believe
16      that in fact they were.
17       Q.    The second assumption that you have
18      at the top of page 4 is that, "While Laura
19      Martin's expertise was primarily on the Time
20      Warner side of AOL Time Warner, she was informed
21      about and prepared forecasts for AOL Time Warner
22      as a whole which showed lower AOL EBITDA than
23      CSFB's published reports."
24           Do you know sitting here which
25      reports that refers to?
```

Page 145

```
1              B. Black
2       A.    Thinking about January 12th, 2001 in
3       particular, and my guess is that the January
4       11th draft that's attached to the January 11th
5       email would be quite similar to the January 12th
6       draft report that I am thinking about.
7           MR. FOX:  I'll just note for the
8       record --
9       A.    I don't recall whether she prepared
10      separate full company forecasts before the April
11      public report or not.
12           MR. FOX:  I would just note for the
13      record it says "published..." it doesn't
14      say reports, it says "...forecasts."
15           MR. GESSER:  Forecasts.  I'm sorry.
16      Did I say reports?
17           MR. FOX:  I think so.
18           MR. GESSER:  Okay.  I apologize.
19           MR. FOX:  That's okay.  I've done
20      more than a few things incorrectly in my
21      time.  No problem.
22      BY MR. GESSER:
23       Q.    What is the basis for your views as
24      to what Ms. Martin's true beliefs as to the
25      correct EBITDA numbers for AOL were?
```

**B. Black**

1    **B. Black**
2        MR. FOX:  Objection.
3        A.    If I'm recalling correctly, she has a
4    draft January report that has EBITDA numbers in
5    it.
6        MR. GESSER:  We're up to Black-10.
7        (Defendants' Exhibit Black 10, Email
8        dated 1/12/01 from Martin to Kiggen and
9        Watters, marked for identification, as of
10       this date.)
11   BY MR. GESSER:
12       **Q.    I'm showing you Black-10, which is an**
13   **email from Laura Martin to Jamie Kiggen and**
14   **Catherine Watters CC'ing Patrick Wang dated**
15   **January 12th 2001.**
16       **I'll give you a second to review it.**
17       **(Document review.)**
18       A.    Okay.  I've seen this before.
19       **Q.    You've seen this before.  Okay.**
20       **And do you view this email as being**
21   **one of the emails that illustrates Laura**
22   **Martin's true non-public beliefs about AOL?**
23       MR. FOX:  Objection.
24       A.    Yes.
25       **Q.    And in her internal emails like this,**

**B. Black**

1    **B. Black**
2    **it's your view that she had reason to be more**
3    **candid than she was allowed to be in her public**
4    **research reports?**
5        MR. FOX:  Objection.
6    BY MR. GESSER:
7        **Q.    Is that correct?**
8        A.    It's a compound question so if you
9    wanted to break it down, I might be able to
10   answer it in pieces.
11       **Q.    Let's take, for example, the price**
12   **target.**
13       **In this email she indicates that she**
14   **could justify a price target between $60 and $65**
15   **a share.  $60 or $65 for AOL; is that correct?**
16       A.    Yes.
17       **Q.    And at the time or around this time,**
18   **Credit Suisse First Boston's price target for**
19   **AOL was what?**
20       A.    $75 I believe.
21       **Q.    Okay.  It was higher.  Whatever it**
22   **was.  $80 or $75, whatever it was.  Okay.**
23       A.    It was either $75 or $80 and it was
24   higher -- and that's higher than $60 or $65.
25       **Q.    Okay.  You and I can agree on that.**

**B. Black**

1    **B. Black**
2        **As between the $60 to $65 number and**
3    **the $70 to $75 number, I believe your report**
4    **assumes that Ms. Martin's true belief is the $60**
5    **to $65 number and that the $75 to $80 number**
6    **that was in her public reports was not her true**
7    **belief.**
8        **Is that a fair reading of your**
9    **report?**
10       MR. FOX:  Objection.
11       A.    No.  I want to be -- in a couple of
12   respects.
13       **Q.    Sure.**
14       A.    First, I take the CSFB public number
15   to be centrally, call it Jamie Kiggen's number
16   is the first named analyst and not to be Laura
17   Martin's number as such.  Her name is on the
18   report but it's centrally his report.  At least
19   that's how I think about it.
20       **Q.    Because his name is on the top?**
21       A.    Because his name is on the top, all
22   right?
23       **Q.    Okay.**
24       A.    In the same way that I think of the
25   Morgan Stanley report that we've reviewed

**B. Black**

1        B. Black
2    earlier as a Mary Meeker report.
3        And --
4        **Q.    Do you think that's the way the**
5    **market views it?**
6        MR. FOX:  Objection.
7        A.    My sense would be that given that
8    Laura Martin was a media analyst who came out of
9    Time Warner and Jamie Kiggen was an Internet
10   analyst who was originally covering AOL, that
11   investors might expect some division of
12   responsibility in the preparation of a detailed
13   forecast such as the one that goes public in
14   April.
15       I don't know that I'd want to be
16   firmer than that in having a view about what
17   investors would think about a report with
18   multiple names on it.
19       Then I think that I am not
20   comfortable saying that I think I know what
21   Laura Martin's true views were at this time.
22   This was a draft report that she proposed to put
23   out into the public domain, but it might well
24   have been that she was skeptical that these
25   numbers were numbers that AOL was likely to

1    B. Black
2  achieve as well.
3       Some of the email traffic makes me
4  think that in some sense she's saying, "Well,
5  here's a set of numbers but I really think --
6  what I really think is going to happen is below
7  those numbers," and so I'm not comfortable
8  saying this is what she believed, this being the
9  exhibit to the email that you've just put in
10 front of me.
11      It's certainly closer in its overall
12 company valuation to what I infer she believed,
13 but I'm not sure that the individual numbers are
14 something that if you said look, you know, you
15 get one shot at predicting AOL TW and you get a
16 gazillion dollars if you get it right and you
17 can retire in luxury for the rest of your life,
18 and you get nothing if you get it wrong, that
19 these would be the numbers that she would come
20 up with.
21      **Q.   And is that partly based on the fact**
22 **that you think she is more likely to be candid**
23 **in internal emails with Kiggen and Watters than**
24 **would be afforded to her through the**
25 **dissemination of public research reports in**

1    **B. Black**
2  **which she and Jamie Kiggen were responsible for**
3  **coverage of AOL?**
4       MR. FOX:  Objection.
5    A.   It's consistent with my understanding
6  of the factual record that she might have had
7  and might have conveyed in emails a personal
8  view which was more negative than her proposal
9  for a public stance.
10   **Q.   Can you think of any reason why she**
11 **would have -- why she -- any reason she would**
12 **have to be not candid about her true opinion in**
13 **internal emails?**
14      MR. FOX:  Objection.
15   A.   Well, the exhibit is intended for
16 potential public distribution.  It's not
17 intended for purely internal distribution.
18      So part of my answer would be even if
19 the internal email was intended to be entirely
20 her full private views, the proposed to be
21 public numbers attached to it would take into
22 account, might well take into account other
23 considerations and therefore might not reflect
24 her best estimate.
25      And if you want me to talk about what

1    B. Black
2  those considerations are, I can.  And as I said,
3  I think there's some evidence in the email
4  traffic that that was the case.
5       I don't have a view that the text of
6  the email messages was anything other than her
7  honest opinions.
8    **Q.   So just so I understand, even this**
9  **report here which is attached, this draft report**
10 **which has the $60 price target which has got her**
11 **name on top, you view even this report as**
12 **possibly not being a true reflection of her**
13 **beliefs?  Is that right?**
14      MR. FOX:  Objection.  I think he
15 answered the question.
16   A.   I would certainly not want to rule
17 out the possibility that this is also not a true
18 reflection of her beliefs.
19   **Q.   Ruling out the possibility and having**
20 **reached a view are two different things, so I'm**
21 **asking you whether you have a view sitting here**
22 **today as to whether if this report had been the**
23 **report that was issued by Credit Suisse First**
24 **Boston as opposed to the actual report that was**
25 **issued whether you would still believe that the**

1    **B. Black**
2  **reports issued by Credit Suisse First Boston**
3  **were misleading because they didn't disclose the**
4  **true beliefs of Laura Martin?**
5       MR. FOX:  Objection.
6    A.   I did not form that opinion.  I do
7  not hold that opinion.
8       But your question three questions
9  back was different; was I assuming that this
10 was her honest belief and I'm not assuming that
11 either.
12   **Q.   Nor, though, are you assuming that it**
13 **wasn't her honest belief.**
14   A.   I am not assuming that the January
15 12th projections were not her honest belief, but
16 I'm not comfortable going so far as saying I'm
17 comfortable that they were.
18   **Q.   Do you have a view as to what the**
19 **market reaction would have been had this report**
20 **been issued on January 12th, 2001 instead of**
21 **what was actually issued by Credit Suisse?**
22      MR. FOX:  Objection.
23   A.   I formed an overall view that the
24 public release by CSFB of opinions such as those
25 reflected in the January 12th draft and which

B. Black

1 reflected Laura Martin's true views would have
2 been likely to impact AOL's share price.
3     I didn't try to pin that down to a
4 particular impact of a particular statement on a
5 particular day because that was going beyond my
6 role in this case.
7     **Q.  So how did you reach that conclusion**
8 **that if CSFB had publicly provided the forecasts**
9 **and opinions consistent with the private views**
10 **of Ms. Martin and Mr. Kiggen, that that likely**
11 **would have been important to investors and**
12 **affected AOL's share price?**
13     MR. FOX:  Objection.
14     A.  I think that that was based on a
15 judgment that at some point, maybe as early as
16 January of 2001, Laura Martin did not think that
17 AOL would meet its 40 and 11 guidance.
18     At some point, though the earliest
19 documents I have date from March of 2001, Jamie
20 Kiggen also was doubtful that they would meet
21 the CSFB published numbers, which might imply
22 that he was doubtful that they would meet their
23 guidance.
24     I think that a statement by two
25

B. Black

1 prominent analysts or perhaps by Laura Martin
2 alone, though that wasn't within the realm of
3 what was going to happen, that they did not
4 think that AOL would meet its 40 and 11 guidance
5 would be likely to have had a significant impact
6 on investors' overall views based on what I know
7 about what other information was in the market
8 at the time.
