# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re CREDIT SUISSE – AOL
SECURITIES LITIGATION

Case No. 1:02 CV 12146
(Judge Gertner)

This Document Relates To:

ALL ACTIONS

**EXPERT REBUTTAL REPORT OF REINIER KRAAKMAN**
**TO THE EXPERT REPORT OF PROFESSOR STULZ**

**A.  QUALIFICATIONS**

1.  My name is Reinier Kraakman.  I am the Ezra Ripley Thayer Professor of
Law at Harvard Law School.  My fields of teaching and research are corporate law,
corporate finance, and corporate governance.  I have written numerous academic articles
in these fields including two that address the Efficient Capital Market Hypothesis
("ECMH") and its implications for aspects of corporate and securities law.  I am broadly
familiar with the literature on market efficiency as well as econometric techniques, such
as event studies, that build upon the assumption of market efficiency.  However, I am not
a financial economist, and therefore take no position on the methodological issues raised
by the expert reports in this litigation.  A full list of my publications accompanies my
*curriculum vitae*, which is attached as Exhibit A to this Report.  The cases during the past
six years in which I have submitted expert reports are listed in Exhibit B to this Report.

2.    I am being compensated at my usual rate of $500 per hour.  My compensation is not dependent on the outcome of this litigation.

**B.    ASSIGNMENT**

3.    I have been asked by lead counsel for the lead plaintiff in the *In re Credit Suisse – AOL Securities Litigation* to opine on four issues:

  a.    whether the reports of prominent securities analysts can have a material effect on share prices in an efficient market;

  b.    whether, assuming such an effect, there is justification for treating analyst statements differently than issuer statements for purposes of fraud-on-the-market theory;

  c.    whether prices in an efficient market react only to new information bearing on share value; and, if so,

  d.    whether prices in an efficient market *necessarily* react to statements by analysts who, although capable of moving market prices, merely repeat information (or misinformation) that is already fully  disclosed to the market.

4.    In preparation for this assignment, I reviewed the Court's prior opinion in this litigation, [1] lead plaintiff's and defendants' briefs concerning class certification; the Expert Report of René M. Stulz, dated May 1, 2008; the event study attached as Exhibit B-1 to the Expert Report of Scott D. Hakala dated March 4, 2008; two Lehman Brothers

---

[1] *In re Credit Suisse--AOL Securities Litigation*, 465 F. Supp.2d 34 (D. Mass. 2006).

research reports on AOL Time Warner dated January 31, 2002 and February 20, 2002;

certain exhibits bearing on the market status of analysts James Kiggen and Laura Martin;[2]

and recent empirical research on the market effects of analyst statements. Although my

knowledge of the record is limited to these sources, I believe it to be sufficient to

complete my assignment.

**C.   EMPIRICAL RESEARCH ESTABLISHES THAT SECURITY ANALYSTS' REPORTS CAN HAVE A DISTINCT AND MATERIAL INFLUENCE ON MARKET PRICES**

5.   Numerous studies confirm the empirical finding that analyst statements can

have a significant and permanent effect on the price of securities in liquid public markets.

The Court's prior opinion in this litigation cites a half dozen empirical studies to this

effect, and observes that "a large body of academic literature suggest[s] that institutional

investors do rely on analyst reports when making decisions and these reports *do* impact

stock prices."[3]   Early research finds significant price responses to upward or downward

revisions of earnings predictions[4] and buy/sell recommendations.[5]   Other research

documents a relationship between price response and analyst ability and reputation,[6] and

between price response and reports issued by more able or better-known analysts (who,

for example, have been named to *Institutional Investor's* All-American Research Team or

have received extensive media coverage).[7]   In addition, the recommendations of analysts

---

[2]   These include Exhibit 3A to the Expert Report of René M. Stulz dated April 26, 2007, as well as the Quattrone emails marked as Quattrone Dep. Exs. 14, 15 and 16.

[3]   *In re Credit Suisse--AOL Securities Litigation*, supra note 1, at 53 n. 21.

[4]   D. Givoly and J. Lakonishok, *The information content of financial analysts' forecasts of earnings*, 13 J. Accounting & Econ.165 (1979).

[5]   E.g., Kent L. Womack, *Do brokerage analysts' recommendations have investment value?* 51 J. Fin. 137 (1996).

