# EXHIBIT 13

 1

 2             UNITED STATES DISTRICT COURT

 3             DISTRICT OF MASSACHUSETTS

 4     ----------------------------X

       IN RE CREDIT SUISSE - AOL      )

 5     SECURITIES LITIGATION          )

                                      )

 6                                    ) Case No. 1:02 CV 12146

       ----------------------------   (Judge Gertner)

 7                                    )

       This document relates to:      )

 8                                    )

       ALL ACTIONS                    )

 9                                    )

       ----------------------------X

10

11             VIDEOTAPED DEPOSITION

12                    OF

13             REINIER KRAAKMAN

14             New York, New York

15            Thursday, August 7, 2008

16

17

18

19

20

21

22

23

24     Reported by:

       ANNETTE ARLEQUIN, CCR, RPR

25     JOB NO. 18033

Page 2

```
 1
 2
 3
 4
 5                   August 7, 2008
 6                   9:54 a.m.
 7
 8         Videotaped deposition of REINIER
 9   KRAAKMAN, held at the offices of Davis,
10   Polk & Wardwell, 450 Lexington Avenue,
11   New York, New York, before Annette
12   Arlequin, a Certified Court Reporter, a
13   Registered Professional Reporter and a
14   Notary Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4
 5         KAPLAN FOX & KILSHEIMER LLP
 6         Attorneys for Plaintiff Bricklayers and
 7         Trowel Trades International Pension Fund,
 8         the Proposed Class and Dr. Hakala
 9            850 Third Avenue, 14th Floor
10            New York, New York   10022
11         BY: FREDERIC S. FOX, ESQ.
12             JOEL B. STRAUSS, ESQ.
13             MELINDA RODON, ESQ.
14
15
16         DAVIS, POLK & WARDWELL
17         Attorneys for Defendants Credit Suisse
18         First Boston LLC and Credit Suisse First
19         Boston USA
20            450 Lexington Avenue
21            New York, New York  10017
22         BY: DANIEL J. SCHWARTZ, ESQ.
23             AVI GESSER, ESQ.
24             MELISSA OLIVER, ESQ.
25             WILLOW D. CRYSTAL, ESQ.
```

