# EXHIBIT 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------x
                                           )
IN RE CREDIT SUISSE – AOL         )
SECURITIES LITIGATION           )
---------------------------------------------------------- )  Case No. 1:02 CV 12146
                                          )  (Judge Gertner)
This document relates to:           )
ALL ACTIONS                   )
                                          )
----------------------------------------------------------x

## Declaration of René M. Stulz

### I.      Qualifications

1.  My name is René M. Stulz.  I hold the Everett D. Reese Chair in Money and Banking at the Ohio State University.  I am also Director of the Dice Center for Research in Financial Economics at the Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts.  Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and the Ohio State University.  I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2.  I am an expert in financial economics.  I am a past president of the American Finance Association, a fellow of the American Finance Association and of the Financial Management Association, and a past president of the Western Finance Association.  I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland, and the Eastern Finance Association gave me its Finance Scholar award in recognition of my contributions to financial economics.  I serve on the editorial boards of more than ten academic and practitioner publications.  I was editor of the *Journal of Finance*

for twelve years and co-editor of the *Journal of Financial Economics* for five years. I serve on the boards of the Community First Financial Group, the Peninsula Financial Group, Banque Bonhôte, and Weggelin Fund Management. I have been a consultant for the IMF, the World Bank, the New York Stock Exchange, the Federal Reserve Bank of New York, corporations, and law firms. I have published more than sixty articles on issues in financial economics, authored a textbook, and edited several books.

3. A copy of my curriculum vitae is attached as Appendix A. A list of all cases in which I have provided testimony in the last four years is attached as Appendix B.

## II.     Assignment

4. I have been asked by counsel for Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) (CSFB) to assess the following questions:

a. Whether analyst reports by CSFB published on AOL Time Warner (AOL) that are mentioned in the Second Consolidated Amended Class Action Complaint (Complaint) affected the stock price of AOL during the class period (January 12, 2001 to July 24, 2002.) As part of this inquiry, I have also been asked to review and opine on Dr. Scott D. Hakala's expert report in this matter filed on March 2, 2007 (the Hakala Report).

b. Whether AOL's stock price reacted to the disclosure of information that the Complaint alleges was omitted by CSFB from its AOL reports during the class period.

c. Whether the risks to AOL posed by a weak advertising market in 2001 were known to the market.

5. In undertaking this assignment, I have relied upon documents and data related to issues in this case. These materials are listed in Appendix C.

### III.   Summary Of Opinions

6.  Based on the analysis described in the remainder of this Declaration, I have
reached the following conclusions:

a.  A rigorous, scientific analysis of whether the stock-price movements of
AOL's common stock were affected by CSFB's analyst reports on AOL
during the class period indicates that CSFB's reports did not affect AOL's
stock price during the class period.

    i.  CSFB's reports did not impact AOL's stock price as a whole.

    ii.  Only one day of the 34 days identified in the Complaint on
which CSFB published a report on AOL was associated with a
positive, statistically significant movement in AOL's stock
price.  This day, April 18, 2001, was a day on which a number
of analyst reports were issued on AOL following AOL's
announcement of better-than-expected financial results.
However, AOL's stock-price movement on this day cannot be
attributed to CSFB's report because a review of AOL's intra-
day stock-price movements demonstrates that AOL's stock
price had achieved all of its gain that day prior to the release of
CSFB's report on AOL to the market.

    iii.  Dr. Hakala's results regarding the significance of AOL's stock
price movements on analyst-report days cannot be relied upon
because his purported "event study" is flawed.

b.  It is not surprising that the CSFB reports did not impact AOL's stock price for
the following reasons:

    i.  Except for two days during the class period on which CSFB
lowered its price target for AOL, CSFB's recommendations
and price targets in its reports on AOL were reiterations, not

Page 3

new news. Academic research has shown that there is typically no impact on the stock price of a company when an analyst reiterates his/her recommendation and price targets for the company, all other things being equal.

    ii.  CSFB's equity analysts covering AOL were not the most prestigious analysts covering AOL during the class period.

    iii.  Throughout the period that CSFB covered AOL, CSFB's forecasts for AOL's 2001 earnings before interest, taxes, depreciation and amortization (EBITDA), revenue, cash earnings per share (EPS), and 12-month price targets were comparable to those of more prestigious analysts. In fact, CSFB's forecasts were lower than or equal to those of several more prestigious analysts for most of the relevant period that CSFB was covering AOL.

c.  There is no evidence that the disclosure to the market of information about allegedly inappropriate accounting and layoffs at AOL (that were allegedly omitted from CSFB's AOL reports) had any effect on AOL's stock price.

    i.  The "curative disclosures" of allegedly inappropriate accounting in the *Washington Post* articles of July 18, 2002 and July 19, 2002 did not result in statistically significant movements in AOL's stock price.

    ii.  The Plaintiff offers no evidence that the announcement of layoffs at AOL on August 13, 2001 is related to the alleged information that CSFB did not disclose. Moreover, there is no evidence that this announcement caused a statistically significant price reaction in AOL's stock.

    iii.  The publication of allegations on October 21, 2002 of an AOL-specific analyst conflict at CSFB did not result in a statistically

significant movement in AOL's stock price.  This is not
surprising given the lack of impact on AOL's stock price of
CSFB's reports when issued.

d.  The market was well aware of the risks to AOL from the weak advertising
market in 2001.

   i.  Contrary to the Plaintiff's assertion, CSFB's reports on AOL
   discussed the slow-down and eventual downturn in the
   advertising market.

   ii.  Moreover, the slow growth in advertising expenditures and the
   eventual downturn in the advertising market in year 2001 were
   reported in numerous analyst reports and in the public press
   before and during the class period.

   iii.  While the market was well aware of the slow-down and
   eventual downturn in the advertising market and the fact that
   the weak advertising market would have an impact on AOL's
   business, AOL represented to the market that its performance
   was less dependent on advertising revenues than other
   comparable firms, and, for many months in 2001, that its
   revenue objectives would be achieved.  Many analysts
   reiterated these statements.  Some prestigious analysts,
   however, also expressed caution to the market about the effect
   of the advertising slump on AOL.

