# EXHIBIT 16

IN RE: CREDIT SUISSE AOL SECURITIES

RENE M. STULZ - 6/21/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



Ellen Grauer
COURT REPORTING Co. LLC
worldwide!

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434    FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

THIS PAGE LEFT INTENTIONALLY BLANK

## Page 1

(1) UNITED STATES DISTRICT COURT
(2) DISTRICT OF MASSACHUSETTS
(3) ------------------------------------x
(4) IN RE:
(5)    CREDIT SUISSE AOL SECURITIES LITIGATION
(6) CASE NO.: 1:02 CV 12146
(7) ------------------------------------x
(8)
(9)            805 Third Avenue
               New York, New York
(10)
               June 21, 2007
(11)           9:32 a.m.
(12)
(13)
(14)     Videotaped Deposition of a
(15) Non-Party Expert, RENE M. STULZ, pursuant to
(16) Agreement, before Sophie Nolan, a Notary Public
(17) of the State of New York.
(18)
(19)
(20)
(21)
(22)
(23)   ELLEN GRAUER COURT REPORTING CO. LLC
       126 East 56th Street, Fifth Floor
(24)      New York, New York 10022
             212-750-6434
(25)         Ref: 84634

## Page 2

(1) A P P E A R A N C E S:
(2)
(3) DAVIS POLK & WARDWELL,
(4)    Attorneys for CSFB and the Witness
(5)       450 Lexington Avenue
(6)       New York, New York  10017
(7) BY:   AVI GESSER, ESQ.
(8)       DANIEL J. SCHWARTZ, ESQ.
(9)       JONATHAN K. CHANG, ESQ.
(10)      PHONE   212-450-4000
(11)      FAX     212-450-3429
(12)      E-MAIL  avi.gesser@dpw.com
(13)
(14) KAPLAN FOX & KILSHEIMER, LLP
(15)    Attorneys for Bricklayers and class members
(16)       805 Third Avenue
(17)       New York, New York  10022
(18) BY:   DONALD R. HALL, ESQ.
(19)       MELINDA RODON, ESQ.
(20)       PHONE   212-687-1980
(21)       FAX     212-687-7714
(22)       E-MAIL  dhall@kaplanfox.com
(23)
(24)
(25)

## Page 3

(1) A P P E A R A N C E S:  (Cont'd)
(2)
(3) WILMER HALE
(4)    Attorneys for Frank Quattrone
(5)       60 State Street
(6)       Boston, Massachusetts
(7) BY:   JEFFREY RUDMAN, ESQ.
(8)       PHONE   617-526-6912
(9)
(10) ALSO PRESENT:
(11)       DAVID JIMENEZ, Legal Videographer

## Page 4

(1) ----------------- I N D E X -----------------
(2) WITNESS: RENE M. STULZ
(3) EXAMINATION BY                              PAGE
(4) MR. HALL                                       9
(5) MR. GESSER                                   169
(6)
(7) ---- DOCUMENTS AND/OR INFORMATION REQUESTED ---
(8) DESCRIPTION                                 PAGE
(9) Copy of regression analysis                   45
(10) Confirmation whether or not what has         82
(11) been marked as Stulz 3 is the actual
(12) regression outputs that were used to
(13) prepare Exhibit 1 to Professor Stulz's
(14) declaration
(15)
(16) ---------------- E X H I B I T S ----------------
(17) STULZ    DESCRIPTION                      FOR I.D.
(18) 1        Declaration of RenT Stulz            71
(19)          dated April 26, 2007
(20) 2        Chart                                75
(21) 3        Document printed from Excel          79
(22)          spreadsheet

Page 5

(1) ---------- E X H I B I T S (Cont'd) ----------
(2) STULZ    DESCRIPTION                    FOR I.D.
(3) 4    Document entitled "Time Series     158
(4)      Models for Business and Economic
(5)      Forecasting, Philip Hans Franses
(6)      Cambridge University Press"
(7) 5    Printout from Thomson Research     163

Page 6

(1)                  S T I P U L A T I O N S
(3)      IT IS HEREBY STIPULATED AND AGREED by
(4) and between the attorneys for the respective
(5) parties herein, that filing and sealing be and
(6) the same are hereby waived.
(7)      IT IS FURTHER STIPULATED AND AGREED that
(8) all objections, except as to the form of the
(9) question, shall be reserved to the time of the
(10) trial.
(11)     IT IS FURTHER STIPULATED AND AGREED that
(12) the within deposition may be sworn to and signed
(13) before any officer authorized to administer an
(14) oath with the same force and effect as if
(15) signed and sworn to before the Court.
(17)               - oOo -

Page 7

(1)                  PROCEEDINGS
(2)      THE VIDEOGRAPHER: This is tape
(3) one. We are now on the record at 9:32
(4) a.m., Thursday June 21, 2007.
(5)      This is the opening of the
(6) deposition of Mr. RenT M. Stulz, In
(7) Re Credit Suisse AOL Security Litigation.
(8) The deposition is being held at the
(9) offices of Kaplan Fox located at 805
(10) Third Avenue, New York, New York.
(11)     The court reporter is Sophie Nolan
(12) with Ellen Grauer Court Reporting. I am
(13) the legal videographer, David Jimenez,
(14) also with Ellen Grauer Court Reporting.
(15)     Would counsel please introduce
(16) themselves?
(17)     MR. HALL: Donny Hall, Kaplan, Fox
(18) & Kilsheimer LLP on behalf of Bricklayers
(19) and the class Plaintiffs, the class
(20) members.
(21)     MS. RODON: Melinda Rodon, also
(22) with Kaplan Fox.
(23)     MR. GESSER: Avi Gesser, Davis,
(24) Polk for Defendant -- the Credit Suisse
(25) Defendants and here on behalf of the

Page 8

(1)                  PROCEEDINGS
(2) witness.
(3)      MR. SCHWARTZ: Daniel Schwartz also
(4) Davis, Polk & Wardwell, also on behalf of
(5) the Credit Suisse Defendants and the
(6) witness.
(7)      MR. CHANG: Jonathan Chang also
(8) from Davis, Polk & Wardwell for the
(9) Credit Suisse Defendants and the witness.
(10)     THE VIDEOGRAPHER: Will the court
(11) reporter please swear in the witness?
(12)     MR. RUDMAN: Jeff Rudman, Wilmer,
(13) Hale, for the Defendant, Frank Quattrone.
(14)     MR. GESSER: Just a couple of
(15) preliminary matters before we swear in
(16) the witness.
(17)     MR. HALL: Okay.
(18)     MR. GESSER: I think I indicated to
(19) you yesterday that he has a flight at
(20) 7:45. I know we've got seven hours on
(21) the record, but he really needs to get
(22) out of here by 6.
(23)     MR. HALL: I understand.
(24)     MR. GESSER: Just so that we
(25) understand, not all the Defendants are

## Page 9

here. Our objections will count for --
for all the Defendants and that all the
objections are preserved except as to
form.

    MR. HALL: Okay. Fine with me.

