Page 69

(1)
(2)   was focused on the CSFB report not on the
(3)   Lehman report.
(4)       Q.   Does that mean that you did not
(5)   come to a determination of the reason for the
(6)   statistically significant adverse drop on that
(7)   day?
(8)       A.   I did not conduct an event study
(9)   that is focused on that date on that report, on
(10)  the impact of that report.
(11)      Q.   Okay.  So is that a no, you did not
(12)  come to a determination of what the reason for
(13)  the statistically significant adverse drop on
(14)  that day was?
(15)      A.   It means the answer is there is no
(16)  opinion in my report about that date.
(17)      Q.   Okay.  I know there's no opinion in
(18)  your report.  In your other analyses, did you
(19)  ever come to an opinion of what caused the
(20)  price to drop that day?
(21)      A.   As I said, I looked at that date on
(22)  my -- what I did was to look at the analyst
(23)  report to see what the new information was in
(24)  that report and I concluded that the new
(25)  information in that report was unrelated to

Page 70

(1)
(2)   advertising and was related to other issues
(3)   about AOL which were not issues raised in the
(4)   complaint.
(5)       Q.   Okay.  What other information did
(6)   you look at for that day?
(7)       A.   So, my recollection is that I had a
(8)   record of newspapers articles for that day.  I
(9)   don't remember what -- what they were.
(10)      Q.   Okay.  Do you recall if any of
(11)  those other news articles, in your opinion,
(12)  contributed to the statistically significant
(13)  adverse drop on February 20th?
(14)      MR. GESSER:  Objection to form.
(15)      A.   So, as I said, I didn't -- I mean,
(16)  I didn't do a study of the stock price reaction
(17)  for that day.  I was concerned about what was
(18)  the new information and once I had determined
(19)  what the new information was, I moved on.
(20)      Q.   Did you look for other new
(21)  information disclosed to the public on that
(22)  day?
(23)      MR. GESSER:  I think he answered
(24)  that.
(25)      A.   I remember that I looked at what

Page 71

(1)
(2)   was published in newspapers on that day, but
(3)   I -- I don't remember what it was.
(4)       Q.   Do you -- do you recall finding any
(5)   new information --
(6)       A.   I don't remember.
(7)       Q.   -- on that day?  Okay.
(8)       MR. HALL:  Why don't we mark as
(9)   Stulz 1 the declaration of RenT Stulz.
(10)  I'm looking for the date, dated April 26,
(11)  2007.
(12)      (Stulz Exhibit 1, declaration of
(13)  RenT Stulz dated April 26, 2007, marked
(14)  for identification.)
(15)      Q.   Take a moment and look this over.
(16)  I believe it is a complete copy of your report.
(17)  It is intended to be, but if you want to take a
(18)  moment and just look it over and see if
(19)  anything appears to be missing to you.
(20)      MR. GESSER:  I just note for the
(21)  record that it's not in color.
(22)      A.   It is my report.
(23)      Q.   It appears to be?
(24)      A.   Except for the color.
(25)      MR. HALL:  Let's take one now.

Page 72

(1)
(2)       THE VIDEOGRAPHER:  We are now off
(3)   the record at 10:56 a.m., June 21, 2007.
(4)       (Recess taken.)
(5)       THE VIDEOGRAPHER:  This is tape
(6)   three of the deposition of Mr. RenT M.
(7)   11:21   Stulz.  We are now on the record at
(8)   a.m., June 21, 2007.
(9)       Q.   Mr. Stulz, you have in front of you
(10)  Stulz 1 which is a copy of your declaration in
(11)  this case.  I believe you said earlier that you
(12)  reviewed at least in re Polymedica in preparing
(13)  your report; is that correct?
(14)      A.   I reviewed -- I mentioned that I
(15)  remembered the DeMarco decision and then you
(16)  asked whether I had read Polymedica and my
(17)  recollection is that I did.
(18)      Q.   Okay.  And have you ever read the
(19)  case entitled Basic v. Levinson?  It's a
(20)  Supreme Court case.
(21)      A.   I did, but a long time ago.  I
(22)  wouldn't remember the details.
(23)      Q.   Do you recall in Polymedica that it
(24)  discusses -- that it's a case discussing class
(25)  certification?

IN RE: CREDIT SUISSE AOL SECURITIES
RENE M. STULZ - 6/21/07

BSA                                                                                          XMAX(19/19)

Page 73

(1)
(2)    A.   I believe so.
(3)    Q.   Okay.  And do you recall that
(4)  there's a discussion about market efficiency?
(5)    A.   Yes.
(6)    Q.   Okay.
(7)    MR. GESSER:  Can we just be clear
(8)  which you're talking about?
(9)    MR. HALL:  Well, my earlier
(10)  question, the first circuit opinion.
(11)    MR. GESSER:  Okay.
(12)    Q.   What is your understanding of what
(13)  market efficiency is?
(14)    MR. RUDMAN:  Objection to the form.
(15)  Do you mean as defined by the first
(16)  circuit in Polymedica or are you talking
(17)  as an economist?
(18)    MR. HALL:  Yeah, just personally as
(19)  his right now.
(20)    **A.   Well, there's different definitions**
(21)  **of efficiency, but the ones that is most common**
(22)  **that the market incorporates information**
(23)  **quickly in an unbiased way.**
(24)    Q.   Okay.  Do you have -- do you have
(25)  any understanding whether that's the same type

Page 74

(1)
(2)  of efficiency the first circuit was talking
(3)  about in Polymedica?
(4)    **A.   Well, I'm not a lawyer.**
(5)    MR. RUDMAN:  Excuse me, I object.
(6)  I think that calls for a conclusion of
(7)  law, but the witness may answer.
(8)    **A.   I'm not a lawyer.**
(9)    Q.   Okay.  Did you review
(10)  Dr. Hakala's -- I can't remember whether it's
(11)  an affidavit or declaration, but his report in
(12)  this litigation?
(13)    **A.   I did.**
(14)    Q.   And do you recall that Dr. Hakala
(15)  concluded that AOL traded in an efficient
(16)  market?
(17)    **A.   Yes.**
(18)    Q.   Okay.  Do you agree with that
(19)  conclusion?
(20)    **A.   Yes.**
(21)    Q.   Okay.  And would your event study
(22)  in regression that you performed, is that the
(23)  reason for your conclusion --
(24)    **A.   No.**
(25)    Q.   -- that it was an efficient market?

Page 75

(1)
(2)    **A.   No.**
(3)    Q.   What is your reason for also
(4)  concluding or agreeing with Dr. Hakala's
(5)  conclusion that AOL traded in an efficient
(6)  market?
(7)    **A.   The example evidenced in the**
(8)  **finance literature is that a firm like AOL**
(9)  **would trade in an efficient market in the sense**
(10)  **that I described for efficiency.**
(11)    Q.   Okay.
(12)    MR. HALL:  I'd like to mark as the
(13)  next document, a document which will be
(14)  marked Stulz 2, a chart with headings
(15)  "NO.," "Date," "Residual Return,"
(16)  "T-Statistic" and "Significance" at the
(17)  top.
(18)    This is an unBates numbered
(19)  document that was included in the
(20)  materials provided by counsel in -- in
(21)  response to a request concerning
(22)  Mr. Stulz's -- Professor Stulz's report.
(23)    **(Stulz Exhibit 2, chart, marked for**
(24)  **identification.)**
(25)    Q.   If you could take a moment to look

Page 76

(1)
(2)  at that to see if you have any understanding of
(3)  what that is and if you remember seeing it
(4)  before.
(5)    MR. GESSER:  Just for the record,
(6)  this document was produced electronically
(7)  in Excel.
(8)    MR. HALL:  That's correct.
(9)    MR. GESSER:  This is a printout of
(10)  that file.
(11)    MR. HALL:  Exactly.  That's one of
(12)  the reasons it doesn't have Bates numbers
(13)  and it was -- just for the witness'
(14)  education, and I believe to be clear what
(15)  it was, I believe it was part of a file
(16)  called Regression Working File that had a
(17)  number of different worksheets within it.
(18)    Just for the record, there does
(19)  appear to be a blank page in there.  I
(20)  don't know if that was because of copying
(21)  or when it printed because of formatting.
(22)    Q.   Have you seen that document before
(23)  in hard copy or electronic form, Professor
(24)  Stulz?
(25)    **A.   So I've seen a spreadsheet that had**

Page 77

(1)
(2) dates on residual returns on T-statistics so I
(3) have seen the numbers that are in the second
(4) and fourth column.
(5)     Q.   Okay.
(6)     A.   I mean, assuming that those numbers
(7) have been printed correctly and so on.
(8)     Q.   I agree, and it is hard sometimes
(9) to tell when we print a file out from a
(10) electronic file, but if it in some way varies
(11) from what was provided to us, I'm sure counsel
(12) will let us know, but my understanding and
(13) belief is that it is exactly what was provided
(14) to us.
(15)         Can you tell me what the different
(16) column headings here mean to you?
(17)     A.   So, the -- the "Number" column, I'm
(18) not really sure what it represents. The "Date"
(19) is the date of the return. The "Residual
(20) Return" is the return that is different from
(21) the predicted return using the regression model
(22) and the "T-statistics" is the statistics that
(23) is used to evaluate the significance of the
(24) residual return.
(25)     Q.   Okay. And "Significance"?

Page 78

(1)
(2)     A.   "Significance" here seems to
(3) indicate significance at the five percent and
(4) the one percent probability level or 95 percent
(5) and 99 percent confidence level.
(6)     Q.   Okay. And how do you determine --
(7) I see that some of these have what look like a
(8) one asterisk and some of them has two. Is
(9) there any difference in those?
(10)     A.   So, the one asterisk would be the
(11) significance at the five percent level and the
(12) two would be at the one percent level.
(13)     Q.   Okay. Was this something that was
(14) prepared in conjunction with the regression
(15) that was done for this litigation?
(16)     A.   Well, it's possible to use the
(17) output of a regression to generate this data.
(18)     Q.   Let's stop there and let's just
(19) mark this so it's out because I think this is
(20) the output that you're referring to.
(21)     MR. HALL:  Let me mark this as
(22) Stulz Number 3. This, again, is a
(23) document that we printed from an Excel
(24) spreadsheet provided to us by counsel.
(25) Again I believe it was from the file

Page 79

(1)
(2) called "Regression Working File."
(3)     Q.   And I will hand this to you and
(4) have you take a look at it and see if you
(5) recognize it.
(6)     (Stulz Exhibit 3, document printed
(7)     from Excel spreadsheet, marked for
(8)     identification.)
(9)     Q.   Have you had a chance to review the
(10) document, at least briefly?
(11)     A.   Yes.
(12)     Q.   Okay. And what is your
(13) understanding of what that document represents?
(14)     A.   This, again, is something that you
(15) can produce as the output of regression. Once
(16) you have estimated the regression, you can
(17) obtain those residuals for the days that you
(18) look at.
(19)     Q.   Okay. Do you know whether or not
(20) this was done in connection with the work that
(21) you performed in this case in this -- in this
(22) case?
(23)     A.   This seems to be the output of a
(24) regression that uses all the dates during the
(25) class period.

