UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re CREDIT SUISSE – AOL
SECURITIES LITIGATION

Case No. 1:02 CV 12146
(Judge Gertner)

This Document Relates To:

**REDACTED VERSION**

ALL ACTIONS

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO PRECLUDE THE EXPERT OPINIONS OF
RENÉ M. STULZ AND JOHN DEIGHTON**

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.    PROFESSOR STULZ'S OPINIONS SHOULD BE PRECLUDED BECAUSE THEY ARE
UNSUPPORTED AND UNRELIABLE ................................................................................ 4

    A.    Professor Stulz's Event Study Results Are Biased And Unreliable, And Should Be
Precluded Entirely ........................................................................................................ 4

        1.    Professor Stulz's Event Study Results Are Admittedly Biased Concerning All Dates
When CSFB Did Not Issue Reports On AOL ................................................................ 4

        2.    Dr. Hakala Has Demonstrated That Professor Stulz's Event Study Results Concerning
The Impact of CSFB's AOL Reports Are Also Biased ................................................ 6

    B.    Professor Stulz's Criticisms of Dr. Hakala's Use of Dummy Variables Should Be
Precluded Because They Are Unsupported And Provably Wrong .................................. 10

    C.    Opinions Concerning Supposed "Flaws" In Dr. Hakala's Analysis Based On Professor
Stulz's Conclusions About The Evidence Are Unreliable And Prejudicial And Should Be
Precluded ........................................................................................................................ 12

        1.    Professor Stulz Essentially Assumes His "Opinions," Rendering Them Unreliable And
Unduly Prejudicial ...................................................................................................... 13

        2.    To The Extent Professor Stulz Purports To Opine Based On His Examination Of The
Evidence, These Opinions Are Likewise Unreliable and Unhelpful ........................... 16

        3.    Professor Stulz's Opinions Concern Observations Which Do Not Require Or Benefit
From Any Technical Or Specialized Knowledge .......................................................... 20

II.    PROFESSOR DEIGHTON'S OPINIONS SHOULD BE PRECLUDED BECAUSE THEY
ARE IRRELEVANT AND UNRELIABLE ......................................................................... 21

    A.    Professor Deighton's Opinions Are Irrelevant ............................................................. 21

    B.    Professor Deighton's Opinions Concern Matters Well Within The Common
Understanding Of The Jury And Hence, Are Not The Proper Subject Of Expert
Testimony ...................................................................................................................... 23

    C.    Professor Deighton's Opinions Are Based on Flawed Assumptions and Improper
Determinations About Witness Credibility ..................................................................... 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

Cipollone v. Yale Indus. Prods., Inc.,
  202 F.3d 376 (1st Cir. 2000).................................................................. 22

Clark v. Takata Corp.,
  192 F.3d 750 (7th Cir. 1999) ................................................................ 14

Daubert v. Merrell Dow Pharm., Inc.,
  509 U.S. 579 (1993)................................................................... 3, 4, 23

Franklin Federal Savings Bank v. U.S.,
  60 Fed. Cl. 55 (Fed. Cl. 2004) ................................................................. 1

Kumho Tire Co., Ltd. v. Carmichael,
  526 U.S. 137 (1999).............................................................................. 3

Owens v. Ford Motor Co.,
  297 F. Supp. 2d 1099 (S.D. Ind. 2003) .................................................. 13

Reedy v. CSX Transportation, Inc.,
  No. 06-758, 2007 WL 1469047 (W.D. Pa. May 18, 2007) .......................... 23, 24, 25

S.E.C. v. Lipson,
  46 F. Supp. 2d 758 (N.D. Ill. 1998) .................................................. 23, 25

Stanford Square, L.L.C. v. Nomura Asset Capital Corp.,
  229 F. Supp. 2d 199 (S.D.N.Y. 2002) ....................................................... 1

Townsend v. Martine,
  77 Fed. Appx. 921 (8th Cir. 2003)........................................................... 25

Tuli v. Brigham & Women's Hospital, Inc.,
  592 F. Supp. 2d 208 (D. Mass. 2009)............................................... passim

U.S. v. Green,
  405 F. Supp. 2d 104 (D. Mass. 2005) ....................................................... 6

U.S. v. Hines,
  55 F. Supp. 2d 62 (D. Mass. 1999) .................................................. 3, 4, 20

U.S. v. Montas,
  41 F.3d 775 (1st Cir. 1994)............................................................. 23, 24

**Rules**

Federal Rules of Evidence
　　Rule 401 ............................................................................................................ 23

　　Rule 403 .............................................................................................................. 3

　　Rule 702 ............................................................................................................ 23

**Other Authorities**

*Confronting the New Challenges of Scientific Evidence,* 108 Harv. L. Rev. 1532, 1552
　　(May 1995) ....................................................................................................... 10

Henry Brandis et al., 1 McCormick on Evidence § 12 (6th ed. 2006)..................................... 4, 21

John D. Jackson et al., *The Impact of Non-Normality and Misspecification on Merger
　　Event Studies*, 13:2 Int. J. of the Econ. of Bus. 247, 262 (2006) ......................................... 7, 8, 9

Nihat Aktas et al., *Event studies with a contaminated estimation period*, 13 J. Corp. Fin.,
　　129 (2007).......................................................................................................... 7

Robert B. Thompson II, et al., *The Influence of Estimation Period News Events on
　　Standardized Market Model Prediction Errors*, 63(3) Acct. Rev., 448, 466-68
　　(Jul. 1988) .......................................................................................................... 7

Lead Plaintiff Bricklayers and Trowel Trades International Pension Fund, on behalf of itself and the Class ("Plaintiffs"), respectfully submits this memorandum and the Declaration of Melinda Rodon (the "Rodon Decl.") in support of Plaintiffs' Motion to Preclude the Expert Opinions of René M. Stulz and John Deighton pursuant to Federal Rules of Evidence 702 and 403.

## PRELIMINARY STATEMENT

In the Declaration of René M. Stulz dated April 26, 2007 (Rodon Decl. Ex. A, (the "Stulz Declaration")) and the Corrected Expert Report of René M. Stulz dated (Rodon Decl. Ex. B, (the "Corrected Report")),[1] Professor Stulz opines that CSFB's AOL reports did not impact AOL's share price and that the market was already fully aware of the risks posed to AOL by the declining ad market in 2001. Additionally, , based on several faulty factual assumptions and conclusions, Professor Stulz opines in his Corrected Report that Dr. Hakala's loss causation and damages analyses are flawed, and he further criticizes Dr. Hakala's event study methodology.[2] Of all of these opinions, the only one which is based in any significant part on an arguably technical or specialized analysis is Professor Stulz's opinion concerning the impact of CSFB's AOL reports. However, even that opinion is rendered unreliable by the severe bias in Professor Stulz's elementary event study of AOL stock price movements submitted as the basis of his

---

[1]     Professor Stulz initially filed his trial report on May 1, 2008 but was forced to file a corrected version on July 8, 2008 due to the discovery of several "errors,"

(Corrected Rpt. ¶ 4.)

