UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE CREDIT SUISSE — AOL
SECURITIES LITIGATION

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

This document relates to:

ALL ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:02 CV 12146
(Judge Gertner)

Oral Argument Requested

**<u>REDACTED VERSION</u>**

**MEMORANDUM OF LAW OF DEFENDANTS
CREDIT SUISSE SECURITIES (USA) LLC AND
CREDIT SUISSE (USA), INC. IN OPPOSITION TO
PLAINTIFF'S MOTION TO PRECLUDE THE EXPERT
<u>OPINIONS OF RENÉ M. STULZ AND JOHN DEIGHTON</u>**

| | |
|---|---|
| Lawrence Portnoy (admitted *pro hac vice*)<br>Avi Gesser (admitted *pro hac vice*)<br>DAVIS POLK & WARDWELL LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Tel: (212) 450-4000<br>Fax: (212) 450-3800<br><br>*Attorneys for Defendants*<br>*Credit Suisse Securities (USA) LLC and*<br>*Credit Suisse (USA), Inc.* | Robert A. Buhlman (BBO #554393)<br>Siobhan E. Mee (BBO #640372)<br>BINGHAM MCCUTCHEN LLP<br>One Federal Street<br>Boston, Massachusetts 02110<br>Tel: (617) 951-8000<br>Fax: (617) 951-8736<br><br>*Attorneys for Defendants*<br>*Credit Suisse Securities (USA) LLC and*<br>*Credit Suisse (USA), Inc.* |

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ..........................................................................................................4

I.     PROFESSOR STULZ'S OPINIONS ARE ADMISSIBLE ...............................5

     A.     Professor Stulz's Event Study Is Reliable and Based on Accepted Methods..........5

          1.     Professor Stulz Properly Examined Abnormal Returns of Non-Event Days ...........................................................................................7

          2.     Professor Stulz's Report Properly Did Not "Dummy Out" All AOL-Specific News Days ................................................................9

     B.     Professor Stulz's Opinions Are Not Based on Flawed Factual Assumptions .......13

     C.     Professor Stulz's Opinions Are Not Prejudicial for Purposes of Federal Rule of Evidence 403 ...............................................................................17

II.     PROFESSOR DEIGHTON'S OPINIONS ARE ADMISSIBLE ......................19

     A.     Professor Deighton's Opinions Are Based Upon Specialized Knowledge and Are the Proper Subject of Expert Testimony ........................................19

     B.     Professor Deighton's Assumption That Martin's Emails Concerned the Traditional Advertising Market Is Not Flawed....................................24

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

### CASES

PAGE

Avila v. Willits Envtl. Remediation Trust,
No. C 99-3941 SI, 2008 WL 360858 (N.D. Cal. Feb. 6, 2008)..............................................18

Baron v. Smith, 380 F.3d 49 (1st Cir. 2004) ........................................................................22

In re Broadcom Corp. Sec. Litig.,
No. SACV 01275 GLTMLGX, 2005 WL 1403756 (C.D. Cal. June 3, 2005) ........................7

In re Credit Suisse – AOL Sec. Litig., 465 F. Supp. 2d 34 (D. Mass. 2006)................................11

In re Credit Suisse First Boston Corp. (Agilent Techs. Inc.) Analyst Reports Sec. Litig.,
431 F.3d 36 (1st Cir. 2005)................................................................................................23

In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.,
250 F.R.D. 137 (S.D.N.Y. 2008) ........................................................................................6

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) ....................................................4, 17

Estate of Edward W. Knoster v. Ford Motor Co., 200 F. App'x 106 (3d Cir. 2006) ....................18

Feinberg v. Katz, No. 01 Civ. 2739, 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007).....................14

Fener v. Belo Corp., 560 F. Supp. 2d 502 (N.D. Tex. 2008)......................................................7

Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996) ...................................................23

Greenberg v. Crossroads Sys., Inc., 364 F.3d 657 (5th Cir. 2004)....................................................6

Key v. Gillette Co., 104 F.R.D. 139 (D. Mass. 1985),
aff'd, 782 F.2d 5 (1st Cir. 1986) ........................................................................................18

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)...............................................................4, 19

In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546 (S.D.N.Y. 2008) .............................7

In re PolyMedica Sec. Litig., 432 F.3d 1 (1st Cir. 2005) ...........................................................22

Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77 (1st Cir. 1998) ...............................4

Schwab v. Philip Morris USA, Inc.,
    No. CV 04-1945(JBW), 2005 WL 2401647 (E.D.N.Y. Sept. 29, 2005) ......................22

Tuli v. Brigham & Women's Hosp., 592 F. Supp. 2d 208 (D. Mass. 2009) ...........................15, 19

United States v. Cap Quality Care, Inc.,
    No. 05-163-P-H, 2006 WL 3591306 (D. Me. Dec. 7, 2006)....................................14

United States v. Diaz, 300 F.3d 66 (1st Cir. 2002)........................................................4

United States v. Mooney, 315 F.3d 54 (1st Cir. 2002) .................................................17

United States v. Schiff, 538 F. Supp. 2d 818 (D.N.J. 2008)........................................20

United States v. Shea, 957 F. Supp. 331 (D.N.H. 1997),
    aff'd, 159 F.3d 37 (1st Cir. 1998) .........................................................................18

In re Vivendi Universal, S.A. Sec. Litig.,
    No. 02 Civ. 5571, 2009 U.S. Dist. LEXIS 34563 (S.D.N.Y. Apr. 6, 2009)...........................15

Voilas v. General Motors Corp., 73 F. Supp. 2d 452 (D.N.J. 1999) ..............................20

In re Xcelera.com Sec. Litig.,
    No. 00-11649 (RWZ), 2008 U.S. Dist. LEXIS 77807 (D. Mass. Apr. 25, 2008) ...........2, 6, 10

STATUTES & RULES

Fed. R. Evid. 403 ...........................................................................................................17

Fed. R. Evid. 702 ......................................................................................................4, 17

OTHER AUTHORITIES

Boehmer et al., Event-study Methodology Under Conditions of
    Event-induced Variance, 30 J. Fin. Econ. 253 (1991)...............................................8

A. Craig MacKinlay, Event Studies in Economics and Finance,
    35 J. Econ. Literature 13 (1997) ...................................................................8, 10, 11

John D. Jackson et al., The Impact of Non-Normality and Misspecification on
    Merger Event Studies, 13 Int'l J. Econ. Bus. 247 (2006)....................................12, 13

John Y. Campbell et al., The Econometrics of Financial Markets (1997)......................................10

Nihat Aktas et al., Event Studies with a Contaminated Estimation Period,
    13 J. Corp. Fin. 129 (2007) ...................................................................................................12

Oya Altinkiliç & Robert S. Hanson, On the Information Role of Stock Recommendation
    Revisions, J. Acct. & Econ. (forthcoming 2009),
    http://dx.doi.org/10.1016/j.jacceco.2009.04.005 ....................................................................11

