UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                )

IN RE CREDIT SUISSE ─ AOL     )
SECURITIES LITIGATION        )   Case No. 1:02 CV 12146
                                )   (Judge Gertner)
                                )

This document relates to:      )
                                )   Oral Argument Requested
ALL ACTIONS                 )
                                )
                                )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**REPLY MEMORANDUM IN FURTHER SUPPORT
OF DEFENDANTS' MOTION TO PRECLUDE THE EXPERT
OPINIONS OF SCOTT D. HAKALA, M. LAURENTIUS
MARAIS, BERNARD BLACK AND REINIER KRAAKMAN**


<table>
<tr>
<td>

Lawrence Portnoy (admitted *pro hac vice*)
Avi Gesser (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 450-3800

*Attorneys for Defendants Credit Suisse
Securities (USA) LLC and Credit Suisse (USA),
Inc.*

</td>
<td>

Robert A. Buhlman (BBO #554393)
Siobhan E. Mee (BBO #640372)
BINGHAM MCCUTCHEN LLP
One Federal Street
Boston, Massachusetts 02110
Tel: (617) 951-8000
Fax: (617) 951-8736

*Attorneys for Defendants Credit Suisse
Securities (USA) LLC, Credit Suisse (USA),
Inc., Elliott Rogers and Jamie Kiggen*

</td>
</tr>
</table>

James R. Carroll (BBO #554426)
Eben P. Colby (BBO #651456)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
Tel: (617) 573-4800
Fax: (617) 573-4822

*Attorneys for Defendant Laura Martin*

Jeff E. Butler (admitted *pro hac vice*)
CLIFFORD CHANCE LLP
31 West 52nd Street
New York, New York 10019
Tel: (212) 878-8000
Fax: (212) 878-8375

Warren L. Feldman (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-2420
Fax: (917) 777-2420

*Attorneys for Defendant Elliott Rogers*

Henry Putzel, III (admitted *pro hac vice*)
LAW OFFICE OF HENRY PUTZEL III
565 Fifth Avenue
New York, New York 10017
Tel: (212) 661-0066
Fax: (212) 661-0415

*Attorney for Defendant Jamie Kiggen*

Jeffrey B. Rudman (BBO #433380)
Jonathan A. Shapiro (BBO #567838)
Timothy J. Perla (BBO #660447)
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Kenneth G. Hausman (admitted *pro hac vice*)
Barbara A. Winters (admitted *pro hac vice*)
HOWARD, RICE, NEMEROVSKI,
CANADY, FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, Seventh Floor
San Francisco, California 94111-4024
Tel: (415) 434-1600
Fax: (415) 217-5910

*Attorneys for Defendant Frank Quattrone*

# TABLE OF CONTENTS

P<small>AGE</small>

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...........................................................................................................................3

I.      Dr. Hakala's Opinions Are Unreliable and Must Be Precluded ............................................3

        A.      Dr. Hakala Did the Same Thing In This Case As In Xcelera ...................................3

        B.      Dr. Hakala's Irrelevant Event Study Tests the Wrong Thing ...................................4

        C.      Dr. Hakala's Methodology Is Not Accepted Within Financial Economics ............6

                1.      Dr. Hakala's dummy variable methodology does not comport with
                        financial economics ......................................................................................6

                2.      Dr. Hakala fails to use relevant event dates ...................................................8

                3.      Dr. Hakala fails to disaggregate confounding factors ..............................10

                4.      Dr. Hakala contravenes market efficiency by attributing price changes
                        to reiterations of old information ...............................................................13

        D.      Dr. Hakala's Methodology is Not Replicable or Reliable ....................................14

        E.      Dr. Hakala's Analyst Proxy Is Fatally Flawed .....................................................15

II.     Dr. Marais's Opinions Are Irrelevant and Cumulative .......................................................16

III.    Professor Kraakman's Opinions Must Be Precluded ...........................................................17

IV.     Professor Black's Opinions Are Unreliable and Must Be Precluded ..............................19

        CONCLUSION ....................................................................................................................20

# TABLE OF AUTHORITIES

### CASES

PAGE

Amelunxen v. Univ. of P.R., 637 F. Supp. 426 (D.P.R. 1986),
    aff'd, 815 F.2d 691 (1st Cir. 1987) ...................................................................14

Basic, Inc. v. Levinson, 485 U.S. 224 (1988)..........................................................4, 6

DeMarco v. Lehman Bros., 222 F.R.D. 243 (S.D.N.Y. 2004) ....................................16

Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005).................................................5, 6

In re Credit Suisse - AOL Sec. Litig., 253 F.R.D. 17 (D. Mass. 2008)..................18, 19

In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.,
    250 F.R.D. 137 (S.D.N.Y. 2008) .................................................................5, 9, 11

In re Nature's Sunshine Prods. Inc. Sec. Litig., 251 F.R.D. 656 (D. Utah 2008)...........4

In re Parmalat Sec. Litig.,
    No. 04-MD-1653, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)...........................4

In re PolyMedica, Inc. Sec. Litig., 431 F.3d 1 (1st Cir. 2005) .............................4, 5, 13

In re Raytheon Co. Sec. Litig.,
    No. 99-12142, 2004 U.S. Dist. LEXIS 30985 (D. Mass. Dec. 6, 2004)...................4

In re Williams Sec. Litig.-WCG Subclass, 558 F.3d 1130 (10th Cir. 2009) .........10, 11

In re Xcelera.com Sec. Litig.,
    No. 00-11649, 2008 U.S. Dist. LEXIS 77807 (D. Mass. Apr. 25, 2008) ....... passim

Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313 (1st Cir. 1999)...................20

Lapin v. Goldman Sachs & Co., 254 F.R.D. 168 (S.D.N.Y. 2008)................................4

McDonough v. City of Quincy, 452 F.3d 8 (1st Cir. 2006).........................................17

Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92 (1st Cir. 1997).................................18

Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261 (5th Cir. 2007)................5

Ruffin v. Shaw Indus., Inc., 149 F.3d 294 (4th Cir. 1998) ............................................14

Tuli v. Brigham & Women's Hosp., Inc., 592 F. Supp. 2d 208 (D. Mass. 2009) ........................18

United States v. Aviles-Colon, 536 F.3d 1 (1st Cir. 2008) ............................................17

United States v. Galbreth, 908 F. Supp. 877 (D.N.M. 1995) ............................................14

United States v. Green, 405 F. Supp. 2d 104 (D. Mass. 2005) ....................................20

Wagner v. Barrick Gold Corp., 251 F.R.D. 112 (S.D.N.Y. 2008) ....................................4

Wright v. Ernst & Young LLP, 152 F.3d 169 (2d Cir. 1998) ............................................9

Zeneca Ltd. v. Pharmachemie B.V.,
    No. Civ. A. 96-12413, 2000 WL 34335805 (D. Mass. Sept. 11, 2000) ..................................14

S<small>TATUTES</small> & R<small>ULES</small>

Federal Rule of Evidence 402 ....................................................................................17

Federal Rule of Evidence 403 ................................................................................17, 18

Federal Rule of Evidence 702 .......................................................................... passim

## PRELIMINARY STATEMENT

Plaintiff's Opposition Memorandum [Dkt. #313] ("Opposition" or "Opp.") fails to demonstrate that <u>any</u> of Plaintiff's expert opinions are reliable and admissible.[1] Despite Plaintiff's attempt to characterize the proffered testimony as within the "range where experts might reasonably differ," the opinions of Plaintiff's experts are "so fundamentally unsupported that [they] can offer no assistance to the jury." (<u>See</u> Opp. 4-5.)

