UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re CREDIT SUISSE – AOL
SECURITIES LITIGATION

This Document Relates To:

ALL ACTIONS

Case No. 1:02 CV 12146
(Judge Gertner)

**REDACTED VERSION**

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF PLAINTIFFS' MOTION TO PRECLUDE THE EXPERT OPINIONS OF
RENÉ M. STULZ AND JOHN DEIGHTON**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................................... 1

ARGUMENT................................................................................................................................... 4

I.    DEFENDANTS HAVE FAILED TO ESTABLISH THE ADMISSIBILITY
OF PROFESSOR STULZ'S UNRELIABLE OPINIONS .................................................... 4

    A.    Defendants Have Failed to Rebut The Fatal Flaws Demonstrated in Professor
Stulz's Biased Event Study................................................................................................. 5

    B.    Defendants' Improperly Submitted New Expert Declaration Fails to Correct the
Fatal Flaws in Professor Stulz's Event Study.................................................................... 10

    C.    Defendants Have Failed to Establish the Admissibility of Professor Stulz's
Erroneous and Unsupported Criticisms of Dr. Hakala's Event Study Methodology ....... 12

    D.    Defendants' Bald Assertions Are Insufficient to Establish the Reliability of
Professor Stulz's Assumed "Opinions" ........................................................................... 15

    E.    Defendants Have Failed to Show that Professor Deighton's Testimony Is
Relevant, Reliable, and Will Assist the Triers of Fact...................................................... 18

    F.    Defendants Have Failed to Establish the Relevance and Helpfulness of Professor
Deighton's Proposed Testimony....................................................................................... 19

    G.    Defendants Cannot Establish That Professor Deighton's Opinions Based on
Flawed Assumptions Are Reliable.................................................................................... 23

CONCLUSION.............................................................................................................................. 23

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Andrews v. Metro North Commuter R. Co.*,
  882 F.2d 705 (2d Cir.1989) ................................................................................... 17

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
  158 F.3d 548 (11th Cir. 1998) .............................................................................. 17

*Clark v. Takata Corp.*,
  192 F.3d 750 (7th Cir. 1999) ................................................................................ 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ............................................................................... 2, 4, 8, 18

*Estate of Edward W. Knoster v. Ford Motor Co.*,
  200 F. App'x 106 (3d Cir. 2006) .......................................................................... 14

*Fener v. Belo Corp.*,
  No. 08-10576, 2009 WL 2450674 (5th Cir. Aug. 12, 2009) ................................... 3

*Franklin Federal Savings Bank v. U.S.*,
  60 Fed. Cl. 55 (Fed. Cl. 2004) ................................................................................ 1

*In re AOL Time Warner Sec. Litig.*,
  No. MDL 1500, 02 Civ. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) .................. 4

*In re Broadcom Corp. Sec. Litig.*,
  No. SACV 01-275 DT (MLGx), 2005 U.S. Dist LEXIS 41976 (C.D. Cal. Sept. 12, 2005)...... 4

*In re Clarent Sec. Litig.*,
  No. 01-3361 CRB (N.D. Cal. Feb. 9, 2005) ........................................................... 4

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ................................................................................ 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  245 F.R.D. 147 (S.D.N.Y. 2007) .......................................................................... 22

*In re Initial Public Offering Sec. Litig.*,
  Master File No. 21 MC 92(SAS), 2009 WL 1649704 (S.D.N.Y. June 10, 2009) ...................... 1

*In re JDS Uniphase Sec. Litig.*,
  No. 02-01486 CW (N.D. Cal. Nov. 1-2, 2007) ....................................................... 3

*In re Metris Co. Sec. Litig.*,
No. 02-CV-3677 (JMR/FLN), 2005 WL 5980051 (D. Minn. Nov. 9, 2005)............................ 4

*In re Micron Tech., Inc. Sec. Litig.*,
247 F.R.D. 627 (D. Idaho 2007) ................................................................................................ 3

*In re Nature's Sunshine Prods. Inc. Sec. Litig.*,
251 F.R.D. 656 (D. Utah 2008) ................................................................................................. 3

*In re Omnicom Group, Inc., Sec. Litig.*,
No. 02 Civ. 4483 (S.D.N.Y.) (Hr'g Tr. Aug. 24, 2007) ............................................................ 3

*In re Parmalat Sec. Litig.*,
No. 04 MD 1653 (LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008).................................. 3

*In re Patriot Am. Hospitality Sec. Litig.*,
No. MDL C-00-1300 VRW, 2005 WL 3801595 (N.D. Cal. Nov. 30, 2005) ............................ 4

*In re Raytheon Co. Sec. Litig.*,
Civil Action No. 99-12142 (D. Mass. May 6, 2004) ................................................................ 4

*In re Williams Co. Sec. Litig.*,
No. 02-cv-72-SFP (FHM) (N.D. Ok. Feb. 12, 2007) ................................................................ 3

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)................................................................................................................... 8

*Lapin v. Goldman Sachs & Co.*,
254 F.R.D. 168 (S.D.N.Y. 2008) ............................................................................................... 3

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007) ...................................................................................................... 9

*Levin v. Dalva Bros., Inc.*,
459 F.3d 68 (1st Cir. 2006)...................................................................................................... 18

*Oscar Private Equity Investments v. Allegiance Telecom, Inc.*,
487 F.3d 261 (5th Cir. 2007) .................................................................................................... 3

*Owens v. Ford Motor Co.*,
297 F. Supp. 2d 1099 (S.D. Ind. 2003).................................................................................... 18

*Ross v. Abercrombie & Fitch Co.*,
Nos. 05 Civ. 819 *et al.* (TPK), 2008 WL 4059873 (S.D. Ohio Aug. 26, 2008) ........................ 3

*Scheiner v. i2 Technologies*,
No. 3:01-CV-418-H (N.D. Tex. Jun. 25, 2004)......................................................................... 4

*Schwab v. Philip Morris USA, Inc.*,
    No. CV 04-1945, 2005 WL 2401647 (E.D.N.Y. Sept. 29, 2005)............................................. 21

*Shirk v. Fifth Third Bancorp*,
    No. 05-cv-049, 2009 WL 692124 (S.D. Ohio Jan. 29, 2009)................................................. 3

*Stanford Square, L.L.C. v. Nomura Asset Capital Corp.*,
    229 F. Supp. 2d 199 (S.D.N.Y. 2002) ...................................................................................... 1

*Taylor v. Evans*,
    No. 94 Civ. 8425, 1997 WL 154010 (S.D.N.Y. April 1, 1997)............................................... 17

*Tuli v. Brigham & Women's Hosp., Inc.*,
    592 F. Supp. 2d 208 (D. Mass. 2009)....................................................................................... 17

*United States v. Downing*,
    753 F.2d 1224 (3rd Cir. 1985) ................................................................................................... 18

*United States v. Ferguson*,
    584 F. Supp. 2d 447 (D. Conn. 2008)......................................................................................... 1

*United States v. Frabizio*,
    445 F. Supp. 2d 152 (D. Mass. 2006) ........................................................................................ 8

*United States v. Green*,
    405 F. Supp. 2d 104 (D. Mass. 2005) .................................................................................. 8, 13

