UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re CREDIT SUISSE – AOL SECURITIES LITIGATION <br><br> This Document Relates To: <br><br> ALL ACTIONS | ) ) ) ) ) ) ) ) )     Civil Action No. 02cv12146-NG |

**GERTNER, D.J.:**

**MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**
August 26, 2011

This is a consolidated securities class action in which the court-appointed lead plaintiff, the Bricklayers and Trowel Trades International Pension Fund ("Plaintiffs"), asserts claims on behalf of the class of individuals who purchased common stock of AOL-Time Warner, Inc. ("AOL") from January 12, 2001, through July 24, 2002 (the "Class Period").

The defendants include Credit Suisse First Boston (USA), Inc. ("CSFB-USA"), an integrated investment bank; Credit Suisse First Boston, LLC ("CSFB"), a wholly-owned direct subsidiary of CSFB-USA; and four individuals who were employed by CSFB during all or part of the Class Period (collectively, "Defendants"). The individual defendants include James Kiggen and Laura Martin, former CSFB research analysts who had been responsible for investment research coverage of AOL during the Class Period. Kiggen and Martin reported to Defendants Frank Quattrone ("Quattrone"), the former Senior Managing Director and Global Head of CSFB's Technology Group, and Elliot Rogers ("Rogers"), who was the Managing Director and Global Director of Technology Research at CSFB during the Class Period.

The motions before the Court are the Motions for Summary Judgment by Defendants CSFB, Laura Martin, and James Kiggen (document #271), Defendant Frank Quattrone

(document #270), and Defendant Elliot Rogers (document #272). In addition, the parties challenge the opposing experts on a variety of grounds, from delayed disclosure to challenges to the substance of the opinions given.[1]

Plaintiffs' claims boil down to allegations that Defendants intentionally ignored material information regarding AOL's financial future in formulating recommendations for the investing public. These faulty recommendations, Plaintiffs argue, were the products not of naive optimism, or an honest disagreement, but of calculated misdirection. The analysts issued research reports, in which they did not believe, and were vetting the projections in those reports with AOL in the hope of generating business for CSFB's investment banking division rather than exercising independent judgment, as they were obliged to do. Put simply, Plaintiffs claim that there is a difference between recommendations made in good faith, but subsequently proven to be incorrect, and deliberately manipulative recommendations.

As a result of CSFB's optimistic reports, Plaintiffs claim, AOL's stock price was inflated at the beginning of the Class Period. Plaintiffs allege that they relied upon these reports in purchasing the stock, and when the corrective disclosures were made from other sources – disclosures surfacing the very information the Defendants' reports did not – the stock began to lose value. By the end of the Class Period, revelations in *The Washington Post* and the

---

[1] The motions with regard to the Defendants' expert focus largely on procedural issues, and the delayed production of the expert's testimony after class discovery had closed. See Plaintiff's Motion to Compel Production of Documents and Testimony Related to Rene M. Stultz's Compensation (documents #248 and #252); Plaintiff's Motion to Preclude the Expert Opinions of Rene M. Stultz and John Deighton (document #310); Plaintiff's Motion to Strike the July 20, 2009, Declaration of Rene Stultz (document #339). And there are motions challenging the Plaintiffs' expert on more substantive grounds: Defendants' Motion to Preclude the Expert Opinions of Scott D. Hakala, M. Laurentius Marais, Bernard Black and Reinier Kraackman (document #303).

disclosure of a Securities and Exchange Commission ("SEC") investigation caused a second, even more precipitous decline in the value of AOL's stock.

The basic elements of a securities fraud action under § 10(b) of the Exchange Act and Rule 10b-5 are: 1) a material misrepresentation (or omission); 2) scienter, i.e., a wrongful state of mind; 3) a connection with the purchase or sale of a security; 4) reliance, often referred to in cases involving public securities markets as "transaction causation"; 5) economic loss; and 6) loss causation, i.e., a causal connection between the material misrepresentation and the loss. In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 6-7 (1st Cir. 2005) (citing, *inter alia*, Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341 (2005)).