9     **Q.  I just think you just restated your**
10 **conclusion.**
11     **I'm asking you how did you reach that**
12 **conclusion.**
13     A.  It would be my judgment that in an
14 environment in which the overall national
15 advertising market was weak, the online
16 advertising market was certainly less strong,
17 perhaps weak, certainly getting worse as time
18 went on, in which AOL was saying often and
19 loudly, "We don't care what's happening to the
20 overall market, it isn't impacting us, we're
21 going to meet our guidance, we're highly
22 confident we're going to meet our guidance," and
23 in which investors would have been unsure about
24 the extent to which AOL would be affected by
25

B. Black

1 those broader trends, that it would likely have
2 been significant to investors' overall opinions
3 for major analysts to have said in effect, "We
4 think AOL isn't going to meet its guidance
5 because of the effect of the -- you know, "We
6 think the national advertising slowdown is going
7 to have more of an effect on AOL than they say
8 it's going to have and we think they're not
9 going to meet their guidance."
10     **Q.  That's your opinion.**
11     A.  That's my opinion.
12     **Q.  And what scientifically tested**
13 **methodology did you use to reach that opinion?**
14     A.  I was not trying to reach --
15     MR. FOX:  Objection.
16     A.  -- a percentage estimate of by how
17 much a particular statement would have affected
18 share price.
19     I was trying to form a judgment about
20 whether given this general background of what
21 was out there in the market, whether a
22 significantly different statement by highly
23 regarded analysts would have been likely, and I
24 don't think I can make a stronger statement than
25

B. Black

1 that, would have been likely to affect share
2 price by significantly affecting the overall mix
3 of information.
4     **Q.  Okay.  And so what did you do?**
5     A.  I tried to become informed about what
6 AOL was saying publicly.  I tried to become
7 generally informed about news stories about AOL
8 during the time period and I tried to become
9 generally informed about the views of other
10 analysts.
11     **Q.  Okay.  And then with that**
12 **information, did you test to see what happened**
13 **if other similarly ranked analysts released**
14 **negative news about AOL and what effect that had**
15 **on AOL's share price?**
16     A.  I did not.  I viewed that as being
17 outside my role in this case.
18     **Q.  So if you didn't do that, what leads**
19 **you to believe that a disclosure by Laura Martin**
20 **would have a negative impact on AOL?**
21     **I mean other than your guess or your**
22 **impression, I'm just not sure what you did that**
23 **requires any either analysis or expertise.**
24     MR. FOX:  Objection.
25

B. Black

1    A.   I think I view myself as, you know,
2  call it being generally knowledgeable about
3  market efficiency and what kinds of information
4  are likely to matter.  So I don't think it, for
5  example, mattered much that, you know, one more
6  analyst or one more pair of analysts was willing
7  to go along with AOL's guidance for 2001 and
8  willing to put out optimistic five-year
9  forecasts for AOL's future growth.
10      Against the background of that's what
11 AOL was saying and that's what other analysts
12 were doing for CSFB to have said, "Gee, you
13 know, we just don't believe it, we think that
14 the ad slowdown is going to have a bigger effect
15 than AOL is saying," would be likely to have
16 made a difference.  That's against the
17 background of what will AOL is saying and what
18 other analysts are saying.
19      Conversely, if AOL is saying this and
20 every other analyst is saying, "They ain't going
21 to make it," and at some point Laura Martin and
22 Jamie Kiggen said, "Well, I guess they're not
23 going to make it, we're going to move over to
24 here," everybody else is there anyway except the

B. Black

1  company.  That would be far less likely to have
2  a substantial impact on the market price.
3      I don't know how you prove that.  I
4  call it an informed judgment about financial
5  markets.
6    **Q.   Clear you don't know how to prove
7  that.**
8      MR. FOX:  Objection.
9  BY MR. GESSER:
10   **Q.   But you haven't read the academic
11 literature on how and when analysts impact stock
12 prices; is that right?**
13     MR. FOX:  Objection.
14   A.   I am not an expert on that
15 literature.
16   **Q.   And you haven't read the cases on,
17 the case law on how analysts -- courts view
18 analysts' impact on stock prices.**
19     MR. FOX:  Objection.
20   A.   That's correct.
21   **Q.   And you didn't look to see whether
22 there are instances during this time frame in
23 2001 where analysts gave negative views about
24 whether AOL was going to hit its guidance and**

**B. Black**

1 **looked to see on those days whether AOL stock
2 price reacted negatively as compared to an index
3 of other companies that may behave the same as
4 AOL with respect to market trends or
5 industry-wide trends.**
6      MR. FOX:  Objection.
7    A.   I took that to be within the scope of
8  the engagement of Scott Hakala and outside my
9  scope.
10   **Q.   So you didn't do it.**
11   A.   I did not do it.
12   **Q.   And so in light of all that, I'm sort
13 of baffled as to in what sense you are providing
14 any expert opinion on this particular issue as
15 to what would have been the impact on AOL's
16 share price had a disclosure, leaving aside that
17 I don't even know what that disclosure would
18 look like, but whether a disclosure by Laura
19 Martin would have had an impact on AOL's share
20 price.**
21     MR. FOX:  Objection.
22   A.   I formed, I think, a qualitative
23 opinion based on the factors I've just described
24 as to a likely impact of information about the

B. Black

1  views of prominent analysts that is consistent
2  with what I know about the academic literature
3  on the impact of analysts' forecasts and
4  consistent with what I know about financial
5  markets and market efficiency in general.
6      As you pointed out in your question,
7  unless you specify sort of a precise statement
8  on a precise date, it would be -- there would be
9  some range of uncertainty in an effort to
10 quantify that impact and I did not attempt to do
11 that.
12   **Q.   Do you believe that you have a
13 superior expertise to make that general
14 conclusion that a disclosure by Laura Martin of
15 her true beliefs in AOL would have some impact,
16 although unquantifiable from your point of view,
17 some impact on AOL's share price?**
18     MR. FOX:  Objection.
19     Superior to whom?
20     MR. GESSER:  Judge Gertner.
21     MR. FOX:  Objection.
22   A.   Several instances during this period
23 in which news comes out about AOL and its stock
24 price reacts fairly sharply on the order of a

1           B. Black
2    ten percent reaction.
3        **Q.    Is there an answer to my question?**
4        A.    I'm getting there.
5        **Q.    Okay.  Big windup.**
6        A.    It is plausible to me that if a
7    respected analysts had said we think X is going
8    to happen, that that would have had a price
9    impact that would have been some portion of the
10   actual observed impact when X in fact happened.
11          And so once it -- so let's put it
12   this way:  Once it becomes clear that AOL is not
13   likely to meet its guidance, and I would say
14   that becomes clear at least on the revenue line
15   when it issues its second quarter of 2001
16   report, it's share price drops on the order of
17   10 percent when that news report comes out, is
18   it likely that if credible analysts said
19   somewhat earlier than that, "We don't think
20   they're going to make their projections," that
21   that would have had an impact of some fraction
22   of the 10 percent?  Yes, my judgment is that
23   would be likely.
24       **Q.    That's your answer to my question?**
25       A.    I believe so.

1           B. Black
2        **Q.    My question is, do you have superior**
3    **expertise to Judge Gertner in making that**
4    **conclusion?**
5        A.    Oh, I didn't understand what the
6    reference to Judge Gertner was.
7        **Q.    Okay.**
8          MR. FOX:  I'm just lost.
9        A.    Now I don't understand the question
10   at all.
11       **Q.    The question is, this conclusion that**
12   **you're reaching based on not having been -- not**
13   **being an expert on the literature on the impact**
14   **of analyst statements on stock prices, not being**
15   **an expert on the case law in this area and not**
16   **having done any quantitative analysis, whatever**
17   **expertise you're bringing to that, to the**
18   **question of whether a disclosure by Laura Martin**
19   **would have had an impact on AOL's stock price,**
20   **I'm asking whether you have superior expertise**
21   **to make that conclusion than Judge Gertner.**
22         MR. FOX:  Objection.
23       A.    I would imagine so, yes.
24       **Q.    Because?**
25       A.    Because I'm knowledgeable in

1           B. Black
2    financial markets, I do valuations, I've looked
3    at the data and I take a federal judge not to be
4    an expert in those areas.
5          But it's not that I know exactly what
6    his expertise is because I don't.
7        **Q.    Her.**
8        A.    Her expertise.  That shows you how
9    much I know.
10       **Q.    When we're talking about -- we've**
11   **been talking about a hypothetical disclosure by**
12   **Laura Martin and what impact it would have on**
13   **the stock price.**
14         **Have you thought at all about what**
15   **that disclosure might look like?**
16         MR. FOX:  Objection.
17       A.    Yes.
18       **Q.    Okay.  What would that disclosure**
19   **look like?**
20       A.    I think you'd have to pin it down to
21   particular points in time so I'm not comfortable
22   answering the question phrased that generally.
23       **Q.    Well, let's take the date of the**
24   **email that you have in front of you.**
25         **So January 12th, 2001, what would a**

1           B. Black
2    **disclosure, in your view, an accurate and**
3    **correct disclosure from Credit Suisse say that**
4    **the actual reports that were issued by Credit**
5    **Suisse in this time frame did not say?**
6        A.    I think I'd want to -- so one thing
7    they would certainly do is move in the direction
8    of the attachment, the January 12th attachment.
9          As I said earlier, it might be that
10   her true best estimate was more negative than
11   what's reflected in that attachment.  They
12   certainly would be moving in that direction.
13       **Q.    When you say -- what would be moving**
14   **in what direction?**
15       A.    Relative to what CSFB's public
16   forecasts were.
17       **Q.    We're operating at a level of**
18   **generality that I don't think is helpful, so why**
19   **don't you tell me what exactly, what would the**
20   **price target on the face of the report say?**
21         MR. FOX:  Objection.
22       A.    I actually don't think that I know
23   what her best estimate would have been.
24         We know that what's in the January
25   12th report are several methods that produce a

B. Black

1  price target of $60 to $65, but those are also
2  based on largely accepting AOL's guidance at
3  least for 2001, and it's not clear to me that
4  she believed at that time that AOL was going to
5  meet its guidance for 2001 as opposed to she
6  wasn't willing to come out publicly and say they
7  weren't at that time.
8       So I don't know that I know exactly
9  how to say here's what I think she would have
10 said if you just said hey, we don't care if the
11 company hates you, we don't care about anything
12 other than just what's your best opinion.  I
13 don't know that I know that.
14     Q.    Okay.  Sorry.  Now I'm very confused.
15     You don't know what the disclosure
16 would look like but you do know that the
17 disclosure would have an impact on the stock
18 price?