[6]   E.g., Scott E. Stickel, *The Anatomy of the Performance of Buy and Sell Recommendations*, Fin. Analysts J., Sept.-Oct. 1995 at 25; Qi Chen et al., *Investor learning about analyst predictive ability*, 39 J. Accounting & Econ.3 (2005).

[7]   E.g., Sarah E. Bonner et al., *Investor Reaction to Celebrity Analysts: The Case of Earnings Forecast Revisions*, at pp. 4-5. AAA 2006 Financial Accounting and Reporting Section (FARS) Meeting Paper

with "celebrity status" (as measured by media coverage) affect share prices significantly more than do those of other analysts, even controlling for professional reputation and the accuracy of past recommendations.[8] These influential analysts are in the phrase of Professors Jill Fisch and Hilary Sale, the "star[s] of the show" in the competition among investment banks for underwriting business.[9]

6.    Correlatively, one can infer whether a given analyst belongs to the influential professional elite by examining the indicia of elite status listed in the empirical literature, such as press coverage, professional prominence, and affiliation with a prominent investment bank. Particularly when these attributes all point in the same direction, they suggest strongly that an analyst is a member of the influential minority of analysts, rather than of the less prominent majority of analysts who may not move share prices through their reports and buy/sell recommendations.

7.    The two analysts at the center of this litigation—Jamie Kiggen and Laura Martin—qualify as influential analysts on the basis of the characteristics singled out by the literature. In addition to being employed by Credit Suisse, a prominent investment bank, both were listed as among *Institutional Investor's* All-American Research Team analysts for sectors relevant to AOL Time Warner, Inc. In 2000, Laura Martin was

---

Available at SSRN: *http://ssrn.com/abstract=758510* (July 2005). Cf. Stickel, supra note 6 (recommendations of less prestigious analysts have little impact on stock prices).

[8] See id.

[9] See Jill H. Fisch and Hillary A. Sale, *The Security Analyst as Agent*, 88 Iowa L. Rev. 1035, 1047 (2003). To be sure, there are credible papers that discount the influence of analysts *in general* on share prices. One well-executed study finds that "most analysts and most analyst forecasts, have no material influence on share values," and that the average price effect of all analyst statements is "systematically less material" than the price effect of issuer statements. Qi Chen et al, *The Applicability of the Fraud on the Market Presumption to Analysts' Forecasts*, at pp. 30, 37 (Duke Univ. Fuqua School of Business Faculty Research Paper No. FRPS06-226, 2005). Nevertheless, this same study also finds that analyst forecasts do significantly influence share prices on average. Id. 11-12. See also, Qi Chen et al., supra note 6, at 5. A plausible way to explain the seeming discrepancy between these two findings is simply to note that while the recommendations of the majority of sell-side analysts do not move share prices, the statements of a highly influential minority have an effect large enough to confer "average" statistical significance on the statements of the entire profession.

named as a third team member for the Cable and Entertainment Divisions, while Jamie

Kiggen was named as a third team member for the E-commerce and New Media

divisions.  In 2001, Martin was again named as a third team member for the

Entertainment Division, and Kiggen was named as a "runner-up" for the Internet Portals

and Software Division.[10]  Equally revealing, Frank Quattrone, Kiggen's future boss,

described Kiggen as Donaldson, Lufkin & Jenrette's (DLJ's) "rock star internet analyst,"

shortly after DLJ was acquired by Credit Suisse in August of 2000.[11]  Quattrone also

urged that Kiggen continue to play the role of a highly prominent analyst at Credit Suisse,

while Martin should play a "big role too," given the complexity of AOL Time Warner's

businesses.[12]

**D.    THERE IS NO JUSTIFICATION FOR DISTINGUISHING THE FRAUDULENT STATEMENTS OF ANALYSTS FROM THOSE OF ISSUERS FOR PURPOSES OF FRAUD-ON-THE-MARKET THEORY**