Page 4

```
 1
 2   A P P E A R A N C E S (Cont'd.):
 3
 4
 5      SKADDEN ARPS SLATE, MEAGHER & FLOM LLP
 6      Attorneys for Laura Martin
 7         Four Times Square
 8         New York, New York  10036
 9      BY:  MICHAEL W. MITCHELL, ESQ.
10
11
12   ALSO PRESENT:
13
14         MICHAEL PINEIRO, Legal Video Specialist
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2         IT IS HEREBY STIPULATED AND AGREED,
 3   by and between the attorneys for the
 4   respective parties herein, that filing
 5   and sealing be and the same are hereby
 6   waived
 7         IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the
 9   form of the question, shall be reserved
10   to the time of the trial.
11         IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn
13   to and signed before any officer
14   authorized to administer an oath, with
15   the same force and effect as if signed
16   and sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

Page 6

1          * Proceedings *
2          THE VIDEOGRAPHER:  This is the start
3    of the tape labeled No. 1 of the videotaped
4    deposition of Reinier Kraakman in the
5    matter of In Re Credit Suisse - AOL
6    Securities Litigation.
7          This deposition is being held at 450
8    Lexington Avenue, New York, New York on
9    August 7th, 2008 at approximately 9:54 a.m.
10          My name is Michael Pineiro from TSG
11    Reporting, Inc.  I'm the legal video
12    specialist.
13          The court reporter is Annette
14    Arlequin in association with TSG Reporting.
15          Will counsel please introduce
16    yourselves.
17          MR. SCHWARTZ:  Daniel Schwartz,
18    Davis, Polk & Wardwell, for the Credit
19    Suisse defendants.
20          MR. GESSER:  Avi Gesser, Davis, Polk
21    & Wardwell, for the Credit Suisse
22    defendants.
23          MS. CRYSTAL:  Willow Crystal, Davis,
24    Polk & Wardwell, for the Credit Suisse
25    defendants.

Page 7

1          * Proceedings *
2          MR. MITCHELL:  Michael Mitchell,
3    Skadden, Arps, for Laura Martin.
4          MR. FOX:  Frederic Fox, Kaplan Fox &
5    Kilsheimer, for the plaintiffs.
6          MS. RODON:  Melinda Rodon, Kaplan Fox
7    & Kilsheimer, for the lead plaintiff.
8          MR. STRAUSS:  Joel Strauss of Kaplan
9    Fox & Kilsheimer for the lead plaintiff.
10          THE VIDEOGRAPHER:  Will the court
11    reporter please swear in the witness.
12          *     *     *
13    R E I N I E R   K R A A K M A N,  called as a
14    witness, having been duly sworn by a
15    Notary Public, was examined and testified
16    as follows:
17    EXAMINATION BY
18    MR. SCHWARTZ:
19          Q.   Professor Kraakman, as I've said, my
20    name is Daniel Schwartz.  I'm with the firm of
21    Davis, Polk and we're representing the Credit
22    Suisse defendants in this case.
23          Have you ever been deposed before?
24          A.   Yes, I have.
25          Q.   Okay.  How many times have you been

Page 8

1          R. Kraakman
2    deposed before?
3          A.   Actually only once.
4          Q.   I'm going to go over the ground rules
5    very briefly.  I take it you're probably
6    familiar with them from your last experience.
7          I'll be asking questions today,
8    you'll be giving me answers.
9          If you don't understand a question or
10    you'd like me to rephrase a question, please let
11    me know.
12          If you need a break at any time,
13    please let me know that as well.
14          And the only caveat to that is that
15    if we're in a middle of a question, I'd like you
16    to give an answer and then we could take a
17    break.
18          Is all of that clear?
19          A.   Yes.
20          Q.   Okay.  Are you represented by counsel
21    today?
22          A.   Well, I have my associates here in my
23    room.  I guess I am.
24          Q.   And by your associates, you're
25    referring to Mr. Fox and --

Page 9

1          R. Kraakman
2          A.   Mr. Fox and Joel and Melinda.
3          Q.   Okay.  Are there any medical or
4    physical conditions that would prevent you from
5    testifying truthfully and accurately today?
6          A.   No.
7          Q.   Okay.  Did you do anything to prepare
8    for your deposition today?
9          A.   I met with Fred and Melinda and Joel
10    yesterday afternoon, read over my report, read
11    over the judge's opinion, Judge Gertner's
12    opinion in this case.
13          Q.   And the meeting yesterday, was that
14    your only meeting in preparation for today's
15    deposition?
16          A.   That was my only meeting.
17          Q.   Did you have any phone calls to
18    prepare?
19          A.   No phone calls to prepare.
20          Q.   Other than the attorneys who you
21    mentioned, was anyone else at the meeting
22    yesterday?
23          A.   No.
24          Q.   Have you spoken with anyone about
25    your deposition today?

R. Kraakman

1
2     A.   No.
3     Q.   About how long did you meet
4  yesterday?
5     A.   Two, two-and-a-half hours maybe.  Two
6  hours.
7          MR. SCHWARTZ:  Can you mark this as
8     Kraakman Exhibit 1.
9          (Defendants' Exhibit Kraakman 1,
10    Expert report of Professor Kraakman, marked
11    for identification, as of this date.)
12         THE WITNESS:  Glad I got one too.
13         MR. GESSER:  Hopefully look familiar.
14         THE WITNESS:  Yes.
15 BY MR. SCHWARTZ:
16    Q.   Professor Kraakman, is this your
17 report in this case, your expert report?
18    A.   This is my expert report.
19    Q.   Can you flip to Appendix A.  Exhibit
20 A rather.  It starts on page 14.
21    A.   My curriculum vitae?
22    Q.   That's correct.
23         And this accurately reflects your CV?
24    A.   Yes.
25    Q.   Could you walk me through your, your

R. Kraakman

1
2  education from the end of high school until the
3  present?
4     A.   Okay.  I went to Harvard College,
5  graduated in 1971.
6          I then had a Fulbright in Germany.  I
7  spent a year studying sociology in Germany.
8          I came back, worked for a year in a
9  Harvard office.  It was called the Office of
10 Tests in those days.
11         And then I spent three years as a
12 graduate student in sociology at Harvard.  So
13 I'm ABD in sociology, all but dissertation in
14 sociology.
15         And then I went to Yale Law School
16 and I think that's it.  I graduated in 1979.
17    Q.   What was your major in college?
18    A.   My major in college was a joint major
19 called history and science that had a core, a
20 set of history of science courses, but also had
21 requirements on the science side and on the
22 history side.
23    Q.   Now as part of your major, did you
24 take any courses on economics?
25    A.   No, I did not.

R. Kraakman

1
2     Q.   And -- other than as part of your
3  major while you were in college, did you take
4  any economics courses?
5     A.   No, I did not.
6     Q.   Did you take any courses in
7  statistics?
8     A.   I did in graduate school in
9  sociology.
10    Q.   And in graduate school did you take
11 any economics courses?
12    A.   No, I did not.
13    Q.   What was the -- was there a
14 particular area of sociology that you were
15 focused on?
16    A.   Well, I did my oral exam on class and
17 stratification.
18    Q.   And can you elaborate on what that
19 is?
20    A.   Yeah.  That's looking at basically
21 people's backgrounds and seeing how much you can
22 predict about where they end up in society.
23 That's looking at mobility studies.  I think
24 that's a fair sampling of what that literature
25 looks like.

R. Kraakman

1
2     Q.   At any point in time in your higher
3  education, have you taken or have you studied
4  economics?
5     A.   I haven't taken any formal courses in
6  economics.
7     Q.   Have you taken any courses that
8  provided instruction on the use of econometric
9  techniques?
10    A.   Well, I mean to some extent the stat
11 course I took in sociology was helpful.
12         I had some early experience during
13 the year I spent working prior to going to
14 graduate school, processing questionnaires,
15 doing regressions.
16         I'm sorry.  What was the question
17 again?
18    Q.   Whether you had taken any courses
19 that provided instruction on the use of
20 econometric techniques.
21    A.   I suppose the only course that would
22 have been helpful in that regard would be the
23 sociology course in basic probability
24 statistics.
25    Q.   After you graduated from Yale Law

**R. Kraakman**

1
2  **School, what have you done since that time?**
3      A.   I clerked on the second circuit for
4  Henry J. Friendly, who was a senior judge at the
5  time.
6          And then I began teaching immediately
7  thereafter at Yale.  Taught there for five
8  years, moved to Cambridge and then there have
9  been some visiting teaching jobs that I've had
10 during the period of time that I've been a
11 professor at Harvard; one at NYU and one at
12 Georgetown.
13     **Q.   What do you teach at Harvard?**
14     A.   I typically teach one of four
15 courses; corporations, a course called corporate
16 finance which is not quite what a school
17 business course in corporate finance would be,
18 but it begins with four weeks devoted to Brealey
19 and Meyers, which is a standard first year
20 casebook in finance.  I think it's even cited in
21 the Stulz expert report.
22         And I teach either a theory course,
23 current issues in corporate theory, or a
24 comparative corporate law seminar.  Both of the
25 latter courses are really seminars.  They're

1                      R. Kraakman
2  not -- they're advanced seminars.  They're not a
3  large selection of courses, whereas the finance
4  course and the basics corporations course are
5  large courses.
6      **Q.   Do you ever teach securities law or**
7  **securities regulation?**
8      A.   Well, there is a little of that that
9  comes into play in the basic corporations course
10 and there is a little that comes into play in
11 the finance course.
12     **Q.   Does Harvard Law School offer a**
13 **course devoted to securities law or securities**
14 **regulation?**
15     A.   Indeed it does.
16     **Q.   Do you ever teach that course?**
17     A.   I do not.
18     **Q.   In the courses that you teach, do you**
19 **employ econometric techniques or instruct on**
20 **econometric techniques?**
21     A.   Well, sometimes I introduce -- yes, I
22 introduce articles from finance journals and
23 seminars.
24         I certainly go through the capital
25 asset pricing model and talk about event studies

1                      R. Kraakman
2  to some extent in the corporate finance course.
3          I don't do hands-on instruction in
4  doing event studies, but I talk about them and,
5  you know, give some rough sense of the
6  methodology behind them.
7      **Q.   Do you teach any courses that discuss**
8  **the role of securities analysts in the capital**
9  **markets?**
10     A.   Well, I'm sure I mention the role of
11 securities analysts in capital markets, but I
12 don't teach a course on that particular subject.
13     **Q.   In the courses that you mentioned,**
14 **the role of securities analysts and the capital**
15 **markets, is that a focus of instruction?**
16     A.   I bring in the notion of
17 informational intermediaries.  I bring in the
18 ideas that are developed in my 1984 article with
19 Ron Gilson in the course.
20         I think it's important to talk about
21 the institutions that contribute to the
22 dissemination of information and its reflection
23 in price.  Security analysts are one of those
24 institutions.
25     **Q.   So would it be fair to say that you**

1                      **R. Kraakman**
2  **discuss the role of security analysts as one of**
3  **a number of institutions?**
4      A.   That is correct.
5      **Q.   Have you ever published academic**
6  **articles?  I assume you have.  Have you?**
7      A.   Have I published academic articles?
8      **Q.   Yes.**
9      A.   Yes, it's here in the...
10     **Q.   Have any of them been published in**
11 **any economic journal?**
12     A.   Well, that depends on how you define
13 an economics journal.
14         If you look at Leo, Law of Economics
15 and Organization, there's an economics journal.
16 It's one of these cross-over journals.  Then
17 I've published an article in an economics
18 journals.
19     **Q.   And is that a peer-reviewed --**
20     A.   Also Journal of Legal Studies.
21         Yeah, that's peer-reviewed.
22     **Q.   The Leo.**
23     A.   Leo is peer-reviewed.
24     **Q.   What was the topic of the article**
25 **that you published in that journal?**

Page 18

R. Kraakman

1
2    A.   It was about gatekeepers.  Let me get
3    you the exact topic.
4          Gatekeepers:  The Anatomy of a
5    Third-Party Enforcement Strategy.
6    **Q.   And do you recall what the article**
7    **was about?**
8    A.   Oh, here's another one.  Hands-Tying
9    Contracts.  Forgot about that.  In the Journal
10   of Law, Economics and Organization, also
11   peer-reviewed.
12   **Q.   Do you recall what the gatekeeper**
13   **article was about?**
14   A.   Yeah.  It was about, it was about the
15   analysis of imposing liability on third parties
16   to control the behavior of primary wrongdoers.
17   **Q.   In any of the articles that you**
18   **published in any journal, have you ever employed**
19   **econometric techniques or have you ever employed**
20   **an event study?**
21   A.   I've never employed an event study.
22   **Q.   Okay.  Have you ever conducted an**
23   **empirical analysis in any of your published**
24   **articles on the effects of statements by**
25   **securities analysts on the price of a stock?**

Page 19

R. Kraakman

1
2    MR. FOX:  Objection to the form.
3          You can -- you may answer.  I just
4    have an objection to the form of the
5    question.
6    A.   I have not.  I'm a consumer of this
7    literature rather than a producer.
8    **Q.   Turning back to your CV, it indicates**
9    **that you served as a Kimber Fellow at the**
10   **University of Toronto Law School and the Toronto**
11   **Stock Exchange.**
12   A.   Yes.
13   **Q.   What is a Kimber Fellow?**
14   A.   That's a -- it's a temporary visiting
15   professorship position.  You teach for two weeks
16   and you get feted, and you get to spend some
17   time in Toronto.
18   **Q.   And what is the involvement of the**
19   **Kimber Fellow with the Toronto Stock Exchange?**
20   A.   I believe the Toronto stock exchange
21   is the funder and as I recall, I don't remember
22   exactly, but I believe I gave a talk to, at the
23   stock exchange to some of the, some of the
24   luminaries there.  I don't quite remember.
25   **Q.   And do you recall what the subject of**

Page 20

R. Kraakman

1
2    **your talk was?**
3    A.   I don't.
4    **Q.   You worked as a consultant for the**
5    **Bank of International Settlements?**
6    A.   Yes, yes.
7    **Q.   And what did you do in that capacity?**
8    A.   I advised them on internal corporate
9    governance, rules for the bank itself.
10   **Q.   And how long did you -- how long was**
11   **your consultancy there?**
12   A.   Oh, I think it went on over, I don't
13   know, nine months or something like that.  A
14   series of episodic meetings and exchanges of
15   drafts, things in that order.
16   **Q.   And you're a board member of the?**
17   **Batya and Isachar Fischer Center of Corporate --**
18   **for Corporate Governance and Capital Markets**
19   **Regulation in Tel Aviv?**
20   A.   I am.
21   **Q.   And what does that position entail?**