## IV.     The CSFB Analyst Reports Had No Impact On The Stock Price Of AOL

### A.  CSFB's Reports Did Not Impact AOL's Stock Price as A Whole.

7.  The Complaint in this matter lists 34 days on which CSFB issued a total of 35 analyst reports on AOL.[1]  For 34 of the 35 reports, the CSFB rating for AOL was a "Buy", with one report containing no rating.[2]  CSFB's highest rating in general was a "Strong Buy."[3]  To investigate whether these 35 CSFB analyst reports had a statistically significant impact on AOL's stock price, I first follow the conventional approach used in academic studies of evaluating the average stock-price reaction to the reports across all 35 reports.[4]

8.  This approach allows for the probability that one or two days out of 34 may be associated with a statistically significant positive stock-price reaction even if analyst reports have no impact whatsoever on the stock price.  The reason for this probability is straightforward: on any day, there is some chance that a stock will have a large positive return or a large negative return.  In fact, by definition, if the criterion for statistical significance is the conventional 95% level, a sample of stock returns on days that analyst reports are published is expected to have 5% of the days showing a significant stock-price reaction, even if it is known that analyst reports have no stock-price impact whatsoever.[5]  Consequently, when investigating a sample of stock returns occurring on days when analyst reports are released, one would expect one out of 20 days when analyst reports are published (i.e., 5% of the reports) to have a significant stock-price reaction even if none of the reports actually had any

---

[1] CSFB issued two reports on June 25, 2001.  See Exhibit 1 for a list of the CSFB report dates and titles. The Complaint incorrectly states the date of the report titled "Concerns About Entertainment Group Priced AOL; Buy at Current Levels" as September 18, 2001.  It was dated September 19, 2001.

[2] CSFB's report dated July 12, 2001 focused on the internet industry and did not issue any rating for AOL.

[3] See, for example, CSFB's report on AOL dated September 19, 2001.

[4] All the academic papers cited in the Court's Memorandum and Order Re: Defendants Motions to Dismiss, December 7, 2006, which report univariate statistics on the impact of analyst reports treat analysts as a group and present averages across reports from different analyst firms.  The relevance of such averages has been questioned by the Courts in some cases (see, for instance, *DeMarco v. Lehman Brothers Inc.*, July 7, 2004.)  In this Declaration, the average I focus on is the average across all reports by the same analysts, namely the CSFB analysts covering AOL.

[5] Significance at the 95% level means that there is only a 5% chance that a return could be that large by chance alone. Consequently, in a large sample, 5% of the returns will be that large by chance alone.

impact on the stock price.  It would be misleading to then point to the report associated with a significant stock-price reaction as evidence that the analyst had a significant impact on the stock price, since doing so would amount to ignoring the fact that the nineteen other reports did not have a significant stock-price reaction.[6]  As one looks at more days individually, the likelihood of observing a day associated with a significant stock-price movement increases.  Evaluating the average stock-price reaction (as a whole across all reports) avoids this incorrect conclusion because it allows for the fact that there will be large positive and negative returns in a sample of returns even if analysts have no stock-price impact.

9.  To measure stock-price movements associated with disclosures and other news, financial economists developed a technique known as an "event study," which has been widely used for almost 40 years.[7]  I have used this technique repeatedly in my peer-reviewed research.[8]

10. As Professor MacKinlay states in a review article on event studies, "Using financial market data, an event study measures the impact of a specific event on the value of a firm."[9]  To determine whether an event has affected the return on a given day, the event study isolates the effect of market and industry factors on that day.[10]  The effect of market and industry factors makes it possible to estimate a stock's expected return on that day, i.e., what

---

[6] A similar problem is encountered when assessing evidence that a stock strategy beats the market.  The fact that, out of a large number of strategies, one beats the market has to be assessed differently than if only one strategy had been tried and it beats the market.  See Ryan Sullivan, Allan Timmermann, and Halbert White, "Data-Snooping, Technical Trading Rule Performance, and the Bootstrap," *Journal of Finance* 54, no. 5 (1999): 1647-1691.

[7] For a review of the role of event studies in litigation, see Mark L. Mitchell and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, vol. 49, February 1994, pp. 545-590.

[8] My resume lists my publications.  Of these publications, eighteen contain an event study.  The first event study listed on my resume is "The Eurobond Market and Corporate Financial Policy:  A Test of the Clientele Hypothesis," with Yong Cheol Kim, *Journal of Financial Economics*, 1988, v22 (2), 189-205.

[9] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, March 1997, p. 13.  This article provides many citations to articles discussing event-study methods as well as to examples of event studies.

[10] Sometimes, it is necessary to take into account other factors that affect the stock price.  For instance, in studying an oil producing company, it might be appropriate to use changes in the price of oil as an additional factor.

the return would have been in the absence of the event.[11]  The difference between a stock's actual return and its expected return is the stock's "abnormal return."  The abnormal return is almost always not zero, but not all abnormal returns are significant.  If it is highly probable that the abnormal return is not due to chance alone (i.e., if the abnormal return is statistically significant), the abnormal return may be deemed attributable to that event.  To the extent that there is more than one piece of news released to the market at a given point in time, however, the event study cannot isolate the effect of each disclosure.