    MR. GESSER: Okay. And I think we never got a formal notice of the deposition and we didn't get any notice that it was being videotaped, but we'll go ahead.

    MR. HALL: Right, I mean, but I think this was done by agreement, not by notice, so --

    THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

R E N E  M.  S T U L Z, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY
MR. HALL:

Q. Can you please state your full name for the record, please?

A. My name is RenT, R-E-N-E, Stulz, S-T-U-L-Z.

## Page 10

Q. And, Mr. Stulz, what is your current address?

A. 2469 Southway, S-O-U-T-H-W-A-Y, Drive, Columbus, Ohio.

Q. Can you generally give me a description of your educational background starting with an undergraduate or the college level degrees and go forward, just in a general way?

A. So, I have an undergraduate degree in economics and I have a Ph.D. in economics and finance.

Q. Okay. And where was your undergraduate degree from?

A. My undergraduate degree was from the University of Neuchatel in Switzerland and my Ph.D. degree is from the Massachusetts Institute of Technology.

Q. And at the Ph.D. level, what was your primary area of focus?

A. So, my dissertation at the Ph.D. level was a dissertation in finance, so my primary focus at the dissertation stage was financial economics.

## Page 11

Q. Did you have any -- withdrawn.

    At the Ph.D. level, did you have any courses on statistics?

A. Yes. The Ph.D. program had required courses in statistics and I took them. In addition, there were additional courses dealing with the econometrics of finance.

Q. Did there ever come some time that you were contacted by someone, either a Defendant or someone representing the Defendant in this litigation, to work in this matter?

A. I'm sorry, I didn't understand the start of the question.

Q. When was the first time you were contacted about working in this matter?

A. In October of last year.

Q. And who were you contacted by?

A. My recollection is that I had a phone call with Mr. Gesser and with somebody from Cornerstone, C-O-R-N-E-R-S-T-O-N-E.

Q. Do you recall who was on the phone from Cornerstone?

A. Yes. It was Chris Nelson.

## Page 12

Q. Had you worked with Mr. Gesser before?

A. Yes.

Q. Okay. And in what matters had you worked with Mr. Gesser?

A. In -- at that time in two matters concerning analyst reports from Credit Suisse.

Q. Do you recall, were they -- were they civil litigation, do you recall?

A. Yes.

Q. Do you recall what the subject of those or the company at issue in those civil litigations were?

A. So, one of the cases led to a report and the company was Winstar, W-I-N-S-T-A-R, the second one did not lead to a report. It was a consulting matter.

Q. Okay. Was anyone else on the phone other than Mr. Gesser or Mr. Nelson?

A. I don't remember.

Q. Okay. Had -- had you worked with Mr. Nelson before?

A. Ms. Nelson, yes.

Q. And on what matters had you worked

### Page 13

(2) with Mr. Nelson before?
(3)   A.  She was involved in the Winstar
(4) case in the consulting matter also.
(5)   Q.  I apologize to Ms. Nelson. I
(6) assumed that Chris meant a Mr.
(7)       Have you been -- have you worked
(8) with Cornerstone before other than that
(9) engagement where you worked with Ms. Nelson?
(10)  A.  Yes.
(11)  Q.  Okay. And what matters have you
(12) worked on with Cornerstone?
(13)  A.  Most of the matters that I
(14) disclosed in the list of testimony involved
(15) Cornerstone and a number of other cases that I
(16) was involved with.
(17)  Q.  What other -- do you recall other
(18) individuals at Cornerstone you've worked with?
(19)  A.  I've worked with John Gould. I've
(20) worked with John Rozoff. I've worked with
(21) Adell Turkei and a number of --
(22)  Q.  Did that conversation with
(23) Mr. Gesser and Ms. Nelson lead to you being
(24) retained in this litigation?
(25)  A.  I was retained obviously in this

### Page 14

(2) litigation. I don't know if the conversation
(3) led to that, but I was retained.
(4)   Q.  Okay. Do you recall when you were
(5) officially retained for this litigation?
(6)   A.  I recall that I started work
(7) towards the end of October, so by that time I
(8) must have been retained.
(9)   Q.  And you're talking about October of
(10) '06 obviously?
(11)  A.  That's right.
(12)  Q.  When you started working towards
(13) the end of October of '06 on this litigation,
(14) was it in a consulting role or in a role as --
(15) to become a testifying expert in this
(16) litigation?
(17)  A.  At that time, I was asked to
(18) perform a task, but that was it at that point.
(19)  Q.  Okay. Was that task something that
(20) you relied upon in preparing your report that
(21) you submitted in this litigation?
(22)  A.  It is part of my report.
(23)  Q.  It is part -- what was the task?
(24)  A.  To investigate the impact of the
(25) analyst reports on the stock price.

### Page 15

(2)   Q.  Okay. And what did you do at that
(3) time to investigate the impact of the analyst
(4) reports?
(5)   A.  Well, first I familiarized myself
(6) with the analyst reports. I read them. I read
(7) the complaint. I started to gather additional
(8) information that I believed would be useful. I
(9) started to -- I started with an event study.
(10)  Q.  Okay. What other information did
(11) you gather that you thought would be useful?
(12)  A.  I started the process of
(13) identifying the information that was available
(14) in the market at various times during the class
(15) period.
(16)  Q.  Okay. Did you do that yourself or
(17) did someone perform that task for you?
(18)  A.  Mostly somebody performed that task
(19) following my instructions.
(20)  Q.  Okay.
(21)       MR. GESSER: Just to remind you, we
(22)    have a stipulation about expert
(23)    discovery, so at some point I may --
(24)       MR. HALL: I understand, but I'm
(25)    only now talking about what he did.

### Page 16

(2)       MR. GESSER: I understand.
(3)   Q.  Who performed those tasks for you?
(4)   A.  So in the -- collecting public
(5) information, Cornerstone did so.
(6)   Q.  Okay. Did Cornerstone provide you
(7) information other than information you
(8) specifically requested?
(9)   A.  The information I requested covered
(10) a very wide range of -- of data, so that's what
(11) I got.
(12)  Q.  Okay. Other than Cornerstone
(13) providing you with that information, has anyone
(14) else provided you information that you used in
(15) your -- or relied upon in preparing your
(16) report?
(17)  A.  Some of the information came from
(18) the attorneys, for instance, reports were given
(19) by the attorneys.
(20)  Q.  Things other than the reports?
(21)  A.  I mean, I received also some legal
(22) decisions that I asked for and I think they
(23) came from them.
(24)  Q.  Okay.
(25)       MR. GESSER: I mean, any

## Page 17

communications that we had that are of a legal nature are protected by the stipulation, so other than that.

    THE WITNESS: Okay.

    MR. HALL: Well, I just want to clarify, my understanding is but to the extent that he relied on that information in his report, I have -- I have the right to ask about that information.

    MR. GESSER: To the extent that it's not work product, I think that's right. To the extent that it's work product.