Page 80

(1)
(2)     Q.   Okay. So is this something in the
(3) regression that you used -- that you relied
(4) upon for the conclusions in your report?
(5)     A.   So, my recollection is that the
(6) regression that I've -- I mean, the result that
(7) I focused on were results that omitted days of
(8) the report.
(9)     Q.   Okay. Let's back up for a minute.
(10) But -- but the regression that was run to get
(11) you those results, did it run for every trading
(12) day?
(13)     A.   So, my recollection is that we did
(14) estimate a regression that didn't include every
(15) trading day, didn't include the trading days
(16) where the reports were published and that for
(17) those days, we used the regression model to
(18) predict the return.
(19)     Q.   Okay. Let's look at the columns at
(20) the top and some of them appear to be cut off,
(21) but if you can -- because of the way they print
(22) from the electronic format, if you can tell me
(23) what your understanding of what those different
(24) columns represent.
(25)     A.   Okay. So the first column seems to

Page 81

(1)
(2) be trading day.  The second column is a date.
(3) The third column is the return of AOL in
(4) decimals.  The third column is the return on
(5) the market index, which is a CRSP index,
(6) C-R-S-P.  The fourth column is a return on the
(7) media index I constructed.  The fifth column is
(8) a return on the techs index I constructed.
(9)         And then we have indicators for
(10) dates of the reports that are -- then we have
(11) residuals for the dates, the trading days, and
(12) then we have T-statistics.  We have an
(13) indicator for significance at the one percent
(14) and the five percent.
(15)         Q.    Okay.  Now, if you turn back to
(16) Stulz 1, just quickly, you have an Exhibit 1
(17) there.  It's right after your resumT towards
(18) the end.  It appears that you have specific
(19) days here and these are the results from the
(20) regression analysis that you relied upon for
(21) your report, Exhibit 1?
(22)         A.    Exhibit 1, that's correct.
(23)         Q.    Okay.  Was this information
(24) obtained from the outputs from Stulz 3 or is
(25) there a different set of outputs for regression

Page 82

(1)
(2) that was used?
(3)         A.    I don't know the answer to that
(4) question.
(5)         Q.    Okay.  How would you go about
(6) trying to determine that?
(7)         A.    I would ask somebody.
(8)         Q.    Okay.  And who would you ask?
(9)         A.    The person who provided me with
(10) this table.
(11)         Q.    Okay.  And you're referencing
(12) Exhibit 1 to your declaration; correct?
(13)         A.    That's correct.
(14)         Q.    Who provided you with this
(15) information in Exhibit 1 to your declaration?
(16)         A.    Somebody at Cornerstone.
(17)         Q.    Okay.
(18)         + MR. HALL:  I would just go on the
(19) record and request that -- we'd like to
(20) confirmation whether or not what has been
(21) marked as Stulz 3 is the actual
(22) regression outputs that were used to
(23) prepare Exhibit 1 to Professor Stulz's
(24) declaration.
(25)         If not, if we would -- we'd ask for

Page 83

(1)
(2) a copy of that or if it's something that
(3) was provided in the other information,
(4) just identify it.
(5)         MR. GESSER:  Okay.  I'm keeping
(6) notes of these.  It may be helpful if
(7) there's a lot of these at the end for
(8) you guys to --
(9)         MR. HALL:  Yeah, we will.  We will.
(10) Yeah, we'll write a letter.
(11)         Q.    Let's look at the first couple of
(12) days that you have in Stulz's -- your report in
(13) Exhibit 1.  I think the first day you list is
(14) 1/12/01.  Do you see that?
(15)         A.    Yes, I see it.
(16)         Q.    You have a T-stat there of a
(17) negative 1.54.  Do you see that?
(18)         A.    That's correct.
(19)         Q.    If you look at Stulz 3, that
(20) appears to be consistent for that part in what
(21) is listed as the T-stat for the same day;
(22) correct?
(23)         A.    That's correct.
(24)         Q.    Okay.  And I know I did the first
(25) four or five as we went through here and

Page 84

(1)
(2) checked and as we go through this, we may want
(3) to go back and forth if we need to compare, but
(4) okay.
(5)         What is -- you referenced a five
(6) percent level.  I've heard it as a 95 percent
(7) level, but I assume it's just the reverse,
(8) another way of looking at it.
(9)         What is the T-stat that is required
(10) so that someone is at the 95 percent level?
(11)         A.    Hopefully I remember the number
(12) exactly.  It should be 1.96.
(13)         Q.    And it could be either negative or
(14) positive depending on the return; is that
(15) correct?
(16)         A.    That's correct.
(17)         Q.    And what does -- what does that
(18) represent something at a T-stat of 1.96 that
(19) is, and I this it was my term at the 95 percent
(20) level, I think you used five percent.
(21)         What does that -- what does that
(22) represent?
(23)         MR. RUDMAN:  Object to the form.
(24)         A.    So, the -- if the model is well --
(25) correctly specified, it tells us that there

Page 85

(2) is -- an abnormal return or residual return is
(3) higher -- I mean, it's such that the
(4) T-statistics exceeds that number, it means that
(5) there is a five percent chance of observing a
(6) number like that if it is drawn from a mean of
(7) zero.
(8)     Q.   Have you ever heard in relation to
(9) a T-stat something that's at the 95 percent
(10) confidence level?
(11)    A.   Yes.
(12)    Q.   And what is that?
(13)    A.   I mentioned that.
(14)    Q.   Okay.
(15)    A.   So, you can have a five percent
(16) probability level and a 95 percent confidence
(17) level.
(18)    Q.   Okay.  And so a T-stat of 1.96 and
(19) above would be something that is at the 95
(20) percent confidence level; is that correct?
(21)       MR. GESSER:  Object to form.
(22)    A.   That's correct.
(23)    Q.   Okay.  Is it possible to say what
(24) would something be if it were at the 90 percent
(25) confidence level?

Page 86

(2)    A.   Yes.
(3)    Q.   And what would the T-stat be for
(4) that?
(5)    A.   1.64.
(6)    Q.   Let's go back to Stulz Exhibit 2,
(7) which -- it has fewer numbers on it, but it has
(8) the columns I want to focus on, so --
(9)       Do you see the -- under the
(10) "Number" column there's one with the number one
(11) with the date of 1/19/01?
(12)    A.   That's correct.
(13)    Q.   Okay.  Do I understand -- do I read
(14) this correctly to state that your regression on
(15) that day found that there were -- there was a
(16) statistically significant impact on the stock
(17) price of AOL based on news that entered the
(18) market that day?
(19)       MR. RUDMAN:  Objection.  I don't
(20)       think the record is that this is his
(21)       regression.
(22)    A.   So, I don't think you can interpret
(23) the result the way you want to.
(24)    Q.   Okay.
(25)    A.   All that we see here is that on

Page 87

(2) that day there is a residual return of 9.46
(3) percent.  That residual return is -- so we have
(4) a residual return of 9.46 percent with a
(5) T-statistic of 3.76 so that residual return is
(6) significantly different from zero.  That's all
(7) I can say based on seeing this.
(8)    Q.   Okay.  But what does that mean?
(9) What does have -- what does having a residual
(10) return that's statistically significant -- what
(11) does that mean?
(12)    A.   Well, just by looking at this, all
(13) we can say is that it would be highly unlikely
(14) to observe residual return at this size if the
(15) true residual return is actually zero on that
(16) day.  It comes from population with -- I mean,
(17) from a distribution with mean equal to zero.
(18)    Q.   Okay.  Let's go to Stulz 3 -- I
(19) mean Stulz 1, I'm sorry, your report.  Back to
(20) Exhibit 1 quickly.
(21)    A.   Okay.
(22)    Q.   Okay.  If we look at the first day
(23) there, in the report it's 1/12/01.  Do you see
(24) that date?
(25)    A.   Yes, I do.

Page 88

(2)    Q.   Okay.  And at the end on the right
(3) hand column over there under T-stats,
(4) "T-statistics," it says negative 1.54.  Do you
(5) see that?
(6)    A.   That's correct.
(7)    Q.   Okay.  What confidence level would
(8) a negative 1.54 T-stat be?
(9)       MR. GESSER:  Objection to form.
(10)    A.   So, I would not be able to give you
(11) the exact number without a computer or a
(12) statistics table, but it would be less than 90
(13) percent.
(14)    Q.   Do you know if it's more than 80
(15) percent?  Can you recall?
(16)    A.   I would believe that it is, but I
(17) can't -- I mean.
(18)    Q.   That's fair.  That's fair.  And --
(19) and January 12, '01 is a date that CSFB issued
(20) a report; correct?
(21)    A.   That's correct.
(22)    Q.   Okay.  Does the resulting T-stat
(23) from your regression analysis that is shown in
(24) Exhibit 1 to your report for that day, January
(25) 12, '01, indicate to you that there was no

Page 89

(1)
(2)    statistically significant impact on the stock
(3)    at -- I think the level you use is at the 95
(4)    percent level, based on news entering the
(5)    market that day?
(6)         MR. GESSER:  Objection to form.
(7)         A.   I'm sorry -- I didn't get the whole
(8)    question.
(9)         Q.   Okay.
(10)        A.   I didn't see when news came in at
(11)   the end.
(12)        Q.   Okay.  What I'm trying to get at
(13)   is, is -- my understanding is is that what the
(14)   T-stat tells you -- actually, let's move --
(15)   let's move down to February 1, '01 because
(16)   there is one where you find is at a level
(17)   that's statistically significant, correct, a
(18)   negative 2.31?
(19)        A.   That's correct.
(20)        Q.   Okay.  So that's a day where you
(21)   found a statistically significant abnormal
(22)   return and in this case it's a drop; is that
(23)   correct?
(24)        A.   That's correct.
(25)        Q.   Okay.  Is it -- is it fair -- would