(Rodon Decl. Ex. C (attaching August 8, 2008 letter and document production marked C_0000001-9 from Daniel Schwartz of Davis Polk & Wardwell).)

[2]     Apparently, this is not the first time Professor Stulz has felt unconstrained by established academic principles or the facts of a case in rendering opinions on damages issues. *See, e.g., Franklin Federal Savings Bank v. U.S.*, 60 Fed. Cl. 55, 71-72 (Fed. Cl. 2004) (rejecting Professor Stulz's damages model because it "defies common sense," "is contrary to established principles" and "suffers from the fundamental problem that it is based on [a] speculative assumption[.]"); *Stanford Square, L.L.C. v. Nomura Asset Capital Corp.*, 229 F. Supp. 2d 199, 204 (S.D.N.Y. 2002) (rejecting Professor Stulz's damages formula because it "is not widely used in the industry or academia" and was based on too limited a sample of data.).

opinion. As the academic literature provides and Dr. Hakala empirically demonstrates, Professor

Stulz's event study is severely biased because it fails to control for *any* of the multitude of

significant news released during the study period, contaminating the predicted returns and

inflating his standard error to render artificially low statistical significance findings.

Compounding this error, Professor Stulz, incredibly, criticizes Dr. Hakala's properly specified

event study for its greater statistical significance findings, without a shred of academic or

empirical support for his claims. Professor Stulz's opinions, based on numerous uncritically

accepted factual assumptions provided by counsel, do little more than instruct the jury on the

conclusions he believes they should draw from the evidence, and criticize Dr. Hakala for not

assuming the same facts. Professor Stulz's opinions are thus unreliable and unhelpful to the jury.

Moreover, his attempts to opine on the specific conclusions the jury should draw and to smear

Dr. Hakala as supposedly employing a "results-oriented" approach through unsupported

methodology criticisms render his opinions highly prejudicial, and warrant preclusion.

In addition, Defendants offer the Expert Report of John Deighton (the "Deighton

Report"), in which Professor Deighton opines that: 1) the market was aware of "the kinds of

concerns expressed internally by Ms. Martin regarding the potentially negative effects of the

declining traditional advertising market on AOL" in 2001; 2) there were "valid reasons why

someone knowledgeable about AOL and the advertising market" might be "optimistic" about

AOL's prospects in 2001; and 3) it was "reasonable" for analysts to be "optimistic" about AOL

in 2001 despite the decline in the advertising markets. These opinions are irrelevant to the

factual disputes in this litigation: irrespective of what might have been "reasonable" for some

hypothetically "optimistic" analyst to believe, the question here is whether Mr. Kiggen and Ms.

Martin were, in fact, as optimistic about AOL's prospects as their reports conveyed. Moreover,

Professor Deighton's attempt to lend his expert "credibility" to the views expressed in certain news and analyst report excerpts is unhelpful and prejudicial. For these reasons and as more fully discussed below, the expert opinions of Professors Stulz and Deighton should be excluded.

## ARGUMENT

Under Federal Rule of Evidence 702, an expert witness may give testimony about specialized knowledge when it will assist the trier of fact. Thus, as this Court has explained, "expert testimony may be admitted where the inferences that are sought to be drawn are inferences that a jury could not draw on its own[,]" or where "the subject *looks like* one the jury understands from every day life, but in fact, the inferences the jury may draw are erroneous." *U.S. v. Hines*, 55 F. Supp. 2d 62, 64 (D. Mass. 1999). Additionally, when expert evidence is offered, the district court must perform a critical "gatekeeping" role to ensure that the scientific or technical evidence admitted is "not only relevant, but reliable."[3] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). *Daubert* prescribed that "*evidentiary reliability* will be based upon *scientific validity*[,]" which turns on a determination of whether "the principle support[s] what it purports to show[.]" *Id.* at 590 n.9 (emphasis in original).

Even where a party offers relevant and reliable expert evidence, such evidence may nonetheless be excluded under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" The Supreme Court has advised that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in

---

[3]     The Supreme Court articulated five non-exclusive factors that bear on the question of the admissibility of scientific testimony: 1) whether the expert's technique or theory can be or has been tested; 2) whether the expert's technique or theory has been subject to peer review and publication; 3) the known or potential error rate; 4) the existence and maintenance of standards and controls; and 5) whether the technique has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Supreme Court subsequently extended this standard to non-traditional sciences, including expertise based on observational, clinical and technical judgments. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation omitted). Indeed, this Court has likewise acknowledged that "a certain patina attaches to an expert's testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve." *Hines*, 55 F. Supp. 2d at 64. Thus, this Court has ruled that "the closer the purported 'expert' comes to testify about the very facts at issue in the case, the more that testimony must be scrutinized." *Tuli v. Brigham & Women's Hospital, Inc.*, 592 F. Supp. 2d 208, 212 n.4 (D. Mass. 2009) (citing Henry Brandis et al., 1 McCormick on Evidence § 12 (6th ed. 2006)).

Application of these standards to the expert testimony offered by Professors Stulz and Deighton mandate their exclusion. As described more fully below, Professor Stulz opines on the basis of an unreliably incomplete and biased event study, and further opines directly on the conclusions the jury should reach regarding disputed facts, based solely on unreliable assumptions provided by counsel and an inadequate review of the cold record. Similarly, Professor Deighton opines on irrelevant matters which, in any event, the jury is perfectly competent to evaluate without the undue influence of "expert" testimony.

## I.    PROFESSOR STULZ'S OPINIONS SHOULD BE PRECLUDED BECAUSE THEY ARE UNSUPPORTED AND UNRELIABLE

### A.    Professor Stulz's Event Study Results Are Biased And Unreliable, And Should Be Precluded Entirely

#### 1.    *Professor Stulz's Event Study Results Are Admittedly Biased Concerning All Dates When CSFB Did Not Issue Reports On AOL*

By Defendants' own admission, Professor Stulz's event study is an invalid measure of the statistical significance of any news other than CSFB's reports because his study did not control for the possible effects of any such news. As Defendants explained:

> In performing the regression, it is important for the economist to exclude the possible effects of the events for which he or she is testing; otherwise, the predicted return will already include such effects, if any, which may cause the predicted return to be higher or lower than it would otherwise be if the event had been excluded. In turn, this could *bias the event study*[.]

(Defs.' *Xcelera* Mem. 4 (Dkt. entry 232) (emphasis added).)  For this reason, Professor Stulz

"excluded the effective date of each of the CSFB reports, so that the effects, if any, of

Defendants' reports – i.e., the effects he was ultimately testing – would not affect the predicted

return he was estimating through his regression." (*Id*. (internal citation omitted).)  Hence, the

*only* events Professor Stulz's event study can even arguably claim to measure are the 35 CSFB

reports on AOL referenced in the complaint; he never prepared any event study concerning the

other relevant disclosures, such as the alleged corrective disclosures in this case, and did not

control for the effects of those disclosures in estimating the predicted returns in the one event

study he did prepare.[4]  Thus, by Defendants' description, Professor Stulz's event study is *biased*

with respect to its measurements of the statistical significance for all news other than the specific

CSFB AOL reports studied because the impact of all such news is subsumed in Professor Stulz's

predicted returns.