Robert B. Thompson II et al., The Influence of Estimation Period News Events on
    Standardized Market Model Prediction Errors, 63 Acct. Rev. 448 (1988)........................12, 13

Stephen J. Brown & Jerold B. Warner, Using Daily Stock Returns: The Case of Event Studies,
    14 J. Fin. Econ. 3 (1985).........................................................................................................8

S.P. Kothari and Jerold B. Warner, Econometrics of Event Studies in 1 Handbook of
    Corporate Finance 3 (B. Espen Eckbo ed. 2006)....................................................................10

## PRELIMINARY STATEMENT

Faced with a very serious challenge to the admissibility of its own experts' testimony, Plaintiff has sought to even the playing field by bringing a flimsy "me too" motion to preclude the opinions of Professors René Stulz and John Deighton, the experts of the Credit Suisse Defendants [Dkt. #311] ("Pl.'s Br."). Tellingly, Plaintiff brought its motion as a response to Defendants' motion to preclude the testimony of Plaintiff's own experts – not, as would be expected, in response to Defendants' motion for summary judgment. Plaintiff's contrived and obfuscatory arguments – which principally derive from the unsound testimony of Plaintiff's own experts – should not distract the Court from the fact that Defendants' experts are eminently qualified to offer the relevant and reliable opinions contained in their reports, while Plaintiff's experts are not.

The attack on Professor Stulz, Defendants' expert on loss causation and damages, demonstrates that Plaintiff's motion is baseless. Nowhere does Plaintiff argue that Professor Stulz is unqualified to perform an event study or to opine on the subjects of his report. Indeed, Plaintiff could not make such an argument. Professor Stulz is a tenured professor of finance at a prestigious university, where he is also the director of the center for research in financial economics. He has published more than 60 articles in peer-reviewed economic journals, including at least 15 event studies. These published, peer-reviewed event studies (including one contained in an award-winning article published just last year) employ the <u>same</u> methodology Professor Stulz used in this case. Nor does Plaintiff contend – again, because it cannot – that Professor Stulz's event study in this case uses a non-standard methodology. Instead, Plaintiff argues that Professor Stulz's opinions must be precluded merely because he did not perform his event study using the same flawed methodology as Plaintiff's expert, Dr. Scott Hakala (who has

not published even a single paper on any subject, much less an event study, in any peer-reviewed finance journal during his 26-year career). This argument is meritless and Plaintiff knows it.

Professor Stulz's event study provides a reliable basis for him to opine on the statistical significance of "abnormal" returns in the stock price of AOL Time Warner, Inc. ("AOL") with respect to all of the dates he addressed in his report. There is no merit to Plaintiff's claim that Professor Stulz was required to "dummy out" – i.e., to exclude from his regression model estimating the baseline measurement of AOL's volatility – all days as to which he offers an opinion on significance. But even if there were such a requirement, Professor Stulz satisfied it. As Plaintiff knows from asking him at his 2007 deposition, Professor Stulz performed additional regressions that dummied out the very days Plaintiff now focuses on to determine whether they would change his results. They did not, which completely rebuts Plaintiff's disingenuous criticism. More generally, it was entirely proper for Professor Stulz to reject Dr. Hakala's approach of using dummy variables to exclude all AOL-specific news days from his regression. Plaintiff has not cited a single published event study that follows Dr. Hakala's use of dummy variables, an approach which Judge Zobel precluded as unreliable in In re Xcelera.com Securities Litigation ("Xcelera"), No. 00-11649 (RWZ), 2008 U.S. Dist. LEXIS 77807, at *2-7 (D. Mass. Apr. 25, 2008). By contrast, Professor Stulz's methodology finds support in all of the prevailing academic literature on the subject of performing event studies – including the articles cited by Plaintiff.

Plaintiff's other assertions about Professor Stulz's report fare no better. Like every other expert who testifies in securities cases, Professor Stulz accepted factual assumptions at the direction of counsel. Contrary to Plaintiff's claim, Professor Stulz never opines that the jury

- 2 -

must find the facts to be in accord with his assumptions. Rather, Professor Stulz's opinions proceed from the basis that <u>if</u> a jury finds the facts as he was instructed to assume them, then the jury may also conclude <u>as an economic matter</u> that Plaintiff's alleged disclosure dates could not have affected AOL's stock price. This is an entirely acceptable opinion for an expert to offer. And Plaintiff's final argument – that Professor Stulz's opinions are unduly prejudicial – fails because the only "prejudice" that Plaintiff appears able to identify is the risk that a jury might find Professor Stulz's devastating criticisms of Dr. Hakala's flawed methods to be persuasive. While that may be grounds to exclude Dr. Hakala, it is no basis to strike Professor Stulz.

Plaintiff's arguments with respect to Professor Deighton – Defendants' advertising expert – are equally meritless. Professor Deighton is more than qualified. For more than two decades, Professor Deighton has taught marketing courses at the business schools of Harvard, the University of Chicago, and Dartmouth; he has authored over 40 peer-reviewed papers and book chapters and more than 25 case studies, and he has served as editor of two marketing journals. For "nonscientific" testimony such as Professor Deighton's, courts test the reliability of a witness's opinions with greater flexibly than in the case of scientific testimony. Indeed, even if Professor Deighton were found to have simply summarized technical analyst reports and news articles concerning the advertising market and AOL, such testimony would be admissible as useful to a jury. Professor Deighton's expert testimony, however, does more than this. Among other things: (1) his testimony regarding the differences between traditional and online advertising (which would not be apparent to the average juror) undermines Plaintiff's attempt to prove that Laura Martin's concerns extended to both forms of advertising; (2) his testimony regarding the extensive public discussion of the declining traditional advertising market in 2001,

- 3 -

as well as his synthesis of what was known to the market at various points throughout the year, will assist the jury in determining whether Martin's views about the advertising market would have been material if they were revealed; and (3) his testimony that, in light of AOL's position in the market, it was reasonable in 2001-02 for an analyst to remain optimistic about AOL's prospects goes not only to the Defendants' scienter, but also to whether or not there was a fraud, as those two elements collapse in misstatement of opinion cases.

Accordingly, Defendants' experts are qualified to testify about the relevant and reliable opinions contained in their reports, and Plaintiff's motion to preclude them should be denied.

## ARGUMENT

The expert testimony of Professors Stulz and Deighton is admissible because it is both "relevant" and "reliable." See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002). Expert testimony is relevant if it likely "would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (citing Daubert, 509 U.S. at 591-92); see also Fed. R. Evid. 702. Expert testimony is reliable if the witness is "qualified . . . by knowledge, skill, experience, training, or education" and his expert testimony is (1) "based upon sufficient facts or data" and (2) "the product of reliable principles and methods" that the expert has (3) "applied . . . reliably to the facts of the case." Id.