The Opposition reprises Plaintiff's strategy at summary judgment: Plaintiff mischaracterizes Defendants' arguments and then makes numerous assertions to counter the resulting strawmen positions in hopes that Defendants will not be able to adequately address all of them, and that the Court will be so confused that it will throw up its hands and deny Defendants' motion. But the opinions of Plaintiffs' experts should not survive here, where they only serve to obfuscate and confuse by way of flawed logic and methodologies.

The Opposition asserts that Defendants' critique of Dr. Hakala's methodology is based on generic factors – like his use of "professional judgment" – that affect not only Dr. Hakala, but any expert employing any economic analysis. (<u>See, e.g.</u>, Opp. 17-18.) This is false. Dr. Hakala has not applied a methodology that depends on his use of standard professional judgment. Rather, in this securities fraud case, in which Defendants are accused of inflating AOL's share price through their analyst reports, Dr. Hakala remarkably admits that 22 of Defendants' 35 analyst reports are entirely irrelevant. (Defs.' Mem. 18.) Dr. Hakala also admits that on 54 of the 57 "relevant" days, on which he believes artificial inflation entered or was removed from AOL's share price, the inflationary and corrective statements were something <u>other</u> than

---

[1] All terms defined in Defendants Memorandum in Support of their Motion to Preclude Plaintiff's experts ("Defs.' Mem.") [Dkt. # 304] have the same meanings here. References to the "Gesser Reply Declaration" ("Gesser Reply Decl.") are to the declaration accompanying this reply. References to the "Stulz 7/20/09 Declaration" ("Stulz 7/20/09 Decl.") are to the declaration accompanying the Credit Suisse Defendants' Memorandum of Law in Support of their Opposition to Plaintiff's Motion to Preclude their experts ("CSFB Expert Opp."), also filed today.

Defendants' reports – either CSFB made no statements at all, or the alleged "relevant" disclosures were made by others.  (Id. at 27; Defs.' S.J. Mem. [Dkt. ##279, 300] 60-61.)  While Plaintiff is correct that Defendants' reports need not be the only relevant statements in this case for proving loss causation (see, e.g., Opp. 24-25), Plaintiff has identified no other case in which none or virtually none of the inflationary statements and corrective disclosures were made by the defendants.  In financial economics, as in securities fraud cases, if disclosures to the market do not coincide with a change in share price, then they cannot be said to have caused any such change.  (See Defs.' Mem. 13-14.)  Thus, in analyzing his "relevant" days, Dr. Hakala is not applying the accepted methods of financial economics.  And however Dr. Hakala selected those relevant days – days when supposedly "corrective" statements were made by analysts at other firms that, in fact, were less negative about AOL than what CSFB was saying to the market at the time (see, e.g., Defs.' S.J. Mem. 60) – Dr. Hakala did not use "professional judgment."

Not only does the Opposition address arguments Defendants did not make, it also fails to address those they did.  The Opposition, for example, has nothing to say about Dr. Hakala's arbitrary disregard of statistical significance in determining which statements artificially inflated AOL's stock price and which disclosures supposedly removed that inflation.  It is fundamental to performing event studies that one cannot attribute insignificant stock price changes to the events being studied, yet 21 of Dr. Hakala's 57 arbitrarily defined "relevant events" – more than one third – are not significant, even by Dr. Hakala's own, unusually low threshold of significance. (See Defs.' Mem. 14 n.10, 27; see also Gesser Decl. [Dkt. #305] Ex. 4 (Hakala Rpt.) Ex. C-1a (listing 19 events with t-statistics less than 1.65 as "relevant"); id. Ex. C-2a (listing 2 additional such days as "relevant").)  Plaintiff has cited no academic articles and no cases that suggest such disregard of statistical significance is generally accepted within financial economics.  For this

reason alone – not to mention all of the other reasons set forth in Defendants' Memorandum and discussed below – Dr. Hakala's testimony must be precluded. And because the opinions of Plaintiff's other experts are equally flawed, they must be stricken as well.

## ARGUMENT

## I.    Dr. Hakala's Opinions Are Unreliable and Must Be Precluded

### A.    Dr. Hakala Did the Same Thing In This Case As In Xcelera

Plaintiff cannot distinguish Dr. Hakala's methodology here from his improper methodology in In re Xcelera.com Sec. Litig. ("Xcelera"), No. 00-1649, 2008 U.S. Dist. LEXIS 77807 (D. Mass. Apr. 25, 2008). In Xcelera, Judge Zobel precluded Dr. Hakala's testimony because his methodology was "flawed in several respects," including his improper use of dummy variables and incorrect event dates, his reliance on event dates that contravene the efficient market hypothesis and his failure to control for confounding news. Id. at *2-*7. These flaws are equally present in Dr. Hakala's report in this case. (Defs.' Mem. 10-23.) Contrary to Plaintiff's suggestion (see Opp. 6-7), it is irrelevant that Defendants here did not offer an event study challenging market efficiency, as the Xcelera defendants did. Indeed, Judge Zobel assumed that the market for Xcelera stock was efficient and did not rely on – or even cite – the defendants' market efficiency study. Xcelera, 2008 U.S. Dist. LEXIS 77807, at *5-*6. Judge Zobel precluded Dr. Hakala's testimony because the fatal flaws in his analysis rendered his testimony unreliable regardless of market efficiency, id. at *7, just as they do here. Plaintiff's other argument – that Judge Zobel struck Dr. Hakala primarily due to his treatment of information leakage (Opp. 7) – is plainly wrong. While Judge Zobel rejected Dr. Hakala's opinion that "negative anticipation" drove down the stock price, Xcelera, 2008 U.S. Dist. LEXIS 77807, at *4, she ultimately excluded his opinion because he used the wrong event dates and "his theory [did] not match the facts," id., a continuing problem for Dr. Hakala here and in other cases.

3

(Defs.' Mem. 7-8, 14.) Moreover, Judge Zobel's additional reasons for excluding Dr. Hakala had

nothing to do with information leakage.  See Xcelera, 2008 U.S. Dist. LEXIS 77807, at *3-*7.[2]

### B.    Dr. Hakala's Irrelevant Event Study Tests the Wrong Thing

Much of the Opposition contains convoluted, technical and ultimately incorrect

arguments about why it was supposedly appropriate for Dr. Hakala to use dummy variables to

exclude from his regression the 217 "material event" days that he identified – i.e., the more than

half of the days in the Class Period on which Dr. Hakala believes any material news about AOL

may have reached the market (see Defs.' Mem. 21, 24 n.19).  While this brief rebuts those

arguments (see infra at 6-14), the Court need not wade into the morass to conclude that Dr.