*United States v. Hines*,
    55 F. Supp. 2d 62 (D. Mass. 1999) ....................................................................... 8, 12, 13, 14

*United States v. Montas*,
    41 F.3d 775 (1st Cir. 1994).................................................................................... 17, 19, 20

*United States v. Schiff*,
    538 F. Supp. 2d 818 (D.N.J. 2008) ......................................................................................... 20

*United States v. Shea*,
    957 F. Supp. 331 (D.N.H. 1997).............................................................................................. 14

*Voilas v. General Motors Corp.*,
    73 F. Supp. 2d 452 (D.N.J. 1999) ............................................................................................ 20

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) ....................................................................................... 3, 22

## Other Authorities

*Confronting the New Challenges of Scientific Evidence*,
    108 Harv. L. Rev. 1532, 1552 (May 1995)................................................................................. 6

Joel E. Thompson, *More Methods that Make Little Difference in Event Studies*,
15(1) J. Bus. Fin. & Acct., 77, 78 (1988) ............................................................................... 13

John D. Jackson et al., *The Impact of Non-Normality and Misspecification on Merger Event
Studies*, 13:2 Int. J. of the Econ. of Bus. 247, 262 (2006) ................................................... 11, 12

Nihat Aktas et al., *Event Studies With a Contaminated Estimation Period*, 13 J. Corp. Fin., 129
(2007) ...................................................................................................................................... 8, 12

Richard Roll, $R^2$, 43 J. Fin. 541, 558-560 (1988) ..................................................................... 6, 13

Robert B. Thompson II, Chris Olsen & J. Richard Dietrich,
*The Influence of Estimation Period News Events on Standardized Market Model Prediction
Errors*, 63(3) Acct. Rev., 448, 466-68 (Jul. 1988) ................................................................ 6, 13

**Rules**

Fed. R. Evid. 702 ......................................................................................................................... 18

## PRELIMINARY STATEMENT

In opposing Plaintiffs' Motion to Preclude The Expert Opinions of René M. Stulz and

John Deighton, ("Plaintiffs' Motion"), Defendants largely failed to respond to the significant

deficiencies in their experts' opinions, and instead, simply touted their experts' credentials as

though credentials were the only relevant consideration under Rule 702.  However, Professor

Stulz's credentials have not prevented other courts from rejecting his flawed opinions.  *See, e.g.,*

*United States v. Ferguson*, 584 F. Supp. 2d 447, 452, 456 (D. Conn. 2008) (rejecting Stulz's

opinions that the corrective disclosures identified by an opposing expert were unrelated to the

fraud or not "new" news); *In re Initial Public Offering Sec. Litig.*, Master File No. 21 MC

92(SAS), 2009 WL 1649704 (S.D.N.Y. June 10, 2009) (rejecting Stulz's opinion that the market

was inefficient and that the opposing expert had failed to correctly identify the news that caused

the relevant stock price responses); *Franklin Federal Savings Bank v. U.S.*, 60 Fed. Cl. 55, 71-72

(Fed. Cl. 2004) (rejecting Professor Stulz's damages model because it "defies common sense,"

"is contrary to established principles" and "suffers from the fundamental problem that it is based

on [a] speculative assumption[.]"); *Stanford Square, L.L.C. v. Nomura Asset Capital Corp.*, 229

F. Supp. 2d 199, 204 (S.D.N.Y. 2002) (rejecting Professor Stulz's damages formula because it

"is not widely used in the industry or academia" and was based on too limited a sample of data.).

Likewise, Professor Deighton's credentials do not render his opinions relevant or beyond the ken

of the lay juror.  Simply put, Defendants have not answered the significant deficiencies under

Rule 702 and *Daubert* in their proffered expert testimony.

Indeed, Defendants barely attempted to refute the empirically demonstrated bias in

Professor Stulz's event study, but rather, relied on the fact that Professor Stulz has published

articles containing event studies in finance journals to try to establish that his method and its

application here are reliable.[1]  Legal precedent dictates otherwise.  No less than the Supreme

Court has stated that publication "is not the *sine qua non* of admissibility; it does not necessarily

correlate with reliability[.]"  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-

94 (1993).  As discussed more fully below, the publication of Professor Stulz's methodology

does nothing to overcome the improper use of his biased event study here, where it does not

"show what it purports to show," *i.e.*, whether certain disclosures had any significant impact on

AOL.

Even when Defendants manage to address Plaintiffs' criticisms, they completely ignore

the record, baldly claiming, for example, that Professor Stulz did not opine on evidentiary

disputes or supplant the jury's determination of the facts, ignoring the plain language of his

report to the contrary.  (*See, e.g.*, Stulz Corrected Rpt. ¶ 5(f)(i) (opining that "my review of the

evidence provided to me by CSFB's counsel leads me to conclude that the accounting

improprieties allegedly revealed to CSFB analysts by the AOL source related to AOL's internal

investigation of its relationship with PurchasePro.com, which was disclosed in the press prior to

the time CSFB is alleged to have learned about these problems from the AOL source.").)

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████[2]  (*See* Pls.' Mot. 1 n.1.)

---

[1]     Additionally, Defendants spend much of their brief reiterating their baseless arguments against Dr. Hakala. Although these arguments are meritless, in the event the Court should ultimately decide to exclude any of Dr. Hakala's opinions, Plaintiffs respectfully request the opportunity to submit another expert on loss causation and damages.

[2]     ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Rather than address the serious deficiencies in their own experts' testimony, Defendants instead spent much of their brief reiterating their baseless attacks against Dr. Hakala and reminding the Court of the infinitesimal minority of cases in which Dr. Hakala's testimony has either not been accepted or was ultimately not persuasive.[3] Putting these cases in perspective, Dr. Hakala's event studies have been admitted in the overwhelming majority of cases in which they were offered, including most recently: *Shirk v. Fifth Third Bancorp*, No. 05-cv-049, 2009 WL 692124, at *7 (S.D. Ohio Jan. 29, 2009) (denying motion to exclude Dr. Hakala's event study and testimony); *In re Nature's Sunshine Prods. Inc. Sec. Litig.*, 251 F.R.D. 656, 667 (D. Utah 2008) (certifying class based on Dr. Hakala's event study); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008) (certifying class based on Dr. Hakala's event study); *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539, at *9-10 (S.D.N.Y. Aug. 21, 2008) (certifying class based on Dr. Hakala's event study); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119-20 (S.D.N.Y. 2008) (granting class certification based on Dr. Hakala's event study); *In re JDS Uniphase Sec. Litig.*, No. 02-01486 CW (N.D. Cal. Nov. 1-2, 2007) (testifying at trial as damages expert); *In re Omnicom Group, Inc., Sec. Litig.*, No. 02 Civ. 4483 (S.D.N.Y. Hr'g Aug. 24, 2007) (denying motion to preclude Dr. Hakala's event study); *In re Williams Co. Sec. Litig.*, No. 02-cv-72-SFP (FHM) (N.D. Ok. Feb. 12, 2007) (order approving plan of allocation based on Dr. Hakala's event study); *In re AOL Time Warner Sec. Litig.*, No. MDL

---

[3]      Indeed, Defendants recently submitted *Fener v. Belo Corp.*, No. 08-10576, 2009 WL 2450674 (5th Cir. Aug. 12, 2009), in which the Fifth Circuit affirmed denial of class certification for failure to establish loss causation, rejecting Dr. Hakala's event study as evidence of the same. However, the loss causation test enunciated by the Fifth Circuit in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007) and applied in *Fener* represents an extreme departure from other circuits, and has been widely rejected. *See, e.g., Ross v. Abercrombie & Fitch Co.*, Nos. 05 Civ. 819 *et al.* (TPK), 2008 WL 4059873, at *3 (S.D. Ohio Aug. 26, 2008) ("No other Court of Appeals, and no district court outside the Fifth Circuit, appears to have followed *Oscar.*"); *In re Micron Tech., Inc. Sec. Litig.*, 247 F.R.D. 627, 634 (D. Idaho 2007) ("It is unlikely that [*Oscar*] would be adopted in this Circuit because it misreads *Basic*").