The Defendants attack these claims in what can only be called a blunderbuss fashion, challenging each element of Plaintiffs' proof and inevitably mixing the strong arguments with the weak. They argue:

1) There were no misstatements (misrepresentation element), and that, in any case, they had no intent to mislead (scienter element).

2) CSFB's reports did not alter the total mix of information in the market about AOL, or have any impact on AOL's stock price. Even if they contained misrepresentations, they were not material (materiality element).

3) Many other analysts were making the same optimistic projections. Plaintiffs could not have relied on CSFB's reports (any more than they relied on the others) (transaction causation element).

4) In any case, any misstatements from CSFB were not the cause of Plaintiffs' loss (loss causation element). The Defendants did not conceal any fact or risk previously unknown to

the market; the information was in the market through numbers of other sources. To the extent there were "corrective" disclosures, they were not related to the information defendants allegedly omitted.

Plaintiffs respond that the Defendants have taken the evidence out of context, relied heavily on self-serving deposition testimony, and, in the final analysis, drawn all inferences in their own favor, which is inappropriate on summary judgment. I agree. On each aspect of the proof, there are competing narratives about materiality, scienter, reliance, loss causation – narratives in part provided by Plaintiffs' experts, in part fairly derived from the factual record. Summary judgment is wholly inappropriate under the circumstances.

Nevertheless, many aspects of this case that are unique and uniquely challenging:

**A.     Emails**

While in many securities cases, the courts are rightly concerned that the litigation is a post-hoc contrivance of the Plaintiffs to recover stock losses that were part of the ordinary risk of investing, in this case, the serious problems attendant on the AOL-Time Warner merger, its *problems*, the misrepresentations made in connection with it, the dramatic losses incurred by investors, at the very minimum justify this private securities litigation brings to supplement the SEC's efforts. The first unique aspect involves the emails: While in many securities cases, the parties rely on circumstantial evidence to recreate what the defendants *must have known* when they were making the challenged representations, here Plaintiffs have provided striking direct evidence to buttress their claims. Plaintiffs have offered scores of emails that are in effect a party's evidentiary admissions (under the Federal Rules of Evidence 801(d)(2)), acknowledging misstatements in CSFB's reports, conceding that important information was omitted, agreeing

that the information was material and even that they had an ulterior and wrongful motive, in *not* disclosing information.

The Defendants issued thirty-five research reports during the Class Period in which they encouraged investors to purchase AOL stock. Contemporaneous emails, however, which the Plaintiffs have recited in detail in their memoranda and have attached to their summary judgment papers, tell a different story. They disclose that the Defendants knew adverse information about AOL, and that the Defendants understood the company's finances to be far more precarious than their reports reflected. Indeed, the emails suggest that *the Defendants* believed the information to be material, so material that they would not release it until they had "negotiated" about their disclosure with AOL.

And they reflect the Defendants' scienter. The Defendants were holding back releasing the information or lowering AOL's recommended price because they wanted AOL's investment banking business. For example, Kiggen stated that he would not "fall on [his] sword" if he could not get AOL to agree to proposed downward revisions to their numbers, meaning he would not take responsibility for lowering AOL's price. At other times he conceded that he had to "negotiate" with AOL about making downward adjustments in revenue and at another, he referred to "intense negotiations" with the company about what would be disclosed. Martin was characteristically more direct. She said that she "would NOT lower numbers on AOL, even though they can't make them," to avoid "pissing off the company." Other emails strongly suggest that AOL was being given editorial control over the CSFB reports. A report that Martin described as "scathing" was submitted to the company for its review, with the admission, "I'll publish whatever they add in the end."

Significantly, the information that the Defendants did not disclose concerned AOL's advertising revenues, accounting irregularities and potential layoffs. The emails suggest that Kiggen and Martin privately believed as early as January 2001, just when the merger had taken place, that AOL could not meet its revenue and Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") projections in the midst of a worsening advertising market, but continued to issue optimistic reports about AOL's prospects through at least January 2002.