19     A.    Disclosure that said in effect we
20 don't -- you know, we're reducing our price
21 target from $75 to $60 or potentially somewhere
22 lower and we think the national ad market is
23 terrible and get -- is bad and getting worse,
24 and that's going to have a substantial impact on

B. Black

1  at least the Time Warner segments, and unless
2  there's a sharp rebound in the second half, then
3  we don't see how they're going to meet their
4  projections for 2001, that's the kind of
5  disclosure that I have in mind at this time
6  frame in saying that I think that disclosure
7  would have been likely to have had a significant
8  impact on market price.
9       Now if you move to a later date --
10     Q.    Well, let's stick with this date.
11     A.    Okay.
12     Q.    So you think that would be an
13 accurate disclosure of Laura Martin's true
14 beliefs at that time.
15          MR. FOX:  Objection.
16 BY MR. GESSER:
17     Q.    A more accurate disclosure.
18     A.    Yes.
19     Q.    What about Jamie Kiggen's beliefs?
20     A.    I approached my report with the view
21 that in large measure Jamie Kiggen was an
22 Internet analyst who was knowledgeable about AOL
23 but wasn't really a media analyst, and therefore
24 was probably relying on Laura Martin or should

B. Black

1  be relying on Laura Martin on the Time Warner
2  side.
3       And so what I suppose I would expect
4  from Jamie Kiggen would be to take his beliefs
5  about America Online, add them to Laura Martin's
6  beliefs about Time Warner and come up with an
7  overall assessment of the entire company.
8       I don't have evidence from this time
9  period as to what his beliefs about America
10 Online were.
11      We've discussed my analysis of the
12 Fidelity report and it's certainly fair to say
13 that his growth projections were highly
14 optimistic and his market share projections, as
15 I say in my report, were, you know, highly
16 unlikely, I think was the phrase I used, to come
17 true.
18      I did not form an opinion as of
19 January as to what his true beliefs were because
20 I don't have a basis and a factual record for
21 forming that.
22     Q.    Okay.  So when you say he should have
23 done this, that's your objective view as to what
24 you think would have been a proper way for an

B. Black

1      analyst to behave in his position, not what you
2  think he needed to do to be consistent with his
3  own beliefs about AOL; is that fair?
4           MR. FOX:  Objection.
5       A.    No.  I think what I was trying to say
6  was, you know, let me put aside the factual
7  dispute over whether Laura Martin was offering
8  views that applied to America Online as well as
9  TW.  She was certainly offering views that
10 applied to TW and she was, you know, the
11 in-house TW expert.
12      I think that if Jamie Kiggen were
13 taking the lead role in a report that reflected
14 his or their combined honest beliefs, that would
15 have to combine his honest belief about AOL with
16 her honest belief about Time Warner.
17      I do not have a basis for assessing
18 whether he had an honest belief in January of
19 2001 as to the AOL numbers other than to observe
20 that they were highly optimistic.
21     Q.    But not necessarily more optimistic
22 than other analysts who were covering AOL at the
23 time?
24          MR. FOX:  Objection.

B. Black
1
2     A.   Again, I haven't systematically done
3   that work.
4     Q.   And you have no evidence that in
5   January 2001, Jamie Kiggen did not believe what
6   was -- anything that was said in the research
7   reports for AOL; is that correct?
8       MR. FOX:  Objection.
9     A.   I think that I don't have information
10  in the factual record available to me as to
11  statements by Jamie Kiggen as to his beliefs
12  during this time period.
13    Q.   So the answer to my question is yes,
14  you have no information that would lead you to
15  believe that Jamie Kiggen did not believe the
16  research reports that were issued by Credit
17  Suisse regarding AOL in January, February 2001.
18      MR. FOX:  Objection.
19    A.   I think I want to say I have no --
20  there's nothing in the factual record that gives
21  me affirmative basis for saying he didn't
22  subjectively believe those numbers.
23    Q.   Okay.  So now getting back to my
24  original question, which is, what would a
25  reasonable disclosure look like in the January

B. Black
1
2   2000 time frame that accurately reflected the
3   views of Credit Suisse?
4       MR. FOX:  Objection.  Asked and
5   answered.
6       MR. GESSER:  No, he did not answer
7   that.
8       MR. FOX:  Oh, he sure did.  He sure
9   did.  You may have not liked the answer,
10  but he sure did answer the question.
11      MR. GESSER:  I hope he's not going to
12  stick with that answer now.
13      MR. FOX:  Well, you're now saying he
14  did answer the question.  If you're just
15  saying I hope he doesn't stick with it,
16  you're saying he answered the question.
17    A.   I think that the published --
18      MR. GESSER:  I'll let the witness
19  decide whether he wants to stick with his
20  answer.
21    A.   I think that the published numbers in
22  January 2001 are not consistent with Laura
23  Martin's views and I don't have affirmative
24  evidence that they're not consistent with Jamie
25  Kiggen's views.

B. Black
1
2       So then when you asked me are they
3   consistent with CSFB's views, I kind of don't
4   know how to answer because I've got two
5   different people here.
6     Q.   And so with a report that was exactly
7   the same as the report that was issued but also
8   had a dissent effectively from Laura Martha that
9   said while I agree with some of the numbers, I
10  disagree with the price target that is in this
11  report, and I believe the price target should be
12  $60 and I disagree whether AOL is going to meet
13  it, all the caveats that exist in her emails, if
14  those were disclosed as being Laura Martin's
15  views in the report and the report remained as
16  it was with Jamie Kiggen's views, would that be
17  a full and honest disclosure, in your view, from
18  Credit Suisse at that time?
19      MR. FOX:  Objection.
20    A.   Framing the hypothetical that way, I
21  would have no reason to think that the
22  combination of the honest beliefs of Jamie
23  Kiggen and the somewhat dissenting beliefs of
24  Laura Martin would not be their combined honest
25  beliefs.  In some sense the question is

B. Black
1
2   tautological.
3     Q.   And what effect do you think that
4   kind of report would have on AOL's stock price?
5       MR. FOX:  Objection.
6   BY MR. GESSER:
7     Q.   Let me step back and ask you, have
8   you thought about that question before?
9     A.   I have not asked myself that
10  question.
11    Q.   Now having asked yourself that
12  question in conjunction with me asking you that
13  question, do you have a view?
14    A.   Let me see if I can frame it the
15  following way:  So instead of having one report
16  with two names, we just have two reports.  We
17  have the Jamie Kiggen report --
18    Q.   Not what I'm asking.
19    A.   -- and the Laura Martin report and
20  Jamie Kiggen --
21    Q.   Not what I'm asking.
22    A.   I'm trying to think my way through to
23  an answer to the question.
24      MR. FOX:  You asked him if he has a
25  view.  He's trying to give you his view.

1          B. Black
2          MR. GESSER:  Okay.
3          MR. FOX:  Wasn't that your question,
4     do you have a view?
5     BY MR. GESSER:
6          Q.   Okay.
7          A.   So I'm imagining that this is roughly
8     equivalent to simultaneous reports; here's the
9     Jamie Kiggen view and here's the Laura Martin
10    view, and Jamie Kiggen thinks the world is
11    wonderful and the price target is $75 and Laura
12    Martin thinks the world isn't so wonderful,
13    especially on the Time Warner side, and thinks
14    the price target is $60 and sees a worsening ad
15    environment.  I think it's perfectly plausible,
16    even likely, that the skeptical views of Laura
17    Martin would have a price impact.
18         MR. FOX:  Could I just make a
19    request?
20         When you're at some kind of breaking
21    point, can we take a ten-minute break?
22         MR. GESSER:  Okay.  We're almost
23    there.
24    BY MR. GESSER:
25         Q.   What if Laura Martin's name had been

1          B. Black
2     taken off of the report entirely?
3          MR. FOX:  Objection.
4          A.   I'm not sure I understand the
5     question.
6          Q.   Would -- you view the Credit Suisse
7     First Boston reports on AOL in the January and
8     February time frame to be misleading because
9     they don't reflect the true beliefs of Laura
10    Martin during that time frame, correct?
11         A.   Let's take that as an assumption
12    because I didn't try to form that belief.
13         I formed a belief that they didn't
14    reflect her true views.
15         Q.   Okay.  Assuming those were issued
16    exactly as they were issued but instead of her
17    name appearing on the report, her name did not
18    appear on the report, would you have a view --
19    first of all, have you considered that question
20    before?
21         A.   No.
22         Q.   Sitting here today, would you have a
23    view as to whether those reports were -- taking
24    as an assumption that they are misleading
25    because they don't reflect Laura Martin's true

1          B. Black
2     views, would they still be misleading if her
3     name no longer appeared on those reports?
4          MR. FOX:  Objection.
5          A.   It would seem to me that the report
6     ought to reflect the beliefs of the writer of
7     the report about the subject matter of the
8     report and so what I'm struggling with is okay,
9     we take Laura Martin's name off but there are
10    still Time Warner numbers that she doesn't think
11    are right and do we take those numbers off?  And
12    where do we get different numbers --
13         Q.   No, no, no.
14         A.   -- from?
15         Q.   No, you weren't listening to my
16    hypothetical.
17         My hypothetical includes every --
18    everything is exactly the same except Laura
19    Martin's name doesn't appear on the report.
20         MR. FOX:  So just so I understand,
21    Laura Martin still is an analyst with
22    CSFB --
23         MR. GESSER:  Correct.
24         MR. FOX:  -- and still has the same
25    views and --

1          B. Black
2          MR. GESSER:  Correct, everything is
3     the same.
4          MR. FOX:  Somebody deleted her name
5     from the report.
6          MR. GESSER:  She deletes her name.
7     She says, "I don't agree with this.  I'm
8     washing my hands.
9          MR. FOX:  I'm off.
10         MR. GESSER:  I'm off the report."
11         A.   I think --
12         MR. FOX:  Objection.
13         A.   -- I would be puzzled as to the basis
14    for the report to be issued under Jamie Kiggen's
15    name 'cause he's not the Time Warner guy, and
16    that's why I answered the prior question the way
17    I did.
18         So I'm imagining Jamie -- Laura comes
19    to Jamie and says, "Here are my Time Warner
20    numbers."
21         And Jamie says, "Oh, no, they're not.
22    These are the Time Warner numbers."
23         And Laura says, "Well, if you're
24    going to use those numbers, I take my name off."
25         He uses those numbers.  I still have

B. Black

1  the question of where did he get his numbers
2  from and does he have a basis, a reasonable
3  basis for honestly believing his Time Warner
4  numbers.