8.    In my opinion, there is no policy (or doctrinal) reason for distinguishing

between the statements of issuers and influential analysts for purposes of fraud-on-the-

market theory.  This Court has already canvassed the principal arguments for according

identical treatment to statements made by issuers and elite analysts who make knowingly

misleading statements, either by affirmative misrepresentation or by the fraudulent

omission of material information.[13]  Analysts presumably lack the inside information that

issuers possess about their own prospects and affairs, but analysts play a key role in

distributing, evaluating, and verifying the information that issuers disclose.  Like

investment banks, credit rating agencies, accounting firms, and similar market

---

[10] Exhibit 3A to the Expert Report of René M. Stulz dated April 26, 2007.
[11] Frank Quattrone email, Sept. 19, 2000 (Quattrone Dep. Ex.16).
[12] Frank Quattrone email, Sept. 21, 2000 (Quattrone Dep. Ex. 15).
[13] *In re Credit Suisse—AOL Securities Litigation*, supra note 1. at p. 44 & n. 9 (discussing the similar market impact of issuers' and prominent analysts' statements and omissions and noting that any differences in impact relate "to the extent of damages caused, not to whether damages have, in fact, been caused.").

institutions, securities analysts are among the "mechanisms of market efficiency" that reduce information costs for investors--not only by gathering information, but also by verifying and processing it.[14] When the market works well, analysts add value by enhancing the quality of the investor information. That is why rational investors rely on analyst reports, and one reason why well-known analysts are able to move market prices. As a general matter, then, securities analysts affect the quality and distribution of information available to investors much like issuers do through their public disclosures.

9.    Of course, analyst reports do differ from issuer disclosures in one respect: numerous analysts issue reports and recommendations about widely-traded stocks such as AOL Time Warner, and the empirical literature shows that not all analysts are created equal. The voices of elite analysts rise above those of other analysts, just as the voices of issuers dominate the voices of other market participants in most cases. In this respect, prominent analysts resemble issuers, which is precisely the policy rationale for bringing these analysts under the purview of the fraud-on-the-market theory.

E.    PRICES IN AN EFFICIENT MARKET REACT ONLY TO NEW INFORMATION
      BEARING ON SHARE VALUE

10.    All parties agree that AOL stock traded in an efficient market during the period at issue in this case. As Professor Stulz observes in his Expert Report, "In an efficient market, the disclosure of any information relevant to the value of a company can affect the stock price of a company only if that information is not already publicly known [footnote deleted]."[15] Put differently, information once revealed to the market is fully

---

[14] See Ronald J. Gilson and Reinier Kraakman, *The Mechanisms of Market Efficiency Twenty Years Later: The Hindsight Bias*, 28 J. Corp. L. 715 (2003); Ronald J. Gilson and Reinier Kraakman, *The Mechanisms of Market Efficiency*, 70 Va. L. Rev. 549 (1984).

[15] Expert Report at p. 12. Professor Stulz cites a classic article, Eugene F. Fama and Kenneth R. French, *Common Risk Factors in the Returns on Stocks and Bonds*, 33 J. Fin. Econ. 3 (1993) in support of his statement, but this definition of market efficiency has an even longer history. See id. (1984) at 554-557.

and very rapidly impounded in share price. Traders cannot make arbitrage profits on information that is public and widely understood. If precisely the same information were announced a second time, even with a great deal of fanfare, it would not affect market price.

11. The hypothesis that stale public information does not affect efficient share prices has several qualifications, however. First, it does *not* imply that a different speaker cannot affect share price by repeating substantive information that has already been publicly disclosed. Imagine, for example, that the *Wall Street Journal* repeats damning information about a CEO's personal life sometime after the identical account appears in a sensationalist tabloid of poor repute. In this case, simple repetition by the *Journal* might be expected to move share price, precisely because repetition in the *Journal* greatly enhances the story's credibility. The content and distribution of the story remain the same, but the likelihood that it is *true* greatly increases.[16] (Whether the *Journal*'s decision to republish the story is itself "new information" or whether it merely verifies information that has already been publicly disclosed is a matter of semantics.)

**F.    PRICES IN AN EFFICIENT MARKET DO NOT NECESSARILY REACT TO STATEMENTS BY ELITE ANALYSTS WHO MERELY REPEAT INFORMATION THAT IS ALREADY FULLY DISCLOSED TO THE MARKET**

12. The preceding analysis suggests the circumstances in which an elite analyst's statement is--and is not—likely to influence share price. To take an easy case, I do *not* expect price movement when an analyst merely repeats her own past report (or the report of another analyst of equal prominence), *unless* new information leads investors to

---

[16] As I discuss in an early article written with my colleague, Ronald J. Gilson, there are three dimensions of cost associated with the acquiring and using trading information: acquisition costs, processing costs, and verification costs. Gilson & Kraakman (1984), supra note 14, at 597-609. Information that is identical in content is not "the same" if it comes from an unreliable source because either it must be verified or, more likely, it must be discounted to reflect the possibility that it is incorrect.