22   **What are your responsibilities?**
23   **Let me rephrase that.**
24   **What are your responsibilities as a**
25   **board member of that institution?**

Page 21

R. Kraakman

1
2    A.   Availability for consultation should
3    they need it.
4    **Q.   Have you ever been called upon to**
5    **provide a consultation?**
6    A.   No, I have not.
7    **Q.   What does that organization do?**
8    A.   Well, it is headed by a former
9    graduate student of mine and I take it it
10   promotes research in capital markets, but it's a
11   largely, my affiliation is largely honorific
12   with that institution.
13   **Q.   You mentioned earlier that -- strike**
14   **that.**
15          **You completed your course work for**
16   **your Ph.D. but you didn't complete your**
17   **dissertation; is that correct?**
18   A.   Not only did I not complete it, I did
19   not begin it.
20   **Q.   Why is that?**
21   A.   Why is that.  Let me see if -- this
22   is either a very long answer or a very short one
23   so I think I'm going to give you the short
24   answer.
25   **Q.   I think I prefer that as well.**

Page 22

R. Kraakman

1
2    A.   Okay.  I was not happy with sociology
3    as a discipline and thought that I could better
4    pursue my academic interests even as a
5    sociologist in law school.
6    Q.   Your CV says that you have served as
7    a litigation consult to several law firms on
8    corporate and securities law issues; is that
9    correct?
10   A.   That's correct.
11   Q.   What does that mean, that you've
12   served as a litigation consultant?
13   A.   I guess I've written several expert
14   reports.  I've also consulted in the sense of
15   giving advice.
16   Q.   What sort of advice have you given in
17   your role as a litigation consultant?
18       MR. FOX:  I would just object and
19       just caution the witness that to the extent
20       that Professor Kraakman's role was as a
21       consultant and not as an expert in any of
22       those cases, you shouldn't reveal the
23       nature of what you did or the identity of
24       who retained you or who the client was.
25   BY MR. SCHWARTZ:

Page 23

R. Kraakman

1
2    Q.   Let me clarify.  I'm not attempting
3    to seek any sort of privileged information.  I
4    just want to get a general sense of the kinds of
5    things that you would consult on, so you can
6    give me general answers to that question, just
7    the general types of issues.
8    A.   General types of issues.  So capital
9    market efficiency, theories of capital market
10   efficiency is one example.
11   Q.   Are there any others that you can
12   think of?
13   A.   I've talked about my views on
14   Delaware corporate law, specifically in the
15   acquisition context, and consulted on that.  The
16   construction of acquisition contracts,
17   particularly provisions.
18   Q.   How many times have you been retained
19   as an expert to issue an expert report?
20   A.   Well, only once in the last four
21   years.
22   Q.   And what case was that?
23   A.   Black Hills.
24   Q.   Is that the Forsythe case?
25   A.   That's the Forsythe case, yes.

Page 24

R. Kraakman

1
2    Q.   What was your expert opinion in that
3    case concerning?
4    A.   Earn-out clauses in acquisition
5    agreements; how to construe them, how to
6    construe this particular earn-out clause.
7    Q.   Is that something that you had prior
8    experience with, earn-out clauses?
9    A.   No, but it's something that there is
10   a literature about and I thought I had something
11   to offer in terms of making sense out of this
12   particular badly drafted agreement.
13   Q.   When you have been retained as a
14   litigation consultant either in terms of issuing
15   an expert report or serving as a consultant, do
16   you more frequently serve in that capacity on
17   behalf of plaintiffs or defendants or is it
18   about equal?
19   A.   Since -- I don't recall over the
20   entire course of my career, but in the one
21   instance besides this one, I was a consultant
22   for the plaintiff.
23   Q.   That's the Forsythe case.
24   A.   That's Forsythe case.
25   Q.   Right, but I'm saying even in cases

Page 25

R. Kraakman

1
2    in which you have not issued an expert report or
3    been retained to issue an expert report, have
4    you -- have your engagements as a consultant
5    tended to be on one side of the case or another?
6    A.   I don't believe so.  I worked as a
7    consultant on other cases recently.  I didn't
8    provide an expert report, but I was on the
9    defense side on that case.
10   Q.   So you would say that you've done
11   work on both sides?
12   A.   Yes.
13   Q.   Have you ever been found unqualified
14   to serve as an expert in a case?
15   A.   Not to my knowledge, no.
16   Q.   Has anyone ever moved to have your
17   testimony, your expert testimony precluded?
18   A.   Yes.  I think that's what happened in
19   my last consultation.  I don't know what the
20   outcome of that was.  I don't know whether --
21   it's my impression they decided not to use my
22   report, the firm that employed me.
23   Q.   Have you ever worked as a research or
24   equity securities analyst?
25   A.   No, I have not.

R. Kraakman

1
2    **Q.   Have you ever worked in the media or**
3  **entertainment industry?**
4      A.   Only to the extent that teaching law
5  can be considered as such.
6    **Q.   Have you ever worked in the Internet**
7  **or online industry?**
8      A.   No, I have not.
9    **Q.   Ever in the advertising industry?**
10     A.   No, I have not.
11   **Q.   Have you ever worked at a law firm?**
12     A.   Well, I did a summer clerkship at
13  Debevoise.
14   **Q.   Are you admitted to the bar?**
15     A.   No, I am not.  That's because I
16  haven't taken the bar by the way.
17   **Q.   And was that by choice that you...**
18     A.   That was by choice, yeah.
19   **Q.   When were you retained in this case?**
20     A.   Gee, I don't remember the exact date.
21   **Q.   Can you give an approximate date?**
22     A.   Two, two-and-a-half months ago I
23  would gab a guess.
24   **Q.   Do you recall whether it was before**
25  **or after May 1 of 2008?**

R. Kraakman

1
2      A.   May 1, 2008?  I don't recall.
3  Probably after but I don't recall.
4    **Q.   By whom were you retained?**
5      A.   I was contacted by Fred Fox here.
6    **Q.   And did you have a general**
7  **understanding of the purpose of why you were**
8  **being retained?**
9      A.   Well, I had a conversation, a general
10  conversation about the nature of the case, I
11  think a relatively brief one and then was sent
12  some documents, including, including the opinion
13  in this case, Judge Gertner's opinion.
14   **Q.   Have you worked with Mr. Fox before?**
15     A.   I have not been an expert for Mr. Fox
16  before.
17   **Q.   Have you served in a consulting**
18  **capacity?**
19     A.   I have served in a consulting
20  capacity.
21   **Q.   More than once?**
22     A.   No.
23   **Q.   And approximately when did you serve**
24  **in that consulting capacity?**
25     A.   Perhaps a year, 14 months ago.

R. Kraakman

1
2    **Q.   Was that in a securities case do you**
3  **recall?**
4      MR. FOX:  I'm going to object and,
5  you know, as you know, work that Professor
6  Kraakman has done as a consultant is not
7  discoverable, so I'll let him answer that
8  question that you just asked but, and I'll
9  listen to your other ones if you have any,
10  but that's probably about it.
11     A.   So would you repeat the question?
12   **Q.   Yes.**
13     **Was it a securities case?**
14     A.   Yes, it was.
15   **Q.   Are you being compensated for your**
16  **time in this case?**
17     A.   I am.
18   **Q.   And at what rate are you being**
19  **compensated?**
20     A.   As my report says, $500 an hour.
21   **Q.   And who is compensating you?**
22     A.   The firm of Kaplan Fox & Kilsheimer.
23   **Q.   Do you have a retention agreement**
24  **with the firm of Kaplan Fox?**
25     A.   No.

R. Kraakman

1
2    **Q.   Have you been -- have you received**
3  **anything so far for your work in this case?**
4      A.   Yes.  I received compensation for all
5  the work I did up until August 1st in this case,
6  including drafting a report.
7    **Q.   And what is the total amount of**
8  **compensation that you've received for your work**
9  **in this case to date, approximately?**
10     A.   Oh, I don't know.  Maybe 10, $11,000.
11   **Q.   Other than your hourly rate, do you**
12  **expect to receive any other compensation in**
13  **connection with your work in this case?**
14     A.   I do not.
15   **Q.   So you won't receive any**
16  **contingency -- you don't have any contingency**
17  **agreement?**
18     A.   I do not.
19   **Q.   And other than Kaplan Fox, are you**
20  **receiving compensation related to this case from**
21  **any other source?**
22     A.   No, I'm not.
23   **Q.   And is anyone else receiving**
24  **compensation based on your work in this case?**
25     A.   No, they are not.

R. Kraakman

1
2     Q.    Have you ever done any work with the
3   CBIZ Valuation Group, C-B-I-Z?
4     A.    No.
5     Q.    How many hours total did you spend
6   preparing your expert report in this case?
7     A.    Well, I guess I'd have to do the
8   math.  I can divide 10, $11,000 by 500 and, you
9   know, 22, 24 hours.  Something like that.
10    Q.    Is that more or less than you spent
11  on your report in the Black Hills case?
12    A.    Oh, it's much less.
13    Q.    And how much time did you spend in
14  Forsythe versus Black Hills, approximately, on
15  your expert report in that case?
16    A.    Well, at least twice as much time,
17  perhaps even more than that.  Maybe three times
18  as much time.  That involved a much more fact
19  specific situation.  A huge amount of
20  depositions to go through and things of that
21  nature.
22    Q.    Did anyone assist you in the
23  preparation of your report?
24        MR. FOX:  In this case?
25        MR. SCHWARTZ:  In this case, yes.

R. Kraakman

1
2     A.    No, they did not.
3     Q.    And you wrote the report yourself?
4     A.    I certainly did, yes.
5     Q.    You did all the drafts of your
6   report?
7     A.    I did all the drafts.
8     Q.    Other than the attorneys at Kaplan
9   Fox, have you spoken with anyone else about
10  your, about your report in this case?
11    A.    No, I have not.
12    Q.    Other than the attorneys with Kaplan
13  Fox, have you spoken with anyone about your
14  opinions in this case?
15    A.    No, I haven't.
16    Q.    You were coauthor of a book with
17  Bernard Black; is that correct?
18    A.    I was.
19    Q.    Are you aware that Professor Black
20  has also given an expert report in this case?
21    A.    I learned that yesterday afternoon.
22    Q.    Have you read his report?
23    A.    I have not.
24    Q.    Have you spoken with him about this
25  case?

R. Kraakman

1
2     A.    I have not.
3     Q.    Have you spoken with him since you
4   were retained in this case?
5     A.    No, I haven't.
6     Q.    Do you have a close relationship with
7   him?
8     A.    I regard him as a friend.  He's a
9   coauthor.  Close relationship, I mean I would
10  ask for a definition but...
11    Q.    Are you familiar with Scott Hakala?
12    A.    Only insofar as I've seen the summary
13  of his event studies.
14    Q.    Have you read his report in this
15  case?
16    A.    I have not read his report in this
17  case.
18    Q.    Have you ever met him or spoken to
19  him?
20    A.    I have never met him or spoken to
21  him.
22    Q.    And how about Laurentis Moray?  Have
23  you ever -- are you familiar with him?
24    A.    His name may have been mentioned to
25  me yesterday.

R. Kraakman

1
2         Is he the statistician or a
3   statistician?
4     Q.    He is a statistician.
5         MR. FOX:  I would just caution the
6   witness not to disclose any communications
7   between --
8         THE WITNESS:  I see.  Okay.
9         MR. FOX:  -- us in preparation for
10  this deposition.
11  BY MR. SCHWARTZ:
12    Q.    But you haven't spoken with Dr. Moray
13  in connection with this case?
14    A.    No.
15    Q.    Or in any other fashion?
16    A.    Not in any other connection.  Never
17  heard of the man.
18    Q.    Professor, are you a financial
19  economist?
20    A.    As I say in my report, I am not a
21  financial economist.
22    Q.    What areas are you an expert in?
23  What are your areas of expertise?
24        MR. FOX:  Objection.
25    A.    Corporate law, the interaction

                    R. Kraakman
1
2    between finance and some aspects of corporate
3    and securities law.
4        Q.    And --
5        A.    Principally corporate law.
6        Q.    And does this report draw on your
7    expertise in corporate law?
8            MR. FOX:  Objection.
9        A.    It draws on my scholarly work on
10   efficient capital markets.
11       Q.    And would you consider that to be
12   your expert -- to be part your expertise in
13   corporate law?
14       A.    In corporate law and corporate
15   finance, yes.
16       Q.    What makes you an expert in corporate
17   law in your view?
18       A.    What makes me an expert?
19       Q.    How did you develop your expertise in
20   corporate law?
21       A.    On-the-job training in the sense of
22   teaching and writing and, I don't know, reading.
23           I have a casebook, which is now in
24   its second edition.  It's coauthored with
25   Chancellor Allen, as you know used to be the

                    R. Kraakman
1
2    chancellor of the Delaware Chancery Court.
3            I teach the stuff.
4        Q.    And your expertise in the interaction
5    between corporate finance and corporate law, how
6    did you develop your expertise in that area?
7        A.    Through research.
8        Q.    Have you written a casebook on that
9    topic?
10       A.    I have not, although I wrote some of
11   the supplements to Ron Gilson's first edition of
12   corporate, corporate -- Mergers and Acquisitions
13   I guess it was called.
14       Q.    Have you ever conducted any original
15   empirical research in the areas of corporate
16   finance?
17       A.    It depends on what you mean by
18   corporate finance.
19           Yes.  I'll just answer that yes.  I
20   have two working papers with John Coates dealing
21   with target companies' decisions to be acquired
22   and the relationship between that and
23   compensation of CEOs, option compensation of
24   CEOs.
25           And also another piece looking at CEO

                    R. Kraakman
1
2    turnover and the choice between or the
3    relationship of CEO tenure to sale of the firm,
4    target firms.
5        Q.    Do either of those working papers
6    involve empirical research on the effects of
7    statements by securities analysts on stock
8    price?
9        A.    No.
10       Q.    You say you're broadly familiar with
11   the literature on market efficiency as well as
12   econometric techniques such as event studies; is
13   that correct?
14       A.    Yes.
15       Q.    What do you mean by broadly familiar?
16       A.    I'm a consumer.  I think I can
17   understand the articles produced by financial
18   economists, but I wouldn't consider myself
19   qualified to, for example, discuss alternative
20   event study methodologies or something like
21   that.
22       Q.    Would you consider yourself qualified
23   to perform an event study?
24       A.    Give me two or three days and I