11. The event-study method relies on the fact that, in an efficient market, an event that provides new information to the market about a firm is incorporated into the firm's stock price almost immediately.  One can therefore investigate the change in the firm's stock price when it is affected by the new information, taking into account contemporaneous changes in known determinants of the stock price not attributable to the event.

12. The most common approach in the event-study literature is to estimate the relation between a firm's stock returns and economy-wide and industry factors for a period that precedes the event subject to analysis.  In this litigation, such an approach is not feasible because the first CSFB report was published on the day of the America Online-Time Warner merger.  I therefore estimate the model for AOL's stock return over the class period excluding the "effective date" of each of the CSFB reports, where the effective date of a report is the report date for reports released before the close of trading on the report date and the next trading day for reports released after the close of trading on the report date.[12]

---

[11] In the language of financial economists, the expected return estimated is actually the "conditional expected return" – it is the expected return conditional on the day's market and industry returns.

[12] Based on CSFB's logs of the time of release of its AOL reports (CSFB-AOL_0004243-4274), CSFB's reports dated April 10, 2001, August 2, 2001, November 26, 2001, and January 30, 2002 were released after the close of trading on the report date.  Therefore, the effective date for these four reports is the trading day after the report date.  For all other reports, which were released before the close of the market on the report date, the effective date is the report date.  The time of release for the report dated September

13. To evaluate whether an abnormal return is statistically significant, one typically compares the abnormal return to the standard deviation of abnormal returns over the period used to estimate the relation between the firm's return and market and industry returns (with some adjustments when these adjustments are warranted).  As one study notes:

> "…An often used convention is the five percent rule – values greater than or equal to 1.96 standard deviations from the mean value are considered significantly different from the typical value because there is only a five percent chance that a randomly selected value will be 1.96 or more standard deviations from the true mean…."[13]

14. I employ regression analysis to identify how AOL's stock returns throughout the alleged class period are related to these two factors.  Regression analysis is a commonly used statistical method of determining the relationship between a dependent variable, in this case AOL's stock returns, and specified independent variables, in this case market and industry returns.  I determined that the best model of the return of AOL's stock is a model where the stock return depends on the return of the NYSE/Nasdaq Composite index and the return of two indices formed from competitors of AOL identified as such in AOL's 10-Ks.[14]

15. I use the relationship established by my regression model to calculate AOL's expected returns during the class period and compute AOL's abnormal return as the difference between AOL's actual return and its expected return.

---

19, 2001 was not available, therefore it is assumed to be released prior to market close on the report date. Since CSFB's report dated April 18, 2001 was released late on the report date at 3:58 P.M., I exclude both the report date and the next trading day from the data used to estimate my regression.

[13] Mitchell and Netter, p. 564.

[14] The two competitor indices are composed of firms listed by AOL as competitors in its 10-K filings for 2000, 2001 and 2002, excluding those not publicly traded in the U.S., and those for which less than 50% of year 2000 revenues were generated in the U.S. or in segments competing with AOL. The Internet competitor index includes Earthlink, United Online (previously Net Zero), and Yahoo, and the Media competitor index includes The News Corporation, Viacom, and Walt Disney Company.  My regression model is able to explain 45.9% of the variation in AOL's stock price, indicating a strong relationship between AOL's stock returns and the three factors that I used.  The remaining 54.1% of the variation in the stock price can be explained by company-specific events and factors not captured by my model.

Exhibit 1 shows AOL's abnormal returns associated with the CSFB reports
mentioned in the Complaint on the effective date of the report.[15]

16. If there were, in fact, a causal relationship between the issuance of CSFB
analyst reports and the stock price of AOL, one would expect to find that the
CSFB reports as a whole caused a significant abnormal reaction in AOL's
stock price.  However, the average abnormal stock-price reaction (-0.27%)
across the effective dates of the 35 CSFB reports listed in the Complaint is
statistically insignificant.  In other words, looked at as a whole, the CSFB
reports had no impact on the stock price of AOL.

B. *Only One Day On Which CSFB Published A Report On AOL Was Associated
With A Positive Significant Abnormal Movement In AOL's Stock Price.
However, AOL's Stock-Price Movement On This Day Cannot Be Attributed To
CSFB's Report.*

17. Having analyzed the CSFB report dates as a whole, I now turn my attention to
each effective date of a CSFB report on AOL to determine the potential
impact of each report.  As shown in Exhibit 1, on only one of the 34 CSFB
report effective dates—April 18, 2001—was the abnormal movement in
AOL's stock price positive and statistically significant.  Standing alone, this
fact cannot serve as a basis for concluding that CSFB's analyst reports on
AOL had an impact on AOL's stock price.  As previously noted (see
paragraph 8 of this Declaration), a normal statistical distribution predicts that,
in the absence of any causal relationship, one would expect to observe at least
one day on which a CSFB report is associated with a statistically significant
movement in AOL's stock price, given that CSFB issued analyst reports on
AOL on more than twenty days during the class period.

---

[15] Any stock-price impact of a CSFB report would be expected to occur on the report's effective date, which, as I defined earlier, is the trading day after the report date for reports issued after the close of trading on the report date, and the report date for reports issued before close of trading on the report date.  Exhibit 1 therefore shows AOL's abnormal return on the effective date of the reports.