    MR. HALL: I disagree. If he relied upon it in preparing his report, I think that's what we're entitled to. If -- I think my understanding of our agreement is that if there were draft exchanges or information was exchanged that did not -- that wasn't used or relied upon in preparing the report and was discarded or something, then that is what the stipulation is meant to protect.

    It's -- there is no way that anyone

## Page 18

would enter into a stipulation that protected information that he actually relied upon in preparing his report.

    MR. GESSER: Well, I mean, you could say that drafts are relied upon in preparing his report. That's excluded by the stipulation.

    MR. HALL: I agree. Let's continue and see if it actually becomes an issue.

    MR. GESSER: Okay.

    Q. What legal decisions did you request?

    A. So, I was -- I mean, I had received at some point memorandum by the judge concerning the case. That memorandum referred to some other cases and my recollection is I asked for a couple of them.

    Q. Okay. Do you recall which ones you asked for?

    A. I received the DeMarco case.

    Q. Other ones you asked for?

    A. I believe that it was one about market efficiency and I don't remember the name of the case.

## Page 19

    Q. Okay. Do you recall reviewing a case called in re Polymedica which is a First Circuit case?

    A. Yes.

    Q. Okay. How about in re Excelera which is another decision by the First Circuit?

    A. I don't remember.

    Q. How are you being compensated for your work in this litigation?

    A. I charge by the hour and so I'm compensated by the hour.

    Q. And how much do you charge per hour?

    A. $700 per the hour.

    Q. Okay. And have you been paid for working this litigation to date?

    A. All my invoices to date have been paid, yes.

    Q. Do you know what the total amount of those are?

    A. No.

    Q. Can you give me an idea?

    A. A very rough idea which would be more than $25,000 and less than $50,000.

## Page 20

    Q. Okay. That's actually not that wide of a range, but thank you.

    MR. GESSER: He's very precise.

    Q. Are you current -- where are you currently employed?

    A. At the Ohio State University.

    Q. Okay. And other than the Ohio State University and consulting or expert testimony work for litigation, do you have any other sources of income?

    A. Can you repeat your question? I'm not sure I understood the second part of it completely.

    Q. Okay. From your testimony, I assume -- let's start over. I assume you get a salary or you get compensated for your work at -- in Ohio.

    A. Yes.

    Q. Okay. I assume that -- you've stated that you get compensated for providing consulting and expert testimony in legal matters; is that correct?

    A. That's correct.

    Q. Okay. Are there any other sources

Page 21

(2) of compensation that you receive from --
(3) from -- other than those two categories?
(4)    A.   Yes.
(5)    Q.   And what are those categories, just
(6) generally? You don't have to go into too much
(7) detail.
(8)    A.   As far as consulting, that would
(9) not be litigation consulting, but --
(10)   Q.   Yeah.
(11)   A.   -- other consulting. I also belong
(12) to some boards which involve compensation.
(13)   Q.   Okay. What boards are you a member
(14) of?
(15)   A.   I'm on the board of a bank holding
(16) company in the U.S. and I'm on the board of a
(17) Swiss private bank and I'm on the board of a
(18) fund management company.
(19)   Q.   And what's the fund management
(20) company?
(21)   A.   It's a small company in Switzerland
(22) called Weggelin, W-E-G-G-E-L-I-N, Fund
(23) Management.
(24)   Q.   Okay. What percentage of your
(25) compensation comes from providing consulting or

Page 22

(2) expert testimony in legal matters?
(3)    A.   I -- I'm not sure. What I know for
(4) sure is that the biggest source of income is my
(5) salary at Ohio State.
(6)    Q.   Okay. Can you give me an estimate
(7) of how much your compensation has been over the
(8) last, say, two years from work you've provided
(9) in legal matters?
(10)   A.   I haven't tried to add it up, so I
(11) don't have a good sense. I'm sure it's in the
(12) six figures, but I don't know much more than
(13) that.
(14)   Q.   Would it be more than a couple of
(15) hundred thousand U.S. dollars?
(16)   A.   If a couple is 200, I'm sure, yes.
(17)   Q.   It's more than that?
(18)   A.   It's more than that.
(19)   Q.   Okay. Is it more than 300,000?
(20)   A.   I don't know. I suspect it is, but
(21) I would have to look at it.
(22)   Q.   Okay. I know in your report which
(23) we will get to in a second, you list some
(24) matters where you provided testimony and I
(25) think it was just a few.

Page 23

(2)         Are there other matters where you
(3) prepared and submitted an expert report that
(4) was, you know, submitted in the litigation that
(5) are not included in your report and where you
(6) haven't testified?
(7)    A.   So, I provided in my report the
(8) list of cases where I testified in deposition
(9) or in court. I did not include the cases where
(10) I testified in -- I mean through a report.
(11)   Q.   What -- can you give me a list of
(12) the cases where you've testified through a
(13) report that you can recall?
(14)        MR. GESSER: For what time period?
(15)   Q.   Let's go over the last few years.
(16)   A.   It would be difficult to -- to
(17) remember the exact cases. I know that over the
(18) last twelve months the cases include an
(19) affidavit, so that wouldn't be part of the
(20) reports. Then it involved reports in Parmalat.
(21)   Q.   Okay. I want to understand the
(22) distinction you made between an affidavit and a
(23) testifying through a report.
(24)        Are there matters in which you
(25) provided an affidavit within the last twelve

Page 24

(2) months that you can remember?
(3)    A.   Yes.
(4)    Q.   And what are those matters?
(5)    A.   It's an analyst case involving the
(6) firm Lantronix, L-A-N-T-R-O-N-I-X.
(7)    Q.   Have you provided an affidavit or
(8) declaration in any other analyst cases?
(9)    A.   No.
(10)   Q.   What about in re Metromedia?
(11)   A.   I'm sorry, I have not provided an
(12) affidavit in other cases. There have been
(13) reports in other cases.
(14)   Q.   All right. And what other cases
(15) have you provided reports in?
(16)   A.   One example would be Metromedia
(17) which would be one in the last twelve months.
(18)   Q.   Other ones that you can recall?
(19)   A.   There was a report on a case named
(20) Corvis. That was three or four years ago.
(21)   Q.   Correct me if I'm wrong, but most
(22) of the ones that you've mentioned now
(23) Lantronix, Corvis, Metromedia, those three at
(24) least have concerned analyst reports; is that
(25) correct?

Page 25

(2) A. That's correct.
(3) Q. In any of those litigations, did
(4) you find that an analyst had impact upon a
(5) stock price?
(6) A. Well, in those reports, you know, I
(7) conducted event studies. Then I analyzed the
(8) abnormal returns associated with the reports.
(9) Q. Okay. But in any of those reports,
(10) was -- based on your analysis, is it your
(11) opinion that the analyst reports affected the
(12) stock price?
(13) A. The data led me to conclude that
(14) they did not in those cases.
(15) Q. Okay. In preparing your event
(16) study, did you attempt to control for certain
(17) events?
(18) A. I'm not sure I understand what
(19) you're asking.
(20) Q. Okay. I could be asking the
(21) question using the wrong term, so I'll try my
(22) best, but not being an economist it gets
(23) difficult sometimes, but when you report --
(24) let's just go -- I'm clear that you did an
(25) event study in this litigation; correct?