Page 90

(1)
(2)    you agree with the statement that what this
(3)    tells you is that there was some information
(4)    that entered the market on that day that caused
(5)    the stock to have an abnormal statistically
(6)    significant drop?
(7)         A.   In an efficient market the stock
(8)    moves because of new information coming into
(9)    the market.  So, there was new information and
(10)   it led to this abnormal return.
(11)        Q.   Okay.
(12)        A.   That is statistically significant.
(13)        Q.   Okay.  So, just to repeat so that I
(14)   have it in my mind correctly, so that means
(15)   there was new information that came into the
(16)   market on February 1, '01 that caused the stock
(17)   price of AOL to have an abnormal return at a
(18)   statistically significant level; correct?
(19)        A.   That's correct.
(20)        Q.   And is that the same if you go down
(21)   to 4/18/01, you see it as a positive 2.05?
(22)        A.   That's right.  The difference being
(23)   that in February it was negative and here it's
(24)   positive.
(25)        Q.   Exactly, but the observation from

Page 91

(1)
(2)    that is, and without getting into what news
(3)    caused it, because I know you talked about that
(4)    in your report, but there was new information
(5)    that entered the market on April 18th, '01 that
(6)    caused the AOL stock price to have an abnormal
(7)    positive return at a statistically significant
(8)    level; is that correct?
(9)         MR. GESSER:  Objection to form.
(10)        A.   I lost my train of the question.
(11)   Could you please repeat it?
(12)        Q.   Does the positive 2.05 T-stat on
(13)   April 18, '01 indicate to you that on that day
(14)   new information entered the market related to
(15)   AOL that caused the AOL stock price to have an
(16)   abnormal return at a statistically significant
(17)   level?
(18)        A.   Yes.
(19)        Q.   Okay.  Okay.  Now I want to go back
(20)   to Stulz 2.  And I understand that you have not
(21)   confirmed exactly that this is the output of
(22)   the regression -- that this is information from
(23)   the output of the regression that you used for
(24)   your report.
(25)             However, this is all the output I

Page 92

(1)
(2)    have and if there's some other output that I
(3)    should be looking at, I would more than gladly
(4)    ask you questions about that.  I'm going to
(5)    assume until counsel or someone tells me that
(6)    I'm wrong, that this is information generated
(7)    from the output of your regression.
(8)             So I want to focus back on the date
(9)    of January 19, '01 which is the one numbered
(10)   one, which has a T-statistic of 3.76.  Do you
(11)   see that?
(12)        A.   Yes, I do.
(13)        Q.   Does that suggest to you that new
(14)   information related to AOL entered the market
(15)   on that day and caused a abnormal return in AOL
(16)   stock price at the statistically significant
(17)   level?
(18)        A.   It would be the interpretation you
(19)   would have for an efficient market as long as
(20)   the regression is well specified.
(21)        Q.   Okay.  But assuming this is from
(22)   your regression, because I have nothing to
(23)   indicate to me that it's not, that would mean
(24)   your regression found that to be the case;
(25)   correct?

Page 93

(1)
(2)  **A.   That's correct.**
(3)      MR. GESSER:  Just to be clear, his
(4)  regression as opposed -- I think we
(5)  testified earlier about a regression that
(6)  was done.  I just want to make sure we
(7)  understand what we mean by his
(8)  regression.
(9)      We talked earlier about a
(10) regression that was performed by
(11) Cornerstone.  So, I mean, are we talking
(12) about -- just so -- maybe you can --
(13)     What do you understand to mean
(14) "your regression"?
(15)     THE WITNESS:  So, the regression
(16) that produced these numbers as
(17) statistical significance on January 19.
(18) **Q.**  But what I think what Mr. Gesser is
(19) getting to is that you also said that there was
(20) an additional regression that wasn't the basis
(21) for your report; is that correct?
(22)     **A.   So, this -- and I may just be**
(23) **having a memory lapse.**
(24)     **Q.   Okay.**
(25)     **A.   So --**

Page 94

(1)
(2)      **Q.   Let me ask you, it's my**
(3)  understanding, and anyone can clarify, it's my
(4)  understanding that Cornerstone performed a
(5)  regression that you used as the basis for your
(6)  report; correct?
(7)      **A.   That I gave instructions to**
(8)  **Cornerstone to perform a regression, that's**
(9)  **correct.**
(10)     **Q.   Okay.  It is -- I requested from**
(11) Mr. Gesser that we be provided with the outputs
(12) from the regression you used for your report.
(13) In return, I got the documents that are in
(14) front of you, Stulz 2 and Stulz 3, as part of
(15) some electronic files that I received.
(16)     I'm assuming since my request was
(17) what are the outputs of the regression used in
(18) the report, I'm assuming that the information I
(19) was given is the outputs or a result of the
(20) outputs from the regression used in the report.
(21)     Do you have any different
(22) understanding or does Mr. Gesser have any
(23) different understanding of that?
(24)     **A.   So, from what I see, the**
(25) **T-statistics are roughly -- I mean, comparable**

Page 95

(1)
(2)  **allowing for rounding.  So, in that sense, the**
(3)  **results are quite similar.  My recollection was**
(4)  **that the format was somewhat different, but I**
(5)  **grant you that the results are -- I mean, very**
(6)  **similar, so --**
(7)      **Q.   Okay.  And when I refer to "your**
(8)  regression," I was talking about the regression
(9)  that was the one that you performed that you
(10) used to -- in support of your report, okay?  Do
(11) we have that understanding?
(12)     **A.   Okay.**
(13)     **Q.   Because I will use it as we go**
(14) down.  And, again, if there is some other
(15) information that I should be looking at, I
(16) would request that we get it and we can clarify
(17) this later.
(18)     Okay.  So, just quickly to recap,
(19) if -- well, let's go back -- let's go down to
(20) the second one that has a number out which is
(21) February 1, '01.  Do you see that?
(22)     **A.   That's correct.**
(23)     **Q.   And it has a T-stat of a negative**
(24) 2.31.  Do you see that?
(25)     **A.   That's correct.**

Page 96

(1)
(2)      **Q.   Now, does that indicate to you**
(3)  that -- that based on this regression, the
(4)  information from this regression that on
(5)  February 1, '01, new information entered the
(6)  market related to AOL that caused a negative
(7)  abnormal return at a statistically significant
(8)  level; correct?
(9)      **A.   So, yes, that's the interpretation**
(10) **of this number.  We should just have a caution**
(11) **though which is -- this is a statistical test**
(12) **and if we look at a large enough number of**
(13) **days, we'll find days that are significant,**
(14) **even though really nothing happened just**
(15) **because of the properties of the test.**
(16)     **So, I can't -- I should have been**
(17) **more careful when I answered and I said the**
(18) **interpretation is that news arrived to the**
(19) **market.  Now, with -- all we can say is that we**
(20) **have a statistically significant return on that**
(21) **day.**
(22)     **Q.   Right, but other than the odd**
(23) statistical chance that you get a false result,
(24) that would indicate that it was based on new
(25) news entering the market; correct?

Page 97

(1)
(2)    A.   That's correct.
(3)    Q.   Okay.  So what I understand you to
(4) be saying is you would still have to look
(5) beyond this to verify that it was based on new
(6) news; correct?
(7)    A.   But it's also a verification that
(8) may not be really possible because sometimes
(9) the market and the stock price will move based
(10) on new information that is private information
(11) rather than public information.
(12)    Q.   So, if you were to look at -- we're
(13) looking at February, 1, '01 and you see a
(14) T-statistic of a negative 2.31, what would you
(15) do to confirm what the reason for that abnormal
(16) return was?
(17)    A.   Well, if this were a report day and
(18) there were no other public information, then in
(19) this set of new public information, the
(20) report -- the report would be -- it would be
(21) legitimate to consider the report to be the
(22) cause of that abnormal return.
(23)    Q.   But I'm not even getting into that.
(24) I'm not trying to, you know, get into what
(25) information caused it.  I'm just trying to see

Page 98

(1) if -- what you would do to confirm what
(2) information caused it.
(3)        Let's say it wasn't a report day,
(4) but there's a statistically significant
(5) abnormal return.  How would you go about
(6) verifying whether or not that was based on new
(7) news entering the market or not?
(8)    A.   Well, I certainly could go and
(9) investigate whether it's due to new public
(10) information by examining public news on that
(11) day and so I could answer that question.
(12)    Q.   Okay.  And if you determine that
(13) there was new public information entering the
(14) market for that day, would it be your
(15) conclusion that the reason on that day that
(16) AOL -- would it be your conclusion that on that
(17) day AOL had a statistically significant
(18) abnormal return based on new news entering the
(19) market?
(20)    A.   Well, the event study method is not
(21) one that allows you to provide a satisfactory
(22) explanation for every return on every day.
(23)        If on that day there were negative
(24) new public information, then it would be

Page 99

(1)
(2) reasonable to conclude that it's responsible
(3) for that return.
(4)    Q.   Okay.  Let's go down to the one
(5) numbered three, which is March 6, '01.  Do you
(6) see that?
(7)    A.   Yes, I do.
(8)    Q.   Okay.  And it has a T-statistic of
(9) a 2.06 positive.  Do you see that?
(10)    A.   Yes.
(11)    Q.   Does that indicate to you that new
(12) news entered the market related to AOL that
(13) caused a abnormal, statistical significant
(14) return of the stock -- the price of AOL stock?
(15)    A.   Again, with the cautions that I
(16) have mentioned so far, yes.
(17)    Q.   Okay.  And we can -- you say that
(18) everyone because we interpret those into each
(19) one.
(20)        Let's look at 4/18/01.  It's on the
(21) next page.  Do you see that?  It has a T-stat
(22) of positive 2.05?
(23)    A.   Yes, I see that.
(24)    Q.   Okay.  Does that indicate to you
(25) that new news entered the market related to AOL