Despite this acknowledged limitation of Professor Stulz's event study, Professor Stulz

repeatedly touts his regression's biased statistical significance findings overall and/or for days he

did not study to argue that *Dr. Hakala's results* are wrong and biased.  (*See, e.g.*, Corrected Rpt.

¶¶ 5(e)(ii)-(iii) (stating that dates which Dr. Hakala found statistically significant "do not

coincide with statistically significant movements in AOL's stock price *when properly measured*"

and that "[o]nly three of Dr. Hakala's curative disclosure dates are associated with negative

---

[4]      This biases the statistical significance findings because the effects of the tested events are already included in the estimation of the predicted return – the return AOL is expected to have without the event.  The statistical significance of an event is determined by taking the difference between the predicted return and the actual return, and dividing it by the standard error in the regression analysis.  (*See* Plts.' Xcelera Reply Mem. pp. 3-4 (Dkt. entry 237).)  Thus, an inflated predicted return will render a smaller difference with the actual return, and artificially decrease the chances of finding statistical significance where there may very well be a significant event.

significant abnormal returns in my event study.")) Clearly, Professor Stulz's artificially low statistical significance findings do not create any valid comparator for demonstrating any flaws he claims in Dr. Hakala's results. If anything, they serve as a measure of the bias in Professor Stulz's results, since Dr. Hakala did control for these other news events.

Additionally, Professor Stulz specifically claims that his biased test properly measures, *inter alia*, the following dates/events that he did not study: January 25, 2001, May 20, 2001 and July 9, 2001 (all dates with certain AOL layoff announcements) (*Id.* at ¶ 48); August 13, 2001 (claiming, "[m]y event study finds that AOL's stock-price movement on this day, the first time that the market received this [layoff] information, was not significant.") (Stulz Decl. ¶ 51); September 24, 2001 (AOL lowered guidance) (*Id.* at ¶ 86); October 21, 2002 (announcement of CSFB-AOL investigation by Mass.) (*Id.* at ¶ 53). Because Professor Stulz's event study is not properly specified to provide unbiased statistical significance results for any of these events, it is unreliable for these purposes. *U.S. v. Green*, 405 F. Supp. 2d 104, 119 (D. Mass. 2005) (Gertner, J.) ("The question of whether the expert's technique or theory is scientifically reliable is a specific one: The issue is . . . whether it is valid for the purposes for which it is being offered, or what the [Supreme] Court has described as a question of 'fit.'"). By Defendants' and Professor Stulz's own admissions, Professor Stulz's event study is not valid for the purposes it is being offered – i.e., as a measure of the true statistical significance of AOL share price movements on non-CSFB report events – and hence, at a minimum, it must be precluded for this purpose.

### 2. Dr. Hakala Has Demonstrated That Professor Stulz's Event Study Results Concerning The Impact of CSFB's AOL Reports Are Also Biased

As predicted by the academic literature and demonstrated by Dr. Hakala, Professor Stulz's event study is significantly biased against finding statistical significance for any events, including the CSFB reports on AOL he purports to "rigorously" study, due to his failure to

control for significant contaminating events included in his event study window. Hence, Professor Stulz's event study is unreliable and should be precluded in its entirety.

It is well established in the statistics literature that the existence of extreme events that are uncontrolled for in an event study's regression analysis can severely bias the estimates of the market model and produce biased results. *See, e.g.*, Nihat Aktas et al., *Event Studies With a Contaminated Estimation Period*, 13 J. Corp. Fin. 129 (2007) ("[U]nrelated events may be present during the chosen estimation window, which *bias* the estimation of the return-generating process parameters.") (emphasis added); John D. Jackson et al., *The Impact of Non-Normality and Misspecification on Merger Event Studies*, 13:2 Int. J. of the Econ. of Bus. 247, 262 (2006) (finding that failing to identify and control for significant events causes "the true significance level of the test [to be] misstated").[5] Thus, as Dr. Hakala explained in his rebuttal declaration, "[i]n the absence of such controls [for significant news], the tests will be consistently biased against finding statistical significance, especially when a significant number of extreme stock price movements exist."[6] (Market Efficiency Rebuttal ¶ 13.) Indeed, "[e]ven a few extreme events not controlled for in the analysis will cause the standard error to be overstated and the statistical significance of events to be understated." (*Id.*)

It is undisputed that Professor Stulz did not control for the effects of any news within his event study window other than the 35 CSFB reports on AOL that he studied. This means that in order for Professor Stulz's event study results to be valid and consistent with the academic literature regarding event-induced contamination, there would have to have been *no significant*

---

[5]    *See also* Robert B. Thompson II, et al., *The Influence of Estimation Period News Events on Standardized Market Model Prediction Errors*, 63(3) Acct. Rev. 448, 466-68 (Jul. 1988) (concluding "that conventional market model parameter estimates are biased relative to those derived from the news-conditional market model").

[6]    Even with this bias artificially decreasing the statistical significance calculations in Professor Stulz's event study, Professor Stulz's study still found statistically significant abnormal returns on five of the days that Plaintiffs allege curative disclosures were made. (*See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Preclude the Expert Opinions of Scott D. Hakala, M. Laurentius Marais, Reinier Kraakman and Bernard S. Black ("Plts.' Daubert Opp.") p. 2.)

7

*AOL news* other than CSFB's reports in Professor Stulz's approximately two-year study period. Such an assumption is highly implausible, given that: (i) AOL was the largest and most successful internet company of its time; (ii) Time Warner was a large media and entertainment conglomerate with numerous media and entertainment operations, and (iii) the study period immediately followed the merger of these major industry forces. Indeed, even with the downward bias in Professor Stulz's results, his regression analysis indicates at a 95% confidence level that there were news-induced stock price movements on *at least* 38 days in his study, of which, Professor Stulz only controlled for two which coincided with CSFB reports on AOL.[7] (Rodon Decl. Ex. D (Stulz 2007 Dep. Ex. 2).) Thus, Professor Stulz's own, biased results nonetheless indicate that he ignored *at least* 36 significant events which contaminated his results.

Indeed, as explained by the academic literature and Dr. Hakala, the fact that Professor Stulz's event study is *biased* due to his failure to control for significant AOL news can be demonstrated empirically by evaluating whether there was an approximately or reasonably "normal" distribution in his predicted (or "residual") returns for non-event days (i.e., days when CSFB did not issue an AOL report). Academic studies have established that residual returns which are not normally distributed can indicate "that the event study has simply ignored some important, but [un]related, events." Jackson et al., *supra*, p. 7. Moreover, this omission of events indicates a fatal bias, misstated significance findings, in the event study: "[u]doubtedly, inferences from these studies . . . are highly questionable because they are based on statistical tests in which *the true significance level of the test is misstated*." *Id*. (emphasis added). Thus, Jackson et al. recommend that:

> [a]t a minimum, analysts should test their residuals for normality, and finding non-normality, they should conduct some sort of re-sampling . . . [a]lternatively, or jointly, they should also document that they have included all relevant events,

---

[7] Those two days are February 1, 2001 and April 18, 2001.