Daubert imposes the same requirements of relevance and reliability on scientific as well as non-scientific expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

The burden of showing that an expert's testimony meets the standards for admissibility is on the party who proffers that testimony. See Ruiz-Troche, 161 F.3d at 85. As demonstrated

below, Defendants easily meet that burden here as to both of their experts. Defendants regret that some of the arguments in this brief are dense and complex. That is, unfortunately, because Plaintiff's experts have deliberately made the issues more confusing than they are (exactly the opposite of what experts are supposed to do). Defendants submit that if the Court calls all of the experts to testify at a hearing to assess their experience and credibility, it will be readily apparent that the challenges to Defendants' experts are entirely without support.[1]

## I.    PROFESSOR STULZ'S OPINIONS ARE ADMISSIBLE

### A.    Professor Stulz's Event Study Is Reliable and Based on Accepted Methods

As an initial matter, Professor Stulz's credentials as a financial economist – which include his experience designing, conducting, and publishing event studies – are impeccable and are far superior to those of Dr. Hakala, the principal source of Plaintiff's baseless attacks on Professor Stulz's opinions. Professor Stulz obtained his Ph.D. in Economics from MIT and has since taught at such institutions as MIT, the University of Chicago, and Ohio State University, where he is currently a chaired professor and director of the university's center for research in financial economics. (Declaration of Melinda D. Rodon in Supp. of Pl.'s Mot. to Preclude [Dkt. # 312] ("Rodon Decl.") Ex. A (Declaration of René M. Stulz, dated Apr. 26, 2007 ("Stulz Decl.") ¶ 1.) Professor Stulz has published more than 60 articles on issues in financial economics, authored a textbook, and edited several books in the field. (Id. ¶ 2.) More than 20 of his peer-reviewed publications have contained an event study, including 15 published in the top three peer-reviewed finance journals. (Declaration of Avi Gesser in Supp. of Credit Suisse

---

[1] Likewise, Professor Stulz has submitted a supplemental declaration in connection with this opposition brief, but only because he has not previously had an opportunity to respond to the new criticisms that have been put forth by Dr. Hakala and are contained in Plaintiff's brief.

Defs.' Opp'n to Pl.'s Mot. to Preclude ("Gesser Decl.") Ex. 1 (Declaration of René M. Stulz, dated July 20, 2009) ("Stulz 7/20/09 Decl.") ¶ 12.)  Last year, one of Professor Stulz's papers containing an event study won a prestigious "best paper" prize from the <u>Journal of Financial Economics</u>, the leading journal in the field.  (<u>Id.</u>)  Professor Stulz also serves on the editorial boards of more than 10 academic and practitioner publications, was editor of the <u>Journal of Finance</u> for 12 years, and co-editor of the <u>Journal of Financial Economics</u> for five years.  (Stulz Decl. ¶ 2.)

Professor Stulz's credentials as a financial economist and an expert on event studies stand in stark contrast to Dr. Hakala's.  Dr. Hakala has never served as a tenured professor (<u>see</u> Gesser Decl. Ex. 2 ("Hakala 2007 Tr.") 14:8-10, 14:14-22) and has never published an article in a peer-reviewed finance journal, whether involving an event study or not.  (Gesser Decl. Ex. 3 (Expert Report of Scott D. Hakala, dated March 4, 2008) ("Hakala Rpt.") Ex. A; Gesser Decl. Ex. 4 ("Hakala 2008 Tr.") 240:7-11.)  Moreover, while Professor Stulz has repeatedly been qualified as an expert, including, recently, as an expert in a research analyst case in which he submitted an event study, <u>see</u> <u>In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.</u> ("<u>Lantronix</u>"), 250 F.R.D. 137, 143 n.14 (S.D.N.Y. 2008), Dr. Hakala has not.  Indeed, in addition to being precluded from testifying last year by Judge Zobel, <u>see</u> <u>Xcelera</u>, 2008 U.S. Dist. LEXIS 77807, at *2-7, Dr. Hakala's opinions have repeatedly been rejected in the last five years by courts nationwide, specifically because the event studies he performed were not based on a scientifically acceptable methodology and because his opinions were not the result of a methodology that he reliably applied to the facts.[2]  Thus, while the event study that Professor

---

[2] <u>See, e.g.</u>, <u>Greenberg v. Crossroads Sys., Inc.</u>, 364 F.3d 657, 666-67 (5th Cir. 2004) (declining to accept Dr. Hakala's opinions on reliance and loss causation because he failed to control for confounding events on key corrective disclosure day);

Stulz performed in this case is the same as the methodology he used in his award-winning and peer-reviewed published research, the methodology used by Dr. Hakala – the method that Plaintiff says Professor Stulz should have used – has never been peer-reviewed or tested at all, but has been expressly rejected by other courts.

### 1.    Professor Stulz Properly Examined Abnormal Returns of Non-Event Days

Plaintiff's first contention is that, because Professor Stulz's event study used dummy variables to control only for the events he actually tests – the 35 CSFB reports on AOL issued during the Class Period – Professor Stulz's opinions are invalid with respect to "abnormal" (or "residual") returns on any other days during the same period.  (Pl.'s Br. 5.)  In particular, Plaintiff identifies its alleged corrective disclosure dates as days on which Professor Stulz cannot validly opine.  (Id. at 5-6.)  However, Plaintiff's criticism does not impugn in any way the results of Professor Stulz's study:  that no CSFB report caused a statistically significant increase in AOL's stock price, a conclusion that is largely supported by Plaintiff's own expert, Dr. Hakala. (See, e.g., Defs.' Mot. to Preclude [Dkt. #304] 27.)  Further, Plaintiff's criticism is baseless. Professor Stulz's decision to control only for the effective dates of the events he tests conforms to standard event study methodology, and there is no scientific basis for Plaintiff's assertion that this prevents Professor Stulz from offering opinions as to any other dates.

---

Fener v. Belo Corp., 560 F. Supp. 2d 502, 506-07 (N.D. Tex. 2008) (rejecting Dr. Hakala's opinions on loss causation because he failed to control for confounding factors and because he "fail[ed] . . . to substantiate [his] claim[s]"); In re Omnicom Group, Inc. Sec. Litig., 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (rejecting Dr. Hakala's opinions on loss causation because his "event study at best incorrectly identifies" corrective disclosures and fails to control for confounding events); cf. In re Broadcom Corp. Sec. Litig., No. SACV 01275 GLTMLGX, 2005 WL 1403756, at *3 (C.D. Cal. June 3, 2005) (excluding Dr. Hakala's opinion on aggregate damages under Daubert because his model was unreliable).