Hakala's testimony should be precluded, because the way in which Dr. Hakala has used dummy

variables ensures that his opinions are not relevant to the causation issues here.

In a fraud-on-the-market case such as this, reliance is usually based on the presumption

that an investor who relies on the integrity of stock price has relied on any public material

misstatements, "[b]ecause most publicly available information [including an alleged

misrepresentation] is reflected in market price . . . ."  Basic, Inc. v. Levinson, 485 U.S. 224, 247-

49 (1988); accord In re PolyMedica, Inc. Sec. Litig., 432 F.3d 1, 7-8 (1st Cir. 2005) (describing

"syllogism" set forth in Basic).  Here, where Defendants have rebutted the premise that their

---

[2]  Unable to address Judge Zobel's criticisms, or those of the many other courts that have rejected Dr. Hakala's event study methodology based on the same failures present here (see Defs.' Mem. 7), Plaintiff attempts to bolster Dr. Hakala's credibility with a list of cases in which his opinions were not precluded (Opp. 7).  However, five of the eight matters listed by Plaintiff are irrelevant to the claim that Dr. Hakala's opinions were given weight as proof of loss causation, either because Dr. Hakala's testimony was not contradicted, was never admitted, or was relevant only to market efficiency.  (See Opp. 7 citing In re Nature's Sunshine Prods. Inc. Sec. Litig., 251 F.R.D. 656, 662 (D. Utah 2008) (no opposing expert evidence); Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 184-85 (S.D.N.Y. 2008) (failing to consider admissibility of Dr. Hakala's event study); In re Raytheon Co. Sec. Litig., No. 99-12142, 2004 U.S. Dist. LEXIS 30985 (D. Mass. Dec. 6, 2004) (same); In re Parmalat Sec. Litig., No. 04-MD-1653, 2008 WL 3895539, at *9 (S.D.N.Y. Aug. 21, 2008) (admitting testimony as evidence of market efficiency only); Wagner v. Barrick Gold Corp., 251 F.R.D. 112 (S.D.N.Y. 2008) (same).)  Indeed, Judge Saris in Raytheon specifically criticized Dr. Hakala's prolific use of dummy variables, and advised plaintiffs' counsel to have Dr. Hakala redo his event study without them.  Raytheon, No. 99-12142 (See Gesser Reply Decl. Ex. 1 (May 13, 2004 Daubert Hr'g Tr.) 55:22-57:11).

alleged misstatements were reflected in AOL's market price by showing that their analyst reports, when issued, did not cause any statistically significant price increases, Plaintiff must show that the misstatements did affect price, otherwise the Basic syllogism breaks down and reliance cannot be established. Cf. PolyMedica, 432 F.3d at 8; see Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 265, 269-70 (5th Cir. 2007); In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Sec. Litig., 250 F.R.D. 137, 143 (S.D.N.Y. 2008). Similarly, to establish loss causation, Plaintiff must prove that the alleged misrepresentation itself – not "the tangle of [other] factors affecting price" – caused the loss when the relevant truth became known. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 343, 344 (2005). Thus, Plaintiff must prove that it relied on Defendants' alleged misstatements, and that those misstatements caused its loss.

However, because of Dr. Hakala's deviations from standard event study methodology, his study does not establish what Basic and Dura require. Simply put, unlike standard event studies used in securities litigation, Dr. Hakala's study does not compare AOL's returns on his 57 "relevant event" days – i.e., the days with disclosures that he believes are related to this case – to the returns on a typical day for AOL.[3] (Defs.' Mem. 15; see Stulz 7/20/09 Decl. ¶ 4.) Instead, he compares returns on his 217 "material event" (i.e., AOL-specific news) days to days without any AOL-specific news. (Defs.' Mem. 21-22.) Because Dr. Hakala's "material events" amount to 55% of the Class Period, the remaining days to which he compares them do not represent the typical day for AOL stock. (Stulz 7/20/09 Decl. ¶ 4.) Rather, the typical day for AOL is an AOL-specific news day (id.), when new "firm-specific facts, conditions, or other events" unrelated to the allegations of this case enter the market, see Dura, 544 U.S. at 343. As Plaintiff

---

[3] The "return" for a given day is the change in stock price. "Abnormal returns" are the actual change in stock price, less the predicted change estimated based on the usual relationship between stock price and market and industry movements. (Gesser Decl. Ex. 14 (Stulz Decl.) ¶ 10.)

acknowledges, the volatility of AOL's share price is likely to be greater on AOL-specific news days (Gesser Decl. Ex. 8 (Marais Rpt.) ¶ 11 n.2), and Professor Stulz has empirically shown that it is (Stulz 7/20/09 Decl. ¶ 6 n.6).  Thus, Dr. Hakala's event study does not show that the abnormal returns on his "relevant event" days differ reliably from AOL's typical returns.  At most, his study shows that his 57 relevant event days differ from AOL's returns on atypical days when no new information about AOL entered the market.  This does not satisfy <u>Basic</u> or <u>Dura</u> because it does not show that it was the "disclosures" as opposed to the normal movement that is typically present in AOL's stock – that had an effect on AOL's share price.  (<u>See</u> <u>Dura</u>, 544 U.S. at 343; <u>Basic</u>, 485 U.S. at 248.)

Accordingly, while Plaintiff trumpets how Dr. Hakala's event study is supposedly superior to Professor Stulz's event study (Opp. 5, 9), Dr. Hakala's approach is not designed to answer the causation questions at issue here, and it therefore will not "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  For this reason, Dr. Hakala's analysis would have to be precluded even if his methodology were generally accepted within the field of financial economics, which it is not.

### C.    Dr. Hakala's Methodology Is Not Accepted Within Financial Economics

#### 1.    Dr. Hakala's dummy variable methodology does not comport with financial economics

The Opposition argues that Dr. Hakala's use of dummy variables finds support in the peer-reviewed, academic finance literature (Opp. 9-10), but Plaintiff is wrong.  (Defs.' Mem. 20-24.)  Most finance textbooks and peer-reviewed articles do not describe the use of dummy variables in event studies <u>at all</u>, let alone anything approaching Dr. Hakala's use of dummy variables to exclude over half of the days in his regression's estimation period, which thereby depresses his baseline measurement of the volatility of AOL's share price.  (Defs.' Mem. 23.)

Indeed, the two most frequently cited academic articles – cited hundreds and thousands of times, respectively – describing proper event study methodology do not recommend using dummy variables that control for all news days.  (Stulz 7/20/09 Decl. ¶¶ 3, 12 n.7.)  Professor Stulz, likewise, does not know of any event study published in a major, peer-reviewed finance journal that uses dummy variables in any way remotely similar to what Dr. Hakala does (Stulz Rpt. ¶ 99; Stulz 7/20/09 Decl. ¶¶ 4, 13-17), and Judge Zobel agreed in <u>Xcelera</u> that "no peer-reviewed journal supports the view that dummy variables may be used on all dates on which <u>any</u> company news appears."  2008 U.S. Dist. LEXIS 77807, at *3.