1500, 02 Civ. 5575 (SWK), 2006 WL 903236, at *18 (S.D.N.Y. Apr. 6, 2006) (approving plan of allocation based on Dr. Hakala's event study); *In re Patriot Am. Hospitality Sec. Litig.*, No. MDL C-00-1300 VRW, 2005 WL 3801595 (N.D. Cal. Nov. 30, 2005) (approving plan of allocation based on Dr. Hakala's event study); *In re Metris Co. Sec. Litig.*, No. 02-CV-3677 (JMR/FLN), 2005 WL 5980051, at *1 (D. Minn. Nov. 9, 2005) (denying motion to preclude Dr. Hakala's event study and testimony); *In re Broadcom Corp. Sec. Litig.*, No. SACV 01-275 DT (MLGx), 2005 U.S. Dist LEXIS 41976 (C.D. Cal. Sept. 12, 2005) (approving plan of allocation based on Dr. Hakala's event study); *In re Clarent Sec. Litig.*, No. 01-3361 CRB (N.D. Cal. Feb. 9, 2005) (testifying at trial as damages expert); *Scheiner v. i2 Technologies*, No. 3:01-CV-418-H (N.D. Tex. Jun. 25, 2004) (order certifying class for purposes of settlement); *In re Raytheon Co. Sec. Litig.*, Civil Action No. 99-12142 (D. Mass. May 6, 2004) (Saris, J.) (order denying motion to strike Dr. Hakala's reports and event study).

Irrespective of Defendants' challenge of Dr. Hakala, the issue here is whether Professors Stulz and Deighton proffer relevant and reliable testimony, and it is Defendants' burden, as the proponents of the testimony, to prove by a preponderance of the evidence that they do. *Daubert*, 509 U.S. at 592 n.10. Defendants have failed to carry that burden and therefore, their proposed expert testimony must be excluded.

## ARGUMENT

## I.    DEFENDANTS HAVE FAILED TO ESTABLISH THE ADMISSIBILITY OF PROFESSOR STULZ'S UNRELIABLE OPINIONS

As described more fully in Plaintiffs' Motion, Professor Stulz opines on the basis of an unreliably incomplete and biased event study, and further opines directly on the conclusions that he claims the jury should reach regarding disputed facts based solely on faulty assumptions provided by counsel and an inadequate review of the cold record. Defendants have barely

4

addressed, much less refuted, these serious deficiencies in Professor Stulz's opinions, thus, his opinions should be excluded.

A.    **Defendants Have Failed to Rebut The Fatal Flaws Demonstrated in Professor Stulz's Biased Event Study**

Dr. Hakala has directly and empirically demonstrated the substantial bias in Professor Stulz's event study caused by his failure to control for significant news.[4] (Pls.' Mot. 9-10 (Dkt. No. 311); Hakala Market Efficiency Rebuttal ¶ 13 (Dkt. No. 162).) Dr. Hakala's replication of Professor Stulz's regression analysis found that controlling for the seven most extreme news events in the period decreased Professor Stulz's standard error by 13% and increased his t-statistics by 14.4%, revealing the true statistical significance of 13 events that Professor Stulz's event study failed to identify. (*Id.*) Likewise, controlling for the same set of significant AOL news as Dr. Hakala controlled for in his own market efficiency event study reduced Professor Stulz's standard error by 28.4%, increasing his t-statistics by 39.6%, revealing the true statistical significance of an additional 41 events. (*Id.*)

Professor Stulz attempts to answer this statistically irrefutable criticism by turning it on its head and claiming that the greater strength of Dr. Hakala's event study is actually a "bias," *i.e.*, falsely inflated statistical significance findings. (Stulz July 20, 2009 Decl. ¶ 5.) The problem with this argument, however, is that the academic literature on the subject says the opposite – that it is the underreporting of significance in Professor Stulz's test, not the more "powerful" results of Dr. Hakala's test, that represents an error and a bias. *See, e.g.,* Robert B. Thompson II, et al., *The Influence of Estimation Period News Events on Standardized Market*

---

[4]    Nonetheless, even Professor Stulz's biased event study, which artificially depresses his findings of statistical significance, concludes that the key disclosures at issue in this case caused statistically significant impacts on AOL's stock. Thus, the event study methodology flaws highlighted by Plaintiffs are primarily significant in refuting Defendants' claims that Professor Stulz's event study correctly measures the impact of disclosures throughout the Class Period.

*Model Prediction Errors*, 63(3) Acct. Rev. 448, 466-68 (Jul. 1988) (concluding "that *conventional market model parameter estimates are biased* relative to those derived from the news-conditional market model," and that there is an "increase in power [which] appears to be due primarily to the inclusion of a broad set of firm-specific news events (*i.e.*, those reported in the *Wall Street Journal Index*) in the model specification.").[5] Indeed, the very definition of "power" in the terminology of statistics is "accuracy," *i.e.*, the "likelihood that [the] test will declare an association when there actually is an association." *Confronting the New Challenges of Scientific Evidence,* 108 Harv. L. Rev. 1532, 1552 (May 1995) (defining "power" in the context of statistical significance tests). Thus, the studies showing that Dr. Hakala's methodology is more "powerful" indicate that it is more *accurate*, not that it simply has higher statistical significance findings.

Defendants attempt to diminish the significance of these studies by pointing out that, according to Defendants' searches of "googlescholar," certain of the studies have not been cited as frequently in academia as other articles regarding event study methodology.[6] (Defs.' Mem. 12; Stulz July 20, 2009 Decl. ¶¶ 11, 17, n. 13.) This observation, assuming it is accurate, has no bearing on the fact that the articles are academically valid, having undergone the same rigorous referee process as any articles in the highly reputable journals that published them, including the *Journal of Finance*, the *Journal of Corporate Finance*, the *International Journal of the*

---

[5]    Likewise, as explained by Dr. Marais, "[i]t is true that any fraud-related price movement will likely stand out more prominently against Dr. Hakala's material-news-free baseline than against a baseline tainted by other, irrelevant but potentially price-moving news events. Dr. Stulz is mistaken, however, in claiming that this consequence is a "bias"; rather, this is precisely—and *properly*—the purpose of Dr. Hakala's procedure." (Rodon Decl. Ex. A at ¶ 13 (attaching Marais Rpt.) (emphasis in original).) Dr. Marais is Vice President and Principal Consultant of a firm specializing in applied mathematical and statistical analysis, and was retained by Plaintiffs to rebut Professor Stulz's erroneous criticisms of Dr. Hakala's event study. He has a Ph.D degree and master's degrees in Business Administration, Mathematics and Statistics from Stanford University, and he has taught, conducted research and published on the subjects of the design and conduct of event studies of the effects of information on security prices. (Marais Rpt. ¶ 2.)