Martin's emails are particularly striking. Her warnings could not have been more clear, and her tone, as Defendants concede, even provocative. There are emails from her expressing total incredulity about AOL's advertising revenues and its impact on AOL's EBITDA, and contrasting them with CSFB's sunny reports. Indeed, Martin went so far as to note that her analysis could be read "to imply that AOL's reported EBITDA is *not honest*." (italics supplied). Other emails describe AOL's earnings as "plummeting." She refers explicitly to AOL's "accounting gimmickry" and its impact on its revenue projections.[2] And she offers a steady drumbeat of warnings – each more insistent than the other – that AOL's stock should be downgraded. Her advice was not followed until September 2001, and then only to a limited degree.[3]

On July 10 and 11, 2001, Kiggen received material, non-public information relating to an accounting investigation and layoffs at AOL from an AOL employee, via another CSFB analyst, yet he did not disclose the information, cease publishing reports on AOL, or downgrade AOL's

---

[2] Martin's language was extraordinary: She told Kiggen: "[i]n real life Jamie: I believe that AOL will not hit the guidance given us for film, cable nets, and music for 2001 . . . at least not without *accounting gimmickry*. I'm willing to hold on with them in public *but let's not lie to ourselves*." (emphasis added)

[3] Indeed, in one email Kiggen refers to the importance of "muffling" Laura [Martin], an approach that Quattrone also endorsed..

stock. Whether or not this information itself needed to be disclosed – Defendants dismiss them as rumors which they were not permitted to disclose – one thing is clear: The information surely matched Kiggen's suspicions about AOL's overly optimistic targets.

By July 2002, *The Washington Post* published two articles that, according to Plaintiffs, confirmed what Defendants had known all along, which is that AOL had engaged in accounting gimmickry and had been artificially inflating its numbers to cover up a material downturn in advertising revenue. In reaction to that information, Plaintiffs claim, the price of AOL stock declined.

Subsequently, on July 24, 2002, the last day of the Class Period, AOL acknowledged that the SEC was investigating accounting practices related to its advertising revenue. On July 25, 2002, *The Washington Post* reported on AOL's disclosure and AOL's confirmation that the SEC had launched a civil investigation into its accounting practices. In reaction to these events, AOL's stock price went down even further. CSFB did resume coverage of AOL, but not until September 3, 2002, nearly two months after the end of the Class Period. By that time, both Martin and Kiggen had left. The September 3 report stated that CSFB was "initiating coverage on AOL-Time Warner" and that the stock was not rated – this in stark contrast to the steady stream of positive analyst reports during the Class Period.

Defendants, needless to say, read the emails and the so-called corrective disclosures entirely differently. They did a superb job at oral argument coming up with an alternative explanation of the communications. These were merely internal professional disagreements, they insisted. They involved nothing more than one professional challenging the projections of another, even using provocative language to do so. Defendant analysts Kiggen and Martin had

an "honest intellectual debate" about AOL's financial prospects and Kiggen's "more optimistic" view won the day. Defendants' arguments, however, are just that, arguments providing an alternative narrative, not dispositive as a matter of law at this stage of the litigation. [4]

**B.      The Difficulty of Valuing AOL-Time Warner**

The second unique aspect of the case is the company involved, a fact which Defendants repeatedly emphasize. The AOL-Time Warner merger produced a unique company, at the very start of the dot-com era. The emails, according to the Defendants, have to be read in light of the fact that this was a company that was extremely difficult for financial experts to value with any degree of consensus, yet another reason to conclude that this was nothing more than an "honest disagreement."