5         So we confirmed that I have no
6  affirmative basis for thinking he didn't believe
7  his own AOL numbers, but I don't know where he
8  gets the basis for believing in Time Warner
9  numbers that are different than her numbers
10  because he's not the Time Warner guy.
11     Q.   I'm sorry.  You think that Jamie
12  **Kiggen substituted his own numbers for Laura**
13  **Martin's numbers on Time Warner and that's the**
14  **reason why they came up with different numbers**
15  **overall?**
16         MR. FOX:  Objection.
17     A.   I'm trying to understand the
18  hypothetical I think, all right?
19     Q.   **But your misunderstand -- our**
20  **misunderstanding of the hypothetical may be due**
21  **to the fact that we have a different view as to**
22  **what actually happened, so let me see if I**
23  **understand what --**
24         MR. FOX:  Why don't you just give him

B. Black

1  your hypothetical.  I mean it's --
2  whatever.  Sorry.
3         MR. GESSER:  I think we're making
4  progress here, so let's just see.
5         MR. FOX:  Okay.  Good.
6  BY MR. GESSER:
7     Q.   **Do you believe that the reason why**
8  **Jamie Kiggen and Laura Martin came to different**
9  **numbers on AOL is because Jamie did not adopt**
10  **Laura's numbers on the Time Warner side and put**
11  **in his own numbers?**
12         MR. FOX:  Objection.
13     A.   In part, yes.
14     Q.   **Where are you getting that from?**
15     A.   There are value estimates from Laura
16  Martin on January 12th that if you take those
17  numbers and you add them to what as best I
18  understand is Jamie Kiggen's view on AOL, they
19  don't add up to $75 a share.
20     Q.   **Okay.  So your assumption that Jamie**
21  **Kiggen did not take Laura Martin's numbers on**
22  **the Time Warner side is not based on your review**
23  **of the transcripts of what both of them said,**
24  **but instead is based on your own calculation of**

B. Black

1  **how the $75 price target is reached, and you**
2  **don't see how the numbers add up without Kiggen**
3  **substituting his own Time Warner numbers for the**
4  **Time Warner numbers he was receiving from Laura**
5  **Martin; is that correct?**
6         MR. FOX:  Objection.
7     A.   I think there are several instances
8  where I believe that to be the case, where the
9  numbers for the Time Warner side have gone up
10  relative to what Laura Martin is saying
11  internally for reasons that I can't understand
12  since she isn't becoming more optimistic over
13  time, other than by speculating that Jamie
14  Kiggen didn't like her numbers so he substituted
15  his own.
16     Q.   **Okay.  Is it possible that there is a**
17  **reason for the discrepancy in your calculations**
18  **that is not attributable to the fact that Jamie**
19  **Kiggen used different numbers than the numbers**
20  **he was receiving for Time Warner from Laura**
21  **Martin?**
22     A.   Yes.
23     Q.   **Okay.  Returning now to --**
24     A.   Can we take a break?

B. Black

1     Q.   **Yeah, let's take a break.**
2         THE VIDEOGRAPHER:  Going off the
3  record.  The time is 2:49 p.m.
4         (Recess is taken.)
5         THE VIDEOGRAPHER:  We are back on the
6  record.  The time is 3:02 p.m.
7         This is the beginning of the tape
8  labeled No. 4.
9  BY MR. GESSER:
10     Q.   **Professor Black, before we took a**
11  **break we were going back and forth about Jamie**
12  **Kiggen's use of Laura Martin's Time Warner**
13  **numbers in the combined reports that he and**
14  **Laura Martin produced for Credit Suisse coverage**
15  **of AOL Time Warner in the 2001 time period, and**
16  **I had asked you what your basis for your belief**
17  **was that Mr. Kiggen had altered the Time Warner**
18  **numbers that he received from Laura Martin and I**
19  **think you had answered that you had done a**
20  **calculation of some kind that led you to believe**
21  **that that was the case.**
22         **And my question then to you was, is**
23  **it possible that whatever discrepancy in your**
24  **calculation is due to something other than**

B. Black

1    Mr. Kiggen altering the numbers he received from
2    Ms. Martin on Time Warner and I think your
3    answer was that it was possible.
4         Now my question to you is, do you
5    have any other evidence, other than your
6    calculation, for the view that Mr. Kiggen in
7    January or February of 2001 was altering the
8    Time Warner numbers that he received from Laura
9    Martin before he combined them with his numbers
10   for AOL to put into the joint reports that
11   Credit Suisse was issuing for AOL Time Warner in
12   that time period?
13        MR. FOX:  Objection.
14   A.   Limited to that time period, no.
15   Q.   So let's just assume for the purposes
16   of my next series of questions that Jamie Kiggen
17   used his numbers for the America Online division
18   and accepted Laura Martin's numbers for Time
19   Warner in creating the reports in the January
20   and February 2001 time period.
21   A.   So you're asking me to make an
22   assumption which I believe to be counterfactual,
23   correct?
24   Q.   Why do you believe that assumption to

B. Black

1    be counterfactual?
2    A.   Because I believe that in part he did
3    not accept her numbers for the Time Warner side.
4    Q.   Based on your calculations.
5    A.   Yes.
6    Q.   Okay.  And to the extent that it's
7    counterfactual based on your calculations, I'm
8    asking you to accept something as
9    counterfactual.
10   A.   All right.
11   Q.   Before I ask the next question, I'm
12   going to allow you to do whatever it is you
13   need to do with your Diet Coke.
14        So assuming what we just -- assuming
15   what we just agreed was an assumption that you
16   understand, if Jamie Kiggen had issued the
17   report exactly as it had been issued, the
18   reports, exactly as they had been issued in
19   January and February of 2001 with the assumption
20   that we just discussed holding, would those
21   reports, in your view, be misleading?
22        MR. FOX:  Objection.
23   A.   I'm not sure I can capture the
24   hypothetical.

B. Black

1    So if I understand the hypothetical
2    correctly, it's Jamie Kiggen says, "Okay.  I
3    know AOL.  I don't care what Laura Martin thinks
4    about AOL, but I believe her on Time Warner.
5    Let me take her Time Warner numbers, let me add
6    them to my AOL numbers and let me see what I
7    come out to in terms of revenue, in terms of
8    EBITDA, in terms of long-term growth, in terms
9    of multiples for different segments of the
10   business and in terms of overall valuation, and
11   let me publish those."
12        Now I don't know what that would look
13   like.  I think it wouldn't look the same as what
14   CSFB actually published, but if --
15   Q.   Why don't you --
16   A.   -- that hypothetical report --
17   Q.   Let me stop you there.
18        Why don't you think that would--
19        MR. FOX:  He was in the middle of an
20   answer.  I mean...
21   BY MR. GESSER:
22   Q.   Okay.
23   A.   I don't think that that
24   hypothetical report -- I would have no reason to

B. Black

1    think that that hypothetical report would not
2    reflect his true beliefs and I prefer to use
3    that phrasing rather than the phrasing of
4    misleading.
5    Q.   Okay.  Now why do you think that that
6    report would look different than the report that
7    was actually issued?
8        MR. FOX:  Objection.
9    A.   We need to pin down which report was
10   actually issued.  So we don't have a full, you
11   know, here's a full model report in January that
12   I can say oh, here's the report that they
13   actually issued.
14        Instead they, you know, issued short
15   small reports but they didn't issue a full
16   report until April, so again, I'm not sure I
17   have a complete hypothetical.
18        So if you wanted to give me a
19   particular report, I can look at that, but
20   something comparable to what she's got on
21   January 12th, they didn't issue publicly at that
22   time.
23   Q.   That's not my question.
24        I'm asking you, you indicated that

B. Black

1  you thought a report that reflected Laura
2  Martin's numbers on Time Warner and Jamie
3  Kiggen's numbers on AOL, assuming that Kiggen
4  didn't alter Martin's numbers, would look
5  different than the reports that were actually
6  issued in the January and February time frame.
7       MR. FOX:  Objection.
8  A.  Yes.
9  Q.  And I'm asking --
10 A.  That's a fair assumption.
11 Q.  And I'm asking you why.  Why do you
12 think they would look different?
13 A.  I'm not holding in my head a picture
14 of particular reports during that time frame, in
15 part because they weren't enormously detailed,
16 but it seems to me that at the least they would
17 be likely to look different as to the price
18 target because the price target is going to be
19 the sum of the value of AOL, America Online in
20 your terminology, and the value of TW, and she
21 had a lower view on the value of TW than
22 apparently he did or that would have added up to
23 a $75 or $80 price target.
24 Q.  Now you're unassuming the assumption

*(Lines 1–25 of Page 186)*

B. Black

1  that we have, right?
2       The assumption is that he's taken her
3  Time Warner numbers.
4  A.  But I don't -- if he takes all her
5  Time Warner numbers, at the least I don't see
6  how he gets the $75 price target.
7       There might be other pieces of
8  individual reports that he might not be able to
9  get to either, so I'm trying to figure out what
10 is the hypothetical report that they would have
11 issued.
12      That's why I started to ask well, can
13 you focus on a particular actual report and then
14 I might be able to have a more definite opinion
15 about what it might have said under your other
16 hypothetical assumption.
17 Q.  But you're simply resisting my
18 assumption, right?
19      My assumption is that he doesn't
20 alter her numbers at all and yet issues the same
21 report that he issued.
22      You're telling me that that's not
23 possible?
24 A.  I don't think that it's internally

*(Lines 1–25 of Page 187)*

B. Black

1  consistent.
2  Q.  Because your calculation suggests
3  that he couldn't get to his $75 price target
4  without altering her numbers, her Time Warner
5  numbers; is that right?
6       MR. FOX:  Objection.
7  A.  At least as to the $75 price target.
8  I have a recollection that the value she was
9  placing on Time Warner was significantly below a
10 value that would have been a component of the
11 $75 overall value.
12 Q.  Is there anywhere in your report you
13 discuss whether Kiggen could have reached his
14 $75 price target using Laura Martin's Time
15 Warner numbers?
16 A.  I believe I discuss in the report, if
17 I remember correctly, that -- so I'm looking at
18 the top of page 8.  I at least discuss, although
19 I don't have a table associated with this
20 statement, that, "Kiggen instead reported higher
21 numbers in multiples for TW than Martin had
22 provided to him for TW."
23 Q.  Where is that?
24 A.  That's the first carryover paragraph

*(Lines 1–25 of Page 188)*

B. Black

1  on page 8.