7

expect the second report to differ from the first and investors are surprised when it does not.[17] For example, if indisputably bad news entered the market between the analyst's first and second reports, investors would expect the analyst to revise her analysis and recommendation accordingly. If she did not, investors might surmise that she had uncovered offsetting good news or that, in her view, the bad news wasn't so bad after all.

13. A second circumstance in which I would not expect an influential analyst's statement to affect share prices is when she merely repeats the issuer's prior claims and assertions, *and* the issuer itself has sufficient credibility to persuade the market of the accuracy of its statements. AOL, for example, was a large and established division of an even larger company during the period at issue here. I strongly suspect that even the market's most influential analyst could not have burnished the credibility of AOL's or AOL Time Warner's statements merely by repeating them. To return to my earlier hypothetical, I would not expect the *Wall Street Journal* to affect market price by repeating damaging information already published in the *Financial Times* (as opposed to a sensationalist tabloid), because the initial disclosure by the *Financial Times* would already have established the credibility as well as the content of the information. Similarly, an influential analyst who merely repeated AOL's highly credible disclosures would add no new information to the market, and therefore would not affect share price.

14. By contrast, consider a circumstance in which I would expect an elite analyst's recommendation to influence AOL Time Warner's share price. If a widely-

---

[17] The caveat here is important because an influential analyst's refusal to alter, say, an earnings target despite a seemingly negative intervening disclosure may actually positively influence share prices by signaling that the analyst considers the disclosure to be benign. As Professor Stulz notes in his Expert Opinion, the academic literature "has shown that there is typically no impact on the stock price of a company when an analyst reiterates his/her recommendation and price targets, *all other things being equal* [emphasis added]. Id. at pp. 9-10.

followed, and previously bullish, analyst suddenly revised her recommendation and price target for AOL Time Warner--and/or if she if she issued a negative report that differed sharply from AOL Time Warner's self-assessment or her own previous views--I would expect AOL's share price to fall. Simply put, the market would take the analyst's change of views as new information undercutting the credibility of both AOL Time Warner's statements and her own prior reports.[18]

15.    By the same logic, if an elite analyst *withheld* negative information about AOL Time Warner (including her own private assessment of its prospects) while parroting AOL Time Warner's positive self-assessment—or her own prior assessments that she no longer believed--she would in fact distort AOL Time Warner's market price in precisely the same way that AOL Time Warner would fraudulently distort its share price if it repeated an optimistic assessment of its own prospects after discovering private information that made this assessment materially misleading.

16.    Hence, if credited, Plaintiff's allegations in the present matter that Jamie Kiggen and Laura Martin withheld negative information about AOL Time Warner while repeating their prior, positive assessments of the company may form a sufficient basis for finding that their misstatements and omissions distorted AOL Time Warner's share price even if AOL Time Warner's share price did not respond to the reiterations.

17.    The market's sharply negative reaction to Lehman Brothers' February 20, 2002, rating downgrade of AOL Time Warner is telling evidence in support of this

---

[18] Put differently, if two speakers with equivalent credibility publish contradictory stories simultaneously, and readers have no reason to believe one story over the other, the market should be expected to discount both stories, muting any share price response that might otherwise have occurred. But if one speaker (say, the *Financial Times*) first publishes a positive story that raises share price, we would expect a subsequent highly negative story published by the *Wall Street Journal* (a speaker of equal credibility) to lower share prices, perhaps to their initial level.

conclusion.[19]  Absent a persuasive case for confounding events on February 20, 2002, it
seems highly plausible that Lehman Brothers' rating downgrade and accompanying
report,[20] authored by two analysts of roughly the same elite status as Kiggen and Martin,
significantly lowered AOL Time Warner's share price, despite Lehman Brothers' earlier
reports and AOL's own upbeat disclosures.