25   could, yeah.  I haven't had to so far.

                    R. Kraakman
1
2        Q.    So you've never been asked to perform
3    an event study.
4        A.    No.
5        Q.    And you've never been retained as an
6    expert to opine on the effect of a particular
7    analyst statement on a particular security's
8    price?
9            MR. FOX:  Objection.
10       A.    No.
11       Q.    Did you make any assumptions in
12   preparing your expert report in this case?
13       A.    Did I make any assumptions.
14           Well, I, I assumed that -- to the
15   extent that I discussed the facts in this case,
16   I assumed that they were as the plaintiffs have
17   represented them and as I understood them to be
18   represented in Judge Gertner's opinion.
19       Q.    Did you do anything to verify those
20   assumptions other than read the opinion or speak
21   with counsel?
22       A.    I did not.  That was not what I was
23   requested to do.
24       Q.    What assumptions -- sorry.
25           Other than the assumptions that you

R. Kraakman

1  R. Kraakman
2  just spoke about with respect to the facts, did
3  you make any other assumptions in the course of
4  preparing your report or reaching your
5  conclusions in this case?
6      A.   Well, I assumed -- I don't know the
7  assumptions.  I think I mentioned -- well, could
8  you give me an example of what you mean by
9  another assumption?
10     Q.   Did you make any assumptions about
11 market conditions, for example?
12         MR. FOX:  Objection.
13 BY MR. SCHWARTZ:
14     Q.   Did you make any assumptions about
15 the content of information that was in the
16 market at any particular time as another
17 example?
18     A.   Beyond what was represented to me by
19 counsel to plaintiff and what I gleaned from
20 Judge Gertner's opinion, I didn't.  I mean I
21 assumed the methodological framework that I,
22 that comes from my 1984 article if that's
23 relevant here.
24     Q.   If any of the assumptions that you
25 made with respect to the facts, for example,

1  R. Kraakman
2  proved to be incorrect as a factual matter,
3  would it change the opinions that you expressed
4  in this report?
5         MR. FOX:  Objection.
6      A.   An example?  For example?
7      Q.   Well, for example, if the facts were
8  not as they were represented to you by
9  plaintiff's counsel but were different from
10 that, would it change?
11     A.   Well, yeah.  If there was no
12 scienter, for example on the part of the
13 security analysts involved.  I mean if -- that
14 would certainly change my analysis of the
15 applicability of the fraud-on-the-market
16 doctrine.  I just have one little throw-away
17 line about, in my report on that but...
18     Q.   So the mental state of the defendants
19 is an assumption that you made that your report
20 relies on?
21     A.   Yes.
22     Q.   Is there -- you said earlier that you
23 re-reviewed your expert report in preparation
24 for this deposition; is that correct?
25     A.   I don't think I said that but I

1          R. Kraakman
2  certainly read it over.
3      Q.   Okay.  Well, be that as it may.
4          In reading it over, did you see
5  anything in it that you wanted to change that
6  you no longer think is correct?
7      A.   I think I misspelled Hillary Sale's
8  name at one point in the report.
9      Q.   Anything of substance.
10     A.   No.
11     Q.   So you stand by all the opinions?
12     A.   I stand by all the opinions expressed
13 in the report.
14     Q.   Paragraph 4 of your report, does that
15 identify the materials that you relied on?
16     A.   Yes, it does.
17     Q.   Did you consult any other materials
18 that are not listed in this paragraph?
19     A.   No, I did not.
20     Q.   Did you review the complaint in this
21 case?
22     A.   Yes, I had a copy of the complaint.
23     Q.   Is that listed here?
24     A.   No.  I guess I overlooked that.
25     Q.   Other than the complaint, are there

1          R. Kraakman
2  any other materials that are not listed here
3  that you reviewed in preparing for your
4  assignment in this case?
5      A.   No.
6      Q.   Do you know what the allegations in
7  this case are?
8      A.   Well, I know the allegations from I
9  suppose my recollection of the complaint and of
10 course Judge Gertner's opinion.
11     Q.   And what do you understand the
12 allegations to be generally speaking?
13     A.   Well, I understand the allegations to
14 be that the Credit Suisse security analysts
15 wrote misleading, misleadingly optimistic
16 reports based -- misleading with respect to both
17 private information they had about the issuer,
18 AOL Time Warner, and with respect to their own
19 actual views about the information, the public
20 information they had and its significance for
21 Time Warner's prospects.
22     Q.   When you say "Time Warner's
23 prospects" --
24     A.   AOL --
25     Q.   -- you're referring to the combined

R. Kraakman

1    R. Kraakman
2 companies?
3      A.   I am, but specifically the AOL
4 division of it.
5      Q.   Besides the expert reports and the
6 portions of expert reports that you've
7 identified in paragraph 4, did you review any of
8 the other expert opinions in this case?
9      A.   No, I did not.
10     Q.   Other than Judge Gertner's opinion in
11 this case, did you read any other cases in
12 preparing your expert report in this case?
13     A.   No, I didn't and I wasn't asked to.
14     Q.   In connection with your expert report
15 in this case, did you read any research analyst
16 reports?
17     A.   Yes.  I read two Lehman Brothers
18 reports that I believe I identified here.
19     Q.   Did you review any Credit Suisse
20 reports?
21     A.   No, I did not.
22     Q.   Prior to your work on this case, had
23 you ever read a research analyst report?
24     A.   I would say I have at some point, but
25 I'm not a big investor in the market so I don't

R. Kraakman

1    R. Kraakman
2 quite remember when.
3      Q.   Would it be fair to say that you
4 don't routinely read research analyst reports?
5      A.   That's fair to say.
6      Q.   Now in paragraph 3 of your report you
7 list the questions you were asked to opine on;
8 is that correct?
9      A.   That is correct.
10     Q.   And did you reach a conclusion as to
11 each of these four questions?
12     A.   I did.
13     Q.   And are those conclusions listed in
14 paragraph 17 of your report?
15     A.   I believe they are, but let me just
16 check what 17 is.
17          (Document review.)
18     Q.   I think there may be two paragraph
19 17s.  I'm talking about the one on page 11.
20     A.   Yes.
21     Q.   Now other than these four questions,
22 did you form an opinion on any other issue in
23 preparing your report in this case?
24     A.   No, I did not.
25     Q.   So you did not form an opinion on

R. Kraakman

1    R. Kraakman
2 whether Credit Suisse's research in fact had an
3 effect on AOL stock price in 2001?
4          MR. FOX:  Objection.
5      A.   I think we need to rephrase that
6 question.
7      Q.   Well --
8      A.   Remember, I made the --
9      Q.   Why don't you answer the question
10 that I asked and if you don't understand it,
11 I'll try and rephrase it.  But if you do
12 understand it, please give me an answer to the
13 question I asked.
14         MR. FOX:  Well, I think he asked you
15 to rephrase the question.
16         MR. SCHWARTZ:  Well, if he asks me to
17 rephrase the question.
18         MR. FOX:  I think he did.
19     A.   Yes.  Could rephrase the question?
20     Q.   Did you form an opinion on whether
21 Credit Suisse's research in fact had an effect
22 on AOL stock price in 2001?
23         MR. FOX:  Objection.
24     A.   I think the best way to answer that
25 is that given the assumptions that I made about

R. Kraakman

1    R. Kraakman
2 what Credit Suisse knew; that is, the
3 allegations made by the plaintiffs here, one
4 could say that there was an effect.
5         Although securities prices didn't,
6 insofar as I know, change dramatically, maybe
7 there were a couple of instances where security
8 prices might have been affected by particular
9 reports.
10        But my understanding, again from
11 reading Judge Gertner's opinion and looking over
12 the, what's his name, Hakala's, summary of
13 Hakala's event studies, that those were
14 relatively dirty dates in terms of other things
15 going on in addition to Credit Suisse's reports.
16     Q.   So is it -- let me make sure I
17 understand this.
18        Is it your testimony that whether or
19 not Credit Suisse's research in fact had an
20 effect on AOL stock price is dependent on the
21 information content that the Credit Suisse
22 analysts had?
23        MR. FOX:  Objection.
24     A.   Well, it's contingent on the
25 information environment as a whole.

R. Kraakman

1
2     Q.   Well --
3     A.   In general, I think that the Credit
4     Suisse report had very little measurable effect
5     on the security prices.  I think there are a
6     couple of instances where they might have, but
7     not more than that.
8          It was my impression, based again on
9     Judge Gertner's opinion and based on actually
10    Professor Stulz' expert report, that by and
11    large most of the Credit Suisse research reports
12    simply reiterated a position that Credit Suisse
13    had taken previously or echoed information from
14    AOL Time Warner.  They were not conduits of new
15    information or misinformation in the -- new
16    information into the market.  Scratch
17    misinformation.
18    **Q.   What I'm trying to understand is,**
19    **when I asked you if you formed an opinion on**
20    **whether Credit Suisse's research in fact had an**
21    **effect on AOL stock price in 2001, what I**
22    **understood you to tell me was that if you --**
23    **that based on assumptions you made about**
24    **information that the analysts had, you could say**
25    **that they had an effect on stock price.**

R. Kraakman

1
2     **So what I'm trying to ask you is, is**
3     **it your view that if the information that they**
4     **had was one thing, then they had an effect on**
5     **stock price and if the information that they had**
6     **was different from that, different from that**
7     **assumption, then they did not have an effect on**
8     **stock price?**
9          MR. FOX:  Objection.
10    A.   It's my view that based on the
11    assumptions that I made about what information
12    they had, that if they had been fully forthright
13    and honest in writing their reports, there would
14    have been an effect on stock prices.
15         But given that they weren't, by and
16    large there was very little effect on stock
17    prices, if any at all.  Nothing I saw was
18    inconsistent with the possibility that a couple
19    of the reports might have influenced stock
20    prices but...
21    **Q.   But you didn't do any study to**
22    **determine whether those reports in fact had an**
23    **effect on stock prices?**
24    A.   No.
25    **Q.   You didn't do any econometric**

R. Kraakman

1
2     studies?
3     A.   I did not.
4     **Q.   Is it -- if everything -- if**
5     **everything the research analysts wrote in their**
6     **report, if they had been forthright, if what was**
7     **the content of their published research reports,**
8     **if you assumed that that was consistent with**
9     **their internal beliefs, would they have had an**
10    **effect on stock price in your view, on AOL stock**
11    **price?**
12         MR. FOX:  Objection.
13    A.   Now if what they had written were
14    consistent with what I assumed --
15    **Q.   But that's not what I'm asking.**
16    A.   Okay.
17    **Q.   I'm asking if you assumed that what**
18    **their internal beliefs were is consistent with**
19    **what was actually published, under those**
20    **circumstances would you believe that they had an**
21    **effect on AOL stock price?**
22         MR. FOX:  Is that a different opinion
23    you're asking for?
24         MR. SCHWARTZ:  I'm trying to
25    understand -- I'm asking the question that

R. Kraakman

1
2     I'm asking.
3          MR. FOX:  Okay.
4     BY MR. SCHWARTZ:
5     **Q.   If you understand.**
6          MR. FOX:  Objection.  I don't
7     understand the question.
8     A.   Well, let's start over.  We know that
9     by and large the Credit Suisse reports did not
10    have in almost all cases any effect on stock
11    prices.
12         If the reports were -- I mean if I
13    switch my assumption and I assume they were
14    honestly reporting their beliefs and there is no
15    merit to the allegations in this case that they
16    had private information about accounting
17    irregularities or layoffs that they did not
18    share in their reports, then there would be --
19    the reports would also have no effect on stock
20    prices, right.
21    **Q.   Okay.  Please describe the**
22    **methodology you used in reaching your**
23    **conclusions and the opinions that you express in**
24    **this report.**
25    A.   Well, I relied on what I take to be

1           R. Kraakman
2   generally accepted in the literature, in
3   finance literature, views about market
4   efficiency. I'm simply extrapolating from a
5   theory I think that I share with Professor
6   Stulz.
7           The methodology is reviewing the
8   finance, reviewing some aspects of the finance
9   literature dealing with analyst reports and
10  bringing that together with my understanding of
11  the larger finance theory and empirical research
12  dealing with market efficiency.
13      **Q.   Now are you an expert on the finance**
14  **literature dealing with the effect of securities**
15  **analyst statements on stock prices?**
16      A.   I've reviewed a portion of that
17  literature.
18      **Q.   Prior to your work in this case, were**
19  **you familiar with that literature?**
20      A.   I had read back in 1984, as you know,
21  this literature goes back to the early 1970s and
22  even before, I had read several articles, I
23  don't recall which, as part my background
24  research for my '84 article on Mechanisms of
25  Market Efficiency.

1           R. Kraakman
2      **Q.   Had you kept up to date with that**
3   **literature since your article on the Mechanisms**
4   **of Market Efficiency?**
5      A.   Not particularly until I began to
6   work on this report.
7      **Q.   So does your review of that**
8   **literature in your view make you an expert on**
9   **that literature?**
10          MR. FOX: Objection.
11      A.   Define an expert for me.
12      **Q.   Someone who is more qualified to**
13  **discuss the contents of the literature than**
14  **someone who is not an expert in that literature.**
15      A.   Well, I think I'm more qualified to
16  discuss the content of that literature than
17  someone who hasn't read the articles I've read.
18  I certainly haven't reviewed the entire
19  literature. You know, there must be 150
20  articles out there, 200 articles.
21      **Q.   Are you more of an expert than**
22  **Mr. Fox, for example, on this literature?**
23          MR. FOX: Objection.
24      A.   I have no idea.
25      **Q.   Okay. Are you more of an -- I'll**

1           **R. Kraakman**
2   **tell you I've read these articles.**
3           **Are you more of an expert than I am**
4   **on this literature?**
5      A.   Probably not. I don't know what your
6   background is and how used you are to reading
7   finance articles but...
8      **Q.   In paragraph 3B you say that the**
9   **question you address is: "Whether assuming such**