18. Moreover, AOL's intra-day stock-price movements on April 18, 2001, shown in Exhibit 2, demonstrate that CSFB's report could not have caused the increase in AOL's stock price on this day.  Exhibit 2 shows that AOL had already reached its end-of-day price of $49 by about 11:02 A.M. following its announcement of first quarter 2001 results at 6:02 A.M.  However, it is evident from references to AOL's "intra-day price of $49" in CSFB's April 18 report that this report was issued after the stock price reached $49, and therefore could not have caused the price increase from the prior day's close of $43.90 to $49.  My review of CSFB's logs of the timing of its AOL report dated April 18, 2001 confirms that the report was released at 3:58 P.M.[16] After reaching the price of $49, and before the CSFB report was released, AOL's stock price moved briefly to $50, its high price for the day, before staying fairly steady around $49 until the end of the day.[17]

19. In addition to the conclusive evidence presented in Exhibit 2 that the CSFB report could not have caused AOL's stock price increase on April 18, 2001, I note that significant new information about AOL entered the market on April 18, 2001.  As previously mentioned, on that day AOL announced its first quarter 2001 results.  In fact, all the statements from CSFB's report published on that day cited by the Complaint are statements in which CSFB summarizes the information disclosed on that day by AOL.  Though the Complaint states that "Defendants falsely reiterated the 2001 guidance of $40+ billion in revenue and $11 billion in EBITDA" and cited "a firming ad market" as a key driver of growth in the second half of 2001 (paragraph 42), all these statements are actually attributed to AOL in the report.

20. In its earnings announcement on April 18, 2001, AOL posted strong gains in total revenues, EBITDA, cash earnings per share and free cash flow over "Pro

---

[16] CSFB-AOL_0004257.
[17] Since CSFB's report on AOL was released late in the day of April 18, 2001, I also considered whether AOL's stock price had a significant stock price reaction on the next trading day, April 19, 2001. It did not (AOL's stock price had an insignificant negative abnormal return of -0.09% on April 19, 2001.)

Forma" results[18] for the previous year's comparable quarter and included several positive statements about AOL's prospects by its senior management. The first quarter actual earnings per share released by AOL exceeded the consensus forecast of analysts according to the CSFB analyst report issued that day and public press.[19]  It is well-known that the market reacts positively to the announcement of unexpectedly high earnings.[20] Academic studies that analyze stock-price reactions to changes in analysts' earnings forecasts often exclude days with such firm-specific confounding announcements from the sample because of the inability to disentangle the response to the news in the earnings announcement from the response to analysts' forecast revisions.[21]

21. Additionally, on April 18, 2001, at least three other analyst reports were issued by three analyst firms.[22]  One of the reports was authored by an analyst at Salomon Smith Barney who was ranked by the Institutional Investor magazine for sectors relevant to AOL.[23]  My review of these three analyst reports shows that the analysts were reacting to AOL's positive first quarter earnings announcements, and all of them refer to the fact that AOL exceeded its estimates for the quarter.

---

[18] Pro Forma results for AOL for the year 2000, released on January 31, 2001, reflected the combined company's financials assuming that the merger occurred on January 1, 1999.  See "AOL Time Warner Holds First Meeting With Investors and Analysts in New York City Today," *Business Wire*, January 31, 2001; "AOL Time Warner to Release Pro Forma Historical Results," *Business Wire*, January 26, 2001.

[19] "Wall Street Finds Cheer from AOL Time Warner's Earnings Report," *Knight Ridder Tribune Business News – KRTBN*, April 18, 2001. (The CSFB report states that "differences in how the Street and the company calculate cash EPS make comparisons difficult.")

[20] Eli Bartov, Dan Givoly, and Carla Hayn, "The Rewards To Meeting Or Beating Earnings Expectations," *Journal of Accounting and Economics*, 2002, v33 (2 June), 173-204.

[21] For instance, Asquith et al. report results excluding such confounding announcements in Table 7 of their study.  See Paul Asquith, Michael B. Mikhail, and Andrea S. Au, "Information content of equity analyst reports," *Journal of Financial Economics* 75 (2005): 259.  Similarly, Ivkovic and Jegadeesh note, "We report the results for the [earnings announcement date] and the next trading day separately because on those two days it is hard to disentangle the price reactions that are in response to the news in the earnings announcements (including any guidance that managers might provide about future earnings) from those in response to earnings forecast revisions."  See Zoran Ivkovic and Narasimhan Jegadeesh, "The Timing and Value of Forecast and Recommendation Revisions," *Journal of Financial Economics* 73 (2004): 448.

[22] The analyst firms are Jefferies & Company, Pittsburgh Research, Inc., and Salomon Smith Barney.

[23] Salomon Smith Barney also issued a second report on the same day with very similar content.

C. *Dr. Hakala's Results Regarding The Significance Of AOL's Price Movements*
   *On Analyst Report Days Are Unreliable Because His Purported "Event Study"*
   *Is Flawed.*

22. I have reviewed the Hakala Report in this matter, in which Dr. Hakala
    presents the results of a purported "event study" of AOL's stock price "[i]n
    order to assess the reaction of AOLTW's share price to relevant news
    events...."[24]

23. Dr. Hakala uses his purported "event study" to conclude that AOL's stock
    price incorporated information quickly and efficiently. I agree with that
    conclusion. However, Dr. Hakala's purported "event study" has significant
    flaws as a tool to assess the stock-price impact of specific events, such as the
    stock-price impact of analyst reports published by CSFB. I address these
    significant flaws below to demonstrate why Dr. Hakala's "event study" cannot
    be used to assess the stock-price impact of analyst reports published by CSFB.
    This discussion does not cover all the aspects in which I believe that Dr.
    Hakala errs in his report.