Page 26

(2) A. That's correct.
(3) Q. Okay. And you -- would you
(4) include -- did you do a regression analysis in
(5) this case?
(6) A. That's correct.
(7) Q. Okay. Did you perform that
(8) regression yourself?
(9) A. No.
(10) Q. Who performed the regression?
(11) A. Cornerstone.
(12) Q. Okay. Who performed the event
(13) study?
(14) A. I performed the event study.
(15) Q. Okay. And can you -- when you say
(16) you performed the event study, can you tell me
(17) what -- what that means to you?
(18) A. What that means is that everything
(19) that was done was done on my instructions and I
(20) give precise instructions as to what I wanted
(21) to consider and how I wanted it to be done.
(22) Q. In performing your regression
(23) analysis, did you attempt to control for
(24) certain events that took place on specific
(25) days?

Page 27

(2) A. The way I performed the event study
(3) was to use the accepted method of doing so and
(4) the accepted method involves controlling for
(5) market movements and industry movements, and I
(6) did so.
(7) Q. Okay. And are there other methods
(8) to performing event study in a regression?
(9) A. There are other ways to control,
(10) for instance, for market movements that do not
(11) involve regression, so the question is not
(12) required to perform an event study.
(13) Q. Okay. How did you go about
(14) selecting which news or information to control
(15) for in performing -- in having Cornerstone
(16) perform the regression?
(17) A. So, the question that was asked was
(18) whether the analyst reports had an impact on
(19) the stock price, so the event study was a
(20) traditional event study designed to investigate
(21) whether those events were associated with
(22) significant abnormal returns on those days.
(23) Q. Okay. Tell me how you went about
(24) performing that analysis.
(25) A. So, I estimated regression that

Page 28

(2) controls for general market movements and
(3) controls for industry-related movements that
(4) are relevant for a firm like AOL and then I
(5) used the regression to obtain estimates of
(6) abnormal returns on the dates of the reports.
(7)    MR. HALL: Let's just take a 30
(8) second break so that the -- I think
(9) something is wrong with the tape, so --
(10)    THE VIDEOGRAPHER: We are now off
(11) the record at 10 o'clock, a.m., June 21,
(12) 2007.
(13)    (Recess taken.)
(14)    THE VIDEOGRAPHER: This is tape two
(15) of the deposition of Mr. RenT M. Stulz.
(16) We are now on the record at 10:02 a.m.,
(17) June 21, 2007.
(18) Q. Mr. Stulz, I'd just like to jump
(19) back one moment. I believe you had given me
(20) earlier at least three other specific cases
(21) that were related to analyst reports. I think
(22) they were Lantronix, Corvis and Metromedia
(23) related cases; correct?
(24) A. We had talked about a fourth one
(25) which was Winstar.

Page 29

Q. Okay, four. And I believe your prior testimony was that in none of those cases did you find that the analyst reports had an impact on the stock price; is that correct?

A. That in none of the cases I found credible evidence of an impact, yes.

Q. Did you find any evidence of impact in those cases?

A. What the event study allowed me to do is find whether there is credible evidence or not.

Q. Okay. Have you -- have you ever analyzed analyst reports in any specific litigation or in general or for something not related to litigation in which you found that analyst reports had impact upon the stock price?

A. We talked about all the litigation cases that I was involved with that involved analysts.

Q. Okay. I'm talking about anything, whether it's litigation related or not.

Have you ever performed a study or an analysis in which you found that analyst

Page 30

reports had an impact on stock price?

A. It would depend on how exactly you define "impact." One of my papers shows that the impact of some events and corporations depends on analyst following. It depends on the diversity of opinion among analysts.

So if that is encompassed by -- I mean, impact encompasses those types of events then I would have yes.

Q. Why don't you define -- define for me how you understand impact to be in reaching your conclusions for this litigation?

MR. GESSER: Objection.

A. So, I mean, as I said in this litigation, the question is did the analyst reports have an impact around the time that they were released on the stock price as measured by an event study.

Q. I know, but why don't you give me what your understanding is of what you just said of the word "impact."

A. So, as I just said, in this context impact would mean that there is a positive abnormal return associated with the analyst

Page 31

report.

Q. Does that mean that that analyst report had to have a positive impact in causing the stock price to increase?

A. So, for the analyst report to lead the stock price to be higher than it would have been otherwise, yes.

Q. Okay. Well, in this litigation, you said you read the complaint; correct?

A. That's correct.

Q. Okay. Part of the allegations here are that certain information, material information, was omitted from the analyst reports; correct?

A. Correct.

Q. And other information was misstated or misleading in the analyst reports. Those are the allegations; correct?

A. Correct.

Q. Okay. So, when you say that the stock price was higher than it otherwise would have been, are you including in that if someone had negative information then they would have disclosed it, but they didn't, the stock price

Page 32

would have dropped, are you including that as impact?

MR. GESSER: Objection to form.

A. So, I told you what I looked at for the impact of the analyst reports. That's all I can tell you. For the other information, I looked at what happened to the stock price when that information came to the market.

MR. RUDMAN: Mr. Hall, can we have agreement that when Mr. Gesser objects, that he's objecting for Mr. Quattrone as well so I don't have to bother you by butting in?

MR. HALL: Yeah. I think he already said that on the record beforehand.

MR. RUDMAN: For Defendants who weren't here, I think, so just to make it clear.

MR. HALL: That's fine. That's the way I understood him. Thank you.

Q. Let me give you a hypothetical. Let's move away from this litigation. Let me give you a pretty -- try to narrow this down

## Page 33

just so I can understand and we can start talking on the same page or at least I understand.

Let's assume you have a pharmaceutical company who is, you know, about to bring a new drug to market and on January 1st they announced that they had preliminary approval by the FDA for this drug and let's assume that the stock price goes up on that news because it's a positive event for the company.

Now assume that the company is speaking on January 31st to the market and they state that everything is going great. We still think we will get approval from the FDA, but the stock doesn't move because the stock prices are incorporated that they would get preliminary approval from the FDA.

Would that be a fair scenario with your understanding of how the market moves?

MR. GESSER: Objection to form.

A. I'm not sure what it means to say that a scenario is fair. You are stating your assumptions that the market moves when the

## Page 34

announcement is made and it doesn't move later on when apparently there is no new information on the market and at this point that's the point you have reached.

Q. Do you disagree that that -- withdrawn. Let's move on.

But what the company didn't say on January 31st was on January 30th they learned that it was unlikely that it would be approved by the FDA, but they did not disclose that on January 31st.

Had they disclosed it a January 31st, the stock price would have declined, assume that, but since they didn't, there was no movement in the stock price.

Under your definition of "impact," would that statement to the market on January 31st, would you conclude that that had impact on the price of the stock?