Page 100

(1)
(2) that caused an abnormal statistically
(3) significant return in the price of AOL stock on
(4) that day?
(5)    A.   Again, with all the caveats I
(6) mentioned so far, yes.
(7)    Q.   Let's go to 7/18/01, which is
(8) number five.  Do you see that it has a -- that
(9) one has a negative 2.73 T-statistic?
(10)    A.   Correct.
(11)    Q.   Okay.  Based on this, would one
(12) conclude that new information related to AOL
(13) entered the market on that day that caused a
(14) negative abnormal statistical significant
(15) return to the price of AOL stock?
(16)    MR. GESSER:  I think we're -- he
(17) said that it's with all the caveats, he
(18) can --
(19)    MR. HALL:  I'm asking every
(20) question on every day.
(21)    MR. GESSER:  All right.
(22)    MR. HALL:  We'll be done well in
(23) time.
(24)    MR. GESSER:  Okay.
(25)    MR. HALL:  I'm going to ask him

BSA                                                                                              XMAX(26/26)

Page 101

(1)
(2)    every day.
(3)        A.   Again, with all the caveats I
(4)    mentioned, yes.
(5)        Q.   Okay. Let's go down to the next
(6)    one. I know you didn't identify this as a
(7)    statistically significant one, but if you look
(8)    at July 19, '01, it has a negative 1.87 T-stat.
(9)    Do you see that?
(10)       A.   That's correct.
(11)       Q.   Would it be fair to conclude from
(12)   that that there was new news entering the
(13)   market about AOL that caused a negative
(14)   abnormal return statistically significant at
(15)   the 90 percent or more confidence level for
(16)   that day?
(17)       A.   I think we have to be careful in --
(18)   in this exercise. Now, the stock is going to
(19)   evolve randomly, I mean going up and down
(20)   positive residuals, negative residuals and so
(21)   the event studies were designed to try to
(22)   identify whether specific events had an impact
(23)   on the stock price.
(24)           This event study is designed to
(25)   identify whether the CSFB reports had an impact

Page 102

(1)
(2)    on the stock price. I did not design this
(3)    event study to evaluate whether on each and
(4)    every specific day new information entered that affected the stock
(5)    information entered that affected the stock
(6)    price of AOL, whether I could identify that
(7)    information.
(8)            The process that I had followed is
(9)    I have a set of dates which are the report
(10)   dates and I investigate whether the reports
(11)   have a statistically significant impact.
(12)           Obviously the stock moves. There
(13)   are days with statistically significant returns
(14)   so if you were to consider those days by
(15)   themselves, you would be led to conclude that
(16)   something happened on those days.
(17)           If you have a T-statistics of 1.87,
(18)   you would not feel confident to reliably
(19)   conclude that something happened if that were a
(20)   report date.
(21)       Q.   Well, you -- that's because you use
(22)   a confidence level of 95 or higher; correct?
(23)       A.   That's correct.
(24)       Q.   If someone were to use a 90 percent
(25)   confidence level, you would conclude that;

Page 103

(1)
(2)    correct?
(3)        A.   So, if somebody were to use 90 --
(4)    90 percent level, you would conclude on the
(5)    7/19, that there was an abnormal return that
(6)    was statistically significant on that day,
(7)    based on what you are showing me -- showing me
(8)    here.
(9)            But, again, this is not -- this
(10)   output is really not designed to address a
(11)   question that you are focused on which is which
(12)   days have positive abnormal returns and which
(13)   do not.
(14)           Now, if all you do is look at a
(15)   large set of returns, at the 95 percent level,
(16)   you will find five percent of the returns being
(17)   statistically significant, even if nothing
(18)   happened.
(19)       Q.   I understand that and that's
(20)   similar to your caveat that you put into your
(21)   earlier answers that, you know, just from a
(22)   statistical matter you would find some that
(23)   would give you abnormal returns where it
(24)   shouldn't have given you abnormal returns;
(25)   correct?

Page 104

(1)
(2)        A.   That's correct.
(3)        Q.   Okay. But assume that it works the
(4)    way it should and you're not getting that false
(5)    result, isn't it fair to say that based on the
(6)    event study alone and the regression, one would
(7)    assume that on 7/19/01, that there was
(8)    information, new information that entered the
(9)    market related to AOL, that caused an abnormal,
(10)   statistically significant return at the 95
(11)   percent confidence level or above?
(12)       A.   Unfortunately I have to correct you
(13)   because if it works as it should, on a large
(14)   number of days we would actually find five
(15)   percent of them being significant.
(16)       Q.   Okay. I know, but you would have
(17)   to do something other than just look at the
(18)   number to determine that, correct, is that what
(19)   you're saying?
(20)       A.   Well, I think I need to kind of
(21)   expand on my previous caveats. What you want
(22)   to do here is look at this large number of days
(23)   where we have a residual return and if you have
(24)   a large number of days like this, by the
(25)   assumptions of the event study, by -- more

Page 105

(1)
(2) precisely by the assumptions of the model that
(3) is used to model the stock returns, you will
(4) find that five percent of those residual
(5) returns will be statistically significant, even
(6) if nothing ever happened.
(7)     Q.   Okay.  I understand that.
(8)     A.   If nothing unusual whatsoever
(9) happened.  So, finding that in this long list
(10) that five percent of the abnormal return as
(11) significant at the 95 percent confidence level
(12) would be no indication that we have five
(13) percent of the days with something important
(14) happening that would be moving the prices.
(15)     It would be -- it could be an
(16) indication that what we see is that the
(17) residual returns follow the normal distribution
(18) and have a mean of zero.
(19)     Q.   Okay.  I understand that, but
(20) unless it was one of those times when you get
(21) the five percent returns of statistically
(22) significance when it shouldn't be, unless that
(23) happens, you would come to the conclusion that
(24) it was statistically significant; correct?
(25)     MR. GESSER:  Object to form.

Page 106

(1)
(2)     MR. RUDMAN:  Object to form.
(3)     A.   But, again, the way that a study
(4) like the one I conducted makes sense is you
(5) identify days when an event has occurred and
(6) then you use the stock returns to identify
(7) whether something significant happened to the
(8) stock returns on that day, as opposed to going
(9) on a fishing expedition for all the residual
(10) returns and try to find out whether they were
(11) significant or not.
(12)     Q.   Okay.  Well, you are aware that
(13) July 19, '01 is a day in which we alleged that
(14) new information entered the market related to
(15) the fraud; correct?
(16)     MR. RUDMAN:  Object to the form of
(17) that question.
(18)     You may answer.
(19)     A.   So, July 19 is -- is a report date
(20) in my event study and so I consider that
(21) specifically on the report statistics that it's
(22) significant at the 90 percent level, but it's
(23) not at the 95 percent level.
(24)     Q.   Okay.  So on that day the
(25) statistically significant return is that the

Page 107

(1)
(2) negative 1.87 is -- statistically significant
(3) abnormal return at the 90 percent confidence
(4) level; correct?
(5)     A.   So, on that day, the stock price
(6) has a negative residual that would be
(7) significant at the 90 percent level, but
(8) clearly that negative residual couldn't be
(9) viewed as evidence of inflation.
(10)     Q.   No, but -- just -- thank you for
(11) your answer, but I'll just clarify that in
(12) the -- in the complaint we allege that there is
(13) a curative disclosure on that day and so one
(14) would expect a negative return, but --
(15)     MR. RUDMAN:  Objection.
(16)     Q.   But whatever we allege, based on
(17) your results you would conclude that that day
(18) there was a negative abnormal return at the 90
(19) percent level and it was statistically
(20) significant at the 90 percent level; correct?
(21)     MR. GESSER:  Objection to form.
(22)     MR. RUDMAN:  Objection to the form.
(23)     A.   So, what I would conclude is that
(24) with the standard that I reference in the paper
(25) with the citation to an academic paper, this

Page 108

(1)
(2) abnormal return would not be significant.
(3)     Q.   At the 95 percent level; correct?
(4)     A.   At the level of significance that I
(5) consider necessary for an abnormal return to be
(6) reliably different from zero.
(7)     Q.   Okay, but that's 95 percent in your
(8) mind; correct?
(9)     A.   Well, in my report I use the 95
(10) percent reference in an academic publication
(11) that states that that's the usual level at
(12) which one would conclude that it's -- that it's
(13) credible.  That's -- at the 90 percent level it
(14) would be significant.  At the 95 percent level
(15) it's not significant.
(16)     Q.   Okay.
(17)     A.   But, so, using the standards of
(18) that academic publication, it's not significant
(19) using the 90 percent standard.  You would reach
(20) a different conclusion.
(21)     Q.   Okay.  And are there other public
(22) economic and statistical publications that
(23) recommend using a 90 percent level?
(24)     MR. GESSER:  Objection to form.
(25)     A.   So, academic research will often

IN RE: CREDIT SUISSE AOL SECURITIES
RENE M. STULZ - 6/21/07

BSA                                                                                          XMAX(28/28)

Page 109

(1)
(2) report significance at one percent, five
(3) percent and ten percent probability level or in
(4) confidence level 99, 95 or 90 percent.
(5)    Q.   Okay, thank you. Let's go down to
(6) 8/14/01.  Do you see there on number six,
(7) 8/14/01, there is a T-statistic of a negative
(8) 2.42?
(9)    A.   That's correct.
(10)    Q.   Okay.  Does that indicate to you
(11) with all of your caveats that you've said in
(12) your prior responses that there were new news
(13) that entered the market concerning AOL on that
(14) day that caused an abnormal return at a
(15) statistically significant level to -- return of
(16) the AOL stock price?
(17)    MR. GESSER:  Objection to form.
(18)    A.   So, with all the caveats, what we
(19) have here is that you have abnormal return on
(20) that day.  I mean, the residual return from the
(21) regression is significant.
(22)    Q.   And -- would it be safe to assume,
(23) unless someone knew something to the contrary,
(24) that it was because new information concerning
(25) AOL entered the market that day?