> both []related and [un]related, in their event study model, particularly if statistical testing is necessary. In the absence of any effort by the profession to take this type of corrective action, we strongly suggest that the event study methodology be put back on the shelf and left there.

*Id.* Here, Dr. Hakala examined Professor Stulz's regression analysis and found precisely such non-normality in Professor Stulz's residual returns on non-event days, evidencing Professor Stulz's misstated significance findings:

> On a first pass, Professor Stulz's regression analysis produces eleven (11) days/observations with a t-statistic of 2.33 or more as compared with a normal distribution expectation of three (3) to four (4) such events. Additionally, in a "normal" process, one would expect to find only zero (0) or one (1) [non-event] days with t-statistics greater than 3.0 in the sample. In this case, there are a total of seven (7) such extreme stock price movement days with t-statistics greater than 3.0 between January 17, 2001 and July 24, 2002, in Professor Stulz's sample.

(Market Efficiency Rebuttal ¶ 13.) Dr. Hakala further noted that "[a]ll of the identified dates with extreme stock price movements not explained by Professor Stulz's regression analysis were associated with identified news in my event study analysis and three (3) of those seven (7) extreme stock price movements were associated with analyst reports[.]" Professor Stulz has never contested Dr. Hakala's findings of the non-normal distribution in Professor Stulz's regression. Thus, it is uncontroverted that Professor Stulz's analysis suffers a fatal bias from his failure to control for significant AOL-specific news in his study period.

Moreover, Dr. Hakala has directly and empirically demonstrated the substantial *degree* of bias imparted in Professor Stulz's event study by this failure to control for significant news. In preparing his rebuttal report on market efficiency, Dr. Hakala replicated Professor Stulz's regression analysis and found that "had Professor Stulz merely controlled for the seven (7) extreme events with t-statistics greater than 3.0 on the first pass [of Professor Stulz's regression analysis] . . . then his standard error would have decreased by 13% and the t-statistics would all have increased by 14.4%." (Market Efficiency Rebuttal ¶ 13.) Additionally, Dr. Hakala found

9

that by controlling for the same set of significant AOL news as Dr. Hakala controlled for in his own market efficiency event study, the standard error in Professor Stulz's regression was reduced by 28.4% and the t-statistics for the tested events increased by 39.6%.[8] (*Id.*) Thus, controlling for all significant AOL-specific news increased both the *t-statistics*, making findings of statistical significance more likely, and the *power* of Professor Stulz's event study, indicating a higher "likelihood that [the] test will declare an association [i.e., statistical significance] when there actually is an association."[9] Professor Stulz has never offered any testing or other refutation of these findings. It is therefore uncontroverted and clear from the record that Professor Stulz's failure to control for the effects of any AOL-specific news in his study period demonstrably inflated his standard error and *substantially* biased his results against finding statistically significant AOL stock price movements.

For these reasons, Professor Stulz's event study is unreliable evidence of the impact of CSFB's reports and any other news on AOL's share price, and must be precluded entirely.

### B. Professor Stulz's Criticisms of Dr. Hakala's Use of Dummy Variables Should Be Precluded Because They Are Unsupported And Provably Wrong

Professor Stulz should be precluded from distracting and misleading the jury with his unsupported and meritless attacks on Dr. Hakala's use of dummy variables to control for significant, AOL-specific news in the event study window. (*See* Corrected Rpt. ¶¶ 99-101.) Professor Stulz ignores the extensive peer-reviewed literature supporting the need to control for the impact of significant news in an event study estimation period and specifically supporting the

---

[8]    Because statistical significance is calculated by taking the difference between the predicted return and the actual return and dividing it by the standard error, the higher a study's standard error, the lower its statistical significance results will be. For example, if the difference between the predicted return and the actual return is 3 and the standard error is 2, the resulting t-statistic is 1.5, which is not statistically significant at the 90% confidence level. However, if the standard error were only 1.5, then the t-statistic would be 2, which is statistically significant at the 95% confidence level.

[9]    *See Confronting the New Challenges of Scientific Evidence,* 108 Harv. L. Rev. 1532, 1552 (May 1995).

use of dummy variables for this purpose.[10]  Moreover, Professor Stulz has never cited a single

academic study to support his claim that controlling for significant company-specific news is

improper or biases test results, or that using dummy variables for this proper purpose is

ineffective.  Further, Professor Stulz has never tested Dr. Hakala's use of dummy variables (or at

least, he has never presented the results of any such test) to empirically demonstrate the claimed

bias in Dr. Hakala's event study.  Hence, Professor Stulz presents absolutely no basis in

academia or fact for his opinions that Dr. Hakala's use of dummy variables is flawed in any way.

The only supposed evidence of bias Professor Stulz presents is to note higher findings of

statistical significance in Dr. Hakala's event study relative to Professor Stulz's.  However, as Dr.

Hakala demonstrated above, this difference is due to the bias *in Professor Stulz's results* (i.e., his

higher standard error due to omitted, significant events).  Indeed, as Dr. Marais explained, "[i]t is

true that any fraud-related price movement will likely stand out more prominently against Dr.

Hakala's material-news-free baseline than against a baseline tainted by other, irrelevant but

potentially price-moving news events.  Dr. Stulz is mistaken, however, in claiming that this

consequence is a "bias"; rather, this is precisely—and *properly*—the purpose of Dr. Hakala's

procedure." (Marais Rpt. ¶ 13 (emphasis in original).)  Thus, Professor Stulz's claim that Dr.

Hakala's more powerful event study which properly controlled for significant AOL-specific

news is somehow "biased" because it found significance where Professor Stulz's analysis found

none is thoroughly discredited by the relevant literature and demonstrably wrong, and should be

precluded.

Given the abstruse technical details of complex event study analyses, Professor Stulz's

unfounded attack on Dr. Hakala's methodology poses a real risk of confusing the jury and

spuriously tainting Dr. Hakala's credibility, and hence, is highly prejudicial.  Indeed, this is

---

[10]    (*See* Plts.' Daubert Opp. pp. 8-10)

plainly Professor Stulz's intention, as he suggests outright that Dr. Hakala engaged in "a results-oriented approach[.]"[11] (Corrected Rpt. ¶ 5(g)(iv).)  Thus, Professor Stulz should be precluded from smearing Dr. Hakala's credibility by leading the jury down this long, winding path to nowhere.