Unlike in Dr. Hakala's study, in a properly performed event study such as Professor Stulz's, there is a clear distinction between pre-selected event days and non-event days.[3]  As stated in the definitive survey article on event study methods – which has been cited more than 775 times (see Stulz 7/20/09 Decl. ¶ 3) – "[t]he initial task of conducting an event study is to define the event of interest."  (Gesser Decl. Ex. 5 (A. Craig MacKinlay, Event Studies in Economics and Finance, 35 J. Econ. Literature 13, 14 (1997) ("MacKinlay")) (emphasis added).[4] The reason for this is simple:  a failure to pre-select events creates a risk that the events will be determined arbitrarily after the study has been performed.  (See Defs.' Mot. to Preclude 15.)  As demonstrated by Dr. Hakala's study, where he did not pre-select his 57 "relevant" events, it is impossible for a different economist to replicate his study, thereby rendering it inherently unreliable.  (See, e.g., id. at 15-20.)  Here, Professor Stulz controlled for the only events to be tested – the CSFB reports.  Because he did not regard Dr. Hakala's disclosure days as true disclosures, he had no reason to control for them.[5]

---

[3] For a general overview of the steps involved in designing and conducting an event study, see Stulz Decl. ¶¶ 9-13; Defs.' Mot. to Preclude 12-14; Defs.' Daubert Mem. [Dkt. # 232] 3-5.

[4] Professor Stulz's event study methodology in this case is also described in Gesser Decl. Ex. 6 (Stephen J. Brown & Jerold B. Warner, Using Daily Stock Returns: The Case of Event Studies, 14 J. Fin. Econ. 3 (1985) ("Brown")), which has been cited more than 2,400 times in the academic literature to date (Stulz 7/20/09 Decl. ¶ 12 n.7), and Gesser Decl. Ex. 7 (Ekkehart Boehmer et al., Event-study Methodology Under Conditions of Event-induced Variance, 30 J. Fin. Econ. 253 (1991) ("Boehmer")), which has been cited more than 500 times (Stulz 7/20/09 Decl. ¶ 12 n.7).

[5] Indeed, Professor Stulz could not have controlled for all of Dr. Hakala's "material events" – even if there were some scientific basis for doing so – because, over the course of this litigation, Dr. Hakala has repeatedly changed the AOL-related news days that he considers to be important or "material" for purposes of his event studies in this case. (See, e.g., Stulz Rpt. ¶¶ 102-109; Defs.' Mot. to Preclude 24-25.)  In light of the repeated changes to Dr. Hakala's selection of "material events," Plaintiff's argument that Professor Stulz's study can only be valid if it excludes all dates that Dr. Hakala considers to be "material" would require Professor Stulz to rerun his event study every time Dr. Hakala has a change of heart concerning the set of days that merits exclusion from his study.

In any event, Plaintiff's criticism of Professor Stulz has absolutely no merit. As Plaintiff well knows (because Professor Stulz testified about it at his 2007 deposition), Professor Stulz has performed additional regressions that controlled for dates that Plaintiff and Dr. Hakala have considered relevant at various points in time to determine whether doing so would affect the results of his study. (See Stulz 7/20/09 Decl. ¶¶ 19-20; Rodon Decl. Ex. F ("Stulz 2007 Tr.") 44:3-16.) These regressions strengthened Professor Stulz's conclusion because, even after controlling for the various event dates as to which Professor Stulz offered any opinions, no additional effective dates of the CSFB AOL reports became statistically significant, nor did any of the excluded days on which Professor Stulz opined become significant. (See Stulz 7/20/09 Decl. ¶¶ 19-20 & Ex. 1; Stulz 2007 Tr. 45:2-7.)

> ## 2.  Professor Stulz's Report Properly Did Not "Dummy Out" All AOL-Specific News Days

Plaintiff next argues preposterously that Professor Stulz's entire report is invalid – even his opinions concerning CSFB's AOL reports – because his event study did not adopt Dr. Hakala's scientifically unsound use of dummy variables. Here, Plaintiff reprises, in somewhat altered fashion, its earlier argument that Professor Stulz should have excluded or "dummied out" from his event study certain other days apart from the event days themselves. (See Pl.'s Br. 6-7.) The point is the same, however: Plaintiff criticizes Professor Stulz for not exercising the same haphazard, irreproducible, and ever-shifting judgments that have led Dr. Hakala to exclude 55% of all days in the Class Period from his model. (See Defs.' Mot. to Preclude 21.)

In fact, the standard, most widely cited, peer-reviewed academic articles on the subject of designing and conducting an event study unanimously support the approach that Professor Stulz employed in this case and do not recommend the use of dummy variables to control for all

company-specific news days, as Dr. Hakala has done.  (See, e.g., Gesser Decl. Ex. 8 (John Y.

Campbell et al., The Econometrics of Financial Markets 151-52 (1997) ("Campbell")) (no

discussion of dummy variables); Brown, at 3-31 (same); Gesser Decl. Ex. 9 (S.P. Kothari &

Jerold B. Warner, Econometrics of Event Studies, in 1 Handbook of Corporate Finance 3, 3-36

(B. Espen Eckbo ed., 2006)) ("Kothari") (same); MacKinlay at 27 (no relevant discussion); see

also Xcelera, 2008 U.S. Dist. LEXIS 77807, at *3 (finding, in precluding Dr. Hakala from

testifying, that "no peer-reviewed journal supports the view that dummy variables may be used

on all dates on which any company news appears"); Defs.' Mot. to Preclude 20-24.)  Indeed,

even Dr. Hakala recognizes that the methodology Professor Stulz used to perform his event study

is the "traditional" one within the field of financial economics.  (Hakala Rpt. ¶ 33 n.18.)

      In addition, Plaintiff has never identified any – and there appear to be no – published

event studies that implement a dummy-variable methodology remotely similar to Dr. Hakala's

approach.  (Stulz Rpt. ¶ 99 (noting that Professor Stulz "know[s] of no event study published in a

peer-reviewed academic journal that uses [Dr. Hakala's] approach"); Stulz 7/20/09 Decl. ¶ 11.)

Plaintiff does not dispute this fact anywhere in its brief.  Further, all of the articles involving

event studies that Professor Stulz has published – including the one for which he recently won

the Best Paper prize – have employed or advocated the same event study methodology approved

in the leading academic articles, which also is the same event study methodology he used in this

case.  (See Stulz 7/20/09 Decl. ¶¶ 2-3, 12.)

      Similarly, all of the articles that have been cited in this case by the parties and the Court

concerning the effects of analyst reports on stock prices are based on event studies employing the

same methodology as Professor Stulz, and none of them have dummied out non-event days in the

way that Dr. Hakala has done. (See Stulz Decl. ¶ 33.) See also In re Credit Suisse – AOL Sec. Litig., 465 F. Supp. 2d 34, 53 n.21 (D. Mass. 2006). Another recent paper that has employed an event study to conclude that analyst reports have no effect on company stock prices likewise has used this same standard approach. (See Gesser Decl. Ex. 10 (Oya Altinkiliç & Robert S. Hanson, On the Information Role of Stock Recommendation Revisions, J. Acct. & Econ. (forthcoming 2009), http://dx.doi.org/10.1016/j.jacceco.2009.04.005).)