Although Plaintiff has located a handful of obscure theoretical articles that discuss removing news days from regression models in event studies (Opp. 9-10), [4] none has been widely cited in the field of financial economics (Stulz 7/20/09 Decl. ¶¶ 14-17).  Nor has Plaintiff identified even a single published event study that employs the models these articles advocate.  (<u>Id.</u>)  Plaintiff's primary support for Dr. Hakala's methodology continues to be the Aktas article that Defendants have already distinguished numerous times.  (<u>Compare</u> Opp. 8-9, 12-13 <u>with</u> Defs.' Mem. 24 n.19.)  Judge Zobel, too, concluded that Aktas does not support Dr. Hakala's approach, despite Dr. Hakala's reliance on the article.  (Gesser Reply Decl. Ex. 2 (<u>Xcelera</u>, No. 00-CV-11649 (4/25/08 Hr'g Tr.)) 8:10-9:18, 24:5-33:11).

Plaintiff also incorrectly asserts that Dr. Hakala's event study can be shown to be less "biased" and "more powerful" than Professor Stulz's study because it has a lower standard error.  (Opp. 9, 10 n.12, 12.)  But this is argument is a red herring that is simply a function of how standard error is calculated.  (Stulz 7/20/09 Decl. ¶ 15 n.11.)  Dr. Hakala's standard error is lower because he computes it exclusively using the less volatile returns on days that are free of

---

[4] These articles are addressed in detail in the other papers Defendants have filed today.  (<u>See</u> CSFB Expert Opp. 18-19; Stulz 7/20/09 Decl. ¶¶ 13-17.)

AOL-specific news.  (Id. ¶ 6 n.6.)  Had Dr. Hakala dummied out yet another 100 days with AOL-specific news, his standard error would surely have been lower still, but that would not have improved his test, and it certainly does not make it superior to Professor Stulz's. Regardless of its standard error, Dr. Hakala's study does not follow the accepted methodology of financial economics and should thus be precluded.[5]

### 2.    Dr. Hakala fails to use relevant event dates

Contrary to Plaintiff's claim (Opp. 23-25), the entire set of days Dr. Hakala uses in calculating damages is based on a nonsensical definition of which events are "relevant."  (See Defs.' Mem. 14-19; Defs.' Daubert Mem. 7-9.)  For example, Dr. Hakala regards 22 days on which CSFB actually released reports about AOL as not "relevant."  (Hakala Rpt. Ex. C-1a; see Defs.' Mem. 18.)  At the same time, Dr. Hakala believes that on February 8, 2001, a Merrill Lynch report on Microsoft somehow caused inflation in AOL's share price that is attributable to CSFB.  (Hakala Rpt. Ex. C-1a at 2; see Defs.' Mem. 18.)  Dr. Hakala provides no logical explanation for his counterintuitive method of identifying relevant events.  (Defs.' Mem. 14-19.)

Rather than come forward with an intelligible explanation of Dr. Hakala's event selection process (indeed, none exists), Plaintiff asserts, incorrectly, that Defendants' challenge to Dr. Hakala presupposes that only CSFB's reports are relevant to demonstrating loss causation. (Opp. 24-25.)  First, Plaintiff fails to cite a single case – and none exists – holding that artificial

---

[5] Plaintiff also claims that Dr. Hakala addressed Defendants' criticism of his methodology by performing an event study in his Rebuttal Report that only dummied out statistically significant days, with the result that statistical significance increased.  (Opp. 11.)  This is another example of Plaintiff's responding to a strawman argument that Defendants never made.  Defendants actually argued that Dr. Hakala should not have dummied out any days except the event days he was testing.  (Defs.' Mem. 13 n.9.)  Since Dr. Hakala does not properly identify "events" as that term is normally used in event studies, he has not, and cannot, address this criticism.  (Defs.' Mem. 16.)  Plaintiff also suggests that Dr. Hakala's extreme overuse of dummy variables did not actually inflate statistical significance, because he found reduced significance for 23 days as compared to his findings at class certification. (Opp. 11.)  But this argument ignores the fact that in his Expert Report, 44 more days (68%) have become statistically significant (according to Dr. Hakala) as a result of his extra dummy variables.  (Defs.' Mem. 20.)

inflation can be attributed to a party who did not make the statement that resulted in a stock price increase.  See Lantronix, 250 F.R.D. at 148-49 (decertifying class where changes in stock price were attributable only to the "avalanche of information released during the Class Period" rather than defendants' own statements); cf. Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (refusing to hold defendant responsible for losses attributable to statements made by another party).  Yet Dr. Hakala attributes inflation to Defendants on 19 of his 21 inflationary days despite his admission that the inflationary statements on those days were made by others. (Hakala Rpt. ¶¶ 9, 13-14; id. Ex. C-1a.)  For example, Dr. Hakala classifies August 15, 2001 as an inflationary day based on positive statements by UBS; but on the same day, CSFB, based primarily on its assessment of AOL's "ad-driven business," lowered Q3 and Q4 revenue and EBITDA numbers by $300 million to below-consensus levels.  (Id. Ex. C-1a at 5; see Gesser Reply Decl. Ex. 3 (CSFB Rpt. dated Aug. 15, 2001).)  There is no credible reason for characterizing a day as inflationary when Defendants issued a negative report about AOL's projections "revealing" exactly what the Complaint alleges they concealed.

Second, as to loss causation, even though Defendants' alleged misstatements may be corrected by other speakers, Dr. Hakala cannot explain why days such as December 7 and 10, 2001 – when other analysts lowered their estimates for AOL – are "relevant" corrective disclosures in his analysis, while days such as September 25, 2001 – when CSFB lowered its estimates for AOL revenue by $600 million and EBITDA by $280 million based on slowing advertising market growth rates – are not.  (See Hakala Rpt. Ex. C-1a at 6, 7; Gesser Reply Decl. Ex. 4 (CSFB Rpt. dated Sept. 25, 2001).)

Finally, Plaintiff's claim that Dr. Hakala's over-inclusion of irrelevant inflationary days "benefited" Defendants by reducing damages (Opp. 23-24) does not address Dr. Hakala's

9

marked deviations from principles of law and financial economics. And while Plaintiff

cavalierly asserts that Dr. Hakala's incoherent event study does not prejudice Defendants,

because individual event effects on damages were "quite small" (Opp. 23), Plaintiff is simply

wrong. To illustrate, on February 8, 2001 – the inflationary Merrill Lynch report day discussed

above (which is not even statistically significant in his study) – Dr. Hakala assigns $8,107,157 in

damages to CSFB. (Hakala Rpt. Ex. E-1 at 2 ($5,342,102 in estimated institutional damages); id.

Ex. E-2 at 2 ($2,765,055 in estimated non-institutional damages).) While $8 million of

improperly attributed damages might not seem like much to Plaintiff, that view is not shared by

Defendants.

### 3. Dr. Hakala fails to disaggregate confounding factors

#### (a) Failure to control for confounding factors is a valid basis to preclude Dr. Hakala's testimony

As in Xcelera, Dr. Hakala has failed in this case to control for confounding news on the

inflationary and corrective disclosure days he identifies in his event study. (Defs.' Mem. 8-10.)