[6]    Professor Stulz concedes that one of the studies Plaintiffs cited, Richard Roll, $R^2$, 43 J. Fin. 541, 558-60 (1988), has been frequently cited and is well known in academia. (Stulz July 20, 2009 Decl. ¶ 14.)

*Economics of Business*, and the *Journal of Business, Finance and Accounting*. Further, it is unsurprising that these articles, concerning only one specific element or problem in event study methodology,[7] would be cited less frequently than the broad survey of event study methodology to which Defendants compared them. (*See* Stulz July 20, 2009 Decl. ¶ 3 (comparing citations to these studies to the 777 citations received by "Event Studies in Economics and Finance," which he described as "a classic survey article.")) This does not render them "obscure" or invalid.[8] Finally, without so much as a single case providing that the number of citations to an academic article bears any significance on its validity in supporting or opposing an expert, Defendants could only have raised the issue as a distraction or out of desperation to diminish the irrefutable bias these studies find in event studies performed like Professor Stulz's here.

Thus, lacking any proof to controvert the demonstrated bias in Professor Stulz's event study, Defendants fall back on the fact that a similar methodology to Professor Stulz's has been applied in the finance literature for other purposes. However, as Dr. Hakala explained:

> [t]he fact that Professor Stulz can point to literature in the field of finance supporting his methods does not validate his event study in this case for a number of reasons: first, the academic event study literature typically analyzes the same type [of] event across multiple companies in order to avoid or reduce . . . the statistical issues raised [here]; second, the event studies in the academic literature typically did not have the budget and time to perform a more complete effort to control for all potentially material news, even though the ideal statistical model would require it; third, the academic event study literature in finance is typically more focused on the measured effect of a type of event or relationship across a large number of companies, rather than the statistical significance of a single event involving a single company; and finally, the development of time series methods within the event study literature in finance has severely lagged . . . the developments in the field of statistics.

---

[7]     Indeed, Aktas et al. specifically noted that the "[t]he estimation period has attracted less attention" than other issues of event study methodology. Aktas et al. at 130.

[8]     Indeed, in deciding that publication was not determinant of reliability or admissibility, the Supreme Court noted that "[s]ome propositions, moreover, are too particular, too new, or of too limited interest to be published . . . " *Daubert*, 509 U.S. at 593-94. It is precisely the case here that single-company event studies are of little interest in corporate finance academia, and hence, studies such as Dr. Hakala's are less commonly published.

(Hakala Market Efficiency Rebuttal ¶ 11.)[9]  Thus, the fact that the finance literature has applied a similar methodology to Professor Stulz's in large-sample event studies, which typically involve broader, more general questions and partially overcome the biasing effect of contaminating news events by examining return data for numerous companies, in no way answers or refutes the bias demonstrated in Professor Stulz's application of the methodology here.

Moreover, as this Court has acknowledged, the fact that a method has been used in the past does not save it from scrutiny.  *United States v. Hines*, 55 F. Supp. 2d 62, 67 (D. Mass. 1999) (*Daubert* "is plainly inviting a reexamination even of 'generally accepted' venerable, technical fields"); *id*. at 65 (*Daubert*'s "rules were intended to open the door to the admission of theories challenging existing orthodoxies.").)  The Supreme Court commanded that "*evidentiary reliability* will be based upon *scientific validity*[,]" which turns on a determination of whether "the principle support[s] what it purports to show[.]"  *Daubert*, 509 U.S. at 590 n.9 (emphasis in original).  Hence, as this Court explained, "[t]he issue is not whether the field in general uses a reliable methodology, but the reliability of the expert's methodology *in the case at bar*, i.e., whether it is valid for the purposes for which it is being offered, or what the Court has described as a question of 'fit.'"  *United States v. Green*, 405 F. Supp. 2d 104, 119 (D. Mass. 2005); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (explaining that an expert's testimony must be "relevant to the task at hand"); *United States v. Frabizio*, 445 F. Supp. 2d 152, 156 n.4 (D. Mass. 2006) ("As the Supreme Court explained in *Kumho Tire,* the reasonableness of any given expert's approach depends upon 'the particular matter to which the expert testimony [is] directly relevant.'").

---

[9]      *See also* Nihat Aktas et al., *Event Studies With a Contaminated Estimation Period*, 13 J. Corp. Fin. 129 (2007) (noting that in a large-sample event study, i.e., a study of the return data for hundreds of companies, controlling for all of the contaminating events in the study window "quickly becomes intractable," and discussing alternative methods of accomplishing the same thing).

Here, where the relevant question is whether the fraud-related disclosures caused *any significant impact* on AOL's stock, Professor Stulz's event study – which, by his own description, only reveals whether certain disclosures caused a *relatively greater impact than all other news during the period* – is simply not relevant to the task at hand. Incredibly, Professor Stulz argues that it is relevant, claiming that because a "typical day for AOL is a news day," one must compare the stock price response caused by relevant news to the average stock price response caused by all other news in order to determine if there is an "abnormal" stock price movement. (Stulz July 20, 2009 Decl. ¶ 4.) In other words, he argues that a stock price response should only count if it is significantly larger than all other news-related stock price movements during the period. This argument is nonsensical: it would make loss causation, and hence, securities fraud, wholly dependent upon the magnitude of the unrelated news released during the period because a dramatic but unrelated news response would skew the baseline against which the fraud-related news is measured. Whatever the merit of such a test in the context of the finance literature, in order to prove securities fraud under Section 10(b), plaintiffs are not required to demonstrate that the fraud-related news was more devastating than all other news impacting the company during the class period, but only that the fraud resulted in *some quantum* of loss and damages.[10] Thus, the fraud-related news must be measured against a baseline that is not skewed by unrelated news, which Professor Stulz's test does not do, rendering it unreliable – a poor "fit" – for these purposes.

Moreover, Defendants misleadingly use Professor Stulz's event study to argue that the relevant disclosures had *no impact* on AOL, when their study only shows the relative impact

---

[10]    "A plaintiff is not required to show 'that a misrepresentation was the *sole* reason for the investment's decline in value' in order to establish loss causation," *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (emphasis in original), but need only calculate a "rough proportion of the whole loss" attributable to Defendants' alleged misconduct, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

(i.e., it only registers an impact when the impact is significantly more dramatic than the impact of all other news). Thus, Professor Stulz's event study does not "show what it purports to show," and should be precluded.