But the Defendants' argument about the uniqueness of the AOL-Time Warner merger proves too much. The very difficulty of valuing this new entity underscores the importance of independent analyses to the investing public. If the reports concerned a more mature company, a company as to which investors had substantial information, from other sources and a long track record, perhaps the analysts reports would have made less of a difference than here. Given the novelty of this merger, the investing public would have relied on analyst's reports even more than in the usual case, and, arguably, on these particularly respected analysts.

---

[4] In any event, I agree with the Plaintiffs that the emails can be read to suggest that, in the final analysis, there was no meaningful disagreement between Kiggen and Martin at all, and surely not the kind of internal disagreement within a company that was alleged to have happened in Hill v. Gozani, 638 F.3d 40 (1st Cir. 2011), reh'g denied, No.10-1048, 2011 WL 2566143 (1st Cir. May 26, 2011). Hill is simply not apposite here. Nor do I believe the Supreme Court's decision in Matrixx Initiatives v. Siracusano, 131 S. Ct. 1309 (2011), to be inconsistent with my conclusions. As the Defendants note, the Supreme Court in Matrixx was unwilling to impose a requirement that adverse event reports of a pharmaceutical company had to be statistically significant, and so pled at the outset of the case, before they would be found to be material and require disclosure to investors. At the same time, the Court's analysis in Matrixx reaffirms the approach to materiality outlined in Basic Inc. v. Levinson , 485 U.S. 224 (1988). See In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 21 (D. Mass. 2008) (extended discussion of Basic). And that approach counsels the denial of summary judgment in the case at bar.

## C. The Application of Section 10(b)(5) to Analysts

To be sure, the fact that the Defendants are analysts rather than the issuers of securities adds to the difficulty of this analysis. While research reports are critical to market efficiency and integrity, it is also true the Defendant analysts are one voice of many reporting on AOL, that fact clearly complicates the evaluation of materiality, transaction causation and loss causation essential to the claim, but just as clearly does not immunize them from scrutiny. In any case, while there is no question that AOL's own projections were optimistic, and that other analysts followed suit, Plaintiffs argue – and the record supports the contention – Defendants here were no ordinary analysts: They were "celebrity analysts." Indeed, at one point Quattrone called Kiggen a "rock star internet analyst," whose credibility "would be important for our practice, both on the research side, as well as on the banking side."

The Kiggen-Martin emails plainly create a disputed issue of fact as to the nature of the omissions, as to scienter – honest disagreement or fraud and even as to materiality, Defendants' efforts to trivialize them notwithstanding. The outline of the facts in my earlier decisions, albeit in different procedural settings, reflect the nature of the contested facts, and I need not recite them again. See In Re Credit Suisse-AOL Sec. Litig., 465 F. Supp. 2d 34 (D. Mass. 2006) (denying motion to dismiss); In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17 (D. Mass. 2008) (certifying a class).

More complex, however, are Plaintiffs' interrelated claims of reliance (transaction causation) and loss (loss causation). Transaction causation and loss causation are the elements of Plaintiffs' claim that necessarily rely on expert testimony, which is why that testimony has

been the locus of the major battles in this litigation. The testimony speaks to what one article described as the following questions:

> Whether the defendants misrepresentation or omission created a disparity between the price of the security and its true value, as measured by the reaction of the market to the disclosure of the concealed information. A misrepresentation or omission that creates such a disparity is material. Plaintiffs who invest at a market price that communicates that disparity have shown reliance by the fraud on that market price. The disclosure of the previously concealed information alters the market price to create an economic loss, which is loss causation.[5]

Expert testimony, and in particular, the approach known as event studies,[6] provides a metric for measuring a specific event's effect – such as the release of corrective information – on stock prices. Significantly, Defendants do not challenge the event study approach in general, only the particular way in which it has been applied here.

Summary judgment – without a full Daubert hearing – is an inappropriate way to decide this issue. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). The expert issues cannot be determined by precedent, pointing out that Plaintiffs' expert was accepted or rejected in this or that case so long as the Defendants are making, in effect, an as-applied challenge on these facts,

---

[5] Michael J. Kaufman & John Wunderlich, Regressing: The Troubling Dispositive Role of Event Studies In Securities Fraud Litigation, 15 Stan. J. L. Bus. & Fin. 183 (2009).