2       I don't think I say explicitly what
3  your question said, but I was trying to think of
4  where I have a similar concept in my report.
5  Q.  In your report you say that -- all
6  right.
7       MR. GESSER:  We're up to Black-11.
8       (Defendants' Exhibit Black 11, "Desk
9  Notes" dated 2/1/01, marked for
10 identification, as of this date.)
11 BY MR. GESSER:
12 Q.  So if you look at the -- this is
13 Black 11.
14      If you go back to Black 1 for a
15 moment --
16 A.  Okay.
17 Q.  -- your report, you say, one of your
18 assumptions, No. 2 at the top of page 4 is that,
19 "She was informed about and prepared forecasts
20 for AOL Time Warner as a whole which showed
21 lower AOL EBITDA than CSFB's published reports."
22      Do you see that?
23 A.  Yes.
24 Q.  Okay.  Looking in February 1st, 2001,

*(Lines 1–25 of Page 189)*

B. Black

1   B. Black
2   Black 11 exhibit, if you look at the third page
3   in under "Guidance," the third paragraph says,
4   "We are publishing..."
5        Do you see that?
6        MR. FOX: I'm sorry.  What page are
7   you on again?
8        MR. GESSER:  The third page of the
9   report.
10       MR. FOX: Okay.  "Guidance."
11  BY MR. GESSER:
12       Q.   "We are publishing a combined model."
13       Do you see that?
14  A.   Yes.
15       Q.   And it's got revenue of $41.5 billion
16  and EBITDA of 10.9.
17  A.   Yes.
18       Q.   And you would agree that is the
19  published CSFB reports for revenue and EBITDA
20  would be, those numbers would be encompassed by
21  what you're talking about in assumption two on
22  the top of page 4; is that right?
23  A.   Yes.  Although assumption two I think
24  was more general.  I would not take it to speak
25  to every published report during this period.

B. Black

1        B. Black
2        Q.   Okay.  Now turning back to Black-10,
3   which is the Laura Martin email to Jamie Kiggen
4   and Catherine Watters where she attaches a draft
5   report.
6   A.   Okay.
7        Q.   Okay?
8        If you go to page 14 of that draft
9   report --
10  A.   Okay.
11       Q.   -- Laura Martin has in her own report
12  she's drafted, she has her own EBITDA number.
13  A.   Yes.
14       Q.   Do you see that number?
15  A.   Yes, I do.
16       Q.   Okay.  What is that number?
17  A.   Her full year EBITDA is 11,023 and
18  that would be in millions of dollars.
19       Q.   Okay.  Which is higher than the
20  EBITDA number that appears in the February 1st
21  2001 report.
22  A.   Mechanically, yes, at an earlier date
23  and higher.
24       Q.   At an earlier date it's higher.
25  A.   It is at an earlier date and it is

B. Black

1   higher.
2        Q.   So when -- so this is an internal
3   number that she has for EBITDA which is higher
4   than a published number for Credit Suisse for
5   AOL.
6        So to the extent that is true, that
7   is inconsistent with this assumption; is that
8   right?
9        MR. FOX:  Objection.
10  A.   No.
11       Q.   Why is that not inconsistent with
12  this assumption?
13  A.   Because of the difference in time
14  frame.  First because of the difference in time
15  frame, which is that the January 12th number is
16  a number that is prepared...
17       So what I'm trying to do is compare a
18  number that was prepared when your last public
19  information was three quarters of 2001 to a
20  published number which was published after full
21  year-end information was available.
22       And what you would want to have in
23  order to see whether a particular forecast was
24  consistent with assumption two is to have both a

B. Black

1        B. Black
2   forecast and a published forecast that are at
3   effectively the same time, and these are
4   effectively not at the same time and so I'm not
5   comparing the right things.
6        Q.   But you did compare the right things?
7        MR. FOX:  Objection.
8   A.   I am -- I don't have a clear picture
9   in my mind of the basis for assumption two,
10  okay, and which specific time periods it refers
11  to.
12       Q.   But sitting here today, you can't
13  think of an example where Laura Martin's
14  internal EBITDA numbers were actually lower than
15  CSFB's published EBITDA numbers?
16  A.   Off the top of my head I am not
17  thinking of specific examples of that that would
18  have been at effectively the same point in time.
19       Q.   Do you know if there were EBITDA
20  numbers published by Credit Suisse on AOL around
21  the time of this draft report, which is January
22  12th, 2001?
23       MR. FOX:  Objection.
24  A.   I am not aware of -- I don't have in
25  my head which reports were issued on which date,

B. Black

1
2   so if you want to show them to me, please do,
3   but I don't know if there were published EBITDA
4   forecasts during January of 2001 prior to AOL
5   releasing full year 2000 numbers.
6       **Q.   So rather than -- if I represent to**
7   **you that the January CSFB reports on AOL did not**
8   **have EBITDA numbers, that wouldn't surprise you?**
9       MR. FOX: Objection.
10      A.   I would accept that representation.
11      **Q.   Okay. I'm going to represent that to**
12  **you.**
13      A.   Okay.
14      **Q.   Which means that the closest in time**
15  **that we have to this internal email in which**
16  **Laura Martin gives the $11 billion EBITDA**
17  **number, the closest one we've got is this**
18  **February 1st which is...**
19      A.   I would say not really the same time.
20      **Q.   So it's not that -- it's as close as**
21  **we can get, but it's not helpful because it's**
22  **too far apart? Is that what you're saying?**
23      A.   Yes, because there was a quarterly
24  earnings report that intervened between the two
25  dates.

B. Black

1
2       **Q.   And that's important.**
3       A.   Yes.
4       **Q.   But as you sit here today, you can't**
5   **think of where you're getting, for assumption**
6   **No. 2 on the top of page 4, where you're**
7   **getting -- where support for this assumption**
8   **comes in terms of a time comparison between**
9   **Laura Martin's private EBITDA numbers and CSFB's**
10  **public EBITDA numbers because it's clearly, in**
11  **your view, not coming from a comparison between**
12  **the EBITDA numbers in Black-10 and Black-11.**
13      A.   The support for assumption two on
14  page 4 of my report is not coming from January
15  2001, assuming your representation about the
16  lack of published EBITDA numbers is correct as I
17  am assuming.
18      **Q.   Do you know where it is coming from?**
19      A.   Off the top of my head, I do not.
20      **Q.   If looking through -- would looking**
21  **through a report help you?**
22      A.   No. I really have to look at, if
23  you will, internal documents and a fuller set of
24  published AOL reports, CSFB analyst reports on
25  AOL.

B. Black

1
2       MR. GESSER: Can we mark this as
3   Black-12.
4       (Defendants' Exhibit Black 12, "Desk
5       Notes" dated 1/16/01, marked for
6       identification, as of this date.)
7   BY MR. GESSER:
8       **Q.   Before we had been talking about what**
9   **would happen if Laura Martin's views were**
10  **published as a dissent in what was otherwise a**
11  **Jamie Kiggen report for AOL in the January 2001,**
12  **February 2001 time frame.**
13      **I think you in answering that**
14  **question postulated that it would be, in your**
15  **view, analogous to think of what would happen if**
16  **two separate reports had been issued; one with**
17  **Kiggen's views and one with Martin's views?**
18      **Is that a fair characterization of**
19  **your testimony?**
20      MR. FOX: Objection.
21      A.   Basically, yes. I analogize that to
22  a situation in which sort of we have two
23  explicitly competing reports; one authored by
24  Jamie Kiggen and one authored by Laura Martin.
25      **Q.   I think in answering my question you**

B. Black

1
2   **told me you hadn't thought about that until I**
3   **posed it to you and that you were just thinking**
4   **about it for the first time in response to my**
5   **question.**
6       MR. FOX: Objection.
7       A.   I think I said I hadn't considered
8   that particular hypothetical and therefore was,
9   you know, offering an imperfectly formed view.
10      **Q.   You ever seen analyst reports with**
11  **dissents in them or two analysts from the same**
12  **firm covering the same company simultaneously**
13  **issuing different reports?**
14      MR. FOX: Objection.
15      A.   I am aware that during this period
16  CSFB had a publication, which I think you're
17  about to show me, called the Media Daily that
18  had a more skeptical view about AOL than one
19  would see in the joint Kiggen-Martin reports.
20      **Q.   Do you think that's responsive to my**
21  **question?**
22      A.   It's certainly responsive to the
23  extent that it is not unheard of for this
24  situation to exist. I would consider it to be
25  unusual.

Page 198

1          B. Black
2      Q.   Are you aware of situations in which
3   an analyst report is published in any topic at
4   any time in any sector from any company in which
5   the analysts break out their separate views, or
6   two analysts issue, at the same firm, issue
7   simultaneous reports on the same company with
8   different views?
9          MR. FOX:  Objection.
10     A.   I am not aware of that practice.
11     Q.   And so in determining what effect
12  that may have on stock prices, would you agree
13  that that is a difficult calculation to do in
14  light of the fact that there would be little
15  precedent for examining what effect that might
16  have on stock price?
17         MR. FOX:  Objection.
18         That's not his area of expertise.
19         MR. GESSER:  I don't know.  He seemed
20  to think that he has an area of expertise
21  in indicating what may happen if there were
22  releases.
23         If he says he has no expertise on
24  that, I'm happy to move on.
25         MR. FOX:  I think your question went

Page 199

1          B. Black
2   beyond that but...
3      A.   I would agree that if one were to try
4   to form a quantitative prediction, it would be
5   difficult because of a lack of comparable
6   evidence.
7      Q.   All right.  And you indicated
8   previously, though, that you thought if Laura
9   Martin's report had been issued by itself or
10  separate from a Kiggen report issued
11  simultaneously, that in your view that that
12  report would have a negative impact on the stock
13  price.
14         MR. FOX:  Objection.
15     A.   I thought that that hypothetical
16  simultaneous publication would be likely to
17  significantly affect investors' overall views as
18  to the likelihood that AOL's sunny story in
19  which the advertising slowdown was not affecting
20  AOL would turn out to be true.
21     Q.   So without further ado, Black-12,
22  which as I think you know is a Media Daily
23  report that was issued by Credit Suisse on
24  January 16th, 2001 in which Laura Martin is
25  listed as the top analyst and provides a mini

Page 200

1          B. Black
2   report on AOL which includes a $60 price target.