    In his Corrected Expert Report, Professor Stulz appears to argue that the February
20, 2002, Lehman Brothers rating downgrade and report on AOL Time Warner—or at
least the negative commentary on online advertising contained in this report—could not
have caused AOL Time Warner's contemporaneous decline in share price because the
same negative information had been previously disclosed in a January 31, 2002, report by
Lehman Brothers.[21]

    In my opinion, however, this argument rests on an overly simple view of market
information and the role of trusted analysts.  The February 20th report contained a
distinctly bleaker and more detailed discussion of AOL's advertising prospects than did
the January 31 report, but—still more important—the February 20th report cast AOL's
advertising difficulties as a principal basis for *lowering Lehman's rating* of AOL Time
Warner from "2 Buy" to "3 Market Perform."  The latter point means that the February
20th report could not have merely repeated the contents of the January 31st report, even if
its factual discussion had been identical (which it wasn't).  In reducing AOL Time
Warner's rating on February 20th, Lehman's analysts announced a changed interpretation
of the trading significance of facts, some of which had been previously reported.  An

---

[19] See Exhibit B-1 to the Expert Report of Scott D. Hakala, "Event Study Summary--Closing Prices", at p.
8 (showing a 7.45% decline in AOL Time Warner share price, with a highly significant t-statistic of -5.46,
upon the release date of the Lehman Brothers rating downgrade).
[20] Lehman Brothers, *AOL Time Warner*, Feb. 20, 2002.
[21] See Corrected Expert Report of René M. Stulz. ¶ 45, at p. 30.

informational intermediary such as Lehman Brothers lowers the cost of information—and hence increases its market accessibility—in at least three ways: by publicizing it, by verifying it, and by "processing" or analyzing its trading significance.[22] Lehman's February 20th report and rating downgrade not only disclosed information, but also "processed" it by publicizing a sharply revised view of its trading significance.[23]

### G. CONCLUSION

17. Thus, as discussed above, it is my opinion that: (a) the reports of prominent securities analysts can have a material effect on share prices in an efficient market; (b) there is no justification for treating analyst statements differently from issuer statements for purposes of fraud-on-the-market theory; (c) prices in an efficient market react only to new information bearing on share value; (d) however, prices in an efficient market do not *necessarily* react to statements by analysts who, although capable of moving market prices, merely repeat information (or misinformation) that is already fully disclosed to the market.

---

[22] See Gilson & Kraakman (1984), supra note 14, at 597-609. See also note 16 infra. As in my earlier hypothetical of a tabloid story republished in the *Wall St. Journal*, infra at p.7, repeated facts accompanied by a change in rating can be thought of as new information (Lehman downgrades AOL Time Warner) or as old information (deteriorating advertising revenues) newly "processed" or analyzed by Lehman, with new meaning for market traders as a result.

[23] My analysis here depends on three assumptions. The first is my earlier caveat that the February 20th report was issued on a "clean day" on which there was no other negative news that might have accounted for AOL Time Warner's stock decline.

The second assumption is that Lehman did not, in fact, convey the *same* view of the trading import of AOL's deteriorating advertising revenues in its January 31st report that it did in its February 20th report. This I believe to be well-grounded because Lehman reasserted its "2 Buy" recommendation for AOL Time Warner on January 31st. The fact that the January 31st report also reduced AOL's price target from $75.00 to $35.00 per share did not surprise the market for good reason: the old target had been set months earlier and was already stale. As the January report notes, the price target reduction was "long overdue," and was related to "significantly lower market levels and sector valuations" as the internet bubble breathed its last. In addition, the January 31st report described AOL Time Warner shares as likely to recover from then-current price levels (although "not overwhelmingly cheap").

My third assumption, which I also consider to be well-grounded, is that a fair reading of Lehman's February 20th report indicates that an increasingly bleak assessment of AOL's advertising prospects was a major factor behind Lehman's decision to downgrade AOL Time Warner.

I declare under penalty of perjury under the laws of the State of Massachusetts

and the United States of America that the foregoing is true and correct.

Executed this 16 day of July 2008 in Cambridge , Massachusetts.

Reinier Kraakman

**EXHIBIT A**

CURRICULUM VITAE OF REINIER KRAAKMAN

# CURRICULUM VITAE

**Reinier H. Kraakman**
Ezra Ripley Thayer Professor of Law

Harvard Law School
Hauser Hall 202
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138

Telephone: (617) 495-3586
Fax:        (617) 496-6118
E-mail    kraakman@law.harvard.edu

## PROFESSIONAL POSITIONS

<u>Academic</u>

Professor, Harvard Law School (1987 - ); Anton Philips Professor, Law Faculty,
University of Tilburg (2003-2004); Visiting Professor, New York University School of
Law (1996-1998); Visiting Professor, Georgetown University Law Center (1993);
Visiting Professor, Harvard Law School (1985-86); Professor, (1985-87); Associate
Professor (1984-85), and Assistant Professor (1980-84), Yale Law School.