10  **an effect..." meaning an effect of the reports**
11  **of prominent securities analysts on share prices**
12  **in an efficient market "...whether there is a**
13  **justification for treating analyst statements**
14  **differently than issuer statements for purposes**
15  **of fraud-on-the-market theory."**
16          **Is that essentially what the second**
17  **question that you addressed is?**
18          MR. FOX: Well, it is what it is.
19      A.   It is what it is.
20      **Q.   What do you mean by the**
21  **fraud-on-the-market theory?**
22      A.   The theory set out in the Basic case
23  and developed in the case law since then; the
24  notion that investors are entitled to the
25  presumption of reliance on market price that's

1           R. Kraakman
2   not distorted by misrepresentations by issuers
3   or other speakers who can be expected to
4   influence the market price.
5      **Q.   Is the presumption of reliance a**
6   **legal device that basic discusses?**
7      A.   Yeah, it's a presumption. It's a
8   legal presumption.
9      **Q.   Do you have more expertise on the**
10  **presumption of reliance than someone who reads**
11  **the Basic case?**
12      A.   Well, as I say, I didn't do a
13  comprehensive review of the case law, of the
14  fraud-on-the-market theory since Basic.
15          I have read some other cases on and
16  off, but I would have to, I would have to bone
17  up on more recent case law.
18          I wasn't asked, by the way, to opine
19  about --
20      **Q.   Well, didn't you say that the**
21  **presumption of reliance was included in the**
22  **fraud-on-the-market theory?**
23      A.   Yes.
24      **Q.   And that the fraud-on-the-market**
25  **theory, the application of the**

R. Kraakman

1    **R. Kraakman**
2    **fraud-on-the-market theory was part of your**
3    **opinion, wasn't it?**
4        A.   That's true.  That's true.
5            What I'm essentially saying here is
6    that just looking at the basic opinion, and
7    which doesn't distinguish between issuers and
8    other speakers, and considering issues of
9    policy, I see no reason to distinguish analysts
10   or at least very prominent analysts from
11   issuance for fraud-on-the-market theory
12   purposes.
13       Q.   **Have you read a case called DeMarco**
14   **versus Lehman Brothers?  Are you familiar with**
15   **that case?**
16       A.   I have not read that case.  I saw a
17   reference to it, a number of references to it in
18   Judge Gertner's opinion, but I have not read it.
19       Q.   **Well.  Have you read the Lantronix case out**
20   **of the Southern District of New York?**
21       A.   No, I have not.
22       Q.   **Have you read the MetroMedia case out**
23   **of the Southern District of New York?**
24       A.   No.
25       Q.   **Have you read any cases other than --**

R. Kraakman

1
2    **have you read any cases that address the**
3    **fraud-on-the-market theory -- strike that.**
4            **Other than Judge Gertner's decision,**
5    **have you read any cases that discuss the**
6    **application of the fraud-on-the-market theory to**
7    **research analyst statements?**
8        A.   No, I have not.
9        Q.   **You said as a policy matter it's your**
10   **view that there is no reason to distinguish the**
11   **opinions of prominent securities analysts from**
12   **issuers for purposes of the fraud-on-the-market**
13   **theory.  Is that --**
14       A.   The statements, yes.
15           MR. FOX:  Objection.
16   BY MR. SCHWARTZ:
17       Q.   **What do you mean as a policy matter?**
18   **What sort of policy are you talking about?**
19       A.   Well, I assume that the principal
20   policy at stake here is the desire to protect
21   market prices from misinformation, from
22   distortions and to allow investors to rely on
23   market prices without concern that those prices
24   are manipulated by authoritative speakers.
25       Q.   **So are you referring to a regulatory**

R. Kraakman

1
2    **policy?**
3        A.   No, a social policy.
4        Q.   **Are you an expert on social policy?**
5        A.   Well, insofar as one writes about or
6    I wrote about market efficiency and the
7    institutions that serve to preserve the
8    efficiency of market prices and the information
9    content of market prices to protect investors, I
10   suppose I am an expert.
11       Q.   **Do you view the court's role -- do**
12   **you believe it's the role of the court to**
13   **implement social policy?**
14           MR. FOX:  Objection.
15       A.   I believe it's the role of the court
16   to implement social policy insofar as the policy
17   is embedded in the law that the court is
18   applying.
19       Q.   **You said that your expertise in**
20   **social policy with respect to the mechanisms of**
21   **the capital markets goes back to your work in**
22   **preparing your article in the early 1980s.**
23       A.   1984 and then a follow-up article in
24   2000 -- I guess it was published in 2003 where
25   Gilson and I revisit in the wake of the tech

R. Kraakman

1
2    bubble on the Internet bubble and the market
3    collapse that followed, the mechanisms of market
4    efficiency.
5        Q.   **Now in between your 1984 article and**
6    **your 2003 article, did you write other articles**
7    **on the mechanisms of market efficiency?**
8        A.   No, I did not.
9        Q.   **And in connection with your 2003**
10   **article, did revisiting your 1984 article, did**
11   **you review the research in the academic finance**
12   **journals about the effects of securities analyst**
13   **statements on stock prices?**
14       A.   I think I may have -- I don't recall.
15   I think I may have read one or two articles on
16   that point.
17           The thrust of the 2003 article is one
18   didn't have to turn necessarily to behavioral
19   finance, noise trading and stuff like that to
20   explain the seemingly irrational market
21   behavior.  Some of that could be explained in
22   terms of conflicts of interest on the part of
23   informational intermediaries in the market and
24   certainly financial analysts, as well as
25   investment banks fall into that category.

1          R. Kraakman
2     Q.    But you're not certain whether you in
3  fact reviewed literature relating to -- that
4  discusses the effects of securities analyst
5  statements --
6     A.    I may well have done so, Dan.  I
7  don't believe I cited any in that article.
8     Q.    But you can't recall for sure.
9     A.    I can't recall for sure.
10     Q.    Did you review any literature that
11  discusses the empirical effects -- strike that.
12          Are you aware of any literature that
13  discusses, that conducts empirical tests on
14  whether conflicts of interest bias securities
15  research in the market?
16     MR. FOX:  Objection.
17     A.    The principal article I read on that
18  point is not empirical research, it's the Jill
19  Fisch and Hillary Sale piece that I cite in the
20  report.
21          I did read a number of articles that
22  looked at the effect of financial analysts'
23  reports on stock prices however.
24     Q.    You read that in connection with your
25  2003 article or you read that in connection

1          R. Kraakman
2  with --
3     A.    I may have read something about that
4  in connection with my 2003 article.  We already
5  went through that.
6     Q.    Right.
7     A.    I certainly read something about that
8  in connection with this report.
9     Q.    Let's look at the first question:
10  "Whether the reports of prominent securities
11  analysts can have a material effect on share
12  prices in an efficient market."
13          Is that an empirical question?
14     A.    It's partly empirical and partly I
15  suppose legal, what a reasonable investor
16  consider.
17     Q.    And do you have any expertise on what
18  a reasonable investor would consider?
19     A.    I think common sense suggests that
20  any report that results in a significant
21  movement in share prices would be important to a
22  reasonable investor.
23     Q.    Do you have more expertise on that
24  common sense, on your common sense understanding
25  that you just articulated?

1          R. Kraakman
2          Do you have more expertise than the
3  ultimate fact finder that will be impaneled in
4  this case?
5     A.    No.
6     Q.    And on the empirical side, the
7  empirical component of the first question --
8     A.    Yes.
9     Q.    -- you conducted no independent
10  studies to reach your conclusion on that
11  question; is that correct?
12     A.    That's correct.
13     Q.    Let's jump to the third question:
14  "Whether prices in an efficient market react
15  only to new information bearing on share value."
16          Is that an empirical question?
17     A.    Yes.
18     Q.    And did you do any studies to
19  determine whether prices in an efficient market
20  react only to new information bearing on share
21  value?
22     A.    I think that's a definition of a
23  semi-strong efficient market.  I think it's also
24  very close to what your expert, Professor Stulz,
25  says at one point in his report.

1          R. Kraakman
2     Q.    I'm not asking whether it's correct
3  or not, I'm asking what you did to reach your
4  conclusion on that question.
5     MR. FOX:  Well, I think that's
6  actually a different question than you
7  asked the first time.
8     MR. SCHWARTZ:  Well, ultimately but
9  let me ask that question.
10     MR. FOX:  Okay.  Because I think your
11  first question was whether he did any
12  empirical research --
13     MR. SCHWARTZ:  Well, right.
14  BY MR. SCHWARTZ:
15     Q.    And your answer to that question was
16  that you did not.
17     A.    I did not.
18     Q.    So my next question then is whether
19  -- is if you did not do any empirical research
20  to answer this empirical question, what did you
21  do to form your opinion on this question?
22     A.    Well, I think all of my reading in
23  financial economics supports the conclusion,
24  it's probably definitional too, that an
25  efficient market, and we all agree the market in

R. Kraakman

1
2 AOL Time Warner was an efficient market, reacts
3 almost, almost instantaneously to public
4 information is well understood.  I think that's
5 simply, that's simply a given out there in the
6 world of financial economics and there is a huge
7 amount of literature out there that supports
8 that proposition.
9 **Q.   So is it fair to say that your**
10 **opinion to the third question, the opinion you**
11 **reached as to this third question, you're**
12 **essentially confirming that a definition that is**
13 **well understood is in fact correct?  Is that**
14 **fair to say?**
15      MR. FOX:  Objection.
16      A.   It's a little more than a definition,
17 but yes.  It's -- I mean you can't make
18 arbitrage profits on public information.  It's
19 reflected very rapidly in share price.  That's
20 based on just a mountain of research out there.
21 **Q.   And that's all part of the definition**
22 **of what it means for there to be an efficient**
23 **market, correct?**
24      A.   That's part of the definition.
25 **Q.   And your opinion in this third**

R. Kraakman

1
2 **question is that that definition is correct?**
3      A.   That definition is essentially
4 correct, yes.
5 **Q.   And to reach your conclusion on that,**
6 **you reviewed research that was conducted in.**
7 **Over a long period of time that appeared in the**
8 **financial academic journals.**
9      A.   That's correct.
10 **Q.   The last question:  "Whether prices**
11 **in an efficient market necessarily react to**
12 **statements by analysts who, although capable of**
13 **moving market prices, merely repeat information**
14 **or misinformation that is already fully**
15 **disclosed to the market."**
16      A.   Yes.
17 **Q.   Is that an empirical question?**
18      A.   Yes.
19 **Q.   And again, did you do any studies or**
20 **tests to answer that empirical question?**
21      A.   No, I did not.
22 **Q.   So what did you do to form your**
23 **conclusion on this question?**
24      A.   I recall having read some studies on
25 point, and I'd also like to point out that

R. Kraakman

1
2 that's entirely consistent with the preceding
3 assumption of what it means to have an efficient
4 market because if you simply reiterate
5 information that's already embedded in share
6 price, why should there be an effect?  I mean
7 the market has already efficiently reflected
8 this information in the share price.
9 **Q.   Now in the review of the studies that**
10 **you were talking about in connection with this**
11 **fourth question, do you feel like you canvassed**
12 **all of the relevant literature out there in**
13 **forming your opinion?**
14      A.   I feel I read enough to feel
15 confident that I was stating the consensus view
16 of the literature.
17 **Q.   How many articles did you read?**
18      A.   I don't know.  We can count them.
19 There are the seven or eight articles that I
20 cite here in working papers.
21      There's also a nice, a nice little
22 summary actually, quite a bit of empirical
23 research in Judge Gertner's opinion.  Footnote
24 21 I believe.
25      And there was also a helpful summary

R. Kraakman

1
2 of some academic articles in Professor Stulz's
3 expert report.
4 **Q.   Other than the articles that you've**
5 **cited in your report and the summary in Judge**
6 **Gertner's opinion and the summary in Professor**
7 **Stulz's report, did you read any other --**
8      A.   Not in preparation for this report.
9 **Q.   Did you read the articles that Judge**
10 **Gertner refers to to the extent that they're not**
11 **referenced in your report?**
12      A.   No, I did not.
13 **Q.   And did you read the articles that**
14 **Professor Stulz refers to to the extent that**
15 **they're not referenced in your report?**
16      A.   No, I did not.
17 **Q.   Do you view your opinion to question**
18 **D as also part of the definition of what it**
19 **means for there to be an efficient market?**
20      A.   I don't think it's purely, purely
21 definitional.  You know, it may be, but it
22 largely is, yes.
23 **Q.   Setting aside for the moment your**
24 **answer to question B, your opinion on question**
25 **B, do your opinions on questions A, C and D add**

R. Kraakman

1
2   anything to the existing literature on market
3   efficiency?
4       A.   No, they don't.
5           MR. SCHWARTZ:   Why don't we take a
6   break so that we can change the tape.
7           THE WITNESS:   Okay.
8           THE VIDEOGRAPHER:   The time is 11:18.
9   This is the end of tape labeled No. 1.   We
10  are going off the record.
11          (Recess is taken.)
12          THE VIDEOGRAPHER:   This is the start
13  of tape labeled No. 2.   The time is 11:29.
14  We are back on the record.
15  BY MR. SCHWARTZ:
16      Q.   Professor Kraakman, could you turn to
17  paragraph 5 of your report, please?
18          (Witness complies.)
19      A.   Um-hmm.
20      Q.   Now you say in that paragraph,
21  "Numerous studies confirm the empirical finding
22  that analyst statements can have a significant
23  and permanent effect on the price of securities
24  in liquid public markets."
25      A.   Um-hmm.

R. Kraakman

1
2       Q.   Do you see that?
3           Do those studies confirm that all
4   analyst statements have an effect on the price
5   of securities all the time?
6       A.   No, they do not.
7       Q.   Do these articles discuss differing
8   factors that may affect whether an analyst