24. Dr. Hakala appears to believe that traditional techniques used in event studies
    are somehow no longer appropriate and that there is a new way to perform
    event studies.[25] Such a view is squarely contradicted by a recent review
    article which states: "Even the most cursory perusal of event studies done
    over the past 30 years reveals a striking fact: the basic statistical format of
    event studies has not changed over time."[26]

25. Dr. Hakala's "event study" does not employ generally accepted techniques in
    academic finance and his analyses are not based on an accepted method. As I
    have described earlier, the finance literature has a well-documented event-

---

[24] Hakala Report, paragraphs 11-18.
[25] In paragraph 15 of his report, Dr. Hakala states that he uses an "integrated regression and event parameter approach."
[26] S.P. Kothari and Jerold B. Warner, "Econometrics of event studies," in *Handbook of Corporate Finance: Empirical Corporate Finance*, Eds. Elsevier/North-Holland, B.E. Eckbo, 2004.

study method for analyzing the impact of particular events on stock prices. Dr. Hakala's method deviates significantly from this well-accepted method, and biases his results towards finding more days with significant abnormal stock-price movements than he would have found had he used the conventional method.

26. The most important aspect in which Dr. Hakala deviates from the accepted event-study method is the way in which he defines what constitutes a normal price movement and what constitutes an abnormal price movement. He subjectively selects 161 "material event" days, amounting in this case to about 38% of his sample of AOL trading days, and removes these days from his calculation of "normal" price movements for AOL using so-called dummy variables.[27] Since any company's returns, including in this case AOL's, are likely to be more volatile on days with news than on other days, removing news days from his analysis has the effect of creating a downward bias in his estimate of the volatility of abnormal returns. This, in turn, triggers a finding of "abnormal" movement more frequently than would be triggered in the accepted methodology for event studies.

27. To justify his use of dummy variables to exclude selected non-event days, Dr. Hakala provides citations of academics using dummy variables or recommending the use of dummy variables. However, none of the references actually recommend the use of dummy variables in the way Dr. Hakala uses them. As an illustration, in footnote 9 of his report, Dr. Hakala cites a textbook by Alexander titled, *Market Models: A Guide to Financial Data Analysis*.[28] I have not found any citations to this textbook before in the context of event studies. This is not surprising since the book has no chapter or section focused on event studies. The term "event study" does not even appear in the book's index. The book, in fact, recommends the use of dummy

---

[27] A dummy variable is a variable that takes the values 1 or 0 to indicate the presence or absence of some effect. Dr. Hakala's event study used 161 dummy variables, one for each "material event" day, where each dummy variable took on a value of 1 on the date of the material event it represented and 0 otherwise.

[28] Carol Alexander, *Market Models: A Guide to Financial Data Analysis*, West Sussex: John Wiley & Sons Ltd., 2001.

variables for handling certain types of data problems, a context that has nothing to do with event studies.

28. Although I do not in any way endorse the event study in the Hakala Report, his report supports my findings on the lack of impact of the CSFB reports on AOL's stock price in at least two ways. First, Dr. Hakala includes as a "material event" day and notes the issuance of a CSFB report on 28 of the 34 effective dates of the CSFB reports mentioned in the Complaint.[29] Of these 28 days, he only finds two days to have abnormal returns significantly positive at the 95% level of confidence. Dr. Hakala's study finds a significant unanticipated stock return on April 18, 2001, as I do. I have already explained, however, that the return on that day cannot be attributed to the CSFB report. The second CSFB report day on which Dr. Hakala finds a significant unanticipated return is March 23, 2001. My event study, using conventional event study methodology, does not find a significant unanticipated return on that day. Moreover, the CSFB report on March 23, 2001 is completely focused on the departure of Richard Bressler from AOL announced in a *Wall Street Journal* article published the same day and the CSFB report contained no additional new information to which AOL's stock-price reaction on that day can be attributed.[30]

29. Second, of the 34 days that Dr. Hakala considers to be days with "significant analyst comments" discussed in paragraph 17 of his report, where his use of the word "significant" is not related to statistical significance, he mentions the issuance of a CSFB report on only six days. Of these six days, only four days correspond to effective dates of CSFB reports mentioned in the Complaint. He makes no attempt to ascertain whether other information about AOL was

---

[29] Dr. Hakala's event study does not include the effective dates of four CSFB reports dated March 7, 2001, April 10, 2001, August 2, 2001, and November 26, 2001 as "material event" days, and does not mention the issuance of a CSFB report on two CSFB report effective dates (January 16, 2001 and September 19, 2001.) He includes the report date of the August 2, 2001 report as a "material event" day, but this day is not associated with a significant price reaction in his purported event study.

[30] "Bressler Quits AOL Time Warner; Job at Viacom Seen as Possible," *The Wall Street Journal*, March 23, 2001.

released to the market on these four days, so his evidence in no way implies that the CSFB reports had a significant impact on the stock price. In fact, his statistical test does not show significance at the 95% level for three of these four days, and shows a negative significant return on the fourth day.

**V.    The Absence Of Any Reaction Of AOL's Stock Price To CSFB's Reports Is Consistent With The Fact That Most Of CSFB's Reports Were Reiterations, That CSFB's Analysts Covering AOL Were Not The Most Prestigious Covering the Company During The Class Period, And That, Throughout The Period That CSFB Covered AOL, CSFB's Forecasts For AOL's Financials And 12-Month Price Target Were Comparable To Or Lower Than Those Of Other More Prestigious Analysts.**

30. The analysis presented in the previous section shows that AOL's stock-price movements cannot be attributed to CSFB's reports on AOL either as a whole or individually on any of the report effective dates. This result is not surprising for the following reasons.