A. Well, you have assumed that the statement didn't affect the stock price, so in performing the event study, I would not be able to find a change in the stock price as a result of the announcement.

## Page 35

What would happen though is at some point the market would find out that it didn't get approved and at that point the stock price would fall and I then would be able to find an impact.

Q. Okay. So if at a later point that information came out to the market and there was a -- a fall in the stock price of a statistically significant nature, you would then conclude that the January 31st statement had an impact on the stock?

A. No. What I would then conclude is that the curative disclosure had a significant impact on the stock price.

Q. But did the January 31st have any effect -- impact on the stock price?

A. You assume that the stock price didn't change.

Q. Well --

A. So in the sense of the event study it didn't have an impact.

Q. Well, that's what I'm trying to get to because I think in one of your earlier answers you said impact was the price was more

## Page 36

than what it otherwise would have been; is that -- is that fair?

A. That -- the focus was on whether the analyst reports led the price of AOL to be higher than it would have been. I specifically looked at that.

Q. Okay. So what I'm asking is in the scenario that I've given you where the stock price doesn't move when they make the announcement on January 31st and I think with your addition that the news comes out sometime later and there's a statistically significant drop with that, doesn't the January 31st statement have an impact on the stock because it kept it inflated?

MR. GESSER: Objection.

Q. Because had they disclosed the information, it would have decreased?

MR. GESSER: Objection to form.

A. So, with your scenario we have the increase on January 1. Then we have the decrease when there is a curative disclosure. Both of those events would be associated with significant abnormal returns under your

Page 37

(2) assumptions and the event study would identify
(3) those events. So, that's for your scenario,
(4) but as my report shows, that scenario is not
(5) relevant.
(6) Q. I'm in my hypothetical. I'm trying
(7) to stay away from your report right now because
(8) what I'm trying to do is get a good
(9) understanding of what seems to be the main
(10) point of your report which is the impact on the
(11) stock price. That's why I want to move to a
(12) hypothetical so we can stay out of this.
(13) We will get into that, I promise
(14) you, but what I'm trying to understand is in my
(15) scenario if on January 31st they did not
(16) disclose the truth, the pharmaceutical company
(17) did not disclose the truth, and it is later
(18) disclosed and deemed to be material because of
(19) a statistically significant drop, would you
(20) conclude, yes or no, whether or not the January
(21) 31st statements to the market had an effect on
(22) the stock price?
(23) MR. GESSER: Objection to form.
(24) A. So, what I would conclude is that
(25) when the truth was revealed the stock price

Page 38

(2) fell so the information that was on the stock
(3) price was negative and significantly so by your
(4) assumptions.
(5) Q. Would you also conclude that had
(6) they disclosed that information on January 31st
(7) the stock price would have declined?
(8) A. To reach that conclusion, I think
(9) you have to be more precise with your scenario.
(10) We have to understand what information came to
(11) the market and exactly the nature of what they
(12) knew on the 31st that -- that they didn't --
(13) they didn't say.
(14) For instance, we would have to be
(15) sure that the market did infuse the probability
(16) of the rejection to be higher than management
(17) claimed that it was. The market might have
(18) been well informed about that probability.
(19) Q. Then why would it have dropped a
(20) statistically significant drop at the end or
(21) did you disagree that that would happen?
(22) A. So, I understood your question that
(23) the management misrepresented the probability
(24) in its statement, but it still was a
(25) probability. It was between zero and one.

Page 39

(2) Q. Okay.
(3) A. And so when the ultimate
(4) announcement was made, all the uncertainty was
(5) resolved. So it could have been that the
(6) market understood perfectly what the true
(7) probability was, despite the statements by
(8) management, but at the time of the
(9) announcement, there was negative information.
(10) Q. Okay. Let's try this again because
(11) I'm trying to do assumptions so we don't
(12) presume anything. We set it up so that it's
(13) clear.
(14) The information in my hypothetical
(15) that the management learned on January 30th,
(16) the day before the January 31st statements, was
(17) that it's unlikely that the drug will be
(18) approved, which is different from what they
(19) said on January 1st, which is the drug will
(20) be -- is likely to be approved.
(21) The news that comes out that causes
(22) the drop in the stock is the management finally
(23) comes clean and says, it is unlikely the drug
(24) will be approved. I'm trying to keep this
(25) clean so there's nothing else conflating the

Page 40

(2) news.
(3) However, on January 31st, they
(4) state the drug is still likely to be approved,
(5) even though they know it's unlikely to be
(6) approved; okay? Are you with me?
(7) A. I'm with you.
(8) Q. Okay. When they finally disclose
(9) that it's unlikely the drug will be approved,
(10) we're assuming that there is a statistically
(11) significant drop in the stock price. Okay?
(12) So, my question is, is in that
(13) hypothetical, would the stock price in your
(14) opinion had dropped on January 31st had they
(15) said the truth which is it is unlikely the drug
(16) will be approved?
(17) MR. GESSER: Objection to form.
(18) A. So, as long as we assume that the
(19) only information that the market had was
(20) information revealed by management and that
(21) nothing else happened, then it would be
(22) reasonable to use a drop at the time of the
(23) curative disclosure as an estimate of that.
(24) Q. Okay. So, if you can isolate that
(25) the curative disclosure was solely related to

## Page 41

(2) that information, is that what you're saying,
(3) you can then assume that it would have
(4) dropped?
(5)     MR. GESSER: Objection to form.
(6)   A. Well, it's not enough to ascertain
(7) that it was solely related to that information.
(8) It has to be the case that the market didn't
(9) have information that corrected the
(10) misstatements of management.
(11)   Q. But wouldn't that be a scenario
(12) where the stock price wouldn't have declined as
(13) much, because even if they had incorporated
(14) some of the probability that I think you're
(15) hinting at, doesn't that just determine how far
(16) the stock price would have dropped at the end
(17) when the information came out?
(18)   A. Right, but -- so, the curative
(19) disclosures may not have -- you know, in the
(20) scenario where the market -- I mean, suppose
(21) that the market knew the true probability and
(22) there is information subsequently that, I mean,
(23) in your scenario is that somehow management
(24) comes clean.
(25)     If at that point the market drops,

## Page 42

(2) you would have to evaluate as to why it is
(3) dropping. Is there some additional information
(4) that is being revealed at that time that has
(5) nothing to do with what happened on January
(6) 30th.
(7)   Q. I understand and I'm telling you in
(8) this assumption there isn't. I'm trying to
(9) keep it clean. I know in practice, and if we
(10) get to this case there are other informations
(11) coming out. I'm just trying to get a basic
(12) understanding on why it is -- what your opinion
(13) is on if there is no other information there,
(14) would the stock have dropped had they said the
(15) correct -- said the same thing they said later
(16) had they said it on January 31st, would the
(17) stock have dropped?
(18)   A. Right. So, if we do the analysis
(19) kind of in a vacuum where there's nothing else
(20) going on, no other information, then you would
(21) be correct that it would have dropped.
(22)   Q. Okay. I believe earlier you said
(23) that you, and I hope I get the term that I had
(24) before the break and I got sidetracked, but
(25) that you attempted to control for market news