Page 110

(1)
(2)    MR. GESSER:  Objection to the form.
(3)    A.   Well, this is a situation where,
(4) rather than assuming, you could go -- one could
(5) look at the information that came to the
(6) market.
(7)    Q.   Okay.  Did you look at that
(8) specific day to see what was the cause of that
(9) statistically significant decline?
(10)    A.   So, as I said early on, I read a
(11) newspaper articles for the whole period -- for
(12) the whole class period and, I mean, I don't
(13) want to be put in a position where I have to
(14) remember what happened on each and every
(15) individual day during the class period, but on
(16) that day there was an announcement about the
(17) quarterly performance of AOL.
(18)    Q.   Did you determine that that was the
(19) reason for the negative abnormal return?
(20)    A.   No.  I mean, as I have already said
(21) several times, my focus was on the report dates
(22) on the specific -- specific disclosure dates
(23) that I have mentioned.
(24)    Q.   Okay.  So you didn't draw a
(25) conclusion one way or another why the stock

Page 111

(1)
(2) dropped on that day?
(3)    A.   I mean, as I said, I know that on
(4) that day AOL reported information about its
(5) performance, but I did not study that date
(6) separately.
(7)    Q.   Okay.  So did you draw any
(8) conclusion about the reason for the negative
(9) residual return on that day?
(10)    A.   No.  I know that information
(11) entered the market on that day because AOL
(12) revealed accounting performance information.
(13) That's all I know.
(14)    Q.   Okay, but you don't conclude that
(15) that is the reason for the abnormal negative
(16) return; correct?
(17)    A.   As I have said, my event study was
(18) focused on the analyst report dates and was
(19) focus on the disclosure dates I discuss in my
(20) report.
(21)    Q.   Okay.  That's great, but did you
(22) come to any conclusion or can you come to any
(23) conclusion sitting here today of why the stock
(24) on August 14, '01 had a negative residual
(25) return at a statistically significant level?

Page 112

(1)
(2)    A.   I told you all I know about that
(3) date.
(4)    Q.   So is that a no or a yes?  I'm a
(5) little unclear.
(6)    A.   I told you that my event study was
(7) designed to evaluate the statistical
(8) significance on the report dates on to -- on
(9) specific disclosure dates.
(10)    Q.   Okay.  But on August 14th then, can
(11) you draw any conclusions from the work that you
(12) did on what the reason for the statistically
(13) significant abnormal return was?
(14)    A.   As I have said, it wasn't one of
(15) the dates that my event study was focused on.
(16)    Q.   So you didn't really even review
(17) it, is that what you're saying?
(18)    A.   No, that's not what I said.
(19)    Q.   All right.  Can you draw a
(20) conclusion or not?
(21)    MR. RUDMAN:  I think this question
(22) has been asked and answered in some form
(23) or other multiple times.
(24)    MR. HALL:  I think it's been asked
(25) a number of times.  I would love to have

Page 113

(1)
(2) an answer and move on.
(3)        MR. RUDMAN:  You have an answer.
(4)        Q.   All I want to know is whether or
(5) not, based on the work you've done, whether or
(6) not you draw any conclusion on what the reason
(7) for the negative abnormal return was on August
(8) 14, '01?  That's a yes or no.
(9)        A.   What I told you is that I know that
(10) on that day AOL revealed, I mean, information
(11) on its quarterly performance and I know that on
(12) that day there was a statistically significant
(13) negative residual based on the information that
(14) you -- that is in Exhibit 2.  That's all I
(15) know.
(16)        MR. GESSER:  That's his conclusion.
(17)        MR. HALL:  Well -- but wait a
(18) minute.
(19)        Q.   But that -- do you conclude that
(20) that is the reason the stock had the negative
(21) residual return?
(22)        A.   No.  I told you that the events I
(23) focused on in my event study was the ones that
(24) I have already mentioned and I have opinions on
(25) those events.  I don't -- I did not investigate

Page 114

(1)
(2) what caused the drops on other days.
(3)        Q.   Okay.  So you have no opinion on
(4) what caused the drop on August 14, '01?
(5)        A.   I told you what I know about that
(6) day and that's it.
(7)        Q.   Let's go to 9/10/01.  It's on the
(8) next page.  It's number seven.  You see that it
(9) has a T-statistic of a 2.7.
(10)        A.   That's correct.
(11)        Q.   Okay.  Can you -- is it -- based on
(12) this information here, with all of your caveats
(13) from your previous answers, can one conclude
(14) that the reason for the abnormal residual
(15) return at a statistically significant level is
(16) due to new information entering the market
(17) regarding AOL?
(18)        MR. GESSER:  Objection to form.
(19)        A.   All the caveats before, I mean --
(20) and also the way the question is posed, in an
(21) efficient market new information moves prices.
(22) And, so, you could say by that that each one
(23) and every one of those days new information
(24) came to the market and moved the price.
(25)        In that sense, that date is no

Page 115

(1)
(2) different from the other ones.
(3)        Q.   But it's different in the fact that
(4) on that day the return gives you an abnormal
(5) return with a 99 percent confidence level;
(6) correct?
(7)        A.   That's perfectly correct, but if
(8) you were to estimate regression on any sample
(9) period, you would end up having, on average,
(10) five percent of the residuals which would have
(11) one asterisk and you would have one percent of
(12) them that would have two asterisks.
(13)        Q.   I understand, but --
(14)        A.   And that's not conducting an event
(15) study.  An event study is going to identify
(16) events whose impact one wants to detriment and
(17) then it's going to look at the best way to
(18) estimate the abnormal returns for those days.
(19)        Q.   I understand that, but other than
(20) the case where you get the one percent result
(21) that you shouldn't have, this would be based on
(22) new news entering the market related to AOL
(23) would be the reason for the residual return at
(24) the 99 percent level; correct?
(25)        MR. GESSER:  Objection to form.

Page 116

(1)
(2)        A.   Well, a better way to put it is
(3) that the 6.81 percent return would be explained
(4) by new news entering the market, but so would
(5) the minus 0.13 percent return of the next
(6) trading day be explained by new news entering
(7) the market.
(8)        Q.   I understand that, but on the 6.81,
(9) you can assume that at the 99 percent
(10) confidence level; correct?
(11)        A.   But that's not -- that's not a
(12) well-formed hypothesis in the context of an
(13) event study.  In the context of an event study,
(14) you would identify an event and then you would
(15) investigate whether that event is associated
(16) with a significant residual return.
(17)        When you look at a long sequence of
(18) residual returns like that, then of course some
(19) of them are going to be significant and some
(20) are not going to be significant.
(21)        Q.   Right, but some of them should be
(22) significant because of new information;
(23) correct?
(24)        A.   Well, all -- all the residual
(25) returns would be the outcome of new information

IN RE: CREDIT SUISSE AOL SECURITIES
RENE M. STULZ - 6/21/07

BSA                                                                          XMAX(30/30)

---

Page 117

(1)
(2) reaching the market, whether they are
(3) significant or not.
(4)      Q.   I understand that, but on this one,
(5) there's only a one-percent chance that it's not
(6) due to -- to new news; correct?
(7)      A.   But, so, as I said before, if you
(8) look at a long list of residual returns, the
(9) test statistic is correctly specified, you are
(10) going to find five percent of one star and one
(11) percent of two star that are in that list, even
(12) if all of those residual returns correspond
(13) from -- I mean, come from a distribution that
(14) has a mean of zero.
(15)      So, the hypothesis that you look at
(16) in an event study is -- is an event that you
(17) identified before looking at the residual
(18) returns, is that event significant. So, this
(19) study is not designed to attribute significance
(20) to specific days. It's designed to evaluate
(21) the statistical significance of the abnormal
(22) returns on days associated with the publication
(23) of analyst reports of specific disclosures.
(24)      Q.   Okay. So are you saying that the
(25) only conclusions that you can draw from your

---

Page 118

(1)
(2) report is related to the days where reports
(3) were issued?
(4)      MR. GESSER:   Objection to form.
(5)      Q.   By CSFB.
(6)      A.   No. What I'm saying is that my
(7) report on the event study I conducted looks at
(8) a specific number of events and is designed to
(9) look at that. It's not designed to be the
(10) basis of a fishing expedition to try to find
(11) significant residual returns.
(12)      Q.   Let's go to 2/20/02 which is a
(13) couple of pages in front. It's marked number
(14) eleven. Do you see that? It has a negative
(15) 3.23 statistic?
(16)      A.   That's right, and we have already
(17) talked about that date.
(18)      Q.   Okay. I understand that. What --
(19) what conclusion can you draw from the
(20) information that you're looking at in front of
(21) you on -- about 2/20/02?
(22)      A.   So, if you were looking at that
(23) date alone, you would conclude, with all the
(24) caveats I've mentioned, that there is a
(25) statistically significant negative return, but

---

Page 119

(1)
(2) again remembering all the caveats.
(3)      Q.   I understand all the caveats.
(4) Based on -- can you draw any conclusion for the
(5) reason for the negative residuals -- the
(6) residual return at a statistically significant
(7) level?
(8)      A.   You already asked that question and
(9) I already answered it.
(10)      Q.   And what's your answer?
(11)      A.   My answer was that my event study
(12) was not designed to evaluate what happened on
(13) that specific day. I looked at that specific
(14) day and I looked at -- I read the Lehman report
(15) to identify the new information that was in
(16) that report, compared to the previous Lehman
(17) report, and so that was the extent of what I
(18) did for that day.
(19)      Q.   Okay. But you didn't draw any
(20) conclusion about why the stock dropped that
(21) day; correct?
(22)      MR. GESSER:   We've asked and
(23)      answered this a bunch of times.
(24)      MR. HALL:   I want to know.
(25)      So, I mean, what I told you before

---

Page 120

(1)
(2) is that I identified the new information in the
(3) report to be related to broadband, the impact
(4) of broadband on AOL and, therefore, there was
(5) no reason for me to pursue this further.
(6)      Q.   Okay. So, then, you came to no
(7) conclusion whether or not that was the reason
(8) for the stock to have a negative abnormal
(9) return?
(10)      MR. GESSER:   Objection. What do
(11)      you mean by "that"?
(12)      Q.   That report.
(13)      A.   I said before and I say it again,
(14) all I know on that day is that there was a
(15) report by Lehman, that that report received a
(16) lot of attention and was a negative report that
(17) it -- that it's new information had to do with
(18) the impact of broadband on AOL and I also know
(19) that on that day there is a residual return of
(20) minus 8.13 percent.
(21)      Q.   Are the two connected, the return
(22) and the report?
(23)      A.   As I said before, I did not pursue
(24) that issue because my event study is not
(25) focused on that issue.