### C. Opinions Concerning Supposed "Flaws" In Dr. Hakala's Analysis Based On Professor Stulz's Conclusions About The Evidence Are Unreliable And Prejudicial And Should Be Precluded

Professor Stulz opines at length throughout both of his reports,[12] but most notably in opinions 2-5 of his Corrected Report, concerning supposed "flaws" in Dr. Hakala's event studies and loss causation and damages analyses due to purported misidentifications of significant "new" news, relevant or curative disclosures, and "confounding" news.  These opinions not only seek to supplant the jury's determinations of evidentiary disputes which do not require any specialized knowledge to resolve, but are unreliably based on uncritically accepted assumptions, which often are the simple mirror image of the opinions offered by Professor Stulz.  Indeed, this Court recently rejected similar conclusory expert opinions, ruling that such factual determinations depend "upon the jurors evaluating the credibility of witnesses and drawing complex inferences from the facts they find[,]" thus, "these opinions are not at all helpful to the jury in rendering a

---

[11]     This contention is ostensibly drawn from the fact that Dr. Hakala's event studies had higher statistical significance finding than Professor Stulz's, discussed above, as well as Professor Stulz's conclusion that minor changes between Dr. Hakala's Market Efficiency study and Damages study increased his statistical significance findings. (*See* Corrected Rpt. ¶¶ 5(g) and 102-109 (arguing that Dr. Hakala's event studies are "not credible" due to minor modifications directly related to the purposes of each study).)  On this latter point, Professor Stulz failed to observe that Dr. Hakala's Damages study did not have increased statistical significance findings across the board, but rather, the statistical significance findings actually *decreased* for 23 days in the study, including 3 days with CSFB AOL reports.  Moreover, Professor Stulz completely ignored the legitimate reasons for the modifications Dr. Hakala made to his most recent study. (*See* Plts.' Daubert Opp. pp. 15, 17.)  Thus, Professor Stulz's conclusory assertion that Dr. Hakala engaged in a results-oriented approach is entirely baseless and should be precluded, as are his criticisms of the modifications to Dr. Hakala's event studies.

[12]     Two of Professor Stulz's opinions from his Declaration at the class certification stage of this litigation track the factual determinations offered in his Corrected Report.  Those Declaration opinions are that: "[t]here is no evidence that the disclosure to the market of information about allegedly inappropriate accounting and layoffs at AOL (that were allegedly omitted from CSFB's AOL reports) had any effect on AOL's stock price" and "[t]he market was well aware of the risks to AOL from the weak advertising market in 2001."

judgment; moreover, simply telling jurors what the outcome should be could well prejudice them." *Tuli*, 592 F. Supp. 2d at 211. Thus, Professor Stulz's opinions on the conclusions to be drawn regarding disputed facts, and his criticisms of Dr. Hakala for not drawing these same conclusions, are unreliable, unhelpful and prejudicial, and should be excluded.

### 1. *Professor Stulz Essentially Assumes His "Opinions," Rendering Them Unreliable And Unduly Prejudicial*

Professor Stulz's opinions that Dr. Hakala's analyses are flawed due to purported misidentifications of significant "new" news, relevant and curative disclosures, and "confounding" news are inseparably based on interpretations of the evidence which Professor Stulz was instructed to assume. As Professor Stulz states: "Dr. Hakala's analysis and conclusions are severely flawed because they depend on several incorrect assumptions *that counsel for CSFB has advised me are not supportable and are contradicted by the facts developed in discovery* and/or by reasonable economic analysis." (Corrected Rpt. ¶ 5(b).) Such hopelessly circular conclusions regarding what the evidence supports are unhelpful to the jury and unreliable. *See Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1107 (S.D. Ind. 2003) (excluding an expert, ruling that "[t]he fact that [the expert] assumed the very thing he was to prove renders his opinion conditional at best and tautological at worst."). Indeed, the purported "flaws" in Dr. Hakala's analysis here amount to nothing more than Dr. Hakala's "failure" to assume, as Professor Stulz did, that the weight of the evidence favors Defendants' arguments over Plaintiffs'.

For example, with respect to the information Defendants learned on July 11, 2001 concerning AOL's accounting investigation into inflated revenues, Professor Stulz assumed:

> that the accounting improprieties allegedly revealed to CSFB on July 11, 2001 were most likely related to AOL's internal investigation of its relationship with PurchasePro.com, which was disclosed in the press in June 2001 prior to the time CSFB allegedly learned about these problems from Ms. Bernard, and were

> separate from the accounting issues discussed at length in the two Washington
> Post articles on July 18 and 19, 2002.

(Corrected Rpt. ¶ 73.) From these assumptions, Professor Stulz unremarkably opines that "Dr.

Hakala's entire analysis is based on a tenuous and unsupported linkage" to the alleged curative

disclosures on July 18 and 19, 2002 and that Dr. Hakala's "approach is extremely speculative. It

fails to consider that the allegedly nonpublic information that CSFB supposedly received on July

11, 2001 likely had been disclosed even prior to that date." (*Id.* at ¶¶ 73, 75.) Thus, Professor

Stulz simply repackaged his assumptions into opinions lambasting Dr. Hakala. *See Clark v.*

*Takata Corp.*, 192 F.3d 750 (7th Cir. 1999) (affirming preclusion of an expert's testimony

because "an expert does not assist the trier of fact in determining whether a product failed if he

starts his analysis based upon the assumption that the product failed (the very question that he

was called upon to resolve).").

Moreover, Professor Stulz's lawyer-istic claim that Dr. Hakala "fail[ed] to consider" the

possibility that a June 2001 article might have fully disclosed the information subsequently

learned by CSFB is completely disingenuous: clearly if the jury should find this to be true, then

there is no omission of a material fact not already known to the market. The "fail[ure]" of Dr.

Hakala that Professor Stulz suggests is thus in providing *any* loss causation and damages analysis

where he essentially should have determined that Plaintiffs' claims are meritless, according to

Professor Stulz. Such opinions "resonate as a lawyer's closing argument rather than an expert

analysis." *Tuli*, 592 F. Supp. 2d at 211.

Likewise, with respect to the information Defendants learned in July 2001 concerning

AOL's undisclosed layoffs, Professor Stulz assumes, as instructed by counsel:

> that layoffs referred to by the AOL source in July 2001 were almost certainly not
> the layoffs disclosed a month later as Dr. Hakala contends, but rather were much
> smaller layoffs that were disclosed in newspaper reports the morning after CSFB
> is alleged to have received such information.

(Stulz Corrected Report ¶ 5(f)(i); *see also* ¶ 67 (same).)  From this assumption, Professor Stulz

concludes that "Dr. Hakala resorts to speculation and fails to consider that the allegedly

undisclosed information was almost certainly revealed in public sources the day after CSFB

obtained the information" and that Dr. Hakala "fails to establish any link whatsoever between the

news released on August 13 and 14, 2001 and the information about layoffs that CSFB received

on July 10, 2001." (*Id.* at ¶¶ 69, 71.)  These wholly assumed "opinions" add nothing to

Defendants' arguments other than the gloss of an expert's authority:  Professor Stulz "is doing

little more than putting his imprimatur on the defendant's case." *Tuli*, 592 F. Supp. 2d at 212.

Indeed, Professor Stulz follows this same pattern of assumed "opinions" with respect to

the allegations that Defendants misrepresented their true views of AOL's financial condition and

the impact the declining ad market would have on the company.  Professor Stulz essentially

assumed that Defendants' entire defense is true:

> Counsel has instructed me to assume, contrary to Dr. Hakala's assumptions, that
> the documents produced in discovery and the deposition testimony in this matter
> establish that (i) Ms. Martin's concerns related to the market for traditional
> advertising as opposed to online advertising, (ii) Ms. Martin's concerns were
> based on publicly available information, (iii) before the America Online-Time
> Warner merger, Ms. Martin followed Time Warner and Mr. Kiggen followed
> America Online, (iv) after the merger, Mr. Kiggen was the lead CSFB analyst
> covering the merged company, with ultimate responsibility for and control of the
> content in the CSFB reports, and (v) after the merger, Ms. Martin focused on the
> Time Warner segments of the combined company, while Mr. Kiggen focused on
> America Online and, with Ms. Martin's input, Mr. Kiggen made final decisions
> about CSFB's research coverage of the merged company.