It should not be surprising that every published event study uses Professor Stulz's approach because, by contrast, Dr. Hakala's approach makes it impossible to discern whether an abnormal return in a company's stock price on a given day was due to disclosures on that day, or just to the normal movements of the company's stock price. (Stulz 7/20/09 Decl. ¶ 5.) Indeed, Dr. Hakala does not compare days with events of interest (in this case, the alleged misstatements and corrective disclosures) to AOL's returns on a typical day; he instead compares them to days with no AOL-specific news. (Id. at ¶¶ 4-6.) But in Dr. Hakala's study, more than 55% of days – i.e., the average or typical day – do contain AOL-specific news. (Id. at ¶ 4.) It is widely accepted in the academic literature that "any company's returns, including in this case AOL's, are likely to be more volatile on days with news than on other days." (Stulz Decl. ¶ 26; Stulz Rpt. ¶ 100; Stulz 7/20/09 Decl. ¶ 6.) See also, e.g., MacKinlay at 27.[6] Thus, by using dummy variables to exclude all days on which he identified "a potentially material company-specific news event" (Hakala Rpt. ¶ 35), Dr. Hakala systematically removes from his regression typical

---

[6] Plaintiff's brief makes much of the supposed "non-normality in Professor Stulz's residuals on non-event days." (Pl.'s Br. 8-9.) In fact, it is the widely known difference in volatility between news and non-news days that virtually ensures that a distribution of residuals on non-event days will not be "normal." (See Stulz 7/20/09 Decl. n.6.) Ultimately, however, not only is such non-normality to be expected – and therefore hardly "empirical[]" evidence of a fatal bias in Professor Stulz's study (Pl.'s Br. 8) – but it is also irrelevant because any adjustment to control for the non-normal distribution of event day abnormal returns would necessarily reduce their significance, and thus could not change Professor Stulz's results. (See Stulz 7/20/09 Decl. n.6.)

days for AOL – i.e., those days with AOL-specific news that "tend to have larger stock-price reactions," which causes more days in an event study to be considered abnormal. (See Stulz Rpt. ¶ 100.) In essence, Dr. Hakala takes what is already considered by academics to be the tricky problem of non-event, news-induced volatility and – by eliminating all AOL-related news from his baseline model – he exacerbates the problem. (Stulz 7/20/09 Decl. ¶¶ 5-6.)

Moreover, even the three obscure articles cited by Plaintiff (see Pl.'s Br. 7-8) do not support Dr. Hakala's approach.[7] Defendants have already demonstrated that Nihat Aktas et al., Event Studies with a Contaminated Estimation Period, 13 J. Corp. Fin. 129 (2007) ("Aktas") (Gesser Decl. Ex. 11), neither follows nor recommends Dr. Hakala's approach. (See Defs.' Mot. to Preclude 24 n.19.) The two other papers cited, Robert B. Thompson II et al., The Influence of Estimation Period News Events on Standardized Market Model Prediction Errors, 63 Acct. Rev. 448, 466-68 (1988) ("Thompson II") (Gesser Decl. Ex. 12), and John D. Jackson et al., The Impact of Non-Normality and Misspecification on Merger Event Studies, 13 Int'l J. Econ. Bus. 247, 254 (2006) ("Jackson") (Gesser Decl. Ex. 13), are methodological papers that at most discuss the theoretical possibility of following an approach with some similarity to Dr. Hakala's.

Rather than support Plaintiff's motion, however, the Thompson II article confirms that the event study methodology employed by Professor Stulz is the one that is well-accepted within the field of financial economics, and thus is not subject to preclusion. Indeed, this article presupposes that Professor Stulz's approach is the one that the "typical study" uses. Thompson

---

[7] The papers cited by Plaintiff have scarcely been cited in the academic literature. As of July 16, 2009, Aktas, Thompson II, and Jackson collectively have only been cited 13 times (Stulz 7/20/09 Decl. ¶¶ 11, 17; Google Scholar, http://scholar.google.com (search for "Aktas, Event Studies with a Contaminated Estimation Period"), as against more than 3,000 citations to the handful of articles Defendants have cited in this brief for primary academic support of Professor Stulz's approach. Plaintiff's cited papers also have not been published in the more prestigious or widely read journals. (Stulz 7/20/09 Decl. ¶¶ 11, 17, n.13.)

II at 448; see also id. at 453 (acknowledging that "[m]ost event studies" use a statistic comparing events to estimation periods "without regard to firm-specific news releases during the estimation period"). The Jackson article also does not impugn Professor Stulz's event study in this case. That article – cited only two times in the scholarly literature (Stulz 7/20/09 Decl. ¶ 17) – studies the effect of injecting intentionally disruptive events into a normal distribution of returns and unsurprisingly concludes that these events can alter the normal distribution if not taken into account. See Jackson at 249, 258-61. The article suggests that the critical value to which t-statistics are compared should be altered in some way to account for the effect of disruptive events. Id. at 259. However, using Jackson's adjusted t-values does not alter the results of Professor Stulz's event study in this case, except that it makes the only positive and significant CSFB report day that Professor Stulz identified (April 18, 2001) insignificant at the 95% confidence level. (Stulz 7/20/09 Decl. ¶ 17.) Thus, even if Plaintiff were correct and Professor Stulz should have applied a non-standard and not well-established adjustment to his methodology, it would not alter his results. This alone requires Plaintiff's motion to be rejected.[8]

### B.    Professor Stulz's Opinions Are Not Based on Flawed Factual Assumptions

Plaintiff next raises a succession of three related and equally misleading arguments: (1) that Professor Stulz's opinions concerning the identification of significant "new" news, relevant and curative disclosures, and confounding news should be precluded because those opinions are identical to his assumptions (see Pl.'s Br. 13); (2) that his opinions warrant

---

[8] Finally, Plaintiff's argument concerning Professor Stulz's purported "failure" to control for significant news events is self-contradictory and illogical on its face. On one hand, Plaintiff repeatedly asserts that Professor Stulz's method results in "artificially low statistical significance findings" (Pl.'s Br. 6; see also id. at 5 & n.4, 7, 8); yet, on the other hand, Plaintiff simultaneously criticizes Professor Stulz's study for producing a non-normal distribution of residuals that produces too many days with high statistical significance (see id. at 9).

preclusion because they are based on an examination and weighing of the evidence (see id. at 16-17); and (3) that his opinions concern factual observations requiring no technical or specialized knowledge (see id. 20-21). Each of these arguments is demonstrably false.

It is untrue that Professor Stulz's assumptions "are the simple mirror image of the opinions offered by Professor Stulz." (Id. at 12.) Contrary to Plaintiff's characterization, Professor Stulz is not opining that any of the factual assumptions he made at the direction of counsel or pursuant to his review of the record should be accepted by a jury. Rather, Professor Stulz's opinions clearly proceed from the basis that if a jury, as trier of fact, finds the facts as Professor Stulz assumed them in his report, then the jury should also conclude as an economic matter that Plaintiff's alleged disclosure dates could not have affected AOL's stock price. Even a cursory review of the relevant portions of Professor Stulz's report makes this clear. (See, e.g., Stulz Rpt. ¶¶ 5(c)(i) ("If this is true, then Dr. Hakala's analysis is flawed . . . ." (emphasis added)), 73 ("If this assumption is accurate, Dr. Hakala's entire analysis is . . . unreliable.").)