Plaintiff contends that this flaw bears only on the weight, and not the admissibility, of Dr.

Hakala's event study (Opp. 25), but Judge Zobel concluded otherwise in Xcelera, 2008 U.S.

Dist. LEXIS 77807, at *7-*8. Subsequently, the Tenth Circuit has taken the same view, holding

that "failure to show why the . . . losses should be attributed to the revelation of fraud and not

other non-fraud related news renders his methodology unreliable." In re Williams Sec. Litig.-

WCG Subclass, 558 F.3d 1130, 1142 (10th Cir. 2009). The same reasoning applies here.

Citing an oral decision from the Southern District of New York, Plaintiff warns that

"Rule 702 . . . should not be transformed into a rule for imposing a more exacting standard of

causality . . . simply because scientific issues are involved." (Opp. 25 (citing In re Omnicom

Group, Inc. Sec. Litig., No. 02 Civ. 4483 (S.D.N.Y. Hr'g Aug. 24, 2007)).) Precluding Dr.

Hakala's testimony on the ground that he has failed to control for confounding events does not impose <u>any</u> heightened causation requirement. Rather, it merely prevents him from offering – under the guise of "expert testimony" – what are nothing more than his speculative and highly prejudicial opinions about what caused AOL's share price to move on particular days, when the methods he has employed do not permit him to answer that question consistent with the accepted techniques of financial economics. (<u>See</u> Defs.' Mem. 8.) Indeed, Dr. Hakala has <u>himself</u> admitted that his event study cannot determine which of two or more simultaneous disclosures, if any, are responsible for a contemporaneous stock price movement, and cannot apportion the stock price movement among them. (<u>Id.</u> 8-9.) While Plaintiff asserts that it need only delineate a rough proportion of the whole loss to Defendants (Opp. 26), Dr. Hakala's techniques do not permit him to apportion to Defendants <u>any</u> of the loss he attributes to confounded disclosures. (Defs.' Mem. 9-10.) And none of the cases Plaintiff cites suggest that the law allows apportionment by speculation as opposed to actual evidence. <u>See</u> <u>In re Williams</u>, 558 F.3d at 1143; <u>Lantronix</u>, 250 F.R.D. at 145 (rejecting as "speculation" expert's testimony that was not based testable hypotheses).

Plaintiff, finally, makes the alarmist claim that such a rule will effectively immunize all defendants from liability, because a plaintiff will never be able to demonstrate loss causation whenever more than one piece of news is released to the market at the same time. (Opp. 28.) But Plaintiff vastly overstates this risk. Defendants have not argued that there are <u>no</u> scientifically valid techniques that would properly control for confounding events.[6] Rather, it is clear that Dr. Hakala has not employed such techniques, and, at most, has merely followed his

---

[6] Indeed, while Defendants are under no obligation to suggest ways that Dr. Hakala might have been able to appropriately control for confounding events, techniques that have been used in other cases include fundamental value analysis of the disclosures at issue, as well as intra-day trading analysis (where the confounding pieces of information did not hit the market at exactly the same time).

subjective intuition in opining that certain pieces of confounding news did not affect AOL's

share price when it suits him to.  (Defs. Mem. 9-10.)  This is not sufficient.

> **(b)    Dr. Hakala's arbitrary weighting system does not control for confounding news**

Plaintiff now asserts, for the first time, that the "weights" Dr. Hakala assigns to his

"relevant event" days are an appropriate way to control for confounding disclosures and to

ensure that only the disclosures allegedly attributable to Defendants factor into Dr. Hakala's loss

causation analysis.[7]  (Opp. 25 & n.41.)  However, these weights have nothing to do with the

information disclosed on the "relevant days," and instead were generated in an entirely arbitrary

fashion by Dr. Hakala.  (Stulz. Rpt. ¶¶ 95-97.)

First, Dr. Hakala derives his standard 13.41% weighting strictly as a function of the

number of relevant events he identified so that the inflation he introduces into AOL's share price

will reach zero on the last "relevant" disclosure day.  (Id.; Gesser Decl. Ex. 7 (Hakala 2008 Tr.)

233:13-235:2.)  If Dr. Hakala had fewer corrective disclosures, his standard weighting would be

greater, and if he had more it would be less.  (Hakala 2008 Tr. 327:22-328:22.)  Because Dr.

Hakala's selection of "relevant event" days lacks any objective standard (Defs.' Mem. 16-19;

supra at 8-10), he could have easily included more or fewer "relevant" days in his analysis – a

clear sign that this method is not based on sound science.

Second, there is no "economic basis" for Dr. Hakala's approach of assigning these

arbitrary weights, as he made no "attempt to consider the importance of the news appearing on

various days to assign weights to them."  (Stulz Rpt. ¶ 97.)  Indeed, Dr. Hakala admitted as much

at his deposition, testifying that he was "not sure that they're all entirely equivalent," but he

---

[7] On certain days (e.g., Jan. 12, 2001), Dr. Hakala attributes 100% of his "1 Day Effect" (i.e., the abnormal return) to Defendants.  (Hakala Rpt. Ex. C-1a.)  Certain other days (e.g., Sept. 19, 2001) are weighted at 50% (id. at 6), but the majority of Dr. Hakala's "relevant event" days get a weight of 13.41% (id. at 1-9).

thought it was a "helpful" assumption to treat them as if they were. (Hakala 2008 Tr. 95:14-24.)

These assumptions epitomize the ad hoc and results-driven nature of Dr. Hakala's event study

and underline his failure to perform any meaningful or reproducible analysis.

> **4.    Dr. Hakala contravenes market efficiency by attributing price changes to reiterations of old information**

Under controlling law, a reiteration of previously released information cannot result in

any change in stock price. E.g., PolyMedica, 432 F.3d at 14. This is a problem for Dr. Hakala,

because, just as in Xcelera, Dr. Hakala purports to identify "relevant event" days on which no

"new" news was disclosed. (Defs.' Mem. 12.) Targeting two days Defendants flagged as

examples of Dr. Hakala's error, Plaintiff contends that on February 5, 2001 and February 20,

2002 – days with reiterations of old news – did, in fact, affect AOL's share price. (Opp. 30.)

However, the relevant information contained in the analyst reports released on these days was

not new. (Defs.' Mem. 12.) Defendants have repeatedly shown that Lehman Brothers' February

20, 2002 report – which reiterated negative advertising information – contained nothing new

relating to the allegations in the complaint. (Defs.' S.J. Mem. 64.) While some of the

commentary and forecast changes in the February 20 Lehman report may have been new,

Defendants have demonstrated that they did not know such information and could not previously

have disclosed it. (Id.) And Dr. Hakala himself acknowledges that CSFB's February 5, 2001

report on AOL contained no new rating, price target, estimates or information, and merely

"reaffirm[ed]" CSFB's earlier position. (Opp. 29-30.) Dr. Hakala speculates that intervening

negative market sentiment rendered the February 5 report suddenly "new." (Opp. 30.)[8]

However, even Dr. Hakala admitted that it was "not clear" why the February 5 report should

---

[8] The February 5, 2001 CSFB report on AOL contained substantial negative information, was not authored by Kiggen or Martin, and was issued just four days after CSFB's February 1 report on AOL, which contained similar (and in some respects, identical) information. (Defs.' S.J. Mem. 69.)

have any significant stock price impact (Hakala 2008 Tr. 188:22-25), and that he "was actually surprised" by his test results for that day (id. 214:8-9).