### B. Defendants' Improperly Submitted New Expert Declaration Fails to Correct the Fatal Flaws in Professor Stulz's Event Study

Even with the improper submission of a new expert declaration more than a year after the close of expert discovery,[11] Defendants cannot rebut the demonstrated flaws and bias in Professor Stulz's event study. Defendants have submitted two new regression analyses, addressing only one of the several flaws Plaintiffs identified in Professor Stulz's event study: the fact that it fails to "dummy out" all of the events upon which Professor Stulz opined, a basic requirement for a valid event study which even Defendants acknowledge. (See Pls.' Mot. 4 (quoting Defs.' *Xcelera* Mem. 4, stating that failing to dummy out the events being studied biases the study's results).) Unable to dispute that controlling for these events is required, Defendants claim that the new regression analyses show that the error was harmless, that correcting it does not significantly alter their results. However, the supposedly corrected regressions still fail to control for all of the events upon which Professor Stulz opines, including the five most important corrective disclosures in this case: July 18, 2001, August 14, 2001,

---

[11]    Plaintiffs herein move to strike Professor Stulz's new declaration as unreliable on the same bases as his other regression analyses and opinions are unreliable, and are further moving separately to strike the new declaration as untimely. This July 20, 2009 declaration was submitted almost a full year after expert discovery closed, in flagrant disregard of the Court's scheduling order and the Federal Rules of Civil Procedure. Despite their footnote to the contrary, Defendants cannot credibly claim to be surprised by Plaintiffs' arguments against Professor Stulz's event study: these arguments were first raised in Dr. Hakala's rebuttal report on market efficiency, submitted on June 26, 2007, and again in his damages rebuttal on July 17, 2008. (See Damages Rebuttal ¶ 14 (Dkt. No. 314, Ex. E) ("[T]o the extent Professor Stulz's event study analyses were less rigorous than the analyses I performed and are 'statistically' dominated by my analyses, his opinions are less 'scientific' and incapable of supporting his claim that my opinions are 'speculation.'"); see also id. at n.8 ("This was discussed in my prior opinions and is further discussed in this declaration with academic support. Specifically, the additional events controlled in my event study improve the 'goodness-of-fit' of the regression analysis by a statistically significant amount, as demonstrated by an F-test").) Indeed, Professor Stulz's new declaration states in its opening paragraphs that "Plaintiffs rehash and repeat arguments that they have offered numerous times before in this case . . ." (Stulz July 20, 2009 Decl. ¶ 2.) Thus, Defendants have had ample time to respond to these criticisms and Plaintiffs should not be penalized with a surprise declaration or needlessly protracted expert discovery due to Defendants failure to timely respond.

February 20, 2002 and July 24-25, 2002. Moreover, these regressions used a different time period – from January 12, 2001 through July 24, 2002, instead of January 12, 2001 through December 31, 2002 in his original regression analysis – and thus, include only approximately 75% of the data from the first analysis and are not fairly comparable to it.

Moreover, these "corrected" regressions still fail to control for any other significant news within the study period, and suffer from the same deficiencies of Professor Stulz's original event study. Namely, they have inflated standard errors (of approximately 2.5%, compared to Dr. Hakala's standard error of 1.4%), causing a downward bias in their statistical significance findings. Additionally, like Professor Stulz's original event study, the results of both of his new regressions are abnormally distributed which, as discussed in Plaintiffs' Motion, indicates an "omitted variables" problem, meaning that they have failed to identify and control for significant events within the study period. (Pls.' Mot. 8-9; Hakala Market Efficiency Rebuttal ¶ 13; Rodon Decl. Ex. B (attaching John D. Jackson et al., *The Impact of Non-Normality and Misspecification on Merger Event Studies*, 13:2 Int. J. of the Econ. of Bus. 247, 262 (2006) (finding that results which are not normally distributed indicates "that the event study has simply ignored some important, but [un]related, events" which causes "the true significance level of the test [to be] misstated")).)[12] Thus, these "corrected" regressions do not correct the biasing problems identified in Professor Stulz's original regression analysis, and should likewise be excluded.

---

[12]    Defendants claim that the Jackson article cited above merely recommends adjusting the critical value used to determine statistical significance when there is unrelated significant news included in the study period. (Defs.' Mem. 13.) However, the article also plainly recommends identifying and including dummy variables for all such news. John D. Jackson et al., *The Impact of Non-Normality and Misspecification on Merger Event Studies*, 13:2 Int. J. of the Econ. of Bus. 247, 262 (2006) (stating that "at a minimum," the significance value should be adjusted, but "alternatively, or jointly," all related and unrelated events should be documented and incorporated in the event study model).) Defendants apparently have no answer for this significant criticism of their event study, and thus, have simply chosen to ignore it.

### C.    Defendants Have Failed to Establish the Admissibility of Professor Stulz's Erroneous and Unsupported Criticisms of Dr. Hakala's Event Study Methodology

As set forth in Plaintiffs' Motion, Professor Stulz's unsupported and incorrect attacks on Dr. Hakala's event study methodology should be excluded because they are unreliable and prejudicial. Defendants apparently have no answer for Plaintiffs' arguments that Professor Stulz's criticisms are incorrect and unreliable, and instead try to cast Plaintiffs' prejudice argument as though the concern is that Professor Stulz's criticisms might legitimately taint Dr. Hakala in the eyes of the jury. (Defs.' Mem. 17.) This is not the case. Rather, because Professor Stulz's criticisms lack any foundation in academia or science, and are erroneous,[13] and yet a "patina" of "'science,' [and] a professional's judgment" may attach to his expert testimony, there is a considerable risk that a jury might overvalue Professor Stulz's fallacious criticisms, and "give more credence to the testimony than it may deserve." *Hines*, 55 F. Supp. 2d at 64.

As described more fully in Plaintiffs' Motion, Professor Stulz presents no support in academia, testing, or other analysis for his claim that Dr. Hakala's use of dummy variables is improper or biases Dr. Hakala's results. (Pls.' Mot. 10-12.) Professor Stulz and Defendants have not provided and cannot provide a single citation to any academic study stating that it is improper to control for significant news, whereas Dr. Hakala has provided citations to at least five academic articles which state the opposite – that a researcher can or must control for significant news.[14] Hence, this is not an instance of disagreement in the field or among experts:

---

[13]    As discussed supra __, the academic literature regarding event studies that control for significant news finds that the failure to control for such news biases a study, not the converse as claimed by Professor Stulz. Likewise, Dr. Hakala has mathematically demonstrated this bias in Professor Stulz's results here. Thus, Professor Stulz's criticism is not only unsupported, but wrong.

[14]    *See* Nihat Aktas et al., *Event Studies With a Contaminated Estimation Period*, 13 J. Corp. Fin. 129 (2007) ("[U]nrelated events may be present during the chosen estimation window, which *bias* the estimation of the return-generating process parameters.") (emphasis added); John D. Jackson et al., *The Impact of Non-Normality and Misspecification on Merger Event Studies*, 13:2 Int. J. of the Econ. of Bus. 247, 262 (2006) (finding that failing to identify and control for significant events causes "the true significance level of the test [to be] misstated"); Robert B.