[6] "An event study is a statistical regression analysis that merely provides one method of examining the effect of an event, such as the disclosure of information on the market price of a particular security." Kaufman and Wunderlich, supra note 5, at 186. See Sanjai Bhagat & Roberta Romano, Event Studies and the Law: Part II: Empirical Studies of Corporate Law, 4 Am L. & Econ. Rev. 380 (2002). Indeed Kaufman and Wunderlich analogize an event study to a "medical experiment in which there is a control group and a treatment group. The control group provides the benchmark against which the treatment group is compared to determine if the event being studied had any effect. In a securities setting, the control group is established by modeling the normal relationship of a stock's price movements to movements of a market and/or industry index. The difference between the stock price movement we actually observe and the movement we expected to observe (i.e. the difference between the treatment and the control group) that occurs upon the release of a particular piece of information is called the excess price movement of the stock at the time of the event. This excess price movement is tested for statistical significance to see whether the result is unusual or unlikely to be explained by the normal random variations of the stock price." Kaufman and Wunderlich, supra note 5, at 193-94.

in this context.[7] It requires more than warring affidavits and strident briefs. It requires an evidentiary hearing. And in the hearing the threshold question is not just the reliability of the expert testimony under the Federal Rules of Evidence 702. It is also whether a jury would fully understand the attacks and counterattacks as they play out in the instant case.[8]

In any event, the better approach here is to follow Judge Zobel's lead in In Re Xcelera.com Sec. Litig., No. 00-11649-RWZ, 2008 WL 7084626 (D. Mass. April 25, 2008). In Xcelera.com Summary judgment was denied, the case proceeded to pretrial proceedings. The Court addressed the admissibility of expert testimony after a full Daubert hearing, and, as Defendants note, excluded Dr. Hakala's testimony. Plaintiffs countered that Judge Zobel's

---

[7] I reject the Defendants' argument that two decisions from other jurisdictions are dispositive of the issues in the case at bar, namely, In re Omnicom Group, Inc. Sec. Litig., 597 F.3d 501 (2d Cir. 2010) and Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330 (5th Cir. 2010). In the case of Halliburton, the Supreme Court granted certiorari and vacated the Fifth Circuit's judgment. See 131 S. Ct. 2179 (2011).

[8] Professor Miller aptly describes the division between judge and jury with respect to expert witnesses:

> [Consider] the case of expert witnesses to fact. What is their function? It is just this, of judging facts. They are called in because they are men of skill and can interpret phenomena which other men cannot, or cannot safely interpret . . . . It is perfectly well settled in our law that such opinions or judgments are merely those of a witness, they are to aid the jury or the judge of fact, and not to bind them; the final judgment is for the jury, and unquestionably, the judgment is one of fact.

Arthur R. Miller, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?, 78 N.Y.U. L. Rev. 982, 1104 n.622 (2003) (citing James B. Thayer, "Law and Fact" in Jury Trials, 4 Harv. L. Rev. 147, 154-55 (1890)).

Professor Miller further explains:

> [T]here is a significant difference between allowing a judge to dispose of a case by applying a determinative legal principle to undisputed facts and allowing a judge to decide a factual issue because he or she believes the evidence allows only one conclusion. A judge always decides the former. As to the latter, if one or more facts are in dispute or different inferences may be drawn from undisputed facts, a jury should be allowed to find for either party.

Id., at 1091-92.

-11-

concerns were not at all reflected in Dr. Hakala's report in the case at bar. In any event, the issue of the admissibility of Dr. Hakala's report and the other experts Defendants challenge requires a closer analysis than can be given on the papers.

At this juncture, on this record, I will take Plaintiffs' experts at their word. Therefore, Defendants CSFB, Laura Martin, and James Kiggen's Motion for Summary Judgment **(document #271)** is **DENIED**.