3          MR. FOX:  Objection.
4   BY MR. GESSER:
5      Q.   Have you seen this document before?
6          MR. FOX:  What number is this, 12?
7          THE REPORTER:  Yes.
8      A.   I have.
9      Q.   Okay.  And do you know what the
10  residual return for AOL's share price close to
11  close was on January 16th, 2001?
12         MR. FOX:  Objection.
13     A.   I do not.
14     Q.   If I were to tell you that it wasn't
15  statistically significant, would that mean
16  anything to you?
17         MR. FOX:  Objection.
18  BY MR. GESSER:
19     Q.   In a sense would you understand what
20  I was saying, first of all, and then we can go
21  on to what the --
22     A.   I would understand what you were
23  saying, yes.
24     Q.   Okay.  So and by implication, I can
25  tell you that both Professor Stulz and

Page 201

1          B. Black
2   Dr. Hakala have done analysis of returns of AOL
3   during the class period and although they
4   disagree on many things, one of things they
5   don't disagree on is that there was not a
6   statistically significant return of AOL's stock
7   price on January 16th, 2001.
8          MR. FOX:  Objection.
9      A.   I will accept that representation.
10     Q.   Okay.  And what was -- do you know
11  what AOL's target price was -- what the CSFB
12  price for AOL was at this time according to a
13  Jamie Kiggen report?
14     A.   I believe it was either $75 or $80.
15     Q.   So --
16         MR. FOX:  Are you saying it was just
17  a Jamie Kiggen report?
18         I'm not clear in the start.  You
19  said --
20         MR. GESSER:  Okay.
21  BY MR. GESSER:
22     Q.   Well, do you know what the CSFB
23  report with Jamie Kiggen's name on it as the top
24  analyst was at this time period, in this time
25  period?

Page 202

**B. Black**

1   **B. Black**
2   A.   I believe that the price target for
3   the standalone reports on AOL authored by Jamie
4   Kiggen and Laura Martin was either $75 or $80.
5   **Q.   Okay.**
6         MR. GESSER:  I'm going to mark this
7   as Black-13.
8         (Defendants' Exhibit Black 13, "Desk
9   Notes" dated 1/16/01, marked for
10  identification, as of this date.)
11  BY MR. GESSER:
12  **Q.   Just so we don't waste time, I've**
13  **circled it.**
14        **Do you see that it's $80?**
15  A.   January 16th is $80, yes.
16  **Q.   So the difference between the price**
17  **target that is in the Kiggen report and the**
18  **price target that is in the Martin report, and I**
19  **refer to the Exhibit 13 as the Kiggen report and**
20  **Exhibit 12 as the Martin report, that's a**
21  **difference of, depending on what you're**
22  **comparing, either 25 percent or 33 percent; is**
23  **that right?**
24        MR. FOX:  Are you asking him to
25        confirm if your math is right, the

Page 203

1   B. Black
2   percentages between $60 and $80?
3         MR. GESSER:  Yes, I'm asking for his
4   expert opinion on the difference between
5   $60 and $80 in terms of his math.
6         MR. FOX:  Professor Black, can you
7   perform that calculation for Mr. Gesser?
8         MR. GESSER:  We'll double check it,
9   believe me but...
10  A.   Sixty plus twenty equals eighty the
11  last time I checked.
12  **Q.   So that's the difference of a third**
13  **of 60?**
14  A.   Eighty percent is four-thirds --
15  Eighty dollars is four-thirds of sixty dollars.
16  **Q.   So would you agree that that's a**
17  **significant difference between the two price**
18  **targets?**
19        MR. FOX:  Objection.
20  A.   I would agree that is an economically
21  significant difference between the two price
22  targets.
23  **Q.   And as I represented to you and I**
24  **think you confirmed that you are accepting my**
25  **representation, that despite the issuance of a**

Page 204

**B. Black**

1         **B. Black**
2   **price target by Ms. Martin that was 33 -- well,**
3   **that was 25 percent lower than the price target**
4   **that Mr. Kiggen had issued on the same day or in**
5   **the same time frame, that AOL stock price did**
6   **not react negatively in any statistically**
7   **significant way.**
8         MR. FOX:  Objection.
9   **Q.   Accepting that as true, does that**
10  **change your view as to whether or not it would**
11  **be likely that a report by Ms. Martin in this**
12  **time frame reflecting her true belief would have**
13  **an effect on the AOL stock price?**
14        MR. FOX:  Objection.
15  A.   Let me ask you a question.
16        Are you representing that Exhibit 13
17  was public?
18  **Q.   Yes.**
19  A.   Okay.  Even though it has these
20  things like, "Do Not Type Here" and three
21  exclamation points on it and things like this,
22  you're sure it's not a draft?
23  **Q.   Yes.**
24        **Well, let's do this:  For the purpose**
25  **of my questioning, you can assume that it was**

Page 205

1         **B. Black**
2   **made public?**
3   A.   Okay.  Or something with stray marks
4   that otherwise look like this was made public,
5   okay.
6         These look weird to me, so I don't
7   know that an investor would say well, one of
8   these is a Kiggen report and one of them is a
9   Martin report.
10        I think they would say that one of
11  them is this sort of Media Daily by Ryan Pappas
12  that has Martin's and Kiggen's name on it and
13  one of them is a standalone report that has
14  Martin's and Kiggen's name on it.
15        Would an investor really notice that
16  the order was flipped?  I'm not sure about that.
17        And so if an investor had both of
18  these together, I think the investor might be a
19  bit puzzled.
20        How many investors had both of them
21  together, I don't know.  I gather that the Media
22  Daily circulation was limited.
23        But if you had both of them together,
24  I think you would be mostly puzzled.
25  **Q.   Do your think that's responsive to my**

Page 206

B. Black

1    **B. Black**
2    question?
3        A.    Well --
4            MR. FOX:  Objection.
5        I mean I don't think it a complete
6    question by any stretch of the imagination.
7            MR. GESSER:  The question is does his
8    view change.
9            MR. FOX:  Whose view change?
10           MR. GESSER:  His view.
11           MR. FOX:  On what?
12   BY MR. GESSER:
13       Q.    Do you understand my question?
14       A.    I --
15           MR. FOX:  On the price target?
16   You're saying is his view that --
17           MR. GESSER:  You're not even
18   following the questioning.
19       Why don't you let your witness answer
20   the question.
21           MR. FOX:  Hold on.  Hold on.  Because
22   you're not posing a clear question.
23       Are you saying does the January 16th
24   Media Daily report, does that report
25   reflect Laura Martin's view as to the price

Page 207

B. Black

1        target?  Is that your question?
2            MR. GESSER:  Why don't you listen to
3    the questions because my question is pretty
4    clear.
5            MR. FOX:  Why don't you ask a fair
6    question and not an incomplete question
7    about reports which you know were not
8    really public, okay?  So why don't you just
9    be fair about it.
10           MR. GESSER:  That I know were not
11   really public?
12       I mean we can spend time on efficient
13   market theory and what is and what is not
14   public but...
15   BY MR. GESSER:
16       Q.    I'm going to ask you assuming that
17   **the Media Daily was distributed in a way that**
18   **was sufficient to satisfy public dissemination**
19   **for the purpose of the efficient market theory**
20   **and that notwithstanding its dissemination, that**
21   **there was no statistically significant impact on**
22   **AOL's stock price, does that change your view**
23   **that had a report been issued that had a dissent**
24   **from Laura Martha that indicated her views along**

Page 208

B. Black

1    **with Jamie Kiggen's views as reflected in the**
2    **January 16th CSFB report, whether that would**
3    **have an impact on the AOL stock price?**
4            MR. FOX:  Objection.
5        All of her non-public views or just
6    the price target?
7            MR. GESSER:  All of her non-public
8    views that he's aware of that were relevant
9    for his consider -- that are relevant to
10   his conclusions at this time.
11           MR. FOX:  Objection.
12       A.    Let me see if I can restate my prior
13   view and the hypothetical that I recall it is
14   being based on, which is so imagine we have two
15   competing sort of full reports with analysis and
16   explanation of how they got there, one authored
17   by Jamie Kiggen and one by Laura Martin, and
18   they come out together and CSFB says to
19   investors, here they are, make what you will of
20   both of them together, and I express the opinion
21   that it seems to me quite plausible, even
22   likely, that that would have had a -- that Laura
23   Martin's would have had a significant effect on
24   AOL's share price at that time; that opinion

Page 209

B. Black

1        would not be affected if I also knew that on
2    another date investors had received, let's
3    assume simultaneously in separate attachments to
4    the same email or however they got them, these
5    two apparently inconsistent reports because I
6    don't know that if investors got these together,
7    they would have been anything other than
8    puzzled.
9        Now maybe they might have called up
10   and said, "We don't understand," but these
11   aren't -- these aren't the same things we were
12   discussing before.  These are two very, you
13   know, very thin reports.  There's some detail on
14   subscribers in Black Exhibit 13 and a different
15   price target, but not the same detail in Black
16   Exhibit 12.
17       But I wouldn't take these as being
18   here's a Martin report and here's a Kiggen
19   report, so I don't think they would affect my
20   opinion on what would hypothetically have
21   happened if there had been two separate reports.
22       Q.    Okay.  So when you say what we were
23   **talking about before, what we were talking about**
24   **before, in your view, is some additional**

Page 210

B. Black

1   **information that Laura Martin -- about some**
2   **additional views of Laura Martin -- that Laura**
3   **Martin had about AOL over and above her price**
4   **target, which you think would have been relevant**
5   **to investors and may have caused them to change**
6   **their mind about AOL such that it could affect**
7   **AOL's stock price; is that correct?**
8       MR. FOX:  Objection.
9       A.   In part I was answering a
10  hypothetical about what I took to be fully
11  formed opinions, not here's my price target as a
12  one-sentence report and Kiggen saying no, here's
13  my price target as a one-sentence report.  That
14  wasn't the hypothetical that I was answering
15  before.
16      **Q.   Okay.  So looking at, back to**
17  **Black-9, is there anything in Black-9 that you**
18  **think could have been disclosed along with the**
19  **January 16th report from Laura Martin that would**
20  **in fact have had a negative impact on AOL's**
21  **stock price?**
22      MR. FOX:  Objection.
23      A.   I am not aware of a January 16th
24  report from Laura Martin.  I'm sorry.

Page 211

B. Black

1       **Q.   Well, what do you have in front of**
2   **you?**
3       A.   I have --
4       **Q.   What's Black-12?**
5       A.   The Media Daily.
6       **Q.   So the Media Daily.**
7       A.   I don't want to call that a Laura
8   Martin report because I don't think that's a
9   fair characterization.