<u>Professional</u>

Fellow of the European Corporate Governance Institute (2008 - )
Professorial Fellow, University of Tilburg (2007-2011).
International Board Member, Batya and Isachar Fischer Center for Corporate Governance
and Capital Markets Regulation, Tel Aviv (2007 - ).
Torys Visting Professor in Business Law, Dalhousie Law School (2006).
Editorial Advisory Board, *Korporativnyj Yurist* ("Corporate Counsel," (a
    Moscow law journal published by Wolters Kluwer NV) (2005).
Member, International Academic Council, University of St. Gallen,
    Switzerland  (2005 - )
Editorial Advisory Board, *The Journal of Corporate Law Studies* (2001).
Kimber Fellow, University of Toronto Law School and the Toronto Stock
Exchange (1996).
Chair, Business Associations Section of the Association of American Law
Schools (1990-91).

<u>Government</u>

Law Clerk to Judge Henry J. Friendly, U.S. Court of Appeals, Second Circuit (1979-80).

<u>Consulting</u>
Consultant on Corporate Governance, Bank for International Settlements (2004 – 2005).
Consultant to United Nations Development Program and Socialist Republic of Viet Nam on
Vietnamese company law Reform (1997-1998).

14

Consultant to the Harvard Institute for International Development, Harvard Project on Economic Reform, on Russian company law (1993-94).
Litigation consultant to several law firms on corporate and securities law issues.

**TEACHING FIELDS**

Corporate law and governance; corporate finance; corporate mergers and acquisitions; the economic analysis of corporate law.

**EDUCATION**

Yale Law School, J.D. (1979)
Harvard University, Ph.D. candidate (1973-76)
University of Frankfurt, Fulbright Fellowship (1971-72)
Harvard College, B.A., magna cum laude (1971).

**LANGUAGES**
English; German (reading and speaking); Dutch (reading only).

## PUBLICATIONS

### Books

CASES AND COMMENTARY ON THE LAW OF BUSINESS ORGANIZATION (2d. Ed.) (with William T. Allen and Guhan Subramanian) (Aspen Publishers 2006).

CASES AND COMMENTARY ON THE LAW OF BUSINESS ORGANIZATION: STATUTORY SUPPLEMENT (with William T. Allen) (Aspen Publishers 2005).

THE ANATOMY OF CORPORATE LAW: A COMPARATIVE AND FUNCTIONAL APPROACH, Reinier Kraakman, et al, eds. (Oxford University Press 2004).

CASES AND COMMENTARY ON THE LAW OF BUSINESS ORGANIZATION (with William T. Allen) (Aspen Publishers 2003).

A GUIDE TO THE RUSSIAN LAW ON JOINT STOCK COMPANIES (with Bernard S. Black and Anna S. Tarassova) (Kluwer Law International 1998).

### Articles

*Rewarding Outside Directors* (with Assaf Hamdani), 105 MICHIGAN LAW REVIEW 1677 (2007).

*Concluding Remarks on Creditor Protection*, 7 EUROPEAN BUSINESS ORGANIZATION LAW REVIEW 465 (2006).

15

*Clark's Treatise on Corporate Law: Filling Manning's Empty Towers* (with Ronald Gilson), 31 J. CORP. L. 599 (2006).

*Law and the Rise of the Firm* (with Henry Hansmann and Richard Squire), 119 HARVARD LAW REVIEW 1333 (2006).

*Takeovers in the Boardroom: Burke versus Schumpeter* (with Ronald J. Gilson), 60 THE BUSINESS LAWYER 1419 (2005).

*The New Business Entities in Evolutionary Perspective* (with Henry Hansmann and Richard Squire), 2005 UNIVERSITY OF ILLINOIS LAW REVIEW 5 (2005).

*Mome in Hindsight: How has "The Mechanisms of Market Efficiency" faired over the past 20 years?* (with Ronald J. Gilson), REGULATION, Winter 2004-2005, at 64-72.