9   statement has an effect on the price of the
10  securities, of securities in the public markets?
11      A.   Yes, they do.
12      Q.   What are some of those factors?
13      A.   The analyst's professional reputation
14  as represented, for example, by whether they are
15  on the institutional -- their ranking on the
16  Institutional Investor All American Team, their
17  ranking by Greenwich, the number of times
18  they're mentioned in the press.   That's the
19  Bonner, et al article.   The status of the
20  investment bank that they're affiliated with.
21  The size of the issuing company.   Those are some
22  of the considerations that seem to have an
23  effect.
24      Q.   How about the time of the month that
25  the report is issued?

R. Kraakman

1
2       A.   The time of the month.
3       Q.   Like beginning of the month or the
4   end of the month.
5       A.   I haven't read anything in particular
6   about that.
7       Q.   How about how accurate the analyst
8   had been in the past?
9       A.   Yes.   At least one of -- the Chen,
10  one of the Chen, et al papers that I cite here
11  claims that this is a kind of Bayesian learning
12  process that goes on with investors, so past
13  accuracy is important and investors learn to
14  trust analysts who are more accurate over time.
15      Q.   How about how close in time the
16  analyst statement is to an earnings release by
17  the company?
18      A.   I believe that, I believe that one of
19  the papers mentioned, and I don't recall which
20  one, that statements that are very close to
21  earnings forecasts may not have as much of an
22  effect as statements that are far removed from
23  the forecast.
24      Q.   How about --
25      A.   Earnings announcements.   I'm sorry.

R. Kraakman

1
2   I didn't mean forecast.
3       Q.   How about the number of analyst
4   reports that are issued at the same time?   Does
5   the research talk about that?
6       A.   Yes, and the research suggests that
7   the effect of several analysts is qualitatively
8   different.   If they release contemporaneous
9   reports, it's qualitatively different from the
10  release of a single analyst.
11          Now again, this is a hazy
12  recollection on my part.   Just exactly how that
13  difference cuts I assume depends on the extent
14  to which the several analysts who release
15  contemporaneous reports have the same views or
16  differing views.
17      Q.   And do you know what article
18  discusses that issue?
19      A.   No.
20      Q.   How about the content of the
21  statement itself and whether it contains a
22  revision or reiteration?   Does that affect
23  whether the statement has an effect on stock
24  price?
25      A.   I think the forecast, yes, if there

1                    R. Kraakman
2    is a revision of, you know, forecasted earnings
3    per share or there's a new price target or
4    there's most importantly perhaps a change in the
5    buy/sell recommendation, that's likely to have
6    an impact if it comes from an elite analyst.
7        Q.    And the size of the revision, how
8    significant a revision it is for an estimate of
9    rating, is that also a factor that the research
10   discusses?
11       A.    I'm sure it does but I'm not aware of
12   the particular article.
13       Q.    Is it fair to say that whether a
14   given analyst statement will impact a given
15   securities price depends on a lot of different
16   circumstances?
17       A.    I would say it's quite contextual,
18   yes, but I think there are some generalities one
19   can make and the literature does make.
20       Q.    Paragraph 5 also says that, "Other
21   research documents a relationship between price
22   response and analyst ability and reputation, and
23   between price response and reports issued by
24   more able or better-known analysts," correct?
25       A.    Um-hmm.

1                    R. Kraakman
2        Q.    And it also says that "The
3    recommendations of analysts with 'celebrity
4    status,' as measured by media coverage affect
5    share prices significantly more than do those of
6    other analysts, even controlling for
7    professional reputation and the accuracy of past
8    recommendations."
9        A.    That is I believe the Bonner, et al
10   paper.
11       Q.    And generally the research you're
12   referring to in this paragraph, you're referring
13   to the specific articles that you cite --
14       A.    Yes.
15       Q.    -- in the footnotes.
16           Now does this research, does it
17   discuss the relationship between stock price
18   response and the statement of a particular
19   analyst or is it talking about average analyst
20   statements, the average effect of analyst
21   statements?
22       A.    Well, that depends on the article one
23   refers to.  Not particular analysts by and
24   large, but analysts within a given class.
25           For example, the literature will

1                    R. Kraakman
2    contrast the All American Team analyst with the
3    lesser, the lesser reliance in the community or
4    the analysts with large numbers of mentions in
5    the press with analysts who have fewer mentions
6    in the press.  One of the articles, the other
7    Chen article we talked about, analysts in
8    general, forecasts in general.
9        Q.    How about the Womack article that you
10   cite; does that deal with average analyst
11   effect?
12       A.    I believe, I believe it does not.  I
13   believe, now I may be mistaken in my
14   recollection, it's been a while since I've
15   looked at that, but I believe that deals with
16   the research departments of, I don't know, 14
17   most prominent investment banks.
18       Q.    Would it surprise you if the Womack
19   article did deal with the average effect of
20   analyst statements on stock price?
21       A.    I believe that the effect that they
22   studied -- it would surprise me if it was all
23   analysts as opposed to a subset of analysts who
24   happen to be associated with prominent
25   investment banks because that's what I

1                    R. Kraakman
2    recollect, but I may be mistaken.
3        Q.    But your recollection is that it
4    deals with a subset, not the effect of an
5    individual analyst's statements on stock prices.
6        A.    Yes.  I believe the finding is a
7    large and permanent effect on stock prices on
8    average from the subset of analysts.
9        Q.    And do you recall what that was a
10   response to, what that effect was in response to
11   that Womack was setting?
12       A.    It may have been buy/sell, I don't
13   recall, but it was certainly one of the summary,
14   summary measures rather than the report as a
15   whole.  Buy/sell recommendations.
16       Q.    Do you recall whether it was a change
17   from the highest recommendation to the lowest
18   recommendation or from the lowest recommendation
19   to the highest recommendation?
20       A.    No, I don't.
21       Q.    You cite an article by Professors
22   Fisch and Sale that refer to the analysts as
23   "the star of the show in competition among
24   investment banks for underwriting business."
25       A.    Um-hmm.

Page 74

R. Kraakman

1
2    Q.    Do those professors conduct any
3  empirical tests in that article?  Do they
4  describe any empirical tests that they've
5  conducted that demonstrate the effect of
6  research analyst statements on stock prices?
7    A.    No, they did not conduct their own
8  empirical studies.
9    Q.    Paragraph 6 you talk about the
10  indicia of elite status for research analysts
11  and you also use the term "influential
12  professional elite."
13    A.    Um-hmm.
14    Q.    Do you mean the same thing when you
15  say an influential analyst and an elite analyst?
16    A.    Yes.
17    Q.    And in your view what does "elite
18  status" mean?
19    A.    Well, a listing as a top analyst by
20  Institutional Investor or by Greenwich or an
21  affiliation with a major investment banking
22  firm.  The same criteria that I referred to
23  earlier in the report.
24    Q.    So the three criteria I believe
25  you've identified are affiliation with a

Page 75

R. Kraakman

1
2  prominent investment bank, press coverage and
3  institutional investor ranking.  Is that fair?
4    A.    Yeah.  A Greenwich ranking, yeah.
5    Q.    Are you aware of any studies that
6  look at the effect of Greenwich rankings on
7  analyst --
8    A.    No.
9    Q.    -- effects?
10    A.    No.
11    Q.    Let's talk about press coverage.
12        How many appearances in the press is
13  required for an analyst to meet the elite
14  status?
15    A.    Well, yeah, the Bonner piece is
16  pretty interesting in that respect because it
17  suggests that there's not a linear relationship
18  between number of mentions and effect on share
19  prices, that at some point over the term of the
20  study it peaks and plateaus from that point on.
21  I mean that's just a curious, a curious effect,
22  a kind of non-linear relationship like that.
23        How many mentions?  I don't know.
24  The number 56 comes to mind.  I'm not sure but I
25  think that's the number mentioned as a cutoff.

Page 76

R. Kraakman

1
2        Now what I don't remember is exactly
3  the time frame, you know, which is probably
4  important here.  56 mentions within a lifetime
5  or, you know, year?  I assume it's in the course
6  of a study.  It must have been a year or two.
7  Something like that.
8        MR. SCHWARTZ:  Can you mark this as
9  Kraakman Exhibit 2, please.
10        (Defendant's Exhibit Kraakman 2,
11        Document entitled "Investor Reaction to
12        Celebrity Analysts:  The Case of Earnings
13        Forecast Revisions" by Sarah E. Bonner,
14        marked for identification, as of this
15        date.)
16  BY MR. SCHWARTZ:
17    Q.    Have you seen this article before?
18    A.    Yes.  This is the Bonner piece so
19  it's two years.
20    Q.    Now do you know whether this article
21  was ever published?
22    A.    I don't know whether it was ever
23  published.
24    Q.    Do you recall whether you checked to
25  see whether it was ever published?

Page 77

R. Kraakman

1
2    A.    I did not check.
3    Q.    Could you turn to page 11 of the
4  article, please.
5        (Witness complies.)
6    A.    Um-hmm.
7    Q.    So do you see where it says, "The
8  sample analysts have a mean of 48. -- it's in
9  the top paragraph about halfway down, "Sample
10  analysts have a mean of 48.67 and a median of 20
11  media appearances during the year."
12    A.    Um-hmm.
13    Q.    So do you understand that to mean
14  that Bonner found in her study that analysts,
15  that there was a median of 20 appearances in all
16  forms of media during --
17    A.    Yes.
18    Q.    -- the year of her study?
19    A.    Right.
20    Q.    And that's one year, not two years?
21    A.    Yes.  That's what she claims here.
22    Q.    So would you agree that in order to
23  be a celebrity analyst that Bonner talks about,
24  the analyst probably has to have more than 20
25  media appearances if that's the median?

Page 78

R. Kraakman

1
2    A.   If that's the median, sure.
3    Q.   Your answer to that is yes?
4    A.   Yes.
5    Q.   Incidentally, do you know how certain
6  Bonner was about the results that she and her
7  coauthors reached in this paper?
8         MR. FOX:  Objection.
9    A.   How certain?  I assume she wouldn't
10 have put this out if she weren't reasonably
11 certain of that result.
12   Q.   Do you recall her expressing any
13 caveats about her findings?
14   A.   I'm sure there are.  I don't recall
15 what they were.
16   Q.   Would you turn to page 2 of the
17 article, please.
18        (Witness complies.)
19   Q.   Towards the end of that first
20 paragraph she writes, "However, we are unable to
21 rule out that our measure of celebrity media
22 coverage is either correlated with a measurement
23 error in our proxies for forecast performance
24 and/or correlated with other unexamined
25 dimensions of forecast performance, thus an

Page 79

R. Kraakman

1
2  alternative interpretation of our results is
3  that consistent with prior work in the area,
4  market participants react more strongly to
5  forecast revisions issued by analysts with
6  superior performance."
7         Do you see where she says that?
8    A.   No, I don't, no.  What page is it on
9  again?
10   Q.   Page 2 of the article.
11   A.   Yes.  And which --
12   Q.   It's at the end of the first
13 paragraph.
14        (Document review.)
15   Q.   It's on the numbered page 2.
16        MR. FOX:  I would just say while
17 Professor Kraakman is reading that, that
18 you ought to feel free to examine the
19 document that Mr. Schwartz has given to you
20 and if you want to read it more in context,
21 I'm sure Mr. Schwartz wouldn't deny you the
22 opportunity to do that, or maybe he would.
23        (Document review.)
24   A.   Yes.
25   Q.   So is she saying that she couldn't

Page 80

R. Kraakman

1
2  rule out that the effect that she finds that's
3  attached to celebrity status may in fact be
4  attributable to something else?
5    A.   That's what she saying.
6    Q.   That's a pretty significant caveat,
7  don't you think?
8    A.   I think it's entirely standard for
9  empirical work like this.
10   Q.   Okay.  But being standard means
11 that -- strike that.
12        Okay.  Let's go back to paragraph 6
13 of your --
14   A.   Of my report.
15   Q.   Of your report.
16        Just before we go on, you just said
17 that a caveat like that is standard.
18        In other research papers that you've
19 read on the effect of research analyst reports
20 on stock price, do you recall seeing caveats
21 like that?
22   A.   I can't recall offhand in the context
23 of papers on analyst reports, but I can recall
24 instances in other finance reports where people
25 say, you know, we can't rule out explanation X,

Page 81

R. Kraakman

1
2  Y or Z.
3         And I think that's simply, that's
4  simply a good, that's simply good research
5  practice, good science to be up front about
6  hypotheses you can't rule out.  It's very rare
7  that you can rule out every other possible
8  explanation for the finding you come up with.
9    Q.   Other than the Bonner piece, are you
10 aware of any other articles that correlate
11 celebrity status with effect on stock price?
12   A.   Well, it depends on how you define
13 "celebrity status."  On the Stickel piece --
14   Q.   Well, let's leave aside the Stickel
15 piece for a second, but celebrity status as
16 measured by media appearances.
17   A.   No.  That's the only one that I know
18 of.
19   Q.   Now going back to the three, the
20 three indicia, the lead status you refer to, is
21 any one of them more important than the other in
22 your view?
23   A.   I have no view on that.
24   Q.   Did you attempt to reach a conclusion
25 on that question?

Page 82

R. Kraakman

1
2     A.    The three are highly intercorrelated
3  is my impression.  The elite status,
4  professional recognition in affiliation with a
5  major investment banking firm.  For example,
6  being on the, one place or another on the All
7  American Investor team, II's All American
8  Investor team in affiliation with a prominent
9  investment bank are pretty heavily correlated,
10 but I would... So...
11     **Q.    So is your answer you didn't attempt**
12 **to determine which of these factors is**
13 **relatively more important than the others?**
14     A.    That's correct.
15     **Q.    You said that the three factors in**
16 **your view are highly correlated with each other.**