A. *Except For Two Days On Which CSFB Lowered Its Price Target For AOL, CSFB's Recommendations And Price Targets In Its Reports On AOL Were Reiterations.*

31. All of the CSFB reports on AOL that included a recommendation for AOL contained a "Buy" recommendation.[31] CSFB's price target for AOL changed only twice from its initial recommendation of $80, once in its report on February 1, 2001 to $75, and again in its report on September 25, 2001 to $45.[32] That is, except for its first report, and its two reports in February and

---

[31]As already mentioned, CSFB's report dated July 12, 2001 focused on the internet industry and did not issue any recommendation for AOL.

[32] CSFB's price target of $80 for AOL from January 12, 2001 to February 1, 2001, matched exactly its price target for America Online in its reports prior to the merger. Although CSFB did not provide sufficient detail on its models to ascertain whether this $80 price target was for the combined company's financials, it is likely to have been so since CSFB's January 16, 2001 report has the title "AOL Time Warner." I understand, however, that there is some ambiguity about analysts' practice for stocks of firms that have undertaken a merger when the merger is not yet completed (see Sara Moeller, Fred Schlingeman,

September 2001, all of the CSFB reports on AOL were reiterations of previous recommendations and price targets and therefore did not contain surprises for the market concerning recommendations and price targets. Exhibit 1 shows that AOL's stock-price reactions on the effective dates of the two reports in which CSFB altered its stock-price recommendation and to its first report on January 12, 2001 were not statistically significant.

32. The discussion in Section IV has shown that the CSFB reports as a whole did not impact stock prices.[33]  This finding is not surprising when it is considered that most of the CSFB reports were reiterations and contained no new information for the market concerning CSFB's recommendation and price target for AOL.  The existing empirical evidence in the finance literature concludes that analyst reiterations of ratings and price targets have an insignificant impact on stock prices, all other factors remaining the same. While there is a large body of finance and accounting literature on the stock-price effects of announcements of analyst recommendations and price targets, much of this literature focuses on changes in recommendations and changes in price targets because of the evidence that reiterations are unlikely to have a price impact.  For example, a recent study by Asquith, Mikhail, and Au concludes that "[c]onsistent with our expectations and prior research, we find statistically significant mean returns of 4.5% for upgrades and -6.6% for downgrades, and an insignificant mean reaction of 0.0% for reiterations."[34]

33. In denying defendants' motion to dismiss, the Court cited several academic papers which provide results on the value to investors and on the stock-price impact of analyst recommendations, forecasts, and target prices.[35]  These

---

and René Stulz, "How do diversity of opinion and information asymmetry affect acquirer returns?" *Review of Financial Studies*, forthcoming.)

[33] Repeating this analysis excluding the effective dates of the two reports in which CSFB's price target changed (February 1, 2001 and September 25, 2001) results in the same finding of no statistical significance.

[34] See Paul Asquith, Michael B. Mikhail, and Andrea S. Au, "Information content of equity analyst reports," *Journal of Financial Economics* 75 (2005): 259.

[35] Footnote 21 of the Memorandum and Order Re: Defendants Motions to Dismiss, December 7, 2006 in this litigation.

articles are consistent with the results of my event study.  In particular, the articles by Green and Womack focus on changes in analyst recommendations.[36]  In the case of CSFB, there were no such changes during the class period.  The article by Brav and Lehavy analyzes price target changes.[37]  Although that article finds a significant impact of joint reiterations of a recommendation and a target price, the authors do not control for confounding effects.  Thus the small but statistically significant stock-price effect they find (0.13%) could be the result of earnings announcements, or other company announcements that coincide with the analyst reports, rather than reiterations.

B.  *CSFB's Equity Analysts Covering AOL Were Not The Most Prestigious Analysts Covering That Company During The Class Period.*

34. The Complaint notes in paragraph 9 that CSFB analyst Jamie Kiggen was "an influential analyst" and that CSFB analyst Laura Martin was "considered an influential analyst, achieving a prestigious third team ranking by the Institutional Investor magazine in 2000 and 2001."  However, CSFB equity analysts were not the most prestigious analysts covering AOL during the class period, based on the Institutional Investor magazine rankings cited in the Complaint.

35. Throughout the class period, AOL was covered by a large number of different analyst firms.  One source lists 48 equity analyst firms covering AOL in 2001 and 43 in 2002.[38]  Thus CSFB was just one of many sources of analyst reports to the market.  Moreover, as noted by the Court, existing academic research shows that the highest ranked analysts are more accurate and influence stock

---

[36] T. Clifton Green, "The Value of Client Access to Analyst Recommendations," Working Paper, Emory University, 2004; Kent L. Womack, "Do Brokerage Analysts' Recommendations Have Investment Value?" *Journal of Finance* (52), 1996.
[37] Alon Brav and Reuven Lehavy, "An Empirical Analysis of Analysts' Target Prices: Short-term Informativeness and Long-term Dynamics," *Journal of Finance* (58), 2003.
[38] *Nelson Information's Directory of Investment Research*, Port Chester: Nelson Information, 2002; *Nelson Information's Directory of Investment Research*, New York: Nelson Information, 2003.

prices more.[39] A review of the Institutional Investor magazine rankings issued in years 2000-2002, listed in Exhibit 3A, shows that Laura Martin was a runner-up in the Cable sector in 2000 and lost that ranking in 2001. She was ranked third-team in the Entertainment sector in years 2000 and 2001. Jamie Kiggen was ranked third-team in the Technology sector in 2000 and dropped to runner-up status in 2001. The higher ranks of first and second team in the Cable and Technology sectors for those two years were received by analysts from Merrill Lynch, Morgan Stanley, Bear Stearns, Lehman Brothers and Goldman Sachs.