## Page 43

(2) and industry news in your regression in this
(3) litigation; is that correct?
(4)   A. No, I attempted to control for
(5) market movements and industry movements.
(6)   Q. Okay. And how did you go about
(7) doing that?
(8)   A. So, in a regression what you're
(9) going to do is to allow for a market index to
(10) affect the predicted return and you're going to
(11) allow for industry values to affect the
(12) predicted return.
(13)     And, so, in my event study I then
(14) constructed indices for industry effects that I
(15) then use in the regression.
(16)   Q. Okay. And then I think you
(17) reference in your report that there are 35 days
(18) that analyst reports were issued as alleged in
(19) the complaint; is that correct?
(20)   A. I thought there was 35 analyst
(21) reports or 34 days.
(22)   Q. You're right. After I said that I
(23) thought that. How did you account for those 34
(24) days in your regression?
(25)   A. So, I estimated the regression

## Page 44

(2) omitting those days.
(3)   Q. Okay. Did you omit any other days?
(4)   A. So, I -- at one stage I verified
(5) that my results would be similar if I omitted
(6) the days of the curative disclosures.
(7)   Q. But you didn't include that in your
(8) report?
(9)   A. I did not include in my report that
(10) I had done that, that's correct.
(11)   Q. Do you have that -- was that a
(12) different regression, you ran a different
(13) regression under a different -- removing
(14) additional days, am I correct in understanding
(15) that?
(16)   A. That's correct.
(17)   Q. Okay. Do you have a copy of that
(18) regression?
(19)   A. Not with me.
(20)   Q. Okay. But do you have access to a
(21) copy of that regression?
(22)   A. Yes.
(23)   Q. Okay. Did Cornerstone also perform
(24) that regression?
(25)   A. That's correct.

Page 45

Q. And did that -- did that regression lead you to conclude that there was no impact in your report also?

A. So, that regression changed no opinion in my report. It changed no -- nothing that would be worth reporting.

Q. Okay. Did it confirm your opinion, in your mind?

A. Well, it didn't change it.

Q. Okay. Okay.

+ MR. HALL: I would request that we have a copy of that regression analysis that Mr. Stulz performed.

MR. GESSER: We'll take a look at the stip and see if it's covered or not.

MR. HALL: Okay.

Q. What days -- do you recall what days you removed in addition to the -- the 34 report days in that regression?

A. So, if I remember correctly, it would be August 13, 2001 and it would be July 23 and 24, 2002, but that's subject to my memory being correct.

Q. Yeah, I understand. There are a

Page 46

lot of dates involved so I understand you. What about August 14th, did you remove that day?

A. No.

Q. Why not, do you recall?

A. Because I did not include it in the curative disclosures.

Q. Are you aware that the complaint includes it as a curative disclosure?

A. I'm aware that the complaint talks about that day, but the information that was -- about the layoffs was out in the market on August 13.

Q. Okay. Does your regression analysis found that there was statistically significant movement in the stock price of AOL on August 14, 2001?

A. I believe that there is a significant drop on August 14, but I would have to check.

Q. Okay. What about July 24 and 25, does your regression show that there's a statistically significant drop on those days?

A. My regression shows it's not a

Page 47

statistically significant drop on the days of the Washington Post articles.

Q. Are you talking about July 18 and 19, 2002?

A. That's correct.

MR. GESSER: At some point it might be helpful to show him whatever documents you're talking about.

MR. HALL: We'll get there when I think it's necessary.

Q. But there are also additional articles on July 24th and 25th; correct?

A. That's correct and I want to correct a statement I made before because I removed 18 and 19, not 23 and 24.

Q. I was getting there. Did you remove July 24th and 25th?

A. No.

Q. Why not?

A. Because the information about the accounting problems was known to the market by that time.

Q. What about the fact that late on the 24th it was disclosed that there was an SEC

Page 48

inquiry?

A. Well, the rumors that you mention in the complaint is not about an SEC inquiry. It's about accounting problems.

Q. I'm not asking you to draw conclusions. In fact, I'm asking you whether or not you considered that to be information that you should account for and control for. So I'm asking you did you remove July 24th and 25th in your additional regression and I believe your answer is no. And I was asking why and is it -- it's my understanding the reason you're saying that is because it's your conclusion that the evidence doesn't support that that was a curative disclosure?

A. No, the evidence supports that the Washington Post articles laid out the accounting problems that -- I mean, alleged about AOL and so those accounting problems were known.

Q. Okay. What if a finder of fact were to conclude that there were, the allegations were part of what was disclosed on

## Page 49

(2) July 24th and 25th, would that change your
(3) opinion?
(4)     MR. GESSER: Objection to form,
(5) calls for a legal conclusion.
(6)  Q. You can answer.
(7)     MR. HALL: He's drawing them, so --
(8)  Q. You may answer.
(9)  A. Could you restate the question?
(10) Q. Yeah, I believe -- well, let me ask
(11) you, let me go back. Why did you, in your
(12) second regression, remove July 24th and 25th?
(13) A. I have already answered the
(14) question.
(15) Q. I know, I want an answer again
(16) because we had some talking in between.
(17) A. The answer is that the Washington
(18) Post articles revealed the accounting problems
(19) at AOL, Time Warner.
(20) Q. Okay. But what, as we allege in
(21) the complaint, that there were additional
(22) information disclosed on the 24th and the 25th,
(23) what if a finder of fact were to conclude that
(24) we were right? Would that change your analysis
(25) of the 24th and 25th?

## Page 50

(2)     MR. GESSER: Objection, calls for a
(3) legal conclusion.
(4)  A. So, my report gives you the
(5) analysis that I can do as a financial economist
(6) and I can't go beyond that.
(7)  Q. Okay. Well, let me -- okay. We'll
(8) go back to that. We'll go back to that.
(9)     I want to talk about you have --
(10) you discuss in your report that that -- I
(11) believe, and correct me if I'm wrong, but my
(12) understanding of your opinion is that one of
(13) the reasons there was no impact, in your
(14) opinion, was that CSFB analysts were just
(15) repeating or reiterating what AOL or others
(16) have said; is that correct?
(17) A. So, in my event study I find that
(18) there is no impact. Then I look at what we
(19) know from the literature to show that the
(20) finding of the event study is not really
(21) surprising because the finance literature finds
(22) a similar result when people look at broad
(23) samples.
(24)     But the event study is the primary
(25) part of the reports that leads to the

## Page 51

(2) conclusions that there is no impact -- is what
(3) leads to the conclusion that there is no
(4) impact -- the primary didn't belong there. I
(5) apologize.
(6)  Q. I understand that, but the way I
(7) read your report you say, well, it's not
(8) surprising because CSFB is just repeating what
(9) AOL had said. For example, on April 18th, you
(10) break that day into kind of two parts, before
(11) CSFB released their analyst report and after
(12) they released it and you say that there was no
(13) movement based on the CSFB report under your
(14) analysis, correct, on that day?
(15) A. So, I want to correct what you said
(16) because it really doesn't correspond to what I
(17) say in the report. In the report I say it's
(18) not surprising that I don't find significant
(19) abnormal returns because we have reiterations
(20) and you made a difference statement about my
(21) report.
(22) Q. Let's go with what you just said.
(23) Would you -- what would you have expected to
(24) happen had CSFB issued a report in which they
(25) disclose that there were accounting problems