---

Page 121

(2) Q. Okay, good. Let's go down to July
(3) 24, '02, which is number 20 on the list. Do
(4) you see July 24, '02 there, number 20 has a
(5) negative T-statistic of a 3.27. Do you see
(6) that?
(7) A. I see that.
(8) Q. And did you come to any conclusions
(9) on why the stock on that day had an abnormal
(10) residual return at a statistically significant
(11) level?
(12) A. We have already talked about those
(13) dates and I pointed out that a lot of
(14) information came to the market on those dates
(15) and that -- that's the extent of what I know.
(16) Q. But did you connect any of the
(17) information, any of the information that came
(18) to the market, to the negative return on that
(19) day?
(20) A. No, because -- I mean, first I --
(21) as we already discussed, I focused on the
(22) information about the accounting practices of
(23) AOL Time Warner and information about those
(24) practices had already been published by then so
(25) that information was in the market at that

Page 122

(2) time.
(3) Q. Okay, and you came to the
(4) conclusion that in your opinion there was no
(5) new news related to the accounting practices at
(6) AOL disclosed on that day?
(7) A. So I have to be precise about this.
(8) The complaint makes allegations about
(9) accounting practices at AOL. The Washington
(10) Post, the week before the dates that we are
(11) talking about, had extensive articles
(12) discussing the accounting practices of AOL.
(13) Certainly the information that was
(14) discussed in those articles was much more
(15) specific than the information that seemed to
(16) be -- is alleged to have been in the hands of
(17) CSFB.
(18) Q. Okay, but did you conclude that
(19) there was any new information related to the
(20) accounting practices at AOL disclosed on July
(21) 24, '02?
(22) A. What I concluded was that -- I
(23) mean, that the market knew about the issues
(24) with the accounting practices earlier than on
(25) July 24 or July 24, '02.

Page 123

(2) Q. So, is it your opinion that all
(3) information -- all the information the market
(4) ever learned about AOL's accounting practices
(5) being improper were disclosed July 18 and 19,
(6) the week earlier, with the Washington Post
(7) articles?
(8) MR. RUDMAN: Timeframe please,
(9) meaning ever?
(10) MR. HALL: Ever, yes.
(11) A. I'm not sure I understand the
(12) question.
(13) Q. Well, you keep -- you keep kind of
(14) indicating that, in your opinion, the market
(15) learned of the accounting practices or the
(16) issues -- alleged issues with the accounting
(17) practices at AOL the week earlier on July 18
(18) and 19; correct?
(19) A. That's correct.
(20) Q. Okay. What I'm asking is, is it
(21) your opinion that subsequent to those two
(22) dates, the market never learned anything new
(23) about the accounting, improper accounting
(24) practices?
(25) MR. GESSER: Objection to form.

Page 124

(2) A. So I'm not sure how this is
(3) relevant to the complaint in the sense that the
(4) market learned about lots of different issues
(5) with accounting practices at AOL Time Warner of
(6) a time that are not discussed in the e-mails
(7) that I mentioned in the complaint.
(8) Q. But, again, that's you drawing your
(9) own factual opinion from the e-mails you've
(10) seen; correct?
(11) A. My understanding is that the
(12) complaint raises the issues that the people at
(13) CSFB had some, allegedly, some information that
(14) there were accounting problems at AOL Time
(15) Warner. The articles in the Washington Post
(16) had a very extensive discussion of accounting
(17) problems at Time Warner and so at that point
(18) people knew that there were accounting
(19) problems.
(20) Q. But are you also aware that we
(21) allege, and we'll attempt to prove at trial,
(22) that there was new information about the
(23) accounting problems and the investigation with
(24) the SEC disclosed on the 24th and 25th that
(25) were the reason for the stock's decline?

Page 125

(1)
(2)        MR. GESSER:  Objection to form.
(3)        A.   I'm not -- I'm not sure I
(4)  understand the question.  There is a lot of
(5)  information coming to the market on July 24,
(6)  25, a lot of it having to do with the
(7)  performance of AOL.
(8)        Q.   And isn't it true that on July 18th
(9)  and 19th, both AOL and Ernst & Young, their
(10)  auditor denied that these accounting --
(11)  improper accounting activities took place?
(12)        A.   Can you repeat the question,
(13)  please?
(14)        Q.   Isn't it true that on July 18th,
(15)  '02 and July 19th, '02, that the press reported
(16)  that AOL -- individuals at AOL were denying
(17)  that the accounting, improper accounting
(18)  activity reported by the Washington Post
(19)  actually took place?
(20)        A.   Well, I'm not an accountant, but I
(21)  wouldn't read what Ernst & Young and AOL said
(22)  as denying that the transactions took place.
(23)  My recollection is that they said that Ernst &
(24)  Young had agreed to the accounting treatment of
(25)  those transactions.

Page 126

(1)
(2)        Q.   And that they were proper; correct?
(3)        A.   Ernst & Young would not have agreed
(4)  to the treatment if it had been improper.
(5)        Q.   Okay, okay.  So that's July 18th
(6)  and 19th.  On July 24th, doesn't AOL disclose
(7)  that they're now cooperating with the SEC into
(8)  an informal investigation?
(9)        A.   But cooperating with the SEC
(10)  doesn't convey any information about whether
(11)  those -- I mean, whether AOL agrees that those
(12)  transactions were improper.
(13)        Q.   But isn't it true that the market
(14)  can interpret that to mean that they're more
(15)  likely to be improper than it was disclosed on
(16)  July 18th and 19th?
(17)        MR. GESSER:  Objection,
(18)    speculation.
(19)        A.   So, as I said, a lot of information
(20)  entered the market on July 24 and 25.  You seem
(21)  to be drawing inferences from what was
(22)  announced on those days.  Obviously it's your
(23)  right to do that, but I have no basis to do
(24)  that.
(25)        Q.   Right.  But you're drawing

Page 127

(1)
(2)  inferences the other way, aren't you; that
(3)  there wasn't anything new disclosed about the
(4)  accounting practices?
(5)        A.   The inferences I'm drawing is that
(6)  the complaint alleges that CSFB had information
(7)  about questionable accounting practices.
(8)  Clearly the Washington Post articles provided
(9)  information to the market as a whole that there
(10)  were questions about accounting practices.
(11)        Q.   Okay.  What if the -- when this
(12)  case goes to trial, what if a jury member -- if
(13)  the jury finds, as a matter of fact, that on
(14)  July 24th there was new information that entered
(15)  the market, would that change your opinion?
(16)  accounting practices at AOL that entered the
(17)        MR. RUDMAN:  Objection to form.
(18)        MR. GESSER:  Objection.  Calls for
(19)    a legal conclusion.
(20)        MR. HALL:  It actually doesn't call
(21)    for a legal conclusion.  The witness is
(22)    making a factual determination which is
(23)    left to the hands of the jury and I'm
(24)    just trying to see if the jury were to
(25)    disagree with his factual determination

Page 128

(1)
(2)  whether that would affect his conclusion.
(3)        MR. RUDMAN:  What if you just asked
(4)    him to assume the falsity of his
(5)    assumption and do it that way.
(6)        MR. HALL:  I'm asking him to --
(7)    never mind.
(8)        Q.   You can answer my question.
(9)        A.   Well, if I'm required to assume for
(10)  some purpose that something happened on July
(11)  25, I would -- I would have to make that
(12)  assumption, but I would -- I mean, that's --
(13)  that's all I could do.  If I'm ordered to do
(14)  something, I would do something.
(15)        Q.   Okay.  I'm telling you right now to
(16)  assume that on July 24th and 25th, new
(17)  information related to the accounting practices
(18)  at AOL entered the market.  Would your
(19)  conclusion be that it's possible that that
(20)  information is the reason that both of those
(21)  days have negative residual returns at a
(22)  statistically significant level?
(23)        A.   Well, to use an event study to
(24)  reach such a conclusion, you would have to be
(25)  in a situation where there are not other pieces

Page 129

(1)
(2)  of information and that enter the market at the
(3)  same time that are confounding news.  Clearly
(4)  on those days, there are confounding news.
(5)      Q.   Okay.  Assuming -- if there is
(6)  confounding news, if -- if there is new
(7)  information related to the accounting
(8)  practices, negative information, couldn't that
(9)  be, in part, the reason why there's a negative
(10) residual return on those days?
(11)     MR. RUDMAN:  Object to the form of
(12)     the that question.
(13)     A.   So, I can only tell you about the
(14) conclusions that my event study allows me to
(15) draw.  The event study allows you to draw clear
(16) conclusions in the absence of simultaneous
(17) confounding news.
(18)     Q.   Okay.  So your event study is not
(19) designed to tell you whether or not July 24th
(20) and 25th, the negative residual return is based
(21) on new information related to the accounting
(22) practices at AOL, is it?
(23)     A.   I'm sorry, you will have to repeat.
(24)     MR. HALL:  Can you repeat the
(25)     question, please?

Page 130

(1)
(2)      (Record read.)
(3)      MR. GESSER:  Objection to form.
(4)      A.   So, what an event study could tell
(5)  you is that if there is one piece of news
(6)  entering the market at a specific point in
(7)  time, does that piece of news have a
(8)  significant impact on the stock price.
(9)      No event study can tell you when
(10) multiple pieces of news enters the market at
(11) the same time, what the impact of those
(12) individual pieces is going to be.
(13)     Q.   Can your event study tell me
(14) anything about the news entering the market on
(15) July 24th and 25th?
(16)     MR. GESSER:  Objection to form.
(17)     A.   Well, as I have said, my study
(18) shows that -- showed that there are lots of
(19) pieces of information entering the market on
(20) those dates.  I have already stated that
(21) information about accounting problems at AOL
(22) was public as of that time.
(23)     Q.   Okay.  So, you assumed that there
(24) was no new information related to AOL's --
(25) withdrawn.