(Corrected Rpt. ¶ 10.)[13]  Professor Stulz proceeds to fault Dr. Hakala for failing to assume all of

these conclusions and failing to conform his analyses to them.  (*See, e.g.*, *id.* at ¶¶ 8-31.)

Although Professor Stulz purports to have examined the evidence and concluded that it supports

the assumptions he made, he blatantly ignores any contradictory evidence, including, for

---

[13]    (*See also* Corrected Rpt. ¶¶ 5(c)(i), 5(c)(iii), 11, and 14 (further describing assumptions provided by
counsel).)

example, evidence that Ms. Martin's comments were not limited to only the "traditional"

segment of the advertising market or that some of her concerns pertained to the America Online

segment of the combined company. (*See* examples cited *infra* p. 25.) Thus, Professor Stulz's

perfunctory regurgitation of these assumptions as strongly worded opinions is wholly unreliable.

Indeed, these opinions are tantamount to claiming that Dr. Hakala failed to assume, as Professor

Stulz did, that the weight of the evidence favors Defendants' arguments over Plaintiffs', which is

not probative of any relevant matter.

Moreover, Professor Stulz carries these erroneously assumed facts forward throughout

the remainder of his report, concluding further that "Dr. Hakala's approach to attempting to

establish that CSFB's alleged nondisclosures impacted AOL's stock price is entirely speculative

and his estimates of any such impact are incorrect[,]" (Corrected Rpt. ¶¶ 32-48), and that "[t]here

is no support for Dr. Hakala's assumption that the declines in AOL's stock price on his curative

disclosure dates can be attributed to CSFB. That is, his theory of loss causation is unfounded."[14]

(Corrected Rpt. ¶¶ 49-78.) Because these opinions cannot stand without the unreliably assumed

factual premises discussed above,[15] they must all be precluded.

### 2. To The Extent Professor Stulz Purports To Opine Based On His Examination Of The Evidence, These Opinions Are Likewise Unreliable and Unhelpful

To the extent Professor Stulz claims his opinions are based on a review of the record,

they are nonetheless unreliable because Professor Stulz selectively ignores any evidence

---

[14]    It is true that Dr. Hakala's estimation of damages and analysis of loss causation depend, in part, on Plaintiffs prevailing with regard to disputed underlying facts. However, unlike Professor Stulz, Dr. Hakala did not merely assume Plaintiffs prevail and reword those assumptions into expert opinions. To the contrary, he prepared a sophisticated event study and other statistical analyses, which are beyond the ken of the lay jury, to support his opinions that there is loss causation and damages.

[15]    For example, in this latter section of his Corrected Report, Professor Stulz opines that "Dr. Hakala simply assumes a link between several of his curative disclosure dates and information that he claims CSFB had earlier in the class period, although the evidence clearly shows that no such link actually exists." (Corrected Rpt. ¶ 54.) Hence, Professor Stulz's related criticisms of other aspects of Dr. Hakala's damages analysis are all inseparably entangled in Professor Stulz's faulty factual findings.

contradicting his conclusions and supporting Plaintiffs' allegations. Moreover, as discussed above, these factual conclusions require more than just a reading of the cold record, but depend on weighing the evidence and making credibility determinations in which Professor Stulz is no more expert than the jury.

For example, Professor Stulz ignores evidence that a February 20, 2002 Lehman Brothers report on AOL – which downgraded AOL from a "2 Buy" to a "3 Market Perform" based in part on AOL's poor advertising revenue performance in the fourth quarter 2001 – revealed new, relevant information related to the fraud. Indeed, Professor Stulz references this report as an example (and his *only* example, at that) of supposed "days with unrelated analyst commentary" included in Dr. Hakala's event study, asserting that the entire focus of the report was limited to commentary on AOL's broadband business. (Corrected Rpt. ¶ 43.) This opinion ignores the fact that Lehman's analysts explicitly noted the disappointing ad revenues as one of the reasons for their downgrade, as did news reports commenting on the downgrade.[16] Moreover, when questioned at his 2007 deposition about the analysis he performed to determine that there was no new, relevant news in this report, Professor Stulz testified that he simply looked at the Lehman report, "concluded that the new information in that report was unrelated to advertising and was related to other issues about AOL which were not issues raised in the complaint" and "moved on." (*See* Rodon Decl. Ex. F, (Stulz 2007 Dep. Tr. 69:21-70:4, 70:15-19.)) A jury is perfectly capable of conducting such an analysis and drawing appropriate inferences.

Additionally, Professor Stulz ignores contradictory evidence in opining that this February 20, 2002 Lehman report merely reiterated ad-related news in a January 31, 2001 Lehman report and should not have been included in Dr. Hakala's study. (Corrected Rpt. ¶ 45.) This opinion

---

[16]     A Bloomberg article released that day, entitled, *AOL Time Warner Falls After Lehman Brothers Downgrade*, notes that Lehman downgraded AOL from "outperform" to "buy," "citing competition for high-speed Web customers and *a drop in online advertising*." (Plts.' 56.1 ¶ 328 (emphasis added)).

fails to account for the substantial additional information contained in the February 20th report and, as Professor Kraakman opined, "rests on an overly simple view of market information and the role of trusted analysts." As Professor Kraakman explained:

> The February 20[th] report contained a distinctly bleaker and more detailed discussion of AOL's advertising prospects than did the January 31 report, but – still more important – the February 20th report cast AOL's advertising difficulties as a principal basis for *lowering Lehman's rating* of AOL Time Warner from "2 Buy" to "3 Market Perform." The latter point means that the February 20th report could not have merely repeated the contents of the January 31st report, even if its factual discussion had been identical (which it wasn't). In reducing AOL Time Warner's rating on February 20[th], Lehman's analysts announced a changed interpretation of the trading significance of the facts . . . Lehman's February 20th report and rating downgrade not only disclosed information, but also 'processed' it by publicizing a sharply revised view of its trading significance.

(Plts.' 56.1 ¶ 329 (Dkt. Entry 290) (emphasis in original).) Thus, Professor Stulz's facile conclusion that the only "new" news in this report concerned an unrelated subject (which, by the way, was also discussed in the January 31, 2001 report he claims fully disclosed the ad revenue issue) ignores evidence contradictory to this conclusion, and hence, is not based on a reliable analysis.