Further, as a legal matter, there is nothing improper about Defendants' counsel instructing their expert witness to assume certain facts for purposes of the expert's analysis and testimony. In denying motions to exclude expert testimony, courts have observed that "all expert witnesses . . . in [their] testimony assume[ ] certain facts as they have been presented to [them] by the party offering [their] testimony." United States v. Cap Quality Care, Inc., No. 05-163-P-H, 2006 WL 3591306, at *2 (D. Me. Dec. 7, 2006) (emphasis added); see also Feinberg v. Katz, No. 01 Civ. 2739, 2007 WL 4562930, at *4 (S.D.N.Y. Dec. 21, 2007) ("Counsel routinely ask their expert witness to 'assume' various facts as the basis for his opinion . . . .").

- 14 -

Indeed, Professor Stulz's use of certain factual assumptions was part and parcel of his effort to analyze the events bearing upon AOL's stock price as an economic matter.[9]  Such practices necessarily fall within the accepted purview of expert witnesses in securities fraud litigation such as this case, and certainly where the proper design of an event study is concerned:

> Sorting out which declines were caused by . . . extraneous factors and which were caused by a materialization of the concealed risk is generally the province of an expert.  It is an expert that produces the almost obligatory "event study" that begins by isolating stock declines associated with market-wide and industry-wide downturns from those specific to the company itself.

In re Vivendi Universal, S.A. Sec. Litig., No. 02 Civ. 5571, 2009 U.S. Dist. LEXIS 34563, at *47-48 (S.D.N.Y. Apr. 6, 2009) (internal citation omitted).[10]

What makes Plaintiff's argument here truly audacious, however, is that even if Professor Stulz's opinions were inadmissible because they assumed certain facts or involved certain factual judgments, then Dr. Hakala's report would unquestionably warrant preclusion.  Paragraph 5 of Dr. Hakala's report, for example, lists page after page of factual assertions that Dr. Hakala "assumed or considered" in designing his event study and forming his opinions.  Moreover, by Dr. Hakala's own admission, each one of those assumed facts were provided to him by

---

[9] Plaintiff also makes the incorrect assertion that any assumptions Professor Stulz made based on his review of the record were unsupported.  For example, Plaintiff argues that Professor Stulz's report characterized CSFB's February 5, 2001 Media Week report as "unequivocally negative" with respect to AOL's future advertising revenues.  (See Pl.'s Br. 19.)  Yet Professor Stulz's report did no such thing.  It simply used the Media Week report to illustrate uncertainty in the ad market in early 2001, noted that the Media Week report found the "outlook [for online advertising] was more positive than the one for traditional advertising," and quoted much of the same positive language that Plaintiff's brief inexplicably argues that Professor Stulz omitted.  (See Stulz Rpt. ¶ 15.)

[10] This is why Plaintiff's reliance on Tuli v. Brigham & Women's Hosp., 592 F. Supp. 2d 208 (D. Mass. 2009) (Gertner, J.), for its contention that Professor Stulz merely assumed Defendants' argument and repackaged it as his opinions (see Pl.'s Br. 12-13, 14, 15), is misplaced.  In Tuli, a gender discrimination case, the expert impermissibly sought to testify on the ultimate issue of fact – that the plaintiff was not the victim of gender discrimination – in an entirely different legal context, exhibiting a different level of scientific complexity, from this case.  See Tuli, 592 F. Supp. 2d at 212.

Plaintiff's counsel. (See Hakala 2008 Tr. 41:22-25 ("[T]he assumptions I made about what are the facts I assumed based on the pleadings and complaint are really set forth in my report in paragraph 5.").) Dr. Hakala accepted these baseless assumptions even when an ultimate question of fact was implicated. (See, e.g., Hakala Rpt. ¶ 5(q) (describing assumption that AOL's announcement of financial results on October 17, 2001 "further revealed a portion of the relevant truth regarding lower-than-expected advertising revenues and results").) If nothing else, Professor Stulz reviewed the portions of the record relevant to the opinions he offers (see Stulz Rpt. App. C), an effort that Dr. Hakala apparently did not undertake. (See, e.g., Hakala 2008 Tr. 113:11-18 (failing to recall whether he had ever reviewed Antonio Lorenzo's deposition transcript), 141:25-142:9 (same with respect to the deposition transcript of Sarah Bernard – the "source" of the layoff and accounting information conveyed to Defendants).)

Finally, the vast majority of Professor Stulz's report is unrelated to any factual assumptions he made, whether at the request of Defendants' counsel or pursuant to his review of the record. As Defendants have already demonstrated, Professor Stulz's opinion that CSFB's AOL reports did not impact AOL's stock price derives from his event study, which – following standard event study methodology – selected a clear and easily replicable set of events: the effective dates of CSFB's AOL reports. Professor Stulz's approach stands in stark contrast to Dr. Hakala's, in which the selection of "material events" heavily impacted the results of his study – and depended entirely on his personal, fact-based judgments concerning relevant news and corrective disclosures. (Defs.' Mot. to Preclude 12-28.) Accordingly, even should the Court find that Professor Stulz's report is problematic with respect to any opinions he rendered on the

basis of assumed facts – in a way that Dr. Hakala's is not – there still would be no basis for precluding the overwhelming majority of Professor Stulz's opinions.

    **C.    Professor Stulz's Opinions Are Not Prejudicial for Purposes of Federal Rule of Evidence 403**

    Finally, Plaintiff scatters in its brief cursory and unsupported assertions that Professor Stulz's opinions should be precluded because they would be prejudicial to the jury, presumably under Federal Rule of Evidence 403.  (See, e.g., Pl.'s Br. 3, 11-12, 13.)[11]  This half-hearted argument is easily refuted.  Plaintiff's claim of prejudice reduces to a lament that Professor Stulz is critical of Plaintiff's expert and his methodology; the "prejudice," it would appear, lies in the possibility that a jury might hear that Dr. Hakala's methods lack academic credibility and are scientifically unsound.  (See, e.g., Pl.'s Br. 11-12 (stating that "Professor Stulz's unfounded attack on Dr. Hakala's methodology poses a real risk of confusing the jury and spuriously tainting Dr. Hakala's credibility").)  This argument is absurd precisely because permitting opposing expert witnesses to testify in an adversarial proceeding and permitting them to criticize one another's methods is clearly contemplated by Federal Rule of Evidence 702.  E.g., United States v. Mooney, 315 F.3d 54, 63 (1st Cir. 2002) (holding that "any flaws in [expert] opinion may be exposed through . . . competing expert testimony"); see also Daubert, 509 U.S. at 596 (identifying the "presentation of contrary evidence" as a "traditional and appropriate means of attacking shaky but admissible evidence").

    Plaintiff cites no legal authority in which an expert's testimony was precluded as unfairly prejudicial because the expert called into question his or her opponent's methods or credibility.