### D.     Dr. Hakala's Methodology is Not Replicable or Reliable

Purporting to use the same methodology in each instance, Dr. Hakala has altered the number of dummy variables in his event study by 60% since class certification (and by 85% since his In re AOL study), increasing the number of significant events by 68% as a result. (Defs.' Mem. 20.)  Nevertheless, Plaintiff remarkably claims that Dr. Hakala's approach is both reliable and replicable simply because the changes Defendants have identified supposedly do not alter Dr. Hakala's results.  (Opp. 16-19.)  This is wrong as both a legal and a factual matter.

Replication refers to repeating the conditions of an initial experiment or test, not just to repeating its ultimate conclusions.  See, e.g., United States v. Galbreth, 908 F. Supp. 877, 894 (D.N.M. 1995).  Indeed, the case law has recognized that "replication" refers to "the ability to achieve the same results consistently and completely independently using the same test methodology in any laboratory."  Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 298 (4th Cir. 1998) (emphasis added) (citation omitted).[9]  Even if another scientist were somehow able to validate the conclusions that Dr. Hakala reached here, such validation would be irrelevant in demonstrating the soundness of Dr. Hakala's event study absent replication of his methodology.

However, Dr. Hakala's results cannot be replicated, even by Dr. Hakala.  The number of statistically significant days in Dr. Hakala's analysis has vastly increased since class certification.  Indeed, February 5, 2001 – the most inflationary day in Dr. Hakala's analysis – was not significant at class certification, but now is.  (Defs.' Mem. 23.)  As Dr. Hakala admitted,

---

[9] See also Zeneca Ltd. v. Pharmachemie B.V., No. Civ. A. 96-12413, 2000 WL 34335805, at *11 (D. Mass. Sept. 11, 2000) (finding a researcher's "failure to comply with a step . . . critical to a proper . . . analysis" to be a failure to "replicate" earlier methods); Amelunxen v. Univ. of P.R., 637 F. Supp. 426, 428 (D.P.R. 1986) ("the scientific method known as replication" involves a "test's repetitions"), aff'd, 815 F.2d 691 (1st Cir. 1987).

if this date were found not to be inflationary – as it would have to be if it were not significant – he would have to redo his entire analysis.  (Hakala 2008 Tr. 328:15-22.)[10]

Plaintiff also claims that Dr. Hakala's selection of "material events" was appropriate, because he purports to have used objective NASD guidelines to arrive at his set of dummy variable days.  (Opp. 14.)  But these are the same NASD guidelines Dr. Hakala used in selecting his "material events" at class certification and in In re AOL, when Dr. Hakala himself identified 60% and 85% fewer "material events," respectively.  (Defs.' Mem. 20 & n.20.)[11]

### E.    Dr. Hakala's Analyst Proxy Is Fatally Flawed

Rather than examine the actual effects of CSFB's reports on AOL stock price, Dr. Hakala assigns artificial inflation to CSFB based on an "average analyst effect" that he computes from 23 days on which analysts at other firms issued sometimes confounded reports on AOL containing information CSFB is not alleged to have known or misstated, but which Dr. Hakala deems to be negative.  (Defs.' Mem. 29-31.)  Plaintiff baldly asserts that Dr. Hakala had to look at disclosures by other firms, because CSFB never issued a true "curative disclosure."  (Opp. 31-32.)  In fact, however, the advertising-related reductions that CSFB made to its 2001 estimates for AOL on August 15 and September 25, 2001, and its 2002 estimates on January 8, 2002, were

---

[10] Plaintiff tries to explain away these and other changes Dr. Hakala has made to his event study, on the ground that Dr. Hakala "somehow" did a better job locating analyst reports here than he did in his In re AOL study, because such disclosures "were relevant to" this case but not to In re AOL.  (Opp. 15-16.)  But as Defendants have already pointed out, this is a spurious explanation, because in both cases, Dr. Hakala's goal in identifying "material event" days was the same – to control for potentially material AOL-specific news.  (Defs.' Mem. 16, 25 n.20.)  If analyst reports are potentially material AOL-specific news, then he should have removed them in both cases, and if not, not.  Moreover, even if Dr. Hakala's explanation were legitimate, it still would not explain the 60% change between his "material event" days at class certification and his current event study.  (Defs.' Mem. 20.)

[11] Finally, Plaintiff entirely glosses over Dr. Hakala's failure to preselect his "relevant events" of interest – i.e., the alleged disclosures that he believes are related to the allegations in this case.  (Defs.' Mem. 15, 17-19.)  This is contrary to what is required in any event study, and injects yet another unreproducible, fundamentally arbitrary element into Dr. Hakala's study.  (Defs.' Mem. 15; Stulz 7/20/09 Decl. ¶ 3.)  Plaintiff asserts that Dr. Hakala selected all of his "events" blindly and on an a priori basis (Opp. 14); but this just conflates the "material event" (dummy variable) days in Dr. Hakala's analysis with the "relevant events" he was supposed to be assessing.

equal to or greater than the estimate reductions made by analysts at other firms on many of the days that Dr. Hakala uses to compute his analyst proxy.[12]  Yet there was no statistically significant decline on <u>any</u> of these days, negating any inference of loss causation. [13]  (Hakala Rpt. Ex. C-1a at 5-7.)  Moreover, Plaintiff has no response to Defendants' showing that Dr. Hakala failed to evaluate the information content of the analyst disclosures on his proxy days, much less to show that it was equivalent to the information CSFB allegedly concealed.  (Defs.' Mem. 30-31.)  Accordingly, Dr. Hakala's opinions must be precluded.

## II.    <u>Dr. Marais's Opinions Are Irrelevant and Cumulative</u>

The primary reason why Dr. Marais's testimony should be precluded is that his opinions are intended to shore up a single aspect (dummy variables) of Dr. Hakala's report, but neither Dr. Marais – who fails to address any of the other flaws in Dr. Hakala's methodology – nor anyone else can rescue Dr. Hakala's arbitrary and unreliable report from exclusion.  (Defs.' Mem. 32.) Additionally, even as to the limited topic that Dr. Marais purports to address, he fails to opine <u>at</u>

---

[12] CSFB lowered 2001 revenue and EBITDA estimates by $349 million and $270 million, respectively, on August 15, 2001, and by another $1.149 billion and $531 million, respectively on September 25, 2001.  (<u>See</u> Gesser Reply Decl. Exs. 3, 4.)  These decreases were greater, for example, than Merrill Lynch's December 7, 2001 revenue decrease of $145 million and EBITDA decrease of $136 million (<u>id.</u> Ex. 5), and Robertson Stephens' December 10 revenue decrease of $80 million and EBITDA decrease of $70 million (<u>id.</u> Ex. 6).  Similarly, CSFB lowered 2002 revenue and EBITDA estimates by $700 million and $1.4 billion, respectively on January 8, 2002.  (<u>See id.</u> Ex. 7.) By contrast, Morgan Stanley's January 2 report only reduced revenue by $418 million and EBITDA by $801 billion (<u>id.</u> Ex. 8); Deutsche Bank's January 3 report lowered AOL's 2002 revenue by only $390 million and EBITDA by $213 million (<u>id.</u> Ex. 9); and Bear Stearns' January 8 report lowered EBITDA by only $963 million (<u>id.</u> Ex. 10).