*all* of the literature on the subject of controlling for significant news events in event studies concludes that doing so renders *superior* results. Likewise, Professor Stulz has never performed any testing or other statistical analysis of Dr. Hakala's methodology to demonstrate the claimed bias.[15] Thus, lacking any credible basis, Professor Stulz's claim that Dr. Hakala's event study is biased is unreliable and does not pass muster for admission as an expert opinion.

Nonetheless, were this criticism by a credentialed academic admitted, it could potentially spuriously taint the jury's view of Dr. Hakala's valid event studies due, in part, to the complexity of the issues involved. Part of the Court's role in determining the admissibility of expert testimony is evaluating "the impact of the evidence on the jury's job as factfinder." *Green*, 405 F. Supp. 2d at 119. One of the relevant issues to that determination is whether "the information is presented in such a way that factfinders will not be fooled into excessively overvaluing the testimony." *Id.* ; *see also Hines*, 55 F. Supp. 2d at 65 ("It is not just how valid the data is, but how well the jury can understand it after direct and cross examination, and legal instructions."). Here, not only is Professor Stulz's criticism of Dr. Hakala's methodology entirely invalid and unsupported, but there is a real risk that the jury will not understand the highly technical

---

Thompson II, et al., *The Influence of Estimation Period News Events on Standardized Market Model Prediction Errors*, 63(3) Acct. Rev. 448, 466-68 (Jul. 1988) (concluding "that conventional market model parameter estimates are *biased* relative to those derived from the news-conditional market model"); Richard Roll, $R^2$, 43 J. Fin. 541, 558-60 (1988) (finding an increase in the explanatory power of event studies that control for all company-specific news listed in the *Wall Street Journal* and Dow Jones news service, with the biggest improvements involving companies that experienced major events such as takeovers or disasters); *and* Joel E. Thompson, *More Methods that Make Little Difference in Event Studies*, 15(1) J. Bus. Fin. & Acct. 77, 78 (1988) (finding that controlling for extraneous events increases the power of an event study).

[15]    In footnote 6 of Professor Stulz's improperly submitted new declaration, he claims to have performed two regression analyses demonstrating that controlling for significant news lowers Dr. Hakala's standard error, thereby increasing his statistical significance findings. He does not, however, provide any basis for his analytical leap that such increased statistical significance findings cause Dr. Hakala to erroneously over-identify events as significant (*i.e.*, increase his "type I errors"), as opposed to simply representing a more accurate measure of significance. Indeed, Dr. Marais, an expert and published author on event study methodology, noted in his report rebutting Professor Stulz that "Dr. Stulz conspicuously fails to identify any violation by Dr. Hakala of any specific, generally accepted mathematical or statistical principle whose violation would logically impart the purported 'bias' to the Hakala results." (Marais Rpt. ¶ 15.) Further, Dr. Marais testified that he had "no reason to expect" that there was any effect on the rate of "false positive" results due to Dr. Hakala's use of dummy variables to control for significant news in the study period. (Marais Dep. Tr. 167:2-168:4.)

arguments concerning statistical methodology, even after cross examination, and simply defer to Professor Stulz on the basis of his supposed authority. *Hines*, 55 F. Supp. 2d at 67 ("cross examination and limiting instructions may be more effective in 'technical' fields because they are more accessible to the jury, than fields with the charisma of science."). Thus, Professor Stulz's scientific-sounding but wholly unsupported and invalid criticisms of Dr. Hakala's event study methodology may unduly influence the jury and should be excluded.[16]

Moreover, contrary to Defendants' argument, allowing Professor Stulz's meritless criticism, which does not satisfy the admissibility standards for expert testimony, does not protect or promote the adversary system and was not "clearly contemplated" by Rule 702. (Defs.' Mem. 17.) The cases cited by Defendants do not suggest that Rule 702 envisioned challenging one expert's testimony with the unsupported and demonstrably wrong opinions of another expert: *United States v. Shea*, 957 F. Supp. 331, 345 (D.N.H. 1997) only stands for the proposition that "relevant and *reliable* expert testimony ordinarily should be admitted notwithstanding Rule 403 unless the potential that it will be used improperly substantially outweighs any legitimate persuasive value that the evidence may have." (Emphasis added.) Indeed, the *Shea* court rejected a rebuttal expert's testimony for precisely the reasons Plaintiffs here challenge Professor Stulz: the rebuttal expert had "offered no scientific support for his theory that this [claimed] methodological flaw could produce false positive signals[.]" *Id.* at 339. Likewise, *Estate of Edward W. Knoster v. Ford Motor Co.*, 200 F. App'x 106, 110 (3d Cir. 2006), cited by Defendants, involved a claim of prejudice due to the rebuttal expert's supposed personal attacks on the petitioner's expert, where the rebuttal expert's report was found to be based on sufficient data and testing. Here, Professor Stulz's criticisms of Dr. Hakala's use of

---

[16]    Clearly, Defendants would be able to question Dr. Hakala on this methodology issue at trial; the only issue here is whether such a completely unfounded criticism should be allowed to emanate from the mouth of an "expert."

dummy variables are not based on any data or testing, and have no academic support. Thus, the present matter is significantly different from the case cited by Defendants, and the cases plainly establish that unreliable rebuttal testimony such as Professor Stulz's challenge to Dr. Hakala's dummy variable use is subject to exclusion under the Federal Rules of Evidence.

### D.     Defendants' Bald Assertions Are Insufficient to Establish the Reliability of Professor Stulz's Assumed "Opinions"

As described more fully in Plaintiffs' Motion, opinions 2-5 of Professor Stulz's declaration make numerous factual findings for Defendants, based largely on assumptions Professor Stulz was instructed to apply, and conclude that Dr. Hakala's analyses are "severely flawed" for applying the evidence differently. (*See, e.g.*, Stulz Corrected Rpt. ¶ 5(b) ("Dr. Hakala's analysis and conclusions are severely flawed because they depend on several incorrect assumptions *that counsel for CSFB has advised me are not supportable* and are contradicted by the facts developed in discovery and/or by reasonable economic analysis.") These opinions attempt to supplant the jury's determinations of evidentiary disputes and to fault Dr. Hakala for a supposed "flaw" that is nothing more than his failure to assume the same facts as Professor Stulz. As such, these opinions are unreliable, unhelpful, and inadmissible.

More particularly, Professor Stulz *assumes* that the information revealed in the allegedly corrective disclosures regarding AOL's ad revenues, layoffs and accounting improprieties is different from the information known to Defendants, and on that basis, he lambasts Dr. Hakala for applying different factual assumptions and finding loss causation and damages, claiming that "Dr. Hakala's entire analysis is based on a tenuous and unsupported linkage," that Dr. Hakala's "approach is extremely speculative," and that Dr. Hakala "fails to establish any link whatsoever" between the fraud and the alleged corrective disclosures. (Stulz Corrected Rpt. ¶¶ 71-75.) These

assumptions repackaged as opinions are not the product of any reliable, independent analysis[17] and thus are inadmissible as expert evidence.