With respect to Defendants Quattrone and Rogers, Plaintiffs have also demonstrated genuine issues of material fact precluding summary judgment. Under Section 20(a) of the Securities Exchange Act. "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" 15 U.S.C. § 78t(a). Whether a defendant is a control person "is an intensely factual question." Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994) (internal citation omitted). This Court has held that a control person relationship exists when: "(I) the alleged control person actually exercised control over the general operations of the primary violator and (ii) the alleged control person possessed – but did not necessarily exercise – the power to determine the specific acts or omissions upon which the underlying violation is predicated." In re Credit Suisse-AOL Sec. Litig., 465 F. Supp. 2d 34, 59 (D. Mass. 2006) (quoting In re Centennial Techs. Litig., 52 F. Supp. 2d 178, 186 (D. Mass. 1999)) (internal citation omitted). Thus, "courts have stated that the right to 'discipline or influence, although short of actual direction, is sufficient to hold a *control person* liable.'" In re Centennial Techs. Litig., 52 F. Supp. 2d at 186 (quoting Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609, 614 (7th Cir. 1996)).

The law does not require proof that the control person, in effect, instructed the primary violators what to say – in this case, orchestrating the emails, or the precise content of the reports – rising to the level of "culpable participation." While the First Circuit has reserved the issue, *see* In re Stone & Webster Sec. Litig., 424 F.3d 24, 26 & n.2 (1st Cir. 2005), other courts have spoken, rejecting such a requirement. See Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1109 (10th Cir. 2003); Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609, 614 (7th Cir. 1996); Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 & n.25 (9th Cir. 1990); Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985); G.A. Thompson & Co., Inc. v. Partridge, 636 F.2d 945, 959-60 (5th Cir. 1981). Requiring proof of culpable participation, as one court noted, "would be in serious tension and probably inconsistent with the language of the statute." In re Parmalat Sec. Litig., 594 F. Supp. 2d 444, 456 (S.D.N.Y. 2009). *But see* Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 425 (S.D.N.Y. 2010) (requiring proof that the defendant had "actual control over the primary violator and the transaction at issue").

Significantly, Judge Zobel agreed with Parmalat, ruling that culpable participation is not required in In re Brooks Automation, Inc. Sec. Litig., No. 06-11068-RWZ, 2007 WL 4754051, at *13-14 (D. Mass. Nov. 6, 2007) (finding persuasive the language of the statute itself, which "places the burden on the defendant to establish his or her good faith as an affirmative defense," rather than placing the burden on the Plaintiffs to prove "culpable participation." See In re Brooks Automation, Inc. Sec. Litig., 2007 WL 4754051, at *14; see also In re Parmalat, 594 F. Supp. 2d at 456.

On this record, however, I do not believe that the "culpable participation" debate is dispositive. I conclude that the proof offered by the Plaintiffs with respect to Quattrone and

Rogers meets either standard. Once again, the emails are critical, amounting to evidentiary admissions of critical facts. While they can be "spun" in the direction of the Defendants, that interpretation is not required. There is sufficient evidence creating a genuine issue of material fact that Quattrone and Rogers created or contributed to the pressure to appease potential banking clients through the reports that were issued, that they continuously and specifically exerted influence over Kiggen and Martin, and that they went so far as to sanction the muffling of Martin's negative AOL analyses and views. A jury could reasonably infer that they did so to curry favor with AOL in the hopes of obtaining lucrative investment banking business, and as such, their actions were not remotely in good faith.

For the foregoing reasons, Defendant Quattrone's Motion for Summary Judgment **(document #270)** and Defendant Rogers' Motion for Summary Judgment **(document #272)** Defendants CSFB, Laura Martin, and James Kiggen's Motion for Summary Judgment **(document #271)** are **DENIED**.

**SO ORDERED.**

Date: **August 26, 2011**        */s/ Nancy Gertner*
          **NANCY GERTNER, U.S.D.J.**