10      **Q.   So what would you like to call it?**
11      A.   I would like to call it the Media
12  Daily mini report.  How's that?
13      **Q.   I'm perfectly happy with the Media**
14  **Daily mini report.**
15      A.   Okay.
16      **Q.   So is there anything in Laura**
17  **Martin's email which is marked as Black-9 which**
18  **had been disclosed in the Media Daily mini**
19  **report of January 16th that you think would have**
20  **caused AOL's stock price to go down?**
21      MR. FOX:  Objection.
22      A.   There is a...
23      (Document review.)
24      A.   Let me look at January 12th.

Page 212

B. Black

1       So I think that the detailed analysis
2   in Black Exhibit 10 of how Laura Martin got to
3   the $60 price target would be much more
4   informative to investors than simply a number;
5   that the analysis matters, not just the bottom
6   line number and it also would have been
7   important --
8       **Q.   You're into an exhibit I haven't even**
9   **asked you about yet, so can you just stick with**
10  **my question because otherwise we're going to**
11  **have to have you back here, okay?**
12      **My question was, is there anything in**
13  **nine that if disclosed you think would have an**
14  **impact on AOL's stock price?**
15      A.   I suppose my problem is that it feels
16  to me as if you are kind of moving a
17  hypothetical around because I thought the
18  hypothetical was a hypothetical Laura Martin
19  report that says here's what I believe and
20  here's why I believe it, and that would have the
21  kind of detail in it that was in the January
22  12th draft which is in Black Exhibit 10, some of
23  which is not in the January 11th draft that is
24  in Black Exhibit 9.

Page 213

B. Black

1       **Q.   I understand the predicament that**
2   **you're in, but in order to move this along, what**
3   **would be helpful for me if you were to say no**
4   **for 9 but for 10, yes, and then we can move on**
5   **to 10 rather than just saying there's stuff in**
6   **10 without answering my question, because that**
7   **makes me to have to ask the question again and**
8   **then we waste time and then I get frustrated**
9   **that we're running out of time, okay?**
10      A.   For my part, since my earlier opinion
11  was based on the January 12th report and I
12  hadn't really focused on the January 11th
13  attachment by itself, it would have taken me
14  some time to work my way through the January
15  11th attachment in order to answer your
16  question.  So I thought it was simpler and
17  faster to say with regard to the January 12th
18  attachment, there's more information there.
19      **Q.   But now you see that it wasn't**
20  **simpler and faster.  It's just simpler and**
21  **faster for you to answer my question and then we**
22  **can go on, okay?**
23      A.   I don't know.  I realize that I've
24  still not answered your question as to January

B. Black

1  11 as a whole and if you want me to sit and look
2
3  through the report, I can.
4      Q.   No.  That's fine.  You can say that,
5  "I don't have an answer to your question, I
6  would need to read the entire report" and then I
7  can decide whether I want you to spend that time
8  or not.
9      Okay?  So let's ask the question one
10  more time.
11      Is there anything in Exhibit 9, which
12  is the January 11th email and attached report,
13  that if disclosed to the market you think would
14  have had an impact on AOL stock price?
15      A.   Possibly, but to have a fuller view,
16  I would have to take a closer look at Black
17  Exhibit 9.
18      Q.   Okay.  Because you haven't read the
19  report itself in great detail with this in mind?
20      A.   That's correct.  I read the cover
21  email, but I focused principally on the one day
22  later January 12th draft report.
23      Q.   Okay.  But the January 11th report
24  was published.  The January 11th report was
25  published so it doesn't matter.  All I'm

B. Black

1
2  concerned is about the email.
3      Do you understand?
4      MR. FOX:  Objection.
5  BY MR. GESSER:
6      Q.   I don't care about the report.  All I
7  care about is what's in the email, so let me
8  reask the question.
9      Is there anything in the email that
10  is the front page of Dayton-9, I'm sorry,
11  Black-9, that if disclosed would have caused
12  AOL's stock price to drop?
13      MR. FOX:  Objection.
14      A.   So I'm trying to understand.  So
15  you're representing that the attachment to Black
16  Exhibit 9 dated January 11th was published.
17      Q.   Yes.  I'm sorry if you were confused
18  about that.
19      A.   Yes, I was confused about that.
20      Q.   Okay.  I've cleared up that confusion
21  now.
22      A.   Okay.  So January 11th was published,
23  January 12th was not.
24      Q.   Correct.
25      A.   Okay.  And the emails of course were

B. Black

1  not.
2
3      Q.   Correct.
4      A.   Okay.  Now that I understand that,
5  can I ask you to restate the question?
6      Q.   Is there anything in the email that
7  is the front page of Black-9 that if disclosed
8  to the market along with Laura Martin's Media
9  Tech Daily mini report from January 16th in your
10  view would have had a negative impact on AOL's
11  stock price?
12      MR. GESSER:  No objection, Fred?
13      A.   I don't --
14      MR. FOX:  Objection.
15      (Laughter.)
16      A.   I don't, I don't -- again, I take the
17  two January 16th reports put side by side to be
18  puzzling and not -- I don't treat one as a Laura
19  Martin report.
20      It's certainly plausible to me that a
21  public statement by Laura Martin that she was
22  seeing substantial weakness in the advertising
23  market or perhaps a public statement by the,
24  quote, U.S. media team, close quote, of CSFB to
25  that effect would have impacted the prices of

B. Black

1
2  companies that were depending on advertising,
3  including AOL.
4      Q.   Do you see six lines from the bottom
5  of the email with the line that starts
6  "Personally..."?  Do you see that?
7      A.   Yes.
8      Q.   She says, "Personally I'm okay with
9  our bullish stance until my earnings estimates
10  go negative for 2001"?
11      A.   Yes.  I do not claim to understand
12  exactly what she means by that.
13      Q.   Do you know if her earnings estimates
14  went negative in 2001 at any time in January,
15  February or March of 2001?
16      MR. FOX:  Objection.
17      A.   I'm not sure what the phrase
18  "earnings estimates go negative" means.
19      Q.   Is it possible that she means she's
20  okay with the bullish stance until such time
21  that has not happened yet?
22      MR. FOX:  Objection.
23      A.   Again, I feel uncomfortable trying to
24  interpret what she means by this sentence.
25      Q.   And yet as a whole you feel

Page 218

B. Black

1   comfortable that whatever is in that sentence,
2   that this email represents views of Laura Martin
3   that were not disclosed in the CSFB reports?
4       A.   This is certainly a piece of her
5   overall views and I do not see the level of
6   concern about the ad market in CSFB's published
7   reports on AOL that I see in Laura Martin's
8   emails.
9       Q.   But you also see that she's okay with
10  the bullish stance, or do you disregard that and
11  only pick the things that you think would be
12  helpful to plaintiffs' case?
13      MR. FOX:  Objection.
14      A.   I want to distinguish -- so the
15  question is what does she mean, I'm speculating
16  here, all right, by, "I am okay with our bullish
17  stance."
18          Does that mean she believes that it's
19  right or she believes in a world where one often
20  publishes things that one doesn't fully believe
21  anymore, that she's okay with it, that's it's
22  not absurdly unrealistic.  I don't know what she
23  means by it.
24      Q.   Have you read her deposition

Page 219

B. Black

1   transcript on this particular email to get a
2   sense of what she might mean?
3       A.   I read the deposition and I don't
4   recall her -- I don't recall testimony about
5   this particular line because I wasn't really
6   focusing on it.
7       Q.   Don't you think this line is fairly
8   important in determining whether or not her true
9   beliefs were represented in Credit Suisse's
10  reports?
11          If this line means what it looks like
12  it means, at least to me, that she was okay with
13  their numbers, I would think that would be
14  fairly important for you to do some
15  investigation on in whether -- in determining
16  whether or not her views were in fact reflective
17  in AOL's -- in the CSFB published reports for
18  AOL.
19      MR. FOX:  Objection.
20      A.   Let's see.  This statement says, "The
21  U.S. media team is out there with a bullish ad
22  stance..."
23          "Personally I am okay with our
24  bullish stance until..."

Page 220

B. Black

1       I take the sentence "Personally I am
2   okay with our bullish stance..." to be a comment
3   on the overall view of the U.S. media team about
4   the overall national ad market and I don't take
5   that to be her view that they are right.
6       I think the first paragraph strongly
7   suggests that she doesn't think that they are
8   right.
9       I'm not sure exactly what it means
10  when she then says, "Personally I'm okay with
11  it..." meaning with not changing it right now,
12  at the same time that she's writing an internal
13  email saying, hey, guys, the national ad market
14  is looking much weaker than five weeks ago and I
15  haven't said this publicly and I have some
16  doubts about the bullish stance of the U.S.
17  media team.
18      Q.   What if she said in her deposition
19  that five weeks is not a lot of data and she was
20  very unsure of the quality of the data that she
21  was getting, and therefore she was happy to go
22  along with the U.S. media team for now because
23  she thought it was improper to reach any
24  conclusions based on such weak data?

Page 221

B. Black

1       MR. FOX:  Objection.
2       A.   Do you want to show me the deposition
3   transcript?  I don't recall that particular
4   testimony.
5       Again, I wasn't focusing on this
6   particular sentence or her explanation.
7       Q.   I'm asking you what if that's what
8   it said in the deposition transcript; would that
9   change your view?
10      A.   Would that change my view on what?
11      Q.   Would that change your view on
12  whether her beliefs as reflected in this email
13  were -- should have been disclosed in Credit
14  Suisse's reports?
15      MR. FOX:  Objection.
16      A.   I think I start out being naive and
17  saying well, if something is important and you
18  didn't say it, why didn't you say it?
19      Q.   Do you think that analysts put
20  everything they think may be important into
21  their reports?
22      A.   I think they clearly make judgments
23  on what to put in their reports and what not to,
24  and when to change prior estimates and when not

B. Black

1  to and...
2
3      Q.   So if they see a trend that looks
4  like it may be something but it's too early to
5  tell what it is, is it a reasonable position for
6  them to say, I'm going to wait till I get more
7  data because I think it's improper for me to
8  draw any conclusions based on data that I think
9  is not reliable enough?
10     MR. FOX:  Objection.
11     A.   Depending on the circumstances, it
12 certainly could be.
13     Q.   Okay.  You have the Laura Martin
14 deposition in front of you.  It's Black-8.
15     A.   Okay.
16     Q.   Okay.  If you look at page 214,
17 starting with "...and I only have..."