*Disclosure and Corporate Governance: An Overview Essay*, in Guido Ferrarini, et al., eds., REFORMING COMPANY AND TAKEOVER LAW IN EUROPE 95-113 (Oxford University Press 2004).

*The End of History for Corporate Law* (with Henry Hansmann), in Jeffery Gordon and Mark Roe eds., ARE CORPORATE GOVERNANCE SYSTEMS CONVERGING? (University of Chicago Press 2004).

*The Mechanisms of Market Efficiency Twenty Years Later: The Hindsight Bias* (with Ronald J. Gilson), 28 JOURNAL OF CORPORATION LAW 215 (2003).

*Property, Contract, and Verification: The* Numerus Clausus *Problem and the Divisibility of Rights* (with Henry Hansmann), 31 JOURNAL OF LEGAL STUDIES S373 (2002).

*Delaware's Takeover Law: The Uncertain Search for Hidden Value* (with Bernard Black) 96 NORTHWESTERN LAW REVIEW 521 (2002).

*Toward a Single Model of Corporate Law?* (with Henry Hansmann), in Joseph A. McCahery et al.eds., CONVERGENCE AND DIVERSITY IN CORPORATE GOVERNANCE REGIMES AND CAPITAL MARKETS (Oxford University Press 2002).

*A Comment on the Durability of the Corporate Form.* In Paul DiMaggio ed., THE TWENTY-FIRST CENTURY FIRM: CHANGING ECONOMIC ORGANIZATION IN INTERNATIONAL PERSPECTIVE (2001).

*The End of History for Corporate Law* (with Henry Hansmann), 89 GEORGETOWN LAW JOURNAL 439 (2000).

*The Essential Role of Organizational Law* (with Henry Hansmann), 110 YALE LAW JOURNAL 387 (2000).

*Organizational Law as Asset Partitioning* (with Henry Hansmann), 44 EUROPEAN ECONOMIC REVIEW 807 (2000).

*Stock Pyramids, Cross-Ownership, Dual Class Equity: The Agency Costs of Separating Control From Cash Flow Rights* (with Lucian Bebchuk and George Triantis), in Randall Morck ed., CONCENTRATED CORPORATE OWNERSHIP (2000).

*When Companies Come Clean: Mitigation is Better Than Environmental Audit Privileges* (with Jennifer Arlen). BUSINESS LAW TODAY, January/February 2000, at pp.46-52.

*Russian Privatization and Corporate Governance: What Went Wrong?* (with Bernard Black and Anna Tarassova), 52 STANFORD LAW REVIEW 1731(2000).

*Third Party Liability* (entry in Peter Newman, ed., The New Palgrave Dictionary of Law and Economics) (1998).

*Limited Shareholder Liability* (entry in Peter Newman, ed., THE NEW PALGRAVE DICTIONARY OF LAW AND ECONOMICS) (1998).

*The Mystery of Union Shareholder Activism: Commentary on Schwab & Thomas*, in EMPLOYEE REPRESENTATION IN THE EMERGING WORKPLACE: ALTERNATIVES/SUPPLEMENTS TO COLLECTIVE BARGAINING 431-437, Samuel Estreicher, ed., (Klewer Law International: 1998).

*Controlling Corporate Misconduct: A Comparative Analysis of Alternative Corporate Incentive Regimes* (with Jennifer Arlen), 72 NEW YORK UNIVERSITY LAW REVIEW 687-779 (1997).

*Die Professionalisierung des Board* in CORPORATE GOVERNANCE 129-142, Dieter Feddersen, Peter Hommelhoff, and Uwe H. Schneider, eds. (Verlag Dr. Otto Schmidt KG, 1996).

*A Self-Enforcing Model of Corporate Law* (with Bernard Black) 109 HARVARD LAW REVIEW 1911-1979 (1996).

*Corporate Law from Scratch* (with Bernard Black and Jonathan Hay) in CORPORATE GOVERNANCE IN EASTERN EUROPE AND RUSSIA 245-302, Cheryl Grey, Roman Frydman, & Andrzej Rapacznski, eds. (Central European University Press, 1996).

*When Are Shareholder Suits in Shareholders' Interests?* (with Hyun Park and Steven Shavell), 82 GEORGETOWN LAW REVIEW 1733-1775 (1994).