17     **Are most research analysts at**
18 **prominent investment banks II ranked on the All**
19 **American team?**
20     A.    No.
21     **Q.    And are most research analysts at**
22 **prominent investment banks celebrities by**
23 **measure of their media appearances?**
24     A.    I suspect not.
25     **Q.    So is it fair to say that affiliation**

Page 83

R. Kraakman

1
2  **with a prominent investment firm is less**
3  **correlated with the other two indicia of elite**
4  **status?**
5     MR. FOX:  Objection.
6     A.    Now that you mention it, it seems
7  plausible.
8     **Q.    Paragraph 6 you write, "Particularly**
9  **when these attributes all point in the same**
10 **direction, they suggest strongly than an analyst**
11 **is a member of the influential minority of**
12 **analysts rather than of the less prominent**
13 **majority of analysts who may not move share**
14 **prices through their reports and buy/sell**
15 **recommendations."**
16     A.    Um-hmm.
17     **Q.    Now is it your view that**
18 **non-prominent, non-elite analysts for simplicity**
19 **sake, that their opinions don't move share**
20 **prices?**
21     MR. FOX:  Objection.
22     A.    I haven't seen in the literature that
23 I reviewed, strong and consistent evidence that
24 they do move share prices.
25     **Q.    And by "elite analysts," what do you**

Page 84

R. Kraakman

1
2  mean by that?
3     A.    Precisely what I say.
4     **Q.    So that they have the indicia of --**
5     A.    Right.
6     **Q.    That you talk about.**
7     **So what happens if all of the indicia**
8  **don't point in the same direction?**
9     **So, for example, what if the analyst**
10 **was associated with a prominent firm but not II**
11 **ranked and not a celebrity analyst?  Would you**
12 **believe that that analyst was part of the elite?**
13     A.    I wouldn't be confident.
14     **Q.    And would the answer be true with**
15 **respect to any of the -- any one indicium of**
16 **eliteness?**
17     A.    No.  I think you rightly suggested a
18 moment ago that probably professional prominence
19 and a high incidence of mention in the press are
20 stronger correlates of elite status but...
21     **Q.    So affiliation with a prominent**
22 **investment firm isn't a very good indicator of**
23 **elite status.**
24     MR. FOX:  Objection.
25     A.    It's probably noisier than the

Page 85

R. Kraakman

1
2  others.
3     **Q.    Are you familiar with a firm**
4  **called -- let me give you an example of**
5  **something.**
6     **Are you familiar with a firm called**
7  **Robertson Stephens?**
8     A.    It's an investment bank I believe.
9     **Q.    Do you know whether they're still**
10 **around?**
11     A.    I don't.
12     **Q.    So if I'm understanding what we've**
13 **been talking about correctly, would it -- well,**
14 **would you regard Robertson Stephens as a**
15 **prominent investment bank?**
16     A.    Certainly not on the -- not as high
17 on the prominent scale, if you will, as Credit
18 Suisse or Merrill Lynch or Solomon Brothers, the
19 big ones.
20     **Q.    Okay.**
21     A.    Goldman Sachs.  I guess I shouldn't
22 forget them, huh?
23     **Q.    So knowing only that an analyst**
24 **worked at Robertson Stephens, that wouldn't**
25 **allow you to conclude that he or she was an**

R. Kraakman
1        R. Kraakman
2 elite analyst.
3     A.   Correct.
4     Q.   Do you know whether Robertson
5 Stephens issued research on AOL Time Warner
6 during the class period in this case?
7     A.   It wouldn't surprise me if they did.
8     Q.   I'll represent that they did.
9     A.   Okay.
10    Q.   And I will represent that there were
11 two analysts at Robertson Stephens who covered
12 AOL during the class period named Lowell Singer
13 and Michael Sabulla?
14    A.   Okay.
15    Q.   Have you ever heard of them?
16    A.   No.
17    Q.   So they're probably not celebrities
18 either.
19        MR. FOX:  Objection.
20    A.   Gee, I didn't count up the number of
21 press mentions or...
22        MR. FOX:  You're asking if he has an
23 opinion as to whether those analysts are
24 celebrities?
25        MR. SCHWARTZ:  I'm asking whether in

1        R. Kraakman
2 his view those analysts meet his criteria
3 for being celebrities as an indicium of a
4 leading analyst.
5        MR. FOX:  If he studied those
6 analysts first.
7     A.   I have not studied those analysts.  I
8 do not have a view on their status.
9     Q.   I will represent, because I have
10 looked at their press appearances, and I will
11 represent that Mr. Singer appeared in the press
12 relating to America Online five times during the
13 year-and-a-half of the class period and that
14 Mr. Sabulla appeared in the press in connection
15 with AOL Time Warner no times during the
16 year-and-a-half of the class period.
17        So based on that information, would
18 you believe that they were influential?
19        MR. FOX:  Objection.
20        You know, the witness has not
21 rendered an opinion on these analysts.
22        MR. GESSER:  Why don't you just make
23 your objection.
24        MR. FOX:  That is my objection.
25        You may answer if you have an opin --

1        R. Kraakman
2 I mean you --
3     A.   I have no opinion on these analysts.
4     Q.   In general would you believe that
5 five press appearances would satisfy the
6 criteria for celebrity status as defined by
7 Bonner?
8        MR. FOX:  Objection.
9     A.   Five seems low but...
10    Q.   If I remind you that the median that
11 he found was 20, would that change your answer?
12    A.   What was that with respect to a
13 particular firm or was it -- can you refresh my
14 memory?
15    Q.   Yes, that was --
16    A.   Or was that with respect to every
17 company that the analyst covered?
18    Q.   That's with respect -- with the
19 analyst name and the firm of the analyst, so in
20 this case it would be these analysts from
21 Robertson Stephens.
22    A.   Well, that wasn't my question.
23        My question was do we count press
24 mentions with respect to a particular issuer or
25 with respect to the universe of issuers?

1        R. Kraakman
2     Q.   Bonner looked at -- what Bonner
3 looked at was the name of the analyst in
4 connection with the firm of the analyst.
5     A.   So but you are not -- I mean so this
6 is kind of an apples and orange comparison,
7 right?
8     Q.   They are not a one-to-one comparison.
9     A.   Yes.
10        So I guess I can't use Bonner to say
11 anything about the status of these particular
12 analysts.
13    Q.   So you think it's -- do you think
14 it's plausible that these analysts would be
15 mentioned very few or no times in connection
16 with one of the companies that they covered, but
17 many times in connection with -- more than 20
18 times in connection with all other companies
19 that they covered?
20        MR. FOX:  Objection.
21    A.   It's possible.
22    Q.   But you have no way of --
23    A.   I have no way of determining that.
24    Q.   Of determining that.
25        Okay.  I'll also represent that

R. Kraakman

1
2    Singer and Sabulla weren't II ranked analysts.
3        So based on all you know about them,
4    do you have a view as to whether they would meet
5    your definition of elite status?
6        MR. FOX:  Objection.
7        A.    Well, the caveat of course is that I
8    don't know how many times they were mentioned in
9    their investment banking firm, but certainly my
10   priori would be that most likely they weren't
11   elite.
12       Q.    In paragraph 7 you conclude that,
13   "Jamie Kiggen and Laura Martin qualify as
14   influential analysts on the basis of the
15   characteristics singled out by the literature."
16       A.    That's right.
17       Q.    And when you call them "influential
18   analysts," you mean that they have the indicia
19   of being elite; is that correct?
20       A.    Yes.
21       Q.    Now in your view, as elite analysts
22   -- actually, strike that.
23           Okay.  In support of your opinion
24   that they qualify as elite analysts, you know
25   that they were both employed by Credit Suisse, a

R. Kraakman

1
2    prominent investment bank?
3        A.    Correct.
4        Q.    But knowing only that they were
5    employed by Credit Suisse, that would not allow
6    you to conclude that they were elite; is that
7    correct?
8        A.    It would make it less likely knowing
9    only that.  I would want to know whether they
10   were on II's All American team, were they
11   mentioned, were they were runner-ups, you know,
12   what about Greenwich.
13           I take Quattrone's phrase here is
14   suggesting an elite analyst, "a rock star
15   Internet analyst."
16       Q.    We'll get to Mr. Quattrone's
17   statement in a moment, but I'm just asking you
18   about, I understand you would want to know more,
19   but if let's say you couldn't know more, the
20   only information you had was that they worked at
21   Credit Suisse, would that allow you to say that
22   they were elite analysts?
23       A.    No.
24       Q.    Now you also mentioned that they were
25   both listed among Institutional Investor's All

R. Kraakman

1
2    American Research Team in sectors for America
3    Online Time Warner; is that correct?
4        A.    That's correct.
5        Q.    Now does it matter to your conclusion
6    that neither Mr. Kiggen nor Ms. Martin were
7    ranked number one by Institutional Investor for
8    either 2000 or 2001?
9        A.    I know it matters in the Stickel
10   article but it doesn't really matter to my
11   conclusions.  I mean Kiggen, as I recall, was
12   also up there.  He was number one I think in the
13   Greenwich.  Previously he had been number two in
14   II for a couple of years running straight.  I
15   certainly would think of him as an
16   elite analyst given that he's, he's been
17   mentioned for a number of years running, as has
18   Martin, as one of the second or third team
19   members on AOL, this rock star characterization,
20   his employment by Credit Suisse.  I haven't done
21   a, I haven't done a literature count on the
22   number of times he was mentioned in conjunction
23   with AOL Time Warner, but I would be interested
24   in knowing that and my guess would be it would
25   be a little over 20.

R. Kraakman

1
2        Q.    Okay.  Well, since we mentioned it --
3        A.    Oh, you have...
4            MR. SCHWARTZ:  Can you mark this as
5    Exhibit 3.
6            (Defendant's Exhibit Kraakman 3,
7    Declaration of René M. Stulz, marked for
8    identification, as of this date.)
9        A.    What are we looking at here?
10           I don't believe I've seen this
11   before.
12       Q.    Well, do you know what it is?
13       A.    Well, it seems to be the declaration
14   of Professor Stulz.  It's mentioned in his
15   expert report but I've never received a copy of
16   it.
17       Q.    Do you know if it's mentioned in your
18   expert report?
19       A.    I don't believe so.
20       Q.    Why don't you look at Footnote 2 and
21   see if that refreshes your recollection.
22           (Document review.)
23       A.    Well, Footnote 2 refers to the expert
24   report, not the declaration.
25       Q.    Well, I mean you wrote your expert

Page 94

R. Kraakman

1  report, right?  I mean that's what you testified
2  to earlier.
3
4      A.   Yes.
5      Q.   And you refer to it here as dated
6  April 26, 2007, correct?
7      A.   I guess so.
8      Q.   And on page 40 of the exhibit I just
9  handed you it says that it's executed on April
10  26th, 2007, right?
11         (Document review.)
12      A.   It says it was filed on April 27,
13  2007.
14      Q.   I asked you when it was executed, on
15  page 40.
16      A.   Page 40.
17         (Document review.)
18      A.   April 26, 2007, yes.
19      Q.   So would you agree that this is
20  likely the document you were referring to in
21  Footnote 2 of your expert report?
22         MR. FOX:  Objection.  I mean it
23  clearly says what it is in Footnote 2 and
24  it says Exhibit 38 --
25         MR. GESSER:  Just make your

Page 95

R. Kraakman

1  objection.  Don't testify.
2         MR. FOX:  Well --
3         MR. GESSER:  Just make your
4  objection.
5         MR. FOX:  -- I'm not.  I'm just
6  telling you what it says.
7         MR. SCHWARTZ:  Well, he's the one who
8  wrote the report.
9         MR. FOX:  I understand he wrote the
10  report but...  Whatever.
11  BY MR. SCHWARTZ:
12      Q.   Professor Kraakman, are you aware of
13  another document called the expert report of
14  René M. Stulz that's dated April 26, 2007 that's
15  different from the declaration of René M. Stulz
16  that's dated April 26, 2007?
17      A.   I don't -- I can't speak to, I can't
18  speak to the date.
19         I can tell you that I read something
20  that was -- I read it in two forms.  There was
21  the expert report and there was the revised
22  expert report and it was not this document.
23      Q.   Okay.  So you've never seen this
24  document.
25

Page 96

R. Kraakman

1      A.   I have never seen this document.
2      Q.   And you have no idea what document
3  you're referring to in Footnote 2.
4      A.   Yeah.  It was entitled the expert
5  report and it's the same document essentially
6  with minor revisions that was submitted to me a
7  little while ago.
8         I don't know.  Do we have a copy
9  of -- I mean do you have another -- do you have
10  a document called the expert report or the
11  revised expert report?
12      Q.   Did you see an expert report of
13  Professor Stulz dated May 1st, 2008?
14      A.   Maybe.  Was that the revised expert
15  report?
16      Q.   Did you see a corrected Stulz report
17  dated in July of 2008?
18      A.   I did.
19      Q.   Now you refer to Exhibit 3A, to the
20  expert report of René M. Stulz dated April 26th,
21  2007 in your Footnote 2; is that correct?
22      A.   It looks that way.  It looks as if...
23         (Document review.)
24      A.   You know, I can't -- I refer to the

Page 97

R. Kraakman

1  expert report.  If there was no expert report,
2  then I obviously made a mistake or...
3      Q.   I'm just asking you, this refers to
4  an Exhibit 3A, correct, in Footnote 2 of your
5  report?
6         (Document review.)
7      A.   Yes.
8      Q.   Could you flip to Exhibit 3A of the
9  Stulz declaration?
10      A.   Where is Exhibit 3A?
11      Q.   It's towards the back.  It's after
12  page 41, it's about the third or fourth page.
13         (Document review.)
14      Q.   Have you seen this exhibit before?
15         MR. FOX:  Let's just make sure he's
16  on the right page.
17         MR. SCHWARTZ:  Sure.  Okay.
18         THE WITNESS:  Yeah.
19         MR. SCHWARTZ:  Yeah, absolutely.
20  Please.
21         THE WITNESS:  Yeah.
22         MR. FOX:  Okay.  3A.
23         THE WITNESS:  Right.  Right.  This is
24  the II.  This is the list of II...

R. Kraakman

1         R. Kraakman
2  BY MR. SCHWARTZ:
3      Q.   So you have seen this exhibit before.
4      A.   I have seen this exhibit before.
5      Q.   Okay.  In light of that, do you
6  believe that your reference to the expert report
7  of René M. Stulz in Exhibit -- in Footnote 2 to
8  your expert report is likely referring to this
9  document?
10     A.   I have seen a -- I have seen this
11 page but not the remainder of the declaration.
12     Q.   Okay.  Can you flip to Exhibit 3B of
13 the Stulz report, please?  The Stulz declaration
14 I should say.
15         Please take a look at it and let me
16 know when you've finished.
17         (Document review.)