36. The articles to which the Court refers contrast the stock-price impact of All-American analysts to the stock-price impact of all other non-ranked analysts. However, not all All-American analysts are the same and work by Scott E. Stickel investigates separately the impact of first-team, second-team, third-team analysts and runners-up, which are the four different rankings assigned by the Institutional Investor magazine. Stickel finds that "Buy" recommendations from first-team and second-team All-American analysts have a bigger stock-price impact than those from non-All-Americans, and that "Buy" recommendations by third-team and runners-up do not have a bigger impact on stock prices than the same recommendations from non All-Americans, all else being equal.[40] Perhaps more importantly, the results of Stickel's model actually imply that the ranking of the CSFB analysts was not sufficiently high for their reports to have had any impact on the price of the stock of a large company like AOL.[41]

---

[39] Footnote 21 of the Memorandum and Order Re: Defendants Motions to Dismiss, December 7, 2006 in this litigation.

[40] Scott E. Stickel, "The Anatomy of the Performance of Buy and Sell Recommendations," *Financial Analysts Journal*, September-October 1995.

[41] I calculated the predicted stock-price impact of a report by an analyst with CSFB's ranking of third team or runner-up during the class period based on the results of Stickel's first regression model reported in Table 6 of his paper. Based on that regression, the point estimate of the impact of a buy recommendation (not accompanied by a change in earnings forecast or an earnings release, and not at the end of the month) of a third-team All-American or a runner-up All-American is slightly negative for a report by an analyst at a large analyst firm on a firm with market capitalization in the top quintile of all firms, such as AOL.

37. This result is consistent with the results of my event study and is not surprising given the large number of research analysts who covered AOL in 2001 and 2002 and the fact that other more prestigious analysts often issued reports at the same time as CSFB.  As noted in the exhibits discussed below, Bear Stearns, Lehman Brothers, Merrill Lynch, and Morgan Stanley, whose analysts received higher rankings than Jamie Kiggen and Laura Martin, often exceeded CSFB's estimates for AOL during the class period.

38. As further support that CSFB analysts named in the Complaint were less influential than other analysts at the time, I find that Laura Martin and Jamie Kiggen were mentioned in the public press much less often than other analysts.  For example, as shown in Exhibit 3B, Jamie Kiggen's name appeared three times and Laura Martin's name never appeared in my review of the public press about AOL.[42]  In contrast, Bernstein Research's Thomas Wolzien had 31 mentions and Merrill Lynch's Jessica Reif Cohen was mentioned 27 times.

C. *CSFB's Estimates For AOL Were Comparable To Those Of Other More Prestigious Analysts And Typically Lower Than Those Of Some Of These Analysts.*

39. To perform the comparison of CSFB's estimates with those of other analysts, I identified investment banks for which at least one analyst received a ranking by the Institutional Investor magazine for coverage of industry sectors relevant to AOL in the magazine's October 2000, 2001, or 2002 rankings issues.[43]  I then reviewed all analyst reports published by the investment banks with ranked analysts that were available to me.  These included Bear Stearns, Bernstein Research, Deutsche Bank, Goldman Sachs, Lehman Brothers,

---

[42] The number of mentions for a particular analyst was obtained by searching for the name of the analyst in public press articles about AOL published during the class period from January 12, 2001, to July 24, 2002.
[43] The other prominent ranking of analysts is *The Wall Street Journal*'s Best on the Street Analysts' Survey. Neither Jamie Kiggen nor Laura Martin is mentioned in that ranking for their coverage during the class period.

Merrill Lynch, Morgan Stanley, Salomon Smith Barney, and UBS Warburg.[44] Comparing CSFB's estimates to those of these banks is appropriate because the estimates from these banks are published by the most prestigious lead analysts in AOL's industry sectors. In fact, in every category for every year, the lead AOL analyst of at least one of these banks was ranked ahead of the lead AOL analysts of CSFB.

40. Exhibits 4A-4D graph CSFB's estimates of AOL's 12-month price target, and 2001 EBITDA, revenue, and cash EPS estimates as well as the estimates of the other banks with ranked analysts for which I was able to review analyst reports. Each exhibit shows clearly that CSFB did not have the highest estimate of the nine banks for any significant period of time during CSFB's coverage of AOL.

41. Exhibits 5A-5D show forecasts for year 2001 reported by CSFB and the nine other banks for four key metrics, and compute the fraction of trading days that CSFB's forecasts were lower than or equal to some other bank's forecast over the period of CSFB's coverage of AOL. The results are as follows:

a) Price target. Exhibit 5A shows that over the entire 260 trading-day period from January 12, 2001 to January 30, 2002, at least one of the other nine banks had a price target that was higher than or equal to CSFB's price target for AOL, with Salomon Smith Barney estimating a price target as high as $115 through April 18, 2001, more than 50% higher than CSFB's $75 estimate.[45]

b) 2001 EBITDA. Exhibit 5B shows that over the 246 trading days between February 1, 2001 and January 29, 2002, CSFB's forecast for

---

[44] Bernstein Research is not a bank in the sense of the other institutions publishing analyst reports that have all-star analysts. However, since the distinction is immaterial to the report, I ignore it.
[45] See footnote 32 regarding CSFB's price target for the period from January 12, 2001 to February 1, 2001. My comparison of CSFB's price target to that of the other banks ends on January 30, 2002, as that is the date of the last CSFB report on AOL during the class period.