## Page 52

(2) at -- at CSFB and they were being investigated
(3) by the SEC. I believe I meant AOL.
(4)  A. Can you repeat the question, too?
(5)  Q. Yeah, yeah. What would you expect
(6) to have happened if CSFB issued an analyst
(7) report and in that analyst report they
(8) disclosed that they had information and they
(9) had analyzed transactions at AOL and AOL was
(10) committing accounting violations and that they
(11) were being investigated by the SEC.
(12)     If CSFB said that before anyone
(13) else did, what would you expect to happen?
(14) A. Well, we know that when the
(15) Washington Post published information about
(16) accounting problems, there was not a
(17) significant abnormal return on those days.
(18) Q. But we know on July 24th and 25th
(19) when those articles were published about the
(20) accounting problems and the SEC investigation,
(21) you do find a significant return, correct,
(22) abnormal return?
(23) A. So, other information came to the
(24) market at that time.
(25) Q. If CSFB had disclosed that

Page 53

(2) information, would you expect the stock price
(3) to drop?
(4) A. Well --
(5) MR. GESSER: Objection, there is no
(6) issue with that information.
(7) MR. HALL: The information that was
(8) disclosed on the 24th and 25th that
(9) caused, according to Mr. Stulz's
(10) regression, a statistical abnormal
(11) return.
(12) MR. GESSER: Objection.
(13) A. At this point, I'm not in a
(14) position to use those days to make any
(15) inferences because other information came to
(16) the markets at that point and I can't reach any
(17) conclusion about the impact of the SEC
(18) announcement, per se.
(19) Q. Why?
(20) A. Because there was other information
(21) coming to the markets on those days.
(22) Q. What other information was coming
(23) to the market on those days?
(24) A. So, if my recollection is right,
(25) there was news on those days about the earnings

Page 54

(2) of AOL.
(3) Q. Right, but don't we allege in the
(4) complaints that those earnings, that missing
(5) those earnings were partial disclosure also?
(6) If they were related to improperly booking
(7) advertising revenue, they would be --
(8) So, what I'm asking you is -- is I
(9) know you didn't perform your study this way,
(10) but I'm asking you, you purport to be an expert
(11) in markets and finance and economics.
(12) I'm asking you a priori before you
(13) do your study, before you do an analysis, if
(14) the information was disclosed on the 24th and
(15) 25th, if CSFB knew that information and
(16) disclosed that information in an analyst report
(17) prior to that time, what would you expect
(18) the -- the market reaction to be? You would
(19) have to confirm it, I understand, but what
(20) would be your initial expectation?
(21) MR. GESSER: Objection. It's still
(22) not clear what we're talking about, that
(23) information.
(24) A. So, a lot of information came to
(25) the market on those two days.

Page 55

(2) Q. Okay. What other information? You
(3) keep throwing out. See, you're -- you're
(4) fighting my hypothetical. I'm saying assume
(5) all of that information because you keep saying
(6) there's more, there's more, there's more.
(7) What I'm saying is there was
(8) information that entered the market on July
(9) 24th and 25th. And whatever that information
(10) was, according to your own regression analysis
(11) there was a statistically significant abnormal
(12) return; correct?
(13) A. That's correct.
(14) Q. Okay. So, what I'm asking you to
(15) assume, and I realize this isn't what you
(16) analyzed, this isn't your report, but I'm
(17) trying to get some of your expertise here and
(18) see what your expertise would lead you to think
(19) what happened, which is had information -- had
(20) that information not been disclosed to the
(21) market but CSFB knew the information that was
(22) disclosed on July 24th and 25th, had CSFB
(23) disclosed it prior to that time, what do you
(24) believe the market reaction would have been?
(25) MR. GESSER: Objection, assumes

Page 56

(2) facts.
(3) A. So, it's a scenario that is really
(4) impossible, but if -- it's impossible because
(5) some of the information revealed by AOL Time
(6) Warner at that time wasn't even known by Time
(7) Warner, AOL Time Warner much before that --
(8) those dates.
(9) Q. What information is that?
(10) A. Well, like, what the earnings would
(11) turn out to be.
(12) Q. Okay. But I'm asking you to assume
(13) because part of our allegations here is that
(14) CSFB did know that AOL couldn't meet their
(15) earnings.
(16) So I'm asking you to assume that
(17) that information -- you know, I'm sure you tell
(18) your students don't fight the hypothetical.
(19) I'm asking you to assume the information that
(20) was disclosed to the market on July 24th and
(21) 25th in which you found your regression, the
(22) one prepared by Cornerstone, there was a
(23) statistically significant abnormal return on
(24) that information that was disclosed on July
(25) 24th and 25th.

Page 57

If CSFB had disclosed that same group of information to the market prior to that time, what do you expect the reaction of the market would have been?

    MR. GESSER: Objection to form.

    A. I think we have to be careful here because there are really two different things. One is a lot of information came to the market on those dates and if all of that information had been revealed at an earlier date, all of it in exactly the same form with the same credibility, it would have had an adverse impact on the stock price.

    Q. Okay. Assume that that -- all of that information you said just now that all of that information was revealed to the market at an earlier time, assume that CSFB was the one providing that information to the market, would you still have expected an adverse reaction in the stock price?

    MR. GESSER: Objection, ambiguous as to, again, what you mean by "that information."

    A. Well, as I already said, CSFB

Page 58

couldn't have that information --

    Q. But I'm telling you to assume they did.

    A. I understand, but there is an additional issue here which is that CSFB talking about things is not the same as the market learning on the 24th and the 25th. It's not -- the information is not conveyed in the same way.

    Q. What do you mean by that?

    A. What I mean by that is that on the 24th, there was an announcement by AOL Time Warner that stated explicitly what the earnings were. That's not the same as an analyst having an opinion that a company might not meet an earnings target. That's not the same information.

    Q. I believe your prior answer was -- is that if that information came to the market at an earlier time through a credible source, that you would expect an adverse reaction in the stock price; is that correct?

    A. We can --

    MR. GESSER: Objection.

Page 59

    A. -- reread my answer. My recollection is I said if it came to the market in the same way.

    Q. Okay. What do you mean by "the same way"?

    A. Well, what I mean by that is that if July 24 and 25 happened at an earlier date in the same way.

    Q. You mean the same speakers?

    A. Yeah.

    Q. So, if someone else would have said the same thing, your opinion is it wouldn't have had an impact on the stock price?

    A. No. My opinion is that at that point we entered the range of speculation because one has to make a lot of assessments about credibility and so on.