Page 131

(1)
(2)      You assumed that there was no new
(3)  information related to the frauds that we
(4)  allege in the complaint disclosed to the market
(5)  on July 24th and 25th and then designed your
(6)  event study; correct?
(7)      MR. GESSER:  That's not what he
(8)      testified to.
(9)      MR. HALL:  I'm asking him a
(10)     question.
(11)     MR. RUDMAN:  Objection insofar as
(12)     that purports to recapitulate his
(13)     testimony.  I object.
(14)     MR. HALL:  That's fine.
(15)     A.   So we have -- we have talked
(16) repeatedly about the fact that the complaint
(17) says that CSFB had allegedly information that
(18) there were accounting problems at AOL Time
(19) Warner.  The Washington Post articles make
(20) clear that there are problems and so the market
(21) knew that there were problems.
(22)     Q.   Can you please answer my question
(23) and the question is, in designing your event
(24) study you assumed that on July 24th, '02 and
(25) July 25th, '02 there was no news -- new

Page 132

(1)
(2)  information regarding the facts alleged in the
(3)  complaint to be fraudulent entering the market,
(4)  didn't you?
(5)      MR. GESSER:  Objection to form.
(6)      A.   So, that's -- I mean, that summary
(7)  is not correct.  When I reviewed the
(8)  information that was available to the market, I
(9)  saw that on July -- I mean, the week before
(10) information reached the market through the
(11) Washington Post articles, as well as other
(12) articles and newspapers, revealing that there
(13) were questionable accounting practices at AOL
(14) Time Warner.
(15)     So, at that time, the market knew
(16) that information and then I proceeded from
(17) there.
(18)     Q.   Okay, but -- so -- so that meant
(19) that you didn't consider whether or not
(20) additional information entered the market on
(21) July 24th and 25th regarding the accounting
(22) activities at AOL; correct?
(23)     A.   So, I read the information that was
(24) published on July 24 and 25th.  I saw that a
(25) lot of information reached the market on those

Page 133

(1)
(2)  days, including that there would be an SEC
(3)  investigation. The SEC usually steps in when a
(4)  large company has questionable accounting
(5)  practices.
(6)      Q.   So, did you consider that to be new
(7)  information related to the accounting practices
(8)  at AOL?
(9)      A.   Well, as I said, it was known the
(10) week before that there were questions about
(11) accounting practices at AOL.
(12)     Q.   I know there were questions known
(13) at that time, but did you consider whether or
(14) not -- did you conclude whether or not there
(15) was any new information disclosed on the 24th
(16) and 25th about AOL's accounting practices?
(17)     A.   There was no new information that
(18) there were questionable accounting practices.
(19) The market had that information.
(20)     Q.   Okay. And with that assumption,
(21) and that determination on your part, then you
(22) designed your event study?
(23)     A.   I have already said that I looked
(24) at the information that reached the market and
(25) I investigated when is it that information

Page 134

(1)
(2)  about questionable accounting practices reached
(3)  the market and it reached the market the week
(4)  before the dates that we are talking about
(5)  through the articles in the Washington Post and
(6)  other articles.
(7)      Q.   Did you do that before or after the
(8)  event study and regression were run?
(9)      A.   I'm sorry.
(10)     MR. GESSER:  Did you what?
(11)     Q.   Did you make the determination that
(12) the articles on July 18 and 19, '02 disclosed
(13) the accounting improprieties, did you make that
(14) determination before or after the regression
(15) was run?
(16)     A.   My recollection is that I read the
(17) Washington Post articles very early in -- in
(18) all of this and certainly I was aware of them
(19) very early at -- I mean, the exact sequence of
(20) what was done when, I know that I kept going
(21) back to information in -- in the news of a
(22) time, but I know that I read those articles
(23) very early.
(24)     MR. GESSER:  Is there a particular
(25)     time we're taking a break?

Page 135

(1)
(2)      MR. HALL:  There's nine minutes
(3)  left on the tape.
(4)      MR. GESSER:  Can we say that
(5)  whenever the tape runs out that's when
(6)  we'll break for lunch?
(7)      MR. HALL:  That's fine.
(8)      MR. GESSER:  Okay.
(9)      Q.   Is it fair to say from your event
(10) study -- I mean, from your regression analysis
(11) that based on the universe of new information
(12) entering the market on July 24th and 25th, that
(13) that universe of information, new information,
(14) caused a negative residual return in the stock
(15) price of AOL at a statistically significant
(16) level?
(17)     A.   I mean, it's fair to say that in
(18) the residual returns from the regression on
(19) those days there are statistically significant
(20) negative returns.
(21)     Q.   Is it fair to say that that
(22) statistically significant negative return is
(23) based on new news entering the market on those
(24) days?
(25)     A.   So what is fair to say is that the

Page 136

(1)
(2)  residual returns on those days are due to new
(3)  news entering the market.
(4)      Q.   Okay.
(5)      MR. HALL:  Actually, why don't we
(6)  stop right here. It's probably a good
(7)  point.
(8)      THE VIDEOGRAPHER:  We are now off
(9)  the record at 12:46 p.m., June 21,
(10) 2007.
(11) (Luncheon recess taken at 12:46 p.m.)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 137

(1)
(2)      A F T E R N O O N   S E S S I O N
(3)           (Time noted:  1:48 p.m.)
(4)   R E N E   M.   S T U L Z, resumed and testified
(5)      as follows:
(6)   CONTINUED EXAMINATION
(7)   BY MR. HALL:
(8)           THE VIDEOGRAPHER:  This is tape
(9)      four of the deposition of Mr. RenT M.
(10)     Stulz.  We are now on the record at 1:48
(11)     p.m., June 21st of 2007.
(12)     Q.    Did you make factual determinations
(13)   in preparing your report?
(14)           MR. GESSER:  Objection, vague.
(15)     A.    You're going to have to clarify.
(16)     Q.    Did you make factual
(17)   determinations -- factual determinations
(18)   regarding the allegations in the complaint in
(19)   preparing your report?
(20)           MR. GESSER:  Same objection.
(21)           MR. RUDMAN:  Do you mean did he
(22)     make determinations as to the truth or
(23)     falsity of materials alleged in the
(24)     complaint?
(25)     Q.    We'll get into what they were, but

Page 138

(1)
(2)   I just want to know if you made any factual
(3)   determinations in preparing your report, any
(4)   factual determinations on the allegations in
(5)   the complaint?
(6)           MR. GESSER:  Objection.
(7)           MR. RUDMAN:  Preserve my objection.
(8)     A.    So, I mean, as I said I read the
(9)   complaint and then gathered materials on --
(10)   focused on my event study.
(11)     Q.    In preparing your event study, did
(12)   you determine which facts were relevant and
(13)   which weren't?
(14)           MR. GESSER:  Objection.
(15)           MR. RUDMAN:  Objection.
(16)     A.    So, I was asked to examine the
(17)   impact of the CSFB report and I was asked to
(18)   consider various other questions and that's
(19)   what I did.
(20)     Q.    Okay.  Did you assume the
(21)   allegations in the complaint were correct?
(22)           MR. GESSER:  Objection.
(23)     A.    So, for the event study, all I had
(24)   to investigate was when the reports were
(25)   published and whether they had an impact at the

Page 139

(1)
(2)   time that they were published.  So, in that
(3)   sense, I don't see what kind of assumptions I
(4)   had to make about the complaint when I did that
(5)   event study.
(6)     Q.    What about August 14th, you
(7)   assumed -- did you not make a determination
(8)   that that was not a relevant disclosure?
(9)     A.    So, the disclosures I looked at
(10)   were when the information came to the market
(11)   about various issues raised in the complaint
(12)   and I investigated the reaction of the market
(13)   on the dates that the information came to the
(14)   market.
(15)     Q.    But in doing that, for example, I
(16)   believe you determined that no new information
(17)   came to the market on August 14, '01; correct?
(18)     A.    So, what I determined is that the
(19)   complaint said -- alleged that CSFB had
(20)   information about possible layoffs and I went
(21)   and looked at when the market learned about
(22)   possible layoffs and I looked at the first date
(23)   when that happened and that was August 13.
(24)           I have to express a caveat here
(25)   which is that it was clear all along that

Page 140

(1)
(2)   layoffs were taking place at AOL and that AOL
(3)   was in a cost-cutting mode.  The second caveat
(4)   is -- I mean, on August 13, there was news
(5)   about possible layoffs at AOL, but I made no
(6)   determination and I could not make a
(7)   determination as to whether the news was
(8)   related to what the complaint claimed that CSFB
(9)   knew.
(10)     Q.    Okay.  There was additional news
(11)   disclosed to the market though about August 14,
(12)   correct, about layoffs on August 14th, sorry?
(13)           MR. GESSER:  Objection to form.
(14)     A.    So, on August 13, the market knew
(15)   about layoffs.
(16)     Q.    But -- I understand that's --
(17)   that's your opinion; correct?
(18)     A.    That's right.
(19)     Q.    Okay.  But there was additional
(20)   information about layoffs disclosed to the
(21)   market on August 14th; correct?
(22)           MR. GESSER:  Objection to form.
(23)     A.    So, on August 13, the market had
(24)   information that layoffs were going to take
(25)   place and that's the information I focused on.

Page 141

(1)
(2)    Q.    Okay.  Do you -- would you agree
(3)    that sometimes information about a subject
(4)    matter can be disclosed but then it not be
(5)    complete and another day later additional
(6)    information is disclosed that makes it more
(7)    complete?  Would you agree with that statement?
(8)    A.    I would agree with the statement
(9)    that you can have more information about a
(10)   particular issue, yes.
(11)   Q.    Okay.  Did you determine whether or
(12)   not on August 14, '01 there was more
(13)   information about layoffs disclosed that were
(14)   not disclosed on August 13, '01?
(15)   A.    So, what I determined was that on
(16)   the 13th the market knew that hundreds of
(17)   people could be laid off.
(18)   Q.    How did they know that?  Did the
(19)   article say that?
(20)   A.    Yes.
(21)   Q.    It did?
(22)   A.    Yes.
(23)   Q.    Did the article the next day give
(24)   more specific -- on August 14th give more
(25)   specific information about the number?