Moreover, Professor Stulz ignores contradictory evidence in opining that CSFB's AOL reports, including a February 5, 2001 report, "AOL – One of One?", unequivocally warned of the uncertainty in AOL's key growth and revenue drivers, including advertising revenues.[17] (Corrected Rpt. ¶¶ 14-15.) In support of his conclusion, Professor Stulz quotes portions of the February 5th report stating that the first quarter is a seasonally slow one for ad revenues and that AOL had revised guidance for ad revenues slightly lower, however, he completely ignores highly positive ad-related comments in the report, including that:

---

[17]    This opinion was part of Professor Stulz's broader opinion that information about the "potential advertising downturn" was well known to the market in 2001 and thus disclosure of this risk "could not have impacted AOL's stock price." (Corrected Rpt. ¶¶ 14-15.) This opinion was derived in part from the assumption that "Ms. Martin did not base her advertising concerns on nonpublic information," hence, this opinion suffers from the same problem as his others in assuming the conclusion, i.e., that CSFB did not have any nonpublic information regarding the ad market downturn. (*Id.* at ¶ 14.)

the first quarter forecast of 9-11% gains in advertising and e-commerce includes the softer Time Warner cable networks, suggesting the company is still expecting substantial gains for the online service. Why would AOL show such strength in the face of Yahoo!'s weakness? Jamie Kiggen thinks the reasons include Yahoo!'s greater reliance on dot.com advertising; AOL's greater success with big corporate sponsorships; and the cross-promotion capabilities inherent via Time Warner's massive media portfolio . . . . *As a result, AOL's share of the internet advertising marketplace is rising, and that increase will likely accelerate this year.*

(Plts.' 56.1 ¶ 117, (Docket Entry 290).) Hence, this report was far from unequivocally negative

about AOL's ad revenue prospects for 2001, and a jury is better equipped to weigh such

countervailing statements.

Finally, Professor Stulz's opinions depend on weighing evidence and witnesses'

credibility which Professor Stulz again, ignores, in opining favorably for Defendants. For

example, Professor Stulz opines that Defendants' published projections of growth and discounted

cash flow value for AOL and/or the America Online segment were "reasonable," apparently

assuming that these projections were issued in good faith and were consistent with Mr. Kiggen's

internally-expressed views on the company.[18] ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (Plts.' 56.1 ¶ 156 (Docket Entry 290).) Moreover,

Professor Stulz's analysis of the "reasonableness" of Defendants' projections uses America

Online's compound annual growth rate from 1996-2000, (Corrected Rpt. ¶ 28(b)), ignoring the

---

[18]    Without such an implicit assumption, this analysis is not only flawed but entirely irrelevant. Irrespective of whether Defendants' published projections were "reasonable," what Plaintiffs must show and Defendants must refute is that they were not made in good faith, but rather, were made with the intent to mislead investors. Evidence that the projections were reasonable might cut against a reckless state of mind, but do not refute direct intent to mislead. Indeed, if Defendants' projections had been outside of a "reasonable" range, they may well have been less effective in misleading investors because they would have been less credible to the market. Hence, Professor Stulz's analysis of the "reasonableness" of Defendants' AOL projections is not probative of any issue in this litigation. Moreover, this opinion, together with Professor Stulz's opinions about what was publicly known concerning ad market trends in 2001, are needlessly cumulative of testimony that will more appropriately be offered by lay witnesses, Mr. Kiggen and Ms. Martin. *See infra* p. 24. Hence, Professor Stulz's opinions should be excluded.

highly significant impact of the Internet bubble burst after the first quarter 2000, as well as the fact that America Online was a more mature company in 2001, which could no longer expect the typically higher growth rate of a new-to-the-market entity. Thus, even where Professor Stulz claims to support his opinions with a review of the evidence, his opinions nonetheless unreliably ignore any countervailing evidence and should be excluded.

### 3. Professor Stulz's Opinions Concern Observations Which Do Not Require Or Benefit From Any Technical Or Specialized Knowledge

The types of simple factual observations underlying Professor Stulz's opinions – such as whether the content of an alleged curative disclosure resembles the information Defendants are alleged to have known but misrepresented and omitted from their reports – are all based on common sense and inferences which the jury can accurately make without expert guidance. *See Hines*, 55 F. Supp. 2d at 64 (distinguishing specialized or technical observations and inferences, such as those involved in analyzing handwriting, assessing witness identification testimony or analyzing battered woman syndrome, from those that a jury can make from common experience.).

Further, even if expert guidance would be helpful to the jury, Professor Stulz provides none, but merely instructs the jury on the conclusions he believes they should draw from the evidence, opining, for example, that "there is no evidence that the disclosure to the market of information allegedly omitted from CSFB's AOL reports (i.e., the advertising market downturn, alleged inappropriate accounting activities, and layoffs at AOL) had any effect on AOL's stock price." (Stulz Decl. ¶ 90.) Like the "expert" opinions rejected by this Court in *Tuli*, Professor Stulz's opinions on the evidence are no more than "value judgments that cannot be reviewed; they are simply his conclusions, *ipse dixit*." Moreover, as this Court has acknowledged, "[c]learly, a 'highly opinionated statement' amounting to a witness' general belief as to how the

case should be decided is simply not helpful to the jury and is unduly prejudicial." *Tuli*, 592 F.

Supp. 2d at 212 (citing Henry Brandis et al., McCormick on Evidence § 12 (6th ed. 2006)).

Hence, Professor Stulz's "expert" opinions regarding what the evidence shows are unreliable,

unhelpful and prejudicial, and should be precluded.

## II.    PROFESSOR DEIGHTON'S OPINIONS SHOULD BE PRECLUDED BECAUSE THEY ARE IRRELEVANT AND UNRELIABLE

Professor Deighton's opinions should be excluded because they are irrelevant to any facts

at issue, do not pertain to any "specialized" or "technical" knowledge, and are based on

unreliable assumptions. (*See* Rodon Decl. Ex. E (attaching the Expert Report of John Deighton,

"Deighton Rpt.").) Thus, his opinions' minimal probative value is substantially outweighed by

the likelihood that his testimony will improperly prejudice and confuse the jury.

### A. Professor Deighton's Opinions Are Irrelevant

Professor Deighton's "expert" opinions concern matters which are not probative of any

facts at issue in the litigation and hence, will not assist the jury. Professor Deighton opines that:

> 1) the kinds of concerns expressed internally by Ms. Martin regarding the potentially negative effects of the declining traditional advertising market on AOL were widely discussed in public by other analysts and market commentators at the time Ms. Martin raised these concerns in 2001; 2) there were several valid reasons why someone knowledgeable about AOL and the advertising market would remain optimistic about AOL's prospects at this time; and 3) it was entirely reasonable during this time period for analysts to remain optimistic about AOL despite the decline in the advertising markets.

(Deighton Rpt. ¶ 40.) These opinions are largely irrelevant to any disputed issues in this

litigation. For example, whether it was reasonable for some other analysts, who did not

internally express disbelief in their own public projections, to "remain optimistic" about AOL's

prospects is dispositive of nothing. The point here is whether Defendants believed their own

published projections; liability does not hinge on whether their published "optimism," i.e., the

alleged misrepresentations, was "reasonable." Professor Deighton testified that he "studiously

stayed away from" the relevant issue of whether Mr. Kiggen and Ms. Martin misrepresented and

omitted negative, material information they had concerning AOL. (Rodon Decl. Ex. F,

(Deighton Dep. Tr. 219:15-220:16.) Indeed, he admitted that he did not study this and does not

know how to measure it. (*Id.*)

Similarly, the opinion that there may be "valid" reasons for a knowledgeable analyst to

be optimistic about AOL's prospects tells the jury nothing about whether Defendants were, in

fact, as optimistic as their reports. Ms. Martin and Mr. Kiggen are the only witnesses who can

testify to their reasons for their published and internal statements about AOL's financial

condition and prospects. Professor Deighton is not a lay witness to these matters, nor can he

claim to be an expert about what Mr. Kiggen and Ms. Martin believed.