---

[11] Federal Rule of Evidence 403 provides in part that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

To the contrary, the Third Circuit recently <u>affirmed</u> the admission of an expert report that stated another expert was "'plainly wrong;' that his theory has been 'addressed and rebutted;' that 'no credible evidence' supports it; . . . and that his testing is 'misleading' and 'completely inconsistent with real world driver behavior.'" <u>Estate of Edward W. Knoster v. Ford Motor Co.</u>, 200 F. App'x 106, 110 (3d Cir. 2006). The Third Circuit further reasoned that this critical report was admissible under Rule 403 because "[t]hese are not arguments against the person; they are arguments against the person's testing and his methodology." <u>Id.</u> Accordingly, the prospect that a jury might lower its assessment of Dr. Hakala's credibility based on Professor Stulz's methodological criticism is irrelevant to the admissibility of Professor Stulz's testimony, and Professor Stulz's criticisms of Dr. Hakala's methods are not unduly prejudicial under Rule 403.[12]

Moreover, the probative value of Professor Stulz's testimony – always to be weighed against any claim of unfair prejudice – militates against exclusion, because a lay jury cannot be expected to understand complicated statistical principles, including the propriety of using dummy variables in an event study. <u>See, e.g.</u>, <u>United States v. Shea</u>, 957 F. Supp. 331, 345 (D.N.H. 1997), <u>aff'd</u>, 159 F.3d 37 (1st Cir. 1998) ("In a real trial setting, the parties are given an opportunity to explain the significance of statistical evidence through expert testimony.").[13] Professor Stulz should be permitted to testify on the proper use of dummy variables – a complicated technique within his area of expertise – and the improper methods to which Dr.

---

[12] Attacks on expert testimony are deemed unduly prejudicial under Federal Rule of Evidence 403 when they are facially <u>ad hominem</u>. <u>See, e.g.</u>, <u>Avila v. Willits Envtl. Remediation Trust</u>, No. C 99-3941 SI, 2008 WL 360858, at *16 (N.D. Cal. Feb. 6, 2008) (excluding testimony claiming adversary's experts were "delusional" and engaging in "illegal" activity). Professor Stulz's observation that Dr. Hakala employs a results-oriented approach does not even approach anything close to that level.

[13] In fact, this Court has previously held that a failure to explain relied-upon statistical methods such as regression analysis can constitute ineffective representation. <u>Key v. Gillette Co.</u>, 104 F.R.D. 139, 140 (D. Mass. 1985) (Caffrey, C.J.), <u>aff'd</u>, 782 F.2d 5 (1st Cir. 1986).

Hakala has put them in his event study in this case.  See <u>Tuli</u>, 592 F. Supp. 2d at 214-16

(admitting testimony of an expert in social framework analysis to testify on issues of sex

stereotyping and discrimination, a subject that was within the expert's expertise).

## II.    PROFESSOR DEIGHTON'S OPINIONS ARE ADMISSIBLE

Plaintiff seeks to exclude Professor Deighton's report on the grounds that his opinions do

not pertain to any specialized or technical knowledge, are irrelevant, and are based on faulty

assumptions.  Plaintiff's contentions are unsupported.  There is no basis for excluding Professor

Deighton's expert testimony.

### A.    Professor Deighton's Opinions Are Based Upon Specialized Knowledge and Are the Proper Subject of Expert Testimony

For expert testimony that is "nonscientific" in nature, the test of reliability is properly a

"flexible" analysis that focuses, not upon a rigid test of methodology, but upon "the personal

knowledge or experience" of the expert himself.  <u>Kumho</u>, 526 U.S. at 141-42, 150.  Professor

Deighton's extensive experience in the field of marketing and the specialty of internet marketing

and advertising is precisely the type of specialized knowledge that qualifies him to offer the

expert opinions that he has set forth in his report regarding the state of the advertising market in

2001-02 and its potential impact on AOL.  Professor Deighton has taught graduate level

marketing courses for over two decades at the business schools of Harvard, the University of

Chicago, and Dartmouth, authored more than 40 peer-reviewed papers and book chapters and

more than 25 case studies, and served as editor of the <u>Journal of Interactive Marketing</u> and the

<u>Journal of Consumer Research</u>.  (Rodon Decl. Ex. E (Expert Report of John Deighton, dated

May 1, 2008) ("Deighton Rpt.") ¶¶ 1-3.)  Indeed, Plaintiff does not contest that Professor

- 19 -

Deighton has extensive personal knowledge that would qualify him to opine on issues related to the markets for various types of advertising.

Instead, Plaintiff contends that Professor Deighton's report would not assist the jury because it merely summarizes analyst reports and news articles concerning the advertising market and AOL. (Pl.'s Br. at 23.) However, Professor Deighton's use of analyst reports to support his opinions is wholly appropriate and does not detract from the reliability of his expert testimony. In United States v. Schiff, 538 F. Supp. 2d 818, 844 (D.N.J. 2008), the plaintiff sought to exclude the report of defendant's expert, a financial advisor who also had extensive experience as both an analyst and investor, on the grounds that the report's "factual summaries" of analyst reports were "not appropriate expert testimony." The court admitted the expert's report, because the expert "cite[d] to analyst reports for corroborating evidence of his opinions regarding what information is important to investors," and holding that "even if [the expert] is offered to summarize the information available from analyst reports, such testimony may still be useful to the jury." Id. at 845. The court held that the crucial factor in analyzing the report's reliability was the expert's "specialized knowledge and long experience as an investor" and it declined to subject the report's methodology to the "same examination as a more scientific or technical expert's would be." Id.; see also Voilas v. General Motors Corp., 73 F. Supp. 2d 452, 459, 461 (D.N.J. 1999) (admitting expert's report, which brought together GM's economic analyses "in a clear and straightforward manner" because it "could certainly prove helpful to the average juror who presumably lacks such experience in and knowledge about complex financial matters, even if doing so does not require employing any particular methodology").

- 20 -

Thus, even if all Professor Deighton's report did was summarize the information available to investors from analyst reports issued in 2001-02 regarding the general advertising climate and its potential impact on AOL in a "clear and straightforward" manner designed to make such dense, jargon-filled industry publications understandable to the jury, the report would still constitute admissible expert testimony.

However, Professor Deighton has done far more than simply summarize analyst reports. His report synthesizes the information available to investors at the time and applies his specialized knowledge of marketing and advertising budgets to explain how AOL's diversified revenue streams could reasonably have been expected to insulate the company from the general downturn in the market for traditional advertising. Moreover, Professor Deighton's opinions bear on several other key issues in the case.