[13] As previously explained, Dr. Hakala's analyst proxy is, in material respects, virtually identical to the study rejected in <u>DeMarco v. Lehman Brothers</u>, 222 F.R.D. 243, 248-49 (S.D.N.Y. 2004).  (Defs.' Mem. 29-30.) Plaintiff's attempt to distinguish Dr. Hakala's analyst proxy from the study rejected in <u>DeMarco</u> (Opp. 33-34) is unpersuasive and appears to be based upon Plaintiff's misunderstanding of what its own expert actually did.  First, while Plaintiff claims that Dr. Hakala's analyst proxy differs from the <u>DeMarco</u> proxy because Dr. Hakala engineered it using actual AOL return data, Plaintiff glosses over the facts that (1) Dr. Hakala made no attempt to determine whether the disclosures on his proxy days were equivalent to each other or to what CSFB supposedly should have disclosed, and (2) Dr. Hakala then uses his computed proxy value to entirely replace the actual results of his event study for January 12, 2001 (which were negative and insignificant).  Thus, just as in <u>DeMarco</u>, Dr. Hakala's approach "has virtually nothing to do with" Defendants or their "alleged influence on the market … or [their] actual statements."  222 F.R.D. at 248.  Moreover – again, as with the study in <u>DeMarco</u> – Dr. Hakala's selection of "'relatively' clean" days where "analyst reports were issued and were viewed as likely to be the primary company-specific news related to AOL" (Hakala Rpt. ¶ 27), is based "only [on] his subjective impression that they were dates when 'confounding news' from the issuer was 'minimal.'"  222 F.R.D. at 249.

all on Dr. Hakala's implementation of dummy variables. (Defs.' Mem. 32-33; Gesser Decl. Ex. 9 (Marais Tr.) 103:3-7 (no opinion on how Dr. Hakala decided which dates to dummy out); id. at 112:3-8 (no opinion on whether Dr. Hakala's use of dummy variables comported with academic literature).) Thus, Dr. Marais fails to "answer[] Professor Stulz's methodological criticisms" (contra Opp. 35) and his report should thus be precluded under Federal Rule of Evidence 402 because it is irrelevant. (See Defs.' Mem. 32.)

Dr. Marais's opinions are also cumulative. (Defs.' Mem. at 33.) In opposition, Plaintiff asserts that Dr. Marais offers testimony "unique" from Dr. Hakala's on the "replicability" of Dr. Hakala's analysis (Opp. 36), but this claim is incorrect. Dr. Marais did not actually test Dr. Hakala's approach, and therefore, as Dr. Marais admitted, "I have no expert opinion one way or the other about the degree of replicability of Dr. Hakala's protocol."[14] (Marais Tr. 91:24-92:3; see Defs.' Mem. 32-33.) Despite Plaintiff's protests (id. at 36-37), an expert may be precluded for cumulativeness alone. (Defs.' Mem. 33; see also Fed. R. Evid. 403.) Indeed, cumulative evidence, such as Dr. Marais's opinions, may be excluded because "the district court retains discretion to 'prevent the needless presentation'" of such evidence. McDonough v. City of Quincy, 452 F.3d 8, 20 (1st Cir. 2006).[15]

## III.    Professor Kraakman's Opinions Must Be Precluded

Professor Kraakman must be precluded from testifying as an expert under Federal Rule of Evidence 702, because any point on which he could conceivably testify is either (1) irrelevant,

---

[14] Moreover, Dr. Marais's testimony is not rendered any less cumulative because his "expanded" discussion of one article (Aktas) is somewhat longer than Dr. Hakala's. (Contra Opp. 36.)

[15] Plaintiff's attempt to distinguish this case thus fails. United States v. Aviles-Colon, 536 F.3d 1, 22-23 (1st Cir. 2008) (see Opp. 36-37), is inapposite. Aviles-Colon allowed overlapping testimony because "[i]t was appropriate for the government to offer evidence from more than one witness to prove [the defendant's] participation in [a] conspiracy." 536 F.3d at 23. This context finds no analogue in Dr. Marais's needless reaffirmation of Dr. Hakala's inadequate responses to Professor Stulz's report.

(2) beyond the range of his qualifications or (3) a legal issue that is not subject to a factfinder's determination, and thus is not appropriate for expert consideration.  (Defs.' Mem. 42.)  In many cases, his opinions are all three.  Thus, his testimony has no "probative value" and would be a "waste of time."  See Fed. R. Evid. 403.

Professor Kraakman's testimony regarding market efficiency (Gesser Decl. Ex. 12 (Kraakman Rpt.) ¶¶ 5-7, 10-16) is unnecessary because the Court has already determined that there is "no dispute that the market for AOL stock was efficient."  See In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 27 (D. Mass. 2008).  Plaintiff's argument that such testimony would be useful to a lay jury (Opp. 39) is therefore irrelevant.  Professor Kraakman's opinions on whether the fraud-on-the-market theory applies to analysts' reports, or to which analysts it should apply (Kraakman Rpt. ¶¶ 8-9), is similarly irrelevant and unnecessary, given the Court's prior ruling that the fraud-on-the-market presumption "provides the proper analytical framework for this case," Credit Suisse-AOL, 253 F.R.D. at 21, and Professor Kraakman's admission that the issue is a purely legal one (Gesser Decl. Ex. 13 (Kraakman Tr.) 53:7-8), which means it is an impermissible subject for expert testimony.  (Defs.' Mem. 43-44 (citing Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997)).)

The issue of whether CSFB's statements affected the price of AOL stock is also beyond Professor Kraakman's qualifications:  he is not a financial economist and has never performed an event study in this or any prior case.[16]  (See Kraakman Rpt. ¶ 1.)  He is no more qualified to

---

[16] Plaintiff's implicit comparison of Professor Kraakman's testimony to testimony admitted in Tuli v. Brigham & Women's Hospital, Inc., 592 F. Supp. 2d 208, 214-15 (D. Mass. 2009) (Gertner, J.), misses its mark (see Opp. 40).  In Tuli, 592 F. Supp. 2d at 212-13, this Court excluded a "well-credentialed" surgeon's testimony because he had no relevant expertise to opine on gender discrimination at the hospital where he worked, but permitted another expert's overview of social framework analysis because this subject was his area of expertise.  Id. at 212, 214-15.  Professor Kraakman plays the surgeon's role here – however strong Professor Kraakman's credentials are on "matters of corporate finance and economic theory" (Opp. 37), his area of expertise is not the effects of analysts' statements on stock prices in an efficient market.

theorize about how analysts like Kiggen and Martin <u>could</u> affect stock price.[17] (Defs.' Mem. 45.) Moreover, even if he <u>were</u> qualified, his opinions concerning Defendants' theoretical impact on AOL's price is irrelevant because – as the event studies of <u>both</u> parties' experts establish – virtually none of Defendants' reports can be shown to have <u>actually had</u> a quantifiable impact on AOL's share price.