Defendants argue that Professor Stulz's opinions do not supplant the jury's determination of factual disputes, but only inform the jury of the "economic" consequences of finding the facts as Professor Stulz assumed, (*i.e.*, that Dr. Hakala's analysis would be "flawed"). (Defs.' Mem. 14.) This argument ignores the plain language in which Professor Stulz directly opined that the evidence supports Defendants' interpretation of the facts, and not Plaintiffs' or Dr. Hakala's. (*See, e.g.*, Stulz Corrected Rpt. ¶ 5(e)(i) (opining that the claim that the corrective disclosures relate to information CSFB had and should have disclosed earlier "is not supported by the documents upon which [Dr. Hakala] claims to rely . . . nor does Dr. Hakala identify any other evidence to support his tenuous linkages"); *id.* at ¶ 5(f)(i) ("my review of the evidence provided to me by CSFB's counsel leads me to conclude that the accounting improprieties allegedly revealed to CSFB analysts by the AOL source related to AOL's internal investigation of its relationship with PurchasePro.com, which was disclosed in the press prior to the time CSFB is alleged to have learned about these problems from the AOL source."); *id.* at ¶ 11 ("Dr. Hakala incorrectly assumes that the concerns that Ms. Martin expressed in her January 2001 email also related to the online advertising market, whereas, as counsel advised me, her concerns related to the market for traditional advertising and not online advertising.").)

Moreover, even if Professor Stulz had not opined at length regarding the veracity of Defendants' narrative of the case, his opinion that Dr. Hakala's analysis is flawed if the allegations are not proven will not assist the triers of fact because it is self evident:  Dr. Hakala

---

[17]    These opinions do not involve any "expert" analysis: at most, Professor Stulz verified that there is some basis in the record for Defendants' arguments about the evidence, however, Professor Stulz is not an expert regarding the facts of this case, and as discussed in Plaintiffs' opening memorandum, (at pages 15-16), Professor Stulz ignored evidence supporting Plaintiffs' claims.

expressly conditioned his loss causation and damages findings upon the facts being as alleged by Plaintiffs. (*See* Hakala Damages Rpt. ¶ 5.) Dr. Hakala's damages report merely provides that *if* Plaintiffs prove the alleged misrepresentations and corrective disclosures, then there is loss causation and damages. Thus, a jury does not need an "expert" to tell them that Dr. Hakala's findings may not stand if the allegations are not proven. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (an expert's testimony is inadmissible if the "trier of fact is entirely capable of determining whether or not to draw [the expert's] conclusions without any technical assistance" from the expert); *Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir.1989) (accord); *United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994) ("Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value"). Moreover, it is clear that Defendants are not paying hundreds of thousands of dollars for Professor Stulz to simply provide the self-evident opinion that Dr. Hakala's findings are conditional upon the alleged facts, but rather, Defendants are trying to present their arguments about how the jury should determine the evidence through an expert witness with the credibility and "charisma of science." *See Taylor v. Evans*, No. 94 Civ. 8425, 1997 WL 154010, at *2 (S.D.N.Y. April 1, 1997) (excluding expert testimony "presenting a narrative of the case which a lay juror is equally capable of constructing"). As proscribed by this Court, Professor Stulz "is doing little more than putting his imprimatur on the defendant's case," *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 212 (D. Mass. 2009), and thus, his opinions that the facts are as Defendants claim and that Dr. Hakala's analyses are flawed for not assuming facts favorable to the defense should be precluded.

Finally, Defendants also feebly argue that all experts assume facts, including Dr. Hakala, and therefore, Professor Stulz's evidentiary opinions based on factual assumptions should be

17

allowed here. However, courts have drawn a line between expert opinions which are based in part on assumed facts, and those which essentially assume the opinion. *See Levin v. Dalva Bros., Inc.*, 459 F.3d 68 (1st Cir. 2006) (admitting expert testimony based on an assumption that an antique clock was authentic where the court found that the purpose of the testimony was not to authenticate the clock); *Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999) (affirming preclusion of an expert opinion which assumed "the very question that [the expert] was called upon to resolve"); *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1107 (S.D. Ind. 2003) (finding "[t]he fact that [the expert] assumed the very thing he was to prove renders his opinion conditional at best and tautological at worst"). Thus, opinions which are little more than restated assumptions, such as Professor Stulz's opinions 2-5 here, are unhelpful and inadmissible.

### E.    Defendants Have Failed to Show that Professor Deighton's Testimony Is Relevant, Reliable, and Will Assist the Triers of Fact

As described in greater detail in Plaintiffs' Motion, Professor Deighton opines on irrelevant matters which a jury is perfectly competent to evaluate without the undue influence of "expert" testimony. (*See* Pls.' Mot. 21-24.) "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591-92 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)). Defendants present Professor Deighton to opine that the market was well-aware of a decline in the advertising market in 2001, however, what the market generally thought about advertising trends in 2001 is not an issue in this case. Moreover, the testimony does not refute the demonstrated market response to AOL's announcement on July 18, 2001 that its ad revenues were impacted by the declining ad market – which *is* the issue in this case. Thus, Professor Deighton's testimony cannot possibly "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Moreover, Professor Deighton's excerpting of reports regarding the 2001 advertising market

trends are unhelpful because this information is "readily intelligible" to an average juror without expert testimony. *See Montas*, 41 F.3d at 784. Indeed, "[e]xpert testimony on a subject that is well within the bounds of a jury's ordinary experience . . . might unduly influence the jury's own assessment of the inference that is being urged." *Id.* Thus, Professor Deighton's opinions should be excluded.

### F.     Defendants Have Failed to Establish the Relevance and Helpfulness of Professor Deighton's Proposed Testimony

Professor Deighton's opinions concerning what was known to the market about the state of "traditional" and online advertising in the first half of 2001 is neither relevant nor helpful. Defendants claim these opinions are helpful, touting Professor Deighton's credentials in the field of marketing to argue that his opinions will help the jury make sense of the "dense, jargon-filled industry publications" commenting on advertising in 2001. (Defs.' Mem. 19-21.) Apparently, it is Defendants' contention that a lay juror cannot understand news articles written for the general public, including: *Business Wire* articles on January 8, 2001 and March 8, 2001; *Wall Street Journal* articles on April 16, 2001, April 30, 2001, June 15, 2001, June 29, 2001, and September 4, 2001; *Business Week* articles on January 8, 2001 and July 12, 2001; and a *Barron's* article on April 16, 2001. Perhaps Plaintiffs hold lay jurors in higher esteem than Defendants, but it is hard to fathom that jurors would require an "expert" to interpret these articles for them. Contrary to Defendants' claims, the quoted materials are neither "dense" nor "jargon-filled." (*See, e.g.*, Deighton Rpt. ¶ 14 (quoting *Business Week* article on January 8, 2001, that "[a]d growth will be the slowest in five years"); *id.* at ¶ 17 (quoting *Wall Street Journal* article dated April 30, 2001, "[i]t's not just the slowdown. It's the uncertainty. That's what magazine publishers are saying about the advertising market as the second quarter comes to an end").) Moreover, the presentation of these selective excerpts by an industry "expert" could unduly influence the jury,

adding Professor Deighton's "stamp of approval" to Defendants' evidence. *See Montas*, 41 F.3d at 784.