18         Do you see that?
19         MR. FOX:  You're asking him to start
20 in the middle of an answer there?
21         MR. GESSER:  Yes.
22         MR. FOX:  Okay.
23 BY MR. GESSER:
24     Q.   Do you see this Professor Black?
25     A.   Yes.

B. Black

1
2      Q.   "...and I only have five weeks of
3  data"?
4      A.   Yes.
5      Q.   It says, "Look, guys, this might be
6  the tip of the iceberg or it might go away.
7  Maybe it's just a December phenomenon.  I'm just
8  giving them the option.  Do we want to take five
9  weeks of data and all go negative or do we want
10 to watch longer.  There's two sets of data; one
11 says everything's fine when one says that's kind
12 of starting, it could be a lead indicator for
13 something that isn't as optimistic as we thought
14 just five short weeks ago."
15         Do you see that?
16     A.   Yes.
17     Q.   Do you remember reading that?
18     A.   Yes.
19     Q.   Does this in any way inform your
20 opinion as to whether or not there was
21 information contained in the January 11th email
22 that should have been disclosed in the CSFB
23 analyst reports?
24         MR. FOX:  Objection.
25     A.   I find it -- do you want me to answer

B. Black

1
2  that question taking into account what I know
3  about Laura Martin's views in statements after
4  January 11th or excluding that in consideration?
5      So do I sort of shut the window on
6  January 11th --
7      Q.   No, no, no.  I'm not asking you to
8  shut the window.  In light of everything that
9  you want to consider.
10     A.   So I think I might react the
11 following way:  That at January 11th, Laura
12 Martin is clearly troubled by what she sees as
13 adverse developments that are important that she
14 hasn't yet said publicly.
15         We also know from later statements
16 that she was not averse to saying different
17 things publicly than she believed privately in
18 some instances.
19         And I think I read the deposition as
20 her saying okay, this is the end of 2007, let me
21 look back and see what I might have meant in
22 January 2001, and this is my reading, I suppose,
23 is let me put a spin on it as to how it might
24 have been consistent with what I was saying
25 publicly, which doesn't necessarily mean that it

B. Black

1
2  was fully consistent at the time.
3      Q.   Well, I'm not quite sure.
4          Are you suggesting that Laura Martin
5  committed perjury when she was testifying?
6      A.   No.
7      Q.   You're suggesting that she picked an
8  interpretation of her email that would have been
9  favorable to defendants' interests in this case
10 regardless of whether or not that was consistent
11 with her recollection of what she meant at the
12 time?
13     A.   I'm speculating, and this is
14 speculation, that this is six-and-a-half, almost
15 seven years later and that there are a range of
16 possible interpretations of what she might have
17 meant by this particular email, and that she's
18 giving an interpretation that is within a range
19 of plausible meanings on the side of more
20 consistent with CSFB's public statements rather
21 than an opinion that focuses on the first
22 paragraph of the email which was more
23 intentioned with this and later public
24 statements.
25     Q.   So --

**B. Black**

1
2       MR. MITCHELL:  I move to strike that
3   part of his testimony, if I can do that, or
4   I'm going to object to it because it's
5   complete speculation on your part as to
6   what her reasons were for her testimony.
7   You have absolutely no basis to have said
8   what you said, Professor Black.
9   BY MR. GESSER:
10      Q.   Let me just see if I understand what
11  you're saying.
12      What you're saying is if you credited
13  what her testimony was as being an accurate
14  reflection of what she meant, that could affect
15  your opinion, but you don't credit it as
16  accurate because you think her testimony was in
17  some way biased by virtue of her position in
18  this case.
19      MR. FOX:  Objection.
20      A.   One could certainly not rule out the
21  possibility of bias in ex post interpretation.
22      Q.   Do you know if Laura Martin has
23  financial exposure in this case?
24      A.   No.
25      Q.   Going back to your report at the top

**B. Black**

1
2   of page 4, you say "During the class period,
3   Laura Martin did not believe that AOL Time
4   Warner would meet its guidance."
5       A.   Is there a question?
6       Q.   Do you see that?
7       A.   Yes.  That's part of what assumption
8   one says.
9       Q.   What's the class period?
10      A.   My understanding is that it starts in
11  early January, it may start on January 11th, I'm
12  not sure exactly, and it ends sometime in 2002.
13      Q.   July 2002?
14      A.   I don't recall exactly.
15      Q.   I'm going to represent to you that it
16  ends in July 2002.
17      Is that what you meant, that during
18  from January 2001 to July 2002 Laura Martin did
19  not believe that AOL Time Warner would meet its
20  guidance?
21      MR. FOX:  Objection.
22      A.   Well, I'm also aware that at some
23  point during this period she became unemployed,
24  at least unemployed by CSFB.  So presumably
25  assumption one would be limited to the period

**B. Black**

1
2   when she was employed by CSFB.
3       Q.   I see.
4       So that's not -- so when you -- so
5   while we're crossing out things in your report
6   that are wrong, we can add to that the term "the
7   class period," that should be from the time that
8   Laura Martin was at Credit Suisse?
9       MR. FOX:  Objection.
10      A.   I would accept a revision that said
11  during some of the class period, or conversely I
12  do not take the assumption to have an implicit
13  word "all" in it.  It doesn't say during all of
14  the class period.
15      Q.   Okay.  All right.  That is a strained
16  reading but just for the sake of accuracy, if I
17  were to put in during the portion of the class
18  period that Laura Martin was employed by Credit
19  Suisse, would that be accurate?
20      A.   I think I would want to not offer an
21  opinion that every day during this class period
22  she had the belief stated in paragraph 1 and
23  instead saying said that, you know, based on the
24  factual record available to me, there are
25  certainly times, maybe chunks of time during the

**B. Black**

1
2   period within the class period when she was
3   employed by CSFB when she did not -- when, you
4   know, she did not believe that AOL would meet
5   its guidance or CSFB's public estimates.
6       Q.   Okay.  Let me ask you this:  From
7   October of 2001 through July of 2002, do you
8   have any basis for the assertion that Laura
9   Martin did not believe that AOL Time Warner
10  would meet its guidance?
11      A.   I don't believe that assumption one
12  makes that assertion and I do not make it.
13      Q.   Okay.  So to the extent that
14  assumption one could be read to include periods
15  of the class period after Laura Martin left
16  Credit Suisse, you would say that that is not
17  accurate.
18      MR. FOX:  Objection.
19      A.   That is not how I read this
20  assumption.
21      Q.   Let's turn to the third assumption,
22  which we haven't been giving much attention; but
23  that is, that "At least as early as March 15,
24  2001, Jamie Kiggen did not believe that AOL Time
25  Warner would meet either its guidance for CSFB

**B. Black**

1
2    public estimates or revenue and EBITDA"?
3        A.    If you're moving to a new topic, can
4    I take a short break?
5        Q.    Sure.
6        THE VIDEOGRAPHER:  Going off the
7    record.  The time is 4:13 p.m.
8        (Recess is taken.)
9        THE VIDEOGRAPHER:  We are back on the
10    record.  The time is 4:24 p.m.
11        This is the beginning of the tape
12    labeled No. 5.
13    BY MR. GESSER:
14        Q.    Just before we took a break, I was
15    asking about the third assumption that's listed
16    on the top of page 4 and I was just reading it
17    to you, but just so we're all on the same page
18    I'm going to read it to you again.
19        It says, "At least as early as March
20    15th, 2001, Jamie Kiggen did not believe that
21    AOL Time Warner would meet either its guidance
22    or CSFB's public estimates for revenue and
23    EBITDA."
24        Do you see that assumption?
25        A.    Yes.

**B. Black**

1
2        Q.    Is that an assumption that you tested
3    and/or came to a view upon or is that something
4    you simply assumed to be true irrespective of
5    what evidence you saw in the course of your work
6    on this case?
7        MR. FOX:  Objection.
8        A.    My recollection is that there is an
9    email from Jamie Kiggen dated March 15th that
10    indicates that he wanted to bring down CSFB's
11    estimates.  That's the basis for the starting
12    date there.
13        Q.    Okay.  Are there emails -- it says,
14    "At least as early as March 15th..."
15        Are there other emails or other
16    internal communications from Mr. Kiggen after
17    March 15th that also led you to believe that he
18    didn't believe that AOL Time Warner would meet
19    its guidance or CSFB's public estimates for
20    revenue and EBITDA, or is the March 15th email
21    the only document that you saw in the course of
22    your work on this case that leads you to believe
23    that Jamie Kiggen did not believe his numbers
24    for AOL Time Warner at any period in time?
25        MR. FOX:  Objection.

**B. Black**

1
2        A.    There are a series of emails over the
3    period of the second half of March, March 15th
4    through the end of March roughly, that suggest
5    to me that at that time Mr. Kiggen did not
6    believe that AOL would meet CSFB's estimates,
7    which also meant it wouldn't meet its guidance.
8        Thereafter the news from AOL only
9    gets worse and CSFB's public estimates don't
10    come down much at all until September, so it's
11    not likely that he changed his view and became
12    more optimistic about AOL as the numbers got
13    worse.
14        So it's likely that he maintained his
15    opinion throughout that period, but the only
16    documents I have, I think, are in the second
17    half of March, but then I couple that with I
18    don't see anything in -- anything much in the
19    factual record to suggest that he would have had
20    a basis for changing his views and becoming more
21    optimistic after that.
22        Q.    Okay.  Just so I understand your
23    answer, because it was for the most part not
24    responsive, other than the March 15th email, you
25    think there are other emails in the March time

**B. Black**

1
2    frame after March 15th that lead you to believe
3    that Mr. Kiggen didn't believe his own numbers
4    for AOL Time Warner, but after that you don't
5    know of any particular document that you saw
6    that would lead you to that conclusion; is that
7    correct?
8        A.    I think after that I have no reason
9    to think that his disbelief would have changed
10    given what we know happened between the end of
11    March and let's call it September 25th about AOL
12    and about CSFB's public statements.
13        Q.    All right.  So let's take a look at
14    the email I think you're referring to, which
15    we're going to mark as Black-14.
16        (Defendants' Exhibit Black 14, Series
17    of emails including email dated 3/15/01
18    from Watters to Wang and Martin, marked for
19    identification, as of this date.)
20    BY MR. GESSER:
21        Q.    Is this in fact the email that you
22    were referring to?
23        A.    The second half of this, the message
24    from Catherine Watters to Patrick Wang and Laura
25    Martin, is what I'm referring to as the March