*Investment Companies as Guardian Shareholders: The Place of the MSIC in the Corporate Governance Debate* (with Ronald J. Gilson), 45 STANFORD LAW REVIEW 985-1010 (1993).

*Do the Capital Markets Compel Limited Liability?* (with Henry Hansmann), 94 YALE LAW JOURNAL 427-436 (1992).

*A Procedural Focus on Unlimited Liability* (with Henry Hansmann), 106 HARVARD LAW REVIEW 446-459 (1992).

*Hands-Tying Contracts: Book Publishing, Venture Capital Financing, and Secured Debt* (with Henry Hansmann), JOURNAL OF LAW, ECONOMICS, AND ORGANIZATION 628-655 (1992).

*The Uneasy Case for Limiting Shareholder Liability in Tort* (with Henry Hansmann), 100 YALE LAW JOURNAL 1879-1934 (1991).

*Reinventing the Outside Director: An Agenda for Institutional Investors* (with Ronald J. Gilson), 43 STANFORD LAW REVIEW 863-906 (1991).

*The Legal Theory of Insider Trading Regulation in the United States*, in K. Hopt & E. Wymeerisch, eds., EUROPEAN INSIDER DEALING 39-54 (Butterworth, 1991).

*Corporate Governance and Portfolio Performance: An Agenda for Institutional Investors* (with Ronald J. Gilson), DIRECTOR'S MONTHLY, May 1991, at pp. 1-4.

*Discounted Share Prices as a Source of Acquisition Gains*, in L. Bebchuk, ed., CORPORATE LAW AND ECONOMIC ANALYSIS 29-73 (Cambridge University Press, 1990).

*What Triggers Revlon?* (with Ronald J. Gilson), 25 WAKE FOREST LAW REVIEW 37-59 (1990).

*Delaware's Intermediate Standard for Defensive Tactics: Is There Substance to the Proportionality Rule?* (with Ronald J. Gilson), 44 THE BUSINESS LAWYER 247-274 (1989).

*Auditor Liability and Information Disclosure: Discussion*, 3 JOURNAL OF ACCOUNTING, AUDITING, & FINANCE 341-348 (1988).

*Taking Discounts Seriously: The Implications of "Discounted" Share Prices as an Acquisition Motive*, 88 COLUMBIA LAW REVIEW 891-941 (1988).

*Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 JOURNAL OF LAW, ECONOMICS, AND ORGANIZATION 53-104 (1986).

*The Economic Functions of Corporate Liability*, in K. Hopt & G. Teubner, eds., CORPORATE GOVERNANCE AND DIRECTORS' LIABILITIES 178-207 (Walter de Gruyter, 1985).

*Corporate Liability Strategies and the Costs of Legal Controls*, 93 YALE LAW JOURNAL 857-898 (1984).

*The Mechanisms of Market Efficiency* (with Ronald J. Gilson), 70 VIRGINIA LAW REVIEW 549-644 (1984).

Note, *Article III Constitution and The Expanding Civil Jurisdiction of United States Magistrates: A Dissenting View*, 88 YALE LAW JOURNAL 1023-1061 (1979).

## Working Papers

*Exit, Voice, and Liability, Legal Dimensions of Organizational Structure* (with Henry Hansmann 2008).

*Incentives and Merger Activity in the 1990s: Stock Options and Real Options* (with John C. Coates IV) (2007).

*CEO turnover, Tenure, and Performance in S&P 500 Companies,* (with John C. Coates IV) (2008).

## Teaching Materials

*Commentaries and Cases on the Law of Business Organization 2005-2006 Supplement* (with William T. Allen) (Aspen Publishers 2005)

*Commentaries and Cases on the Law of Business Organization 2005-2006 Statutory Supplement* (with William T. Allen) (Aspen Publishers 2005).

Corporate Finance: Cases and Materials, Harvard Law School Mimeo (2005).

The Law and Finance of Corporate Acquisitions: 1988 & 1989 Supplements (with Ronald J. Gilson), Foundation Press.

19

**EXHIBIT B**

**EXPERT TESTIMONY PROVIDED BY REINIER KRAAKMAN OVER THE PAST FOUR YEARS**

*Gerald R. Forsythe, et al. vs. Black Hills Corporation, et al.*, Case No. 04 C 5361 (N.D. Ill. 2007)