18     A.   Yes.
19     Q.   Okay.
20     A.   Okay.
21     Q.   Now I believe you said before that
22 you expected Mr. Kiggen to have well over 20
23 press mentions in connection with AOL.
24     A.   No, in connection with Credit Suisse.
25     Q.   Do you see the other analysts who are

R. Kraakman

1         R. Kraakman
2  listed here and their number of press mentions?
3      A.   Well, this is in connection with AOL,
4  right?
5      Q.   It is in connection with AOL, but I'm
6  asking you whether you see the other analysts,
7  the number of press mentions in connection with
8  AOL.
9      A.   Um-hmm.
10     Q.   And would you agree that Mr. Kiggen
11 has -- that Mr. Kiggen's three press mentions in
12 connection with AOL are not particularly high in
13 comparison to some of the other analysts?
14         MR. FOX:  Objection.
15     A.   To some of the other analysts, but
16 again, this doesn't go to Bonner's paper because
17 it's only in connection with AOL.  It's not in
18 connection with Credit Suisse, right?
19     Q.   So is it your view that Mr. Kiggen
20 would be more likely to have an effect on AOL
21 stock price if he was mentioned many times in
22 connection with Credit Suisse but very few times
23 in America Online?
24         MR. FOX:  Objection.
25     A.   It would be my view that if his name

R. Kraakman

1         R. Kraakman
2  was out there in the press a lot, he, based on
3  the Bonner paper again, he would be more likely
4  to have a significant influence on, on AOL Time
5  Warner stock price, yeah.
6      Q.   Even if he was never quoted or rarely
7  quoted in connection with AOL's stock price,
8  that would still be your opinion.
9          MR. FOX:  Objection.
10     A.   Well, the more mentions, the better
11 seems to be the message of the Bonner article.
12     Q.   Well, do you think --
13     A.   And again, this doesn't go back to
14 his earlier, his earlier mentions before he
15 joined Credit Suisse, right, when I believe he
16 was on the second team with respect to AOL.
17     Q.   Does Bonner talk about prior mentions
18 in her article, mentions before the period of
19 study?
20     A.   No.
21     Q.   Do you think that all mentions are
22 equal?  If someone is just mentioned in the
23 press in connection with Credit Suisse, it's the
24 same as if he's mentioned or she is mentioned in
25 the past in connection with a company that she

R. Kraakman

1         R. Kraakman
2  actually covers or he actually covers in
3  connection with Credit Suisse?
4      A.   It's plausible that they're not
5  equal.
6      Q.   Now when I asked you to -- you can
7  put away the Stulz declaration for a minute.
8          (Witness complies.)
9      Q.   Now when I asked you earlier whether
10 it mattered to your view that Mr. Kiggen and
11 Ms. Martin were influential analysts, when I
12 asked you whether it mattered that they were not
13 ranked first or second team All American by
14 Institutional Investor, you said that you were
15 aware that it matters to Stickel.
16     A.   Um-hmm.
17     Q.   What do you mean by that?
18     A.   Well, as I recall, he found that the
19 influence of analyst reports seemed to have been
20 substantially greater for first team and second
21 team and third team runners-up.
22     Q.   Do you recall whether he found that
23 third team and runner-up analysts had any more
24 effect on stock price than unranked analysts?
25     A.   I believe in his particular case, I

26

Page 102

R. Kraakman

1  think his finding was that they didn't.  It was
2  some bizarre result with respect to runner-ups
3  that was inexplicable I seem to remember.  So
4  going on that basis alone...
5      Q.   Sorry.  Going on that basis alone
6  what?
7      A.   Strike that.
8         As I say, I don't think these -- I
9  don't think the II mentions are the only
10 indicia.  I think this has got to be highly
11 contextual and in affiliation with Credit
12 Suisse.
13     Q.   Well, let's talk about those I guess.
14        MR. FOX:  Were you finished with your
15 answer?
16 BY MR. SCHWARTZ:
17     Q.   I'm sorry.  I didn't mean to cut you
18 off.
19     A.   Well, that and Quattrone's views of
20 who this guy was.  I assume he received quite a
21 bit of past coverage, even if Bonner didn't
22 look at that, when he was with his prior
23 investment bank.  This guy appears to have been,
24 based on the emails I looked at, pretty hot, a

Page 103

R. Kraakman

1  pretty hot, pretty hot fellow.
2      Q.   Well, let's talk about the indicia
3  you identify of influence in paragraph 7.
4         We talked about their affiliation
5  with Credit Suisse and you said knowing that
6  alone, you wouldn't able to say that they were
7  influential analysts.
8      A.   Right.
9      Q.   We talked about press appearances and
10 you said that you don't have data from which to
11 make that assessment, but that you assume that
12 they have a lot of press mentions in connection
13 with Credit Suisse; is that correct?
14     A.   A lot of press mentions in connection
15 with Credit Suisse, that's correct.
16     Q.   We looked at their press mentions in
17 connection with AOL and saw that there weren't
18 very many; is that also correct?
19     A.   Yes.
20        MR. FOX:  Objection.
21     A.   Well, there are three.  Not as many
22 as some of the other analysts that you had on...
23     Q.   Well, the top analysts, the analysts
24 with the most number of press mentions on that

Page 104

R. Kraakman

1  chart had 31, so in comparison with that, not
2  very many, correct?
3      A.   Right.
4      Q.   We discussed their II rankings and as
5  you noted in Stickel's article, second -- sorry,
6  13 and runner-up analysts aren't associated with
7  greater stock price effect; is that correct?
8      A.   That's correct.
9      Q.   And other than Stickel's article, did
10 you review any articles that talked about the
11 different rankings in II and what the effects of
12 each ranking were?
13     A.   No, I did not.
14     Q.   And you didn't conduct any of your
15 own research to determine that as an empirical
16 matter.
17     A.   No, I did not.
18     Q.   So you've mentioned a couple of times
19 Frank Quattrone's emails and your reference to
20 them in this article.
21        Now do Mr. Quattrone's views
22 establish as an empirical matter that Jamie
23 Kiggen had an effect on AOL stock price?
24     A.   Well, first of all, we haven't -- I

Page 105

R. Kraakman

1  haven't said that Kiggen's reports did have an
2  effect on AOL stock price.  I mean the issue was
3  would they would have had -- would they have had
4  an effect had he been entirely truthful.
5         But I do think that Frank Quattrone's
6  view of his abilities is evidentiary.  I think
7  it points to a high reputational status in the
8  analyst community and perhaps among
9  institutional investors.
10     Q.   Are you aware of any research that
11 that has looked at the effect of Mr. Quattrone's
12 views on an analyst's ability to affect stock
13 price?
14     A.   No.
15     Q.   Do you suspect that no such research
16 exists?
17     A.   I suspect that's true, but I suspect
18 that probably Mr. Quattrone is a pretty good
19 judge of horse flesh out there and he's putting
20 his money on his beliefs so...
21     Q.   Do you think Mr. Quattrone had any
22 motivation for pumping up the reputation of
23 Credit Suisse research analysts?
24        MR. FOX:  Objection.

1          R. Kraakman
2    BY MR. SCHWARTZ:
3        Q.   Can you think of any motivation he
4    might have had?
5            MR. FOX:  It calls for speculation.
6        A.   I don't know what his, what his
7    motivations were.
8        Q.   Well, you mentioned -- you cited
9    Professors Fisch and Sale before.  You say that,
10   "Research analysts are the star of the show in
11   competition among investment banks for
12   underwriting business."
13           Do you think attempting to attract
14   underwriting business could have been a reason
15   why Frank Quattrone would have had positive
16   things to say about Credit Suisse research
17   analysts?
18       A.   Possibly, but he said this before, as
19   I recall, Kiggen was hired.
20       Q.   Do Mr. Quattrone's views, do they
21   make it any more likely that Mr. Kiggen in fact
22   had the ability to affect stock price?
23       A.   Yes, I think they do.  They are
24   evidentiary.  I mean they're not among the holy
25   trinity of three factors that I mentioned in

1          R. Kraakman
2    earlier paragraphs of the report, but I think in
3    context they point to reputational positions of
4    Mr. Kiggen.
5        Q.   So in your view Mr. Quattrone's views
6    are a proxy for Mr. Kiggen's professional
7    prominence.
8        A.   Well, they're evidentiary, yeah.
9        Q.   So they speak to but they don't
10   establish his professional prominence.
11       A.   That's correct.
12       Q.   And they don't, and Mr. Quattrone's
13   views are not additive as an indicium of elite
14   status to Mr. Kiggen's professional prominence?
15           MR. FOX:  Objection.
16       A.   I would take, I would take the
17   statement to be additive to the other criteria
18   of professional prominence, yes.
19       Q.   You say that -- sorry.  I just want
20   to clarify what you said just now.
21           Mr. Quattrone's views are not
22   additive to the other indicia of professional
23   prominence?
24       A.   No.  On the contrary.  I think they
25   are -- no, I meant to say exactly the opposite.

1          R. Kraakman
2    They are additive.
3        Q.   Okay.  What do you base that on?
4        A.   My belief that Mr. Quattrone was a
5    central executive, head of all research at
6    Credit Suisse and it was in his interest to hire
7    the best.
8        Q.   And are you bringing any expertise to
9    that opinion?
10       A.   Just common sense.
11       Q.   Are you aware that Mr. Quattrone is a
12   defendant in this case?
13       A.   Yes.
14       Q.   Let's look at paragraph 8 of your
15   report.
16       A.   All right.
17       Q.   You say, "In my opinion there is no
18   policy or doctrinal reason for distinguishing
19   between the statements of issuers and
20   influential analysts for purposes of
21   fraud-on-the-market theory."
22       A.   I do.
23       Q.   Okay.  And why do you believe that?
24       A.   Which?
25       Q.   Well, give me the policy reasons.

1          R. Kraakman
2        A.   Because I believe that influential
3    analysts are able to distort market prices
4    through misrepresentation of their views just as
5    issuers are able to distort market prices.
6        Q.   Do you believe that most statements
7    by issuers affect their stock prices?
8        A.   I haven't, I haven't the vaguest
9    idea.  I would imagine there are many statements
10   by issuers but I haven't the vaguest idea.
11           Does every press release an issuer
12   makes affect stock prices?  Are they
13   anticipated?  I don't know.
14       Q.   How about most earnings releases?  Do
15   you think most earnings releases by an issuer
16   affect the stock price?
17       A.   It depends on how well they're
18   anticipated by the market.
19       Q.   I understand what it depends on, but
20   I'm asking if you think that most of the time
21   when an issuer issues an earnings release, it
22   affects its stock price.
23       A.   I don't know.
24       Q.   Do you think most --
25       A.   I would say it happens frequently,

Page 110

1          R. Kraakman
2   but most of the time?  I don't know.
3      Q.   Do most statements by influential
4   analysts affect stock price?
5          MR. FOX:  Objection.
6      A.   I don't know.  I would offer Credit
7   Suisse reports as an example of statements by
8   influential analysts that by and large didn't
9   influence stock prices.
10     Q.   So it's your view that -- and so your
11  opinion is the same regardless of whether most
12  statements by influential analysts affect stock
13  price or have no effect on stock price; is that
14  correct?
15         MR. FOX:  Objection.
16     A.   My opinion about what?
17     Q.   Whether the fraud-on-the-market
18  theory should apply to their statements like it
19  applies to issuer statements.
20     A.   I don't think, I don't think these
21  two points are connected.  To the extent that
22  influential analysts repeat themselves or repeat
23  issuer releases in their reports, I wouldn't
24  expect them to influence stock prices.
25         I don't know what the proportion of,

Page 111

1          R. Kraakman
2   you know, revised recommendations, revised
3   forecasts, revised earning targets is to the
4   number of reports that don't make any
5   significant revisions, so that's what it would
6   turn on it seems to me.
7      Q.   Okay.  Well, let's assume for the
8   moment that most statements by the group of
9   people you're referring to as influential
10  analysts don't have an effect on stock prices.
11     A.   Okay.
12     Q.   Would you still believe that the
13  fraud-on-the-market theory should apply to them
14  the same way it applies to issuers?
15         MR. FOX:  Objection.
16     A.   Yeah.
17     Q.   Why?
18     A.   Well, I mean consider the analogy
19  with an issuer.  The issuer has released a
20  misleading statement or has made a statement
21  that the issuer comes to believe is misleading
22  based on private information, and the issuer
23  fails to reveal that private information,
24  persists in making the same statement, stock
25  prices don't change as a consequence, no

Page 112

1          R. Kraakman
2   question a fraud-on-the-market doctrine would
3   apply to the issuer and I'm just analogizing an
4   influential analyst to the issuer, right?
5      Q.   What do issuers -- so are you
6   referring, are you referring to a fraud by an
7   omission here in that context?
8      A.   Yeah, it would be a fraud by
9   omission.
10     Q.   How about a fraud by misstatement
11  where someone is affirmatively misstating
12  something?  Would you believe that the
13  fraud-on-the-market presumption should apply the
14  same way to any influential analyst as it does
15  to an issuer with respect to an affirmative
16  misstatement?
17     A.   Yes.  I think they're in all respects
18  analogous.
19     Q.   And why do you think that?
20     A.   Because they're capable of distorting
21  market prices, both of them.  The issuers
22  perhaps more so than most analysts, but
23  influential analysts certainly as well.
24     Q.   So in your view, whether the
25  fraud-on-the-market theory should apply and with

Page 113

1          R. Kraakman
2   that the presumption of reliance, turns solely
3   on ability to influence market prices; is that
4   correct?
5          MR. FOX:  Objection.
6      A.   No.  It's a legal doctrine.  It turns
7   on the elements of 10b5.
8      Q.   I'm just trying to understand the
9   scope of your opinion here.
10         You have said that with respect to
11  omissions, it doesn't matter whether most
12  statements by influential analysts affect stock
13  price or not to your view that the
14  fraud-on-the-market theory should apply to their
15  omissions because they have the ability to
16  influence stock prices.
17     A.   That is correct.
18     Q.   Okay.  And I believe you also said
19  that in your view whether most statements by
20  influential analysts affect stock price also
21  doesn't matter to your view that the
22  fraud-on-the-market theory should apply to their
23  statements again because they have the ability
24  to influence stock price.
25     A.   Correct.