2001 EBITDA was equal to or lower than at least one other forecast by a ranked analyst for all of the days.[46]

c)  2001 Revenue. Exhibit 5C shows that CSFB's forecast was lower than or equal to other forecasts 72% of the period from February 1, 2001 to January 29, 2002.[47]  The highest forecast exceeded CSFB's forecast by more than $1 billion for significant periods for time, and by as much as $2.5 billion for some time.

d)  2001 Cash EPS.  A company's Cash EPS is an important metric closely watched by market participants.  Exhibit 5D shows that CSFB's Cash EPS estimate was lower than those of the nine other banks 100% of the period from February 1, 2001 to January 29, 2001.[48]

e)  I also find that other analysts used language regarding AOL in their reports that was far more strongly supportive of the company than CSFB.  For example, Goldman Sachs stated "Given its opportunity, scale, and attractive valuation, we believe AOL Time Warner is the Internet/media blue chip stock to own over the next 12-18 months," while Salomon Smith Barney and Morgan Stanley analysts referred to AOL as their "Top Pick" or their "best money-making idea," in their reports in January and April 2001, and Deutsche Bank referred to AOL

---

[46] My comparison of CSFB's EBITDA to that of the other banks starts on February 1, 2001, as it is not clear that CSFB's reports for AOL from January 12, 2001 to February 1, 2001, updated all financials to reflect the combined company's financials.  For example, these reports show a fiscal year end of June, corresponding to America Online's fiscal year end, instead of the combined company's fiscal year end of December and EBITDA/share numbers that appear to be for America Online.  The result that CSFB's forecast for 2001 EBITDA was equal to or lower than at least one other bank's forecast continues to hold if January 2001 is included in the comparison.  My comparison ends on January 29, 2002, as that is the last date prior to the release of 2001 actual results by AOL.

[47] CSFB did not provide a revenue estimate for the combined company until its February 1, 2001 report, hence my comparison starts on February 1, 2001.  See footnote 46 for an explanation of the end date of January 29, 2002 for the comparison.

[48] My comparison of CSFB's EPS to that of other banks starts on February 1, 2001, for the same reasons that EBITDA comparisons start on February 1, 2001 (see footnote 46.)  The result that CSFB's forecast for 2001 EPS was lower than at least one other bank's forecast continues to hold if January 2001 is included in the comparison.  See footnote 46 for an explanation of the end date of January 29, 2002 for the comparison.

as their "favorite large-cap stock." In its February 2, 2001 report, Merrill Lynch stated "AOL is now the only stock in our Internet universe that is NOT rated High Risk (D)." Even as late as September 25, 2001, Bear Stearns stated, "We are still believers in the AOL Time Warner story, and the company remains our top fundamental pick."[49]

42. To summarize, analysts who were more prestigious than CSFB typically had higher or equally optimistic forecasts on AOL than CSFB for significant periods of time during the class period. Therefore, it is not surprising that the CSFB reports had no effect on AOL's share price during the class period.

## VI. There Is No Evidence That The Disclosure To The Market Of Information Allegedly Concealed By CSFB's AOL's Reports Had Any Effect On AOL's Stock Price.

43. The Complaint alleges that when certain "…material adverse information, which Defendants knew of, but did not disclose during the Class Period, materialized and became public, AOL's stock price declined materially, causing losses to the Lead Plaintiff and the Class…."[50] The material adverse information that the Complaint alleged was concealed by CSFB includes knowledge of a "substantial weakening in the advertising markets that would negatively affect AOL…," "…'inappropriate accounting activities' relating to 'some deals booked [which] inappropriately inflated revenue'…," and "…undisclosed layoffs at AOL, which would 'not be announced publicly.'"[51] In this section, I show that AOL's stock price did not react significantly to the allegedly concealed material information regarding "inappropriate accounting activities" and "undisclosed layoffs at AOL" when this information became public. In the next section, I show that the market received information about

---

[49] Goldman Sachs report dated January 23, 2001, Salomon Smith Barney report dated January 18, 2001, Morgan Stanley reports dated January 19, 2001, and April 20, 2001, and Deutsche Bank reports through April 3, 2001.
[50] Complaint, paragraphs 3 and 4.
[51] Complaint, paragraph 4.

the risks to AOL posed by a weak advertising market in 2001 both from CSFB's reports on AOL and from other sources.

A. *AOL's Stock Price Did Not React Significantly To The Washington Post Articles In July 2002 That Discussed Allegedly Inappropriate Accounting At AOL.*

44. On July 18, 2002 and July 19, 2002, the *Washington Post* published two articles discussing allegedly inappropriate accounting for certain advertising contracts at AOL. My event study shows that AOL's stock-price movement was not significant on either day, indicating that the stock market did not view the information published in the *Washington Post* to be material. Moreover, even Dr. Hakala's purported event study does not find the stock-price reaction on these two days to be significant.

45. It is not surprising that AOL's stock price did not move significantly in response to the *Washington Post* articles when it is considered that the revenue of $270 million from the advertising deals discussed in the articles represented only 6% of America Online's advertising/commerce revenues, which was only 1.7% of America Online's total revenue and only 0.4% of AOL's total revenue.[52] Analyst reports by prestigious analysts published on July 18, 2002 discuss the small relative size of the amount of transactions under question and the confirmation of the validity of the transactions by Ernst & Young, AOL's auditors.[53] Analysts also told the market that their interpretation of the *Washington Post* articles was that the articles highlighted the fact that there was no illegal or fraudulent accounting, though there may have been aggressive business practices at AOL.[54]

46. Even assuming that the unspecified AOL accounting irregularities known to CSFB through the unspecified source were the same accounting irregularities

---

[52] "Accounting Practices vs. Business Practices – Not to be Confused," Bear Stearns, July 18, 2002.
[53] See, for example, "Accounting Practices vs. Business Practices - Not To Be Confused," Bear Stearns, July 18, 2002; "Accounting Allegations Arise; Volatility in Near-Term," Salomon Smith Barney, July 18, 2002.
[54] "Accounting Practices vs. Business Practices - Not To Be Confused," Bear Stearns, July 18, 2002.