    Q. Okay. But I'm telling you who would have been the source of the information, CSFB, and I'm just trying to get your answer. If you think that would not have been a credible source then say it, but what I'm trying to get at is if CSFB had been the one saying the same set of information that was

Page 60

disclosed on the 24th and 25th, would the -- would your opinion be that there would be an adverse reaction to the stock price?

    A. So, it's the hypothetical that in -- I mean, you don't give any timing in this hypothetical, so that makes -- I mean --

    Q. Say it came out a month earlier.

    A. Well, a month earlier it would have been a guess.

    Q. But you're putting that into the hypothetical. I'm telling you it wasn't a guess. For some reason they know exactly what's going to happen and they say it.

    A. That's impossible.

    Q. It's not impossible in a hypothetical. So I'm asking you a hypothetical.

    MR. GESSER: So then it's just completely irrelevant.

    MR. HALL: No, it's not irrelevant because I'm sure another expert would argue to you about what information actually caused the stock to decline on the 24th and the 25th and what I'm trying

Page 61

to do is get over your defense of keep
adding different additional information.
You know, you keep trying to change the
hypothetical and not to answer it.
  Q.  So, all I'm asking is assume that
that is the same information. CSFB says it 30
days before that.
     MR. GESSER: I think he's saying
that it's impossible for it to be the
same information.
     MR. HALL: But it's not.
     MR. RUDMAN: Could I be heard on
this, too? You're obviously entitled to
examine an expert on a hypothetical,
nobody is arguing with you about that and
Mr. Gesser has given you vary
considerable latitude.
     Once the expert tells you in his
opinion that your hypothetical is
impossible, that concludes the discussion
as long as the expert --
     MR. HALL: Stop, stop. Everyone
can say their objections on the record.
I don't need a lecture from you about how

Page 62

to ask a question. The expert is not
answering my hypothetical. He keeps
changing it. I will ask the hypothetical
as many ways and as many times as I want
to.
     If you guys want to instruct the
expert not to answer anymore, then do so.
From now on I want to hear objections to
form and what the basis and that's it. I
don't want to hear any complete sentences
and paragraphs being spoken.
     MR. RUDMAN: Well, your
semi-documentary tantrum notwithstanding,
I wasn't giving you a lecture. I was
trying --
     MR. HALL: Well, okay, stop. I'm
ready to go back on the record and
continue questioning the witness.
     MR. RUDMAN: Don't talk to me that
way.
     MR. HALL: Well, don't you talk to
me that way. Listen, listen, you're
entitled to state your objection. State
your objection and stop making a speech.

Page 63

I don't need to hear a speech from you.
If you want to have a speech, go down on
the street and maybe you can find someone
to listen.
     MR. RUDMAN: Well, if I were
looking for somebody really dumb to talk
to, I think I'd rather talk to you.
     MR. HALL: Oh, you would?
     MR. RUDMAN: Yeah.
     MR. HALL: Yeah, we'll see, we'll
see. Sit back, say your objections, be
the smart ass you are and sit there,
okay? Be quiet.
     MR. RUDMAN: Yes, sir. Whatever
you say, sir.
     MR. HALL: Now you've got the
rules.
  Q.  Okay. So let's get back to my
hypothetical. Assume that they did have all of
that information and they say it 30 days
beforehand, would CSFB saying that have moved
the market?
     MR. GESSER: Objection,
speculation.

Page 64

  A.  So, if CSFB had known, had had a
crystal ball about the evolution of the
earnings of AOL Time Warner for the remainder
of the quarter which hadn't taken place, and
could predict exactly what would happen to
those earnings and people actually believed
that it could do that, so believed that CSFB
could predict what would happen on the
subsequent -- I mean, during the subsequent
months, which hasn't happened yet, which are a
third of the quarterly earnings.
     So if CSFB could -- had that kind
of crystal ball that nobody has, everybody
agreed that CSFB had it, then if by CSFB saying
what the earnings would be, and if that were
different from what the market knew that they
were going to be, then there would be a price
impact.
  Q.  Okay. Thank you. Was there any
time during the time that you analyzed that an
analyst made a negative statement about CSFB --
I mean AOL's earnings that caused a
statistically significant drop in the stock
price?

Page 65

A. Well, it depends what you mean by statements about earnings. The statements of analysts are -- involve a number of different points and those points generally may or may not affect earnings.

Q. Okay. What about February 20, 2002, Lehman issues a report, a negative report about AOL. On that day, you find a statistically significant drop. Did you do an analysis of what the reason for the statistically significant drop was on that day?

A. So, what I did is I went and read the analyst report and tried to understand what information it conveyed that wasn't in the earlier report by the same analyst.

Q. And what was your conclusion?

A. The conclusion was that -- was what is new in that report as it concerns about AOL's ability to deal with broadband and about synergies that would result from the merger.

Q. Okay. And was it your conclusion that the Lehman report was the reason that the stock took a statistically significant drop on that day?

Page 66

A. So, I did not study the impact of other analysts. I studied the impact of the CSFB reports, but there is a significant drop on that day. There's no question about that.

Q. Okay. And what do you attribute the reason that the stock took a statistically significant drop on that day to?

A. Well, as I just said, I didn't focus on that date attempting to explain it. I know that on that date there was an analyst report and there was a drop in the stock price.

Q. Okay. But -- so you didn't -- you didn't really try to determine what the reason for the drop was on that day? Did you?

MR. GESSER: He already answered it.

A. As I said, there was a significant negative drop on that day and there was analyst reports that received a lot of attention.

Q. Okay. Do you realize that in the complaint we list that as one of the curative disclosure days?

A. I understand that.

Q. Okay. And, so, what I'm trying to

Page 67

get at is -- is what, you know -- if you analyzed that day, what did you conclude was the reason the stock dropped?

MR. GESSER: It's asked and answered.

MR. RUDMAN: Object to the form of that question.

MR. GESSER: Objection to form. Asked and answered.

A. So, as I said earlier on, the information in that report is not about issues raised in the complaint. The information in that report that deals with advertising is already in the earlier report of Lehman.

Q. Okay. But is it -- was it your conclusion that that report, the Lehman report, was the reason the stock took a statistically significant adverse drop on that day?

MR. RUDMAN: Objection. This question has now been asked, in some form or another, four times.

Q. And I would like an answer.

A. I did give an answer.

Q. What's your answer?

Page 68

A. The answer is that my event study was designed to evaluate the impact of the CSFB reports on -- of the curative disclosure dates, alleged curative disclosure dates that I discuss in my report and that's all I did.

Q. So, you never reached a determination of why the stock took a statistically significant adverse drop on that day?

A. As I have said, what I noticed is that on that day there is an adverse report by Lehman that received a lot of attention and there is a negative drop in the stock price.

Q. I know --

A. That is significant. That's what I already said and that's what I will keep saying.

Q. Okay, but is the answer to my question no then; that did you determine what was the reason for the statistically significant adverse drop on February 20, 2002? It's a yes or no answer.

A. I have told you what I concluded based on what I saw on that. My event study