Page 142

(1)
(2)    A.    So, the article the next day had a
(3)    number of a thousand in it that an article on
(4)    the 13th did not have, that's correct.
(5)    Q.    And you made the factual
(6)    determination in your opinion that that was not
(7)    new information, did you not?
(8)    MR. GESSER:  Objection to form.
(9)    A.    So, I made the determination that
(10)   the market knew about layoffs on the 13th.  The
(11)   complaint alleged that CSFB had information
(12)   about possible layoff -- layoffs by the 13th.
(13)   The market had information about possible
(14)   layoffs.
(15)   Q.    But you made the determination that
(16)   the information on August 14th was not new
(17)   information related to the layoffs, did you
(18)   not?
(19)   A.    I made the determination that on
(20)   the 13th the market knew that there were going
(21)   to be layoffs.
(22)   Q.    What determination did you make
(23)   about August 14th?
(24)   A.    That it wasn't information to the
(25)   market that there were going to be layoffs;

Page 143

(1)
(2)    that the market knew on the 13th that there
(3)    were going to be layoffs.
(4)    Q.    So you disregarded what took place
(5)    on August 14th, '01; correct?
(6)    A.    I don't know if the word
(7)    "disregard" is the right one.  What I
(8)    determined was that on the 13th the market knew
(9)    that there were going to be layoffs.  I add the
(10)   caveat it needs to be -- I mean, the two
(11)   caveats that I mentioned that need to be
(12)   repeated; that there had already been layoffs,
(13)   that it was known by the market that AOL was in
(14)   a cost cutting mode and that the layoffs that
(15)   were announced on the 13th may or may not be
(16)   the ones that are alleged in the complaint.
(17)   Q.    Right, but that's a question of
(18)   fact that should be left to someone else,
(19)   shouldn't it?
(20)   A.    That's right.
(21)   Q.    But you found that there was an
(22)   abnormal, statistically significant return on
(23)   August 14th; correct?
(24)   A.    So, in the sheets that we looked at
(25)   this morning on the 14th, there is a

Page 144

(1)
(2)    significant residual, that's right.
(3)    Q.    And you don't discuss August 14th
(4)    in your report anywhere, do you?
(5)    A.    I don't know if I do or do not
(6)    mention the date, but I -- we have talked about
(7)    why August 13 is the date when the market
(8)    learns about it.
(9)    Q.    If a proper person that determines
(10)   facts in this case were to determine that there
(11)   was new information about layoffs on August 14,
(12)   01, could it be possible that the reason for
(13)   the negative statistically significant abnormal
(14)   return could be associated with that news?
(15)   MR. RUDMAN:  Objection to form.
(16)   MR. GESSER:  Objection to form.
(17)   A.    Well, I mean, if somebody decides
(18)   that it's new information about layoffs that is
(19)   creating this abnormal return, then that's what
(20)   they decide.  That's not what I was -- I mean,
(21)   I did a study and I reached my conclusions and
(22)   what people might decide is a different issue.
(23)   Q.    Right, because deciding an event
(24)   study requires some degree of judgment, doesn't
(25)   it, about determining what is relevant and

Page 145

(1)
(2) material events?
(3)     A.   Well, in this case, the issue was
(4) more to determine when the market learned about
(5) possible layoffs and it's quite clear that the
(6) market learned about them on August 13.
(7)     Q.   But that's your judgment, right?
(8) Someone else could think that they learned some
(9) on August 13th and more on August 14th;
(10) correct?
(11)     MR. RUDMAN:  Objection.  This is
(12)     entirely argumentative.
(13)     A.   So my judgment -- my reading of the
(14) evidence is that by the 13th the market knew
(15) about possible layoffs of hundreds of people.
(16)     Q.   Okay.  Did you discuss July 24th
(17) and 25th, '02 in your report anywhere?
(18)     A.   I'm sure I mentioned the date of
(19) July 24 because I believe it's the end of the
(20) class period.
(21)     Q.   Okay.  Did you discuss it in
(22) relation to the regression analysis or event
(23) study you performed or I should say that
(24) Cornerstone performed for you?
(25)     A.   We talked about July 23 and July 24

Page 146

(1)
(2) extensively.  As I said before, the information
(3) about accounting was made public the week
(4) before.
(5)     Q.   I know, but other than what appears
(6) on page two of your report, which is the class
(7) period ending on July 24, '02, can you find
(8) anywhere in your report or the exhibits to your
(9) report that you discuss the events that
(10) occurred on July 24th and 25, '02?
(11)     A.   I --
(12)     Q.   Take all the time you need?
(13)     A.   I don't -- I don't believe I
(14) discussed those events because there was no
(15) reason for me to discuss them since the
(16) accounting information was public by that time.
(17)     Q.   And there was no reason because --
(18) in your judgment there was no reason to discuss
(19) them; correct?
(20)     A.   Well, the allegation was that CSFB
(21) knew about possible accounting problems at AOL.
(22) The Washington Post articles and other articles
(23) a week before made clear that there were such
(24) problems, that the market knew about the
(25) problems.

Page 147

(1)
(2)     Q.   Weren't there other allegations in
(3) the complaint though other than that allegation
(4) you just stated?
(5)     A.   So we have been discussing the
(6) allegation about layoffs and we talked about
(7) that.
(8)     Q.   Okay.  So, but you determined in
(9) your judgment that none of the news entering
(10) the market on July 24th or 25th was new
(11) information related to the allegations in the
(12) complaint; correct?
(13)     MR. GESSER:  Objection to form.
(14)     A.   So, what I determined is that the
(15) complaint states that CSFB had information
(16) about possible accounting problems.  Then I saw
(17) that these possible accounting problems were --
(18) that possible -- that accounting problems at
(19) AOL were discussed with great specificity in
(20) the Washington Post articles.
(21)     Q.   So, in your judgment, there was
(22) nothing additional related to the accounting
(23) activities disclosed on July 24th and 25th?
(24)     MR. GESSER:  Objection to form.
(25)     A.   The question for me was when is it

Page 148

(1)
(2) that the market became aware that there could
(3) be accounting problems.
(4)     Q.   Is that really the question or is
(5) the question when does the full truth enter the
(6) market?
(7)     MR. GESSER:  Objection to form.
(8)     A.   The -- I mean, I'm not sure I
(9) understand the --
(10)     Q.   Well, I mean if -- if a -- if I
(11) understand you and we probably have to go to a
(12) hypothetical here because you don't agree --
(13) you've made your own interpretation of the
(14) facts and allegations in the case.
(15)     So, if on one day there's a
(16) disclosure that there are accounting problems
(17) at a company, company X, but then a week later
(18) there's a disclosure on -- that the market
(19) reads that it's more -- that it's more
(20) significant that it's being investigated by the
(21) SEC, it quantifies it more, it has an impact on
(22) the company's earnings, couldn't both of those
(23) be relevant events because the first one didn't
(24) disclose fully the extent of the problem?
(25)     MR. RUDMAN:  Object to the form.

## Page 149

(1)
(2)     MR. GESSER:  Object to form.
(3)     A.   In this case, though, the issue is
(4) what information did CSFB have and could have
(5) had.  The complaint describes information that
(6) CSFB allegedly knew that there were possible
(7) accounting problems at AOL.  Information about
(8) possible accounting problems was disclosed in
(9) the Washington Post articles.
(10)    Q.   What about information about an
(11) investigation into AOL?  Wasn't it disclosed on
(12) July 24th of an SEC investigation?
(13)    A.   There was information on the 24th
(14) about an SEC investigation starting at that
(15) time.
(16)    Q.   Okay, but let's stop right there.
(17) But you made the determination in your mind
(18) that that was not the same investigation that
(19) was alleged in the complaint; correct?
(20)    MR. GESSER:  Objection to form.
(21)    A.   So, the information that I saw was
(22) that the SEC was starting an investigation at
(23) that point.
(24)    Q.   So you made the determination in
(25) your mind then that that could not be the same

## Page 150

(1)
(2) investigation that was alleged to be known by
(3) CSFB in the complaint, didn't you?
(4)    A.   Well, at that point it was a new --
(5) I mean, whatever it was, it was something that
(6) started at that time in response to the
(7) articles of the previous week.
(8)    Q.   In your -- in your opinion;
(9) correct?
(10)    A.   From my reading of the articles,
(11) yes.
(12)    Q.   Were you told by counsel to assume
(13) that it was a different investigation?
(14)    A.   No, I was not told by counsel.
(15)    Q.   Okay.  All right.  Could someone
(16) else reviewing the material -- the information
(17) that was disclosed to the market on July 24th
(18) come to the conclusion that it does relate to
(19) information in the complaint -- I mean,
(20) allegations in the complaint?
(21)    MR. GESSER:  Objection to form.
(22)    MR. RUDMAN:  Objection to form.
(23)    Could we have that question read
(24) back, please?
(25)    (Record read.)

## Page 151

(1)
(2)    MR. RUDMAN:  Save my objection.
(3)    A.   So, somebody reviewing the evidence
(4) would conclude that by July 24 the market knew
(5) about accounting problems, so there was -- that
(6) was known.  Somebody looking at the evidence
(7) would then see that on July 24 and 25, there
(8) was a lot of information coming to the market.
(9) To make a conclusion that those abnormal
(10) returns are caused by the announcement of a
(11) possible SEC investigation at that time is not
(12) somebody -- is not something that somebody
(13) could do using the event study method.
(14)    Q.   My question wasn't about an event
(15) study.  My question was could someone looking
(16) at all the information that was disclosed on
(17) July 24th and 25th come to the conclusion that
(18) some of that information was new information
(19) related to the allegations in the complaint?
(20)    MR. GESSER:  Objection to form.
(21)    MR. RUDMAN:  Object to the form.
(22)    Is your question -- could someone
(23)    disagree with Dr. Stulz?
(24)    MR. HALL:  Yes, that's what my
(25)    question is.  And he doesn't seem to want

## Page 152

(1)
(2)    to answer that.  I think that's a simple
(3)    question.  That's all I'm asking.
(4)    Q.   Could a jury member look at that
(5) and come to a different conclusion than you
(6) did?
(7)    MR. RUDMAN:  I object.  I mean --
(8)    MR. GESSER:  I object.
(9)    A.   I mean, I can't decide what the
(10) jury will conclude.
(11)    Q.   I'm not saying decide what they're
(12) going to conclude, but is it possible that
(13) someone disagrees with your judgment that no
(14) new information entered the market related to
(15) the allegation on the 24th and the 25th of
(16) July?
(17)    A.   I mean, the jury can reach
(18) different conclusions.
(19)    Q.   Okay.  So, is that a yes?  I
(20) don't --
(21)    A.   I mean, could somebody reach
(22) different conclusions, yes.
(23)    Q.   Okay.  Because you made a judgment
(24) call that there was no new information on those
(25) days related to the allegations in the