Finally, whether it was generally known that there was a decline in the advertising market

or subsets of the ad market (traditional and online advertising), and/or whether the "types of

concerns" internally expressed by Ms. Martin were "discussed" in the market is largely irrelevant

to the issue of whether Defendants adequately disclosed their true beliefs concerning AOL.

Professor Deighton's report does not go so far as to opine on the loss causation and damages

issues of whether and when the market became fully informed of the information allegedly

misrepresented or omitted by Defendants, thus, his opinions do not even present evidence, albeit

weak evidence, cutting against Plaintiffs' proof on these issues. Hence, Professor Deighton's

opinions will not assist the jury in determining any fact at issue in this litigation.

According to the First Circuit, the inquiry into the helpfulness of an expert's testimony is

the "ultimate purpose of the *Daubert* inquiry." *Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d

376, 380 (1st Cir. 2000). Since Professor Deighton's opinions do not make "the existence of any

fact that is of consequence to the determination of the action more probable or less probable than

it would be without the evidence," his opinions will not "assist the trier of fact to understand the

evidence or to determine a fact in issue," and should be excluded under Rule 702. *See* Fed. R.

Evid. 401 & 702; *see also Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard

requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

### B. Professor Deighton's Opinions Concern Matters Well Within The Common Understanding Of The Jury And Hence, Are Not The Proper Subject Of Expert Testimony

Professor Deighton's opinions are based on reiterated excerpts from numerous articles

and analyst reports concerning ad market trends in 2001, and thus, are based on observations

within the common understanding of the jury. Experts should not "merely [ ] repeat or

summarize what the jury independently has the ability to understand," *Reedy v. CSX Transp.,*

*Inc.*, No. 06-758, 2007 WL 1469047, at *3 (W.D. Pa. May 18, 2007) (quoting *S.E.C. v. Lipson*,

46 F. Supp. 2d 758, 763 (N.D. Ill. 1998)); however, Professor Deighton's expert report does just

this. The news articles and reports concerning the advertising market that Professor Deighton

summarizes in his report are "readily intelligible" to an average juror, and Defendants can

present the same information directly to the jury, without improperly putting an expert's

imprimatur on the evidence. *See U.S. v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994); (Deighton

Rpt. ¶¶ 14-39). As the First Circuit has noted:

> Expert testimony on a subject that is well within the bounds of a jury's ordinary
> experience generally has little probative value. On the other hand, the risk of
> unfair prejudice is real. By appearing to put the expert's stamp of approval on [a
> party's] theory, such testimony might unduly influence the jury's own assessment
> of the inference that is being urged.

*Montas*, 41 F.3d at 784. Indeed, when asked in his deposition what he, as an "expert" on reading

the *Wall Street Journal*, adds beyond the actual content of a *Wall Street Journal* article,

Professor Deighton replied that he brought "credibility to what otherwise is . . . just a journalist's

opinion." (Deighton Dep. Tr. 92:18-22.) This is precisely the type of expert testimony that the

First Circuit cautions will "unduly influence the jury's own assessment." *See Montas*, 41 F.3d at 784.  Rule 702 does not permit Defendants to "filter fact evidence and testimony through its expert merely to lend credence to the same." *Reedy*, 2007 WL 1469047, at *3.

Moreover, Professor Deighton's opinions are needlessly cumulative of the testimony that Mr. Kiggen and Ms. Martin will provide on the same subject matter.  (*See, e.g.*, Rodon Decl. Ex. F, (Martin Depo. Tr. 205:12-18, 206:11-207:6, 213:10-216:9, 265:21-25, 268:15-20; Kiggen Depo. Tr. 148:9-18, 273:16-274:17.))  As lay witnesses with specific knowledge about AOL and ad market trends during the Class Period, Mr. Kiggen and Ms. Martin are much better qualified to testify regarding what was generally known by the market in 2001 concerning the risk to AOL's revenues and performance posed by the rapidly eroding ad market.  Accordingly, Professor Deighton's testimony should be precluded under Federal Rule of Evidence 403, as its minimal probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues . . . [and] needless presentation of cumulative evidence."

### C. Professor Deighton's Opinions Are Based on Flawed Assumptions and Improper Determinations About Witness Credibility

Professor Deighton based his opinions on the assumption provided by counsel that "Ms. Martin's references to downturns in the advertising market were based on and related to traditional media and the traditional advertising market." (Deighton Rpt. ¶ 13.) ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████  (*See, e.g,* Plts.' 56.1 ¶ 150 (Docket Entry 290) ████████

████████████████████████████████████████████████████████████

███████  *id.* at ¶ 208 ████████████████████████████████████████

████████████████████████████████████████

████ Martin Dep. Tr. 313:14-17 ████████████

███████████████████████████████████████ *see*

*also* Plts.' 56.1 ¶ 93 (noting online advertising revenue streams in other media companies which Ms. Martin covered).) Thus, Professor Deighton's indiscriminate acceptance of this faulty assumption renders his analysis and opinions unreliable.

Moreover, to the extent any of Ms. Martin's emails are unclear as to whether they refer to the advertising market as a whole or only some subcategory, this is a determination for the jury to make, weighing the credibility and inferences from Ms. Martin's contemporaneous emails against her testimony now, as a defendant. It is not for Professor Deighton to assume. Expert testimony should not "invade the quintessential jury function of determining the credibility of witnesses." S*ee Reedy*, 2007 WL 1469047, at *3 (citing *S.E.C. v. Lipson*, 46 F. Supp. 2d at 763). In addition, expert testimony fails the helpfulness requirement of Rule 702 when "'it draws inferences or reaches conclusions within the jury's competence,' such as witness credibility." *Townsend v. Martine*, 77 Fed. Appx. 921, 922 (8th Cir. 2003) (affirming district court's exclusion of expert testimony that "boiled down to witness credibility and was within the jury's competence.") (citation omitted). Thus, Professor Deighton's unhelpful and prejudicial opinions should be precluded.

## CONCLUSION

For all of the foregoing reasons, the expert opinions of Professors René Stulz and John Deighton should be precluded in their entirety.

DATED:  June 5, 2009

KAPLAN FOX & KILSHEIMER LLP

/s/  Frederic S. Fox
Frederic S. Fox (admitted *pro hac vice*)
Joel B. Strauss (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Melinda D. Rodon (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714

*Lead Counsel for Class Plaintiffs*

Edward F. Haber (BBO #215620)
Todd Heyman (BBO #643804)
SHAPIRO HABER & URMY LLP
53 State St.  37th Floor
Boston, MA 02109
Telephone:  617-439-3939
Facsimile:  617-439-0134

*Liaison Counsel for Class Plaintiffs*