First, Professor Deighton's expert testimony regarding the differences between traditional and online advertising severely undermines Plaintiff's attempt to prove that Laura Martin's advertising concerns about AOL applied to both forms of advertising. Professor Deighton's testimony makes clear that analysts did not refer to the "advertising market" as a monolithic entity with one set of estimates and growth projections to be applied to all companies, but rather viewed online advertising as a new and "explosive" phenomenon, with AOL poised to capture much of that growth in 2001. (Deighton Rpt. ¶¶ 11-15.) Professor Deighton contrasted this with the market's view of traditional advertising, which CSFB and other analysts viewed as slowing considerably throughout 2001, a trend that could negatively impact traditional media companies that were heavily dependent on advertising revenues. (Deighton Rpt. ¶¶ 14, 16-19.) These opinions provide an instructive backdrop for determining which type of advertising Martin was

speaking about when she referred in her emails to a decline in the advertising market, and are

therefore both relevant and useful to the jury in making this determination.  See Schwab v. Philip

Morris USA, Inc., No. CV 04-1945, 2005 WL 2401647, at *5 (E.D.N.Y. Sept. 29, 2005)

(Weinstein, J.) (observing that "[a]dvertising methodologies are esoteric; the average juror could

be helped by an explanation of how they work and were used by defendants").  Indeed, Plaintiff

has effectively conceded that this issue is relevant by attacking the validity of Professor

Deighton's assumption that Martin's concerns about the downturn in the advertising market

related to the market for traditional advertising, as discussed below in Part II.B.

Second, Professor Deighton's testimony regarding the extensive public discussion of the

declining traditional advertising market in 2001, as well as his synthesis of what was known to

the market at various points throughout the year, informs the jury as to whether the allegedly

undisclosed views of Laura Martin concerning the advertising market would have been material

if they were revealed.  If, as Professor Deighton testified, "the market was already well aware

that the traditional advertising market was in decline and that it could have negative effects on

AOL" at the time Martin expressed her views regarding the state of the traditional advertising

market (Deighton Rpt. ¶ 9), then the disclosure of her views would not have been viewed "by the

reasonable investor as having significantly altered the 'total mix' of information made available"

(assuming they were not already disclosed in the CSFB reports).  In re PolyMedica Sec. Litig.,

432 F.3d 1, 7 n.11 (1st Cir. 2005); see also Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004)

(holding that an omission is not actionable where the information omitted has already been made

public).  Indeed, an understanding of what constituted the "total mix" of information available to

investors regarding the state of the traditional advertising market in 2001 is indispensable to

determining what disclosures could have impacted that mix, and Professor Deighton's testimony on this point is therefore highly relevant.

Third, Professor Deighton's testimony that it was reasonable in 2001-02 for an analyst to remain optimistic about AOL's prospects, goes not only to the Defendants' scienter, but also to whether or not there was a fraud, as those two elements collapse in misstatement of opinion cases because the test of subjective intent under the scienter analysis is subsumed by the analysis of the subjective falsity of the opinion itself. See In re Credit Suisse First Boston Corp. (Agilent Techs. Inc.) Analyst Reports Sec. Litig., 431 F.3d 36, 47 & n.3 (1st Cir. 2005). Professor Deighton testified that many analysts in the market believed in 2001 that AOL would be less affected by the downturn in the advertising market than other media companies, and even other online advertisers. Professor Deighton gave two bases for this belief at the time: (1) AOL was selling a "broad set of marketing and promotional services" that companies purchase using marketing budgets that boost direct sales and are therefore less susceptible to spending cuts than traditional advertising budgets, which focus more on long-term brand building, and (2) AOL was the only company in 2001 that was large and diversified enough to take advantage of large cross-promotional deals that effectively gave AOL monopolistic power in the market. (Deighton Rpt. ¶¶ 30-33.) CSFB, like a number of firms, held these views at the time. This is highly relevant because it shows that CSFB's views were reasonable and honestly held, which defeats Plaintiff's claim that CSFB's published projections and reports on AOL were fraudulent. See Glassman v. Computervision Corp., 90 F.3d 617, 627 (1st Cir. 1996) ("[F]orecasts . . . may be actionable [only] to the extent they are not reasonably based on, or are inconsistent with, the facts at the time the forecast is made.")

- 23 -

**B.    Professor Deighton's Assumption That Martin's Emails Concerned the Traditional Advertising Market Is Not Flawed**

Plaintiff's arguments regarding the validity of Professor Deighton's assumptions are similarly without merit.  For purposes of his expert report, Professor Deighton assumed that Martin's references in her emails to downturns in the advertising market related to the market for traditional advertising, as opposed to online advertising.  (Deighton Rpt. ¶ 13.)  As Professor Deighton noted in his report, ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Plaintiff argues that Professor Deighton "completely ignored the evidence undermining" this assumption.  (Pl.'s Br. 24-25.)  However, Plaintiff fails to point to <u>any</u> evidence indicating that Martin's concerns related to the online advertising market.  Plaintiff hangs its hat on one email – ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ as Professor Deighton testified, any decline in the traditional advertising affecting "the Time Warner business will affect AOL as a company." (Gesser Decl. Ex. 15 ("Deighton Tr.") 131:24-132:2.)

Finally, even assuming arguendo that Martin's concerns extended to the online advertising market, despite the uncontroverted evidence to the contrary, that would not render Professor Deighton's expert report unhelpful to the jury. In Section B.3 of his report, Professor Deighton observed that AOL would have been uniquely positioned to withstand a downturn even in the online advertising market due to the diversified nature of its revenue streams and because what AOL sold to advertisers and markets was "a broad set of marketing and promotional services somewhat different from conventional 'advertising.'" (Deighton Rpt. ¶ 30.) As noted above, Professor Deighton's expert opinions regarding the different budgets that companies were drawing from to purchase marketing (from AOL) versus advertising (from other companies) are helpful in understanding the unique position of AOL in 2001 and the valid reasons for optimism regarding its prospects, which is the cornerstone of an admissibility analysis.

In sum, because Professor Deighton relied on his extensive personal knowledge and experience in the areas of marketing and advertising, as well as on analyst reports that he used to substantiate and explicate his opinions on a complex subject matter that is highly relevant to the issues in this case, his report is admissible as expert testimony under Federal Rule of Evidence 702 and Plaintiff's motion to strike should be denied.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's motion.

CREDIT SUISSE SECURITIES (USA) LLC
& CREDIT SUISSE (USA), INC.

By their attorneys,

/s/ Siobhan E. Mee
Robert A. Buhlman (BBO #554393)
Siobhan E. Mee (BBO #640372)
siobhan.mee@bingham.com
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA 02110
Tel: (617) 951-8265
Fax: (617) 428-6327

- and -

Lawrence Portnoy (admitted *pro hac vice*)
Avi Gesser (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
Fax: (212) 450-3800

*Attorneys for Defendants*
*Credit Suisse Securities (USA) LLC and*
*Credit Suisse (USA), Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and, except to the extent registered participants at the same firm(s) received copies electronically as identified on the Notice of Electronic Filing, paper copies will be sent to those indicated as non-registered participants by U.S. Mail on July 20, 2009.

/s/ Sarah G. Kim
Sarah G. Kim

Bingham McCutchen LLP
One Federal Street
Boston, MA 02110