## IV.    <u>Professor Black's Opinions Are Unreliable and Must Be Precluded</u>

Plaintiff claims that save for "a single, isolated error," Professor Black's report is completely reliable. (Opp. 49.) But far from making an "isolated" error, Professor Black changed more than a <u>dozen</u> figures in his report during his deposition. (Gesser Decl. Ex. 10 (Black Rpt.) 9.) Professor Black's wildly inaccurate calculation of Defendants' projections for AOL undermines central conclusions in his report. (<u>Id.</u>; <u>see also</u> Gesser Decl. Ex. 11 (Black Tr.) 102:20-23.) For example, Professor Black opined that Defendants had projected an "absurd" 19% quarter-over-quarter growth rate for AOL for the fourth quarter of 2000. (Black Rpt. ¶ 9.) But at his deposition, Professor Black admitted that he relied on the wrong data set, and, when provided with the correct data, recalculated that Defendants' fourth-quarter growth projection was actually only 11.8% - 38% <u>lower</u> than Black calculated in his report. (<u>See</u> Black Tr. 93:4-9, 97:4-9, 102:20-23.) Professor Black's erroneous 19% figure is the foundation of his conclusions that Defendants' projections were "unreasonable" and "not plausible." (Defs.' Mem. 35-36.) Indeed, at his deposition, Professor Black acknowledged that his 19% calculation impacted his overall analysis, (Black Tr. 57:23-59:9), and was forced to downgrade his assessment of Defendants' projections from "absurd" to "highly optimistic" (<u>id.</u> 103:7-107:15) – the same

---

[17] Further, all of the articles Professor Kraakman cites to support his opinion that analysts like Kiggen and Martin can affect a company's stock price demonstrate the effect of analyst statements, where there is any, through event study results. (Kraakman Rpt. ¶ 5 nn.6-9; Kraakman Tr. 71:2-73:8.) Accordingly, Professor Kraakman's testimony on the subject would not only be unreliable and unsupported, but it would be directly contrary to the evidence and the literature on which he purports to rely.

epithet he used to characterize a contemporaneous report by Morgan Stanley, which has not been accused of fraud (Black Tr. 121:3-123:6).  Professor Black's grossly incorrect computation undermines not only his ability to conduct this type of analysis, but also his conclusion that Defendants' projections were "unreasonable" and "not plausible."  (See Defs.' Mem. 35-36.) Plaintiff's legally incorrect assertions notwithstanding (see Opp. 49),[18] Professor's Black's admitted lack of factual support renders his opinions inadmissible.  See Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 321 (1st Cir. 1999).

    In addition, Plaintiff never addresses Professor Black's failure to compare Defendants' projections to those published by other analysts reporting on AOL.  (See Defs.' Mem. 36-37.) Had Professor Black performed this comparison, which he admitted at his deposition would have been relevant to his conclusions (Black Tr. 248:19-249:5), he would have discovered what Defendants demonstrated at the July 1, 2009 hearing on summary judgment: Defendants' projections were in the middle of the pack of more than 40 firms covering AOL.  (See S.J. Hr'g Tr. [Dkt. #319] 15:11-16:13.)  Professor Black's report does not explain how Defendants' projections were unreasonable at the time they were published when all analysts' projections for AOL turned out to be overly optimistic, and especially when some projections were substantially higher than Defendants'.  This failure exacerbates the fatal unreliability of Professor Black's report under Federal Rule of Evidence 702.  (See Defs.' Mem. 36-37.)

## CONCLUSION

    For the foregoing reasons, the Court should preclude the opinions of Plaintiff's experts.

---

[18] The precedents cited by Plaintiff are inapposite because they concern the admissibility of testimony when there is a known error rate in a particular discipline or mode of analysis, see, e.g., United States v. Green, 405 F. Supp. 2d 104, 119 (D. Mass. 2005) (Gertner, J.), rather than the admissibility of testimony based on information known with complete certainty to be wrong.  (See Opp. 49-50.)

CREDIT SUISSE SECURITIES (USA) LLC,
CREDIT SUISSE (USA), INC., AND
ELLIOTT ROGERS AND JAMIE KIGGEN,

By their attorneys,

/s/ Siobhan E. Mee
Robert A. Buhlman (BBO #554393)
Siobhan E. Mee (BBO #640372)
siobhan.mee@bingham.com
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, MA 02110
Tel: (617) 951-8265
Fax: (617) 428-6327

-and-


Lawrence Portnoy (admitted *pro hac vice*)
Avi Gesser (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000
Fax: (212) 450-3800

*Attorneys for Defendants*
*Credit Suisse Securities (USA) LLC and*
*Credit Suisse (USA), Inc.*

-and-

Jeff E. Butler (admitted *pro hac vice*)
CLIFFORD CHANCE LLP
31 West 52nd Street
New York, NY 10019
Tel: (212) 878-8000
Fax: (212) 878-8375
-and-

Warren L. Feldman (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-2420

LAURA MARTIN,

By her attorneys,

/s/ James R. Carroll
James R. Carroll (BBO #554426)
james.carroll@skadden.com
Eben P. Colby (BBO #651456)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
Tel: (617) 573-4800
Fax: (617) 573-4822


FRANK QUATTRONE,

By his attorneys,

/s/ Jeffrey B. Rudman
Jeffrey B. Rudman (BBO #433380)
Jonathan A. Shapiro (BBO #567838)
jonathan.shapiro@wilmerhale.com
Timothy J. Perla (BBO #660447)
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

-and-


Kenneth G. Hausman (admitted *pro hac vice*)
Barbara A. Winters (admitted *pro hac vice*)
HOWARD, RICE, NEMEROVSKI,
CANADY, FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, Seventh Floor
San Francisco, CA 94111-4024
Tel: (415) 434-1600

Fax: (917) 777-2420

*Attorneys for Defendant Elliott Rogers*

-and-

Henry Putzel, III (admitted *pro hac vice*)
LAW OFFICE OF HENRY PUTZEL III
565 Fifth Avenue
New York, NY 10017
Tel: (212) 661-0066
Fax: (212) 661-0415

*Attorney for Defendant Jamie Kiggen*

Fax: (415) 217-5910

*Attorneys for Defendant Frank Quattrone*

22

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and, except to the extent registered participants at the same firm(s) received copies electronically as identified on the Notice of Electronic Filing, paper copies will be sent to those indicated as non-registered participants by U.S. Mail on July 20, 2009.

/s/ Sarah G. Kim
Sarah G. Kim

Bingham McCutchen LLP
One Federal Street
Boston, MA 02110