Defendants nonetheless argue that other courts have found similar expert testimony to be helpful, (Defs.' Mem. 21), however, the cases they have cited are inapposite. In *Voilas*, the expert, an experienced economist, provided testimony to clarify the business plans of a large corporation, which the court concluded were "complex financial matters" beyond the ken of a layperson. *Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452, 461-62 (D.N.J. 1999). By contrast, here Professor Deighton is merely excerpting quotes from news articles and a handful of analyst research reports which are *written for laypersons*; the general public and the media and institutional investors, respectively. Thus, the complexity of the proffered testimony is not fairly comparable. Additionally, in *United States v. Schiff*, although the court admitted an expert's summaries of analyst reports, the expert was only citing the excerpts as corroboration for his opinion that investors were focused on factors that drive long-term earnings potential when deciding whether to invest in pharmaceutical companies. *United States v. Schiff*, 538 F. Supp. 2d 818, 845 (D.N.J. 2008). This is plainly a more complex and less intuitive matter than the simple advertising trends discussed in public news and reports here, and in any event, the summaries were only ancillary to the expert's opinion, which concerned an issue "at the heart of the dispute" in that litigation. *Id.* Here, Professor Deighton's opinions regarding what was generally known about advertising market trends in 2001 is irrelevant to any issue in the case, which is information readily intelligible to the jury directly from the cited sources. Thus, these cases do not support Defendants' claim that Professor Deighton's proposed testimony will assist the triers of fact.

Additionally, Defendants incredibly argue that Professor Deighton's testimony is relevant because it may help the jury determine "which type of advertising Martin was speaking about when she referred in her emails to a decline in the advertising market[.]" (Defs.' Mem. 21-22.) However, Professor Deighton is not a fact witness, nor is he an expert concerning Laura Martin's emails. Laura Martin has testified regarding what she referred to in her emails, and some of those emails by her own admission referred to both traditional and online advertising, (see Pls.' Mot. 24-25), despite Professor Deighton's opinion that the two subsets of the advertising market would not be addressed as a "monolithic entity." (Defs.' Mem. 21.) Finally, Defendants' citation to *Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945, 2005 WL 2401647, at *4 (E.D.N.Y. Sept. 29, 2005) to bolster their claim that Professor Deighton's testimony is relevant fails, because *Schwab* involved "esoteric" issues regarding "advertising methodologies," not an expert who is merely trying to reinterpret the words of a Defendant and fact witness in a way that Defendants believe will benefit them.

Defendants further argue that Professor Deighton's opinions are relevant in determining what the market knew about advertising trends in 2001 and uncertainty regarding how the trends might impact AOL, which they claim will demonstrate that the information was already part of the "total mix" of information and thus, could not have impacted AOL's stock. However, Plaintiffs do not allege that Defendants misrepresented general advertising trends in 2001, but rather, that Defendants misrepresented their own, firmly-held views that the declining ad market was dramatically impacting AOL's revenues in 2001 and 2002. Thus, the proposed testimony regarding general ad trends and uncertainty around AOL is irrelevant. Indeed, the fact that the market was unaware of the specific information Defendants are alleged to have misrepresented is empirically evidenced by both Defendants' and Plaintiffs' event studies, which show that the

revelations that AOL was impacted by the declining ad market caused statistically significant declines in AOL's stock price. Thus, Professor Deighton's opinions about what the market knew regarding general ad trends is not only irrelevant but completely incompetent for challenging the event studies regarding the impact of the corrective disclosures. *See Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 120 n.7 (S.D.N.Y. 2008) ("[N]umerous courts have held that an event study is a reliable method for determining . . . the market's responsiveness to certain events or information."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 170 (S.D.N.Y. 2007) (accord).

Finally, Defendants argue that Professor Deighton's opinions are relevant in determining whether Defendants' AOL reports were "reasonable" in 2001-2002, which they claim bears on both scienter and whether there were any misstatements. This argument might have some merit in a case with less than the mountain of direct evidence of intent that exists here. As described at length in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, the evidence here shows that Defendants Jamie Kiggen and Laura Martin intentionally misrepresented and withheld their true views about AOL because they did not want to "piss off" AOL and risk potential banking business, and indeed, Jamie Kiggen checked with CSFB's bankers about pending deals before "negotiating" downward revisions with AOL for just that purpose. (Pls.' Opp'n Mem. 3-4 & 42-44.) Moreover, Kiggen's and Martin's emails reflect significantly more negative views of AOL's expected performance throughout the Class Period than those which they published in their contemporaneous AOL reports. (Pls.' Opp'n Mem. 9-12 & 44-47.) Thus, irrespective of whether their AOL reports were "reasonable," Defendants' reports intentionally misrepresented Defendants' true views, and are actionable. Thus, Professor Deighton's opinions are irrelevant, unhelpful, and should be precluded.

### G.    Defendants Cannot Establish That Professor Deighton's Opinions Based on Flawed Assumptions Are Reliable

As set forth in Plaintiffs' Motion, Professor Deighton based his opinions on the assumption that "Ms. Martin's references to downturns in the advertising market were based on and related to traditional media and the traditional advertising market," (Deighton Rpt. ¶ 13), and ignored contrary evidence noted by Plaintiffs. (*See* Pls.' Mot. 24-25.) Defendants falsely claim that Plaintiffs "fail to point to *any* evidence indicating that Martin's concerns related to the online advertising market," (Defs.' Mem. 24 (emphasis in original)), when in fact, Plaintiffs cited three documents and a deposition transcript excerpt, (*id.*), which was by no means intended as an exhaustive list of Plaintiffs' evidence on the point. (*See also*, Pls.' 56.1 ¶¶ 85-94, 150, 210-11 & 221 (Dkt. No. __).)

Otherwise, Defendants' only response to the faulty assumptions applied by Professor Deighton is to claim that "even assuming *arguendo* that Martin's concerns extended to the online advertising market . . . that would not render Professor Deighton's expert report unhelpful to the jury." However, Plaintiffs' argument regarding Professor Deighton's incorrect assumptions is that they render his opinions *unreliable*. Reliability is, after all, the keystone of *Daubert* and Rule 702. Clearly, if Professor Deighton's assumption that Martin was referring only to traditional advertising in her emails is wrong, then his opinion that the market was already fully informed of her beliefs is likewise wrong or at least, unsupported, because he did not opine that the market was aware in January 2001 of the decline in online advertising. Either way, these opinions remain irrelevant, and hence, are likewise unhelpful.

### CONCLUSION

For all of the foregoing reasons, the expert opinions of Professors René Stulz and John Deighton should be precluded in their entirety.

DATED:  September 3, 2009

KAPLAN FOX & KILSHEIMER LLP

/s/ *Frederic S. Fox*

Frederic S. Fox (admitted *pro hac vice*)
Joel B. Strauss (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Melinda D. Rodon (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile: 212-687-7714

*Lead Counsel for Class Plaintiffs*

Edward F. Haber (BBO #215620)
Todd Heyman (BBO #643804)
SHAPIRO HABER & URMY LLP
53 State St.
Boston, MA 02109
Telephone:  617-439-3939
Facsimile:  617-439-0134

*Liaison Counsel for Class Plaintiffs*